**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OHIO**

| | | |
|---|---|---|
| _____ | ) | |
| In re POLYURETHANE FOAM ANTITRUST | ) | |
| LITIGATION | ) | MDL Docket No. 2196 |
| _____ | ) | Index No. 10-MD-2196 (JZ) |
| | ) | |
| This document relates to: | ) | **JURY TRIAL DEMANDED** |
| | ) | |
| ALL DIRECT PURCHASER CASES | ) | |
| _____ | ) | |

**DIRECT PURCHASER PLAINTIFFS'**
**CONSOLIDATED AMENDED CLASS ACTION COMPLAINT**

Direct Purchaser Plaintiffs ("Plaintiffs"), individually and on behalf of a class of all those

similarly situated, bring this action for damages under the antitrust laws of the United States

against Defendants, and allege as follows:

**NATURE OF THE ACTION**

1.      This case arises out of a conspiracy among Defendants and their co-conspirators

that had the purpose and effect of fixing prices of flexible polyurethane foam and flexible

polyurethane foam products (collectively, "flexible polyurethane foam").  As used herein,

flexible polyurethane foam refers to both slabstock and molded polyurethane foam, both of

which were the focus of the conspiracy alleged herein.  Flexible polyurethane foam is a

commodity widely utilized for cushioning and insulation in a variety of goods, including but not

limited to furniture, bedding, packaging, flooring, and motor vehicles.

2.      This lawsuit is brought as a class action on behalf of all entities and persons, exclusive of Defendants and their co-conspirators (and their respective officers, employees, agents, representatives, parents, subsidiaries and affiliates), that purchased flexible polyurethane foam directly from one or more of the Defendants from January 1, 1999 to the present ("Class Period").

3.      During the Class Period, Defendants and their co-conspirators contracted, combined, or conspired to fix, raise, maintain, and/or stabilize prices and allocate customers for flexible polyurethane foam in the United States, by the means and mechanisms described herein. As set forth in detail below, executives and employees of Defendants engaged in specific and detailed communications between and among each other to fix prices and allocate customers.

4.      Plaintiffs each directly purchased flexible polyurethane foam from one or more of the Defendants during the Class Period.  As a direct and proximate result of the unlawful conduct and price-fixing conspiracy of Defendants alleged herein, Plaintiffs and other members of the Class (defined below) have paid more during the Class Period for flexible polyurethane foam than they otherwise would have paid in a competitive market and have therefore been injured in their respective businesses and property.

5.      Plaintiffs bring this class action lawsuit pursuant to Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26, to recover damages suffered by the Class and the costs of suit, including reasonable attorneys' fees; to enjoin Defendants' anticompetitive conduct; and for such other relief as is afforded under the antitrust laws of the United States for Defendants' violations of Section 1 of the Sherman Act, 15 U.S.C. § 1.

## PLAINTIFFS

6.      Plaintiff Ace Foam, Inc. ("Ace Foam") is a Mississippi corporation with its principal place of business at 615 Crossover Road, Tupelo, Mississippi 38801.  During the Class Period, Ace Foam purchased flexible polyurethane foam from one or more of the Defendants or their co-conspirators and has suffered pecuniary injury as a result of the antitrust allegations alleged herein.

7.      Plaintiff Adams Foam Rubber Co., a/k/a Adams Foam Rubber Company, Inc. ("Adams Foam") is an Illinois corporation with its principal place of business at 4737 S. Christiana Avenue, Chicago, Illinois 60632.  During the Class Period, Adams Foam purchased flexible polyurethane foam from one or more of the Defendants or their co-conspirators and has suffered pecuniary injury as a result of the antitrust allegations alleged herein.

8.      Plaintiff Cambridge of California, Inc. ("Cambridge") is a California corporation with its principal place of business at 1656 W. 134th Street, Gardena, California 90249.  During the Class Period, Cambridge purchased flexible polyurethane foam from one or more of the Defendants or their co-conspirators and has suffered pecuniary injury as a result of the antitrust allegations alleged herein.

9.      Plaintiff GCW Carpet Wholesalers, Inc. t/a Floors USA ("Floors USA") is a Pennsylvania corporation with its principal place of business at 555 South Henderson Road, King of Prussia, Pennsylvania 19406.  During the Class Period, Floors USA purchased flexible polyurethane foam from one or more of the Defendants or their co-conspirators and has suffered pecuniary injury as a result of the antitrust allegations alleged herein.

10.     Plaintiff Foam Factory, Inc. ("Foam Factory") is a California corporation with its

3

principal place of business at 17515 S. Santa Fe Avenue, Rancho Dominguez, California 90221.

During the Class Period, Foam Factory purchased flexible polyurethane foam from one or more

of the Defendants or their co-conspirators and has suffered pecuniary injury as a result of the

antitrust allegations alleged herein.

11.     Plaintiff J&S Packaging, Inc. ("J&S") is an Ohio corporation with its principal

place of business at 10399 Danner Drive, Streetsboro, Ohio 44241.  During the Class Period,

J&S purchased flexible polyurethane foam from one or more of the Defendants or their co-

conspirators and has suffered pecuniary injury as a result of the antitrust allegations alleged

herein.

12.     Plaintiff VFP Acquisitions d/b/a Vanguard Foam and Packaging Company

("Vanguard") is a California corporation with its principal place of business at 15126 S

Broadway Street, Gardena, California 90248.  During the Class Period, Vanguard purchased

flexible polyurethane foam from one or more of the Defendants or their co-conspirators and has

suffered pecuniary injury as a result of the antitrust allegations alleged herein.

## DEFENDANTS

13.     Defendant The Carpenter Company ("Carpenter U.S.") is a privately owned and

operated company with its principal place of business at 5016 Monument Avenue, Richmond,

Virginia 23230.  Carpenter U.S. operates at least 15 facilities in the United States that

manufacture and distribute flexible polyurethane foam for bedding, including flexible

polyurethane foam cushioning, foam mattresses, and fibers; carpet cushion products; and flexible

foam packaging.  During the Class Period, Carpenter U.S. directly sold flexible polyurethane

foam throughout the United States.

14.  Defendant E.R. Carpenter, L.P. (f/k/a Carpenter Chemical, L.P.) ("E.R. Carpenter") is a Virginia limited partnership with its principal place of business at 5016 Monument Avenue, Richmond, Virginia 23230.  During the Class Period, E.R. Carpenter directly sold flexible polyurethane foam throughout the United States.

15.  Defendant Carpenter Holdings, Inc. ("Carpenter Holdings," collectively with Carpenter U.S. and E.R. Carpenter, "Carpenter") is a Virginia corporation with its principal place of business at 5016 Monument Avenue, Richmond, Virginia 23230.  During the Class Period, Carpenter Holdings directly sold flexible polyurethane foam throughout the United States.

16.  Carpenter is the world's largest producer of flexible foam products for comfort cushioning.

17.  Defendant Domfoam International, Inc. ("Domfoam") is a subsidiary of Valle Foam Industries, with its principal place of business at 8785 Langelier Boulevard, Montreal, Quebec, H1P 2C Canada.  During the Class Period Domfoam directly sold flexible polyurethane foam throughout the United States.  Domfoam manufactures flexible polyurethane foam primarily for the bedding, flooring, furniture, and packaging industries.

18.  Defendant Valle Foam Industries (1995), Inc. ("Valle") is a privately owned and operated corporation with its principal place of business at 4 West Drive, Brampton, Ontario L6T 2H7, Canada.  Valle manufactures flexible polyurethane foam for, *inter alia*, the furniture, bedding, packaging, and flooring industries.  During the Class Period, Valle and/or affiliates it controlled directly sold flexible polyurethane foam throughout the United States.

19.  Valle participated in the conspiracy through the actions of its respective officers, employees, and representatives acting with actual or apparent authority.  Further, Valle benefited

5

from the conspiracy by receiving greater profits than it would have received had the conspiracy

not existed.  Valle also was a member of the conspiracy by virtue of its status during the Class

Period as the alter ego or agent of Domfoam.  Valle dominated or controlled Domfoam regarding

conspiracy activities and used that domination or control to charge artificially high prices for

flexible polyurethane foam.

20.     Defendant Flexible Foam Products, Inc. ("Flexible Foam Products") is a privately

owned and operated Ohio company with its principal place of business at 12575 Bailey Road,

Spencerville, Ohio 45887, and operations in Texas, Indiana, Florida and Wisconsin.  Flexible

Foam Products is a subsidiary or "division" of Ohio Decorative Products, Inc., also of

Spencerville, Ohio.  Flexible Foam manufactures flexible polyurethane foam and rebond

products for customers in the bedding, flooring, furniture, packaging, and transportation

industries.  During the Class Period, Flexible Foam Products directly sold flexible polyurethane

foam throughout the United States.

21.     Defendant Ohio Decorative Products, Inc. ("Ohio Decorative," collectively with

Flexible Foam Products, "Flexible Foam") is a private corporation with its principal place of

business at 220 S. Elizabeth Street, Spencerville, Ohio 45887.  Ohio Decorative is the parent

company of Flexible Foam Products.  During the Class Period, Ohio Decorative and/or affiliates

it controlled directly sold flexible polyurethane foam throughout the United States.

22.     Ohio Decorative participated in the conspiracy through the actions of its

respective officers, employees, and representatives acting with actual or apparent authority.

Further, Ohio Decorative benefited from the conspiracy by receiving greater profits than it would

have received had the conspiracy not existed.  Ohio Decorative also was a member of the

conspiracy by virtue of its status during the Class Period as the alter ego or agent of Flexible

Foam Products.  Ohio Decorative dominated or controlled Flexible Foam Products regarding

conspiracy activities and used that domination or control to charge artificially high prices for

flexible polyurethane foam.

23.     Defendant FXI – Foamex Innovations, Inc., (f/k/a Foamex International, Inc.)

("Foamex") is a privately owned and operated company with its principal place of business at

Rose Tree Corporate Center II, 1400 N. Providence Road, Suite 2000, Media, Pennsylvania

19063-2076.  During the Class Period, Foamex directly sold flexible polyurethane foam

throughout the United States.

24.     Foamex provides foam for the home, as well as for healthcare, electronics,

industrial, personal care, and transportation.  Its flexible polyurethane foam is used in automotive

cushioning, shipping packages, beds, and furniture.  Foamex also provides components for

filters, dispensers, gaskets, and seals for products ranging from blood oxygenators to computer

disk drives.

25.     Defendant Future Foam, Inc. ("Future Foam") is a privately owned and operated

company with its principal place of business at 1610 Avenue N, Council Bluffs, Iowa 51501.

Future Foam produces flexible polyurethane foam for the bedding, flooring, furniture, and

packaging industries.  During the Class Period, Future Foam directly sold flexible polyurethane

foam throughout the United States.

26.     Defendant Hickory Springs Manufacturing Company ("Hickory Springs") is a

North Carolina corporation with its principal place of business located at 235 2nd Avenue, NW,

Hickory, North Carolina 28601.  During the Class Period, Hickory Springs directly sold flexible

polyurethane foam throughout the United States.

27.     Hickory Springs is one of the nation's largest integrated component manufacturers and suppliers for the furniture and bedding industries, with more than 60 operating facilities in the United States and throughout the world.  The furniture industry is the largest segment of Hickory Springs' customer base.  With more than 160 flexible polyurethane foam formulations, Hickory Springs is one of the largest producers of flexible polyurethane foam in the United States.

28.     Defendant Inoac International Co., Ltd. ("Inoac International") is a Japanese company with its principal place of business at 450-0003 2-13-4 Meieki-Minami, Nakamura-ku, Nagoya, Japan.  Inoac International is a subsidiary of Inoac Corp., and part of Inoac's domestic Japanese network engaged in production and sales of flexible polyurethane foam.  During the Class Period, Inoac International and/or affiliates it controlled directly sold flexible polyurethane foam throughout the United States.

29.     Defendant Inoac USA Inc. ("Inoac USA") is a private corporation with its principal place of business at 901 ½ Nutter Drive, Bardstown, Kentucky 40004.  Inoac USA is the parent company of Defendant Crest Foam Industries Inc.  Inoac USA itself is a subsidiary of Inoac Corp., and part of Inoac's overseas network engaged in foam products fabrication sales. During the Class Period, Inoac USA and/or affiliates it controlled directly sold flexible polyurethane foam throughout the United States.

30.     Defendant Inoac Corporation ("Inoac Corp.," and collectively with Inoac International and Inoac USA, "Inoac") is a Japanese company with its principal place of business located at 450-0003 2-13-4 Meieki Minami, Nakamura-ku, Nagoya, Aichi, Japan.  Inoac Corp.

makes flexible polyurethane foam for, *inter alia*, furniture, bedding, and cushions.  During the Class Period, Inoac Corp. and/or affiliates it controlled directly sold flexible polyurethane foam throughout the United States.

31.     Inoac Corp. participated in the conspiracy through the actions of its respective officers, employees, and representatives acting with actual or apparent authority.  Further, Inoac Corp. benefited from the conspiracy by receiving greater profits than it would have received had the conspiracy not existed.  Inoac Corp. also was a member of the conspiracy by virtue of its status during the Class Period as the alter ego or agent of Inoac USA and Inoac International.  Inoac Corp. dominated or controlled Inoac USA and Inoac International regarding conspiracy activities and used that domination or control to charge artificially high prices for flexible polyurethane foam.

32.     Defendant Crest Foam Industries Inc. ("Crest") is a Delaware corporation with its principal place of business at 100 Carol Place, Moonachie, New Jersey 07074.  Crest, a wholly-owned subsidiary of Inoac USA, was formerly a joint venture between Vitafoam and Inoac Corp. in which Vitafoam had majority control.  In 2010, Inoac took 100% control of Crest.  During the time period for which Vitafoam had majority control of Crest, executives of Vitafoam acted as agents for Crest in the conspiracy described in this Complaint.   During the Class Period, Crest and/or affiliates it controlled directly sold flexible polyurethane foam throughout the United States.

33.     Defendant Leggett & Platt Inc. ("Leggett") is a Missouri corporation with its principal place of business at 1 Leggett Road, Carthage, Missouri 64836.  Leggett manufactures, *inter alia*, flexible polyurethane foam and other components for the bedding and furniture

industries.  During the Class Period, Leggett and/or affiliates it controlled directly sold polyurethane foam throughout the United States.

34.     Defendant Mohawk Industries Inc. ("Mohawk") is a Delaware corporation with its principal place of business located at 160 S. Industrial Boulevard, Calhoun, Georgia 30701. Mohawk manufactures, *inter alia*, flexible polyurethane foam and other components for the flooring industry.  During the Class Period, Mohawk and/or affiliates it controlled directly sold polyurethane foam throughout the United States.

35.     Defendant Otto Bock Polyurethane Technologies, Inc. ("Otto Bock") is a private company with its principal place of business at 3 Penn Center West, Suite 406, Pittsburgh, Pennsylvania 15205.  Otto Bock is a subsidiary of Otto Bock Holding GmbH & Co. KG, a German company with its principal place of business at Max-Naeder-Street 15, 37115 Duderstadt, Germany and the corporate slogan "Best in Foam."  During the Class Period, Otto Bock and/or affiliates it controlled sold flexible polyurethane foam throughout the United States.

36.     Defendant Plastomer Corporation ("Plastomer") is a private company with its principal place of business at 37819 Schoolcraft Road, Livonia, Michigan 48150.  Plastomer, which describes itself as "the recognized Pioneer in Flexible Foam products for manufacturing industries in North America and the World," produces and sells flexible polyurethane foam primarily for the transportation industry.  During the Class Period, Plastomer and/or affiliates it controlled sold flexible polyurethane foam throughout the United States.

37.     Defendant Scottdel Inc. ("Scottdel") is a privately held corporation with its headquarters at 400 Church Street, Swanton, Ohio 43558.  Scottdel was recently placed into receivership in the action *Fifth Third Bank v. Scottdel, Inc., et al.*, Case No. 10-CV-000293 (Ct.

Common Pleas, Fulton Cty., Ohio).  During the Class Period, Scottdel and/or affiliates it controlled directly sold flexible polyurethane foam throughout the United States.

38.     Defendant Louis Carson is a United States citizen and a resident of Swanton, Ohio.  Mr. Carson was the President of Scottdel whose responsibilities included, *inter alia*, setting prices for Scottdel's products throughout the United States.  During the Class Period, Mr. Carson directed Scottdel and/or affiliates it controlled to directly sell flexible polyurethane foam throughout the United States.

39.     Defendant David Carson is a United States citizen and resident of Swanton, Ohio. Mr. Carson was the Vice President, Manufacturing of Scottdel whose responsibilities included, *inter alia*, setting prices for Scottdel's products throughout the United States.  During the Class Period, Mr. Carson directed Scottdel and/or affiliates it controlled to directly sell flexible polyurethane foam throughout the United States.

40.     Scottdel began manufacturing bonded urethane carpet cushion in 1961 and manufactures a complete line of commercial and residential bonded urethane cushions ranging in density from 3.5 pounds to 10 pounds per cubic foot.

41.     Defendant Vitafoam Products Canada Limited ("Vitafoam Canada") is a privately owned and operated company with its headquarters at 150 Toro Road, North York, Ontario M3J 2A9, Canada.  Vitafoam Canada manufactures flexible polyurethane foam for use in furniture, bedding and automotive applications, including packaging, medical, industrial and a full range of memory foams.  During the Class Period, Vitafoam Canada and/or affiliates in controlled directly sold flexible polyurethane foam throughout the United States.

42.     Vitafoam Inc. ("Vitafoam Inc.," collectively with Vitafoam Canada, "Vitafoam")

is a privately owned and operated company with its headquarters a 2215 Shore Drive, High

Point, North Carolina 27263.  During the Class Period, Vitafoam Inc. and/or affiliates it

controlled directly sold flexible polyurethane foam throughout the United States.

43.     Vitafoam, Inc. offers, among other things, flexible polyurethane foam products

for the packaging, furniture, and upholstery industries; flexible polyurethane foam for fabric

producers, laminators, trim companies, and original equipment manufacturers in the automotive

industry; and flexible polyurethane foam for the residential and commercial sectors.

44.     Defendant Woodbridge Foam Corporation ("Woodbridge Foam") is a Canadian

corporation with its headquarters at 4240 Sherwoodtowne Blvd., Mississauga, Ontario, L4Z 2G6,

Canada.  Woodbridge Foam has a global partnership with Inoac Corp. called the "World

Polyurethane Alliance."  During the Class Period, Woodbridge Foam and/or affiliates it

controlled directly sold flexible polyurethane foam throughout the United States.

45.     Defendant Woodbridge Sales & Engineering, Inc. ("Woodbridge S&E") is a

Michigan corporation with its principal place of business at 1515 Equity Drive, Troy, Michigan

48084.  During the Class Period, Woodbridge S&E and/or affiliates it controlled directly sold

flexible polyurethane foam throughout the United States.

46.     Defendant Woodbridge Foam Fabricating, Inc. ("WFFI," collectively with

Woodbridge Foam and Woodbridge S&E, "Woodbridge") is a private company with its principal

place of business at 1120 Judd Road, Chattanooga, Tennessee 37406.  WFFI is a joint venture

between Woodbridge Group and Inoac Corp. During the Class Period, WFFI and/or affiliates it

controlled directly sold flexible polyurethane foam throughout the United States.

47.     Woodbridge's primary focus is supplying flexible polyurethane foam for

automotive components, but Woodbridge also supplies flexible polyurethane foam for commercial and recreational transportation, building products, construction, packaging, and several consumer and industrial products.

## AGENTS AND CO-CONSPIRATORS

48.     The acts alleged against the Defendants in this Complaint were authorized, ordered, or done by their officers, agents, employees, or representatives, while actively engaged in the management and operation of Defendants' businesses or affairs.

49.     Various persons and/or firms not named as Defendants herein—including at least A-Z Sponge & Foam Products Ltd. (also known as A to Z Foam), Broadway Foam & Fabric Supplies Ltd. (also known as Broadway Foam), and CMI Enterprises (also known as CMI Automotive)—may have participated as co-conspirators in the violations alleged herein and may have performed acts and made statements in furtherance thereof.

50.     Each Defendant acted as the principal, agent, or joint venture of, or for, other Defendants with respect to the acts, violations, and common course of conduct alleged by Plaintiffs.

## JURISDICTION AND VENUE

51.     Plaintiffs bring this action to recover damages, including treble damages, costs of suit, and reasonable attorneys' fees, as well as injunctive relief, arising from Defendants' violations of Section 1 of the Sherman Anti-Trust Act (15 U.S.C. § 1).

52.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1337 and 15 U.S.C. §§ 15, 26.

53.     Venue is proper in this district pursuant to 28 U.S.C. §§ 15, 22 and 26 and

pursuant to 28 U.S.C. § 1391(b), (c) and (d), because, at all times relevant to the Complaint, (a) Defendants transacted business, were found, or acted through subsidiaries or agents present in this district; (b) a substantial part of Plaintiffs' claims occurred in this district; (c) a substantial portion of the affected interstate trade and commerce described below has been carried out in this district.

54.     Venue is also proper in this district for pre-trial purposes by order of the Judicial Panel on Multidistrict Litigation, which consolidated Plaintiffs' actions in this District pursuant to 28 U.S.C. § 1407.

55.     This Court has *in personam* jurisdiction over each of the Defendants because, *inter alia*, each of the Defendants: (a) committed acts in this district in furtherance of the conspiracy alleged herein and directed the unlawful conspiracy through persons and entities located in this district, including fixing the prices of flexible polyurethane foam sold to purchasers in this district; (b) transacted business in flexible polyurethane foam and other products in this district; (c) maintained continuous and systemic contacts with this district prior to and during the Class Period; and (d) purposefully availed itself of the benefits of doing business in this district.  Accordingly, each of the Defendants maintains minimum contacts with this district more than sufficient to subject it to service of process and sufficient to comply with due process of law.

**FACTUAL ALLEGATIONS**

**The Flexible Polyurethane Foam Market**

56.     While there are many different uses for flexible polyurethane foam, the uses generally can be grouped into three main product segments:  (1) block foam, also known as

14

commodity or slabstock foam, which is poured and then cut for use in such products as furniture

cushions; (2) carpet underlay, made primarily from scrap flexible foam; and (3) engineered, or

molded, foam, which is fabricated for use in, among other things, automobile products.  (By

contrast, "rigid" or "technical" foam is primarily used in construction for insulation purposes.)

57.     Flexible polyurethane foam is typified by open cells that make the end product

soft, light, resilient and breathable.  To manufacture flexible polyurethane foam for cushioning,

two basic procedures are used.  In one, the chemical mix is poured onto a moving conveyor,

where it is allowed to react and expand.  Sides on the conveyor allow the foam to rise into a

"bun" or slab anywhere from two to four feet high.  The continuous slab is then cut, stored, and

allowed to cure for up to 24 hours.  This manufacturing procedure is the slabstock production

process.  The cured foam is subsequently fabricated into useful shapes. Most foam for use in

furniture and bedding is produced this way.

58.     A second method, foam molding, is a process where the same or substantially the

same chemical mix is poured into specially shaped molds, allowing the foam reaction to take

place.  This process is used primarily for automotive cushioning, although some furniture utilizes

molded cushions.

59.     In 2010, domestic revenue for the polyurethane foam industry was projected at

$12 billion.  Typically, flexible polyurethane foam averages between 70-85% of the total output

of polyurethane foam in the United States.  In 2009, flexible polyurethane foam for furniture and

bedding products accounted for approximately 38% of flexible polyurethane foam sales revenue;

flexible polyurethane foam for transportation products accounted for approximately 32% of

flexible polyurethane foam sales revenue; flexible polyurethane foam for flooring products

accounted for approximately 25% of flexible polyurethane foam sales revenue; and flexible

polyurethane foam for other end uses—including but not limited to packaging and textiles—

accounted for approximately 5% of flexible polyurethane foam sales revenue.

**The Conspiracy To Fix Prices For Polyurethane Foam**

  A.  **Evidence Of The Conspiracy To Fix Flexible Polyurethane Foam Prices**

    *1)*  *Defendant Vitafoam admits to the conspiracy*

  60.  In February 2010, Vitafoam voluntarily approached the U.S. Department of

Justice, Antitrust Division ("DOJ"), to self-report evidence of illegal antitrust activities amongst

itself and other companies and individuals in the flexible polyurethane foam industry and to seek

acceptance into the DOJ's Corporate Leniency Program.  Since that time, Vitafoam and its

employees have been cooperating with a criminal investigation into illegal anticompetitive

conduct in the flexible polyurethane foam market.

  61.  As a result of its application, Vitafoam has received a conditional leniency letter

from the DOJ, which means that Vitafoam admitted to its participation in a conspiracy to violate

the U.S. antitrust laws.  As a November 19, 2008 presentation available on the DOJ's website

explains, "[a conditional leniency] applicant must admit its participation in a criminal antitrust

violation involving price fixing…before it will receive a conditional leniency letter."

  62.  In seeking conditional leniency with the DOJ and in connection with a pending

Canadian government investigation of antitrust violations by manufacturers of flexible

polyurethane foam, several current and former Vitafoam employees agreed to be interviewed

regarding the flexible polyurethane foam price fixing conspiracy.  These interviews revealed the

mechanisms, participants, duration, and impact of the conspiracy.  These employees described a

cartel among Defendants, who are responsible for production of the majority of flexible polyurethane foam, and other co-conspirators.

2) *Vitafoam employees explain how Defendants conspired to fix prices and allocate customers*

63.     Defendants established a practice where they would communicate and reach an agreement or understanding on the percentage amount and timing of price increases and market allocation in the sale and supply of polyurethane foam.  Price increase discussions occurred approximately two to three times per year and often coincided with the bi-annual meetings held by the Polyurethane Foam Association ("PFA").

64.     The general pretext used to explain the conspiratorial price increases was increases in raw material costs.  Defendants (or "foamers" as they are referred to at times in the industry) utilize chemicals, including polyols and toluene diisocyanate (or "TDI") in the manufacturing of flexible polyurethane foam.  When Defendants' raw material suppliers announced price increases for chemical ingredients of foam, such as polyols and TDI, Defendants contacted each other because this provided an opportunity to raise prices. Defendants viewed price fixing as necessary because, if defendants did not increase their foam prices by the same percentage amount and at around the same time period, the attempted price increase would fail.

65.     The conspiracy, understanding and agreements regarding price increase percentage amounts among Defendants was the result of telephone conversations, exchanges of price increase letters, face-to-face meetings, and bilateral discussions among the competitors for the purpose of coordinating the amount and timing of price increases.

66.     During the Class Period, there was an understanding and agreement among the

Defendants and their co-conspirators to collectively support supracompetitive prices.  This understanding and agreement was reached in actual discussions among competitors about the percentage of price increases, the dates of the increases, and how the conspirators would announce the increases with the same, or nearly the same, effective dates.  Price increase announcement letters were then mailed to customers, reflecting the prices determined by the conspirators.  Defendants policed these increases to ensure they were implemented by their co-conspirators, and they did not permit price reductions without consent of the overall group.

### i.    Former Vitafoam executives

67.    A former President of Vitafoam, who worked for Vitafoam from the 1960s until October 2008, along with other individuals at Vitafoam, directly participated in the long-running price fixing and customer allocation conspiracy alleged herein relating to flexible polyurethane foam in North America.

68.    The former President of Vitafoam together with Defendants engaged in frequent and regular unlawful communications during the Class Period where they discussed and agreed to specific price increases and the timing of announcements regarding the effective date of those increases.

69.    Vitafoam had a purported company policy of not having conversations with competitors, but this policy was merely window-dressing and was not followed in practice during the Class Period.

70.    As part of the conduct to coordinate and/or support price increases during the Class Period, the former President of Vitafoam instructed his sales people to send copies of their draft price increase letters to other Defendants and obtain other Defendants' versions of the

same.  Defendants utilized these drafts to confirm their anticompetitive agreements and further implement the conspiracy.  The Defendants with whom he spoke also discussed how much each competitor wanted to raise prices, when the price increases should go into effect, and when the price increase letters should be issued.  As described below, these measures were used not only to set supracompetitive prices, but also to police the conspiracy and ensure compliance. Vitafoam personnel, including at least Steve Pendock, Gerry Hannah, David Gurley, Frank Roncadin, George Newton, Tim Prescott, and Phil Fonseca, participated in these discussions with other Defendants to share information about and reach agreement on price increases.

71.     Vitafoam's discussions relating to coordinating price increases among Defendants during the Class Period were conducted primarily by means of telephone, electronic mail, and in-person meetings.  In person discussions frequently took place at Polyurethane Foam Association ("PFA") meetings.

72.     The former President of Vitafoam, along with his subordinates, had conspiratorial discussions during the Class Period as described above with other Defendants regarding fixing prices and allocating customers.  These discussions included at least Tony Dacosta, Al Zinn, and Doug Dauphin of Foamex; Max Tenpow of Carpenter; Bruce Schneider of Future Foam; Don Coleman of Hickory Springs; and Robert Valle and Dean Brayiannis of Valle.

73.     A former Vice President of Sales and Marketing for Vitafoam who has worked in the polyurethane foam industry since 1963 participated in interviews and admitted his role in the conspiracy.  He first worked for Woodbridge, and then in 1973 joined Vitafoam's predecessor, Pre-Fab Cushioning Products.  This former Vice President worked for Vitafoam in Canada until March 2009 when he retired.  He was personally involved in a long-running price fixing and

customer allocation conspiracy throughout North America along with other individuals at Vitafoam as well as at other companies.

74.     The former Vice President of Vitafoam also participated in conspiratorial conduct during the Class Period with many individuals employed by numerous competitors, including at least Valle, Carpenter, Woodbridge, Flexible Foam, Hickory Springs, Domfoam, Scottdel, and Foamex.   The communications involved discussions of price increase percentages and effective dates of such increases, typically by telephone.  The competitors exchanged copies of price increase letters to coordinate and support these increases.  Individuals from competitors with whom the former Vice President conspired to fix prices and allocate customers included at least Stanley Pauley, Ed Malacheck, Mark Kane and Max Tenpow of Carpenter; Tony Vallecoccia, Dean Brayiannis and Robert Valle of Valle; Doug Dauphin and Tony Dacosta of Foamex; and John Howard of Domfoam.

75.     The former Vice President of Vitafoam and Mark Kane of Carpenter had discussions on multiple occasions during the Class Period involving price increases concerning a shared customer.  In an effort to coordinate their price increases and to make sure those increases went through for the mutual customer, the former Vice President and Kane called each other and exchanged copies of draft price increase letters by fax.

76.     Robert Valle and Tony Vallecoccia of Valle also communicated with other Defendants by telephone and faxed each other copies of their draft price increase letters that would be sent to customers in order to coordinate and collude on price increase percentages and their effective dates.  They reported on these efforts to Vitafoam.

77.     Vitafoam employee David Gurley was a manager during the Class Period

involved in scrap foam, obtained by Vitafoam for carpet underlay production.  During the Class Period, Gurley had numerous contacts with other Defendants in furtherance of the conspiracy. As a result of these contacts, Gurley provided the former Vitafoam executives and co-employee Steve Prescott with other Defendants' draft price increase letters, competitor price lists, and other information.

78.     During the Class Period, Vitafoam employee George Newton exchanged information with Carpenter employee Max Tenpow regarding the amount and effective date of price increases.  Newton also provided this conspiratorial information to other Defendants.

79.     In addition to these unlawful agreements to fix prices, the former Vitafoam executives and Defendants agreed to avoid each other's customers and refrain from taking business or market share from one another during the Class Period.

### ii.     Recent or current Vitafoam executives

80.     In addition, a former Woodbridge employee was employed in Ontario, Canada, from 1986 until 2009 and participated in the conspiracy.  While working at Defendant Woodbridge, this employee served most recently as Vice President of Commercial Sales where he had authority to determine prices.  In April 2009, this former Woodbridge employee became Vitafoam's Vice President of Sales.  In his position at Vitafoam, he had authority to determine prices.  This Vitafoam Vice President has also admitted to his role in the long-running price fixing and customer allocation conspiracy with other Defendants.

81.     This Vitafoam Vice President engaged in conspiratorial activity while employed by Woodbridge and Vitafoam during the Class Period by reaching understandings and agreements on price increases with other Defendants.  These agreements concerned both the

21

amount and the effective date of the price increases.  The objective of the price increase coordination was for the conspirators to pass on cost increases to customers, as well as to maintain their respective market share.

82.     During the Class Period, the Vice President personally engaged in this conspiratorial conduct to fix prices and maintain market share with at least Woodbridge, Vitafoam, Foamex, Carpenter, Future Foam, Hickory Springs, Scottdel, Valle and Flexible Foam.  Co-workers at both Woodbridge and Vitafoam also participated in the scheme.

83.     Information sworn under oath on July 21, 2010 by Pierre-Yves Guay of the Commissioner of Competition in Canada to support a search warrant describes information provided by "Witness A," this same employee of Vitafoam, regarding conduct "in Canada and in the United States."  The information states under oath: "Witness describes himself as someone who gathers and shares information across the foam sectors.  Witness A confirmed to Competition Law Officers that he had discussions, exchanges of information and agreements regarding the price of foam with the following contacts within the foam industry:

| Companies | Contacts | Positions |
|---|---|---|
| Foamex | Vinnie A. Bonaddio | Senior Vice President, Technical Products Group |
| Foamex | Don Phillips | Executive Vice President, Automotive Parts Division |
| Vallefoam | Tony Vallecoccia | President |
| DomFoam International Inc [sic] | John Howard | President |
| Ottobock [sic] | John Vins | Sales Manager |

22

| Plastomer | Bill Baughman | Chief Executive Officer |
|---|---|---|
| Inoac International Co. | Mike Cotter | Marketing Manager |
| Inoac International Co. | Ken Miya | Managing Director |
| Hickory Springs | Todd Councilman | Marketing – Sales Manager |
| Flexible Foam Products | Mike Crowell | VP Sales and Marketing |
| Vita | Mel Himel | President |
| Hickory Springs | Buster Mann | VP, Eastern Division |
| CMI Automotive | Jorge Canamero | President |

Conduit of information[1]:

| Companies | Contacts | Positions |
|---|---|---|
| Bondtex Incorporated | Jerry Hightower | President |
| Cerex Fabric | Dan Holsenbeck | Sales Manager |
| Inoac USA | Max Ozeki | VP Foam Division |
| Morbern Inc | John Weaver | VP Sales and Marketing |

84.     The sworn affidavit from Pierre-Yves Guay also separately states that it is the

result of an investigation of "previous and ongoing conduct contrary to" the Competition Act of

Canada by entities including Carpenter, Valle Foam, Domfoam, A to Z Foam, Vita Foam Group,

Foamex, Flexible Foam, Future Foam, Mohawk, Scottdel,  Broadway Foam, Woodbridge,

---

[1]  "Conduit of information means that Witness A had discussions with these individuals who reported market conditions and price increases by alleged cartel members to him.  These discussions were not about price fixing or market allocation but rather represented simply a transmission of information."

Leggett & Platt, and Hickory Springs.  The violations of law alleged in the affidavit concerned conduct both "in Canada and in the United States."

85.    During the Class Period, while he was employed by Woodbridge, the Vitafoam Vice President also confirmed that he spoke to Bill Lucas, the President of Vitafoam, to discuss price increases specifically for foam applications in the automotive industry.  Bill Lucas, also acted for Crest, which was controlled by Vitafoam, in these communications.

86.    When Defendants discussed price increases for foam products for the automotive industry, although price increases for automotive foam products generally involved telephone calls, rather than letters, the discussions included price increase letters for foam products. Defendants discussed price increase letters for foam products generally, even in specific communications about automotive foam products, because this helped the competitors coordinate price increases and timing of price increases for automotive foam products.

87.    The Vitafoam Vice President, while he was employed by Woodbridge, also had contacts with Vincent Bonaddio at Foamex to discuss price increases for automotive foam products.

88.    In 2004, while employed by Woodbridge, the Vitafoam Vice President attended a meeting at Crest with Bill Lucas, who was representing Vitafoam and Crest.  During the meeting, there was a discussion regarding price increases of foam.

89.    On May 26 & 27, 2010, the current Vice President attended a PFA meeting in Baltimore, MD.  While there, he discussed foam pricing with Michael Crowell of Flexible Foam. Crowell asked why Vitafoam was not raising prices or following a recent increase.

90.    Another Vitafoam executive, the President, was previously the Director of

Corporate Engineering at Woodbridge from 1985 until January 2008, where he had authority to determine prices.  As the President of Vitafoam, a position he held beginning in August 2008, he also had authority to determine prices.  Along with other individuals from Defendant companies, he participated in the long-running price fixing and customer allocation conspiracy.

91.     During the Class Period, discussions with competitors in the foam industry involving the current President of Vitafoam while he was at Woodbridge included conversations about legitimate topics like business development or potential joint ventures, and then ultimately led to conspiratorial conversations about price increases.  These discussions about coordinating pricing took place during in-person discussions, electronic mail communications, and telephone conversations.

92.     During the Class Period, the President of Vitafoam participated in conspiratorial discussions concerning pricing in the flexible polyurethane foam market with various competitors at both Woodbridge and Vitafoam, including at least Bill Lucas of Vitafoam; Donald Phillips and Vincent Bonaddio of Foamex; Michael Crowell of Flexible Foam; Tony Vallecoccia of Valle; Stanley Pauley of Carpenter; Don Simpson, Buster Mann and Lee Lunsford of Hickory Springs; and, Bruce Schneider and Robert Heller of Future Foam.  David Gurley also sent an email to the current President of Vitafoam in which he acknowledged receiving draft price increase letters from competitor Don Simpson of Hickory Springs.  These discussions led to a clear understanding and agreement that the participants would discuss and implement coordinated price increases on the same effective dates.

93.     A Vitafoam executive had several communications with Dean Brayiannis from Valle leading to an agreement on June 2009 on the promotional pricing for carpet foam for a

shared customer.  This agreement to offer the same promotional pricing was followed after June 2009.

94.     Specifically, each of the price increases for flexible polyurethane foam during the Class Period, going back to at least 1999 and until Vitafoam's entry into the leniency program, were the result of conspiratorial discussions among Defendants on pricing.

### 3)     Defendants implement and enforce the conspiracy

95.     Defendants also undertook substantial efforts to police the conspiracy. Participants, including the former Vice President of Vitafoam, followed up after discussions with other Defendants to determine if the specific agreed price increases and effective dates were implemented.  If one of the Defendants did not agree to raise prices at the same amount or in the same time period as the other Defendants, the other Defendants would pressure the hold out until it acquiesced.

96.     Furthermore, Defendants routinely exchanged and reviewed each other's price increase letters in order to confirm that their conspiratorial agreements were being implemented. When a Defendant would fail to exchange or confirm its price increase letters, the other Defendants would hound that Defendant and threaten action to engage in competitive price wars against the non-cooperating Defendant.

97.     On April 9, 2010, in Cleveland, Ohio, Bruce Schneider of Future Foam spoke by telephone to an executive from Vitafoam.  Schneider worked at Future Foam headquarters. Schneider called to inform Vitafoam that Future, Foamex and Flexible intended to increase the price of foam by 20% in the next weeks.

98.     On another call, Schneider again discussed price increases by the Defendants with

the President of Vitafoam. Schneider stated: "Now it's looking it's all everything is postponed to May 31st or June 1st.  There is a letter out from Carpenter for 31st of May.  This is a letter out from Flexible for June 1st.  Foamex sent a letter two weeks ago at 15% but it looks like now that the increase is going to be 10 and 12% on foam."  The Vitafoam President asked: "Are you hearing anything from the other guys? Or is it just kinda market stuff?"  Schneider responded: "Oh, from the other, the other people the foamers?  Yeah, we are hearing 10-12… It's kinda what we hear from other people what they expect.  Ya know, it would have been great to get 20% but I don't think so."  The conversation concluded with a request for information from Schneider.  "If you hear anything from your friends in Europe.  What's going on over there, I sure would like to know that as well."

99.     On June 10, 2010, Bruce Schneider of Future Foam left a voice mail message for the current President of Vitafoam.  In this message, Schneider stated, "Hi [President], this is Bruce Schneider… If you want to give me a call I've got information of why the increase changed from 10 to 12 to 9."

100.     On May 20, 2010, John Howard, President of Domfoam, called the current Vitafoam Vice President twice to voice complaints about a Vitafoam salesman, Normand Widmer, attempting to acquire Domfoam customers.  During the call, Howard stated:

> "Your fellow in Montreal here has been out, has his salesman Claude Robinson out knocking on doors they've never knocked on before, selling at or quoting at low low prices.  If he wants a battle, I'll give him a battle…These guys have been in at accounts they've never sold at…if he wants a battle, he's got one.  We will start going after his accounts and it won't be pretty.  We'll both end up hurting…I'm pissed off and our sales guys are pissed off and they're saying 'John, are you going to do something about this, or are you just going to let this guy keep quoting low prices and taking business away from us.  So. I'll let the dogs loose or I don't let the dogs loose.  Want to mill it over and give me a shout back?"

The Vice President of Vitafoam responded:

> "It's sort of a bad time for me right now."

Howard then stated:

> "I don't expect an answer right now but, I'm leaving tomorrow night for a week.  I would like to at least give the guys some indication that, 'Guys, give me another week.  I think the dust is going to settle.'  Or, 'Guys just do what you have to do.  Go follow their delivery trucks and find out who the customers are and start knocking on doors and do whatever the hell you have to do.  We have to respond.'  So you're in a spot, I don't expect you to answer right now, but can you give me a shout back tomorrow?"

101.    On May 25, 2010, the Vice President of Vitafoam called Howard back.  During the call, Howard stated:

> "Just, you know we've kind of stayed out of each other's way for some time here while business is quiet.  There's just no business to be had and dropping prices is only going to benefit the customers.  I can't afford to have him take stuff away…It'll be a rough go if he wants to go and quote prices in places where he's not currently selling…Tell Normand it's a, I mean we just don't even know who your accounts are.  Basically we've just never interfered, but, if he's going to go selling to guys quoting prices at guys where he doesn't currently sell, we're going to go after his accounts.  So, business decision, you know, whatever way the chips fall, that's the way they're going to fall, and life will go on.  But the buyers are asking me, you know, 'John, you're always telling us to stay away.'  We do the same thing with Foamex, we don't go after their accounts.  Haven't for a while business has been in the shitter.  Just kind of stayed away and they've stayed away from our accounts too, so prices have been fairly stable.  There ain't much business out there and dropping prices and only the customers are going to benefit.  But let him make his decision and if it's to continue going after them then tell him there'll be some consequences.  That's it.  I'm not gonna, no threats but I can't not do anything.  The sales guys are getting kind of…'Hey, John, you're telling us don't go here, don't go there, don't sell that one, don't go quote prices there.'  You know, eventually they're going to think I got no nuts, so sooner or later I've got to tell them 'Guys, just go and do what you got to do.'…Keep an eye on this guy, it's ah, he needs coaching, there you go."

102.    On May 25, 2010, Howard also left a voicemail message for the Vice President of

Vitafoam:

> "Hi, it's John…we never really did resolve anything, I guess I did most of the talking…where do we leave this thing , vis-à-vis going after each other's accounts.  I'd be quite happy just to let it settle right here and not do anything more.  But if [the President of Vitafoam] got some real pressure on this fellow Widmer and he's going to continue to go after accounts that he currently doesn't sell, then I got to, I can't continue to hold our sales guys off.  So, give it some thought and maybe over the next day or two, just give me a shout and let me know.  I understand you can't override [President of Vitafoam], but I can't just hold our guys at bay and tell them, 'Well, don't do anything guys,' That's not a winning strategy for us either.  So, give me a call in the next day or two would you?  And let me know what course of action Widmer's going to take here."

103.    On June 2, 2010, two executives of Vitafoam spoke concerning a price increase announcement.  One of the Vitafoam executives explained it was important to talk to Raj Mehta of CrestFoam about the price increase announcement.

104.    On June 4, 2010, Tim Prescott of Vitafoam left a voice mail message for Vitafoam's Vice President:

> "Hey, it's Tim…Can you give me a call when you get a chance.  I don't know whether you've spoken to [President] but I had a message earlier from Dale over at Carpenter and when I called him back he was asking what we're going with the increase and he just called me again asking can VPS please call John Howard over at Domfoam."

105.    On June 3, 2010, Dean Brayiannis of Valle called Steve Prescott of Vitafoam:

Brayiannis:    "I sent you a text regarding price increase letters.  I'm assuming you've got most of the ones that you wanted to see."

Prescott:    "I didn't see, I had the old boy had faxed me one from a couple of days ago…Yah, okay, no problem,  Yah, I guess, like that's, you know, it's game on again, isn't it."

Brayiannis:    "Ah, we'll see what happens.  I've got Carpenter, Flexible, Mohawk, Leggett."

| | |
|---|---|
| Prescott: | "But it's warranted, you know what I mean. Like, we know the prices of raw material have been going up, so ah." |
| Brayiannis: | "Well, you know, I guess what we've gotta see is have another one right behind this one, hopefully the first one will stick right but I guess we will see what our friends at Carpenter will do." |
| Prescott: | "Yah, yah. Well, yah, like I say it's it's game on. So I would imagine that most manufacturers will move forward with it. We will have to see whether they, whether they do or not and see how that goes." |
| Brayiannis: | "Yah, yah. Alright. Well our letter is out so hopefully I'm assuming you've probably put something out by now." |
| Prescott: | "It's as good as done." |
| Brayiannis: | "Okay. Well we're already out, so we've already put our letter out." |

106.   On June 9, 2010, Brayiannis called Prescott twice, leaving a voice mail message first, then called again to further discuss the price increase.

| | |
|---|---|
| Brayiannis: | "Still haven't seen or heard of your increase letter yet." |
| Prescott: | "Well, have a look around." |
| Brayiannis: | "I have. Haven't found anything yet…I've still got one guy telling me that you haven't issued a letter. So have you issued? Yes or no?" |
| Prescott: | "People will lie to you, Dean." |
| Brayiannis: | "Are you around the same time frame as us? July 5th or what?" |
| Prescott: | "Ah, yah, close." |
| Brayiannis: | "Okay. And you haven't seen what, sorry? You haven't seen other increase letters or did you get all of those?" |
| Prescott: | "Well, I know, I know that, know Stan, Stan said that he'd |

> seen the Mohawk one and…I guess one of the other U.S.
> guys.  You know, everyone waits for the leader and once
> the leader goes out then everyone else follows cause we all
> know that the prices of material have gone up so, you know
> what I mean?"

Brayiannis:     "Well at the end of the day over the last two increases we
                have chatted about it so just wanna make sure you got your
                letter out."

Prescott:       "Yah.  Okay pal."

107.    On May 25, 2010, Vitafoam received a call from Michel Legendre of Carpenter,

who informed Vitafoam that Carpenter would be raising its prices on June 28, 2010.  Six days

later, on May 31, 2010, Legendre again called Vitafoam and told them that Carpenter would be

raising prices by 11%.  The following day, Carpenter provided Vitafoam with a copy of the letter

it sent to its customers, which included the dates and amounts of the price increases.

108.    After Vitafoam raised its own prices, Legendre once again contacted the

company, this time on June 15, 2010.  He spoke with the Vitafoam Vice President and asked

whether Vitafoam was "ready for round 2?"  Legendre informed the Vice President that

Carpenter was preparing to send a letter the following day with a 12% price increase, effective

July 19, 2010.  He also confirmed that manufacturers in "the States were similarly raising

prices."

109.    Once the two men finished discussing the details of the second price increase,

they then turned to a discussion of whether they should be speaking at all:

Legendre:       "Hey let me ask you something.  That new boss of yours,
                you've got a guy there apparently I heard doesn't want us
                to communicate.  Is that correct?"

Vitafoam:       "Ahhh…yah, that's that's true.  That's ahh very true
                actually."

31

| | |
|---|---|
| Legendre: | "Mine…[As you know] mine are the same right." |
| Vitafoam: | "Oh I understand." |
| Legendre: | "But I heard that jeez, the same thing I guess this guy you've got, I forget his name now, said the same thing he doesn't want nobody to talk and I'm like holy [expletive] ok here we go." |
| Vitafoam: | "Yah.  Well, you know, that's, that's, that's, that's policy so…" |
| Legendre: | "Yah" |
| Vitafoam: | "That's…it's corporate stuff right." |
| … | |
| Legendre: | "Ok. You know, I'm actually waiting for a third one [price increase].  I think it is going to be a repeat of, what is it, last year or the year before, I don't know." |
| Vitafoam: | "It was about three years ago.  We didn't go up enough last year.  The prices have been, the prices have been pretty low for a bit." |
| Legendre: | "Yah, you know what they've actually been too low really." |
| Vitafoam: | "Sorry?" |
| Legendre: | "They've actually been too low." |

110.    On May 27, 2010, Lee Lunsford of Hickory Springs called the Vitafoam President and inquired whether Vitafoam was raising prices.  When the Vitafoam President expressed hesitation about doing so, Lunsford noted that there was "no volume anywhere" and "there is twice as much capacity as demand."

111.    Despite this acknowledgment, on June 3, 2010, Lunsford again called Vitafoam, this time speaking with the current Vitafoam Vice President.  In their conversation, the Vice President informed Lunsford that Vitafoam was raising its prices at the end of the month. Lunsford inquired how much and, when told it would be by approximately 12%, agreed that this was an acceptable number to Hickory Springs.

112.    The Defendants also exchanged emails in furtherance of the conspiracy to fix prices for flexible polyurethane foam:

a.    In June of 2000, the Vitafoam Vice President – who was an employee at Woodbridge at the time – sent an email to a Vitafoam salesperson asking whether he spoke to Don Phillips of Foamex to which the salesperson responded "Yes, we told him we are going out with our letters 12% effective July 30th; he said we would follow."

b.    During October and November 2004, the Vitafoam Vice President reported to his supervisor at Woodbridge by email that he had discussions with Bill Lucas, acting for Vitafoam and Crest, which resulted in an agreement for a foam price increase effective January 1, 2005.

c.    On October 21, 2004, the Vitafoam Vice President sent an email to his supervisor at Woodbridge where he said: "Lucas and I are talking about our favorite subject. Jan. 1 as a possible date."  This email concerned a price increase discussion for foam for the automotive sector with an effective date of January 1, 2005.

d.    On November 2, 2004, the Vitafoam Vice President sent an email to his supervisor at Woodbridge and other superiors at Woodbridge saying that he "Met with Lucas at PFA" and that Lucas was "most interested in their auto increases.  They will announce for Jan. 1.

They would go +20%."

       e.      On March 9, 2005, the Vitafoam Vice President sent an email to his supervisor at Woodbridge with the subject header "Spoke to Lucas."  The email stated "They are going to market probably next week.  Looking for a Jan. 1 effective date.  Were going at 18%.  I said we would most likely be closer to 15%."  He reported that he "has not heard from Foamex" and "is going to try to call them again to see what number they will go with."

       f.      On March 9, 2005, the Vitafoam Vice President sent an email to his supervisor at Woodbridge regarding another call with Bill Lucas, representing Vitafoam and Crest.  "Spoke with Lucas again last week.  We are trying to meeting in Chattanooga." He also wrote: "We use the schedule[d] discussions to lead into the real reasons for the calls.  Said that they were successful at the mills, in Furniture – they were still one [price increase] behind."  The email continued: "I let him know we were going March 15th in Detroit [automotive sector].  He said they would probably wait until May 1.  Would have liked a more coordinated push."

       g.      On May 5, 2005, the Vitafoam Vice President while he an employee at Woodbridge emailed that he spoke with Bill Lucas of Vitafoam and Raj Mehta, the General Manager of Crest, regarding price increases for May 2005.  This relationship between Woodbridge, Crest, and Vitafoam continued for years.  In a June 2, 2010 conversation between the Vitafoam Vice President and the current President, they discussed Mr. Mehta again and information to pass to him in furtherance of the conspiracy.

       h.      On September 14, 2005, the head of a competitor company wrote to a Vitafoam executive and stated "In separate conversation, I talked to Lucas.  They are out with 11%  on blocks nothing on Auto."  He asked the Vitafoam executive to have one of his

employees "call Buster [Mann at Hickory Springs] today." After placing the call to Mann, the Vitafoam employee wrote "I called Buster yesterday. We spoke about the bedding stuff. It is at numbers we are not used to."

        i.     On May 22, 2008, Nikki Walborn at Scottdel sent an email with an attachment of a draft Scottdel fuel surcharge and price increase letter to a number of Scottdel employees, including Louie Carson and Jeff Carter. (Within a year of this email, Jeff Carter went from Scottdel to Future Foam in Texas.) On May 29, 2008, Jeff Carter forwarded this email and price increase letter to David Gurley at Vitafoam, and Gurley then forwarded the email and price increase letter to his superior at Vitafoam, the current President.

        j.     On July 7, 2008, Jeff Carter, while still at Scottdel, forwarded via email a draft price increase letter to David Gurley of Vitafoam, stating, "David, Here is a copy of our next increase letter. Jeff." Gurley forwarded this email and draft increase letter to the company President. The President forwarded this string of emails and draft increase letter to his subordinates at Vitafoam, the Vice President of Sales & Marketing, and Steve Prescott.

        k.     On July 9, 2008, Steve Prescott forwarded the email string and letter to Stan Miller of Vitafoam, with the message, "Hey pal you thought the first one was tough! Check with your Carpenter contact to see when they plan on pulling the trigger."

        l.     On July 11, 2008, Stan Miller reported back to Prescott via email, stating:

    "Steve, I talked to Carpenter and he says that he has found his info. That Mohawk has gone up the 12 points on business other then the EOR orders from the show. He said they went up the full 12% in Vancouver and they have gotten some for the business back. He had not heard of Scottdale [sic] increase but had been told that there was a good chance they would be going up. I just talked to Randy from Shnier and he said from the pricing his sales people have found that Mohawk has not gone up. Carmine has been after him for copies of their pricing but he can't get his

hands on it.  He told me they lost an order to Mohawk in Calgary for Carpet Supermarket and that is where Ben Flagel is now."  Prescott asked in an email to Miller "Will Ben share info?"  Miller shortly thereafter on the same day responds to Prescott via email, stating, "Dan from Carpenter just called and said they will be going up 13% on Aug. 11/08."

m.     On May 21, 2009, Steve Prescott of Vitafoam sent draft price increase letters to other Vitafoam employees.  One of the recipients, David Gurley of Vitafoam, forwarded those price increase letters to Jeff Carter of Future Foam in Texas.  Jeff Carter then forwarded this email to David Carson and Louie Carson of Scottdel stating: "Louie and David, You probably have seen all these.  It's crazy out there again, personally I don't think this is enough of an increase."

n.     Letters announcing a May 2009 increase from Flexible Foam dated April 7, 2009, from Mohawk dated April 10, 2009, from Carpenter dated April 13, 2009, from Vita Canada dated April 14, 2009, from Leggett & Platt dated April 15, 2009, and Future Foam dated April 16, 2009 were all present in Vitafoam files.  Following that price increase, there was another price increase in June 2009.  Price increase letters from Mohawk, Flexible Foam, Carpenter and Future Foam all dated May 18, 2009, and from Leggett & Platt and Vita Canada dated May 19, 2009 were also also present in Vitafoam files.

o.     Louie Carson responded to Carter thanking Carter for the information.  Carter forwarded his string of emails with Louie Carson back to David Gurley at Vitafoam.  Gurley forwarded the string to his superiors at Vitafoam, the Vice President of Sales & Marketing and President, with the message: "Please keep this confidential and read from the bottom up.  It was sent to my friend Jeff Carter @Future Foam in Texas and talks about Vita and Ohio Valley.  Louie Carson is one of the owners of Scottdel."

36

### 4)  *Defendants kept the conspiracy secret*

113.    As described in this Complaint, the Vitafoam employees discussed herein and
other participants in the conspiracy took numerous steps to avoid detection of their conspiracy.
At times, full names would not be used in correspondence and instead participants would only
use first names or initials.

114.    Conspirators took advantage of attending trade association meetings along with
their competitors and met to discuss coordinating price increases outside of the formal meetings.
During the Class Period, representatives of Defendants regularly met through such organizations
as the PFA, International Sleep Products Association ("ISPA"), and Surfaces, a trade group that
includes polyurethane carpet underlay producers.

115.    Representatives of Defendants claimed these trade association meetings were
nothing more than "meet-and-greet" sessions with their competitors.

116.    Representatives of Defendants disguised their attendance at these events as
information gathering, but in fact used them as an opportunity to fix prices and divvy up their
customers.

117.    Representatives of Defendants had no genuine intention of learning about the
market at these meetings.  Defendants essentially controlled the market, and attended these
meetings to further ensure and perpetuate their control.

118.    Defendants also visited each other's manufacturing facilities for the purported
purpose of sharing technological and operational advances, but were actually using the
opportunity to discuss coordinated price increases.  Defendants' employees also would avoid
detection by communicating through fax machines at a local Staples or other store, so that the

identification of the sender would be hidden on the fax transmittal.

**B.     Market Factors Support The Existence Of The Conspiracy**

119.     Various market factors made the market for flexible polyurethane foam highly
susceptible to anticompetitive practices and unlawful collusion, which allowed Defendants to
implement their anticompetitive conspiracy.

*1)     Limited competition*

120.     As a result of flexible polyurethane foam's manufacturing and product
characteristics, importation into the United States from outside North America is neither
practical nor economical.  Consequently, the vast majority of flexible polyurethane foam sold in
the United States comes from North America or a company with a United States-based
subsidiary.  Defendants—all of whom are based in the North America or have United States-
based subsidiaries or affiliates—collectively represent the majority of flexible polyurethane foam
manufacturers.

121.     In addition, the industry has been consolidating rather than attracting new
entrants. Major players within this industry have been active in acquiring smaller companies and
other competitors over the course of the last ten years. For example:

a.     In 2007, Defendant Carpenter acquired its European competitor Dumo
NV.

b.     In 2006, following the purchase of its parent corporation, Defendant
Vitafoam, Inc. sold one of its plants to Olympic Products LLC (a joint venture between
Woodbridge and Hickory Springs), and sold another plant to Flexible Foam Products.

### 2)    *Inelastic demand due to lack of substitutes*

122.    "Elasticity" is a term used to describe the sensitivity of supply and demand to changes in one or the other. For example, demand is said to be "inelastic" if an increase in the price of a product results in little or no decline in the quantity sold of that product. In other words, customers have nowhere to turn for alternative, cheaper products of similar quality, and so continue to purchase despite a price increase.

123.    For a cartel to profit from raising prices above competitive levels, demand must be relatively inelastic at competitive prices.  Otherwise, increased prices would result in declining sales, revenues and profits, as customers purchased substitute products or declined to buy altogether.

124.    Demand for flexible polyurethane foam is relatively inelastic.  In furniture and bedding applications, for example, short staple polyester fiber and cotton can be used instead of flexible polyurethane foam, but both alternative materials have poor height recovery characteristics after compression and are therefore inferior to flexible polyurethane foam.  Steel springs recover well but must be insulated from the user with some type of cushioning material (i.e. polyurethane foam).  Comparing flexible polyurethane foam to alternative materials in terms of economics, comfort potential, ease of use, and durability, there is not an acceptable substitute.

### 3)    *Standardized commodity product with high degree of interchangeability*

125.    A "commodity product" is characterized as a product that is readily interchangeable and for which competition is primarily driven by price rather than other market pressures, such as branding and marketing.  The mass production and interchangeability of commodity products results not only in pressure for competitors to enter into conspiracies to fix

and maintain prices, but serves as a mechanism to successfully adopt and implement such conspiracies.

126.    Flexible polyurethane foam is a commodity used in hundreds of consumer products to provide comfort, support, safety and durability.  Flexible polyurethane foam is interchangeable across manufacturers.  The last major technological breakthroughs in the production of flexible polyurethane foam occurred in the mid-20th century, and flexible polyurethane foam is now classified as a commodity chemical product.

127.    Accordingly, each Defendant has the capability to produce the same or similar flexible polyurethane foam products, and flexible polyurethane foam customers make purchase decisions based principally on price.  This commoditization and interchangeability of flexible polyurethane foam facilitated Defendants' conspiracy by making coordination on price much simpler than if Defendants had numerous distinct products with varying features.

### 4)    *Opportunities to conspire*

128.    Defendants are members of trade associations, including the PFA, ISPA, Alliance of Flexible Polyurethane Foam, Carpet Cushion Council, and Surfaces.  The PFA is one of the largest such trade associations, and approximately 70% of U.S. polyurethane foam manufacturers are PFA members.

129.    As discussed above, during trade association meetings—including PFA meetings—Defendants seized opportunities to meet in person to allocate customers and coordinate price increases.

### ACCRUAL OF CLAIM, CONTINUING VIOLATION, EQUITABLE TOLLING, AND FRAUDULENT CONCEALMENT

130.    Plaintiffs did not discover and could not discover through the exercise of

reasonable diligence the existence of the conspiracy alleged herein prior to disclosure in 2010 of the raids by government agencies of certain Defendants' facilities.

131.    Since the start of the Class Period, Defendants and their co-conspirators have committed continuing violations of the antitrust laws resulting in monetary injury to Plaintiffs and Class members.  These violations each constituted injurious acts.

132.    In addition, Defendants' and their co-conspirators' agreement, understanding and conspiracy in violation of the antitrust laws was kept secret.  As a result, Plaintiffs and the Class members were unaware of Defendants' unlawful conduct alleged herein and did not know that they were paying artificially high prices for flexible polyurethane foam in the United States throughout the Class Period.  Defendants and their co-conspirators affirmatively and fraudulently concealed their unlawful conduct.

133.    Plaintiffs and the Class members did not discover, nor could have discovered through reasonable diligence, that Defendants and their co-conspirators were violating the antitrust laws until shortly before this litigation was initially commenced, because Defendants and their co-conspirators used deceptive and secret methods to avoid detection and to affirmatively conceal their violations.

134.    Neither Defendants nor their co-conspirators told Plaintiffs or other Class members that they were fixing prices and allocating customers, or engaging in the other unlawful collusive practices alleged herein.  By its very nature, the conspiracy by Defendants and their co-conspirators was inherently self-concealing.

135.    Defendants and their co-conspirators engaged in a successful price-fixing and customer allocation conspiracy that they affirmatively concealed:

a.      By meeting secretly (including use of private telephonic and electronic communications) to discuss prices, customers, and markets of flexible polyurethane foam in the United States and elsewhere;

b.      By agreeing among themselves at meeting and in communications not to discuss publicly, or otherwise reveal, the nature and substance of the acts and communications in furtherance of their alleged scheme;

c.      By holding secret meetings outside and separate from the formal trade association meetings Defendants were publicly attending; and

d.      By disguising price-fixing meetings and communications as technical and operational meetings, or by sending communications in a manner designed to hide the origin or source of the communication, as detailed above.

## ANTITRUST INJURY

136.    The unlawful contract, combination and/or conspiracy alleged above had and is having, *inter alia*, the following effects:

a.      Prices charged by Defendants and their co-conspirators to Plaintiffs and the members of Class for flexible polyurethane foam have been  maintained at artificially high and supracompetitive levels;

b.      Plaintiffs and members of the Class have been required to pay more for flexible polyurethane foam than they would have paid in a competitive marketplace unfettered by Defendants' and their co-conspirators' collusive and unlawful price-fixing; and

c.      Plaintiffs and members of the Class have been deprived of the benefits of free, open, and unrestricted competition in the market for flexible polyurethane foam.

137.    During and throughout the period of the contract, combination, or conspiracy alleged above, Plaintiffs and members of the Class directly purchased flexible polyurethane foam in the United States.

138.    Plaintiffs and the other Class members paid more for the flexible polyurethane foam than they would have paid under conditions of free and open competition.

139.    As a direct and proximate result of the illegal combination, contract, or conspiracy alleged above, Plaintiffs and the members of the Class were injured and financially damaged in their businesses and property, in amounts to be determined at trial

140.    Plaintiffs and members of the Class suffered the type of antitrust injury that the federal laws were meant to punish and prevent.

## CLASS ACTION ALLEGATIONS

141.    Plaintiffs incorporate by reference as if fully set forth herein the allegations contained in the proceeding paragraphs of this Complaint.

142.    Plaintiffs bring this action on behalf of themselves and the members of the class comprising:

> All persons or entities that purchased flexible polyurethane foam directly from Defendants and/or their co-conspirators from January 1, 1999 to the present.  Excluded from the Class are governmental entities, Defendants, their co-conspirators and their officers, employees, agents, representatives, parents, subsidiaries and affiliates.

("Class").

143.    Plaintiffs reserve the right to amend the Class definition prior to certification.

144.    Plaintiffs bring this case as a class action under Rules 23(a), 23(b)(2), and 23 (b)(3) of the Federal Rules of Civil Procedure on behalf of all members of the Class.

145.    Based on the nature of the trade and commerce involved, Plaintiffs believe the Class numbers in the thousands, the exact number and identities being known only by Defendants.

146.    The Class is so numerous and geographically dispersed that joinder of all members is impracticable.

147.    Class members are identifiable from information and records in the possession of Defendants.

148.    There are questions of law and fact common to the Class.  These common questions relate to the existence of the conspiracy alleged, the conduct of the Defendants in agreeing to and participating in the conspiracy, and to the type and common pattern of injury sustained as a result thereof.  The questions include but are not limited to:

a.    Whether Defendants and their co-conspirators engaged in a combination and conspiracy among themselves to fix, raise, maintain, and/or stabilize the price charged for flexible polyurethane foam sold in the United States;

b.    Whether Defendants and their co-conspirators engaged in a combination and conspiracy among themselves to allocate customers for flexible polyurethane foam sold in the United States;

c.    The identity of participants in the conspiracy;

d.    The duration of the conspiracy alleged in this Complaint and the nature and character of the acts performed by Defendants and their co-conspirators in the furtherance of the conspiracy;

e.    Whether the alleged conspiracy violated Section 1 of the Sherman Act;

f.      Whether the conduct of Defendants and their co-conspirators, as alleged in this Complaint, caused injury to the business and property of Plaintiffs and other members of the Class;

g.      The effect of Defendants' conspiracy on the prices of flexible polyurethane foam in the United States during the Class Period; and

h.      The appropriate measure of damages sustained by Plaintiffs and other members of the Class.

149.    Plaintiffs are members of the Class.  Plaintiffs' claims are typical of the claims of other members of the Class, and Plaintiffs will fairly and adequately protect the interests of the members of the Class.  Plaintiffs bought flexible polyurethane foam directly from one or more of Defendants.  Plaintiffs' interests are aligned with, and not antagonistic to, those of the other members of the Class.  In addition, Plaintiffs are represented by competent counsel experienced in the prosecution of class action antitrust litigation.

150.    The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.

151.    The questions of law and fact common to the members of the Class predominate over any questions affecting only individual members, including legal and factual issues relating to liability and damages.

152.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy.  Prosecution as a class action will eliminate the possibility of repetitious litigation.  Treatment as a class action will permit a large number of similarly situated

persons to adjudicate their common claims in a single forum simultaneously, efficiently, and

without the duplication of effort and expense that numerous individual actions would engender.

Class treatment will also permit the adjudication of relatively small claims by members of the

Class that otherwise could not afford to litigate an antitrust claim such as is asserted in this

Complaint.  This class action presents no difficulties of management that would preclude its

maintenance as a class action.

## INTERSTATE TRADE AND COMMERCE

153.    The conduct of Defendants and their co-conspirators has taken place in, and

affected the continuous flow of interstate trade and commerce of the United States, in that, *inter*

*alia*:

a.       Defendants and their co-conspirators have sold flexible polyurethane foam

throughout the United States;

b.       Defendants and their co-conspirators have each used instrumentalities of

interstate commerce to sell flexible polyurethane foam throughout the United States;

c.       In furtherance of the conspiracy alleged herein, Defendants have traveled

between states and have exchanged communications through interstate wire communications and

via U.S. mail; and

d.       The conspiracy alleged herein has affected billions of dollars of

commerce. Defendants and their co-conspirators have inflicted antitrust injury by artificially

raising prices paid by Plaintiffs and other entities who are themselves engaged in commerce.

## CLAIM FOR RELIEF

### For Violation of Section 1 of the Sherman Act and Section 4 of the Clayton Act

154.    Plaintiffs incorporate by reference as if fully set forth herein the allegations contained in the preceding paragraphs of this Complaint.

155.    Beginning at a time presently unknown to Plaintiffs, but at least as early as January 1, 1999 and continuing through the present, Defendants and their co-conspirators entered into a continuing agreement, understanding, and conspiracy in restraint of trade in violations of Section 1 of the Sherman Act, 15 U.S.C. § 1, and Section 4 of the Clayton Act, 15 U.S.C. § 15.

156.    In furtherance of the unlawful conspiracy, each of the Defendants and their co-conspirators has committed overt acts, including, *inter alia*:

    a.      Agreeing to charge prices at certain levels and otherwise to fix, increase, maintain and/or stabilize prices of flexible polyurethane foam sold in the United States;

    b.      Participating in meetings, conversations, and communications with co-conspirators regarding prices to be charged for flexible polyurethane foam;

    c.      Agreeing to allocate customers;

    d.      Meeting with co-conspirators in order to keep the existence of the conspiracy unknown as to foster the illegal anti-competitive conduct described herein; and

    e.      Refraining from competing by refusing to offer flexible polyurethane foam at prices below the agreed-upon price.

157.    The combination and conspiracy alleged herein has had the following effects, among others:

    a.      Price competition in the sale of flexible polyurethane foam has been

47

restrained, suppressed, and/or eliminated;

   b. Prices for flexible polyurethane foam sold by Defendants and their co-conspirators have been fixed, raised, maintained, and stabilized at artificially high, non-competitive levels; and

   c. Plaintiffs and members of the Class have been deprived of the benefits of free and open competition.

  158. Defendants and their co-conspirators engaged in the activities described above for the purpose of effectuating unlawful arrangements to fix, maintain, raise and/or stabilize prices of flexible polyurethane foam.

  159. As a direct and proximate result of Defendants' illegal agreement, contract, combination trust, and/or conspiracy, Plaintiffs and the members of the Class have been injured and damaged in their respective businesses and property in an amount to be determined according to proof and are entitled to recover threefold the damages sustained pursuant to Section 4 of the Clayton Act, 15 U.S.C. § 15.

  160. The conduct of Defendants and their co-conspirators constitutes a *per se* violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

## PETITION FOR RELIEF

WHEREFORE, Plaintiffs petition that:

A.      The Court determine that this action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, that Plaintiffs be appointed class representatives and that Interim Co-Lead Counsel for the Proposed Direct Purchaser Class be appointed as lead counsel for the Class.

B.      The Court adjudge and decree that the acts of the Defendants are illegal and unlawful, including the agreement, contract, combination, or conspiracy, and the acts done in furtherance thereof by Defendants and their co-conspirators be adjudged to have been a *per se* violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, and that Judgment be entered against Defendants, jointly and severally, and in favor of Plaintiffs and members of the Class for treble the amount of damages sustained by Plaintiffs and the Class as allowed by law, together with costs of the action, including reasonable attorneys' fee, pre- and post-judgment interest.

C.      Each of the Defendants, and their respective successors, assigns, parent, subsidiaries, affiliates, and transferees, and their officers, directors, agents, and representatives, and all other persons acting or claiming to act on behalf of Defendants or in concert with them, be permanently enjoined and restrained from, in any manner, directly or indirectly, continuing, maintaining or renewing the combinations, conspiracy, agreement, understanding, or concert of action as alleged herein.

D.      The Court award Plaintiffs and members of the Class such other and further relief as may be necessary and appropriate.

**DEMAND FOR JURY TRIAL**

Pursuant to Rule 38(a) of the Federal Rules of Civil Procedure, Plaintiffs demand a jury

trial as to all issues triable by a jury.

DATED: February 28, 2011

Respectfully Submitted,

/s/ William A. Isaacson
William A. Isaacson
BOIES, SCHILLER & FLEXNER LLP
5301 Wisconsin Avenue, NW
Washington, DC  20015
Phone:  202-237-5607
Fax:     202-237-6131

/s/ Stephen R. Neuwirth
Stephen R. Neuwirth
QUINN EMANUEL URQUHART
  & SULLIVAN, LLP
51 Madison Avenue, 22nd Floor
New York, NY  10010
Phone:  212-849-7165
Fax:     212-849-7100

*Direct Purchaser Plaintiffs' Interim Co-Lead Counsel*

Stanley Bernstein
BERSTEIN LIEBHARD LLP
Bernstein Liebhard LLP
10 East 40th Street, 22nd Floor
New York, NY 10016
Phone: 212-779-1414
Fax:     212-779-3218

Michael Hausfeld
HAUSFELD LLP
1700 K Street, NW Suite 650
Washington, DC 20006
Phone: 202-540-7200
Fax:     202-540-7201

Mindee Reuben
WEINSTEIN KITCHENOFF & ASHER, LLC
1845 Walnut Street, Suite 1100
Philadelphia, PA 19103
Phone: 215-545-7200
Fax:     215-545-6535

Brian Strange
STRANGE & CARPENTER
12100 Wilshire Boulevard, Suite 1900
Los Angeles, CA 90025
Phone: 310-207-5055
Fax:     310-826-3210

Robert Eisler
GRANT & EISENHOFER P.A.
1201 North Market Street
Wilmington, DE 19801
Phone: 302-622-7000
Fax:     302-622-7100

Bernard Persky
LABATON SUCHAROW LLP
140 Broadway
New York, NY 10005
Phone: 212-907-0700
Fax:     212-818-0477

Bruce Simon
PEARSON, SIMON, WARSHAW & PENNY, LLP
44 Montgomery Street, Suite 2450
San Francisco, CA 94104
Phone: 415-433-9000
Fax:     415-433-9008

Stephen Weiss
SEEGER WEISS LLP
One William Street
New York, NY 10004
Phone: 212-584-0700
Fax:     212-584-0799

*Executive Committee for the Direct Purchaser Plaintiffs*