UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| IN RE: POLYURETHANE FOAM  ANTITRUST LITIGATION | ) ) ) | No. 10 MD 2196-JZ |
| THIS DOCUMENT RELATES TO: INDIRECT PURCHASER ACTIONS | ) ) | Hon. Jack Zouhary |
| Vicky's Furniture, Inc. v. Hickory Springs Manufacturing Co., et.al., 1:10-pf-10007-JZ  and Gomez v. Hickory Springs Manufacturing Co., et al., 1:11 cv 00166, and Johs v. Hickory Springs Manufacturing Co., | ) ) ) ) ) | JURY TRIAL DEMANDED |

## INDIRECT PURCHASER PLAINTIFFS' CONSOLIDATED AMENDED COMPLAINT

Indirect Purchaser Plaintiffs, Greg  Beastrom,  Marjean Coddon, Susan Gomez , Joseph Jasinski, Henry Johs,  Joseph Lord,  Kirsten Luenz, Kory Pentland, Jonathan Rizzo,  Catherine Wilkinson, Jeffrey S. Williams and The Parker Company as authorized agent for the following: Met 2 Hotel, LLC ("Indirect Purchaser Plaintiffs"), individually and on behalf of a class of all those similarly situated, bring this action to recover damages and to obtain injunctive relief for violations of antitrust and consumer protection laws and for unjust enrichment against Defendants The Carpenter Company, Crest Foam Industries, Inc., Domfoam International, Inc., Flexible Foam Products, Inc., FXI-Foamex Innovations, Inc., Future Foam, Inc., Hickory Springs Manufacturing Company, Inoac International Co., Ltd.,  Inoac USA, Inc., Mohawk Industries, Inc., Ohio Decorative Products, Inc., Otto Bock Polyurethane Technologies, Inc., Plastomer Corporation, Scottdel Inc., Leggett & Platt Inc., Valle Foam Industries, Inc., Vitafoam Products Canada Limited,  Vitafoam Inc., Woodbridge Foam Corporation, Woodbridge Sales & Engineering, Inc., Woodbridge Foam Fabricating, Inc., Louis Carson and David Carson ("Defendants"), which are or were operating in the market known as polyurethane foam in the United States between at least 1999 and the present.  Except as to those allegations about

1

themselves and their transactions, Indirect Purchaser Plaintiffs make the allegations below upon information and belief and upon the investigation of counsel.

## NATURE OF THE ACTION

1.      This case arises out of a long-standing (national and international) price-fixing conspiracy among Defendants and their co-conspirators that had the purpose and effect of fixing prices of flexible polyurethane foam and flexible polyurethane foam products (collectively, "flexible polyurethane foam").  As used herein, flexible polyurethane foam refers to slabstock polyurethane foam, which was the focus of the conspiracy alleged herein. Flexible polyurethane foam is a commodity widely used for cushioning and insulation in a variety of goods, including but not limited to furniture, bedding, packaging, flooring and motor vehicles.

2.      This lawsuit is brought as a class action on behalf of all entities and persons, exclusive of Defendants and their co-conspirators (and their respective officers, employees, agents, representatives, parent companies, subsidiaries and affiliates), that or who purchased flexible polyurethane foam indirectly from one of more of the Defendants during the period January 1, 1999 through the present ("the "Class Period").

3.      During the Class Period, Defendants and their co-conspirators contracted, combined, or conspired to fix, raise, maintain, and/or stabilize prices and allocate customers for flexible polyurethane foam in the United States, by the means and mechanisms described herein. As set forth in detail below, Defendants' executives and employees engaged in specific and detailed communications between and among each other to fix prices and allocate customers.

4.      During the Class Period, each Plaintiff purchased product(s) containing flexible polyurethane foam which was supplied by one or more of the Defendants or their co-conspirators.  As a direct and proximate result of the unlawful conduct and price-fixing conspiracy of Defendants alleged herein, Plaintiffs and the other members of the Class (defined

in ¶ 153 below) have paid more during the Class Period for flexible polyurethane foam than they otherwise would have paid in a competitive market and have therefore been injured in their respective businesses and property.

5.     Plaintiffs bring this class action lawsuit to recover damages suffered by the Class and the costs of suit, including reasonable attorneys' fees, and for such other relief as is afforded under the antitrust and consumer protection laws and unjust enrichment claims of the relevant jurisdictions in the United States.

6.     Plaintiffs also bring this lawsuit as a class action pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, to enjoin Defendants' anticompetitive conduct and for costs of suit, including reasonable attorneys' fees, and for such other relief as is afforded under the antitrust laws of the United States.

## PLAINTIFFS

7.     Greg Beastrom is a California resident.  During the Class Period he purchased, not for resale, mattresses and pad that contain flexible polyurethane foam which was supplied by one or more of the Defendants and suffered injury as a result of Defendants' unlawful conduct. The prices Greg Beastrom paid for the products containing flexible polyurethane foam were greater than the prices he would have paid in the absence of Defendants' unlawful conduct alleged herein.  He has therefore been injured by reason of Defendants' antitrust and consumer protection law violations.  Beastrom brings this lawsuit as a class action on behalf of himself and all indirect purchasers who, during the Class Period, purchased products containing flexible polyurethane foam manufactured and/or distributed by one or more of the Defendants which resulted in injury.

8.     Marjean Coddon is a Tennessee resident.  During the class period she purchased,

not for resale, a sofa that contains flexible polyurethane foam which was supplied by one or more of the Defendants and suffered injury as a result of Defendants' unlawful conduct.   The price Marjean Coddon paid for the product containing flexible polyurethane foam was greater than the price she would have paid in the absence of Defendants' unlawful conduct alleged herein.  She has therefore been injured by reason of Defendants' antitrust and consumer protection law violations.  Coddon brings this lawsuit as a class action on behalf of herself and all indirect purchasers who, during the Class Period, purchased products containing flexible polyurethane foam manufactured and/or distributed by one or more of the Defendants which resulted in injury.

9.      Susan Gomez is a Wisconsin resident.  During the Class Period, Susan Gomez purchased, not for resale, a mattress that contains flexible polyurethane foam which was supplied by one or more of the Defendants and suffered injury as a result of Defendants' unlawful conduct.  The price Susan Gomez paid for the product containing flexible polyurethane foam was greater than the price she would have paid in the absence of Defendants' unlawful conduct alleged herein.  Susan Gomez has therefore been injured by reason of Defendants' antitrust and consumer protection law violations.  Gomez brings this lawsuit as a class action on behalf of herself and all indirect purchasers who, during the Class Period, purchased products containing flexible polyurethane foam manufactured and/or distributed by one or more of the Defendants which resulted in injury.

10.      Joseph Jasinski is a Wisconsin resident.  During the Class Period, he purchased, not for resale, carpet padding made of flexible polyurethane foam which was supplied by one or more of the Defendants and suffered injury as a result of Defendants' unlawful conduct.  The price Joseph Jasinski paid for the product containing flexible polyurethane

foam was greater than the price he would have paid in the absence of Defendants' unlawful conduct alleged herein.  He has therefore been injured by reason of Defendants' antitrust and consumer protection law violations.  Jasinski brings this lawsuit as a class action on behalf of himself and all indirect purchasers who, during the Class Period, purchased products containing flexible polyurethane foam manufactured and/or distributed by one or more of the Defendants which resulted in injury.

11.     Henry Johs is a Tennessee resident.  During the Class Period, he purchased, not for resale, mattresses that contain flexible polyurethane foam which were supplied by one or more of the Defendants and suffered injury as a result of Defendants' unlawful conduct.  The prices Henry Johs paid for the products containing polyurethane foam were greater than the prices he would have paid in the absence of Defendants' unlawful conduct alleged herein.  Henry Johs has therefore been injured by reason of Defendants' antitrust and consumer protection law violations.  Johs brings this lawsuit as a class action on behalf of himself and all indirect purchasers who, during the Class Period, purchased products containing flexible polyurethane foam manufactured and/or distributed by one or more of the Defendants which resulted in injury.

12.     Joseph Lord is an Arizona resident.  During the Class Period, he purchased, not for resale, a mattress that contains flexible polyurethane foam which was supplied by one or more of the Defendants and suffered injury as a result of Defendants' unlawful conduct.  The price Joseph Lord paid for the product containing flexible polyurethane foam was greater than the price he would have paid in the absence of Defendants' unlawful conduct alleged herein.  Joseph Lord has therefore been injured by reason of Defendants' antitrust and consumer protection law violations.  Lord brings this lawsuit as a class action on behalf of

himself and all indirect purchasers who, during the Class Period, purchased products containing flexible polyurethane foam manufactured and/or distributed by one or more of the Defendants which resulted in injury.

13.     Kirsten Luenz is a Kansas resident.  During the Class Period, she purchased, not for resale, two mattresses that contain flexible polyurethane foam which was supplied by one or more of the Defendants and carpet padding that was made of flexible polyurethane foam from a vendor who purchased the flexible polyurethane foam from Defendant Carpenter Co. and suffered injury as a result of Defendants' unlawful conduct. The prices Kirsten Luenz paid for the products containing flexible polyurethane foam was greater than the prices she would have paid in the absence of Defendants' unlawful conduct alleged herein.  Kirsten Luenz has therefore been injured by reason of Defendants' antitrust and consumer protection law violations.  Luenz brings this lawsuit as a class action on behalf of herself and all indirect purchasers who, during the Class Period, purchased products containing flexible polyurethane foam manufactured and/or distributed by one or more of the Defendants which resulted in injury.

14.     Gerald and Kathleen Nolan are Massachusetts residents.  During the Class Period, they purchased, not for resale, a pillow that contains flexible polyurethane foam which was supplied by one or more of the Defendants and suffered injury as a result of Defendants' unlawful conduct.  The price Gerald and Kathleen Nolan paid for the product containing flexible polyurethane foam was greater than the prices they would have paid in the absence of Defendants' unlawful conduct alleged herein.  Gerald and Kathleen Nolan have therefore been injured by reason of Defendants' antitrust and consumer protection law violations.  The Nolans brings this lawsuit as a class action on behalf of themselves and all

indirect purchasers who, during the Class Period, purchased products containing flexible polyurethane foam manufactured and/or distributed by one or more of the Defendants which resulted in injury.

15.    Kory Pentland is a Michigan resident.  During the Class Period, he purchased, not for resale, two sofas that contain flexible polyurethane foam which was supplied by one or more of the Defendants and suffered injury as a result of Defendants' unlawful conduct.  The prices Kory Pentland paid for the products containing flexible polyurethane foam were greater than the prices he would have paid in the absence of Defendants' unlawful conduct alleged herein.  Kory Pentland has therefore been injured by reason of Defendants' antitrust and consumer protection law violations.  Pentland brings this lawsuit as a class action on behalf of himself and all indirect purchasers who, during the Class Period, purchased products containing flexible polyurethane foam manufactured and/or distributed by one or more of the Defendants which resulted in injury.

16.    Jonathan Rizzo is an Arizona resident.  During the Class Period, he purchased, not for resale, a pillowtop mattress that contains flexible polyurethane foam which was supplied by one or more of the Defendants and suffered injury as a result of Defendants' unlawful conduct.  The price Jonathan Rizzo paid for the product containing flexible polyurethane foam was greater than the price he would have paid in the absence of Defendants' unlawful conduct alleged herein.  Jonathan Rizzo has therefore been injured by reason of Defendants' antitrust and consumer protection law violations.  Rizzo brings this lawsuit as a class action on behalf of himself and all indirect purchasers who, during the Class Period, purchased products containing flexible polyurethane foam manufactured and/or distributed by one or more of the Defendants which resulted in injury.

17.     Catherine Wilkinson is a California resident.  During the Class Period, she purchased, not for resale, a mattress that contains flexible polyurethane foam which was supplied by one or more of the Defendants and suffered injury as a result of Defendants' unlawful conduct.  The price Catherine Wilkinson paid for the product that contains flexible polyurethane foam was greater than the price she would have paid in the absence of Defendants' unlawful conduct alleged herein.  Catherine Wilkinson has therefore been injured by reason of Defendants' antitrust and consumer protection law violations.  Wilkinson brings this lawsuit as a class action on behalf of herself and all indirect purchasers who, during the Class Period, purchased products containing flexible polyurethane foam manufactured and/or distributed by one or more of the Defendants which resulted in injury.

18.     Jeffrey S. Williams is a North Carolina resident.  During the Class Period, he purchased, not for resale, a mattress that contains flexible polyurethane foam which was supplied by one or more of the Defendants and suffered injury as a result of Defendants' unlawful conduct.  The price Jeffrey S. Williams paid for the product that contains flexible polyurethane foam was greater than the price he would have paid in the absence of Defendants' unlawful conduct alleged herein.  Jeffrey S. Williams has therefore been injured by reason of Defendants' antitrust and consumer protection law violations.  Williams brings this lawsuit as a class action on behalf of himself and all indirect purchasers who, during the Class Period, purchased products containing flexible polyurethane foam manufactured and/or distributed by one or more of the Defendants which resulted in injury.

19.     The Parker Company, LLC, d/b/a The Parker Company ("Parker Company") is a Florida corporation with its principal place of business in Miami, FL. The Parker Company is the authorized purchasing agent for Met 2 Hotel, LLC, the owner/operator of the JW Marriott Marquis

in Miami, Florida. During the Class Period, the Parker Company was engaged by Met 2 Hotel,

LLC to purchase products containing polyurethane foam (such as mattresses, lobby or pool

furniture, or carpet padding for example) for use in the JW Marriott Marquis.  The Parker

Company coordinated these purchases of, and payments for, products containing polyurethane

foam, and the Parker Company maintains the records of those purchases. In purchasing products

containing polyurethane foam on behalf of Met 2 Hotel, LLC, the Parker Company did not mark

up the cost of the product; rather, the Parker Company is paid a flat, agreed-upon fee by Met 2

Hotel, LLC for the purchasing and other services it provided -- which included locating the

appropriate sellers based on the particulars of the order and the type of products desired by the

hotel, negotiating the purchase price, establishing timeframes for completion and delivery, and

arranging for storage, shipment and final delivery of the products to the hotel.

     20.     During the Class Period, Met 2 Hotel, LLC (through The Parker Company)

purchased, not for resale, products containing flexible polyurethane foam which was

supplied by one or more of the Defendants and suffered injury as a result of Defendants'

unlawful conduct.  The prices Met 2 Hotel, LLC paid for the products that contain flexible

polyurethane foam were greater than the prices it would have paid in the absence of

Defendants' unlawful conduct alleged herein.  Met 2 Hotel, LLC has therefore been injured by

reason of Defendants' antitrust and consumer protection law violations.  The Parker Company

brings this lawsuit on behalf of Met 2 Hotel, LLC and as a class action on behalf of  all indirect

purchasers who, during the Class Period, purchased products containing flexible

polyurethane foam manufactured and/or distributed by one or more of the Defendants which

resulted in injury.

## DEFENDANTS

21.     The Carpenter Company ("Carpenter U.S.") is a privately owned and operated company with its principal place of business at 5016 Monument Avenue, Richmond, Virginia 23230.  Carpenter operates at least 15 facilities in the United States that manufacture and distribute flexible polyurethane foam for bedding, including flexible polyurethane foam cushioning, foam mattresses, and fibers; carpet cushion products; and flexible foam packaging. During the Class Period, Carpenter sold flexible polyurethane foam throughout the United States.

22.     Carpenter is the world's largest producer of flexible polyurethane foam products for cushioning.  It has divisions in the following areas, among others: bedding, carpet cushion, consumer products, and flexible foam packaging furniture.

23.     Domfoam International, Inc. ("Domfoam") is a subsidiary of Valle Foam Industries, with its principal place of business at 8785 Langelier Blvd., Montreal, Quebec, H1P 2C, Canada.  During the Class Period Domfoam sold polyurethane foam throughout the United States.  Domfoam manufactures flexible polyurethane foam primarily for the following purposes:  mattresses, sponge foam blocks, carpet cushion, pillows, bolsters, convolute, furniture foam, toppers, antistatic foam, antimicrobial foam, visco-elastic foam, camping foam, and sporting goods.

24.     Valle Foam Industries (1995), Inc. ("Valle") is a privately owned and operated corporation with its principal place of business at 4 West Dr., Brampton, Ontario, L6T 2H7, Canada.  Valle manufactures flexible polyurethane foam for, *inter alia*, the furniture, bedding, packaging, and carpet industries.  During the Class Period, Valle and/or its affiliates it controlled or sold flexible polyurethane foam throughout the United States.

25.     Valle participated in the conspiracy through the actions of its respective officers,

employees, and representatives acting with actual or apparent authority.  Further, Valle

benefited from the conspiracy by receiving greater profits than it would have received had the

conspiracy not existed.

26.     Flexible Foam Products, Inc. ("Flexible Foam Products") is a privately owned and

operated Ohio company with its principal place of business at 12575 Bailey Road, Spencerville,

Ohio 45887 and operations in Texas, Indiana, Florida and Wisconsin.  Flexible Foam Products is a

subsidiary of Ohio Decorative Products, Inc., also of Spencerville, Ohio.  Flexible Foam Products

manufactures flexible polyurethane foam and rebond products serving customers in the bedding,

flooring, furniture, packaging, and transportation industries.  During the Class Period, Flexible

Foam Products sold flexible polyurethane foam throughout the United States.

27.     Ohio Decorative Products, Inc. ("Ohio Decorative," collectively with Flexible

Foam Products) is a private corporation with its principal place of business at 220 S. Elizabeth

Street, Spencerville, Ohio 45887.  Ohio Decorative is the parent company of Flexible Foam

Products.  During the Class Period, Ohio Decorative and/or affiliates it controlled sold flexible

polyurethane foam throughout the United States.

28.     Ohio Decorative participated in the conspiracy through the actions of its

respective officers, employees, and representatives acting with actual or apparent authority.

Further, Ohio Decorative benefited from the conspiracy by receiving greater profits than it

would have received had the conspiracy not existed.  Ohio Decorative Products also was a

member of the conspiracy by virtue of its status during the Class Period as the alter ego or

agent of Flexible Foam Products.  Ohio Decorative dominated or controlled Flexible Foam

Products regarding conspiracy activities and used that domination or control to charge

artificially high prices for flexible polyurethane foam.

29.     FXI- Foamex Innovations, Inc., (f/k/a Foamex International, Inc. ("Foamex")), is a privately owned and operated company with its principal place of business at Rose Tree Corporate Center II, 1400 N. Providence Road, Suite 2000, Media, Pennsylvania 19063-2076. During the Class Period, Foamex sold flexible polyurethane foam throughout the United States.

30.     Foamex provides flexible polyurethane foam for the home, healthcare, electronics, industrial, personal care and transportation markets.  Its flexible polyurethane foam is used in automotive cushioning, shipping packages, furniture and beds.  Foamex also provides components for filters, dispensers, gaskets, and seals for products ranging from blood oxygenators to computer disk drives.

31.     Future Foam, Inc. ("Future Foam") is a privately owned and operated company with its principal place of business at 1610 Avenue N, Council Bluffs, Iowa 51501. Future Foam produces flexible polyurethane foam products for the bedding, flooring, furniture, and packaging industries.  During the Class Period, Foamex sold flexible polyurethane foam throughout the United States.

32.     Hickory Springs Manufacturing Company ("Hickory Springs") is a North Carolina corporation with its principal place of business located at 235 2nd Avenue, NW, Hickory, North Carolina 28601.  During the Class Period, Hickory Springs sold flexible polyurethane foam throughout the United States.

33.     Hickory Springs is one of the nation's largest integrated components manufacturers and suppliers for the furniture and bedding industries, with more than 60 operating facilities in the United States and throughout the world. The furniture industry is the largest segment of Hickory Springs' customer base. With more than 160 flexible polyurethane foam formulations, Hickory Springs is one of the largest producers of flexible polyurethane foam

in the United States.

34. Inoac International Co., Ltd. ("Inoac International") is a Japanese company with its principal place of business at 450-0003 2-13-4 Meieki-Minami, Nakamura-ku, Nagoya, Japan. Inoac International is a subsidiary of Inoac Corp., and part of Inoac's domestic Japanese network engaged in production and sales of flexible polyurethane foam. During the Class Period, Inoac International and/or affiliates it controlled sold flexible polyurethane foam throughout the United States.

35. Inoac USA, Inc. ("Inoac USA") is a private corporation with its principal place of business at 901 ½ Nutter Drive, Bardstown, Kentucky 40004. Inoac USA is the parent company of Defendant Crest Foam Industries Inc. Inoac USA itself is a subsidiary of Inoac Corp., and part of Inoac's overseas network engaged in foam products fabrication sales. During the Class Period, Inoac USA and/or affiliates it controlled sold flexible polyurethane foam throughout the United States.

36. Inoac Corporation ("Inoac Corp." and collectively with International and Inoac USA, "Inoac") is a Japanese corporation with its principal place of business located at 450-0003 2-13-4 Meieki Minami, Nakamura-ku, Nagoya, Aichi, Japan. Inoac Corp. makes flexible polyurethane foam for, *inter alia*, furniture, bedding, and cushions. During the Class Period, Inoac Corp. and/or affiliates it controlled sold flexible polyurethane foam throughout the United States.

37. Inoac Corp. participated in the conspiracy through the actions of its respective officers, employees, and representatives acting with actual or apparent authority. Further, Inoac Corp. benefited from the conspiracy by receiving greater profits than it would have received had the conspiracy not existed. Inoac Corp. also was a member of the conspiracy by

virtue of its status during the Class Period as the alter ego or agent of Inoac USA and Inoac

International.  Inoac Corp. dominated or controlled Inoac USA and Inoac International

regarding conspiracy activities and used that domination or control to charge artificially high

prices for flexible polyurethane foam.

38.     Crest Foam Industries, Inc. ("Crest") is a Delaware Corporation with its

principal place of business at 100 Carol Place, Moonachie, New Jersey 07074.  Crest, a wholly-

owned subsidiary of Inoac USA, was formerly a joint venture between Vitafoam and Inoac

Corp. in which Vitafoam had majority control of Crest.  Executives of Vitafoam acted as agents

for Crest in the conspiracy described in this Complaint.  During the Class Period, Crest and/or

affiliates it controlled sold flexible polyurethane foam throughout the United States.

39.     Leggett & Platt Inc. ("Leggett") is a Missouri corporation with its principal

place of business at 1 Leggett Road, Carthage, Missouri 64836.  Leggett manufactures, *inter

alia*, flexible polyurethane foam and other components for the bedding and furniture industries.

During the Class Period, Leggett and/or affiliates it controlled sold flexible polyurethane foam

throughout the United States.

40.     Mohawk Industries Inc. ("Mohawk") is a Delaware corporation with its

principal place of business located at 160 S. Industrial Boulevard, Calhoun, Georgia 30701.

Mohawk manufactures, inter alia, flexible polyurethane foam and other components for the

flooring industry.  During the Class Period, Mohawk and/or affiliates it controlled sold

polyurethane foam throughout the United States.

41.     Defendant Otto Bock Polyurethane Technologies, Inc. ("Otto Bock") is a private

company with its principal place of business at 3 Penn Center West, Suite 406, Pittsburgh,

Pennsylvania 15205. Otto Bock is a subsidiary of Otto Bock Holding GmbH & Co. KG, a

German company with its principal place of business at Max-Naeder-Street 15, 37115 Duderstadt, Germany. During the Class Period, Otto Bock and/or affiliates it controlled sold flexible polyurethane foam throughout the United States.

42. Defendant Plastomer Corporation ("Plastomer") is a private company with its principal place of business at 37819 Schoolcraft Road, Livonia, Michigan 48150. Plastomer, which describes itself as "the recognized Pioneer in Flexible Foam products for manufacturing industries in North America and the World," produces and sells flexible polyurethane foam primarily for the transportation industry. During the Class Period, Plastomer and/or affiliates it controlled sold flexible polyurethane foam throughout the United States.

43. Scottdel Inc. ("Scottdel") is a privately held corporation with its headquarters located at 400 Church Street, Swanton, Ohio 43558. Scottdel was recently placed in to receivership in the action *Fifth Third Bank v. Scottdel, Inc., et.al.*, Case No. 10-CV-000293 (Ct. Common Pleas, Fulton Cty., Ohio). Scottdel began manufacturing bonded urethane carpet cushion in 1961 and the company manufactures a complete line of commercial and residential bonded urethane cushions ranging in density from 3.5 pounds to 10 pounds per cubic foot." During the Class Period, Scottdel and/or affiliates it controlled sold flexible polyurethane foam throughout the United States.

44. Vitafoam Products Canada Limited ("Vitafoam Canada") is a privately owned and operated company with its headquarters located at 150 Toro Road, North York, Ontario M3J 2A9, Canada. Vitafoam Canada manufactures flexible polyurethane foam for use in furniture, bedding and automotive applications, including packaging, medical, industrial and a full range of memory foams. It also produces latex mattresses and toppers. During the Class Period, Vitafoam Canada and/or affiliates it controlled sold flexible polyurethane foam

throughout the United States.

45.     Vitafoam Inc. ("Vitafoam Inc.," collectively with Vitafoam Canada, "Vitafoam") is a privately owned and operated company with its headquarters located a 2215 Shore Drive, High Point, North Carolina 27263. During the Class Period, Vitafoam Inc. and/or affiliates it controlled sold flexible polyurethane foam throughout the United States.

46.     Vitafoam, Inc. offers, among other things, flexible polyurethane foam products for the packaging, furniture, and upholstery industries; flexible polyurethane foam for fabric producers, laminators, trim companies, and original equipment manufacturers in the automotive industry; and flexible polyurethane foam for the residential and commercial sectors.

47.     Woodbridge Foam Corporation ("Woodbridge Foam") is a Canadian corporation with its headquarters at 4240 Sherwoodtowne Blvd., Mississauga, Ontario, L4Z 2G6, Canada. Woodbridge Foam has a global partnership with Inoac Corp. called the "World Polyurethane Alliance." During the Class Period, Woodbridge Foam and/or affiliates it controlled sold flexible polyurethane foam throughout the United States.

48.     Woodbridge Sales & Engineering, Inc. ("Woodbridge S&E") is a Michigan corporation with its principal place of business at 1515 Equity Drive, Troy, Michigan 48084. During the Class Period, Woodbridge S&E and/or affiliates it controlled sold flexible polyurethane foam throughout the United States.

49.     Woodbridge Foam Fabricating, Inc. ("WFFI," collectively with Woodbridge Foam and Woodbridge S&E, "Woodbridge") is a private company with its principal place of business at 1120 Judd Road, Chattanooga, Tennessee 37406. WFFI is a joint venture between Woodbridge Group and Inoac Corp.  During the Class Period, WFFI and/or affiliates it controlled sold flexible polyurethane foam throughout the United States.

50.     Woodbridge's primary focus is supplying flexible polyurethane foam for automotive components, but Woodbridge also supplies flexible polyurethane foam for commercial and recreational transportation, building products, construction, packaging, and several consumer and industrial products.

**Individual Defendants**

51.     Louis Carson is a United States citizen and a resident of Swanton, Ohio.  Louis Carson was the President of Scottdel whose responsibilities included, *inter alia*, setting prices for Scottdel's products throughout the United States.  During the Class Period, Louis Carson directed Scottdel and/or affiliates it controlled to sell flexible polyurethane foam throughout the United States.

52.     David Carson is a United States citizen and resident of Swanton, Ohio.  David Carson was the Vice President, Manufacturing of Scottdel whose responsibilities included, *inter alia*, setting prices for Scottdel's products throughout the United States.  During the Class Period, David Carson directed Scottdel and/or affiliates it controlled to sell flexible polyurethane foam throughout the United States.

## AGENTS AND CO-CONSPIRATORS

53.     The acts alleged against the Defendants in this Complaint were authorized, ordered, or done by their officers, agents, employees, or representatives, while actively engaged in the management and operation of Defendants' businesses or affairs.

54.     Various persons, corporations, and entities not named as defendants herein -- including at least A-Z Sponge & Foam Products Ltd. (also known as A to Z Foam), Broadway Foam & Fabric Supplies Ltd. (also known as Broadway Foam), and CMI Enterprises (also

known as CMI Automotive) --may have participated as co-conspirators in the violations alleged

herein and may have performed acts and made statements in furtherance thereof.

55.     Each Defendant acted as the principal, agent, or joint venturer of, or for, other

Defendants with respect to the acts, violations, and common course of conduct alleged by

Plaintiffs.

## UNNAMED COCONSPIRATORS

56.     Other entities with which the Defendants may have possibly conspired or who are

connected with the named Defendants and who are on notice and have knowledge of the facts

and claims that can or may be alleged against them by virtue of the allegations in the Direct

Purchaser Plaintiffs' Consolidated Amended Complaint filed in this Multidistrict Litigation, the

investigations of the United States Department of Justice, the Competition Committee of Canada

and the United Kingdom and the European Union, include, but are not limited to E.R. Carpenter,

L.P. (f/k/a Carpenter Chemical, L.P.)("E.R. Carpenter"), a Virginia limited partnership with its

principal place of business at 5016 Monument Avenue, Richmond, Virginia 23230, Carpenter

Holdings, Inc. ("Carpenter Holdings," collectively with Carpenter U.S. and E.R. Carpenter,

"Carpenter"), a Virginia corporation with its principal place of business at Monument Avenue,

Richmond, Virginia, 23230, and Recticel NV/SA, a Belgium-based company that specializes in

the production of flexible polyurethane foam products.  Upon further investigation and discovery

in this case, Plaintiffs may add those entities, and others, as named Defendants to the action.

## JURISDICTION AND VENUE

57.     Plaintiffs bring this action to obtain injunctive relief arising from Defendants'

violations of Section 16 of the Clayton Act (15 U.S.C. § 26) to obtain injunctive relief for violations

of Section 1 of the Sherman Act (15 U.S.C. § 1), as there is no indication that aside from the

leniency Defendant discussed below, none of the other Defendants has taken any affirmative action to terminate is participation in the price-fixing conspiracy for polyurethane foam. under the particular state antitrust and consumer protection statutes alleged herein, as well as under the common law of unjust enrichment of the particular states alleged herein. Plaintiffs also seek to recover the costs of suit, including reasonable attorneys' fees, and to seek such other relief as is afforded under the antitrust laws of the United States or under the state laws asserted herein.  The Court has jurisdiction over the federal claim under 28 U.S.C. §§ 1331 and 1337.  The Court has supplemental jurisdiction over the state law claims under 28 U.S.C. § 1367 because those claims are so related to the federal claim that they form part of the same case or controversy.  The Court also has jurisdiction over the state law claims under 28 U.S.C. §1332 because the amount in controversy for the Class exceeds $5,000,000, and there are members of the Class who are citizens of a different state than the Defendants.

58.     Venue is proper in this District pursuant to 15 U.S.C. § 22 and 28 U.S.C. § 1391(b), (c) and (d), because at all times relevant to the Complaint, Defendants resided, transacted business, were or are found, or acted through subsidiaries or agents present in this District.

59.     Additionally, a substantial part of the interstate trade and commerce involved and affected by the alleged violations of the antitrust laws was and is carried on in part within this District. The acts complaint of have had, and will have, substantial anti-competitive effects within this District.

60.     This Court has *in personam* jurisdiction over each of the Defendants because, *inter alia*, each of the Defendants through their activities and acts in furtherance of their conspiracy: (a) committed acts in this District and/or participated in the unlawful conspiracy

through persons and entities located in this District, including the fixing prices of flexible

polyurethane foam sold to purchasers in this District; (b) transacted business in flexible

polyurethane foam and other products in this District; (c) maintained continuous and systemic

contacts with this District prior to and during the Class Period; (d) purposefully availed itself of the

benefits of doing business in this District.  This Court also has jurisdiction over each of the

Defendants as the MDL court to which all similar actions have been assigned by the Judicial

Panel for Multidistrict Litigation.  Accordingly, each of the Defendants maintains minimum

contacts with this district more than sufficient to subject it to service of process and sufficient to

comply with due process of law.

## FACTUAL ALLEGATIONS

### The Polyurethane Foam Market

61.     Flexible polyurethane foam is widely used for its qualities: it is light weight,

resilient, quiet, low odor and resistant to mildew and other triggers of common allergies.  Flexible

polyurethane foam may also be cut.  For example, in 2008, over 590,000 metric tons of slabstock

flexible polyurethane foam were produced in the U.S.

62.     Flexible polyurethane foam is widely used for cushioning, to insulate objects or

reduce shock.  Specifically, flexible polyurethane foams are used in bedding, packaging, seat

cushioning, carpet cushioning, shipping pads and cushioning, car interiors, fluid filtration

systems, anti-noise and vibration systems in aircraft, medical devices, and in a number of

consumer applications.

63.     Flexible polyurethane foam is most often used in bedding and upholstery,

while the more rigid variety is used for products, thermal insulation and in automobile

dashboards.  The four classes of flexible polyurethane foam, all with different physical

properties, are created by varying a basic addition polymerization reaction involving a diol or polyol, a diioscyanate, and water.

64.     The diisocyanate reacts with the diol or polyol to create the urethane polymer. Water reacts with some of the isocyanate groups to produce carbon dioxide gas, and the bubbles get trapped in the viscous liquid as it polymerizes, expands, and solidifies. Catalysts and surfactants can be added to boost the reactions and control the foaming process. A wide range of other additives, including stabilizers, dyes, fire retardants, and fungicides, may be added to meet specific performance demands. Auxiliary blowing agents, such as hydrofluorcarbons, liquid carbon dioxide, and acetone, are also typically used to prepare the foam. Ultimately, the kinds and amounts of raw materials used in the manufacturing process help determine how the final product performs.

65.     To manufacture foam for cushioning, two basic procedures are used. In one, the chemical mix is poured onto a moving conveyor, where it is allowed to react and expand. Sides on the conveyor allow the foam to rise into a "bun" or slab anywhere from two to four feet high. The continuous slap is then cut, stored, and allowed to cure for up to 24 hours. This manufacturing procedure is the "slabstock" production process. The cured foam is subsequently fabricated into useful shapes. Most foam for use in furniture and bedding is produced this way.

66.     Although the final revenue figures are not yet available for 2010, domestic revenue for polyurethane foam industry for that year was projected to be approximately $12 billion. Throughout the Class Period, flexible polyurethane foam averaged 39.5% of the total output of polyurethane foam in the United States. In 2008, for instance, furniture and bedding accounted for approximately 43% of U.S. consumption of flexible polyurethane foam in metric tons; transportation products accounted for approximately 17.5% of U.S.

consumption of flexible polyurethane foam in metric tons; flooring products accounted for approximately 33.4% of U.S. consumption in metric tons of flexible polyurethane foam; and flexible polyurethane foam for other end uses –including but not limited to packaging and textiles—accounted for approximately 6.1% of U.S. consumption of flexible polyurethane foam in metric tons.

67.    Flexible foams have mainly open cells, formed by gas bubbles that have popped. Air can pass through the foam easily, resulting in a soft, resilient, flexible material. In rigid foams, most of the cells stay closed. The material is thus harder and less resilient. Controlling the proportion of open cells to closed cells during the production process is one of the ways that the properties of foam can be manipulated, adding to the material's versatility.

68.    There are few acceptable alternatives for flexible polyurethane foam.  In furniture and bedding applications, short staple polyester fiber or cotton may be used, but both alternative materials have poor height recovery characteristics after compression.  Steel springs also recover well, but must be insulated from the user with some type of cushioning material. According to the Polyurethane Foam Association, a trade association in which the non-individual Defendants are members, "comparing [polyurethane foam] to alternative materials in the areas of economics, comfort potential, ease of use, and durability, there is not an acceptable substitute for polyurethane foam."

69.    There has been a recent trend towards consolidation within the industry.  Major players within the industry have been active in acquiring smaller companies and other competitors over the course of the last ten years.  For example, in 2007, Defendant Carpenter acquired its European competitor, Dumo NV. Carpenter owns approximately 16.3% of the market share in this industry.

70.     After its parent corporation was acquired in 2006, Vitafoam, Inc. sold one plant to Olympics Product, LLC, a joint venture between Woodridge and Hickory Springs.  It sold another plant to Flexible Foam Products.

71.     Defendants alleged here to be participants in the conspiracy are most of the major North American polyurethane foam producers, representing a significant portion of the United States market.  There are virtually no imports of products in this industry due to the prohibitive freight costs involved in transporting these bulky, low unit priced products over long distances.

**The Conspiracy To Fix Prices For Polyurethane Foam**

**A.          Evidence Of The Conspiracy To Fix Flexible Polyurethane Foam Prices**

**1)  Defendant Vitafoam Admits To The Conspiracy**

72.     In February 2010, Vitafoam voluntarily approached the U.S. Department of Justice's ("DOJ"), Antitrust Division, to self-report evidence of illegal antitrust activities amongst itself and other companies and individuals in the industry ("competitors") and to seek acceptance into the Antitrust Division's Corporate Leniency Program.  Since that time, Vitafoam and its employees have been cooperating with a criminal investigation into illegal anticompetitive conduct in the flexible polyurethane foam market.

73.     As a result of its application, Vitafoam has received a conditional leniency letter from the DOJ, which means that Vitafoam admitted to its participation in a conspiracy to violate the U.S. antitrust laws. As a November 19, 2008 presentation available on the DOJ's website at: http://www.usdoj.gov/atr/public/criminal/239583.pdf) explains, "[a conditional leniency] applicant must admit its participation in a criminal antitrust violation involving price fixing…before it will receive a conditional leniency letter."

74.     In seeking conditional leniency with the DOJ and in connection with a pending

Canadian government investigation of antitrust violations by manufacturers of flexible

polyurethane foam, several current and former Vitafoam employees agreed to be interviewed

regarding the flexible polyurethane foam price fixing conspiracy.  These interviews revealed the

mechanisms, participants, duration, and impact of the conspiracy.  These employees described a

cartel among Defendants, who are responsible for production of the majority of flexible

polyurethane foam, and other co-conspirators.

> **2)  *Vitafoam employees explain how Defendants conspired to fix
>       prices and allocate customers***

75.     Defendants established a practice where they would communicate and reach an

agreement or understanding on the percentage amount and timing of price increases and market

allocation in the sale and supply of polyurethane foam.  Price increase discussions occurred

approximately two to three times per year and often coincided with the bi-annual meetings held

by the Polyurethane Foam Association ("PFA").

76.     The general pretext used to explain the conspiratorial price increases was

increases in raw material costs. Defendants (or "foamers" as they are referred to at times in the

industry) utilize chemicals, including polyols and toluene diisocyanate (or "TDI") in the

manufacturing of flexible polyurethane foam. When Defendants' raw material suppliers

announced price increases for chemical ingredients of foam, such as polyols and TDI,

Defendants contacted each other because this provided an opportunity to raise prices. Defendants

viewed price fixing as necessary because, if Defendants did not increase their foam prices by the

same percentage amount and at around the same time period, the attempted price increase would

fail.

77.     The conspiracy, understanding and agreements regarding price increase

percentage amounts among Defendants was the result of telephone conversations, exchanges of

price increase letters, face-to-face meetings, and bilateral discussions among the competitors for the purpose of coordinating the amount and timing of price increases.

78.     During the Class Period, there was an understanding and agreement among the Defendants and their co-conspirators to collectively support supracompetitive prices. This understanding and agreement was reached in actual discussions among competitors about the percentage of price increases, the dates of the increases, and how the conspirators would announce the increases with the same, or nearly the same, effective dates.  Price increase announcement letters were then mailed to customers, reflecting the prices determined by the conspirators.  Defendants policed these increases to ensure they were implemented by their coconspirators, and they did not permit price reductions without consent of the overall group.

### 3)  Former Vitafoam executives

79.     A former President of Vitafoam, who worked for Vitafoam from the 1960s until October 2008, along with other individuals at Vitafoam, directly participated in the long-running price fixing and customer allocation conspiracy alleged herein relating to flexible polyurethane foam in North America.

80.     The former President of Vitafoam together with Defendants engaged in frequent and regular unlawful communications during the Class Period where they discussed and agreed to specific price increases and the timing of announcements regarding the effective date of those increases.

81.     Vitafoam had a purported company policy of not having conversations with competitors, but this policy was merely window-dressing and was not followed in practice during the Class Period.

82.     As part of the conduct to coordinate and/or support price increases during the Class Period, the former President of Vitafoam instructed his sales people to send copies of their draft price increase letters to other Defendants and obtain other Defendants' versions of the same. Defendants utilized these drafts to confirm their anticompetitive agreements and further implement the conspiracy. The Defendants with whom he spoke also discussed how much each competitor wanted to raise prices, when the price increases should go into effect, and when the price increase letters should be issued. As described below, these measures were used not only to set supracompetitive prices, but also to police the conspiracy and ensure compliance. Vitafoam personnel, including at least Steve Pendock, Gerry Hannah, David Gurley, Frank Roncadin, George Newton, Tim Prescott, and Phil Fonseca, participated in these discussions with other Defendants to share information about and reach agreement on price increases.

83.     Vitafoam's discussions relating to coordinating price increases among Defendants during the Class Period were conducted primarily by means of telephone, electronic mail, and in-person meetings. In person discussions frequently took place at Polyurethane Foam Association ("PFA") meetings.

84.     The former President of Vitafoam, along with his subordinates, had conspiratorial discussions during the Class Period as described above with other Defendants regarding fixing prices and allocating customers. These discussions included at least Tony Dacosta, Al Zinn, and Doug Dauphin of Foamex; Max Tenpow of Carpenter; Bruce Schneider of Future Foam; Don Coleman of Hickory Springs; and Robert Valle and Dean Brayiannis of Valle.

85.     A former Vice President of Sales and Marketing for Vitafoam who has worked in the polyurethane foam industry since 1963 participated in interviews and admitted his role in the conspiracy. He first worked for Woodbridge, and then in 1973 joined Vitafoam's predecessor,

Pre-Fab Cushioning Products. This former Vice President worked for Vitafoam in Canada until March 2009 when he retired. He was personally involved in a long-running price fixing and customer allocation conspiracy throughout North America along with other individuals at Vitafoam as well as at other companies.

86.     The former Vice President of Vitafoam also participated in conspiratorial conduct during the Class Period with many individuals employed by numerous competitors, including at least Valle, Carpenter, Woodbridge, Flexible Foam, Hickory Springs, Domfoam, Scottdel, and Foamex. The communications involved discussions of price increase percentages and effective dates of such increases, typically by telephone. The competitors exchanged copies of price increase letters to coordinate and support these increases. Individuals from competitors with whom the former Vice President conspired to fix prices and allocate customers included at least Stanley Pauley, Ed Malacheck, Mark Kane and Max Tenpow of Carpenter; Tony Vallecoccia, Dean Brayiannis and Robert Valle of Valle; Doug Dauphin and Tony Dacosta of Foamex; and John Howard of Domfoam.

87.     The former Vice President of Vitafoam and Mark Kane of Carpenter had discussions on multiple occasions during the Class Period involving price increases concerning a shared customer. In an effort to coordinate their price increases and to make sure those increases went through for the mutual customer, the former Vice President and Kane called each other and exchanged copies of draft price increase letters by fax.

88.     Robert Valle and Tony Vallecoccia of Valle also communicated with other Defendants by telephone and faxed each other copies of their draft price increase letters that would be sent to customers in order to coordinate and collude on price increase percentages and their effective dates. They reported on these efforts to Vitafoam.

89.     Vitafoam employee David Gurley was a manager during the Class Period involved in scrap foam, obtained by Vitafoam for carpet underlay production. During the Class Period, Gurley had numerous contacts with other Defendants in furtherance of the conspiracy. As a result of these contacts, Gurley provided the former Vitafoam executives and co-employee Steve Prescott with other Defendants' draft price increase letters, competitor price lists, and other information.

90.     During the Class Period, Vitafoam employee George Newton exchanged information with Carpenter employee Max Tenpow regarding the amount and effective date of price increases. Newton also provided this conspiratorial information to other Defendants.

91.     In addition to these unlawful agreements to fix prices, the former Vitafoam executives and Defendants agreed to avoid each other's customers and refrain from taking business or market share from one another during the Class Period.

### 4) Recent or current Vitafoam executives

92.     In addition, a former Woodbridge employee was employed in Ontario, Canada, from 1986 until 2009 and participated in the conspiracy. While working at Defendant Woodbridge, this employee served most recently as Vice President of Commercial Sales where he had authority to determine prices. In April 2009, this former Woodbridge employee became Vitafoam's Vice President of Sales. In his position at Vitafoam, he had authority to determine prices. This Vitafoam Vice President has also admitted to his role in the long-running price fixing and customer allocation conspiracy with other Defendants.

93.     This Vitafoam Vice President engaged in conspiratorial activity while employed by Woodbridge and Vitafoam during the Class Period by reaching understandings and agreements on price increases with other Defendants. These agreements concerned both the

amount and the effective date of the price increases. The objective of the price increase coordination was for the conspirators to pass on cost increases to customers, as well as to maintain their respective market share.

94.     During the Class Period, the Vice President personally engaged in this conspiratorial conduct to fix prices and maintain market share with at least Woodbridge, Vitafoam, Foamex, Carpenter, Future Foam, Hickory Springs, Scottdel, Valle and Flexible Foam. Co-workers at both Woodbridge and Vitafoam also participated in the scheme.

95.     Information sworn under oath on July 21, 2010 by Pierre-Yves Guay of the Commissioner of Competition in Canada to support a search warrant describes information provided by "Witness A,"  regarding conduct "in Canada and in the United States." The information states under oath: "Witness describes himself as someone who gathers and shares information across the foam sectors. Witness A confirmed to Competition Law Officers that he had discussions, exchanges of information and agreements regarding the price of foam with the following contacts within the foam industry:

| Companies | Contacts | Positions |
|---|---|---|
| Foamex | Vinnie A. Bonaddio | Senior Vice President, Technical Products Group |
| Foamex | Don Phillips | Executive Vice President Automotive Parts Division |
| Vallefoam | Tony Vallecoccia | President |
| DomFoam International Inc. | John Howard | President |
| Ottobock | John Vins | Sales Manager |
| Plastomer | Bill Baughman | Chief Executive Officer |
| Inoac International Co. | Mike Cotter | Marketing Manager |
| Inoac International Co. | Ken Miya | Managing Director |
| Hickory Springs | Todd Councilman | Marketing – Sales Manager |
| Flexible Foam Products | Mike Crowell | VP Sales and Marketing |
| Vita | Mel Himel | President |
| Hickory Springs | Buster Mann | VP, Eastern Division |
| CMI Automotive | Jorge Canamero | President |

Conduit of information[1]:

| Companies | Contacts | Positions |
|---|---|---|
| Bondtex Incorporated | Jerry Hightower | President |
| Cerex Fabric | Dan Holsenbeck | Sales Manager |
| Inoac USA | Max Ozeki | VP Foam Division |
| Morbern Inc. | John Weaver | VP Sales and Marketing |

96.     The sworn affidavit from Pierre-Yves Guay also separately states that it is the result of an investigation of "previous and ongoing conduct contrary to" the Competition Act of Canada by entities including Carpenter, Valle Foam, Domfoam, A to Z Foam, Vita Foam Group, Foamex, Flexible Foam, Future Foam, Mohawk, Scottdel, Broadway Foam, Woodbridge, Leggett & Platt, and Hickory Springs. The violations of law alleged in the affidavit concerned conduct both "in Canada and in the United States."

97.     During the Class Period, while he was employed by Woodbridge, the Vitafoam Vice President also confirmed that he spoke to Bill Lucas, the President of Vitafoam, to discuss price increases specifically for foam applications in the automotive industry.  Bill Lucas, also acted for Crest, which was controlled by Vitafoam, in these communications.

98.     When Defendants discussed price increases for foam products for the automotive industry, although price increases for automotive foam products generally involved telephone calls, rather than letters, the discussions included price increase letters for foam products. Defendants discussed price increase letters for foam products generally, even in specific communications about automotive foam products, because this helped the competitors coordinate price increases and timing of price increases for automotive foam products.

---

[1] "Conduit of information means that Witness A had discussions with these individuals who reported market conditions and price increases by alleged cartel members to him. These discussions were not about price fixing or market allocation but rather represented simply a transmission of information."

99.     The Vitafoam Vice President, while he was employed by Woodbridge, also had contacts with Vincent Bonaddio at Foamex to discuss price increases for automotive foam products.

100.    In 2004, while employed by Woodbridge, the Vitafoam Vice President attended a meeting at Crest with Bill Lucas, who was representing Vitafoam and Crest. During the meeting, there was a discussion regarding price increases of foam.

101.    On May 26 & 27, 2010, the current Vice President attended a PFA meeting in Baltimore, MD. While there, he discussed foam pricing with Michael Crowell of Flexible Foam. Crowell asked why Vitafoam was not raising prices or following a recent increase.

102.    Another Vitafoam executive, the President, was previously the Director of Corporate Engineering at Woodbridge from 1985 until January 2008, where he had authority to determine prices. As the President of Vitafoam, a position he held beginning in August 2008, he also had authority to determine prices.  Along with other individuals from Defendant companies, he participated in the long-running price fixing and customer allocation conspiracy. During the Class Period, discussions with competitors in the foam industry involving the current President of Vitafoam while he was at Woodbridge included conversations about legitimate topics like business development or potential joint ventures, and then ultimately led to conspiratorial conversations about price increases. These discussions about coordinating pricing took place during in-person discussions, electronic mail communications, and telephone conversations.

103.    During the Class Period, the President of Vitafoam participated in conspiratorial discussions concerning pricing in the flexible polyurethane foam market with various competitors at both Woodbridge and Vitafoam, including at least Bill Lucas of Vitafoam; Donald

Phillips and Vincent Bonaddio of Foamex; Michael Crowell of Flexible Foam; Tony Vallecoccia of Valle; Stanley Pauley of Carpenter; Don Simpson, Buster Mann and Lee Lunsford of Hickory Springs; and, Bruce Schneider and Robert Heller of Future Foam. David Gurley also sent an email to the current President of Vitafoam in which he acknowledged receiving draft price increase letters from competitor Don Simpson of Hickory Springs. These discussions led to a clear understanding and agreement that the participants would discuss and implement coordinated price increases on the same effective dates.

104. Price increases for the carpet cushion segment of the flexible polyurethane foam market occurred again in April and May 2009. Thus, in April 2009, many competitors announced a 12% increase on carpet cushion to be effective May 18, 2009. This price increase was facilitated through exchange of letters amongst the following defendants: Flexible Foam, Mohawk, Carpenter, Vita Canada, Leggett & Platt, and Future Foam. Immediately after the April 2009 increase another 14-15% price increase on bonded carpet cushion was implemented in May 2009.

105. A Vitafoam executive had several communications with Dean Brayiannis from Valle leading to an agreement on June 2009 on the promotional pricing for carpet foam for a shared customer. This agreement to offer the same promotional pricing was followed after June 2009. Specifically, each of the price increases for flexible polyurethane foam during the Class Period, going back to at least 1999 and until Vitafoam's entry into the leniency program, were the result of conspiratorial discussions among Defendants on pricing.

### 5)  *Defendants implement and enforce the conspiracy*

106.    Defendants also undertook substantial efforts to police the conspiracy. Participants, including the former Vice President of Vitafoam, followed up after discussions with other Defendants to determine if the specific agreed price increases and effective dates were implemented. If one of the Defendants did not agree to raise prices at the same amount or in the same time period as the other Defendants, the other Defendants would pressure the hold out until it acquiesced.

107.    Furthermore, Defendants routinely exchanged and reviewed each other's price increase letters in order to confirm that their conspiratorial agreements were being implemented. When a Defendant would fail to exchange or confirm its price increase letters, the other Defendants would hound that Defendant and threaten action to engage in competitive price wars against the non-cooperating Defendant.

108.    On April 9, 2010, in Cleveland, Ohio, Bruce Schneider of Future Foam spoke by telephone to an executive from Vitafoam.  Schneider worked at Future Foam headquarters. Schneider called to inform Vitafoam that Future, Foamex and Flexible intended to increase the price of foam by 20% in the next weeks.

109.    On another call, Schneider again discussed price increases by the Defendants with the President of Vitafoam. Schneider stated: "Now it's looking it's all everything is postponed to May 31st or June 1st. There is a letter out from Carpenter for 31st of May. This is a letter out from Flexible for June 1st. Foamex sent a letter two weeks ago at 15% but it looks like now that the increase is going to be 10 and 12% on foam." The Vitafoam President asked: "Are you hearing anything from the other guys? Or is it just kinda market stuff?" Schneider responded:

"Oh, from the other, the other people the foamers? Yeah, we are hearing 10-12… It's kinda what we hear from other people what they expect. Ya know, it would have been great to get 20% but I don't think so." The conversation concluded with a request for information from Schneider. "If you hear anything from your friends in Europe. What's going on over there, I sure would like to know that as well."

110.    On June 10, 2010, Bruce Schneider of Future Foam left a voice mail message for the current President of Vitafoam. In this message, Schneider stated, "Hi [President], this is Bruce Schneider… If you want to give me a call I've got information of why the increase changed from 10 to 12 to 9."

111.    On May 20, 2010, John Howard, President of Domfoam, called the current Vitafoam Vice President twice to voice complaints about a Vitafoam salesman, Normand Widmer, attempting to acquire Domfoam customers. During the call, Howard stated:

> "Your fellow in Montreal here has been out, has his salesman Claude Robinson out knocking on doors they've never knocked on before, selling at or quoting at low low prices. If he wants a battle, I'll give him a battle…These guys have been in at accounts they've never sold at…if he wants a battle, he's got one. We will start going after his accounts and it won't be pretty. We'll both end up hurting…I'm pissed off and our sales guys are pissed off and they're saying 'John, are you going to do something about this, or are you just going to let this guy keep quoting low prices and taking business away from us. So. I'll let the dogs loose or I don't let the dogs loose. Want to mill it over and give me a shout back?"

The Vice President of Vitafoam responded:

> "It's sort of a bad time for me right now."

Howard then stated:

> "I don't expect an answer right now but, I'm leaving tomorrow night for a week. I would like to at least give the guys some indication that, 'Guys, give me another week. I think the dust is going to settle.' Or, 'Guys just do what you have to do. Go follow their delivery trucks and find out who the customers are and start knocking on doors and do whatever the hell

you have to do. We have to respond.' So you're in a spot, I don't expect you to answer right now, but can you give me a shout back tomorrow?"

112.   On May 25, 2010, the Vice President of Vitafoam called Howard back. During the call, Howard stated:

> "Just, you know we've kind of stayed out of each other's way for some time here while business is quiet. There's just no business to be had and dropping prices is only going to benefit the customers. I can't afford to have him take stuff away…It'll be a rough go if he wants to go and quote prices in places where he's not currently selling…Tell Normand it's a, I mean we just don't even know who your accounts are. Basically we've just never interfered, but, if he's going to go selling to guys quoting prices at guys where he doesn't currently sell, we're going to go after his accounts. So, business decision, you know, whatever way the chips fall, that's the way they're going to fall, and life will go on. But the buyers are asking me, you know, 'John, you're always telling us to stay away.' We do the same thing with Foamex, we don't go after their accounts. Haven't for a while business has been in the shitter. Just kind of stayed away and they've stayed away from our accounts too, so prices have been fairly stable. There ain't much business out there and dropping prices and only the customers are going to benefit. But let him make his decision and if it's to continue going after them then tell him there'll be some consequences. That's it. I'm not gonna, no threats but I can't not do anything. The sales guys are getting kind of…'Hey, John, you're telling us don't go here, don't go there, don't sell that one, don't go quote prices there.' You know, eventually they're going to think I got no nuts, so sooner or later I've got to tell them 'Guys, just go and do what you got to do.'…Keep an eye on this guy, it's ah, he needs coaching, there you go."

113.   On May 25, 2010, Howard also left a voicemail message for the Vice President of Vitafoam:

> "Hi, it's John…we never really did resolve anything, I guess I did most of the talking…where do we leave this thing , vis-à-vis going after each other's accounts. I'd be quite happy just to let it settle right here and not do anything more. But if [the President of Vitafoam] got some real pressure on this fellow Widmer and he's going to continue to go after accounts that he currently doesn't sell, then I got to, I can't continue to hold our sales guys off. So, give it some thought and maybe over the next day or two, just give me a shout and let me know. I understand you can't override [President of Vitafoam], but I can't just hold our guys at bay and tell them, 'Well, don't do anything guys,' That's not a winning strategy for us either. So, give me a call in the next day or two would you? And

let me know what course of action Widmer's going to take here."

114.    On June 2, 2010, two executives of Vitafoam spoke concerning a price increase announcement. One of the Vitafoam executives explained it was important to talk to Raj Mehta of CrestFoam about the price increase announcement.

115.    On June 4, 2010, Tim Prescott of Vitafoam left a voice mail message for Vitafoam's Vice President:

> "Hey, it's Tim…Can you give me a call when you get a chance. I don't know whether you've spoken to [President] but I had a message earlier from Dale over at Carpenter and when I called him back he was asking what we're going with the increase and he just called me again asking can VPS please call John Howard over at Domfoam."

116.    On June 3, 2010, Dean Brayiannis of Valle called Steve Prescott of Vitafoam:

| | |
|---|---|
| Brayiannis: | "I sent you a text regarding price increase letters. I'm assuming you've got most of the ones that you wanted to see." |
| Prescott: | "I didn't see, I had the old boy had faxed me one from a couple of days ago…Yah, okay, no problem, Yah, I guess, like that's, you know, it's game on again, isn't it." |
| Brayiannis: | "Ah, we'll see what happens. I've got Carpenter, Flexible, Mohawk, Leggett." |
| Prescott: | "But it's warranted, you know what I mean. Like, we know the prices of raw material have been going up, so ah." |
| Brayiannis: | "Well, you know, I guess what we've gotta see is have another one right behind this one, hopefully the first one will stick right but I guess we will see what our friends at Carpenter will do." |
| Prescott: | "Yah, yah. Well, yah, like I say it's it's game on. So I would imagine that most manufacturers will move forward with it. We will have to see whether they, whether they do or not and see how that goes." |
| Brayiannis: | "Yah, yah. Alright. Well our letter is out so hopefully I'm |

assuming you've probably put something out by now."

Prescott:  "It's as good as done."

Brayiannis:  "Okay. Well we're already out, so we've already put our letter out."

117.  On June 9, 2010, Brayiannis called Prescott twice, leaving a voice mail message first, then called again to further discuss the price increase.

Brayiannis:  "Still haven't seen or heard of your increase letter yet."

Prescott:  "Well, have a look around."

Brayiannis:  "I have. Haven't found anything yet…I've still got one guy telling me that you haven't issued a letter. So have you issued? Yes or no?"

Prescott:  "People will lie to you, Dean."

Brayiannis:  "Are you around the same time frame as us? July 5th or what?"

Prescott:  "Ah, yah, close."

Brayiannis:  "Okay. And you haven't seen what, sorry? You haven't seen other increase letters or did you get all of those?"

Prescott:  "Well, I know, I know that, know Stan, Stan said that he'd seen the Mohawk one and…I guess one of the other U.S. guys. You know, everyone waits for the leader and once the leader goes out then everyone else follows cause we all know that the prices of material have gone up so, you know what I mean?"

Brayiannis:  "Well at the end of the day over the last two increases we have chatted about it so just wanna make sure you got your letter out."

Prescott:  "Yah. Okay pal."

118.  On May 25, 2010, Vitafoam received a call from Michel Legendre of Carpenter,

who informed Vitafoam that Carpenter would be raising its prices on June 28, 2010. Six days

later, on May 31, 2010, Legendre again called Vitafoam and told them that Carpenter would be

raising prices by 11%. The following day, Carpenter provided Vitafoam with a copy of the letter

it sent to its customers, which included the dates and amounts of the price increases.

119.    After Vitafoam raised its own prices, Legendre once again contacted the

company, this time on June 15, 2010. He spoke with the Vitafoam Vice President and asked

whether Vitafoam was "ready for round 2?" Legendre informed the Vice President that

Carpenter was preparing to send a letter the following day with a 12% price increase, effective

July 19, 2010. He also confirmed that manufacturers in "the States were similarly raising prices."

120.    Once the two men finished discussing the details of the second price increase,

they then turned to a discussion of whether they should be speaking at all:

| | |
|---|---|
| Legendre: | "Hey let me ask you something. That new boss of yours, you've got a guy there apparently I heard doesn't want us to communicate. Is that correct?" |
| Vitafoam: | "Ahhh…yah, that's that's true. That's ahh very true actually." |
| Legendre: | "Mine…[As you know] mine are the same right." |
| Vitafoam: | "Oh I understand." |
| Legendre: | "But I heard that jeez, the same thing I guess this guy you've got, I forget his name now, said the same thing he doesn't want nobody to talk and I'm like holy [expletive] ok here we go." |
| Vitafoam: | "Yah. Well, you know, that's, that's, that's, that's policy so…" |
| Legendre: | "Yah" |
| Vitafoam: | "That's…it's corporate stuff right." |
|  | … |

| Legendre: | "Ok. You know, I'm actually waiting for a third one [price increase]. I think it is going to be a repeat of, what is it, last year or the year before, I don't know." |
| Vitafoam: | "It was about three years ago. We didn't go up enough last year. The prices have been, the prices have been pretty low for a bit." |
| Legendre: | "Yah, you know what they've actually been too low really." |
| Vitafoam: | "Sorry?" |
| Legendre: | "They've actually been too low." |

121.    On May 27, 2010, Lee Lunsford of Hickory Springs called the Vitafoam President and inquired whether Vitafoam was raising prices. When the Vitafoam President expressed hesitation about doing so, Lunsford noted that there was "no volume anywhere" and "there is twice as much capacity as demand."

122.    Despite this acknowledgment, on June 3, 2010, Lunsford again called Vitafoam, this time speaking with the current Vitafoam Vice President. In their conversation, the Vice President informed Lunsford that Vitafoam was raising its prices at the end of the month. Lunsford inquired how much and, when told it would be by approximately 12%, agreed that this was an acceptable number to Hickory Springs.

123.    The Defendants also exchanged emails in furtherance of the conspiracy to fix prices for flexible polyurethane foam:

a.    In June of 2000, the Vitafoam Vice President – who was an employee at Woodbridge at the time – sent an email to a Vitafoam salesperson asking whether he spoke to Don Phillips of Foamex to which the salesperson responded "Yes, we told him we are going out with our letters 12% effective July 30th; he said we would follow."

b.      During October and November 2004, the Vitafoam Vice President reported to his supervisor at Woodbridge by email that he had discussions with Bill Lucas, acting for Vitafoam and Crest, which resulted in an agreement for a foam price increase effective  January 1, 2005.

c.      On October 21, 2004, the Vitafoam Vice President sent an email to his supervisor at Woodbridge where he said: "Lucas and I are talking about our favorite subject. Jan. 1 as a possible date." This email concerned a price increase discussion for foam for the automotive sector with an effective date of January 1, 2005.

d.      On November 2, 2004, the Vitafoam Vice President sent an email to his supervisor at Woodbridge and other superiors at Woodbridge saying that he "Met with Lucas at PFA" and that Lucas was "most interested in their auto increases. They will announce for Jan. 1. They would go +20%."

e.      On March 9, 2005, the Vitafoam Vice President sent an email to his supervisor at Woodbridge with the subject header "Spoke to Lucas." The email stated "They are going to market probably next week. Looking for a Jan. 1 effective date. Were going at 18%. I said we would most likely be closer to 15%." He reported that he "has not heard from Foamex" and "is going to try to call them again to see what number they will go with."

f.      On March 9, 2005, the Vitafoam Vice President sent an email to his supervisor at Woodbridge regarding another call with Bill Lucas, representing Vitafoam and Crest. "Spoke with Lucas again last week. We are trying to meeting in Chattanooga." He also wrote: "We use the schedule[d] discussions to lead into the real reasons for the calls. Said that they were successful at the mills, in Furniture – they were still one [price increase] behind." The email continued: "I let him know we were going March 15th in Detroit [automotive sector]. He said they would probably wait until May 1. Would have liked a more coordinated push."

g.      On May 5, 2005, the Vitafoam Vice President while he an employee at Woodbridge emailed that he spoke with Bill Lucas of Vitafoam and Raj Mehta, the General Manager of Crest, regarding price increases for May 2005. This relationship between Woodbridge, Crest, and Vitafoam continued for years. In a June 2, 2010 conversation between the Vitafoam Vice President and the current President, they discussed Mr. Mehta again and information to pass to him in furtherance of the conspiracy.

h.      On September 14, 2005, the head of a competitor company wrote to a Vitafoam executive and stated "In separate conversation, I talked to Lucas. They are out with 11% on blocks nothing on Auto." He asked the Vitafoam executive to have one of his employees "call Buster [Mann at Hickory Springs] today." After placing the call to Mann, the Vitafoam employee wrote "I called Buster yesterday. We spoke about the bedding stuff. It is at numbers we are not used to."

i.      On May 22, 2008, Nikki Walborn at Scottdel sent an email with an attachment of a draft Scottdel fuel surcharge and price increase letter to a number of Scottdel employees, including Louie Carson and Jeff Carter. (Within a year of this email, Jeff Carter went from Scottdel to Future Foam in Texas.) On May 29, 2008, Jeff Carter forwarded this email and price increase letter to David Gurley at Vitafoam, and Gurley then forwarded the email and price increase letter to his superior at Vitafoam, the current President.

j.      On July 7, 2008, Jeff Carter, while still at Scottdel, forwarded via email a draft price increase letter to David Gurley of Vitafoam, stating, "David, Here is a copy of our next increase letter. Jeff." Gurley forwarded this email and draft increase letter to the company President. The President forwarded this string of emails and draft increase letter to his subordinates at Vitafoam, the Vice President of Sales & Marketing, and Steve Prescott.

k.      On July 9, 2008, Steve Prescott forwarded the email string and letter to Stan

Miller of Vitafoam, with the message, "Hey pal you thought the first one was tough! Check with

your Carpenter contact to see when they plan on pulling the trigger."

l.      On July 11, 2008, Stan Miller reported back to Prescott via email, stating:

"Steve, I talked to Carpenter and he says that he has found his info. That
Mohawk has gone up the 12 points on business other then the EOR orders
from the show. He said they went up the full 12% in Vancouver and they
have gotten some for the business back. He had not heard of Scottdale
[sic] increase but had been told that there was a good chance they would
be going up. I just talked to Randy from Shnier and he said from the pricing
his sales people have found that Mohawk has not gone up. Carmine has been
after him for copies of their pricing but he can't get his hands on it. He told
me they lost an order to Mohawk in Calgary for Carpet Supermarket and that
is where Ben Flagel is now." Prescott asked in an email to Miller "Will Ben
share info?" Miller shortly thereafter on the same day responds to Prescott via
email, stating, "Dan from Carpenter just called and said they will be going up
13% on Aug. 11/08."

m.      On May 21, 2009, Steve Prescott of Vitafoam sent draft price increase letters to

other Vitafoam employees. One of the recipients, David Gurley of Vitafoam, forwarded those

price increase letters to Jeff Carter of Future Foam in Texas. Jeff Carter then forwarded this

email to David Carson and Louie Carson of Scottdel stating: "Louie and David, You probably

have seen all these. It's crazy out there again, personally I don't think this is enough of an

increase."

n.      Letters announcing a May 2009 increase from Flexible Foam dated April 7, 2009,

from Mohawk dated April 10, 2009, from Carpenter dated April 13, 2009, from Vita Canada

dated April 14, 2009, from Leggett & Platt dated April 15, 2009, and Future Foam dated April

16, 2009 were all present in Vitafoam files. Following that price increase, there was another

price increase in June 2009. Price increase letters from Mohawk, Flexible Foam, Carpenter and

Future Foam all dated May 18, 2009, and from Leggett & Platt and Vita Canada dated May 19, 2009 were also present in Vitafoam files.

      o.    Louie Carson responded to Carter thanking Carter for the information. Carter forwarded his string of emails with Louie Carson back to David Gurley at Vitafoam. Gurley forwarded the string to his superiors at Vitafoam, the Vice President of Sales & Marketing and President, with the message: "Please keep this confidential and read from the bottom up. It was sent to my friend Jeff Carter @Future Foam in Texas and talks about Vita and Ohio Valley. Louie Carson is one of the owners of Scottdel."

### 6) Defendants kept the conspiracy secret

124.    As described in this Consolidated Amended Complaint, the Vitafoam employees discussed herein and other participants in the conspiracy took numerous steps to avoid detection of their conspiracy. At times, full names would not be used in correspondence and instead participants would only use first names or initials.

125.    Conspirators took advantage of attending trade association meetings along with their competitors and met to discuss coordinating price increases outside of the formal meetings. During the Class Period, representatives of Defendants regularly met through such organizations as the PFA, International Sleep Products Association ("ISPA"), and Surfaces, a trade group that includes polyurethane carpet underlay producers.

126.    Representatives of Defendants claimed these trade association meetings were nothing more than "meet-and-greet" sessions with their competitors.

127.    Representatives of Defendants disguised their attendance at these events as information gathering, but in fact used them as an opportunity to fix prices and divvy up their customers.

128.     Representatives of Defendants had no genuine intention of learning about the market at these meetings. Defendants essentially controlled the market, and attended these meetings to further ensure and perpetuate their control.

129.     Defendants also visited each other's manufacturing facilities for the purported purpose of sharing technological and operational advances, but were actually using the opportunity to discuss coordinated price increases.  Defendants' employees also would avoid detection by communicating through fax machines at a local Staples or other store, so that the identification of the sender would be hidden on the fax transmittal.

130.     With the exception of Vitafoam, which sought leniency from the DOJ (see allegations *supra*) and Scottdel which recently went into liquidation (see paragraph 41, *supra*), there is no indication that any of the other Defendants have taken affirmative action to leave the conspiracy.

**B.     Market Factors Support The Existence Of The Conspiracy**

131.     Various market factors made the market for flexible polyurethane foam highly susceptible to anticompetitive practices and unlawful collusion, which allowed Defendants to implement their anticompetitive conspiracy.

*1)     Limited Competition*

132.      As a result of flexible polyurethane foam's manufacturing and product characteristics, importation into the United States from outside North America is neither practical nor economical. Consequently, the vast majority of flexible polyurethane foam sold in the United States comes from North America or a company with a United States-based subsidiary. Defendants—all of whom are based in the North America or have United States

based subsidiaries or affiliates—collectively represent the majority of flexible polyurethane foam manufacturers.

133.    In addition, the industry has been consolidating rather than attracting new entrants. Major players within this industry have been active in acquiring smaller companies and other competitors over the course of the last ten years. For example:

a. In 2007, Defendant Carpenter acquired its European competitor Dumo NV.

b. In 2006, following the purchase of its parent corporation, Defendant Vitafoam, Inc. sold one of its plants to Olympic Products LLC (a joint venture between Woodbridge and Hickory Springs), and sold another plant to Flexible Foam Products.

### 2) *Inelastic demand due to lack of substitutes*

134.    "Elasticity" is a term used to describe the sensitivity of supply and demand to changes in one or the other. For example, demand is said to be "inelastic" if an increase in the price of a product results in only a small, decline in the quantity sold of that product, if any. In other words, customers have nowhere to turn for alternative, cheaper products of similar quality, and so continue to purchase despite a price increase.

135.    For a cartel to profit from raising prices above competitive levels, demand must be relatively inelastic at competitive prices. Otherwise, increased prices would result in declining sales, revenues and profits, as customers purchased substitute products or declined to buy altogether.

136.    Demand for polyurethane foam is relatively inelastic. According to the Polyurethane Foam Association, "In furniture and bedding applications, short staple polyester fiber is often used instead of [flexible polyurethane foam], as is cotton, but both alternative materials have poor height recovery characteristics after compression. Steel springs also recover

well but must be insulated from the user with some type of cushioning material. Comparing [flexible polyurethane foam] to alternative materials in the areas of economics, comfort potential, ease of use, and durability, there is not an acceptable substitute."

### 3) Standardized commodity product with high degree of interchangeability

137.    A "commodity product" is characterized as a product that is readily interchangeable and for which competition is primarily driven by price rather than other market pressures, such as branding and marketing.  The mass production and interchangeability of commodity products results not only in pressure for competitors to enter into conspiracies to fix and maintain prices, but serves as a mechanism to successfully adopt and implement such conspiracies.

138.    Flexible polyurethane foam is a commodity used in hundreds of consumer products to provide comfort, support, safety and durability.  Flexible polyurethane foam is interchangeable across manufacturers. The last major technological breakthroughs in the production of flexible polyurethane foam occurred in the mid-20th century, and flexible polyurethane foam is now classified as a commodity chemical product.

139.    Accordingly, each Defendant has the capability to produce the same or similar flexible polyurethane foam products, and flexible polyurethane foam customers make purchase decisions based principally on price. This commoditization and interchangeability of flexible polyurethane foam facilitated Defendants' conspiracy by making coordination on price much simpler than if Defendants had numerous distinct products with varying features.

### 4)    Opportunities To Conspire

140.    Defendants are members of trade associations, including the PFA, International Sleep Products Association, Alliance of Flexible Polyurethane Foam, Carpet Cushion Council, and Surfaces.  The PFA is one of the largest such trade associations, and approximately 70% of

U.S. polyurethane foam manufacturers are PFA members.

141.     As discussed above and below, during trade association meetings – including PFA meetings - Defendants seized opportunities to meet in person to allocate customers and coordinate price increases.

### ACCRUAL OF CLAIM, CONTINUING VIOLATION, EQUITABLE TOLLING AND FRAUDULENT CONCEALMENT

142.     Plaintiffs did not discover and could not have discovered through the exercise of reasonable diligence the existence of the conspiracy alleged herein prior to disclosure in 2010 of the raids by government agencies of certain Defendants' facilities.

143.     Plaintiffs believe that prior to the Class Period Defendants formulated and prepared a plan to implement a conspiracy and in furtherance of their agreements, throughout the Class Period, Defendants and their co-conspirators have committed continuing violations of the antitrust laws resulting in monetary injury to Plaintiffs and Class members.  These violations each constituted injurious acts.

144.     In addition, Defendants and their co-conspirators' agreement, understanding and conspiracy in violation of the antitrust laws was kept secret.  As a result, Plaintiffs and members of the Class were unaware of Defendants' unlawful conduct alleged herein and did not know that they were paying artificially high prices for flexible polyurethane foam in the United States throughout the Class Period.  Defendants and their co-conspirators affirmatively and fraudulently concealed their unlawful conduct.

145.     Plaintiffs and the Class did not discover, nor could have discovered through reasonable diligence, that Defendants and their co-conspirators were violating the antitrust laws until shortly before this litigation was initially commenced, because Defendants and their co-conspirators used deceptive and secret methods to avoid detection and to affirmatively

conceal their violations.

146.     Neither Defendants nor their co-conspirators told Plaintiffs or the Class that they were fixing prices and allocating customers, or engaging in the other unlawful collusive practices alleged herein. By its very nature, Defendants' and their co-conspirators' conspiracy was inherently self-concealing.

147.      Defendants and their co-conspirators engaged in a successful price-fixing and customer allocation conspiracy, which they affirmatively concealed:

   a.   by meeting secretly (including use of private telephonic communications) to discuss prices, customers, and markets of polyurethane foam sold in the United States and elsewhere;

   b.   by agreeing among themselves at meetings and in communications not to discuss publicly, or otherwise reveal, the nature and substance of the acts and communications in furtherance of their illegal scheme;

   c.   by holding secret meetings outside and separate from the formal trade association meetings Defendants were publicly attending; and

   d.   by disguising price-fixing meetings and communications as technical and operational meetings.

## ANTITRUST INJURY

148.     The unlawful contract, combination and/or conspiracy alleged above had and is having, *inter alia,* the following effects:

   a.   Prices charged by Defendants and their co-conspirators to suppliers to Plaintiffs and the Class for polyurethane foam products were maintained at artificially high and *supra*-competitive levels;

   b.   Plaintiffs and the Class were required to pay more for products manufactured with polyurethane foam than they would have paid in a competitive marketplace unfettered by Defendants' and their co-conspirators' collusive and unlawful price-fixing; and

   c.   Plaintiffs and the Class have been deprived of the benefits of free, open and

unrestricted competition in the market for polyurethane foam.

149.     During and throughout the period of the contract, combination or conspiracy alleged above, Plaintiffs and the Class indirectly purchased polyurethane foam from Defendants in the United States.

150.     Plaintiffs and the Class paid more for the products utilizing polyurethane foam than they would have paid under conditions of free and open competition.

151.     As a direct and proximate result of the illegal combination, contract or conspiracy alleged above, Plaintiffs and the Class were injured and financially damaged in their businesses and property, in amounts that are not presently determined.

## CLASS ACTION ALLEGATIONS

152.     Plaintiffs incorporate by reference as if fully set forth herein the allegations contained in the preceding paragraphs of this Complaint.

153.     Plaintiffs bring this action on their own behalf and as a class action pursuant to Rules  23(b)(2) for injunctive relief and (b)(3) of the Federal Rules of Civil Procedure and/or respective state statute(s), on behalf of all members of the following class (the "Class") with respect to claims under the antirust and/or consumer protection statutes of each of the below jurisdictions and under common law principles of unjust enrichment recognized in each of those jurisdictions:

> All persons or entities in Alabama, Arizona, California, Colorado, District of Columbia, Florida, Hawaii, Idaho, Illinois, Iowa, Kansas, Maine, Massachusetts,  Michigan, Minnesota, Mississippi, Missouri, Nebraska, Nevada, New Hampshire, New Mexico, New York, North Carolina, North Dakota, Oregon, Pennsylvania, Rhode Island, South Dakota, Tennessee, Vermont, West Virginia, and Wisconsin who purchased products containing flexible polyurethane foam which were manufactured, produced or supplied by Defendants or their unnamed co-conspirators from January 1, 1999 to the present.  Excluded from the Class are governmental entities, Defendants, their co-conspirators and their representatives, parents, subsidiaries and affiliates.

154.     The precise number of Class members is unknown to Plaintiffs. However, due to

the nature of the trade and commerce involved, Plaintiffs reasonably believe, and thereon allege, that the Class numbers in the thousands who are geographically across the country and throughout the states for which claims are asserted, such that joinder is impractical.

155.     There are questions of law and fact common to the Class. The antitrust, consumer protection and unjust enrichment statutes and laws of the Class jurisdictions are similar and require proof of the same elements. These common elements relate to the existence of the conspiracy alleged, the enrichment obtained by Defendants, and the type and common pattern of injury sustained as a result thereof. The questions include, but are not limited to:

a.   Whether Defendants and their co-conspirators engaged in a combination and conspiracy among themselves to fix, raise, maintain and/or stabilize the price charged for flexible polyurethane foam sold in the United States and in particular, those states for which antitrust, consumer protection and unjust enrichment claims are asserted;

b.   The identity of participants in the conspiracy;

c.   The duration of the conspiracy alleged in this Complaint and the nature and character of the acts performed by Defendants and their co-conspirators in the furtherance of the conspiracy;

d.   Whether Defendants' and their co-conspirators' conduct, as alleged in this Complaint, caused injury to the business and property of Plaintiffs and the Class;

e.   Whether the Defendants' and their co-conspirators' conduct, as alleged in this Complaint, unjustly enriched Defendants;

f.   The appropriate nature of class-wide equitable relief;

g.   The effect of Defendants' conspiracy on the prices of flexible polyurethane foam in the United States and in the states for which claims are asserted on behalf of the

50

Class during the Class Period; and

h.   The appropriate measure of damages sustained by Plaintiffs and the Class.

156.    Plaintiffs are members of the Class. Plaintiffs' claims are typical of the claims of other members of the Class, and Plaintiffs will fairly and adequately protect the interests of the members of the Class. Plaintiffs bought products containing or made of flexible polyurethane foam that was produced, manufactured or supplied by one or more of the Defendants. Plaintiffs' interests are aligned with, and not antagonistic to, those of the other members of the Class. In addition, Plaintiffs are represented by competent counsel experienced in the prosecution of class action antitrust litigation.

157.    The questions of law and fact common to the members of the Class predominate over any questions affecting only individual members, including legal and factual issues relating to liability and damages.

158.    Class action treatment is a superior method for the fair and efficient adjudication of this controversy because:

a.   It will avoid a multiplicity of suits and consequent burden on the courts and Defendants;

b.   It would be virtually impossible for all members of the Class to intervene as parties-plaintiff in this action;

c.   It will allow numerous individuals with claims too small to adjudicate on an individual basis because of the prohibitive cost of this litigation, to obtain redress for their economic injuries;

d.   The prosecution of separate actions by individual Class members would create the risk of inconsistent or varying adjudications, establishing incompatible standards

of conduct for Defendants; and

    e.   It will provide court oversight of the claims process, once Defendants' liability is

adjudicated.

159.    This class action presents no difficulties of management that would preclude its

maintenance as a class action.

## INTERSTATE TRADE AND COMMERCE

160.    The Defendants' and their co-conspirators' conduct has taken place in, and

affected the continuous flow of interstate trade and commerce of the United States, in that, *inter*

*alia:*

    a.   Defendants and their co-conspirators have sold flexible polyurethane indirectly

throughout the United States, including those states for which claims for state antitrust,

consumer protection laws and unjust enrichment are asserted;

    b.   Defendants and their co-conspirators have each used instrumentalities of interstate

commerce to sell polyurethane foam throughout the United States;

    c.   In furtherance of the conspiracy alleged herein, Defendants have traveled

between states and have exchanged communications through interstate wire

communications and via U.S. mail; and

    d.   The conspiracy alleged herein has affected billions of dollars of commerce.

Defendants and their co-conspirators have inflicted antitrust injury by artificially raising prices paid

by Plaintiffs and other entities who are themselves engaged in commerce.

## FIRST CLAIM FOR RELIEF

## (Violation of the Clayton Act)

161.    Plaintiffs re-allege and incorporate by reference the allegations set forth in

paragraphs 1 through 160 as if fully set forth herein.

162.    Beginning at a time presently unknown to Plaintiffs, but at least as early as 1999 and continuing through the present, Defendants and their co-conspirators entered into a continuing agreement, understanding, and conspiracy in restraint of trade in violations of Section 16 of the Clayton Act, 15 U.S.C. § 15 and Section 1 of the Sherman Act, 15 U.S.C. § 1.

163.    In furtherance of the unlawful conspiracy, each of the Defendants and their co-conspirators has committed overt acts, including, *inter alia:*

a.    agreeing to charge prices at certain levels and otherwise to fix, increase, maintain and/or stabilize prices of polyurethane foam sold in the United States;

b.    participating in meetings, conversations, and communications with co-conspirators regarding prices to be charged for polyurethane foam;

c.    agreeing to allocate customers;

d.    meeting with co-conspirators in order to keep the existence of the conspiracy unknown as to foster the illegal anti-competitive conduct described herein; and

e.    refraining from competing by refusing to offer polyurethane foam at prices below the agreed-upon fixed price.

164.    The combination and conspiracy alleged herein has had the following effects, among others:

a.    Price competition in the sale of polyurethane foam has been restrained, suppressed, and/or eliminated;

b.    Prices for polyurethane foam sold by Defendants and their co-conspirators have been fixed, raised, maintained and stabilized at artificially high, non-competitive levels; and

c.    Those who purchased polyurethane foam indirectly from Defendants and their co-

conspirators have been deprived of the benefits of free and open competition.

165.     Defendants and their co-conspirators engaged in the activities described above for the purpose of effectuating unlawful arrangements to fix, maintain, raise and/or stabilize prices of polyurethane foam.

166.     As a direct and proximate result of Defendants' illegal agreement, contract, combination trust and/or conspiracy, Plaintiffs and the members of the Class have been injured and damaged in their respective businesses and property according to proof and will continue to be damaged as long as Defendants' actions continue, and are accordingly entitled to injunctive relief pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26.

## SECOND CLAIM FOR RELIEF

### (Violation of State Antitrust Statutes)

167.     Plaintiffs re-allege and incorporate by reference the allegations set forth in paragraphs 1 through 160 as if fully set forth herein.

168.     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Arizona Revised Stat. §§44-1401 et seq.

169.     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of California Bus. & Prof. Code §§16700 et seq. and Cal. Bus. & Prof. Code §§17200 et seq.

170.     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of District of Columbia Code Ann. §§28-4502 et seq.

171.     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Hawaii's Rev. Stat. § 480-3 et. seq.

172.     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Illinois Antitrust Code, 740 Ill. Comp. Stat. 10/7 (2).

173.    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Iowa Code §§553.1 et seq.

174.    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Kansas Stat. Ann. §§50-101 et seq.

175.    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Maine Rev. Stat. Ann. 10, §§1101 et seq.

176.    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Michigan Comp. Laws Ann. §§445.772 et seq.

177.    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Minnesota Stat. §§325D.51 et seq.

178.    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Mississippi Antitrust Act, Miss. Stat. § 75-21-1, et. seq.

179.    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Nebraska Rev. Stat. §§59-801 et seq.

180.    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Nevada Rev. Stat. Ann. §§598A et seq.

181.    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of New Mexico Stat. Ann. §§57-1-1 et seq.

182.    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of New York General Business Law §§ 340 et seq.

183.    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of North Carolina Gen. Stat. §§75-1 et seq.

184.    By reason of the foregoing, Defendants have entered into agreements in restraint of

trade in violation of North Dakota Cent, Code §§51-08.1-0 et seq.

185.     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Oregon Antitrust Act, Ore. Rev. Stat. §§ 646.725, et.seq.

186.     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of South Dakota Codified Laws Ann. §§37-1 et seq.

187.     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Tennessee Code Ann. §§47-25-101 et seq.

188.     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Vermont Stat. Ann. 9 §§2453 et seq.

189.     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of West Virginia Code §§47-18-1 et seq.

190.     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Wisconsin Stat. § § 133.01 et seq.

## THIRD CLAIM FOR RELIEF

### (Violation of State Consumer Protection and Unfair Competition Laws)

191.     Plaintiffs re-allege and incorporate by reference the allegations set forth in paragraphs 1 through 160 as if fully set forth herein.

192.     Defendants engaged in unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of the state consumer protection and unfair competition statutes listed below.

193.     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of California Bus. & Prof. Code § 17200 et seq.

194.     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Colorado's Consumer Protection Act, Colo. Rev. Stat. § 6-1-101 et.

seq.

195.     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of District of Columbia Code §28-3901 et seq.

196.     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Florida Stat. §501.201 et seq.

197.     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Hawaii Rev. Stat. §481 et seq.

198.     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Idaho Code §48-601 et seq.

199.     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of the Illinois Consumer Fraud Act, 815 ILCS 505 et. seq.

200.     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of 5 Maine Rev. Stat. §207 et seq.

201.     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Massachusetts Gen. Laws Ann. Ch. 93A et. seq.

202.     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Missouri Merchandising Practices Act §407.010 et seq. for goods purchased primarily for personal or family or household purposes.

203.     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Nebraska Rev. Stat. §59-1601 et seq.

204.     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of New Hampshire Stat. New Hampshire Rev. Stat. §358-A:2 et seq.

205.     Defendants have engaged in unfair competition or unfair or deceptive acts or

practices in violation of New Mexico Stat. §57-12-1 et seq.

206.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of New York Gen Bus. Law §349 et seq.

207.    Defendants have engaged in unfair competition or unfair or deceptive acts of or practices in violation of North Carolina Gen. Stat. §75-1.1 et seq.

208.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Oregon Rev. Stat. §646.605 et seq.

209.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of 73 Pennsylvania Const. Stat. §201-9.2 et seq. for goods purchased primarily for personal or family or household purposes.

210.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Rhode Island Gen. Laws §6-13.1-1 et seq. for goods purchased primarily for personal or family or household purposes.

211.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of 9 Vermont §2451 et seq. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of West Virginia Code §46A-6-101 et seq.

## FOURTH CLAIM FOR RELIEF

### (Unjust Enrichment and Disgorgement of Profits)

212.    Plaintiffs re-allege and incorporate by reference the allegations set forth in paragraphs 1 through 160 as if fully set forth herein.

213.    By paying more for products containing flexible polyurethane foam than they would have in the absence of Defendants' wrongful conduct, Plaintiffs and the Class have conferred a benefit on Defendants.

214. As a result of Defendants' wrongful conduct, Defendants were able to charge more for flexible polyurethane foam which overpayments were made by Plaintiffs and the Class.

215. Defendants have been unjustly enriched by Plaintiffs' and the Class' overpayments. Equity demands that Defendants be required to make restitution and return the overpayment to Plaintiffs and the Class.

216. Plaintiffs and members of the Class seek disgorgement of all profits resulting from such overpayments and establishment of a constructive trust from which Plaintiffs and Class members may seek restitution.

### Unjust Enrichment: Alabama

217. By engaging in the unlawful conduct in this Consolidated Amended Complaint, Defendants received higher prices for their flexible polyurethane foam that was sold to indirect purchasers in Alabama than would have been possible absent the illegal conduct.

218. The Defendants were able to achieve their increased revenues and profits from their sale of flexible polyurethane foam to Alabama indirect purchasers because the demand for flexible polyurethane foam is relatively price inelastic, as Defendants understood. Thus, the ability of Defendants to profit from their sales of flexible polyurethane foam to indirect purchasers in Alabama was connected to and due to the increased prices paid for Defendants' flexible polyurethane foam by indirect purchasers in Alabama.

219. The enrichment of Defendants that occurred because of Defendants' illegal activities was without legally cognizable justification. To the extent legal remedies do not sufficiently accomplish disgorgement of Defendants' illegal profits from the sales of products containing flexible polyurethane foam to indirect purchasers in Alabama, Defendants should be ordered to make restitution for the benefit of Alabama indirect purchasers because it would allow

Defendants to retain the benefits of their sales of flexible polyurethane foam at illegally inflated prices.

## Unjust Enrichment: Arizona

220.     By engaging in the unlawful conduct in this Consolidated Amended Complaint, Defendants received higher prices for their flexible polyurethane foam that was sold to indirect purchasers in Arizona than would have been possible absent the illegal conduct.

221.     The Defendants were able to achieve their increased revenues and profits from their sale of flexible polyurethane foam to Arizona indirect purchasers because the demand for flexible polyurethane foam is relatively price inelastic, as Defendants understood.  Thus, the ability of Defendants to profit from their sales of flexible polyurethane foam to indirect purchasers in Arizona was connected to and due to the increased prices paid for Defendants' flexible polyurethane foam by indirect purchasers in Arizona.

222.     The enrichment of Defendants that occurred because of Defendants' illegal activities was without legally cognizable justification.  To the extent legal remedies do not sufficiently accomplish disgorgement of Defendants' illegal profits from the sales of products containing flexible polyurethane foam to indirect purchasers in Arizona, Defendants should be ordered to make restitution for the benefit of Arizona indirect purchasers because it would allow Defendants to retain the benefits of their sales of flexible polyurethane foam at illegally inflated prices.

## Unjust Enrichment: California

223.     By engaging in the unlawful conduct in this Consolidated Amended Complaint, Defendants received higher prices for their flexible polyurethane foam that was sold to indirect purchasers in California than would have been possible absent the illegal conduct.

224. The Defendants were able to achieve their increased revenues and profits from their sale of flexible polyurethane foam to California indirect purchasers because the demand for flexible polyurethane foam is relatively price inelastic, as Defendants understood. Thus, the ability of Defendants to profit from their sales of flexible polyurethane foam to indirect purchasers in California was connected to and due to the increased prices paid for Defendants' flexible polyurethane foam by indirect purchasers in California.

225. Defendants were enriched by their illegal activities at the expense of California indirect purchasers of flexible polyurethane foam and thus Defendants should be ordered to make restitution for the benefit of California indirect purchasers because it would be unjust to allow Defendants to retain the benefits of their sales of flexible polyurethane foam in California at illegally inflated prices.

**Unjust Enrichment: Colorado**

226. By engaging in the unlawful conduct in this Consolidated Amended Complaint, Defendants received higher prices for their flexible polyurethane foam that was sold to indirect purchasers in Colorado than would have been possible absent the illegal conduct.

227. The Defendants were able to achieve their increased revenues and profits from their sale of flexible polyurethane foam to Colorado indirect purchasers because the demand for flexible polyurethane foam is relatively price inelastic, as Defendants understood. Thus, the ability of Defendants to profit from their sales of flexible polyurethane foam to indirect purchasers in Colorado was connected to and due to the increased prices paid for Defendants' flexible polyurethane foam by indirect purchasers in Colorado.

228. The enrichment of Defendants that occurred because of Defendants' illegal activities was without legally cognizable justification. To the extent legal remedies do not

sufficiently accomplish disgorgement of Defendants' illegal profits from the sales to indirect purchasers in Colorado, Defendants should be ordered to make restitution for the benefit of Colorado indirect purchasers because it would allow Defendants to retain the benefits of their sales of flexible  polyurethane foam at illegally inflated prices.

## Unjust Enrichment: District of Columbia

229.    By engaging in the unlawful conduct in this Consolidated Amended Complaint, Defendants received higher prices for their flexible polyurethane foam that was sold to indirect purchasers in the District of Columbia than would have been possible absent the illegal conduct.

230.    The Defendants were able to achieve their increased revenues and profits from their sale of flexible polyurethane foam to the District of Columbia indirect purchasers because the demand for flexible polyurethane foam is relatively price inelastic, as defendants understood. Thus, the ability of Defendants to profit from their sales of flexible polyurethane foam to indirect purchasers in the District of Columbia was connected to and due to the increased prices paid for products containing Defendants' flexible polyurethane foam by indirect purchasers in the District of Columbia.

231.    Defendants were enriched by their illegal activities at the expense of the District of Columbia indirect purchasers of flexible  polyurethane foam and thus Defendants should be ordered to make restitution for the benefit of the District of Columbia indirect purchasers because it would be unjust to allow Defendants to retain the benefits of their sales of flexible polyurethane foam at illegally inflated prices.

## Unjust Enrichment: Florida

232.    By engaging in the unlawful conduct in this Consolidated Amended Complaint, Defendants received higher prices for their flexible polyurethane foam that was sold to indirect

purchasers in Florida than would have been possible absent the illegal conduct.

233.    The Defendants were able to achieve their increased revenues and profits from their sale of flexible polyurethane foam to Florida indirect purchasers because the demand for flexible polyurethane foam is relatively price inelastic, as Defendants understood.  Thus, the ability of Defendants to profit from their sales of flexible polyurethane foam to indirect purchasers in Florida was connected to and due to the increased prices paid for Defendants' flexible polyurethane foam by indirect purchasers in Florida.

234.    Defendants were enriched by their illegal activities at the expense of Florida indirect purchasers of flexible polyurethane foam and thus Defendants should be ordered to make restitution for the benefit of Florida indirect purchasers because it would be unjust to allow Defendants to retain the benefits of their sales of flexible polyurethane foam at illegally inflated prices.

### Unjust Enrichment: Hawaii

235.    By engaging in the unlawful conduct in this Consolidated Amended Complaint, Defendants received higher prices for their flexible polyurethane foam that was sold to indirect purchasers in Florida than would have been possible absent the illegal conduct.

236.    The Defendants were able to achieve their increased revenues and profits from their sale of flexible polyurethane foam to Florida indirect purchasers because the demand for flexible polyurethane foam is relatively price inelastic, as Defendants understood.  Thus, the ability of Defendants to profit from their sales of flexible polyurethane foam to indirect purchasers in Florida was connected to and due to the increased prices paid for Defendants' flexible polyurethane foam by indirect purchasers in Florida.

237.    Defendants were enriched by their illegal activities at the expense of Florida

indirect purchasers of flexible polyurethane foam and thus Defendants should be ordered to make restitution for the benefit of Florida indirect purchasers because it would be unjust to allow Defendants to retain the benefits of their sales of flexible polyurethane foam at illegally inflated prices.

## Unjust Enrichment: Idaho

238. By engaging in the unlawful conduct in this Consolidated Amended Complaint, Defendants received higher prices for their flexible polyurethane foam that was sold to indirect purchasers in Idaho than would have been possible absent the illegal conduct.

239. The Defendants were able to achieve their increased revenues and profits from their sale of flexible polyurethane foam to Idaho indirect purchasers because the demand for flexible polyurethane foam is relatively price inelastic, as Defendants understood. Thus, the ability of Defendants to profit from their sales of flexible polyurethane foam to indirect purchasers in Idaho was connected to and due to the increased prices paid for Defendants' flexible polyurethane foam by indirect purchasers in Idaho.

240. Defendants were enriched by their illegal activities at the expense of Idaho indirect purchasers of flexible polyurethane foam and thus Defendants should be ordered to make restitution for the benefit of Idaho indirect purchasers because it would be unjust to allow Defendants to retain the benefits of their sales of flexible polyurethane foam at illegally inflated prices.

## Unjust Enrichment: Illinois

241. By engaging in the unlawful conduct in this Consolidated Amended Complaint, Defendants received higher prices for their flexible polyurethane foam that was sold to indirect purchasers in Illinois than would have been possible absent the illegal conduct.

242.     The Defendants were able to achieve their increased revenues and profits from their sale of flexible polyurethane foam to Illinois indirect purchasers because the demand for flexible polyurethane foam is relatively price inelastic, as defendants understood.  Thus, the ability of Defendants to profit from their sales of flexible polyurethane foam to indirect purchasers in Illinois was connected to and due to the increased prices paid for Defendants' flexible polyurethane foam by indirect purchasers in Illinois.

243.     Defendants were enriched by their illegal activities at the expense of Illinois indirect purchasers of flexible polyurethane foam and thus Defendants should be ordered to make restitution for the benefit of Illinois indirect purchasers because it would be unjust to allow Defendants to retain the benefits of their sales of flexible polyurethane foam at illegally inflated prices.

## Unjust Enrichment: Iowa

244.     By engaging in the unlawful conduct in this Consolidated Amended Complaint, Defendants received higher prices for their flexible  polyurethane foam that was sold to indirect purchasers in Iowa than would have been possible absent the illegal conduct.

245.     The Defendants were able to achieve their increased revenues and profits from their sale of flexible polyurethane foam to Iowa indirect purchasers because the demand for flexible polyurethane foam is relatively price inelastic, as Defendants understood.  Thus, the ability of Defendants to profit from their sales of flexible polyurethane foam to indirect purchasers in Iowa was connected to and due to the increased prices paid for Defendants' flexible polyurethane foam by indirect purchasers in Iowa.

246.     Defendants were enriched by their illegal activities at the expense of Iowa indirect purchasers of flexible polyurethane foam and thus Defendants should be ordered to make

restitution for the benefit of Iowa indirect purchasers because it would be unjust to allow Defendants to retain the benefits of their sales of flexible polyurethane foam at illegally inflated prices.

## Unjust Enrichment: Kansas

247.    By engaging in the unlawful conduct in this Consolidated Amended Complaint, Defendants received higher prices for their polyurethane foam that was sold to indirect purchasers in Kansas than would have been possible absent the illegal conduct.

248.    The Defendants were able to achieve their increased revenues and profits from their sale of flexible polyurethane foam to Kansas indirect purchasers because the demand for flexible polyurethane foam is relatively price inelastic, as Defendants understood.  Thus, the ability of Defendants to profit from their sales of flexible polyurethane foam to indirect purchasers in Kansas was connected to and due to the increased prices paid for Defendants' flexible polyurethane foam by indirect purchasers in Kansas.

249.    Defendants were enriched by their illegal activities at the expense of Kansas indirect purchasers of flexible polyurethane foam and thus Defendants should be ordered to make restitution for the benefit of Kansas indirect purchasers because it would be unjust to allow Defendants to retain the benefits of their sales of flexible polyurethane foam at illegally inflated prices.

## Unjust Enrichment: Maine

250.    By engaging in the unlawful conduct in this Consolidated Amended Complaint, Defendants received higher prices for their flexible  polyurethane foam that was sold to indirect purchasers in Maine than would have been possible absent the illegal conduct.

251.    The Defendants were able to achieve their increased revenues and profits from

their sale of flexible polyurethane foam to Maine indirect purchasers because the demand for flexible polyurethane foam is relatively price inelastic, as Defendants understood.  Thus, the ability of Defendants to profit from their sales of flexible polyurethane foam to indirect purchasers in Maine was connected to and due to the increased prices paid for Defendants' flexible polyurethane foam by indirect purchasers in Maine.

252.    Defendants were enriched by their illegal activities at the expense of Maine indirect purchasers of flexible polyurethane foam and thus Defendants should be ordered to make restitution for the benefit of Maine indirect purchasers because it would be unjust to allow Defendants to retain the benefits of their sales of flexible polyurethane foam at illegally inflated prices.

### Unjust Enrichment: Massachusetts

253.    By engaging in the unlawful conduct in this Consolidated Amended Complaint, Defendants received higher prices for their flexible  polyurethane foam that was sold to indirect purchasers in Massachusetts than would have been possible absent the illegal conduct.

254.    The Defendants were able to achieve their increased revenues and profits from their sale of flexible polyurethane foam to Massachusetts indirect purchasers because the demand for flexible polyurethane foam is relatively price inelastic, as Defendants understood.  Thus, the ability of Defendants to profit from their sales of flexible polyurethane foam to indirect purchasers in Massachusetts was connected to and due to the increased prices paid for Defendants' flexible polyurethane foam by indirect purchasers in Massachusetts.

255.    Defendants were enriched by their illegal activities at the expense of Massachusetts indirect purchasers of flexible polyurethane foam and thus Defendants should be ordered to make restitution for the benefit of Massachusetts indirect purchasers because it would

be unjust to allow Defendants to retain the benefits of their sales of flexible polyurethane foam at illegally inflated prices.

## Unjust Enrichment: Michigan

256.     By engaging in the unlawful conduct in this Consolidated Amended Complaint, Defendants received higher prices for their flexible  polyurethane foam that was sold to indirect purchasers in Michigan than would have been possible absent the illegal conduct.

257.     The Defendants were able to achieve their increased revenues and profits from their sale of flexible polyurethane foam to Michigan indirect purchasers because the demand for flexible polyurethane foam is relatively price inelastic, as Defendants understood.  Thus, the ability of Defendants to profit from their sales of flexible polyurethane foam to indirect purchasers in Michigan was connected to and due to the increased prices paid for products containing Defendants' flexible polyurethane foam by indirect purchasers in Michigan.

258.     Defendants were enriched by their illegal activities at the expense of Michigan indirect purchasers of flexible polyurethane foam and thus Defendants should be ordered to make restitution for the benefit of Michigan indirect purchasers because it would be unjust to allow Defendants to retain the benefits of their sales of flexible polyurethane foam at illegally inflated prices.

## Unjust Enrichment: Minnesota

259.     By engaging in the unlawful conduct in this Consolidated Amended Complaint, Defendants received higher prices for their flexible polyurethane foam that was sold to indirect purchasers in Minnesota than would have been possible absent the illegal conduct.

260.     The Defendants were able to achieve their increased revenues and profits from their sale of flexible polyurethane foam to Minnesota indirect purchasers because the demand for

flexible polyurethane foam is relatively price inelastic, as Defendants understood.  Thus, the ability of Defendants to profit from their sales of flexible polyurethane foam to indirect purchasers in Minnesota was connected to and due to the increased prices paid for products containing the Defendants' flexible polyurethane foam by indirect purchasers in Minnesota.

261.    Defendants were enriched by their illegal activities at the expense of Minnesota indirect purchasers of flexible polyurethane foam and thus Defendants should be ordered to make restitution for the benefit of Minnesota indirect purchasers because it would be unjust to allow Defendants to retain the benefits of their sales of flexible polyurethane foam at illegally inflated prices.

### Unjust Enrichment: Mississippi

262.    By engaging in the unlawful conduct in this Consolidated Amended Complaint, Defendants received higher prices for their flexible polyurethane foam that was sold to indirect purchasers in Mississippi than would have been possible absent the illegal conduct.

263.    The Defendants were able to achieve their increased revenues and profits from their sale of flexible polyurethane foam to Mississippi indirect purchasers because the demand for flexible polyurethane foam is relatively price inelastic, as Defendants understood.  Thus, the ability of Defendants to profit from their sales of flexible polyurethane foam to indirect purchasers in Mississippi was connected to and due to the increased prices paid for products containing Defendants' flexible polyurethane foam by indirect purchasers in Mississippi.

264.    Defendants were enriched by their illegal activities at the expense of Mississippi indirect purchasers of flexible polyurethane foam and thus Defendants should be ordered to make restitution for the benefit of Mississippi indirect purchasers because it would be unjust to allow Defendants to retain the benefits of their sales of flexible polyurethane foam at illegally

inflated prices.

## Unjust Enrichment: Nebraska

265.     By engaging in the unlawful conduct in this Consolidated Amended Complaint, Defendants received higher prices for their flexible  polyurethane foam that was sold to indirect purchasers in Nebraska than would have been possible absent the illegal conduct.

266.     The Defendants were able to achieve their increased revenues and profits from their sale of flexible polyurethane foam to Nebraska indirect purchasers because the demand for flexible polyurethane foam is relatively price inelastic, as Defendants understood.  Thus, the ability of Defendants to profit from their sales of polyurethane foam to indirect purchasers in Nebraska was connected to and due to the increased prices paid for products containing Defendants' flexible polyurethane foam by indirect purchasers in Nebraska.

267.     Defendants were enriched by their illegal activities at the expense of Nebraska indirect purchasers of flexible polyurethane foam and thus Defendants should be ordered to make restitution for the benefit of Nebraska indirect purchasers because it would be unjust to allow Defendants to retain the benefits of their sales of flexible polyurethane foam at illegally inflated prices.

## Unjust Enrichment: Nevada

268.     By engaging in the unlawful conduct in this Consolidated Amended Complaint, Defendants received higher prices for their flexible  polyurethane foam that was sold to indirect purchasers in Nevada than would have been possible absent the illegal conduct.

269.     The Defendants were able to achieve their increased revenues and profits from their sale of flexible polyurethane foam to Nevada indirect purchasers because the demand for flexible polyurethane foam is relatively price inelastic, as Defendants understood.  Thus, the

ability of Defendants to profit from their sales of flexible polyurethane foam to indirect purchasers in Nevada was connected to and due to the increased prices paid for products containing the Defendants' flexible polyurethane foam by indirect purchasers in Nevada.

270.     Defendants were enriched by their illegal activities at the expense of Nevada indirect purchasers of flexible polyurethane foam and thus Defendants should be ordered to make restitution for the benefit of Nevada indirect purchasers because it would be unjust to allow Defendants to retain the benefits of their sales of flexible polyurethane foam at illegally inflated prices.

## Unjust Enrichment: New Hampshire

271.     By engaging in the unlawful conduct in this Consolidated Amended Complaint, Defendants received higher prices for their flexible  polyurethane foam that was sold to indirect purchasers in New Hampshire than would have been possible absent the illegal conduct.

272.     The Defendants were able to achieve their increased revenues and profits from their sale of flexible polyurethane foam to New Hampshire indirect purchasers because the demand for flexible polyurethane foam is relatively price inelastic, as Defendants understood. Thus, the ability of Defendants to profit from their sales of flexible polyurethane foam to indirect purchasers in New Hampshire was connected to and due to the increased prices paid for products containing the Defendants' flexible polyurethane foam by indirect purchasers in New Hampshire.

273.     Defendants were enriched by their illegal activities at the expense of New Hampshire indirect purchasers of flexible polyurethane foam and thus Defendants should be ordered to make restitution for the benefit of New Hampshire indirect purchasers because it would be unjust to allow Defendants to retain the benefits of their sales of flexible polyurethane

foam at illegally inflated prices.

## Unjust Enrichment: New Mexico

274.     By engaging in the unlawful conduct in this Consolidated Amended Complaint, Defendants received higher prices for their flexible  polyurethane foam that was sold to indirect purchasers in New Mexico than would have been possible absent the illegal conduct.

275.     The Defendants were able to achieve their increased revenues and profits from their sale of flexible polyurethane foam to New Mexico indirect purchasers because the demand for flexible polyurethane foam is relatively price inelastic, as Defendants understood.  Thus, the ability of Defendants to profit from their sales of flexible polyurethane foam to indirect purchasers in New Mexico was connected to and due to the increased prices paid for products that contain Defendants' flexible polyurethane foam by indirect purchasers in New Mexico.

276.     Defendants were enriched by their illegal activities at the expense of New Mexico indirect purchasers of flexible polyurethane foam and thus Defendants should be ordered to make restitution for the benefit of New Mexico indirect purchasers because it would be unjust to allow Defendants to retain the benefits of their sales of flexible polyurethane foam at illegally inflated prices.

## Unjust Enrichment: New York

277.     By engaging in the unlawful conduct in this Consolidated Amended Complaint, Defendants received higher prices for their flexible  polyurethane foam that was sold to indirect purchasers in New York than would have been possible absent the illegal conduct.

278.     The Defendants were able to achieve their increased revenues and profits from their sale of flexible polyurethane foam to New York indirect purchasers because the demand for flexible polyurethane foam is relatively price inelastic, as Defendants understood.  Thus, the

ability of Defendants to profit from their sales of flexible polyurethane foam to indirect purchasers in New York was connected to and due to the increased prices paid for products that contain Defendants' flexible polyurethane foam by indirect purchasers in New York.

279.    Defendants were enriched by their illegal activities at the expense of New York indirect purchasers of flexible polyurethane foam and thus Defendants should be ordered to make restitution for the benefit of New York indirect purchasers because it would be unjust to allow Defendants to retain the benefits of their sales of flexible polyurethane foam at illegally inflated prices.

### Unjust Enrichment: North Dakota

280.    By engaging in the unlawful conduct in this Consolidated Amended Complaint, Defendants received higher prices for their flexible  polyurethane foam that was sold to indirect purchasers in North Dakota than would have been possible absent the illegal conduct.

281.    The Defendants were able to achieve their increased revenues and profits from their sale of flexible polyurethane foam to North Dakota indirect purchasers because the demand for flexible polyurethane foam is relatively price inelastic, as Defendants understood.  Thus, the ability of Defendants to profit from their sales of flexible polyurethane foam to indirect purchasers in North Dakota was connected to and due to the increased prices paid for products that contain Defendants' flexible polyurethane foam by indirect purchasers in North Dakota.

282.    Defendants were enriched by their illegal activities at the expense of North Dakota indirect purchasers of flexible polyurethane foam and thus Defendants should be ordered to make restitution for the benefit of North Dakota indirect purchasers because it would be unjust to allow Defendants to retain the benefits of their sales of flexible polyurethane foam at illegally inflated prices.

## Unjust Enrichment: South Dakota

283.    By engaging in the unlawful conduct in this Consolidated Amended Complaint, Defendants received higher prices for their flexible  polyurethane foam that was sold to indirect purchasers in South Dakota than would have been possible absent the illegal conduct.

284.    The Defendants were able to achieve their increased revenues and profits from their sale of flexible polyurethane foam to South Dakota indirect purchasers because the demand for flexible polyurethane foam is relatively price inelastic, as Defendants understood.  Thus, the ability of Defendants to profit from their sales of flexible polyurethane foam to indirect purchasers in South Dakota was connected to and due to the increased prices paid for products that contain Defendants' flexible polyurethane foam by indirect purchasers in South Dakota.

285.    Defendants were enriched by their illegal activities at the expense of South Dakota indirect purchasers of flexible polyurethane foam and thus Defendants should be ordered to make restitution for the benefit of South Dakota indirect purchasers because it would be unjust to allow Defendants to retain the benefits of their sales of flexible polyurethane foam at illegally inflated prices.

## Unjust Enrichment: Tennessee

286.    By engaging in the unlawful conduct in this Consolidated Amended Complaint, Defendants received higher prices for their flexible polyurethane foam that was sold to indirect purchasers in Tennessee than would have been possible absent the illegal conduct.

287.    The Defendants were able to achieve their increased revenues and profits from their sale of flexible polyurethane foam to Tennessee indirect purchasers because the demand for flexible polyurethane foam is relatively price inelastic, as Defendants understood.  Thus, the ability of Defendants to profit from their sales of flexible polyurethane foam to indirect

purchasers in Tennessee was connected to and due to the increased prices paid for Defendants'
flexible polyurethane foam by indirect purchasers in Tennessee.

288.    Defendants were enriched by their illegal activities at the expense of Tennessee
indirect purchasers of flexible polyurethane foam and thus Defendants should be ordered to
make restitution for the benefit of Tennessee indirect purchasers because it would be unjust to
allow Defendants to retain the benefits of their sales of flexible polyurethane foam at illegally
inflated prices.

**Unjust Enrichment: Utah**

289.    By engaging in the unlawful conduct in this Consolidated Amended Complaint,
Defendants received higher prices for their flexible  polyurethane foam that was sold to indirect
purchasers in Utah than would have been possible absent the illegal conduct.

290.    The Defendants were able to achieve their increased revenues and profits from
their sale of flexible polyurethane foam to Utah indirect purchasers because the demand for
flexible polyurethane foam is relatively price inelastic, as Defendants understood.  Thus, the
ability of Defendants to profit from their sales of flexible polyurethane foam to indirect
purchasers in Utah was connected to and due to the increased prices paid for products containing
the Defendants' flexible polyurethane foam by indirect purchasers in Utah.

291.    Defendants were enriched by their illegal activities at the expense of Utah indirect
purchasers of flexible polyurethane foam and thus Defendants should be ordered to make
restitution for the benefit of Utah indirect purchasers because it would be unjust to allow
Defendants to retain the benefits of their sales of flexible polyurethane foam at illegally inflated
prices.

**Unjust Enrichment: Vermont**

292.    By engaging in the unlawful conduct in this Consolidated Amended Complaint, Defendants received higher prices for their flexible  polyurethane foam that was sold to indirect purchasers in Vermont than would have been possible absent the illegal conduct.

293.    The Defendants were able to achieve their increased revenues and profits from their sale of flexible polyurethane foam to Vermont indirect purchasers because the demand for flexible polyurethane foam is relatively price inelastic, as Defendants understood.  Thus, the ability of Defendants to profit from their sales of flexible polyurethane foam to indirect purchasers in Vermont was connected to and due to the increased prices paid for products that contain Defendants' flexible polyurethane foam by indirect purchasers in Vermont.

294.    Defendants were enriched by their illegal activities at the expense of Vermont indirect purchasers of flexible polyurethane foam and thus Defendants should be ordered to make restitution for the benefit of Vermont indirect purchasers because it would be unjust to allow Defendants to retain the benefits of their sales of flexible polyurethane foam at illegally inflated prices.

**Unjust Enrichment: West Virginia**

295.    By engaging in the unlawful conduct in this Consolidated Amended Complaint, Defendants received higher prices for their flexible polyurethane foam that was sold to indirect purchasers in West Virginia than would have been possible absent the illegal conduct.

296.    The Defendants were able to achieve their increased revenues and profits from their sale of flexible polyurethane foam to West Virginia indirect purchasers because the demand for flexible polyurethane foam is relatively price inelastic, as Defendants understood.  Thus, the ability of Defendants to profit from their sales of flexible polyurethane foam to indirect

purchasers in West Virginia was connected to and due to the increased prices paid for products that contain Defendants' flexible polyurethane foam by indirect purchasers in West Virginia.

297.     Defendants were enriched by their illegal activities at the expense of West Virginia indirect purchasers of flexible polyurethane foam and thus Defendants should be ordered to make restitution for the benefit of West Virginia indirect purchasers because it would be unjust to allow Defendants to retain the benefits of their sales of flexible polyurethane foam at illegally inflated prices.

### Unjust Enrichment: Wisconsin

298.     By engaging in the unlawful conduct in this Consolidated Amended Complaint, Defendants received higher prices for their flexible  polyurethane foam that was sold to indirect purchasers in Wisconsin than would have been possible absent the illegal conduct.

299.     The Defendants were able to achieve their increased revenues and profits from their sale of flexible polyurethane foam to Wisconsin indirect purchasers because the demand for flexible polyurethane foam is relatively price inelastic, as Defendants understood.  Thus, the ability of Defendants to profit from their sales of flexible polyurethane foam to indirect purchasers in Wisconsin was connected to and due to the increased prices paid for products that contain the Defendants' flexible polyurethane foam by indirect purchasers in Wisconsin.

300.     Defendants were enriched by their illegal activities at the expense of Wisconsin indirect purchasers of flexible polyurethane foam and thus Defendants should be ordered to make restitution for the benefit of Wisconsin indirect purchasers because it would be unjust to allow Defendants to retain the benefits of their sales of flexible polyurethane foam at illegally inflated prices.

### PETITION FOR RELIEF

WHEREFORE, Plaintiff respectfully pray that the Court enter judgment as follows:

A.  Determining that this action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure;

B.  Enjoining Defendants from continuing to implement their unlawful agreement and ordering Defendants to take such actions necessary to remediate the market condition that Defendants created which would allow them to maintain, or continue to increase, prices above competitive levels;

C.  Awarding Plaintiffs and the relevant Class Members compensatory damages under the state statutes in an amount to be proven at trial, multiple damages under the state statutes in an amount to be proven at trial, multiple damages according to law against Defendants, jointly and severally;

D.  Awarding Plaintiffs and the relevant Class Members punitive, exemplary, statutory, and full consideration damages under the aforementioned state laws;

E.  Ordering Defendants to disgorge their profits earned as a result of their wrongful conduct and ordering them to make restitution to Plaintiffs and the Class;

F.  Awarding Plaintiffs and the Class pre-judgment and post-judgment interest;

G.  Awarding Plaintiffs and the Class their costs of suit, including reasonable attorneys' fees; and

H.  Granting Plaintiffs and the Class such other and further relief as the Court deems just and proper.

## <u>JURY DEMAND</u>

Plaintiffs hereby demand a trial by jury, pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, of all issues so triable in this case.

March 21, 2011                                   Plaintiffs,

                                         */s/*  Marvin A. Miller
                                         Marvin A. Miller
                                         Lori A. Fanning
                                         Matthew E. Van Tine
                                         **MILLER LAW LLC**
                                         115 S. LaSalle Street, Suite 2910
                                         Chicago, IL 60603
                                         Tele: (312) 332-3400
                                         Fax:  (312) 676-2676
                                         Email: MMiller@MillerLawLLC.com
                                                              LFanning@MillerLawLLC.com
                                                              MVantine@MillerLawLLC.com

                                         ***Interim Lead Counsel for Indirect Purchasers***

Richard M. Kerger (0015864)
Kimberly Conklin (0074726)
**KERGER & HARTMAN, LLC**
33 S. Michigan Street, Suite 100
Toledo, OH 43604
Telephone: (419) 255-5990
Fax: (419) 255-5997
Email: Rkerger@kergerlaw.com
         Kconklin@kergerlaw.com

*Executive Committee for Indirect Purchasers*

Shpetim Ademi
Guri Ademi
David Syrios
ADEMI & O'REILLY, LLP
3620 East Layton Avenue
Cudahy, Wisconsin 53110
(414) 482-8000
Email:   SAdemi@ademilaw.com
          GAdemi@ademilaw.com
          DSyrios@ademilaw.com

Jay B. Shapiro
Samuel O. Patmore
Abigail E. Corbett
Matthew Dates
STEARNS WEAVER MILLER WEISSLER
ALHADEFF & SITTERSON, P.A.
150 West Flagler Street
Miami, Florida 33130
(305) 789-3200
Email: JShapiro@stearnsweaver.com
         SPalmore@stearnsweaver.com
         ACorbett@stearnsweaver.com
         MDates@stearnsweaver.com

Martin D. Holmes
M. Reid Estes
DICKINSON WRIGHT PLLC
424 Church Street
Suite 1401
Nashville, TN 37219
(615) 244-6538
Email: MDHolmes@dickinsonwright.com
         MREstes@dickinsonwright.com

79

Daniel Lynch
Avidan J. Stern
LYNCH & STERN LLP
150 South Wacker Drive
Suite 2600
Chicago, IL 60606
(312) 346-1600
Email: Dan@lynchandstern.com
        Avi@lynchandstern.com

Eric D. Barton
WAGSTAFF CARTMELL
4740 Grand Avenue, Suite 300
Kansas City, MO 64112
(816) 701-1100
Email: EBarton@wagstaffcartmell.com

David Schiller
SCHILLER & SCHILLER, PLLC
Professional Park at Pleasant Valley
5540 Munford Road • Suite 101
Raleigh, North Carolina 27612
Telephone: (919) 789-4677
Email: DSchiller@yahoo.com

Susan Bernstein
Attorney at Law
200 Highland Avenue, Suite 306
Needham, MA 02494
Telephone: (781) 290-5858
Email: Susan@sabernlaw.com

***Counsel for Indirect Purchaser Plaintiffs***

## CERTIFICATE OF SERVICE BY ELECTRONIC MEANS

I, Marvin A. Miller, one of the attorneys for plaintiffs, hereby certify that on March 21, 2011, service of Indirect Purchaser Plaintiffs' Consolidated Amended Complaint, was accomplished pursuant to ECF as to Filing Users and I shall comply with Local Civil Rule 5.1.

*/s/ Marvin A. Miller*