UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF OHIO

| | | |
|---|---|---|
| _____ ) | | |
| | ) | |
| In re POLYURETHANE FOAM ANTITRUST | ) | |
| LITIGATION | ) | |
| | ) | MDL Docket No. 2196 |
| _____ ) | | Index No. 10-MD-2196 (JZ) |
| | ) | |
| | ) | |
| This document relates to: | ) | |
| | ) | |
| | ) | |
| ALL DIRECT PURCHASER CASES | ) | |
| | ) | |
| _____ ) | | |

**DEFENDANTS' JOINT "COMMON ISSUES"
MEMORANDUM OF LAW IN SUPPORT OF
MOTION TO DISMISS DIRECT PURCHASER PLAINTIFFS'
<u>CONSOLIDATED AMENDED CLASS ACTION COMPLAINT</u>**

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................................. ii

SUMMARY OF ARGUMENT ............................................................................................ 1

STATEMENT OF THE ISSUES TO BE DECIDED.......................................................... 2

BACKGROUND FACTS .................................................................................................... 2

    I.      The Products ....................................................................................................... 2

    II.     The Parties ......................................................................................................... 4

         A.      Plaintiffs .............................................................................................. 4

         B.      Defendants .......................................................................................... 4

    III.    The Purported Conspiracy ................................................................................. 5

MOTION TO DISMISS STANDARD.................................................................................. 8

LEGAL ANALYSIS............................................................................................................ 14

    I.      The CAC Fails to Satisfy the Pleading Requirements Set Forth in
*Twombly* ............................................................................................................ 14

         A.      The CAC's Conclusory Allegations Should Be Ignored for
Purposes of this Motion to Dismiss ................................................... 15

         B.      The CAC Does Not Allege Facts Establishing the Time Span or
Formation of a Conspiracy.................................................................. 16

         C.      The CAC Does Not Allege Facts Establishing Each Defendant's
Participation in the Alleged Conspiracy ............................................. 18

         D.      The CAC Does Not Plead Facts Establishing a Plausible
Conspiracy to Allocate Customers....................................................... 21

         E.      The CAC Does Not Plead Facts Establishing a Plausible
Conspiracy Impacting the Sale of Every Type of Polyurethane
Foam Product ....................................................................................... 23

         F.      The CAC Does Not Plead Facts Establishing a Plausible
Conspiracy Spanning the Entire United States ...................................... 28

         G.      The CAC Does Not Plead Facts Establishing a Conspiracy of
Plausible Size and Scope ..................................................................... 32

         H.      Plaintiffs' "Plus Factors" Do Not Plausibly Suggest a Conspiracy......... 35

         I.      Allegations that Defendants Exchanged Price Information Do Not
Plausibly Establish a Price Fixing Conspiracy ................................... 39

    II.     The CAC Fails to Adequately Plead Fraudulent Concealment ........................... 41

CONCLUSION.................................................................................................................... 43

# TABLE OF AUTHORITIES

**Page(s)**

### CASES

*Amey, Inc. v. Gulf Abstract & Title, Inc.*,
 758 F.2d 1486 (11th Cir. 1985) ..........................................................................40

*Anderson News, LLC v. Am. Media, Inc.*,
 732 F. Supp. 2d 389 (S.D.N.Y. 2010)..................................................................11

*Ashcroft v. Iqbal*,
 129 S. Ct. 1937 (2009)........................................................................8, 14, 26

*Barnosky Oils, Inc. v. Union Oil Co.*,
 665 F.2d 74 (6th Cir. 1981) ..................................................................................41

*Bell Atlantic Corp. v. Twombly*,
 550 U.S. 544 (2007)............................................................................... passim

*Blomkest Fertilizer, Inc. v. Potash Corp. of Saskatchewan, Inc.*,
 203 F.3d 1028 (8th Cir. 2000) .............................................................................40

*Broad. Music, Inc. v. CBS*,
 441 U.S. 1 (1979)..................................................................................................39

*Dombroski v. WellPoint, Inc.*,
 895 N.E.2d 538 (Ohio 2008) ...............................................................................19

*Dowdy & Dowdy P'ship v. Arbitron, Inc.*,
 No. 2:09-cv-253, 2010 U.S. Dist. LEXIS 107123 (S.D. Miss. Oct. 6, 2010)..............17, 32, 35

*Garner v. United States*,
 244 F.2d 575 (6th Cir. 1957) ...............................................................................38

*Gering v. Fraunhofer USA, Inc.*,
 No. 05-73458, 2009 WL 2877414 (E.D. Mich. Sept. 3, 2009)..............................19

*Hammond v. Brown*,
 323 F. Supp. 326 (N.D. Ohio), *aff'd*, 450 F.2d 480 (6th Cir. 1971) ......................38

*Hinds Country v. Wachovia Bank N.A.*,
 620 F. Supp. 2d 499 (S.D.N.Y 2009)...................................................................41

*In re Baby Food Antitrust Litig.*,
 166 F.3d 112 (3d Cir. 1999)............................................................................35, 40

*In re Bath & Kitchen Fixtures Antitrust Litig.*,
No. 05-cv-00510 MAM, 2006 U.S. Dist. LEXIS 49576 (E.D. Pa. July 19, 2006) ...........17, 24

*In re Cal. Title Ins. Antitrust Litig.*,
No. C 08-01341 JSW, 2009 U.S. Dist. LEXIS 43323 (N.D. Cal. May 21, 2009)...................11

*In re Citric Acid Litig.*,
191 F.3d 1090 (9th Cir. 1999) ......................................................................................40, 41

*In re Elevator Antitrust Litig.*,
No. 04 CV 1178 (TPG), 2006 WL 1470994 (S.D.N.Y. May 30, 2006), *aff'd*, 502 F.3d
47 (2d Cir. 2007)...................................................................................................................24

*In re Elevator Antitrust Litig.*,
502 F.3d 47 (2d Cir. 2007)..............................................................................11, 18, 28, 31

*In re Fla. Cement & Concrete Antitrust Litig.*,
No. 09-23187-CIV, 2010 U.S. Dist. LEXIS 108528 (S.D. Fla. Oct. 12, 2010) .............. passim

*In re Graphics Processing Units ("GPU") Antitrust Litig.*,
527 F. Supp. 2d 1011 (N.D. Cal. 2007) ..........................................................................12, 38

*In re Hawaiian & Guamanian Cabotage Antitrust Litig.*,
647 F. Supp. 2d 1250 (W.D. Wa. 2009) ...............................................................11, 31, 36, 38

*In re Iowa Ready-Mix Concrete Antitrust Litig.*,
No. C 10-4038-MWB, 2011 U.S. Dist. LEXIS 23311 (N.D. Iowa Mar. 8, 2011) .......... passim

*In re Late Fee & Over Limit Fee Litig.*,
528 F. Supp. 2d 953 (N.D. Cal. 2007) .................................................................12, 36, 37, 38

*In re LTL Shipping Servs. Antitrust Litig.*,
No. 1:08-MD-01895-WSD, 2009 U.S. Dist. LEXIS 14276 (N.D. Ga. Jan. 29, 2009).... passim

*In re Mun. Derivatives Antitrust Litig.*,
620 F. Supp. 2d 499 (S.D.N.Y. 2009).......................................................................... passim

*In re NASDAQ Market-Makers Antitrust Litig.*,
894 F. Supp. 703 (S.D.N.Y. 1995)..........................................................................................23

*In re Pa. Title Ins. Antitrust Litig.*,
648 F. Supp. 2d 663 (E.D. Pa. July 21, 2009) ..........................................................12, 18, 19

*In re Parcel Tanker Shipping Servs. Antitrust Litig.*,
541 F. Supp. 2d 487 (D. Conn. 2008)......................................................................................12

*In re TFT-LCD (Flat Panel) Antitrust Litig.*,
586 F. Supp. 2d 1109 (N.D. Cal. 2008) ...........................................................................19, 20

*In re TFT-LCD (Flat Panel) Antitrust Litig.*,
No. M 07-1827 SI, 2010 U.S. Dist. LEXIS 65037 (N.D. Cal. June 28, 2010)..................24, 28

*In re Travel Agent Comm'n Antitrust Litig.*,
MDL Docket No. 1561, 2007 U.S. Dist. LEXIS 79918 (N.D. Ohio Oct. 29, 2007)...39, 40, 41

*In re Travel Agent Comm'n Antitrust Litig.*,
583 F.3d 896 (6th Cir. 2009) ...................................................................................... passim

*In re Welding Fume Prods. Liab. Litig.*,
No. 1:03-CV-17000, 2010 U.S. Dist. LEXIS 57859 (N.D. Ohio June 11, 2010) ..................19

*Jacobs v. Tempur-Pedic, Int'l*,
626 F.3d 1327 (11th Cir. 2010) ..........................................................................................11

*Kendall v. Visa U.S.A., Inc.*,
518 F.3d 1042 (9th Cir. 2008) ......................................................................................11, 27

*Krehl v. Baskin-Robbins Ice Cream Co.*,
664 F.2d 1348 (9th Cir. 1982) ............................................................................................40

*LaFlamme v. Societe Air France*,
702 F. Supp. 2d 136 (E.D.N.Y. 2010) .................................................................................11

*Lubic v. Fid. Nat. Fin., Inc.*,
No. C08-0401 MJP, 2009 U.S. Dist. LEXIS 62092 (W.D. Wash. July 20, 2009) ......12, 18, 19

*Mountain View Pharmacy v. Abbott Labs.*,
630 F.2d.1383 (10th Cir. 1980) ....................................................................................23, 24

*N. Pac. Ry. Co. v. United States*,
356 U.S. 1 (1958).................................................................................................................39

*RxUSA Wholesale, Inc. v. Alcon Labs., Inc.*,
661 F. Supp. 2d 218 (E.D.N.Y. 2009) ................................................................................17

*Total Benefits Planning Agency, Inc. v. Anthem Blue Cross & Blue Shield*,
552 F.3d 430 (6th Cir. 2008) .......................................................................................11, 18

*Transition Healthcare Assocs., Inc. v. Tri-State Health Investors, LLC*,
306 F. App'x 273 (6th Cir. 2009) .......................................................................................19

*United States v. Citizens & S. Nat'l Bank*,
422 U.S. 86 (1975)...............................................................................................................39

*Whetstone Candy Co. v. Kraft Foods, Inc.*,
351 F.3d 1067 (11th Cir. 2003) ..........................................................................................20

*White v. R.M. Packer Co.*,
 No. 10-1130, 2011 U.S. App. LEXIS 3276 (1st Cir. Feb. 18, 2011)............................. passim

*Williamson Oil Co. v. Philip Morris USA*,
 346 F.3d 1287 (11th Cir. 2003) ...........................................................................................35

### STATUTES

15 U.S.C. § 1........................................................................................................................ passim

15 U.S.C § 15b....................................................................................................................41

The Telecommunications Act of 1996........................................................................................9

Fed. R. Civ. P. 8(a)(2)..........................................................................................................8

Fed. R. Civ. P. 9(b) .........................................................................................................42, 43

Fed. R. Civ. P. 12(b)(6).....................................................................................................2, 8

## SUMMARY OF ARGUMENT

The Consolidated Amended Class Action Complaint ("CAC") alleges in conclusory fashion that at some unidentified point in time, in some unidentified fashion, the twenty-six named defendants ("Defendants"), and perhaps additional unnamed co-conspirators, reached an agreement to fix prices and allocate customers in the markets for flexible polyurethane foam and all flexible polyurethane foam products, in violation of § 1 of the Sherman Antitrust Act ("Sherman Act"), 15 U.S.C. § 1.  (CAC ¶¶ 1-4.)  The supposed boundaries of this conspiracy are as vast as they are unspecific, allegedly existing at least for the past twelve years, spanning the entirety of the United States, and supposedly affecting every sale of every type of product containing flexible polyurethane foam.  *Id.*

The CAC pleads few facts to support the generous scope of Plaintiffs' conspiracy theory, and none to support its plausibility.  No mention is made, for example, of who initiated the conspiracy, when and where it began, how and why it came to be, or even when any of the twenty-six named Defendants, situated as they are in many different markets and locations, supposedly joined or why they did so.  The same is true of the CAC's claims that Defendants conspired to allocate customers.  Instead, Plaintiffs allege sporadic instances of communications between a few employees of some Defendants occurring during narrow bands of time relating to unidentified products and markets, the kind of "search for" market intelligence and background "noise" not uncommon to competitive markets.  From this, Plaintiffs try to extrapolate a far reaching conspiracy among more than two dozen companies, many of which never are mentioned in any of the communications, involving hundred of products and numerous variants of foam.  The disconnect between facts and allegations is palpable and under *Twombly* fatal.  Simply put, the Plaintiffs' allegations of conspiracy, untethered to supporting facts, implausible in the market dynamics they describe, and contradictory of allegations in a number of the

"legacy" complaints underlying the CAC, far overreach, and the CAC should be dismissed for failure to state a claim pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.

## STATEMENT OF THE ISSUES TO BE DECIDED

Whether the limited factual allegations pled in Plaintiffs' CAC in support of an alleged nationwide, twelve year conspiracy involving twenty-six different defendants and an untold number of co-conspirators, covering all types and grades of polyurethane foam and unenumerated foam products are sufficient to "raise a right to relief above the speculative level" and to "state a claim to relief that is plausible on its face" under *Twombly* and its progeny.  *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555, 570 (2007).

## BACKGROUND FACTS

### I.    <u>The Products</u>

The CAC broadly purports to allege a conspiracy to restrain trade in the market for flexible polyurethane foam and all types of flexible polyurethane foam products.  (CAC ¶ 1.) According to the CAC, flexible polyurethane foam, a variety of foam typified by open cells that make the end product soft, light, resilient and breathable, (CAC ¶ 57), is used in "hundreds of consumer products" to provide cushioning, insulation, comfort, support, safety, and durability. (CAC ¶ 126.)  The CAC acknowledges, as it must, the differentiated nature of the applications for flexible foam by describing some of them--furniture, bedding, packaging, flooring, mattresses, memory foam products, carpet underlay, textiles, upholstery, electronics, filters, dispensers, gaskets, motor vehicles and motor vehicle components, medical and healthcare products, industrial products, building and construction products, personal care items, and seals for products ranging from blood oxygenators to computer disk drives.  (CAC ¶¶ 1, 13-47, 59, 126.)  It also concedes the variability of the foams needed to address these differing applications,

noting, for example, that one of the named Defendants uses more than 160 flexible polyurethane foam formulations.  (CAC ¶ 27.)

According to the CAC, the manufacturing processes for flexible foam demonstrate an equal lack of homogeneity.  (CAC ¶ 57.)  Block foam, used in furniture and bedding, is manufactured by pouring chemicals called polyols and toluene diisocyanate ("TDI"),  (CAC ¶ 64) onto a moving conveyor, where the resulting slab or "bun" is allowed to form before being cut, stored, cured and then fabricated into usable shapes and sizes.  (CAC ¶¶ 56-57.)  Molded foam, by contrast, is manufactured by pouring a similar chemical mix into molds, where the chemical reaction takes place and the size and shape of the resulting product is determined.  (CAC ¶ 58.)  The price of the constituent chemicals is the primary influence on the cost of producing all forms of polyurethane foam.  (Foam Factory Compl. ¶ 70.)  Other foam products, such as carpet cushion, are not the result of reactive chemistry at all, but are manufactured from scrap foam, both virgin and recycled, (CAC ¶ 56), subjecting carpet cushion to a completely different cost calculation.

One inconvenient truth left out of the CAC, but a key part of the CAC's "legacy" complaints--the individual complaints filed by the various plaintiffs before consolidation into the CAC--is that flexible foam is expensive and uneconomical to ship long distances because of its large mass-to-weight ratio.  It is bulky.  (Adams Foam Rubber Compl. ¶ 47; Ace Foam Compl. ¶ 43; J&S Compl. ¶ 56.)  This natural constraint on competition means that sales regions, customers and competitors, like foam products themselves, are fragmented and discrete, and plant location often limits the geographic areas in which foam manufacturers and other sellers compete.

II.  **The Parties**

A.  **Plaintiffs**

The CAC is brought by a diverse group of seven Plaintiffs from five different states, who claim to have purchased some unspecified type of foam product from one or more of the Defendants at some point between January 1, 1999 and the present.  (CAC ¶ 2.)  Plaintiff Adams Foam Rubber Co. ("Adams Foam"), by way of example, is an Illinois corporation allegedly in the business of converting and fabricating flexible polyurethane foam.  (Adams Foam Compl. ¶ 13.)  Plaintiff J&S Packaging, Inc. ("J&S"), on the other hand, is an Ohio corporation that purports to manufacture packaging materials for commercial customers.  (J&S Compl. ¶ 10.) Plaintiff GCW Carpet Wholesalers, Inc. t/a Floors USA ("Floors USA"), is a Pennsylvania company that allegedly sells and installs various types of flooring, including hardwood flooring, carpeting, area rugs, tile, stone, laminate, and vinyl (Floors USA Compl. ¶ 10), while Foam Factory, Inc. ("Foam Factory"), a California corporation, claims to purchase slab foam.  (Foam Factory Compl. ¶ 12.)  Plaintiffs Cambridge of California, Ace Foam, Inc. and VFP Acquisitions d/b/a Vanguard Foam do not specify the types of foam they purchased or the markets in which they operate.

B.  **Defendants**

Plaintiffs allege that each of the twenty-four named corporate Defendants "directly sold flexible polyurethane foam throughout the United States" and that the two individual Defendants "directed" certain of those entities to do so.  (CAC ¶ 13-47.)  Like Plaintiffs, the named Defendants are a diverse group.  Sixteen of the Defendants are United States corporations, headquartered in eleven different states.  (CAC ¶¶ 13-15, 20-21, 23, 25-26, 32-37, 45-46.)  Seven are foreign corporations – five Canadian and two Japanese.  (CAC ¶¶ 17-18, 28-29, 41-42, 44.) Two Defendants are joint ventures.  (CAC ¶¶ 32, 46.)  Another is a holding company.  (CAC

-4-

¶ 15.)  Some of the Defendants are parent or subsidiary corporations of other Defendants.  (CAC ¶¶ 17, 20 21, 28, 29, 32.)

Plaintiffs acknowledge that there are differences among the Defendants in the types of products they sell and that none of the Defendants sell all of the types of flexible polyurethane foam products encompassed by the CAC.  Only five of the twenty-six named Defendants, for example, are alleged to sell flexible polyurethane foam for the flooring industry.  (CAC ¶¶ 17, 18, 20, 25, 34.)  Four allegedly sell automotive products.  (CAC ¶¶ 24, 41, 43, 47.)  Two others sell industrial products.  (CAC ¶¶ 24, 41, 47.)  According to the CAC, only one Defendant sells upholstery products (CAC ¶ 43), while one other sells components for filters, dispensers, gaskets, and seals for products such as blood oxygenators and computer disk drives. (CAC ¶ 24.)  For several Defendants the CAC does not identify the markets in which they compete, but simply avers that they sold flexible polyurethane foam during the Class Period. (*See, e.g.*, CAC ¶¶ 14, 15, 21, 25, 28-30, 31.)

## III.  **The Purported Conspiracy**

Plaintiffs allege broadly that the twenty-six named corporate and individual Defendants "contracted, combined, or conspired to fix, raise, maintain, and/or stabilize prices and allocate customers for flexible polyurethane foam in the United States" during the period "from January 1, 1999 to the present."  (CAC ¶¶ 2-3.)  Plaintiffs further claim, without any supporting facts, that Defendants carried out this purported conspiracy by meeting two or three times per year, often coinciding with the bi-annual meetings by the Polyurethane Foam Association ("PFA").  (CAC ¶ 63.)  Plaintiffs, however, concede that only 70% of U.S. polyurethane foam manufacturers belong to the PFA.  (CAC ¶ 128.)  They identify only a small number of Defendants who allegedly are or have been PFA members and attended meetings.  (CAC ¶¶ 71, 89, 112d.)

Apparently realizing the determinative impact chemical prices have on the cost of producing flexible foam, Plaintiffs attempt to diffuse the issue by labeling as "pretextual" the fact that announcements of price increases in foam, not surprisingly, generally followed announcements of price increases by chemical manufacturers.  (CAC ¶ 64.)  According to the CAC, when Defendants' raw material suppliers announced a price increase, Defendants contacted each other to discuss raising foam prices, *id.*, allegedly talking by telephone and exchanging copies of price increase letters to customers.  (CAC ¶¶ 70, 74, 75.)  They further allege that "if defendants did not increase their foam prices by the same percentage amount at around the same time period, the attempted price increase would fail," (CAC ¶ 64), thereby describing legitimate pricing behavior, not a price fixing conspiracy illegal under any interpretation of the Sherman Act.

It is in support of these claims of communications between certain Defendants during periods of raw material price increases that Plaintiffs produce the only arguably "factual" allegations in the CAC.  Relying almost exclusively on unsealed affidavits submitted in support of applications by the U.S. Department of Justice and the Canadian Competition Bureau for search warrant authority, Plaintiffs allege sporadic communications involving a small number of employees of a few Defendants during limited periods of time, allegedly involving unidentified foam products in unspecified markets.  From these isolated, inconclusive exchanges, Plaintiffs attempt to build their elaborate nationwide, twelve year conspiracy involving twenty-six different defendants by embedding the small number of communications alleged in the CAC within sweeping, conclusory allegations of conspiracy not even remotely tied to or supported by those communications.  The communications do not mention most of the Defendants.  To illustrate, despite the claim of a nationwide conspiracy involving twenty-six Defendants and an untold

number of unnamed co-conspirators, involving all foam products, the factual allegations in the

CAC are few:

- No factual allegations whatsoever for the year 1999.

- Only one allegation relating to 2000 that states no more than that in June of that year, two of the twenty-six named Defendants communicated by email about a price increase.  (CAC ¶ 112a.)

- No allegations whatsoever for the years 2001, 2002, 2003, or for the first nine months of 2004.

- Allegations that in late 2004, three Defendants communicated about prices for foam in the automotive sector.  These same Defendants allegedly communicated regarding automotive products again in March 2005 and September 2005.  (CAC ¶¶ 112b-e.)

- No allegations of any nature for the years 2006, 2007, and the first four months of 2008.

- Allegations that in May 2008, Scottdel sent a copy of its price increase letter to Vitafoam seven days *after* Scottdel had circulated it internally.  (CAC ¶ 112i.)

- Allegations that in July 2008, four of the twenty-six Defendants communicated regarding a price increase *in Canada.*  (CAC ¶¶ 112j-l.)

- No allegations concerning the period from August 2008 through April 2009.

- Allegations that in May 2009, Vitafoam sent copies of its price increase letter to Future Foam, which then allegedly forwarded it to Scottdel.  (CAC ¶¶ 112m.)  Plaintiffs further aver that competitors' letters announcing a May 2009 price increase were present in Vitafoam's files, (CAC ¶ 112n), although they do not claim that Vitafoam received these price increase letters from its competitors.

- The purely conclusory allegation that in June 2009, two of the named Defendants reached an agreement with respect to promotional pricing for carpet foam.  (CAC ¶ 93.)

- No allegations regarding the time period from July 2009 through March 2010.

- Allegations of competitor communications during the April to June 2010 time frame, involving only a few Defendants.  (CAC ¶ 97.)  Plaintiffs claim that by that point in time, Vitafoam was cooperating with the Department of Justice ("DOJ").  (CAC ¶¶ 60-61.)  One such allegation, for example, simply states

that the Vice President of Vitafoam attended a PFA meeting in Baltimore, Maryland where he "discussed" foam pricing with a competitor. (CAC ¶ 89.) Plaintiffs do not allege that any of the other twenty-six Defendants were present during this conversation, or that this conversation resulted in an agreement either on price or customers. (*Id.*)

- A similar allegation claims that the President of Domfoam called the Vice President of Vitafoam to complain about Vitafoam competing for Domfoam's customers in Canada. (CAC ¶¶ 100-102.) Once again, there is no allegation that this complaint resulted in an agreement between Domfoam and Vitafoam not to compete for each other's customers. Just the opposite is true— complaints about competition would not be necessary unless competition existed. (*Id.*)

## MOTION TO DISMISS STANDARD

In *Bell Atlantic Corporation v. Twombly*, 550 U.S. 544, 555 (2007), the United States Supreme court re-examined federal pleading requirements under Rule 12(b)(6) in the context of an antitrust case. Recognizing the enormity of the burden placed on defendants in defending against casual allegations of "conspiracy," the Court held that "a plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' [under Rule 8(a)(2)] requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." 550 U.S. at 555. To survive dismissal, a complaint must instead contain "factual allegations" that are sufficient "to raise a right to relief above the speculative level" and "to state a claim to relief that is plausible on its face." *Id.* at 555, 570.

Although *Twombly*'s principles now have been expanded well-beyond the antitrust arena, *see Ashcroft v. Iqbal*, 129 S. Ct. 1937 (2009), coming as it did from the context of a Sherman Act conspiracy case, *Twombly* provides crystal clear direction in antitrust cases, and federal courts have not hesitated to dismiss cases that have violated its teachings. Because § 1 of the Sherman Act prohibits only "contracts, combinations . . . or conspiracies, in restraint of trade or commerce," the crucial question in any § 1 case is "whether the challenged anticompetitive conduct 'stem[s] from *independent* decision or from an agreement, tacit or express.'" *Twombly*,

550 U.S. at 553 (emphasis added). Allegations of similar, even parallel conduct, plainly are not enough. *Id.* at 551-57.

*Twombly* arose in the aftermath of passage of the Telecommunications Act of 1996 (the "Act"), which was designed to promote competition in the market for local telephone service. *Id.* at 549. The Act required Incumbent Local Exchange Carriers ("ILECs") to open their government-sanctioned regional monopolies over local telephone service to competition from so-called "Competitive Local Exchange Carriers" ("CLECs"). *Id.*

Plaintiffs alleged that ILECs conspired to restrain trade by engaging in parallel conduct in their respective service areas to inhibit the growth of upstart CLECs. *Id.* at 550. The complaint asserted, for example, that ILECs made unfair agreements with the CLECs for access to ILEC networks, provided inferior connections to the networks, and overcharged and billed in ways designed to sabotage CLECs' relationships with their own customers. *Id.* Plaintiffs further alleged that the ILECs agreed not to compete with each other, as evidenced by their failure to meaningfully pursue attractive business opportunities, and by a statement from the CEO of Qwest, an ILEC, stating that competing in the territory of another ILEC "might be a good way to turn a quick dollar but that doesn't make it right." *Id.* at 551. The complaint also maintained that the defendants "communicate[d] amongst themselves" through numerous industry associations. *Id.* at 572 (Stevens, J., dissenting).

In finding these allegations inadequate to survive a motion to dismiss, the Supreme Court noted the obvious: "[a]part from identifying a 7-year span in which the § 1 violations were supposed to have occurred (*i.e.*, 'beginning at least as early as February 6, 1996, and continuing to the present'), the pleadings mentioned no specific time, place or person involved in the alleged conspiracy." *Id.* at 565 n.10 (internal citations omitted). With regard to inhibiting the growth of

CLECs, the Court found that nothing in the complaint suggested the ILECs' resistance to upstart CLECs was anything more than the natural, unilateral reaction of each ILEC attempting to keep its regional dominance. *Id.* at 566. Resisting competition, the Court explained, "is routine market conduct," and as such, "there is no reason to infer that the companies had agreed among themselves to do what was only natural anyway." *Id.* To the contrary, the Court found that the ILECs' competitive reticence was *logical* because, prior to the Act, monopolies were the norm in the telecommunication industry and, as a result, "a natural explanation for the noncompetition alleged is that the former Government-sanctioned monopolists were sitting tight, expecting their neighbors to do the same thing." *Id.* at 568. The Court also flatly rejected plaintiffs' suggestion that belonging to the same trade association "plausibly" suggested the existence of a conspiracy. *Id.* at 567 n.12. Because plaintiffs' allegations were not sufficient to "nudge[] their claim across the line from conceivable to plausible," the Supreme Court upheld the lower court's dismissal. *Id.* at 570.

The Court's explanation of its rationale for requiring plaintiffs to plead *facts* establishing a *plausible* entitlement to relief before proceeding with an antitrust claim is important. Requiring factual support and "plausibility" in pleadings is necessary to expose deficiencies in the plaintiff's claim "at the point of minimum expenditure of time and money by the parties and the court." *Id.* at 558. Discovery – especially in antitrust cases – is expensive, and courts must "'insist upon some specificity in pleading before allowing a potentially massive factual controversy to proceed.'" *Id.* (quoting *Associated Gen. Contractors of Cal., Inc. v. Carpenters*, 459 U.S. 519, 528 n.17 (1983)). Needlessly expansive discovery would be particularly problematic in this case, with twenty-six named defendants, several alleged unnamed "co-

conspirators," large numbers of potential witnesses, countless products, and allegations of a twelve year, national conspiracy.

The federal courts, including the Sixth Circuit, have embraced *Twombly's* principles, routinely granting motions to dismiss improperly supported § 1 claims and dramatically narrowing the temporal and geographic scope of conspiracy claims that overreach the extent of any factual support that may exist.  *See In re Travel Agent Comm'n Antitrust Litig.*, 583 F.3d 896, 911 (6th Cir. 2009) (affirming dismissal of § 1 claim); *Total Benefits Planning Agency, Inc. v. Anthem Blue Cross & Blue Shield*, 552 F.3d 430, 436 (6th Cir. 2008) (same); *Jacobs v. Tempur-Pedic, Int'l*, 626 F.3d 1327, 1343 (11th Cir. 2010) (same); *Kendall v. Visa U.S.A., Inc.*, 518 F.3d 1042, 1048 (9th Cir. 2008) (same); *In re Elevator Antitrust Litig.*, 502 F.3d 47, 50-52 (2d Cir. 2007) (same); *In re Iowa Ready-Mix Concrete Antitrust Litig.*, No. C 10-4038-MWB, 2011 U.S. Dist. LEXIS 23311, at *49 (N.D. Iowa Mar. 8, 2011) (granting motion to dismiss § 1 claim); *In re Fla. Cement & Concrete Antitrust Litig.*, No. 09-23187-CIV, 2010 U.S. Dist. LEXIS 108528, at *58 (S.D. Fla. Oct. 12, 2010) (narrowing scope of § 1 claim for failure to plead sufficient facts even though some defendants had pled guilty to criminal charges); *Anderson News, LLC v. Am. Media, Inc.*, 732 F. Supp. 2d 389, 405 (S.D.N.Y. 2010) (granting motion to dismiss § 1 claim); *LaFlamme v. Societe Air France*, 702 F. Supp. 2d 136, 154-55 (E.D.N.Y. 2010) (same); *In re Hawaiian & Guamanian Cabotage Antitrust Litig.*, 647 F. Supp. 2d 1250 (W.D. Wa. 2009) (same); *In re LTL Shipping Servs. Antitrust Litig.*, No. 1:08-MD-01895-WSD, 2009 U.S. Dist. LEXIS 14276, at *43-44 (N.D. Ga. Jan. 29, 2009) (same); *In re Mun. Derivatives Antitrust Litig.*, 620 F. Supp. 2d 499, 516 (S.D.N.Y. 2009) (granting motion to dismiss § 1 claim as to certain defendants); *In re Cal. Title Ins. Antitrust Litig.*, No. C 08-01341 JSW, 2009 U.S. Dist. LEXIS 43323, at *25, *29 (N.D. Cal. May 21, 2009) (granting motion to

dismiss § 1 claim); *Lubic v. Fid. Nat. Fin., Inc.*, No. C08-0401 MJP, 2009 U.S. Dist. LEXIS 62092, at *13-14 (W.D. Wash. July 20, 2009) (same); *In re Pa. Title Ins. Antitrust Litig.*, 648 F. Supp. 2d 663, 689 (E.D. Pa. 2009) (same); *In re Parcel Tanker Shipping Servs. Antitrust Litig.*, 541 F. Supp. 2d 487, 492 (D. Conn. 2008) (same); *In re Late Fee & Over Limit Fee Litig.*, 528 F. Supp. 2d 953, 965 (N.D. Cal. 2007) (same); *In re Graphics Processing Units ("GPU") Antitrust Litig.*, 527 F. Supp. 2d 1011, 1024-25 (N.D. Cal. 2007) (same).[1]

The Sixth Circuit only recently affirmed the dismissal of a § 1 complaint even though it alleged meetings between competitors followed by industry-wide rate cuts. The allegations did not plausibly suggest an agreement because they were equally consistent with independent, unilateral conduct. *See In re Travel Agent Comm'n Antitrust Litig.*, 583 F.3d at 911. In *In re Travel Agent*, the plaintiff travel agencies alleged that the defendant airlines entered into a conspiracy to reduce, cap, and eventually eliminate the payment of base commissions to travel agencies. 583 F.3d at 898. They claimed the conspiracy began in 1995, when Delta, American, Northwest, United, and Continental each announced caps on base commissions. *Id.* at 899. Plaintiffs maintained that from 1997 through 2001, the airlines continued to institute various caps and commission cuts and, in each case, one of the airlines would announce the commission cap or cut, followed shortly thereafter by its competitors. *Id.* Then, in 2002, after Delta announced

---

[1] As noted in *In re LTL Shipping Services*, four helpful insights can be gleaned from post-*Twombly* cases. 2009 U.S. Dist. LEXIS 14276, at *43-51. First, a plaintiff can allege the existence of a conspiracy either directly or through circumstantial evidence, but circumstantial evidence of a conspiracy "must do more than merely show parallel conduct. A plaintiff must also plead *facts* plausibly suggesting that the parallel conduct was caused by an agreement." *Id.* at *43-44 (emphasis in original). Second, "for allegations of a conspiracy to reach the plausibility threshold required by *Twombly*, they often must include factual allegations such as the specific time, place, and persons involved in the conspiracy alleged." *Id.* at *45. Third, courts are often persuaded that a conspiracy is plausible by allegations of "'complex and historically unprecedented changes in pricing structure made at the very same time by multiple competitors, and made for no other discernible reason.'" *Id.* at *48 (quoting *Twombly*, 550 U.S. at 556 n.4). Finally, *Twombly*'s pleading standard "is rooted in the practical reality" that discovery is "enormously expensive" in antitrust cases, and that courts should insist on pleadings that provide a factual basis for relief before subjecting antitrust defendants to discovery. *Id.* at *50.

that it would eliminate its practice of paying base commissions, effective immediately, its competitors followed suit within ten days.  *Id.*

Plaintiffs argued that the elimination of travel agency base commissions could not have occurred without collusion because such an action, if taken independently, would have been contrary to each defendant's self-interest.  *Id.* at 900-01.  In support of this proposition, they relied upon United's unsuccessful attempts to cut base commission rates in 1981 and American Airlines' similar failure in 1983.  *Id.*  Following the failed 1983 commission cut, plaintiffs alleged that an unnamed American Airlines executive stated that the airlines had learned not to try to cut commissions until everyone was on board, and that he further encouraged an executive of an unnamed competitor airline to increase fares by 20% to "make more money."  *Id.* at 911. Plaintiffs also relied upon the deposition testimony of former American Airlines executive Michael Gunn, who testified that "industry consensus" was necessary for the commission cuts and caps to hold.  *Id.* at 900.  He conceded that "he had to match commission cuts exactly or he would undercut the movement."  *Id.*

Plaintiffs had more.  They alleged, for example, that defendants attended various meetings where competitors were present.  *Id.*  More specifically, the complaint alleged that in mid-1999, executives from three of the airlines "met for three hours in a Dallas hotel conference room," and that in 2001, a Delta executive "met for a weekend of golf and socializing" at the home of an executive of American Airlines who had pricing authority.  *Id.*  The dates and locations of these meetings all were pled, as was the fact that "industry-wide simultaneous rate cuts . . . followed immediately thereafter."  *Id.* at 913.  As further "evidence" of the alleged conspiracy, plaintiffs relied on the fact that the airlines exchanged pricing information through the Airline Reporting Corporation ("ARC"), an information exchange clearinghouse.  *Id.* at 907.

None of this was found sufficient to state a plausible conspiracy. *Id.* at 908. Although plaintiffs tried to distinguish *Twombly* on grounds that their complaint alleged "independent allegations of *actual* agreement," the Sixth Circuit found that plaintiffs' averments of "agreement" were "nothing more than a legal conclusion 'masquerading' as a factual allegation." *Id.* at 905 (emphasis added). Importantly, the Court also concluded that indeterminate allegations regarding conduct by "defendants" or "defendants' executives" could not be used to implicate any specific defendant because "they represent precisely the type of naked conspiratorial allegations rejected by the Supreme Court in *Twombly*." *Id.* at 905. The Court was similarly unpersuaded by the allegations that defendants obtained competitor base commission rates from the ARC. *Id.* at 907. Because the complaint did not allege that the defendants had access to such information before implementing rate reductions, access to the ARC did not suggest a viable means to collude. *Id.* Nor did the statements of Michael Gunn provide evidence of an agreement. *Id.* at 909. The Court understood and accepted that matching a competitor's commission cap does not suggest illegality because it just as plausibly could have been the result of "a reasoned, prudent business decision" to reduce internal commission costs, *id.* at 910, and the 1983 statements by the American Airlines executive were "too remote in time to support a plausible inference of agreement." *Id.* at 911.

## LEGAL ANALYSIS

I. __The CAC Fails to Satisfy the Pleading Requirements Set Forth in *Twombly*.__

In *Ashcroft v. Iqbal*, 129 S. Ct. 1937 (2009), the Supreme Court declared that district courts should apply the principles of *Twombly* by following a two-pronged approach when evaluating the factual sufficiency of a complaint. First, the court should identify and disregard those allegations "that, because they are no more than conclusions, are not entitled to the assumption of truth." *Iqbal,* 129 S. Ct. at 1950. Second, the court should assume the veracity of

any well-pleaded allegations and determine whether they *plausibly* give rise to relief. *Id.*

(emphasis added). Applying these principles to the present case, the factual allegations in the

CAC do not plausibly suggest any conspiracy and certainly not one of the vast scope and

duration alleged by Plaintiffs, and the CAC should be dismissed.

> **A.**   **The CAC's Conclusory Allegations Should Be Ignored for Purposes of this Motion to Dismiss.**

The CAC is largely made up of conclusory allegations that must be ignored for purposes

of deciding this motion to dismiss. For example, paragraphs 1-5 and 63-69 of the CAC simply

repeat in various ways the broad allegation that "Defendants" "conspired," "communicated,"

held "meetings," and reached "agreements" or "understandings" regarding price increases.

Those paragraphs offer *no* facts in support any of these claims, and are therefore not entitled to a

presumption of truth or any weight or consideration in deciding this Motion to Dismiss. *See,*

*e.g., In re Travel Agent*, 583 F.3d at 905 (indeterminate assertions regarding "agreements" and

"defendants" are "precisely the type of naked conspiratorial allegations rejected by the Supreme

Court in *Twombly*").

Similarly, paragraphs 70-87 and 91-94 claim in purely conclusory fashion that

"Defendants" "coordinat[ed] price increases," "had conspiratorial discussions," "communicated

. . . by telephone and fax[]," and "exchanged copies of price increase letters." While some of

these allegations purport to be supported by a list of names, and in some cases job titles, of

individuals who supposedly participated in the alleged conspiracy, under *Twombly* listing names

and job titles "cannot make the conspiracy itself more plausible, when those allegations do not

contain any other specific details." *See In re Mun. Derivatives Antitrust Litig.*, 620 F. Supp. 2d

at 518 ("Although the CAC does provide the names and positions of the employees allegedly

involved, that is not enough to state a claim for antitrust violations, because otherwise a § 1

claim could be stated simply by obtaining the names and positions of a defendant's relevant employees, which requires relatively minimal inquiry.").

At least 90 paragraphs of the 160-paragraph CAC are unquestionably conclusory and of no moment for purposes of deciding this Motion.  (CAC ¶¶ 1-5, 48-55, 62-87, 90-96, 113-120, 122-125, 127, 129-160.)  Of the remaining paragraphs, 42 describe the parties (CAC ¶¶ 6-47), and five purport to describe the market for flexible polyurethane foam (CAC ¶¶ 56-59, 121, 126).  The remaining twenty paragraphs contain bits and pieces of factual support, but none that plausibly support the broad, long-running conspiracy Plaintiffs attempt to plead.

### B.    The CAC Does Not Allege Facts Establishing the Time Span or Formation of a Conspiracy.

As courts recognize, those complaints alleging a § 1 violation that have survived motions to dismiss typically plead "specific dates, or at least a specific limited date range, during which the defendants were thought to have reached an anticompetitive agreement."  *In re LTL Shipping Servs. Antitrust Litig.*, 2009 U.S. Dist. LEXIS 14276, at \*45.  There are no such allegations in the CAC, no allegations establishing when and how the alleged conspiracy was formed, by whom, where, and for what purposes.  That alone requires dismissal.

In *Twombly*, for example, the complaint included the allegation that the conspiracy began "at least as early as February 6, 1996, and continu[ed] to the present."  *Twombly*, 550 U.S. at 565 n.10.  The Court held that simply "identifying a 7-year span in which the § 1 violations were supposed to have occurred" was not sufficient to state a claim where it did not allege the "specific time, place, or person involved."  *Id.*  Similarly, in *In re LTL Shipping Serv. Antitrust Litig.*, 2009 U.S. Dist. LEXIS 14276, at \*66, the allegation that a conspiratorial agreement was reached at some point between 2003 and 2007, was found not to "state a time frame of agreement with sufficient particularity" to allow the court to infer a conspiracy.  *Id.* at \*66.

As a number of courts have found, dismissal of a § 1 complaint is proper, without more, if it fails to include factual allegations regarding the formation of the conspiracy.  *See, e.g., Dowdy & Dowdy P'ship v. Arbitron, Inc.*, No. 2:09-cv-253, 2010 U.S. Dist. LEXIS 107123, at *8-9 (S.D. Miss. Oct. 6, 2010) (dismissing complaint where plaintiff did not allege "when, where, or how the conspiracy was formed"); *RxUSA Wholesale, Inc. v. Alcon Labs., Inc.*, 661 F. Supp. 2d 218, 233 (E.D.N.Y. 2009) (dismissing complaint where there were no "allegations as to when th[e] alleged scheme formed or what the alleged conspirators specifically agreed to do"); *In re Bath & Kitchen Fixtures Antitrust Litig.*, No. 05-cv-00510 MAM, 2006 U.S. Dist. LEXIS 49576, at *16 (E.D. Pa. July 19, 2006) (pre-*Twombly* case dismissing complaint where "except for alleging that the agreement to fix prices was carried out over an approximately four year time period, [the complaint made] no claims as to when the defendants actually formed the conspiracy").

At one point, the CAC alleges that the purported conspiracy has affected polyurethane foam prices "going back to *at least* 1999," suggesting that Plaintiffs believe the alleged conspiracy began at some unknown point prior to 1999.  (CAC ¶ 94.) (emphasis added). Elsewhere in the CAC, however, Plaintiffs maintain that Defendants reached an agreement to restrain trade at some unknown point in time "[d]uring" the twelve-year Class Period.  (CAC ¶ 3.)  Thus, beyond simply saying that it happened, Plaintiffs have not in any way narrowed the timeframe during which the alleged conspiracy began, or provided a single factual allegation detailing who initiated the purported conspiracy, how and where it was formed, and when each of the twenty-six Defendants supposedly joined.

The essence of a § 1 claim is an agreement.  There are no allegations in the CAC establishing when the Defendants supposedly entered into an agreement to fix the prices of foam.

Just as importantly, there is nothing in the CAC suggesting that a conspiracy to fix prices in foam among twenty-four disparate companies and two individuals selling different products in different markets is "plausible."  Without plausible, factual allegations establishing when or how that agreement was reached and the nature of that agreement, Plaintiffs have not met even the first step in their *Twombly* pleading obligations, and the CAC should be dismissed.

### C. The CAC Does Not Allege Facts Establishing Each Defendant's Participation in the Alleged Conspiracy.

As *Twombly* makes clear, a complaint asserting a § 1 violation must allege facts establishing *each* defendant's participation in the alleged conspiracy.  *See In re Travel Agent Comm'n Antitrust Litig.*, 583 F.3d at 905-06 (affirming dismissal of named defendants that were not mentioned in the body of the complaint and holding that allegations generally referencing "defendants" or "defendants' executives" were conclusory); *Total Benefits Planning Agency, Inc.*, 552 F.3d at 436 ("Generic pleading, alleging misconduct against defendants without specifics as to the role each played in the alleged conspiracy, was specifically rejected by *Twombly*."); *In re Elevator Antitrust Litig.*, 502 F.3d at 50-51 (a complaint that pleads in "entirely general terms without any specification of any particular activities by any particular defendant . . . is nothing more than a list of theoretical possibilities, which one could postulate without knowing any facts whatever" (internal quotation marks and alterations omitted)); *In re Pa. Title Ins. Antitrust Litig.*, 648 F. Supp. 2d at 688 (under *Twombly*, plaintiffs must allege "sufficiently independent participation in the conspiracy" on the part of each defendant); *Lubic*, 2009 U.S. Dist. LEXIS 62092, at *15 ("A complaint must allege that each individual defendant joined the conspiracy and played some role in it because at the heart of an antitrust conspiracy is an agreement and a conscious decision by each defendant to join it").  Despite that obligation, the CAC does not even mention several Defendants except to say who they are in its introductory

-18-

portions.  It attempts to link other Defendants to its expansive conspiracy claims only by reference to alleged "communications" between a small number of employees of some Defendants during discrete time periods regarding, in some instances, inquiries about "pricing," "price increases" or whether price increase letters for unidentified products in unidentified markets have or will be published.  Nothing in those allegations suggests any agreement at all – many of the communications show just the opposite – and certainly not a twelve year conspiracy among twenty-six defendants and perhaps others, involving all foam products and extending nationwide.

The problems with the CAC do not stop there, however.  For example, Plaintiffs have named as Defendants multiple entities in the same corporate families, improperly lumping them together and referring to them collectively throughout the CAC as if they were single entities. (*See* CAC ¶¶ 15, 21, 30, 46.)  Under *Twombly* that too is impermissible.  *See In re TFT-LCD (Flat Panel) Antitrust Litig.*, 586 F. Supp. 2d 1109, 1115, 1117 (N.D. Cal. 2008) (dismissing claims against all defendants that had been improperly lumped together by corporate family); *see also Lubic*, 2009 U.S. Dist. LEXIS 62092, at *15 (dismissing parent corporations as defendants because the complaint failed to allege their role in the alleged conspiracy); *In re Pa. Title Ins. Antitrust Litig.*, 648 F. Supp. 2d at 689 (same).[2]

---

[2] It is axiomatic that a parent corporation generally is not liable for the acts of its subsidiary, even wholly owned subsidiaries.  *See Transition Healthcare Assocs., Inc. v. Tri-State Health Investors, LLC*, 306 F. App'x 273, 280 (6th Cir. 2009).  The reverse also is true; subsidiaries are not generally liable for the actions of a parent.  *Gering v. Fraunhofer USA., Inc.*, No. 05-73458, 2009 WL 2877414, at *3 (E.D. Mich. Sept. 3, 2009) (attempts to hold a subsidiary liable for actions of a parent was a "novel" legal theory for which the Court found no support).  Only in "extraordinary cases" will courts "pierce the corporate veil and disregard the corporate entity.  *Transition Healthcare Assocs., Inc.*, 306 F. App'x at 280.

Courts require a three-part showing to pierce the corporate veil:  "(1) control over the corporation by those to be held liable was so complete that the corporation has no separate mind . . . (2) control . . . was exercised in such a manner as to commit fraud or an illegal act against the person seeking to disregard the corporate entity, and (3) injury or unjust loss resulted to the plaintiff from such control."  *Dombroski v. WellPoint, Inc.*, 895 N.E.2d 538, 543 (Ohio 2008) (internal quotation marks omitted); *see also In re Welding Fume Prods. Liab. Litig.*, No. 1:03-CV-17000, 2010 U.S. Dist. LEXIS 57859, at *47 (N.D. Ohio June 11, 2010) (finding plaintiffs' complaints failed to

The complaint in *In re TFT-LCD (Flat Panel) Antitrust Litigation*, which did not contain "individualized allegations" about each corporate entity, but instead referred to entities in the same corporate families collectively, for example, as "NEC" or "Hitachi," 586 F. Supp. 2d at 1116-17, illustrates the point.  The court there held that allegations as to "a single corporate entity such as 'Hitachi' [were] insufficient to put specific defendants on notice of the claims against them," *id.* at 1117, and granted defendants' motions to dismiss.  Only by including "allegations specific to each defendant alleging that defendant's role in the alleged conspiracy" would plaintiffs be able to state a claim.  *Id.*  The same is true here.

The essence of Plaintiffs' conspiracy theory is that Defendants "conspired" to raise foam prices when the price of chemicals increased, a quintessential "independent" business reason for a foam manufacturer to increase prices.  As at least one of the legacy complaints alleges, the price of the constituent chemicals is the primary influence on the cost of producing polyurethane foam.  (Foam Factory Compl. ¶ 70.)  That fact simply adds to the utter implausibility of two dozen or more disparate companies selling different products to different customers in different markets *conspiring* to raise foam prices when the prices of chemicals constituting the primary influence on the cost of producing foam increase.  The Supreme Court expressly noted in *Twombly* that "there is no reason to infer that the companies had agreed among themselves to do what was only natural anyway," *Twombly,* 550 U.S. at 566.  Put slightly differently, there is nothing inconsistent with unilateral decision-making when competitors react in similar fashion to similar market inputs.  *See In re Travel Agent,* 583 F.3d at 903.  Because behavior consistent

---

allege facts sufficient to support a veil-piercing theory under any state's law); *Whetstone Candy Co. v. Kraft Foods, Inc.*, 351 F.3d 1067, 1078-79 (11th Cir. 2003).

Despite grouping Defendants, Plaintiffs have pled no facts to support a challenge to the autonomy of the individual Defendants or to pierce the corporate veil.  Under *Twombly* that is insufficient.

with unilateral decision making simply cannot provide the basis for a Section 1 Complaint, as in *Twombly*, Plaintiffs have not even come close to nudging this case across the line from "conceivable" to "plausible," 550 U.S. at 570, and the CAC should be dismissed. *See White v. R.M. Packer Co.*, 2011 U.S. App. LEXIS 3276 at *12-14 (1st Cir. Feb. 18, 2011).

> **D.**  **The CAC Does Not Plead Facts Establishing a Plausible Conspiracy to Allocate Customers.**

The CAC fails to plead any facts plausibly suggesting a conspiracy to allocate customers in the market for flexible polyurethane foam.  Only eleven paragraphs of the 160-paragraph CAC mention this supposed conspiracy, and eight of those paragraphs are conclusory on their face. (CAC ¶¶ 3, 67, 72-74, 79-80, 90, 100-102.)  The remaining three paragraphs of the CAC mentioning "customers" plainly do not even distantly support Plaintiffs' claim that any of the twenty-six Defendants reached an agreement to allocate foam customers in the United States. (CAC ¶¶ 100-102.)  Rather, at most, these three paragraphs suggest that during three telephone conversations *in May 2010*, efforts by the President of Domfoam to dissuade Vitafoam from selling to a customer of Domfoam in the Canadian market were unsuccessful, and no agreement was reached.  (*Id.*)

It is entirely plausible and rational, and in a company's individual best interest, to make judgments about where and when a company will attempt to take business from a competitor. Assessing the competitors' likely reaction in terms of market response—will the competitor be able to lower prices and keep the customer, or will the activity launch a price war—are all legitimate considerations every competitor must make each time it targets new business.  It is very similar to two gas stations located across from each other at a busy intersection.  If one station lowers its posted prices to try to attract more customers, it invites its competitor to lower prices also, meaning that both will sell gasoline for less.  If one of the stations raises prices, the

competitor must decide whether to "follow" or keep his prices where they are in the hopes of attracting more customers.  Pricing decisions of this nature are made everyday by competitors  in many different industries—automobiles and airlines to name just two of them—and it is a normal part of the competitive arena, a point well made in *White*,  2011 U.S. App. LEXIS 3276 at *12-14.[3]  Simply labeling this type of rational pricing behavior as "sinister" or "pretextual" does not make it so or change its competitive nature, as *Twombly* and its progeny make clear.

The conversations alleged in paragraphs 100-102 of the CAC are far more consistent with two companies making competitive decisions based on independent assessments of market conditions than they are with the notion that two companies have reached agreement to allocate a customer.  There is no reference at all in the communications, in fact, to an "agreement," which logically would have been mentioned if it existed.  The calls instead reflect little more than competitive bluster.  What is even clearer, however, is that these three paragraphs provide not a *scintilla* of support for the existence of a conspiracy to allocate customers affecting the United States as a whole, involving all twenty-six Defendants, lasting twelve years, and involving the direct purchasers of hundreds of flexible polyurethane foam products.

---

[3] In *White*, the court concluded that "[o]ne does not need an agreement to bring about this kind of follow-the-leader effect in a concentrated industry."  2011 U.S. App. LEXIS 3276 at *34.  The defendants in *White* operated four of the nine gas stations on Martha's Vineyard.  *Id.* *10.  The court noted that because gasoline is a homogeneous good, meaning that consumers buy it based mostly on price and convenience, the gas stations had the incentive to prominently post their prices, which not only informed consumers the price, but also allowed competitors to monitor and quickly respond to price changes.  *Id.* at *12-13.  Under these circumstances, the court noted that competitors have very little incentive to cut prices.  *Id.* at *13.  If, for example, one station were to drop its price in an effort to attract more business, its competitors could quickly drop their prices to match.  *Id.*  The price "cheater" would obtain almost no benefit from the price cut, and all of the gas stations would suffer a decrease in profit margin.  *Id.*  In contrast, a gas station acting as a price "leader" has nothing to lose by raising its prices under such market conditions.  *Id.*  Other gas stations are likely to follow the price increase because it will mean higher prices and profit margins for everyone, but if for some reason the competitors do not follow the increase, the leader can easily drop its price again so that few customers are lost to the lower-priced competition.  *Id.* at *13-14.  The court concluded that "[k]nowing these features of the market, each gas station owner is likely to reach its own independent conclusion that its best interests involve keeping prices high, including following price changes by a price 'leader' (if one emerges), in confidence that the other station owners will reach the same independent conclusion."  *Id.* at *14.

E.    **The CAC Does Not Plead Facts Establishing a Plausible Conspiracy
      Impacting the Sale of Every Type of Polyurethane Foam Product.**

Even before *Twombly*, a plaintiff alleging the existence of a conspiracy impacting

multiple products was required to allege factual allegations that were separately and specifically

directed to *each* of those products.  *In re NASDAQ Market-Makers Antitrust Litig.*, 894 F.

Supp. 703 (S.D.N.Y. 1995), for example, the court dismissed a complaint in which plaintiffs

alleged that 33 market makers on a stock exchange conspired to fix and maintain the "spread"

paid by plaintiffs "in certain NASDAQ-listed securities." *Id.* at 706-07.  Defendants moved to

dismiss on grounds that "[t]he Complaint afford[ed] defendants no notice regarding the identity

(or even the number) of the 'Class Securities,' that will be the subject of this action." *Id* at 710.

The court agreed:

> Sufficient notice has not been given to potential defendants in this
> action as to the securities alleged to be the subject of the
> conspiracy.  While some defendants are named in the Complaint
> others are described simply as major-market makers that traded
> Class Securities.  The Class Securities are defined as "any and all
> stocks traded on the Nasdaq National Market for which odd-eighth
> quotations were effectively eliminated for a period of at least on
> continuous, full year within the period of May 1, 1989 to May 27,
> 1994." ¶¶ 81 and 82, Complaint.  Given the massive nature of the
> conspiracy alleged, it is reasonable to require the plaintiffs to
> identify the subject stocks so that adequate notice is given to
> defendants and co-conspirators that the allegations pertain to those
> securities.

*Id.* at 711 (citing *Mountain View Pharmacy v. Abbott Labs.*, 630 F.2d 1383, 1387-88 (10th Cir.
1980)).

Similarly, in *Mountain View Pharmacy*, the district court dismissed a complaint filed by

thirteen independent drugstores alleging that 28 drug manufacturers violated Section 1 of the

Sherman Act.  630 F.3d at 1385.  Two subsequent amended complaints were filed – and

dismissed – because they contained only "allegations relating to one specific drug and one

manufacturer, [and] no facts had been added to support the alleged statutory violations." *Id.*  The

-23-

Tenth Circuit affirmed, noting that "[t]he complaint failed to allege any specific act by any defendant concerning any drug upon which injury to any plaintiff was predicated." *Id.* at 1387; *see also, e.g.*, *In re Elevator Antitrust Litig.*, No. 04CV 1178 (TPG), 2006 WL 1470994, at *8 (S.D.N.Y. May 30, 2006), *aff'd*, 502 F.3d 47 (2d Cir. 2007) ("The point is that a complaint alleging antitrust violation in elevator sales and maintenance is truly vacuous unless it contains allegations about specific plaintiffs, specific transactions, and specific wrongdoing.").

 *Twombly* clearly did not diminish the high degree of specificity linking specific products to identifiable predicate acts the courts have insisted upon in order for an antitrust complaint to survive a motion to dismiss.  *See In re TFT-LCD (Flat Panel) Antitrust Litig.*, 2010 U.S. Dist. LEXIS 65037, at *31; *see also In re Bath & Kitchen Fixtures Antitrust Litig.*, 2006 U.S. Dist. LEXIS 49576, at *23-24 (dismissing complaint where "the plaintiffs appear[ed] to be using different . . . products interchangeably when making allegations of price fixing").  The CAC fails in this essential pleading requirement as well.

 *In re Flat Panel Antitrust Litigation* provides a recent analysis of this important pleading obligation.  In that case, Motorola filed a complaint separate from the class action complaint alleging a conspiracy by suppliers of liquid crystal display ("LCD") panels.  2010 U.S. Dist. LEXIS 65037, at *6.  Unlike the class action complaint, which involved only thin-film transistor ("TFT") panels, Motorola alleged that the conspiracy impacted three types of products:  (1) TFT panels; (2) color super-twist nematic ("CSTN") panels; and (3) monochrome super-twist nematic ("MSTN") panels.  *Id.* at *30.  Defendants filed a motion to dismiss, arguing that the factual allegations in the complaint referred only to TFT-LCD panels, and that Motorola had not alleged any facts establishing that the alleged conspiracy encompassed panels using CSTN or MSTN technology.  *Id.* at *31.  The motion was granted.  *Id.* at *34.  Because the complaint did not

contain "any specific factual allegations that defendants conspired to fix the prices" of CSTN or MSTN panels, the district court could not "infer the existence of such an expanded conspiracy based solely on allegations of price-fixing in the TFT-LCD market." *Id.*

In this case, Plaintiffs attempt to allege a conspiracy to fix prices across "hundreds of consumer products" containing flexible polyurethane foam. (CAC ¶ 126.) Plaintiffs concede that those products are diverse. (CAC ¶¶ 1, 13-47, 59, 126.) Nowhere, however, does the CAC particularize allegations with respect to any of them.

By way of example, the CAC contains a single allegation related to carpet underlay, and that allegation claims only that two of the Defendants, Vitafoam and Valle, reached an agreement on June 2009 on the promotional pricing for carpet foam for a *common* customer. (CAC ¶ 93.) In addition to being purely conclusory, this allegation, limited to a single incident regarding one customer, is neither descriptive nor supportive of Plaintiffs' contention that the twenty-six Defendants engaged in a twelve-year conspiracy spanning the entire United States to fix the prices of all foam products.

The CAC's allegations regarding the automotive sector provide another example. All relate either to alleged communications between Bill Lucas, Vitafoam's President, and Woodbridge in the late 2004 to late 2005 time frame or conclusory allegations of communications between Vitafoam and Foamex "regarding automotive price increases." (CAC ¶¶ 85-87, 112c-d, 112f, 112h.) It simply is not possible to extrapolate from these limited contacts a nationwide conspiracy involving the twenty-six Defendants, lasting for twelve-years, to fix the prices of foam used in automotive products, let alone the prices for all flexible polyurethane foam products.

Even furniture is mentioned in only a single allegation in the CAC, paragraph 112, where Plaintiffs allege that on March 9, 2005, Bill Lucas told a Woodbridge employee that "in Furniture – they were still one [price increase] behind." (CAC ¶ 112f.) How this allegation, which shows that Vitafoam and Woodbridge were not even charging the same prices as other manufacturers for foam used in furniture, plausibly suggests a price fixing agreement even with respect to furniture products is not explained and, at the risk of being overly repetitive, it certainly does not support claims of conspiracy among twenty-six Defendants to fix the price of all foam products sold in the United States over a twelve year period.

Another "single allegation" product category is bedding. Allegedly, in June 2005, Vitafoam and Hickory Springs representatives spoke on the telephone about "the bedding stuff." (CAC ¶ 112h.) Whether or not true, reliance on this type of ambiguous comment is more suggestive of "straw grasping" than "conspiracy."

Even with respect to *categories* of products, the CAC engages in a definitional sleight of hand. For example, the CAC *defines* "flexible polyurethane foam" to "refer[] to both slabstock and molded polyurethane foam," and then simply makes the claim that "both" product families "were the focus of the conspiracy alleged herein." (CAC ¶ 1.) This is not, however, a factual showing of conspiracy, and the Federal Rules "[do] not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions." *Iqbal*, 129 S. Ct. at 1950.

The CAC's conclusory assertion that molded foam is a "focus" of the purported conspiracy is unsupported by any facts. Only two paragraphs in the CAC even make reference to molded foam. (CAC ¶¶ 56, 58.) No named plaintiff is identified as a purchaser of molded foam, and no defendant is identified as a producer. No facts relating to the pricing of molded foam are alleged. In the two paragraphs of the CAC that mention molded foam,  moreover,

Plaintiffs concede that it is a separate "product segment," produced by a different method and is different from "commodity or slabstock foam."  *Id*.  And, despite attempting to bolster their allegations of conspiracy with claims that the commodity nature of the market for foam make it susceptible to collusion, (*see, e.g.*, CAC ¶¶ 125-127), the CAC describes molded foam as anything but a commodity, recognizes that molded products are specially "engineered" for high-end uses—primarily automobile seats.[4]  (CAC ¶¶ 56, 58.)

The indiscriminate and contradictory nature of the CAC's allegations also are evident from a number of the Plaintiffs' legacy complaints, which acknowledge the lack of any factual basis for a molded foam conspiracy.  For example, Spring Air International LLC admits that slabstock foam and molded foam are "two separate markets" and concedes it "does not allege violations of Section 1 in the market for . . . flexible, molded polyurethane foam."  (Spring Air Compl. Intro., ¶ 1.)  Other legacy complaints say the same thing.[5]  The Indirect Purchaser complaint likewise limits its allegations to foam slabstock.  (Indirect Purchaser Pls.' CAC ¶ 1 ("As used herein, flexible polyurethane foam refers to slabstock polyurethane foam, which was the focus of the conspiracy alleged herein").)

As the Sixth Circuit has explained, "[p]ursuant to *Twombly*, district courts must assess the plausibility of an alleged illegal agreement *before* parties are forced to engage in protracted litigation and bear excessive discovery costs."  *In re Travel Agent Comm'n Antitrust Litig.*, 583 F.3d at 908-09 (original emphasis).  This is "because discovery in antitrust cases frequently causes substantial expenditures and gives the plaintiff the opportunity to extort large settlements even where he does not have much of a case."  *Kendall v. Visa U.S.A., Inc.*, 518 F.3d 1042, 1047

---

[4] If Plaintiffs are suggesting that all slabstock foam is a commodity product, that too is unsupported by factual allegations in the CAC.  For example, one Defendant, Plastomer "develops patented blends for specific applications," the antithesis of a commodity product.
*See, e.g.*, www.plastomer.com/plastomeradvanceddesignguide.pdf.
[5] (Alyanna Amended Compl. Intro., ¶ 1; J&S Compl. Intro., ¶ 1; Abdinoor's Carpet Compl. Intro., ¶ 1.)

(9th Cir. 2008). Speculative, broad-brush pleading cannot, without more, state a claim for conspiracy. *See, e.g.*, *In re Elevator Antitrust Litig.*, 502 F.3d at 52 (allegation of conspiracy in one market does not alone suffice to plead basis for conspiracy in another market; rejecting "if it happened there, it could have happened here" pleading); *In re TFT-LCD (Flat Panel) Antitrust Litig.*, 2010 U.S. Dist. LEXIS 65037, at *34 (rejecting argument that pleading of alleged conspiracy in one product sufficed to plead conspiracy in related product).

None of the allegations in the CAC are tied to any specific products or even categories of products, and nothing in the CAC would allow any court to infer the broad, long running conspiracy allegedly involving "hundreds" of different products Plaintiffs purport to plead.

**F.    The CAC Does Not Plead Facts Establishing a Plausible Conspiracy Spanning the Entire United States.**

To establish a plausible conspiracy in a particular geographic market, a plaintiff must allege "specific factual allegations" establishing that defendants compete for sales in that market. *In re Iowa Ready-Mix Concrete Antitrust Litig.*, 2011 U.S. Dist. LEXIS 23311, at *49. Where the plaintiffs do not allege sufficient facts establishing the geographic market in which the defendants compete, a "wide-ranging conspiracy" cannot be inferred. *Id.*

Although Plaintiffs purport to allege a nationwide conspiracy, none of Plaintiffs' factual allegations speak to supposedly conspiratorial conduct affecting customers actually located in the United States. There are, in fact, only three paragraphs in the 160-paragraph CAC containing factual allegations that arguably reference the United States. (CAC ¶¶ 89, 97, 112m-o.) One of those allegations posits that in May 2010, the Vice President of Vitafoam – who worked in Canada for Vitafoam, a Canadian corporation – attended a PFA meeting in Baltimore, Maryland, where he discussed pricing with a competitor. (CAC ¶ 89.) Vitafoam had no operations in the United States in May 2010. Regardless, since the CAC provides no allegations regarding that

such "discussions" related to future prices or had any pricing implications at all, either in Canada or in the United Sates, it certainly is not possible to infer whether "agreement" was invited, much less reached.

The two remaining allegations mentioning the United States state no more than the same Vitafoam employee in Canada exchanged price information with individuals located in the United States.  (CAC ¶¶ 97, 112m-o.)  Once again, it is impossible to tell from these content-challenged allegations whether the exchange, assuming it happened at all, involved current or future prices or customers in the United States and, if so, during what period of time or for what products, or whether agreement on price was contemplated or reached.  Certainly, the exchange of price related information, even if it occurred, between a few employees of a small number of Defendants, is not the type of activity from which a nationwide conspiracy involving twenty-six Defendants and foam products not even sold by the alleged price exchangers can be inferred.

The allegations in Plaintiffs' legacy complaints provide further evidence that the CAC's geographic market allegations (*i.e.*, the United States) are not plausible.  Specifically, when Plaintiffs first filed complaints in this litigation several of them alleged that it is uneconomical to ship flexible polyurethane foam long distances because of foam's large mass-to-weight ratio.  (Adams Foam Rubber Compl. ¶ 47.)  It is expensive to ship, in other words, because it is bulky and takes up a lot of space.  (*Id.*; Ace Foam Compl. ¶ 43; J&S Compl. ¶ 56.)  While this allegation was not included in the CAC, we do not understand Plaintiffs to repudiate what they alleged in their legacy complaints, and the fact that foam is bulky and expensive to ship is self-evident in any event.

In a very recent decision, *In re Iowa Ready-Mix Concrete Antitrust Litig.*, 2011 U.S. Dist. LEXIS 23311, at *49, the district court for the Northern District of Iowa addressed

specifically whether it is possible to infer a plausible conspiracy, expansive in scope,  if the

product in question can only be shipped within a limited geographical area.  Plaintiffs in that

case actually alleged an industry-wide conspiracy to fix prices in a much smaller geographic area

– the market for ready-mix concrete in the so-called "Iowa region."  *Id.* at *36.  In support of the

existence of such a conspiracy, Plaintiffs alleged that employees of certain corporate defendants

had pleaded guilty to engaging in a conspiracy to fix prices in the market for ready-mix concrete

in Northwest Iowa and into the surrounding states.  *Id.* at *38.  Plaintiffs further pled that

because antitrust conspiracies are secretive by nature, it would be premature to require them to

plead the exact temporal and geographical scope of the conspiracy.  *Id.* at *39.  The court

disagreed.  Because plaintiffs had alleged that ready-mix concrete is a product that must be

produced and delivered within a limited geographic area, a conspiracy covering the entire Iowa

region could not be inferred absent factual allegations establishing that each of the defendants

actually competed in that geographic market.  *Id.* at *49.  Since plaintiffs "d[id] not even allege

the geographical market in which any of the defendants operated or any overlap among their

geographical markets," the court was unable to infer the existence of a "wide-ranging

conspiracy."  *Id.*

In similar fashion, the CAC does not contain factual allegations establishing the

geographic regions in which individual Defendants operate and compete, what products they sell

in the various geographic areas, when they sold those products, where and when Defendants

competitively overlap, or any other details that would allow the Court to determine whether

allegations of a nationwide conspiracy are plausible, economically or factually.

Where the CAC does include allegations relating to geographic markets, those allegations

relate to flexible foam sold in Canada.  Plaintiffs concede that their allegations regarding the

alleged conspiracy were taken from interviews of Canadian employees (CAC ¶¶ 73, 82-83) of two Canadian corporations – Vitafoam and Woodbridge (CAC ¶¶ 41, 44) – in connection with a "pending Canadian government investigation." (CAC ¶ 62.) In addition, most of the very few instances where Plaintiffs are able to plead at least some facts allegedly supporting their conspiracy theories relate to Canada, not the United States. Paragraphs 100-102 of the CAC, for example, involve complaints by Domfoam about a Vitafoam salesman attempting to acquire Domfoam customers in Montreal. (CAC ¶¶ 100-102.) Paragraph 108 of the CAC relates to a 12% price increase in Canada, as evidenced by that paragraph's separate reference to rising prices in "the States." (CAC ¶ 108.) Paragraph 112l of the CAC relates to a 12% price increase by Mohawk in Vancouver and losing customers to Mohawk in Calgary. (CAC ¶ 112l.) In other instances communications alleged in the CAC do not identify the markets to which they relate, but involve the same individuals as in the Canada-specific allegations, suggesting that these allegations also relate to Canada. (CAC ¶¶ 74, 75, 81, 82, 84, 85, 87, 88, 89, 107, 109, 112k.)

Allegations of pricing communications in Canada regarding foam customers in Canada do not plausibly suggest the existence of a conspiracy in the United States, and any number of courts have rejected a "if it happened there, it could have happened here" approach to assessing the viability of conspiracy allegations. *See In re Elevator Antitrust Litig.*, 502 F.3d at 52 (anticompetitive conduct in Europe did not create a plausible inference of a conspiracy in the United States); *In re Hawaiian & Guamanian Cabotage Antitrust Litig.*, 647 F. Supp. 2d at 1258 (guilty pleas in the Puerto Rico trade lane did not create a plausible inference of a conspiracy in the Hawaii-Guam trade lane).

Because the CAC does not plead specific factual allegations regarding conduct in the United States or impacting the United States market for polyurethane foam sufficient to allow the

Court to infer the *nationwide* conspiracy alleged—indeed, the allegations in Plaintiffs' legacy complaints are to the contrary—the CAC should and must be dismissed.

**G.    The CAC Does Not Plead Facts Establishing a Conspiracy of Plausible Size and Scope.**

Where a complaint fails to plead facts plausibly supporting what Plaintiffs allege to be the duration of the conspiracy, it is proper for the court to narrow the scope of the conspiracy to only those years where facts suggesting a conspiracy are alleged, if any. *See In re Fla. Cement & Concrete Antitrust Litig.*, 2010 U.S. Dist. LEXIS 108528, at *86-87 (holding that although plaintiffs had pleaded a conspiracy beginning in 2004, the complaint's factual allegations plausibly suggested a conspiracy beginning in 2008).  "Proving an antitrust conspiracy of *unspecified timing and scope* is precisely the type of sprawling, costly, and hugely time-consuming undertaking that should not be commenced on the strength of a Complaint consisting entirely of conclusory allegations and vague generalities."  *Dowdy & Dowdy P'ship*, 2010 U.S. Dist. LEXIS 107123, at *14 (internal quotations omitted) (emphasis added).

The factual allegations in the CAC plainly do not support the existence of the twelve year conspiracy Plaintiffs have attempted to allege.  Rather, it is clear that Plaintiffs have done little more than "gin up" a "conspiracy period" and have no support for the claim that a nationwide conspiracy has been on-going for the hundreds of different types of foam products since 1999 or longer.  We noted above that there are no factual allegations regarding a single meeting, competitor communication, or parallel price increase that took place at any point in 1999 or for most years thereafter.  The CAC contains one isolated factual allegation relating to 2000, specifically in June of that year, allegedly involving a communication between Woodbridge and Vitafoam that references Foamex.  (CAC ¶ 112a.)  The CAC does not maintain that this communication resulted in an agreement, or that those Defendants actually raised prices

following that communication.  (*Id.*)  For 2001, 2002, 2003, and the majority of 2004, the CAC does not contain any allegations of competitor contacts at all.

The CAC alleges that in October and November 2004, there were communications and a meeting involving "Witness A" of Woodbridge and Bill Lucas of Vitafoam, (and allegedly, Crest).  (CAC ¶¶ 88, 112b-d.)  According to the CAC, however, these communications related to a price increase (by unidentified sellers) for the automotive sector, not to the universe of polyurethane foam products the CAC includes within the conspiracy it purports to allege.  (CAC ¶ 112c.)  In paragraphs 112e-h, the CAC alleges a small number of competitive contacts between a few of the Defendants, involving a limited number of foam products in 2005, but does not allege that agreements were reached.  (CAC ¶¶ 112e-h.)  There are no factually supported allegations of competitor contacts or communications in 2006, 2007, and the first half of 2008.

As demonstrated by the graph below, almost all of the allegations of contacts between competitors relate to 2010.  None of these alleged communications even hint at an industry-wide conspiracy to fix the price of all foam products in the United States.



The CAC's allegations, moreover, unquestionably are at odds with some of the legacy complaints filed by Plaintiffs, including complaints filed by lawyers now serving on Plaintiffs'

Executive Committee.  Foam Factory, represented by Bruce Simon, now serving on that Executive Committee, for example, initially alleged that based on an economic regression analysis the purported conspiracy in foam products did not begin until approximately November 1, 2005.  (Foam Factory Compl. ¶ 1.)  Foam Factory maintained, among other things, that "market fundamentals" support the existence of a conspiracy beginning on that date because from January 1996 through October 2005, the prices of flexible polyurethane foam remained stable, but began to rapidly increase in November 2005.  (Foam Factory Compl. ¶¶ 69, 71.)  This price rise in polyurethane foam is an unsurprising fact because, as the Court undoubtedly is aware, this was the time period when the Gulf Coast had been battered by Hurricane Katrina, resulting in significant damage to coastal refineries and causing a sharp rise in the prices of petroleum based chemicals, including those used to manufacture foam.  In further support of its contention that there was no price-fixing conspiracy from 1996 through October 2005, Foam Factory pointed out that in late 2000 and early 2001, the Producer Price Index for flexible slab polyurethane foam for furniture *declined* by 4%, during a period when raw material costs increased by 9%.  (Foam Factory Compl. ¶ 70.)

If Plaintiffs have any facts to challenge the allegations made by a member of their Executive Committee that prices for foam were stable, even declining, until Hurricane Katrina intervened, they have not pled them.  They have not, in fact, pled any facts sufficient to establish a plausible conspiracy period, much less a plausible conspiracy.

Normally, the Court would have the option of narrowing an overbroad conspiracy period to that period of time where conspiracy could be inferred from the factually supported allegations in the complaint.  With respect to the CAC in this case, however, that option simply does not exist—there are no allegations sufficient to support either the existence of any conspiracy or any

time period during which it may have existed—and the CAC should be dismissed.  *See, e.g.*, *Dowdy & Dowdy P'ship, Inc.*, 2010 U.S. Dist. LEXIS 107123, at *8-9 (dismissing complaint where plaintiff did not allege "when, where, or how the conspiracy was formed").

### H. Plaintiffs' "Plus Factors" Do Not Plausibly Suggest a Conspiracy.

Plaintiffs have attempted to make up for their lack of factual allegations by suggesting the existence of certain factors – sometimes referred to in the case law as "plus factors" – that, when coupled with allegations of parallel conduct, may render the existence of a conspiracy plausible. *See Williamson Oil Co. v. Philip Morris USA*, 346 F.3d 1287, 1301 (11th Cir. 2003); *In re Baby Food Antitrust Litig.*, 166 F.3d 112, 122 (3d Cir. 1999).  Plaintiffs rely on four such factors in an effort to salvage a CAC otherwise virtually devoid of any meaningful factual allegations supporting their conspiracy claims:  market factors; opportunities to conspire at trade association meetings; the investigation by the DOJ; and Vitafoam's leniency application.  The fact that Plaintiffs have to resort to these allegations as "support" simply underscores the frail foundation on which the CAC lies because each of these factors has been squarely rejected by the courts and deemed irrelevant to the determination of the plausibility of the existence of an antitrust conspiracy.

Plaintiffs first allege that the market for flexible polyurethane foam has certain characteristics that make it "highly susceptible" to anticompetitive conduct.  (CAC ¶ 119.) Plaintiffs claim, for example, that "the industry has been consolidating" (CAC ¶ 121), that the demand for flexible polyurethane foam is "relatively" inelastic because there are no acceptable substitutes (CAC ¶ 124), that flexible polyurethane foam is a commodity product that is interchangeable across manufacturers (CAC ¶ 126), and that flexible polyurethane foam customers make purchase decisions based principally on price.  (CAC ¶ 127.)  Even accepting these conclusory allegations as true, however, courts consistently have rejected the notion that

allegations of market concentration and product homogeneousness plausibly suggest the existence of a conspiracy.  *See In re Fla. Cement & Concrete Antitrust Litig.*, 2010 U.S. Dist. LEXIS 108528, at *77-78; *In re Hawaiian & Guamanian Cabotage Antitrust Litig.*, 647 F. Supp. 2d at 1261-62; *In re LTL Shipping Servs. Antitrust Litig.*, 2009 U.S. Dist. LEXIS 14276, at *65; *In re Late Fee & Over Limit Fee Litig.*, 528 F. Supp. 2d 953, 964 (N.D. Cal. Nov. 16, 2007); *see also White*, 2011 U.S. App. LEXIS 3276, at *23-24 ("High barriers to entry and inelastic demand are two hallmarks for oligopolistic markets susceptible to parallel pricing practices, but neither helps to distinguish between agreement and mere conscious parallelism as the root cause of those practices.").  The courts, in fact, recognize that these market factors actually explain why competitors *independently* would decide to raise prices in parallel.  As explained by the Supreme Court in *Twombly*:

> Even "conscious parallelism," a common reaction of "firms in a concentrated market [that] recogniz[e] their shared economic interests and their interdependence with respect to price and output decisions" is "not in itself unlawful."
>
> The inadequacy of showing parallel conduct or interdependence, without more, mirrors the ambiguity of the behavior: consistent with conspiracy, but just as much in line with a wide swath of rational and competitive business strategy unilaterally prompted by common perceptions of the market.

550 U.S. at 553-54 (citations omitted).

As another court put it:

> One LTL carrier would generally not have a financial incentive to charge less for fuel than all other carriers when the market will by its structure bear whatever fuel surcharges are assessed by other carriers in a market of fungible services and inelastic demand . . . . As one LTL competitor raises prices and improves its profits, the other competitors have a natural incentive to do the same, comfortable in the knowledge that demand for LTL services will not drop appreciably as a result.

*In re LTL Shipping Servs. Antitrust Litig.*, 2009 U.S. Dist. LEXIS 14276, at *68-69; *see also In re Fla. Cement & Concrete Antitrust Litig.*, 2010 U.S. Dist. LEXIS 108528, at *78 ("In fact, the market Plaintiffs describe makes cooperative behavior like price following and competitive reticence perfectly rational even in the absence of an agreement."); *In re Late Fee & Over Limit Fee Litig.*, 528 F. Supp. 2d at 964 (in a concentrated market, competitors "recogniz[e] their shared economic interests" to reach similar "price and output decisions" independently); *White*, 2011 U.S. App. LEXIS 3276, at *13-14 (noting that where products are homogeneous, competitors are likely to reach their own independent conclusion that their best interests involve keeping prices high and following price changes by price leaders).

Plaintiffs' allegations regarding the market dynamics for flexible polyurethane foam, in other words, do not plausibly suggest a conspiracy, but demonstrate the independent business justifications for parallel pricing decisions based on the increases in chemical prices that the CAC alleges. *See White,* 201 U.S. App. LEXIS 3276, at *12-14.

Plaintiffs next contend that Defendants are members of several of the same trade associations, and that during the meetings of such trade associations, "Defendants seized opportunities to meet in person to allocate customers and coordinate price increases." (CAC ¶¶ 128-29.) In similarly conclusory allegations, Plaintiffs maintain that Defendants engaged in price discussions that coincided with bi-annual meetings held by the Polyurethane Foam Association ("PFA"), (CAC ¶¶ 63, 71), although they concede that only 70% of polyurethane foam manufacturers in the United States belong to the PFA (CAC ¶ 128) without identifying the Defendants who are members or the meetings they allegedly attended.

Regardless, it is well-settled that belonging to the same trade associations and having the "opportunity" to conspire at trade association meetings is an insufficient basis to plausibly

suggest the existence of a conspiracy.  *See Twombly*, 550 U.S. at 567 n.12; *In re Travel Agent Comm'n Antitrust Litig.*, 583 F.3d at 910-11; *In re Fla. Cement & Concrete Antitrust Litig.*, 2010 U.S. Dist. LEXIS 108528, at *76-77; *In re Hawaiian & Guamanian Cabotage Antitrust Litig.*, 647 F. Supp. 2d at 1261; *In re LTL Shipping Servs. Antitrust Litig.*, 2009 U.S. Dist. LEXIS 14276, at *60, 66-67; *In re Late Fee & Over Limit Fee Litig.*, 528 F. Supp. 2d at 963-64 (collecting cases and noting that "other courts have consistently refused to infer the existence of a conspiracy from these kinds of averments"); *In re GPU Antitrust Litig.*, 527 F. Supp. 2d 1011, 1023 (N.D. Cal. 2007).  As found by the court in *In re GPU Antitrust Litigation*, "[a]ttendance at industry trade shows and events is *presumed legitimate* and is not a basis from which to infer a conspiracy, without more."  527 F. Supp. 2d at 1023 (emphasis added).

In like manner, Plaintiffs' attempts to allege a third "plus factor," that the DOJ is investigating the flexible polyurethane foam industry, fails to plausibly suggest the existence of a conspiracy.  (CAC ¶ 60.)  As courts have recognized, "[b]ecause of the grand jury's secrecy requirement, the scope of [a DOJ] investigation is pure speculation," which renders the existence of the grand jury investigation "a non-factor" when pleading an antitrust claim.  *In re GPU Antitrust Litig.*, 527 F. Supp. 2d at 1024 (holding that subpoenas served on the defendants and a grand jury investigation carry no weight in pleading an antitrust conspiracy where it is unknown whether the investigation will result in indictments or nothing at all); *see also In re Iowa Ready Mix Concrete Antitrust Litig.*, 2011 U.S. Dist. LEXIS 23311, at *38-49.  Even an indictment is not evidence of guilt.  *Garner v. United States*, 244 F.2d 575, 576 (6th Cir. 1957); *Hammond v. Brown*, 323 F. Supp. 326, 342 (N.D. Ohio), *aff'd*, 450 F.2d 480 (6th Cir. 1971).

Finally, as common sense would suggest, Plaintiffs' allegation that Vitafoam entered into the DOJ leniency program, (CAC ¶ 60), creates no inference of conspiracy with respect to the

remaining Defendants in the absence of specific factual allegations establishing their

involvement in the alleged conspiracy.  *In re Mun. Derivatives Antitrust Litig.*, 620 F. Supp. 2d

at 515 (holding that one defendant's participation in the leniency program "is not sufficient to

state a claim against the [defendants] who are not the subject of specific allegations").

    **I.**       **Allegations that Defendants Exchanged Price Information Do Not Plausibly
Establish a Price Fixing Conspiracy.**

Setting aside the CAC's conclusory and irrelevant allegations, and interpreting the CAC's

factual allegations in a fashion most favorable to Plaintiffs, the CAC, at most, shows sporadic

and limited occasions where some employees of some Defendants shared some price information

related to some foam products in some geographic areas.  Based on these allegations, the CAC

maintains that all Defendants violated the antitrust laws by engaging in a nationwide conspiracy

to fix prices and allocate customers in all foam products over a 12 year period.  (CAC ¶ 3.)

Agreements to fix prices and allocate customers, if proven, constitute *per se* violations of

the antitrust laws, meaning that they are deemed to be violations that "would always or almost

always tend to restrict competition and decrease output."  *Broad. Music, Inc. v. CBS*, 441 U.S. 1,

19-20 (1979).  Such violations are presumed unreasonable "without elaborate inquiry as to the

precise harm they have caused or the business excuse for their use."  *N. Pac. Ry. Co. v. United

States*, 356 U.S. 1, 5 (1958).

Agreements to exchange price information, however, do not alone constitute *per se*

violations of the antitrust laws.  *United States v. Citizens & S. Nat'l Bank*, 422 U.S. 86, 113

(1975) ("[T]he dissemination of price information is not itself a *per se* violation of the Sherman

Act."); *In re Travel Agent Comm'n Antitrust Litig.*, MDL Docket No. 1561, 2007 U.S. Dist.

LEXIS 79918, at *35 (N.D. Ohio Oct. 29, 2007) ("[T]he exchange of price data and other

information among competitors does not invariably have anticompetitive effects; indeed such

practices can in certain circumstances increase economic efficiency and render markets more, rather than less, competitive''').  And, as numerous courts have found, simply exchanging price information does not give rise to the inference of a conspiracy.  *Blomkest Fertilizer, Inc. v. Potash Corp. of Saskatchewan, Inc.*, 203 F.3d 1028, 1033 (8th Cir. 2000) (noting that "[T]he evidence of interfirm communications does not tend to exclude the possibility of independent action"); *In re Citric Acid Litig.*, 191 F.3d 1090, 1103 (9th Cir. 1999) (refusing to infer conspiracy from evidence of competitor communications); *In re Baby Food Antitrust Litig.*, 166 F.3d at 125-26 ("[e]vidence of sporadic exchanges of shop talk" did not support the inference of an agreement); *Amey, Inc. v. Gulf Abstract & Title, Inc.*, 758 F.2d 1486, 1505 (11th Cir. 1985) ("recognizing that there is nothing unlawful about competitors meeting and exchanging price information"); *Krehl v. Baskin-Robbins Ice Cream Co.*, 664 F.2d 1348, 1357-58 (9th Cir. 1982) (finding that twelve communications over the course of seven years was "idle shop talk" and did not establish an unlawful conspiracy).

In *In re LTL Shipping Servs. Antitrust Litigation*, 2009 U.S. Dist. LEXIS 14276, at *24, for example, plaintiffs alleged that beginning in July 2003, "Defendants exchanged information in both private and public settings regarding their fuel surcharge levels."  *Id.*  They further alleged that "[t]o communicate movements in pricing and to police price fixing . . . each Defendant published its current fuel surcharge and possible future fuel surcharges on its website."  *Id.* at *25.  The court found these allegations insufficient to "show enough facts for the Court to find that agreement was plausible."  *Id.* at *70.  A similar result was reached in *In re Travel Agent Comm'n Antitrust Litig.* 2007 U.S. Dist. LEXIS 79918, at *35, where the court dismissed the complaint on the grounds that allegations of price exchanges, which can be pro-competitive, did not plausibly suggest a conspiracy to restrain trade.  *Id.*

Plaintiffs' allegations that price increase letters and pricing information of some foam manufacturers were in the possession of their competitors (*e.g.*, CAC ¶ 112n) is of no greater significance in the *Twombly* analysis.  Pricing information is routinely gathered legally from customers and other sources, and possession of such information is completely consistent with pro-competitive, unilateral decision-making.  *See In re Citric Acid Litig.*, 191 F.3d at 1103 (finding evidence of competitor price lists in Cargill's files not indicative of a conspiracy because "[t]here are many legal ways in which Cargill could have obtained pricing information on competitors").  There are no factual allegations in the CAC that any price letters or other information were obtained from other than lawful sources or that such information influenced any foam manufacturers pricing decisions.

Once again viewing the CAC in a light most favorable to Plaintiffs, all it has alleged factually is that on isolated occasions, a limited number of employees from some Defendants exchanged snippets of information about prices or price increases relating to mostly unidentified products in unknown geographic territories, for unspecified purposes.  That is not enough to sustain an inference of conspiracy, and certainly not enough to sustain allegations of a nationwide conspiracy among twenty-six disparate Defendants over a twelve year period involving every foam product sold in the United States.

## II.     The CAC Fails to Adequately Plead Fraudulent Concealment.

Under the Clayton Antitrust Act, 15 U.S.C § 15b, the statute of limitations for civil antitrust claims is four years.  Consequently, claims for damages allegedly incurred more than four years prior to the filing of suit are time barred.  *See, e.g.*, *Barnosky Oils, Inc. v. Union Oil Co.*, 665 F.2d 74, 81 (6th Cir. 1981); *Hinds Country v. Wachovia Bank N.A.*, 620 F. Supp. 2d 499, 519 (S.D.N.Y. 2009).  Plaintiffs nevertheless claim that the statute of limitations should be

tolled, and their claims for damages going back twelve years allowed, because Defendants fraudulently concealed the allegedly unlawful conduct. (CAC ¶¶ 130-135.)

Like all fraud claims, however, a claim of fraudulent concealment must be pled with particularity.  Fed. R. Civ. P. 9(b); *In re Mun. Derivatives Antitrust Litig.*, 620 F. Supp. 2d at 520.  This means, at a minimum, that in order to toll the statute of limitations on fraudulent concealment grounds, an antitrust plaintiff must plead *facts* establishing:  (1) that the defendant concealed the existence of the antitrust violation; (2) that plaintiff remained in ignorance of the violation until sometime within the four-year antitrust statute of limitations; and (3) that plaintiff's continuing ignorance was not the result of lack of diligence.  *Id.*  It plainly is not enough to simply recite those essentials.

In *In re Mun. Derivatives Antitrust Litig.* for example, the complaint summarily alleged that:

> Plaintiffs and Class members did not discover, nor could have discovered through reasonable diligence, that Defendant and their co-conspirators were violating the antitrust laws until shortly before this litigation was commenced, because Defendants and their co-conspirators used deceptive and secret methods to avoid detection and affirmatively conceal their violations.

620 F. Supp. 2d at 521-22.  Because plaintiffs had not alleged that they had made "any specific inquiries of defendants, or detail[ed] when such inquiries were made, to whom, regarding what, and with what response," the court found that fraudulent concealment had not been adequately pled.  *Id.* at 521. (internal quotations omitted).

The fraudulent concealment allegations in this case are nearly *identical* to the allegations found to be insufficient in *In re Municipal Derivatives Antitrust Litigation* (CAC ¶ 133), and are just as lacking in the detail required by the heightened pleading requirements of  Fed. R. Civ. P. 9(b).  They should be dismissed.

-42-

## CONCLUSION

The CAC does not plausibly suggest a twelve-year agreement between the twenty-six Defendants to fix prices and allocate customers for hundreds of products spanning the entire United States.  At best, the CAC pleads random communications and sporadic exchanges of "shop talk" between certain Defendants at isolated times during some time periods, mainly in 2010.  Because such allegations do not support the expansive conspiracy alleged, or any conspiracy at all, the CAC should be dismissed.

April 15, 2011                                  Respectfully submitted,

/s/  James H. Walsh                             /s/  Kendall Millard
James H. Walsh                                  Kendall Millard
Howard Feller                                   BARNES & THORNBURG, LLP
Bethany Lukitsch                                11 South Meridian Street
MCGUIREWOODS LLP                                Indianapolis, IN 46204-3535
One James Center                                Phone: (317) 231-7461
901 East Cary Street                            Fax:    (317) 231-7433
Richmond, VA 23219-4030                         kmillard@btlaw.com
Phone: (804) 775-4356
Fax:    (804) 698-2200                          /s/   Michael D. Mustard
jwalsh@mcguirewoods.com                         Michael D. Mustard
hfeller@mcguirewoods.com                        BARNES & THORNBURG LLP
blukitsch@mcguirewoods.com                      600 One Summit Square
                                                Fort Wayne, IN 46802-3119
                                                Phone:  (260) 423-9440
*Counsel for Carpenter Co., E.R.*               Fax:    (260) 424-8316
*Carpenter, L.P., Carpenter Holdings, Inc.*     mmustard@btlaw.com
*and Carpenter Canada Co.*
                                                *Counsel for Flexible Foam Products, Inc.,*
                                                *Ohio Decorative Products, Inc.*

/s/   Frank A. Hirsch, Jr.
Frank A. Hirsch, Jr.
Matthew P. McGuire
ALSTON & BIRD LLP
4721 Emperor Blvd.
Suite 400
Durham, NC 27703
Phone:  (919) 862-2200
Fax:      (919) 852-2260
frank.hirsch@alston.com
matt.mcguire@alston.com

*Counsel for Defendant Hickory Springs
Manufacturing Company*

/s/   Edward G. Warin
Edward G. Warin
John P. Passarelli
KUTAK ROCK LLP
1650 Farnam Street
Omaha, NE  68102
Phone:  (402) 346-6000
Fax:      (402) 346-1148
edward.warin@kutakrock.com
john.passarelli@kutakrock.com

*Counsel for Defendant Future Foam, Inc.*

/s/   Howard B. Iwrey
Howard B. Iwrey
DYKEMA GOSSETT, PLLC
39577 Woodward Ave., Suite 300
Bloomfield Hills, MI 48304-2820
Phone:  (248) 203-0526
Fax:      (248) 203-0763

*Counsel for Defendants Inoac USA Inc.
and Crest Foam Industries, Inc.*

/s/   Daniel R. Warncke
Daniel R. Warncke
TAFT STETTINIUS & HOLLISTER LLP
425 Walnut Street, Suite 1800
Cincinnati, OH 45202-3957
Phone:  (513) 381-2838
Fax:  (513) 381-0205
warncke@taftlaw.com

Joe Rebein
SHOOK, HARDY & BACON LLP
2555 Grand Blvd.
Kansas City, MO 64108
(816) 559-2227
jrebein@shb.com

*Counsel for Defendant Leggett & Platt,
Inc.*

/s/   Francis P. Newell
Francis P. Newell
Peter M. Ryan
COZEN O'CONNOR
1900 Market Street
Philadelphia, PA 19103
Phone:  (215) 665-2118
Fax:      (215) 665-2013
fnewell@cozen.com
pryan@cozen.com

*Counsel for Defendant FXI - Foamex
Innovations, Inc.*

/s/   Richard A. Duncan
Richard A. Duncan
FAEGRE & BENSON LLP
2200 Wells Fargo Center
90 South Seventh St.
Minneapolis, MN 55402-3901
Phone:  (612) 766-7000
Fax:  (612) 766-1600
rduncan@faegre.com

*Counsel for Defendant Otto Bock
Polyurethane Technologies, Inc.*

/s/   Robert J. Gilmer, Jr.
Robert J. Gilmer, Jr.
Eastman & Smith Ltd.
One SeaGate, 24th Floor
P.O. Box 10032
Toledo, Ohio 43699-0032
Phone: (419) 247-1766
Fax:     (419) 247-1777
rjgilmer@eastmansmith.com

/s/   Timothy J. Coleman
Timothy J. Coleman
Bruce McCulloch
Terry Calvani
John K. Warren
FRESHFIELDS BRUCKHAUS
DERINGER US LLP
701 Pennsylvania Avenue, NW
Suite 600
Washington DC 20004-2692
Phone: (202) 777-4555
Fax:     (202) 777-4555
tim.coleman@freshields.com

*Counsel for Vitafoam, Inc. and Vitafoam
Products Canada Ltd.*

/s/   Daniel G. Swanson
Daniel G. Swanson
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA 90071
Phone: (213) 229-6690
Fax:     (213) 229-6919
dsawnson@gibsondunn.com

Cynthia Richman
John W.F. Chesley
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, DC 20036-5306
Phone:  (202) 530-8500
Fax:     (202) 530-9651
crichman@gibsondunn.com
jchesley@gibsondunn.com

*Counsel for Woodbridge Foam
Corporation, Woodbridge Sales and
Engineering, Inc., and Woodbridge Foam
Fabricating, Inc.*

/s/   Randall L. Allen
Randall L. Allen
Teresa T. Bonder
Erica F. Ghali
ALSTON & BIRD LLP
One Atlantic Center
1201 W. Peachtree St.
Atlanta, GA 30309
Phone:  (404) 881-7000
Fax:     (404) 881-7777
randall.allen@alston.com
teresea.bonder@alston.com
erica.ghali@alston.com

*Counsel for Mohawk Industries, Inc.*

/s/  Shepard Goldfein
Shepard Goldfein
Elliot A. Silver
Skadden, Arps, Slate,
Meagher & Flom LLP
Four Times Square
New York, NY 10036
Phone: (212) 735-3000
Fax:     (212) 735-2000
shepard.goldfein@skadden.com
elliot.silver@skadden.com

*Counsel for Domfoam International, Inc.*
*and Valle Foam Industries (1995) Inc.*

/s/   Sheldon Klein
Sheldon Klein
BUTZEL LONG
Stoneridge West
4100 Woodward Ave.
Bloomfield Hills, MI 48304
Phone:  (248) 258-1414
Fax:     (248) 258-1439
klein@butzel.com

*Counsel for Defendant Plastomer*
*Corporation*

<u>CERTIFICATION OF COUNSEL PURSUANT TO L.R. 7.1(f)</u>

       Pursuant to L.R. 7.1(f), Defendants hereby certify that this case has been assigned to the complex track.  Pursuant to Order Granting Motion Regarding Page Limitations as Modified and Amending the Initial Case Management Order entered in this action on April 14, 2011, Defendants were allotted up to 50 pages for a "common issues" brief in support of their Motions to Dismiss and an additional 75 pages total for individual briefs to be allocated as Defendants may agree.  Defendants hereby certify that this "common issues" brief meets those requirements and that the individual pages were allocated as follows:

Carpenter Co., E.R. Carpenter Company, L.P., Carpenter Holdings, Inc. and Carpenter
      Canada Co. - 3 pages jointly

Leggett & Platt, Incorporated and Mohawk Industries, Inc. - 8 pages jointly

Hickory Springs Manufacturing Company - 5 pages

Flexible Foam Products, Inc. and Ohio Decorative Products, Inc. - 4 pages jointly

Future Foam, Inc. - 7 pages

Inoac USA Inc. and Crest Foam Industries, Inc. - 8 pages jointly

FXI - Foamex Innovations, Inc. - 14 pages

Otto Bock Polyurethane Technologies, Inc. - 7 pages

Vitafoam, Inc. and Vitafoam Products Canada Ltd. - 5 pages jointly

Woodbridge Foam Corporation, Woodbridge Sales and Engineering, Inc. and
      Woodbridge Foam Fabricating, Inc. - 3 pages jointly

Plastomer Corporation - 3 pages

Domfoam International, Inc. and Valle Foam Industries (1995) Inc. – 8 pages jointly


               /s/  Bethany G. Lukitsch

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on April 15, 2011, a copy of the forgoing Defendants' Joint "Common Issues" Memorandum of Law in Support of Motion to Dismiss Direct Purchaser Plaintiffs' Consolidated Amended Class Action Complaint was filed electronically.  Notice of this filing will be sent by operation of the Court's electronic filing system to all parties indicated on the electronic filing receipt.  Parties may access this filing through the Court's system.

        /s/ Bethany G. Lukitsch
Bethany G. Lukitsch
MCGUIREWOODS LLP
One James Center
901 East Cary Street
Richmond, VA  23219-4030
Phone: (804) 775-4711
Fax:    (804) 698-2261
blukitsch@mcguirewoods.com