# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO

———————————————————————— )
In re POLYURETHANE FOAM ANTITRUST )
LITIGATION )        MDL Docket No. 2196
———————————————————————— )        Index No. 10-MD-2196 (JZ)
 )
This document relates to: )
 )        **JURY TRIAL DEMANDED**
ALL CASES )
———————————————————————— )

## DIRECT PURCHASER PLAINTIFFS' OMNIBUS RESPONSE TO DEFENDANTS' SEPARATELY FILED MEMORANDA IN SUPPORT OF THEIR MOTIONS TO DISMISS

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ...........................................................................................1

ARGUMENT .....................................................................................................................2

I.     LEGAL PRINCIPLES APPLICABLE TO DEFENDANTS' INDIVIDUAL
MEMORANDA ........................................................................................................2

      A.     The Test for Participation in a Conspiracy is "Slight Evidence" ............................2

      B.     Conspirators Are Jointly Liable. ....................................................................5

      C.     "Corporate Form" Arguments Are Inappropriate And Immaterial At This
Stage ..................................................................................................................6

II.     RESPONSES TO DEFENDANTS' SEPARATE MEMORANDA .................................8

      A.     The Carpenter Parties ..........................................................................................9

           1.     Allegations relevant to the Carpenter Parties ..............................................9

           2.     Responses to the Carpenter Parties' specific arguments ...........................12

      B.     Domfoam and Valle ...........................................................................................14

           1.     Allegations relevant to Domfoam and Valle. ...........................................14

           2.     Responses to Domfoam and Valle's specific arguments ..........................17

      C.     The Flexible Foam Parties ..................................................................................18

           1.     Allegations relevant to the Flexible Foam Parties ....................................18

           2.     Responses to the Flexible Foam Parties' specific arguments ...................20

                (a)     The CAC adequately pleads that Ohio Decorative is liable
as the alter ego of Flexible Foam. ...................................................20

                (b)     Plaintiffs adequately plead the Flexible Foam Parties'
involvement in the conspiracy. .......................................................21

      D.     Future Foam ........................................................................................................23

|  | 1. | Allegations relevant to Future Foam | 23 |
|  | 2. | Responses to Future Foam's specific arguments | 25 |
| E. | Hickory Springs | | 30 |
|  | 1. | Allegations relevant to Hickory Springs | 30 |
|  | 2. | Responses to Hickory Springs' specific arguments | 32 |
| F. | Inoac USA And Crest | | 35 |
|  | 1. | Allegations relevant to Crest and the Inoac Parties | 35 |
|  | 2. | Responses to Inoac USA and Crest's specific arguments | 38 |
|  |  | (a) Inoac USA | 38 |
|  |  | (b) Crest | 39 |
| G. | Leggett and Mohawk | | 40 |
|  | 1. | Allegations relevant to Leggett and Mohawk | 40 |
|  | 2. | Responses to Leggett and Mohawk's specific arguments | 42 |
| H. | Otto Bock and Plastomer | | 44 |
|  | 1. | Allegations relevant to Otto Bock and Plastomer | 44 |
|  | 2. | Responses to Otto Bock and Plastomer's specific arguments | 45 |
| I. | The Vitafoam Parties | | 47 |
|  | 1. | Allegations relevant to the Vitafoam Parties | 47 |
|  | 2. | Responses to the Vitafoam Parties' specific arguments | 50 |
| J. | The Woodbridge Parties | | 51 |
|  | 1. | Allegations relevant to the Woodbridge Parties | 51 |
|  | 2. | Responses to the Woodbridge Parties' specific arguments | 55 |
| K. | Foamex | | 57 |
|  | 1. | Allegations relevant to Foamex | 57 |

2.      Responses to Foamex's specific arguments.................................59

(a)      The Old Foamex bankruptcy and Asset Sale do not affect Foamex's pre-Asset Sale liability ...................................59

(i)      Plaintiffs never received adequate notice and thus their claims are not extinguished by the Sale Order. .........63

(ii)      Public policy considerations favor Plaintiffs proceeding with their claims.............................66

(iii)      The Sale Order is inapplicable because Foamex continued the price fixing scheme after the Asset Sale, and the Sale Order cannot affect Plaintiffs' claims ...............................................................68

(b)      Foamex in any event is liable for damages caused by the conspiracy throughout the conspiracy period. ..............70

CONCLUSION...................................................................................73

## <u>TABLE OF AUTHORITIES</u>

<u>Page</u>

### <u>Cases</u>

*Aetna Cas. and Sur. Co. v. Leahey Constr. Co.*,
   219 F.3d 519 (6th Cir. 2000) ..................................................................26

*In re Aftermarket Filters Antitrust Litig.*,
   2009 WL 3754041 (N.D. Ill. Nov. 5, 2009) ...............................................25

*American Column & Lumber Co. v. U.S.*,
   257 U.S. 377 (1921)..........................................................................28, 29

*Ashcroft v. Iqbal*,
   129 S. Ct. 1937 (2009)....................................................................2, 8, 33

*Bell Atlantic Corp. v. Twombly*,
   550 U.S. 544 (2007) ...................................................................... *passim*

*Beltz Travel Serv., Inc. v. Int'l Air Transp. Ass'n*,
   620 F.2d 1360 (9th Cir. 1980) ...................................................................4

*Brager & Co. v. Leumi Sec. Corp.*,
   429 F. Supp. 1341 (S.D.N.Y. 1977).............................................................7

*Bucyrus-Erie Co. vs. General Prod. Corp.*,
   643 F.2d 413 (6th Cir. 1981) .....................................................................7

*In re Bulk Popcorn Antitrust Litig.*,
   783 F. Supp. 1194 (D. Minn. 1991) ............................................................3

*In re Burns & Roe Enters.*,
   2005 Bankr. LEXIS 3173 (Bankr. D.N.J. Feb. 17, 2005)...............................68

*In re Cathode Ray Tube (CRT) Antitrust Litig.*,
   738 F. Supp. 2d 1011 (N.D. Cal. 2010) .....................................................32

*Chemetron Corp. v. Jones*,
   72 F.3d 341 (3d Cir. 1996)......................................................................65

*In re Chocolate Confectionary Antitrust Litig.*,
   602 F. Supp. 2d 538 (M.D. Pa. 2009) .......................................................51

*In re Cool Fuel, Inc.*,
   210 F.3d 999 (9th Cir. 2000) ..................................................................62

*Copperweld Corp. v. Independence Tube Corp.*,
   467 U.S. 752 (1984)................................................................................66

*Corman v. Morgan ( In re Morgan),*
   197 B.R. 892 (N.D. Cal. 1996) ...................................................................62

*Corrigan v. United States Steel Corp.,*
   478 F.3d 718 (6th Cir. 2007) .......................................................................6

*County of Stanislaus v. Pacific Gas and Elec. Co.,*
   1994 WL 706711 (E.D. Cal. Aug. 25, 1994) .............................................6

*DXS, Inc. v. Siemens Med. Sys., Inc.,*
   100 F.3d 462 (6th Cir. 1996) .....................................................................68

*Dalton Dev. Project v. Unsecured Creditors Comm. (In re Unoil),*
   948 F.2d 678 (10th Cir. 1991) ...................................................................64

*Dombroski v. Wellpoint, Inc.,*
   895 N.E.2d 538 (Ohio S.C. 2009) ..............................................................8

*In re Fine Paper Antitrust Litig.,*
   685 F.2d 810 (3d Cir. 1982).........................................................................4

*In re Flash Memory Antitrust Litig.,*
   643 F. Supp. 2d 1133 (N.D. Cal. 2009) ................................................4, 28

*Fortress Value Recovery Fund I, LLC v. Columbus Components Group LLC,*
   2011 WL 1130442 (N.D. Ohio 2011) ........................................................21

*Gering v. Fraunhofer USA, Inc.,*
   2009 WL 2877414 (E.D. Mich. 2009) .........................................................8

*Havoco of Am., Ltd. v. Shell Oil Co.,*
   626 F.2d 549 (7th Cir. 1980) ........................................................5, 13, 71

*Hexcel Corp. v. Stepan Co.,*
   239 B.R. 564 (N.D. Cal. 1999) ............................................................62, 63

*In re High Fructose Corn Syrup Antitrust Litig.,*
   295 F.3d 651 (7th Cir. 2002) ........................................................25, 27, 28

*Hyland v. Homeservices of Am., Inc.,*
   2007 WL 2407233 (W.D. Ky. Aug. 17, 2007) ........................................44

*In re Hypodermic Prod. Antitrust Litig.,*
   2007 WL 1959225 (D.N.J. 2007) .........................................................14, 32

*Indus. Bldg. Mat, Inc. v. Interchemical Corp.,*
   437 F.2d 1336 (9th Cir. 1971) ...................................................................71

*In re Jensen,*
   995 F.2d 925 (9th Cir. 1993) .....................................................................61

*In re K-Dur Antitrust Litig.*,
  338 F. Supp. 2d 517 (D.N.J. 2004) ...........................................................................5, 13, 71

*Kemper v. Saline Lectronics*,
  366 F. Supp. 2d 550 (N.D. Ohio 2005)...................................................................................67

*Kentucky ex rel. Gorman v. U.C. Milk Co.*,
  1996 U.S. Dist. LEXIS 20034 (W.D. Ky. 1996) .....................................................................3

*Kleen Prod., LLC v. Packaging Corp. of Am.*,
  2011 WL 1343203 (N.D. Ill. 2011) ........................................................................................72

*Klehr v. A.O. Smith Corp.*,
  521 U.S. 179 (1997)................................................................................................................68

*Lubic v. Fid. Nat. Fin., Inc.*,
  2009 U.S. Dist. LEXIS 62092 (W.D. Wash. 2009) ..................................................................7

*Michigan Employment Sec. Comm'n v. Wolverine Radio Co. (In re Wolverine Radio Co.)*,
  930 F.2d 1132 (6th Cir. 1991) ................................................................................................60

*Minpeco, S.A. v. ContiCommodity Servs., Inc.*,
  673 F. Supp. 684 (S.D.N.Y. 1987) ...........................................................................................3

*Mullane v. Central Hanover Bank & Trust Co.*,
  339 U.S. 306 (1950)................................................................................................................64

*In re Municipal Derivatives Antitrust Litig.*,
  700 F. Supp. 2d 378 (S.D.N.Y. 2010).................................................................................4, 46

*In re NASDAQ Market-Makers Antitrust Litig.*,
  894 F. Supp. 703 (S.D.N.Y. 1995) ...........................................................................................4

*In re Nat'l Century Fin. Enter., Inc., Inv. Litig.*,
  541 F. Supp. 2d 986 (S.D. Ohio 2007) ...................................................................................26

*Nilavar v. Mercy Health Sys. Western Ohio*,
  142 F. Supp. 859 (S.D. Ohio 2000) ........................................................................................27

*In re Nissan Motor Corp. Antitrust Litig.*,
  430 F. Supp. 231 (S.D. Fla. 1977) ..............................................................................5, 13, 71

*Nobody in Particular Presents, Inc. v. Clear Channel Commc'ns, Inc.*,
  311 F. Supp. 2d 1048 (D. Colo. 2004)......................................................................................6

*O'Loghlin v. County of Orange*,
  229 F.3d 871 (9th Cir. 2000) ..................................................................................................69

*In re OSB Antitrust Litig.*,
  2007 WL 2253419 (E.D. Pa. 2007) ..........................................................................................4

*In re Pa. Title Ins. Antitrust Litig.*,
648 F. Supp. 2d 663 (E.D. Pa. 2009) ...............................................................7

*In re Packaged Ice Antitrust Litig.*,
723 F. Supp. 2d 987 (E.D. Mich. 2010)...............................25, 27, 43, 51

*Perma Life Mufflers, Inc. v. Int'l Parts Corp.*,
392 U.S. 134 (1968)........................................................................................66

*In re Pettibone*,
162 B.R. 791 (Bankr. N.D. Ill.  1994) ........................................................63

*Pinkerton v. United States*,
328 U.S. 640 (1946)..........................................................................................5

*Pinney Dock & Transport Co. v. Penn Cent. Corp.*,
991 F. Supp. 908 (N.D. Ohio 1998)..............................................................5

*Reading Int'l, Inc. v. Oaktree Capital Mgmt., LLC*,
317 F. Supp. 2d 301 (S.D.N.Y. 2003).......................................................6, 7

*Reynolds Metals Co. v. The Columbia Gas Sys., Inc.*,
669 F. Supp. 744 (E.D. Va. 1987) ..............................................................56

*Roofers Local 149 Security Benefit Trust Fund v. Milbrand Roofing Group, Inc.*,
2008 WL 53710 (E.D. Mich. Jan. 3, 2008).................................................7

*In re Se. Milk Antitrust Litig.*,
555 F. Supp. 2d 934 (E.D. Tenn. 2008)....................................................27

*SigmaPharm, Inc. v. Mutual Pharmaceutical Co., Inc.*,
2011 WL 743394 (E.D. Pa. 2011) ..............................................................26

*Signature Combs, Inc. v. United States*,
253 F. Supp. 2d 1028 (W.D. Tenn. 2003).............................................62, 68

*Square D Co. v. Schneider SA*,
760 F. Supp. 362 (S.D.N.Y. 1991) ...............................................................6

*In re Steve & Barry's Manhattan LLC*,
2008 Bankr. LEXIS 4348 (Bankr. S.D.N.Y. Aug 22, 2008) ....................68

*In re TFT-LCD (Flat Panel) Antitrust Litig.*,
586 F. Supp. 2d 1109 (N.D. Cal. 2008) ......................................................7

*In re TFT-LCD (Flat Panel) Antitrust Litig.*,
599 F. Supp. 2d 1179 (N.D. Cal. 2009) .................................................8, 40

*In re Taylor-Wharton Int'l, LLC*,
2010 Bankr. LEXIS 3268 (Bankr. D. Del. June 8, 2010)........................68

vii

*In re Teton Energy Corp.*,
  2010 Bankr. LEXIS 3275 (Bankr. D. Del. Jan. 20, 2010) ...................................................68

*Texaco Inc. v. Dagher*,
  547 U.S. 1 (2006) .............................................................................................................56, 57

*In re Text Messaging Antitrust Litig.*,
  630 F.3d 622 (7th Cir. 2010) .................................................................................26, 28, 35

*In re Trans World Airlines, Inc.*,
  322 F.3d 283 (3d Cir. 2003) .................................................................................60, 70

*Transition Healthcare Associates, Inc. v. Tri-State Health Investors, LLC*,
  2009 WL 67869 (6th Cir. 2009) .........................................................................................8

*In re Travel Agent Commission Antitrust Lit.*,
  583 F.3d 896 (6th Cir. 2009) .............................................................................60, 61, 68, 70

*In re Trump Taj Mahal Assocs.*,
  156 B.R. 928 (Bankr. D.N.J. 1993) ...................................................................................66

*U.S. Audio & Copy Corp. v. Philips Bus. Sys. Inc.*,
  1983 U.S. Dist. LEXIS 17440 (N.D. Cal. 1983) ..............................................................3

*U.S. v. Atomic Fire Equip. Co.*,
  57 F.R.D. 531 (N.D. Ohio 1973) ......................................................................................71

*U.S. v. Bestfoods*,
  524 U.S. 51 (1998) ..............................................................................................................6

*U.S. v. Consolidated Packaging Corp.*,
  575 F.2d 117 (7th Cir. 1978) .............................................................................................3

*U.S. v. Crozier*,
  259 F.3d 503 (6th Cir. 2001) .............................................................................................3

*U.S. v. Gibbs*,
  182 F.3d 408 (6th Cir. 1999) .............................................................................................3

*U.S. v. Henley*,
  360 F.3d 509 (6th Cir. 2004) .............................................................................................2

*U.S. v. Othman El-Hindi*,
  2011 U.S. App. LEXIS 2261 (6th Cir. 2011) ...................................................................2

*U.S. v. Short*,
  671 F.2d 178 (6th Cir. 1982) ............................................................................................26

*U.S. v. Wade*,
  318 F.3d 698 (6th Cir. 2003) .............................................................................................5

*Wachovia Bank, N.A. v. Zomax Inc.*,
    2009 WL 3698443 (S.D. Ohio 2009)..................................................................................21

*In re Welding Fume Prod. Liab. Litig.*,
    2010 WL 2403355 (N.D. Ohio 2010) ..................................................................................8

*In re Weldon*,
    184 B.R. 710 (Bankr. D.S.C. 1995) ...................................................................................62

*Western Auto Supply Co. v. Savage Arms, Inc. (In re Savage Indus., Inc.)*,
    43 F.3d 714 (1st Cir. 1994) ...........................................................................................63, 64

*Whetstone Candy Co., Inc. v. Kraft Foods, Inc.*,
    351 F.3d 1067 (11th Cir. 2003) ...........................................................................................8

*In re White Motor Credit Corp.*,
    75 B.R. 944 (Bankr. N.D. Ohio 1987) ...............................................................................60

*Wilk v. Am. Med. Ass'n*,
    735 F.2d 217 (7th Cir. 1983) ...............................................................................................3

*Wills Trucking, Inc. v. Baltimore and Ohio R. Co.*,
    181 F.3d 106 (Table) (6th Cir. 1999) ..................................................................................5

*Wilson v. International Bhd. of Teamsters*,
    83 F.3d 747 (6th Cir. 1996) .................................................................................................7

*In re Zilog, Inc.*,
    450 F.3d 996 (9th Cir. 2006) .............................................................................................62

## Statutes

11 U.S.C. § 101 ...............................................................................................................61

11 U.S.C. § 363 ...............................................................................................................60

11 U.S.C. § 1123 .............................................................................................................60

11 U.S.C. § 1141 .............................................................................................................60

Fed. R. Bankr. Pro. 1007 ...............................................................................................62

Fed. R. Civ. P. 8 .............................................................................................................25

Direct Purchaser Plaintiffs ("Plaintiffs"), individually and on behalf of a class of all those similarly situated, by their undersigned counsel, hereby submit this omnibus response to Defendants' separate memoranda of law in support of their respective motions to dismiss (Dkt. 89, 91-92, 95-97, 99-103, 109). Plaintiffs are filing separately a response to Defendants' joint memorandum of law (Dkt. 90) ("Joint Brief").

## Preliminary Statement

Defendants have each (individually, or with other members of the same Defendant "family") filed memoranda of law. In large part, these memoranda argue that even if the Plaintiffs' Consolidated Amended Class Action Complaint ("CAC") adequately alleges a conspiracy, the allegations as to particular Defendants are inadequate. Such arguments are entirely without merit. As demonstrated herein, the CAC is replete with details of the collusive conduct of each Defendant named in the CAC. Each of the named Defendants has been identified in documents and information emerging from the pending government investigations of collusion among flexible polyurethane foam manufacturers. The CAC's allegations far surpass what is necessary to meet the governing legal standard to establish liability—a standard, as articulated by the Sixth Circuit, requiring no more than "slight" evidence of participation in a conspiracy. And the CAC's allegations certainly go far beyond putting each Defendant on notice of what part it is alleged to have played in the conspiracy.

One Defendant, Foamex, argues that it cannot be liable for acts prior to a bankruptcy filing of Foamex International, Inc. and certain affiliates (collectively, "Old Foamex") and Old Foamex's sale of its assets in mid-2009 to Foamex. But Foamex overtly misstates the applicable bankruptcy principles, which provide no safe haven for Foamex here. Moreover, the CAC

expressly alleges collusive conduct by Foamex in both 2009 and 2010, following the bankruptcy and asset sale, and the law is clear that based on that post-bankruptcy conduct alone Foamex is jointly liable for *all* acts of the conspiracy, including those preceding the bankruptcy.[1]

For all the reasons stated herein and in Plaintiffs' response to Defendants' Joint Brief, Plaintiffs respectfully submit that the motions to dismiss should be denied in their entirety.

<u>Argument</u>

I.      **LEGAL PRINCIPLES APPLICABLE TO DEFENDANTS' INDIVIDUAL MEMORANDA**

      A.      <u>**The Test for Participation in a Conspiracy is "Slight Evidence"**</u>

The CAC here provides detailed and specific allegations of how the conspiracy worked and the involvement of each Defendant in the scheme.  As demonstrated in Plaintiffs' separately filed response to Defendants' Joint Brief, the allegations more than satisfy the pleading standards discussed in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), *Ashcroft v. Iqbal*, 129 S. Ct. 1937 (2009) and their progeny.  On this basis alone the motions to dismiss should all be denied.

To the extent that Defendants now argue that the allegations as to particular Defendants are purportedly inadequate, these arguments ignore not only the factual allegations as to each Defendant, but also that those allegations set forth facts that far exceed what is legally required to establish each Defendants' liability for involvement in the conspiracy.  For as the Sixth Circuit has explained, "Once a conspiracy has been shown, only 'slight' evidence is needed to connect a defendant to a conspiracy."  *U.S. v. Henley*, 360 F.3d 509, 514 (6th Cir. 2004) (citing *U.S. v. Gibbs*, 182 F.3d 408, 422 (6th Cir. 1999)); *see also U.S. v. Othman El-Hindi,* 2011 U.S. App.

---

[1]      For efficiency purposes, the Defendants' separate memoranda of law are addressed herein in alphabetical order by Defendant, except that the response to Foamex's memorandum, which raises bankruptcy issues unique to Foamex, is addressed last.

Lexis 2261, at *14 (6th Cir. 2011) (same); *U.S. v Crozier*, 259 F.3d 503, 517 (6th Cir. 2001) (same).  So slight is the required involvement in the conspiracy that in one case, the Court held that a defendant was rightfully convicted of a criminal price fixing conspiracy even where it was merely on the conspiracy's "outer crust."  *U.S. v. Consolidated Packaging Corp.*, 575 F.2d 117, 126-27 (7th Cir. 1978).

Applying this standard, courts regularly deny summary judgment motions in civil conspiracy cases where the allegations include even slight evidence of the defendant's involvement in the conspiracy.  *E.g., Kentucky ex rel. Gorman v. U.C. Milk Co.*, 1996 U.S. Dist. LEXIS 20034, at *18 (W.D. Ky. 1996) (denying motion for summary judgment in bid-rigging case on the ground that "[o]nce a conspiracy is shown, only slight evidence is needed to link another defendant to it");  *In re Bulk Popcorn Antitrust Litig.*, 783 F. Supp. 1194, 1197 (D. Minn. 1991) (denying summary judgment in price-fixing action on the ground that "[o]nce a conspiracy is established, even slight evidence connecting a defendant to the conspiracy may be sufficient to prove the defendant's involvement") (citations omitted); *Minpeco, S.A. v. ContiCommodity Servs., Inc.*, 673 F. Supp. 684, 689 (S.D.N.Y. 1987) (denying summary judgment motion in antitrust and RICO action on the same ground); *U.S. Audio & Copy Corp. v. Philips Bus. Sys. Inc.*, 1983 U.S. Dist. LEXIS 17440, at *26 (N.D. Cal. 1983) (denying motion for summary judgment in antitrust case on ground that "[o]nce PBSI creates a material issue of fact as to the existence of a conspiracy to restrain trade, it need produce only slight evidence to show that Audio was a member of the conspiracy"); *Wilk v. Am. Med. Ass'n*, 735 F.2d 217, 219 (7th Cir. 1983) (in affirming denial of Rule 50 motion, noting that "[e]ven in a criminal case, 'once the conspiracy has been established, slight evidence is needed to connect a particular participant'").

Courts reviewing Rule 12(b)(6) motions thus routinely hold that antitrust conspiracy allegations need not be detailed "defendant by defendant."  *In re Fine Paper Antitrust Litig.*, 685 F.2d 810, 822 (3d Cir. 1982) (improper to "compartmentalize" a conspiracy claim through "a seriatim examination of the claims against each of the five defendants as if they were separate lawsuits"); *In re NASDAQ Market-Makers Antitrust Litig.*, 894 F. Supp. 703, 712 (S.D.N.Y. 1995).  As stated in *In re Flash Memory Antitrust Litig.*, 643 F. Supp. 2d 1133 (N.D. Cal. 2009):

> In addition to the joint motion to dismiss, [five defendants] filed their own, separate motions to dismiss.  The arguments adduced in those motions overlap with those presented in the joint submission.  Their central point of contention appears to be the lack of specific allegations directed at their particular company.  This argument fails.  For pleading purposes, allegations of antitrust conspiracy need not be detailed on a "defendant by defendant" basis.

*Id.* at 1142 n.7.  Plaintiffs only "must allege  that each individual defendant joined the conspiracy and played some role in it."  *In re OSB Antitrust Litig.*, 2007 WL 2253419, at *5 (E.D. Pa. 2007).

It is not necessary to prove—let alone plead—that each defendant participated in "every detail in the execution of the conspiracy . . . to establish liability, for each conspirator may be performing different tasks to bring about the desired result."  *Beltz Travel Serv., Inc. v. Int'l Air Transp. Ass'n*, 620 F.2d 1360, 1367 (9th Cir. 1980).  Thus, even "one lone paragraph" concerning a particular defendant suffices to survive a motion to dismiss if, when viewed with other allegations, the CAC alleges that the defendant "joined the conspiracy and committed acts in furtherance of it."  *OSB*, 2007 WL 2253419, at *5-6; *see also In re Municipal Derivatives Antitrust Litig.*, 700 F. Supp. 2d 378, 395-96 (S.D.N.Y. 2010) (upholding antitrust conspiracy claim again defendant Morgan Stanley on basis of single allegation of a taped conversation in which a person stated he had given Morgan Stanley the opportunity to lower its bid price through a "last look" and an additional allegation from a companion complaint).

4

**B.** **Conspirators Are Jointly Liable.**

It is a related and equally fundamental principle that each participant in a conspiracy is jointly liable for its co-conspirators' acts. *Pinkerton v. United States*, 328 U.S. 640, 646-47 (1946); *U.S. v. Wade*, 318 F.3d 698, 701 (6th Cir. 2003). This principle applies fully in civil cases. *Wills Trucking, Inc. v. Baltimore and Ohio R. Co.*, 181 F.3d 106 (Table), at *4 (6th Cir. 1999) ("Regardless of whether B & LE was involved in the non-rate activity of the conspiracy, B & LE was a member of the entire conspiracy, and is primarily liable for all acts performed by its co-conspirators in furtherance of the conspiracy.") (*citing Pinkerton*, 328 U.S. at 646-47); *Pinney Dock & Transport Co. v. Penn Cent. Corp.*, 991 F. Supp. 908, 911 (N.D. Ohio 1998) ("[O]nce a party takes the affirmative step of entering into an illegal conspiracy, that party is responsible for all the acts and consequent injury caused in furtherance of the conspiracy").

This means that a defendant alleged to have participated in only part of a conspiracy is liable for all acts of all of the conspirators over the life of the entire conspiracy. *Havoco of Am., Ltd. v. Shell Oil Co.*, 626 F.2d 549, 554 (7th Cir. 1980) ("a co-conspirator who joins a conspiracy with knowledge of what has gone on before and with an intent to pursue the same objectives may, in the anti-trust context, be charged with the preceding acts of its co-conspirators"); *In re K-Dur Antitrust Litig.*, 338 F. Supp. 2d 517, 538 (D.N.J. 2004) ("a co-conspirator is liable for all acts committed in furtherance of a conspiracy, regardless of when it entered the conspiracy"); *In re Nissan Motor Corp. Antitrust Litig.*, 430 F. Supp. 231, 232 (S.D. Fla. 1977) ("proof of unlawful affiliation is sufficient to render a co-conspirator liable for all damages that the conspiracy caused, regardless of the exact time defendant became a member or the extent of its participation").

5

C.    **"Corporate Form" Arguments Are Inappropriate And Immaterial At This Stage.**

The CAC alleges that certain Defendants—including Valle Foam, Ohio Decorative, Inoac USA/Crest, and the Woodbridge Parties—conspired with and/or for their respective parent(s), affiliate(s), or subsidiary(s).  These Defendants argue in their respective separate briefs that, as a matter of "corporate form" the claims against them should be dismissed.

A corporate parent, however, can participate in a conspiracy through its subsidiary if that subsidiary acts as an agent for, or co-conspirator with, the parent.  *See, e.g., County of Stanislaus v. Pacific Gas and Elec. Co.*, 1994 WL 706711, at *31 (E.D. Cal. Aug. 25, 1994) (denying motion to dismiss where defendant allegedly committed antitrust violations through and with its subsidiaries); *Reading Int'l, Inc. v. Oaktree Capital Mgmt., LLC*, 317 F. Supp. 2d 301, 325 (S.D.N.Y. 2003) (denying motion to dismiss where defendant allegedly coordinated subsidiaries' actions in violation of antitrust law); *Nobody in Particular Presents, Inc. v. Clear Channel Commc'ns, Inc.*, 311 F. Supp. 2d 1048, 1071-72 (D. Colo. 2004) (denying motion for summary judgment where defendant parent corporation directed the activities of a subsidiary that committed antitrust violations).

Moreover, corporate form will be disregarded, and the parent and subsidiary will be treated as a single entity, when the corporate forms are utilized for wrongful purposes.  *See, e.g., Corrigan v. United States Steel Corp.,* 478 F.3d 718, 724 (6th Cir. 2007) (*citing U.S. v. Bestfoods,* 524 U.S. 51 (1998)).

Assessing the relationship between a parent and subsidiary in the context of conspiracy allegations is a highly factual analysis that generally is not susceptible to resolution on a motion to dismiss.  *See, e.g., Square D Co. v. Schneider SA*, 760 F. Supp. 362, 367–68 (S.D.N.Y. 1991)

(whether parent corporation exercised control over subsidiary "is a question of fact that precludes granting of the motion to dismiss"); *Reading Int'l*, 317 F. Supp. 2d at 325 (denying motion to dismiss, noting that "the threshold question of whether such [parent company] control exists is a fact-specific inquiry hinging on the particular structure and dynamics of the two entities.  Such a determination 'must await hearing on the merits'") (quoting *Brager & Co. v. Leumi Sec. Corp.*, 429 F. Supp. 1341, 1345  (S.D.N.Y. 1977)); *see also Wilson v. International Bhd. of Teamsters,* 83 F.3d 747, 759 (6th Cir. 1996) ("[a] determination of alter ego status is a question of fact"); *Bucyrus-Erie Co. vs. General Prod. Corp.*, 643 F.2d 413, 418 (6th Cir. 1981) ("no precise test for disregarding the corporate fiction has been articulated by the courts, each case being regarded as 'sui generis' and decidable on its own facts."); *Roofers Local 149 Security Benefit Trust Fund v. Milbrand Roofing Group, Inc.*, 2008 WL 53710, at *2 (E.D. Mich. Jan. 3, 2008) (determination of alter ego status is case specific and generally a question of fact).

The cases Defendants cite on this point that were actually decided on a motion to dismiss are entirely distinguishable.  In each of *In re TFT-LCD (Flat Panel) Antitrust Litig.*, 586 F. Supp. 2d 1109 (N.D. Cal. 2008) ("*TFT-LCD I*"), *Lubic v. Fid. Nat. Fin., Inc.*, 2009 U.S. Dist. LEXIS 62092 (W.D. Wash. 2009), and *In re Pa. Title Ins. Antitrust Litig.*, 648 F. Supp. 2d 663 (E.D. Pa. 2009), the issue was that the respective complaints did not allege a parent corporation's role in the conspiracy.  In contrast, the CAC here alleges for each parent corporation, subsidiary, and affiliate that they sold flexible polyurethane foam in the U.S. during the Class Period, that they acted as each other's agents and representatives in the conspiracy, and that, in some cases, the subsidiary can be considered the alter ego of the parent.[2]

---

[2] The other authorities cited by Defendants on this issue were all decided on *summary judgment*, further

7

Certainly the CAC here (*see, e.g.*, CAC ¶¶ 13-22, 28-32, 44-48, 50) alleges that the members of Defendant corporate "groups" worked hand-in-hand together in furtherance of the conspiracy. *See In re TFT-LCD (Flat Panel) Antitrust Litig.*, 599 F. Supp. 2d 1179, 1184-85 (N.D. Cal. 2009) ("*TFT-LCD II*") (finding that plaintiffs adequately alleged different members of corporate groups participated in conspiracy where allegations showed that conspirators did not pay attention to co-conspirators' corporate form and where corporate representatives acted on behalf of parents, subsidiaries, and affiliates within the same corporate group).

## II.   RESPONSES TO DEFENDANTS' SEPARATE MEMORANDA[3]

Plaintiffs do not restate in this brief the various arguments they have made in their separately filed response to the Defendants' Joint Brief.  For purposes of efficiency, Plaintiffs incorporate those arguments by reference here—including, in particular, the detailed discussion of the applicable pleading standards as addressed in *Twombly*, *Iqbal* and their progeny.

---

confirming that issues of parent and subsidiary involvement in a conspiracy are not appropriate for resolution at the motion to dismiss stage, or are clearly inapposite.  *See Gering v. Fraunhofer USA, Inc.*, 2009 WL 2877414, at *4-5 (E.D. Mich. 2009) (court granted summary judgment on the issue of alter ego liability only after a fact intensive analysis and acknowledgement that such allegations had survived a previous motion to dismiss); *Transition Healthcare Associates, Inc. v. Tri-State Health Investors, LLC*, 2009 WL 67869, at *8 (6th Cir. 2009) (summary judgment granted after an extremely fact intensive analysis); *Whetstone Candy Co., Inc. v. Kraft Foods, Inc.*, 351 F.3d 1067, 1071-1074 (11th Cir. 2003) (court granted summary judgment after review of the factual record including an in depth analysis of the agreement between the parent and subsidiary companies); *In re Welding Fume Prod. Liab. Litig.*, 2010 WL 2403355, at *5-8 (N.D. Ohio 2010) (court undertook intensive review of the factual record before finding that plaintiffs did not "adduce[ ] sufficient evidence to create a genuine issue of material fact").  Lastly, Defendants inappropriately analogize *Dombroski v. Wellpoint, Inc.*, 895 N.E.2d 538, 541-545 (Ohio S.C. 2009) (granting motion to dismiss because corporation was alleged to have committed bad faith—not fraud or other illegal acts—which was not the type of "wrong that piercing is designed to remedy").

[3] Each Defendant is referred to herein using the defined term in Paragraphs 13-47 of Plaintiffs' Consolidated Amended Class Action Complaint ("CAC").  In order to address certain collective briefs, Plaintiffs collectively refer to Carpenter U.S., E.R. Carpenter, Carpenter Holdings, and Carpenter Canada as the "Carpenter Parties"; Flexible Foam Products and Ohio Decorative as the "Flexible Foam Parties"; Inoac International, Inoac USA, and Inoac Corp. as the "Inoac Parties"; Vitafoam Canada and Vitafoam Inc. as the "Vitafoam Parties"; and Woodbridge Foam, Woodbridge S&E, and WFFI as the "Woodbridge Parties."

A.    **The Carpenter Parties**

    1.    Allegations relevant to the Carpenter Parties

The CAC alleges in detail the Carpenter Parties' participation in the conspiracy.  First, the CAC identifies the relevant Carpenter entities:

> 13.    Defendant The Carpenter Company ("Carpenter U.S.") is a privately owned and operated company with its principal place of business at 5016 Monument Avenue, Richmond, Virginia 23230. … During the Class Period, Carpenter U.S. directly sold flexible polyurethane foam throughout the United States.
>
> 14.    Defendant E.R. Carpenter, L.P. (f/k/a Carpenter Chemical, L.P.) ("E.R. Carpenter") is a Virginia limited partnership with its principal place of business at 5016 Monument Avenue, Richmond, Virginia 23230. During the Class Period, E.R. Carpenter directly sold flexible polyurethane foam throughout the United States.
>
> 15.    Defendant Carpenter Holdings, Inc. ("Carpenter Holdings," collectively with Carpenter U.S. and E.R. Carpenter, "Carpenter") is a Virginia corporation with its principal place of business at 5016 Monument Avenue, Richmond, Virginia 23230. During the Class Period, Carpenter Holdings directly sold flexible polyurethane foam throughout the United States.

Contrary to the Carpenter Parties' implications, (Br. at 2 n.3), *all* of the Carpenter Parties identified in the CAC are subject to criminal investigation in United States *and* Canada and are together defined as "Carpenter" in the sworn Information from the Canadian Competition Commission.  The sworn affidavit of Pierre-Yves Guay, sworn on July 21, 2010 (CAC ¶ 83), expressly references the Canadian Competition Commission's investigation of "previous and ongoing conduct contrary to" the Competition Act of Canada by entities including Carpenter…. The violations of law alleged in the affidavit concerned conduct both 'in Canada and in the United States.'" *Id.* ¶ 84.

The CAC then sets forth specifics of Carpenter's participation in the conspiracy:

> 72.    The former President of Vitafoam, along with his subordinates, had conspiratorial discussions during the Class Period as described above with other Defendants regarding

9

fixing prices and allocating customers. These discussions included at least…Max Tenpow of Carpenter…

74.     The former Vice President of Vitafoam also participated in conspiratorial conduct during the Class Period with many individuals employed by numerous competitors, including at least…Carpenter…. The communications involved discussions of price increase percentages and effective dates of such increases, typically by telephone. The competitors exchanged copies of price increase letters to coordinate and support these increases. Individuals from competitors with whom the former Vice President conspired to fix prices and allocate customers included at least Stanley Pauley, Ed Malacheck, Mark Kane and Max Tenpow of Carpenter[.]

75.     The former Vice President of Vitafoam and Mark Kane of Carpenter had discussions on multiple occasions during the Class Period involving price increases concerning a shared customer. In an effort to coordinate their price increases and to make sure those increases went through for the mutual customer, the former Vice President and Kane called each other and exchanged copies of draft price increase letters by fax.

78.     During the Class Period, Vitafoam employee George Newton exchanged information with Carpenter employee Max Tenpow regarding the amount and effective date of price increases. Newton also provided this conspiratorial information to other Defendants.

82.     During the Class Period, the [Vitafoam] Vice President personally engaged in this conspiratorial conduct to fix prices and maintain market share with at least…Carpenter….

92.     During the Class Period, the President of Vitafoam participated in conspiratorial discussions concerning pricing in the flexible polyurethane foam market with various competitors at both Woodbridge and Vitafoam, including at least…Stanley Pauley of Carpenter[.] … These discussions led to a clear understanding and agreement that the participants would discuss and implement coordinated price increases on the same effective dates.

104.    On June 4, 2010, Tim Prescott of Vitafoam left a voice mail message for Vitafoam's Vice President:

> "Hey, it's Tim…Can you give me a call when you get a chance. I don't know whether you've spoken to [President] but I had a message earlier from Dale over at Carpenter and when I called him back he was asking what we're going with the increase and he just called me again asking can VPS please call John Howard over at Domfoam."

105.    On June 3, 2010, Dean Brayiannis of Valle called Steve Prescott of Vitafoam:

Brayiannis: "I sent you a text regarding price increase letters. I'm assuming you've got most of the ones that you wanted to see."

Prescott: "I didn't see, I had the old boy had faxed me one from a couple of days ago…Yah, okay, no problem, Yah, I guess, like that's, you know, it's game on again, isn't it."

Brayiannis: "Ah, we'll see what happens. I've got Carpenter, Flexible, Mohawk, Leggett." Prescott: "But it's warranted, you know what I mean. Like, we know the prices of raw material have been going up, so ah."

Brayiannis: "Well, you know, I guess what we've gotta see is have another one right behind this one, hopefully the first one will stick right but I guess we will see what our friends at Carpenter will do."

Prescott: "Yah, yah. Well, yah, like I say it's it's game on. So I would imagine that most manufacturers will move forward with it. We will have to see whether they, whether they do or not and see how that goes."

Brayiannis: "Yah, yah. Alright. Well our letter is out so hopefully I'm assuming you've probably put something out by now."

Prescott: "It's as good as done."

Brayiannis: "Okay. Well we're already out, so we've already put our letter out."

107.    On May 25, 2010, Vitafoam received a call from Michel Legendre of Carpenter, who informed Vitafoam that Carpenter would be raising its prices on June 28, 2010. Six days later, on May 31, 2010, Legendre again called Vitafoam and told them that Carpenter would be raising prices by 11%. The following day, Carpenter provided Vitafoam with a copy of the letter it sent to its customers, which included the dates and amounts of the price increases.

108.    After Vitafoam raised its own prices, Legendre once again contacted the company, this time on June 15, 2010. He spoke with the Vitafoam Vice President and asked whether Vitafoam was "ready for round 2?" Legendre informed the Vice President that Carpenter was preparing to send a letter the following day with a 12% price increase, effective July 19, 2010. He also confirmed that manufacturers in "the States were similarly raising prices."

109.    Once the two men finished discussing the details of the second price increase, they then turned to a discussion of whether they should be speaking at all…

11

112.    The Defendants also exchanged emails in furtherance of the conspiracy to fix prices for flexible polyurethane foam:

…

k.    On July 9, 2008, Steve Prescott forwarded the email string and letter to Stan Miller of Vitafoam, with the message, "Hey pal you thought the first one was tough! Check with your Carpenter contact to see when they plan on pulling the trigger."

l.    On July 11, 2008, Stan Miller reported back to Prescott via email, stating:

"Steve, I talked to Carpenter and he says that he has found his info.  [Reports details of Mohawk, Scottdel, and Carpenter price increases]

…

n.    Letters announcing a May 2009 increase…from Carpenter dated April 13, 2009…were all present in Vitafoam files. Following that price increase, there was another price increase in June 2009. Price increase letters from…Carpenter…all dated May 18, 2009…were also present in Vitafoam files.

2.    <u>Responses to the Carpenter Parties' specific arguments</u>

The CAC's allegations with respect to the Carpenter Parties indisputably go far beyond putting them on notice of their role in the alleged conspiracy.  The Carpenter Parties' suggestion that the CAC includes only five "factual" allegations about the Carpenter Parties involvement in the conspiracy, *see* Carpenter Br. at 3 (citing CAC ¶¶ 104, 107-09, 112), misreads the CAC.

Nor does the CAC rely on general "group" pleading about the Carpenter Parties.  Rather, the CAC includes (a) specific allegations identifying each Carpenter Party's involvement in the conspiracy; (b) allegations of conduct by Carpenter Parties separate and distinct from allegations of conduct by other Defendants; and (c) identification of specific employees of Carpenter involved in the conspiracy. For example, Stanley Pauley, referenced in Paragraph 74 of the CAC, is identified by public records as the President of Carpenter Holdings, Inc.

Equally meritless is the Carpenter Parties' assertion that the allegations as to them are "implausible" because the CAC purportedly does not allege either when the Carpenter Parties joined the conspiracy, or any of the Carpenter Parties' "specific customers, products or territories, [or] agreement[s] on price."  Carpenter Br. at 2-3.  First, the CAC alleges with detailed specificity how Defendants (including the Carpenter Parties) fixed prices and how the conspiracy originated.  CAC ¶¶ 63-66, 68, 70, 72, 74, 77-78, 82-83, 92, 94, 96.  Because this conspiracy was *secret*, more details of its genesis will almost certainly emerge during discovery. Second, the CAC alleges that the Carpenter Parties participated in the conspiracy from 1999 to 2010 and each joined the conspiracy during or before that period.  CAC ¶¶ 13-16, 63-66, 94.

While the Carpenter Parties argue the CAC fails to specify the exact date they joined the conspiracy, no such detail need be pleaded.  Even if the Carpenter Parties joined the conspiracy at some point after 1999, they are liable for *all* acts of the conspiracy throughout the conspiracy period.  *See Havoco of Am., Ltd.* 626 F.2d at 554  ("[A] co-conspirator who joins a conspiracy with knowledge of what has gone on before and with an intent to pursue the same objectives may, in the anti-trust context, be charged with the preceding acts of its co-conspirators"); *In re K-Dur Antitrust Litig.*, 338 F. Supp. 2d at  538 ("[A] co-conspirator is liable for all acts committed in furtherance of a conspiracy, regardless of when it entered the conspiracy"); *In re Nissan Motor Corp. Antitrust Litig.*, 430 F. Supp. at  232 ("[P]roof of unlawful affiliation is sufficient to render a co-conspirator liable for all damages that the conspiracy caused, regardless of the exact time defendant became a member or the extent of its participation").

Finally, Carpenter Holdings maintains that, although it is a Virginia corporation, it purportedly never "directly" sold flexible foam into the U.S. market.  Carpenter Br. at 2 n.2.

This is not an issue that may be resolved on a motion to dismiss. But in any event, whether

Carpenter Holdings sold "directly" into the U.S., is not dispositive of whether it participated in a

conspiracy with respect to sales in the U.S.  *In re Hypodermic Prod. Antitrust Litig.*, 2007 WL

1959225, at *12-15 (D.N.J. 2007) (finding complaint adequately alleged conspiracy where

defendant's actions potentially affected sales of the subject products in the U.S.).  Here, of

course, it is alleged that Defendants, including Carpenter Holdings, conspired and implemented

their conspiracy in both the U.S. and Canada, with all of that conduct affecting prices in the U.S.

**B.**     **Domfoam and Valle**

1.     Allegations relevant to Domfoam and Valle.

The CAC alleges in detail the participation of Domfoam and Valle in the conspiracy.

First the CAC identifies the relevant entities:

17.     Defendant Domfoam International, Inc. ("Domfoam") is a subsidiary of Valle
Foam Industries, with its principal place of business at 8785 Langelier Boulevard,
Montreal, Quebec, H1P 2C Canada. During the Class Period Domfoam directly sold
flexible polyurethane foam throughout the United States. Domfoam manufactures
flexible polyurethane foam primarily for the bedding, flooring, furniture, and packaging
industries.

18.     Defendant Valle Foam Industries (1995), Inc. ("Valle") is a privately owned and
operated corporation with its principal place of business at 4 West Drive, Brampton,
Ontario L6T 2H7, Canada. Valle manufactures flexible polyurethane foam for, *inter alia*,
the furniture, bedding, packaging, and flooring industries. During the Class Period, Valle
and/or affiliates it controlled directly sold flexible polyurethane foam throughout the
United States.

19.     Valle participated in the conspiracy through the actions of its respective officers,
employees, and representatives acting with actual or apparent authority. Further, Valle
benefited from the conspiracy by receiving greater profits than it would have received
had the conspiracy not existed. Valle also was a member of the conspiracy by virtue of its
status during the Class Period as the alter ego or agent of Domfoam. Valle dominated or
controlled Domfoam regarding conspiracy activities and used that domination or control
to charge artificially high prices for flexible polyurethane foam.

The CAC then provides specific information concerning Domfoam and Valle's

participation in the conspiracy:

> 72.    The former President of Vitafoam, along with his subordinates, had conspiratorial discussions during the Class Period as described above with other Defendants regarding fixing prices and allocating customers. These discussions included at least…Robert Valle and Dean Brayiannis of Valle.

> 74.    The former Vice President of Vitafoam also participated in conspiratorial conduct during the Class Period with many individuals employed by numerous competitors, including at least Valle…Domfoam…. The communications involved discussions of price increase percentages and effective dates of such increases, typically by telephone. The competitors exchanged copies of price increase letters to coordinate and support these increases. Individuals from competitors with whom the former Vice President conspired to fix prices and allocate customers included at least…Tony Vallecoccia, Dean Brayiannis and Robert Valle of Valle…and John Howard of Domfoam.

> 76.    Robert Valle and Tony Vallecoccia of Valle also communicated with other Defendants by telephone and faxed each other copies of their draft price increase letters that would be sent to customers in order to coordinate and collude on price increase percentages and their effective dates. They reported on these efforts to Vitafoam.

> 82.    During the Class Period, the [Vitafoam] Vice President personally engaged in this conspiratorial conduct to fix prices and maintain market share with at least…Valle…. Co-workers at both Woodbridge and Vitafoam also participated in the scheme.

> 83.    Information sworn under oath on July 21, 2010 by Pierre-Yves Guay of the Commissioner of Competition in Canada to support a search warrant describes information provided by "Witness A," this same employee of Vitafoam, regarding conduct "in Canada and in the United States." The information states under oath: "Witness describes himself as someone who gathers and shares information across the foam sectors. Witness A confirmed to Competition Law Officers that he had discussions, exchanges of information and agreements regarding the price of foam with the following contacts within the foam industry:

| Companies | Contacts | Positions |
|---|---|---|
| Vallefoam | Tony Vallecoccia | President |
| DomFoam Int'l Inc | John Howard | President |

> 84.    The sworn affidavit from Pierre-Yves Guay also separately states that it is the result of an investigation of "previous and ongoing conduct contrary to" the Competition

Act of Canada by entities including…Valle Foam, Domfoam…. The violations of law alleged in the affidavit concerned conduct both "in Canada and in the United States."

92.     During the Class Period, the President of Vitafoam participated in conspiratorial discussions concerning pricing in the flexible polyurethane foam market with various competitors at both Woodbridge and Vitafoam, including at least…Tony Vallecoccia of Valle…. These discussions led to a clear understanding and agreement that the participants would discuss and implement coordinated price increases on the same effective dates.

93.     A Vitafoam executive had several communications with Dean Brayiannis from Valle leading to an agreement on June 2009 on the promotional pricing for carpet foam for a shared customer. This agreement to offer the same promotional pricing was followed after June 2009.

100.    On May 20, 2010, John Howard, President of Domfoam, called the current Vitafoam Vice President twice to voice complaints about a Vitafoam salesman, Normand Widmer, attempting to acquire Domfoam customers…

101. On May 25, 2010, the Vice President of Vitafoam called Howard back. During the call, Howard stated:

> "Just, you know we've kind of stayed out of each other's way for some time here while business is quiet. There's just no business to be had and dropping prices is only going to benefit the customers. I can't afford to have him take stuff away…It'll be a rough go if he wants to go and quote prices in places where he's not currently selling…Tell Normand it's a, I mean we just don't even know who your accounts are. Basically we've just never interfered, but, if he's going to go selling to guys quoting prices at guys where he doesn't currently sell, we're going to go after his accounts. So, business decision, you know, whatever way the chips fall, that's the way they're going to fall, and life will go on. But the buyers are asking me, you know, 'John, you're always telling us to stay away.' We do the same thing with Foamex, we don't go after their accounts. Haven't for a while business has been in the shitter. Just kind of stayed away and they've stayed away from our accounts too, so prices have been fairly stable. There ain't much business out there and dropping prices and only the customers are going to benefit…"

102. On May 25, 2010, Howard also left a voicemail message for the Vice President of Vitafoam:

> "Hi, it's John…we never really did resolve anything, I guess I did most of the talking…where do we leave this thing , vis-à-vis going after each other's accounts…"

104. On June 4, 2010, Tim Prescott of Vitafoam left a voice mail message for Vitafoam's Vice President:

> "Hey, it's Tim…Can you give me a call when you get a chance. I don't know whether you've spoken to [President] but I had a message earlier from Dale over at Carpenter and when I called him back he was asking what we're going with the increase and he just called me again asking can VPS please call John Howard over at Domfoam."

2.        <u>Responses to Domfoam and Valle's specific arguments</u>

Domfoam and Valle argue that the CAC is deficient as to them because (i) specific allegations of collusion by Domfoam and Valle with Vitafoam purportedly are ambiguous, because the CAC purportedly does not identify whether the collusion involved Vitafoam in Canada ("Vita Canada") or in the United States ("Vita U.S."), and (ii) allegations of Domfoam and Valle's involvement in the conspiracy purportedly refer only to "Canadian conduct," rather an involvement in a U.S. conspiracy.  Domfoam-Valle Br. at 4-7.

As shown above, the CAC is replete with the details of specific individuals involved in collusion with Domfoam and Valle.  There is no ambiguity as to which Vitafoam parties did what in connection with the collusion.  Domfoam and Valle know well who are the Vitafoam witnesses identified in the CAC—Domfoam and Valle even argue that all of these Vitafoam witnesses are from Canada.  Domfoam-Valle Br. at 5-6.

The CAC also alleges that Domfoam and Valle participated in a conspiracy that spanned both the U.S. and Canada.  CAC ¶ 83-84.  Vitafoam received a conditional leniency letter from the Justice Department after admitting its participation in a conspiracy that spanned *North America* and violated *U.S. antitrust laws*.  *Id.* ¶¶ 61-62, 67, 73.  As set forth in the CAC, the DOJ warrant in connection with the ongoing criminal investigation mentions both Domfoam and

Valle several times.  *Id.* ¶¶ 72, 74, 76, 82, 92-93.  The CAC also notes that materials from the

ongoing Canadian investigation make clear that the conspiracy occurred "in Canada *and* in the

United States."  *Id.* ¶ 83-84 (emphasis added).

Domfoam and Valle contend that allegations regarding Domfoam's policing of the

conspiracy with respect to customer allocation in Montreal limit the scope of their involvement

in the conspiracy to Canada.  Domfoam-Valle Br. at 8.  But as the CAC makes clear, this specific

instance of customer allocation in Montreal was part—and must be viewed in light—of the larger

conspiracy to fix prices and allocate customers throughout North America.

    **C.**    **The Flexible Foam Parties**

        1.    <u>Allegations relevant to the Flexible Foam Parties</u>

The CAC includes detailed allegations about the Flexible Foam Parties' participation in

the conspiracy.  First the CAC identifies the relevant entities and their relationship:

> 20.    Defendant Flexible Foam Products, Inc. ("Flexible Foam Products") is a privately owned and operated Ohio company with its principal place of business at 12575 Bailey Road, Spencerville, Ohio 45887, and operations in Texas, Indiana, Florida and Wisconsin. Flexible Foam Products is a subsidiary or "division" of Ohio Decorative Products, Inc., also of Spencerville, Ohio.  Flexible Foam manufactures flexible polyurethane foam and rebond products for customers in the bedding, flooring, furniture, packaging, and transportation industries. During the Class Period, Flexible Foam Products directly sold flexible polyurethane foam throughout the United States.

> 21.    Defendant Ohio Decorative Products, Inc. ("Ohio Decorative," collectively with Flexible Foam Products, "Flexible Foam") is a private corporation with its principal place of business at 220 S. Elizabeth Street, Spencerville, Ohio 45887. Ohio Decorative is the parent company of Flexible Foam Products. During the Class Period, Ohio Decorative and/or affiliates it controlled directly sold flexible polyurethane foam throughout the United States.

> 22.    Ohio Decorative participated in the conspiracy through the actions of its respective officers, employees, and representatives acting with actual or apparent authority. Further, Ohio Decorative benefited from the conspiracy by receiving greater profits than it would have received had the conspiracy not existed. Ohio Decorative also

was a member of the conspiracy by virtue of its status during the Class Period as the alter ego or agent of Flexible Foam Products. Ohio Decorative dominated or controlled Flexible Foam Products regarding conspiracy activities and used that domination or control to charge artificially high prices for flexible polyurethane foam.

The CAC then provides specific information concerning the Flexible Foam Parties'

participation in the conspiracy:

74.     The former Vice President of Vitafoam also participated in conspiratorial conduct during the Class Period with many individuals employed by numerous competitors, including at least…Flexible Foam…. The communications involved discussions of price increase percentages and effective dates of such increases, typically by telephone. The competitors exchanged copies of price increase letters to coordinate and support these increases. …

82.     During the Class Period, the [Vitafoam] Vice President personally engaged in this conspiratorial conduct to fix prices and maintain market share with at least…Flexible Foam.  Co-workers at both Woodbridge and Vitafoam also participated in the scheme.

83.     Information sworn under oath on July 21, 2010 by Pierre-Yves Guay of the Commissioner of Competition in Canada to support a search warrant describes information provided by "Witness A," this same employee of Vitafoam, regarding conduct "in Canada and in the United States." The information states under oath: "Witness describes himself as someone who gathers and shares information across the foam sectors. Witness A confirmed to Competition Law Officers that he had discussions, exchanges of information and agreements regarding the price of foam with the following contacts within the foam industry:

| Companies | Contacts | Positions |
|---|---|---|
| Flexible Foam Products | Mike Crowell | VP Sales and Marketing |

84.     The sworn affidavit from Pierre-Yves Guay also separately states that it is the result of an investigation of "previous and ongoing conduct contrary to" the Competition Act of Canada by entities including…Flexible Foam…. The violations of law alleged in the affidavit concerned conduct both "in Canada and in the United States."

89.     On May 26 & 27, 2010, the current Vice President attended a PFA meeting in Baltimore, MD. While there, he discussed foam pricing with Michael Crowell of Flexible Foam. Crowell asked why Vitafoam was not raising prices or following a recent increase.

92.     During the Class Period, the President of Vitafoam participated in conspiratorial discussions concerning pricing in the flexible polyurethane foam market with various competitors at both Woodbridge and Vitafoam, including at least…Michael Crowell of

19

Flexible Foam…. These discussions led to a clear understanding and agreement that the participants would discuss and implement coordinated price increases on the same effective dates.

97. On April 9, 2010, in Cleveland, Ohio, Bruce Schneider of Future Foam spoke by telephone to an executive from Vitafoam. Schneider worked at Future Foam headquarters. Schneider called to inform Vitafoam that Future, Foamex and Flexible intended to increase the price of foam by 20% in the next weeks.

105. On June 3, 2010, Dean Brayiannis of Valle called Steve Prescott of Vitafoam:

> Brayiannis: "I sent you a text regarding price increase letters. I'm assuming you've got most of the ones that you wanted to see."

> Prescott: "I didn't see, I had the old boy had faxed me one from a couple of days ago…Yah, okay, no problem, Yah, I guess, like that's, you know, it's game on again, isn't it."

> Brayiannis: "Ah, we'll see what happens. I've got Carpenter, Flexible, Mohawk, Leggett."

112. The Defendants also exchanged emails in furtherance of the conspiracy to fix prices for flexible polyurethane foam:

> n.    Letters announcing a May 2009 increase from Flexible Foam dated April 7, 2009…were all present in Vitafoam files. Following that price increase, there was another price increase in June 2009. Price increase letters from…Flexible Foam…all dated May 18, 2009…were also present in Vitafoam files.

> 2.    <u>Responses to the Flexible Foam Parties' specific arguments</u>

>> (a)    The CAC adequately pleads that Ohio Decorative is liable as the alter ego of Flexible Foam.

The Flexible Foam Parties' primary challenge to the CAC is that the allegation that Ohio Decorative is the "alter ego or agent" of Flexible Foam is purportedly "conclusory."  Flexible Foam Br. at 1.   But the Flexible Foam Parties cite no authority to support their position, and there is none.  For it is well settled alter ego allegations do not require detailed pleading, especially where, as here, it is alleged that one corporate entity wholly owns another corporate entity alleged to have been involved in an antitrust conspiracy and lists that subsidiary as its

"division."  *Fortress Value Recovery Fund I, LLC v. Columbus Components Group LLC*, 2011 WL 1130442, at *5 (N.D. Ohio 2011) ("Although these allegations, to some degree, read like a recitation of various elements courts are supposed to analyze when deciding if a corporation is an alter ego of its owner, for purposes of a motion to dismiss, they are sufficient to carry the Plaintiff's pleading burden"); *Wachovia Bank, N.A. v. Zomax Inc.*, 2009 WL 3698443, at *6 (S.D. Ohio 2009) ("Under the applicable standard of review, Capital City is not required to plead with particularity any connections between ComVest and Zomax.  Here, Capital City's 'factual allegations ... raise a right to relief above the speculative level on the assumption that all the allegations in the complaint are true'") (citing *Twombly*, 550 U.S. at 555).

> (b)  Plaintiffs adequately plead the Flexible Foam Parties' involvement in the conspiracy.

The Flexible Foam Parties argue that none of the price fixing allegations in the CAC pertain to Flexible Foam.  But the CAC alleges in detail that competitors obtained Flexible Foam's pricing information:  recorded phone calls demonstrate Flexible Foam's competitors had advance information on the timing and amount of Flexible Foam's price increases, CAC ¶¶ 97-98; consistent with the conspiracy described by Vitafoam witnesses cooperating with the government, competitors obtained copies of Flexible Foam's price increase letters, *id.* ¶ 105; and Flexible Foam price increase letters were actually found in Vitafoam's files, *id.* ¶ 112(n).

The Flexible Foam Parties assert that the CAC should also have described *how* competitors obtained Flexible Foam Parties' price increase information.  Flexible Foam Br. at 2-3.  But this argument, without any legal foundation, ignores the CAC's allegations that, as admitted by the cooperating Vitafoam witnesses, Defendants engaged in price increase discussions approximately 2-3 times per year, CAC ¶ 63; Defendants contacted each other

specifically to discuss price increases and collusion, *id.* ¶¶ 64-65; and the Defendants exchanged price increase letters as a means to exchange pricing information and monitor and enforce the conspiracy, *id.* ¶¶ 70, 96.

The Flexible Foam Parties' motion simply ignores the gravamen of the CAC.  The CAC alleges that price increase discussions occurred both before and after the actual price increases, so conspirators could agree on prices beforehand, and police the increases after.  CAC ¶¶ 89, 97-98.  These allegations include several specific instances of the Flexible Foam Parties' involvement.  *Id.* ¶¶ 74, 82-83, 92.

The Flexible Foam Parties also argue that "[t]here is not a single allegation of fact directed at Flexible Foam concerning any customer allocation."  Flexible Foam Br. at 2.  This argument also is flatly false.  The CAC alleges that a former Vice President of Vitafoam admitted to the Justice Department that he had customer allocation discussions with Flexible Foam, CAC ¶ 73-74; the Vitafoam witnesses admitted they had allocation agreements with all Defendants, including Flexible Foam, *id.* ¶ 79; and that Flexible Foam participated in allocation discussions at trade shows with other Defendants, *id.* ¶ 116.

Finally, while the Flexible Foam Parties admit that the CAC alleges the existence of government investigations in the United States and Canada, and that the CAC identifies the "industry participants" that have been referenced in documents emerging from the investigations, the Flexible Foam Parties argue that the CAC purportedly lacks adequate information about the scope of the ongoing government investigations.  Flexible Foam Br. at 3.  This argument is difficult to comprehend.  The CAC provides multiple details of the Flexible Foam Parties' direct involvement in the conspiracy as confirmed in documents from the ongoing investigations.

**D.**    **Future Foam**

1.    Allegations relevant to Future Foam

The CAC provides detailed allegations of Future Foam's participation in the conspiracy.

First the CAC identifies the relevant entity:

25.    Defendant Future Foam, Inc. ("Future Foam") is a privately owned and operated company with its principal place of business at 1610 Avenue N, Council Bluffs, Iowa 51501.  Future Foam produces flexible polyurethane foam for the bedding, flooring, furniture, and packaging industries. During the Class Period, Future Foam directly sold flexible polyurethane foam throughout the United States.

The CAC then provides specific information concerning Future Foam's participation in

the conspiracy:

72.    The former President of Vitafoam, along with his subordinates, had conspiratorial discussions during the Class Period as described above with other Defendants regarding fixing prices and allocating customers. These discussions included at least…Bruce Schneider of Future Foam….

82.    During the Class Period, the [Vitafoam] Vice President personally engaged in this conspiratorial conduct to fix prices and maintain market share with at least…Future Foam…. Co-workers at both Woodbridge and Vitafoam also participated in the scheme.

84.    The sworn affidavit from Pierre-Yves Guay also separately states that it is the result of an investigation of "previous and ongoing conduct contrary to" the Competition Act of Canada by entities including…Future Foam…. The violations of law alleged in the affidavit concerned conduct both "in Canada and in the United States."

92.    During the Class Period, the President of Vitafoam participated in conspiratorial discussions concerning pricing in the flexible polyurethane foam market with various competitors at both Woodbridge and Vitafoam, including at least…Bruce Schneider and Robert Heller of Future Foam. … These discussions led to a clear understanding and agreement that the participants would discuss and implement coordinated price increases on the same effective dates.

97.    On April 9, 2010, in Cleveland, Ohio, Bruce Schneider of Future Foam spoke by telephone to an executive from Vitafoam.  Schneider worked at Future Foam headquarters. Schneider called to inform Vitafoam that Future, Foamex and Flexible intended to increase the price of foam by 20% in the next weeks.

23

98.     On another call, Schneider again discussed price increases by the Defendants with the President of Vitafoam. Schneider stated: "Now it's looking it's all everything is postponed to May 31st or June 1st. There is a letter out from Carpenter for 31st of May. This is a letter out from Flexible for June 1st. Foamex sent a letter two weeks ago at 15% but it looks like now that the increase is going to be 10 and 12% on foam." The Vitafoam President asked: "Are you hearing anything from the other guys? Or is it just kinda market stuff?" Schneider responded: "Oh, from the other, the other people the foamers? Yeah, we are hearing 10-12… It's kinda what we hear from other people what they expect. Ya know, it would have been great to get 20% but I don't think so." The conversation concluded with a request for information from Schneider. "If you hear anything from your friends in Europe. What's going on over there, I sure would like to know that as well."

99.     On June 10, 2010, Bruce Schneider of Future Foam left a voice mail message for the current President of Vitafoam. In this message, Schneider stated, "Hi [President], this is Bruce Schneider… If you want to give me a call I've got information of why the increase changed from 10 to 12 to 9."

112.     The Defendants also exchanged emails in furtherance of the conspiracy to fix prices for flexible polyurethane foam:

            …

            m. On May 21, 2009, Steve Prescott of Vitafoam sent draft price increase letters to other Vitafoam employees. One of the recipients, David Gurley of Vitafoam, forwarded those price increase letters to Jeff Carter of Future Foam in Texas. Jeff Carter then forwarded this email to David Carson and Louie Carson of Scottdel stating: "Louie and David, You probably have seen all these. It's crazy out there again, personally I don't think this is enough of an increase."

            n. Letters announcing a May 2009 increase from…Future Foam dated April 16, 2009 were all present in Vitafoam files. Following that price increase, there was another price increase in June 2009. Price increase letters from…Future Foam all dated May 18, 2009…were also present in Vitafoam files.

            o. Louie Carson responded to Carter thanking Carter for the information. Carter forwarded his string of emails with Louie Carson back to David Gurley at Vitafoam. Gurley forwarded the string to his superiors at Vitafoam, the Vice President of Sales & Marketing and President, with the message: "Please keep this confidential and read from the bottom up. It was sent to my friend Jeff Carter @Future Foam in Texas and talks about Vita and Ohio Valley. Louie Carson is one of the owners of Scottdel."

24

2.    Responses to Future Foam's specific arguments

Future Foam's primary argument is that the CAC supposedly fails to link Future Foam to the price fixing conspiracy. Future Foam Br. at 1-3. Future Foam asserts that the CAC does not actually describe Future Foam's direct acts in support of conspiracy, and that many of the allegations purportedly are just exercises in "listing Future Foam's employees." *Id.* Given the specific allegations of Future Foam's direct involvement set forth above, these arguments are obviously meritless.

As noted in the CAC, the Vitafoam witnesses cooperating with the Justice Department have expressly identified Future Foam as a participant in the conspiracy. CAC ¶¶ 72, 82, 84, 92. This alone would be sufficient to create a plausible inference of Future Foam's direct involvement.[4] Furthermore, to the extent that the specific examples of Future Foam's express involvement listed in the CAC are from 2009 and 2010, this does not preclude a plausible inference that Future Foam was involved as well in the period prior to 2009, given all of the allegations by the Vitafoam witnesses that the collusive conduct they described occurred regularly during all years of the alleged conspiracy period. CAC ¶¶ 72, 82, 84, 92.

That being said, nothing in *Twombly* or Fed. R. Civ. P. 8 requires a complaint to identify every time or place that a defendant was involved in collusion. *See, e.g., Aftermarket Filters*, 2009 WL 3754041, at *3 (rejecting defendant's argument that failure to allege specific meetings for specific years somehow renders the conspiracy for those years implausible); *see also In re*

---

[4]   *See, e.g.,* Joint Brief Opp. at 23-26, 34; *In re High Fructose Corn Syrup Antitrust Litig.*, 295 F.3d 651, 654 (7th Cir. 2002) (direct evidence of conspiracy—including an admission from an insider, such as Vitafoam here—is sufficient to survive a *summary judgment* motion); *see also In re Aftermarket Filters Antitrust Litig.*, 2009 WL 3754041, at *3 (N.D. Ill. Nov. 5, 2009) (allegations of (i) methods used to facilitate conspiracy, (ii) specific meetings at which scheme was discussed, (iii) advanced communications of price increases, and (iv) defendant's agreement to participate in conspiracy were sufficient to plead defendant liability).

*Packaged Ice Antitrust Litig.*, 723 F. Supp. 2d 987, 1005-07 (E.D. Mich. 2010) (denying motion to dismiss where complaint alleged the general outlines of the conspiracy but was unable to provide every, or even many, specific instance of conspiratorial conduct).  Where a conspiracy is *secret*, it is often expected that plaintiffs will have *no* direct examples of conduct, as opposed to the many examples cited in the CAC with respect to Future Foam.  *See SigmaPharm, Inc. v. Mutual Pharmaceutical Co., Inc.*, 2011 WL 743394, at *5 (E.D. Pa. 2011) (denying motion to dismiss where complaint alleged no "specifics of when, where and how the agreement was reached" because such facts are often unavailable at the pleading stage); *In re Nat'l Century Fin. Enter., Inc., Inv. Litig.*, 541 F. Supp. 2d 986, 1016-17 (S.D. Ohio 2007) (denying motion to dismiss conspiracy claims "[b]ecause conspirators seldom make records of their illegal agreements, [therefore] the existence of an agreement is often provable only through circumstantial evidence.") (citing *U.S. v. Short*, 671 F.2d 178, 182 (6th Cir. 1982), and *Aetna Cas. and Sur. Co. v. Leahey Constr. Co.*, 219 F.3d 519, 538 (6th Cir. 2000)).

Contrary to case law, Future Foam argues that it should be dismissed from this case because it can "explain" its participation in the conspiracy as mere "market intelligence" and "shop talk."  Future Foam Br. at 4, 7.  Recharacterizing *per se* anticompetitive conduct does not make it lawful, and it certainly does not make involvement in a conspiracy less plausible.  As the Seventh Circuit recently articulated, courts assessing a motion to dismiss need not determine whether the allegations "*compel* an inference of conspiracy; the case is just at the complaint stage and the test for whether to dismiss a case at that stage turns on the complaint's 'plausibility.'"  *See In re Text Messaging Antitrust Litig.*, 630 F.3d 622, 627-29 (7th Cir. 2010).  While, for purposes of a summary judgment motion, a Section 1 plaintiff may have to offer

evidence that "tend[s] to rule out the possibility that the defendants were acting independently," *Twombly*, 550 U.S. at 554, a plaintiff on a motion to dismiss need only allege "enough factual matter (taken as true) to suggest that an agreement was made." *Id.* at 556.[5]  Future Foam's attempted contextualizations are therefore irrelevant.  *See Packaged Ice*, 723 F. Supp. 2d at 1005 ("*Twombly* did not purport to place on a plaintiff alleging an antitrust conspiracy claim a summary judgment standard at the pleading stage."); *In re Se. Milk Antitrust Litig.*, 555 F. Supp. 2d 934, 943-44 (E.D. Tenn. 2008) (finding it inappropriate on a motion to dismiss to resolve whether alleged unlawful agreements were "legitimate").

Here, moreover, Vitafoam witnesses have told the government that Future Foam was involved in the collusion, and provided specific examples of when that occurred.  So the attempt by Future Foam, before any discovery, to offer some alternative explanation must be rejected. *See, e.g.*, *Nilavar v. Mercy Health Sys. Western Ohio*, 142 F. Supp. 2d 859, 873-78 (S.D. Ohio 2000) (denying motion to dismiss antitrust claims because defendants' attempts to rationalize certain contracts as "pro-competitive" were factual inquiries).  Furthermore, it is difficult to take seriously Future Foam's unsubstantiated effort to explain away its employee Jeff Carter's emails with co-conspirators as nothing more than competitors "independently jump[ing] at opportunities to increase prices when trends allow it," and as employees attempting "to stay abreast of price changes among their competitors."  *See* Future Foam Br. at 4.  There is nothing "independent" or seemingly "non-collusive" about exchanging draft price increase letters with competitors to *determine* an appropriate price.  Indeed, this type of information exchange is the hallmark of a

---

[5] Even at the summary judgment stage, a defendant cannot simply "combine[] a recital of the facts favorable to the defendants with an interpretation favorable to them of the remaining evidence" to win dismissal because that would usurp the role of the jury at trial.  *See High Fructose Corn Syrup*, 295 F.3d at 655.

price fixing conspiracy. *American Column & Lumber Co. v. U.S.*, 257 U.S. 377, 411-12 (1921) (finding price exchanges for the intent of "procur[ing] 'harmonious' individual action among a large number of naturally competing dealers" violated the Sherman Act, and the admission alone is sufficient to render the allegations of Future Foam's participation in the conspiracy plausible); *see also Text Messaging*, 630 F.3d  at 628 (the "smoking gun in a price fixing case . . . usually takes the form of an admission by an employee of one of the conspirators, that officials of the defendants had met and agreed explicitly on the terms of a conspiracy to raise price"; denying motion to dismiss even in absence of such "smoking gun.").[6]

Future Foam's purported explanation for why investigators found its price increase letter in competitor Vitafoam's files is similarly flawed.  Future Foam Br. at 5.  The CAC alleges that Defendants exchanged letters to agree on price and to enforce the conspiracy, and reference admissions to that effect by Vitafoam witnesses.  *E.g.*, CAC ¶¶ 70, 96.  At the very least, these are precisely the types of non-conclusory, factual allegations that must be accepted as true at the motion to dismiss stage.  *See Flash Memory*, 643 F. Supp. 2d at 1143 (denying motion to dismiss because the complaint alleged "Defendants routinely exchanged highly sensitive competitive information, including pricing and production data, to facilitate and monitor their alleged price fixing conspiracy."); *cf. High Fructose Corn Syrup*, 295 F.3d at 662 (finding documents discussing coordination of pricing with competitors probative of price fixing).

Future Foam's attempts to argue away the detailed allegations of Bruce Schneider's

---

[6] Also flawed is the suggestion that the Court should ignore Carter's unlawful email correspondence because Plaintiffs fail to detail whether Carter had pricing responsibilities.  Future Foam relies on the contention that it is logical and appropriate for businesses to "stay abreast" of their competitors' pricing information.  Future Foam Br. at 4.  Future Foam does not explain why it is appropriate to infer that an employee would want to "stay abreast" of his competitor's price information when he had no pricing responsibility, but not to also infer that he exchanged information to fix prices because he had pricing authority.

unlawful conversations are equally unavailing. Future Foam Br. at 5-7. Future Foam offers two purported—and wholly unsubstantiated—justifications for Schneider's conduct. First, it contends the conversations were simply a "postmortem analysis" of price increases. Future Foam Br. at 6-7. Again, there is nothing obviously "independent" about polling your competitors to ensure that your price increases are consistent. Rather, such communications are typical of price fixing arrangements. *American Column*, 257 U.S. at 411-12. Moreover, the communications make clear that this conduct was not merely a "postmortem." The CAC alleges that Schneider stated in his conversations with Vitafoam that he heard "from other people what they *expect*"; that is, Schneider indicated that his competitors told him what would happen to prices in the *future*. CAC ¶ 98.

Second, Future Foam argues that because Schneider and his co-conspirators griped that price increases should have been larger, it is likely that competitors were acting "independently." Future Foam Br. at 7. But for one competitor to tell another that price increases should have been larger is again what one would most likely expect as part of collusion, not competition. In any event, the CAC expressly alleges how the very conversation at issue, CAC ¶¶ 97-99, reflects the collusion in which Future Foam was participating. In April, May, and June 2010, Schneider and his Vitafoam counterpart discussed how much their companies would raise prices. *Id.* What started out as a potential 20% increase in early April morphed into a 10-12% increase after other conspirators weighed in on the issue. *Id.* ¶ 98. It was at this point that Schneider complained he wished they had decided to go with the original 20% increase. *Id.* However, as time progressed, the conspirators further reduced the price increase to 9% for reasons that Schneider was willing to relate. *Id.* ¶ 99. Contrary to Future Foam's conclusions, this conversation exemplifies the

negotiation and collusion that went into the conspirators' price increases.  And colluding on a 9%
price increase is no less illegal where the conspirators first considered, but ultimately rejected, an
even higher price increase.

    E.    **Hickory Springs**

        1.    <u>Allegations relevant to Hickory Springs</u>

The CAC includes detailed allegations of Hickory Springs' participation in the alleged

conspiracy.  First the CAC identifies the relevant entity:

> 26.    Defendant Hickory Springs Manufacturing Company ("Hickory Springs") is a
> North Carolina corporation with its principal place of business located at 235 2nd
> Avenue, NW, Hickory, North Carolina 28601. During the Class Period, Hickory Springs
> directly sold flexible polyurethane foam throughout the United States.

> 27.    Hickory Springs is one of the nation's largest integrated component
> manufacturers and suppliers for the furniture and bedding industries, with more than 60
> operating facilities in the United States and throughout the world. The furniture industry
> is the largest segment of Hickory Springs' customer base. With more than 160 flexible
> polyurethane foam formulations, Hickory Springs is one of the largest producers of
> flexible polyurethane foam in the United States.

The CAC then provides specific information concerning Hickory Spring's participation

in the conspiracy:

> 72.    The former President of Vitafoam, along with his subordinates, had conspiratorial
> discussions during the Class Period as described above with other Defendants regarding
> fixing prices and allocating customers. These discussions included at least…Don
> Coleman of Hickory Springs….

> 74.    The former Vice President of Vitafoam also participated in conspiratorial conduct
> during the Class Period with many individuals employed by numerous competitors,
> including at least…Hickory Springs…. The communications involved discussions of
> price increase percentages and effective dates of such increases, typically by telephone.
> The competitors exchanged copies of price increase letters to coordinate and support
> these increases…

> 82.    During the Class Period, the [Vitafoam] Vice President personally engaged in this
> conspiratorial conduct to fix prices and maintain market share with at least…Hickory

Springs…. Co-workers at both Woodbridge and Vitafoam also participated in the scheme.

83.     Information sworn under oath on July 21, 2010 by Pierre-Yves Guay of the Commissioner of Competition in Canada to support a search warrant describes information provided by "Witness A," this same employee of Vitafoam, regarding conduct "in Canada and in the United States." The information states under oath: "Witness describes himself as someone who gathers and shares information across the foam sectors. Witness A confirmed to Competition Law Officers that he had discussions, exchanges of information and agreements regarding the price of foam with the following contacts within the foam industry:

| Companies | Contacts | Positions |
|-----------|----------|-----------|
| Hickory Springs | Todd Councilman | Marketing – Sales Manager |
| Hickory Springs | Buster Mann | VP, Eastern Division |

84.     The sworn affidavit from Pierre-Yves Guay also separately states that it is the result of an investigation of "previous and ongoing conduct contrary to" the Competition Act of Canada by entities including…Hickory Springs. The violations of law alleged in the affidavit concerned conduct both "in Canada and in the United States."

92.     During the Class Period, the President of Vitafoam participated in conspiratorial discussions concerning pricing in the flexible polyurethane foam market with various competitors at both Woodbridge and Vitafoam, including at least…Buster Mann and Lee Lunsford of Hickory Springs…. David Gurley also sent an email to the current President of Vitafoam in which he acknowledged receiving draft price increase letters from competitor Don Simpson of Hickory Springs. These discussions led to a clear understanding and agreement that the participants would discuss and implement coordinated price increases on the same effective dates.

110.    On May 27, 2010, Lee Lunsford of Hickory Springs called the Vitafoam President and inquired whether Vitafoam was raising prices. When the Vitafoam President expressed hesitation about doing so, Lunsford noted that there was "no volume anywhere" and "there is twice as much capacity as demand."

111.    Despite this acknowledgment, on June 3, 2010, Lunsford again called Vitafoam, this time speaking with the current Vitafoam Vice President. In their conversation, the Vice President informed Lunsford that Vitafoam was raising its prices at the end of the month. Lunsford inquired how much and, when told it would be by approximately 12%, agreed that this was an acceptable number to Hickory Springs.

112.    The Defendants also exchanged emails in furtherance of the conspiracy to fix prices for flexible polyurethane foam:

h. On September 14, 2005, the head of a competitor company wrote to a Vitafoam executive and stated "In separate conversation, I talked to Lucas. They are out with 11% on blocks nothing on Auto." He asked the Vitafoam executive to have one of his employees "call Buster [Mann at Hickory Springs] today." After placing the call to Mann, the Vitafoam employee wrote "I called Buster yesterday. We spoke about the bedding stuff. It is at numbers we are not used to."

2.    Responses to Hickory Springs' specific arguments

The detailed allegations about Hickory Springs are more than adequate to satisfy Rule 8 pleading standards.  Hickory Springs nonetheless argues that the CAC purportedly does not allege "what foam products they purchased, from whom, when, and at what price," a deficiency that ostensibly requires dismissal.  Hickory Springs Br. at 2-3.  This is apparently some sort of standing argument, but it has no bearing on the plausibility of the alleged conspiracy.  Hickory Springs sold flexible polyurethane foam in the United States during the Class Period, a fact which is not in dispute.  CAC ¶¶ 26-27.  As Hickory Springs admits, Plaintiffs *do* allege that they each purchased flexible polyurethane foam from one or more of the Defendants during the Class Period.  *Id.*; *see also* ¶ 4.  This is all that is required in a complaint.  *See, e.g.*, *In re Cathode Ray Tube (CRT) Antitrust Litig.*, 738 F. Supp. 2d 1011, 1023 (N.D. Cal. 2010) (finding direct purchaser adequately alleged antitrust injury where they simply alleged "they purchased CRTS or CRT Products from Defendants or their subsidiaries at inflated prices due to Defendants' unlawful conduct");  *Hypodermic*, 2007 WL 1959225, at *11-13 (rejecting defendants' argument that plaintiffs needed to alleged the products they purchased and markets in which they operated, because no "legal authority indicated that antitrust injury must be plead with such specificity" and no reason to believe "the antitrust injury alleged by Plaintiffs is somehow implausible").

Hickory Springs also argues that the CAC purportedly fails to implicate Hickory Springs

in the conspiracy, Hickory Springs Br. at 3-5, though this inaccurate argument can only be made by selectively quoting certain allegations to make the CAC into something it is not.

To begin with, Hickory Springs attempts to treat the detailed allegations about it as no more than conclusory. Certainly, this is not mere recitation of the elements of a claim. *Iqbal*, 129 S. Ct. at 1950-51. The very paragraphs cited by Hickory Springs, Hickory Springs Br. at 3, either explicitly reference other paragraphs describing the conspiratorial conduct in detail, or explain in the paragraph itself what the conversations entailed. *See, e.g.*, CAC ¶ 72 (Vitafoam had "conspiratorial discussions during the Class Period *as described above* with other Defendants *regarding fixing prices and allocating customers*.") (emphasis added); ¶ 74 (Hickory Springs' "conspiratorial conduct" entailed "discussions of price increase percentages and effective dates of such increases, typically by telephone[,] . . . competitors exchang[ing] copies of price increase letters to coordinate and support these increases[,]"); ¶ 92 ("During the Class Period, the President of Vitafoam participated in conspiratorial discussions concerning pricing in the flexible polyurethane foam market with various competitors [including Hickory Springs]. These discussions led to a clear understanding and agreement that the participants would discuss and implement coordinated price increases on the same effective dates").

While Hickory Springs similarly attempts to write off Plaintiffs' allegations that Hickory Springs "exchanged information" with Vitafoam, Hickory Springs Br. at 3, these allegations expressly explain that the "exchanges of information" had to do with the *price of foam*. CAC ¶ 83. Hickory Springs also ignores the detailed (and damning) allegation that a Vitafoam witness explained to the government that price increase letters were obtained from competitors as part of the conspiracy and then "acknowledged receiving draft price increase letters from competitor

Don Simpson of Hickory Springs." *Id.* ¶ 92.

Hickory Springs also challenges the implications to be drawn from Plaintiffs' allegations concerning conspiratorial phone calls between Vitafoam and Lee Lunsford of Hickory Springs in May and June 2010.  Hickory Springs Br. at 4-5.  This challenge asserts the specific communications fall outside the "relevant time period" and are not indicative of the conspiracy. These arguments are confusingly misplaced.  The "relevant time period," however, is defined in the CAC as "from January 1, 1999 to the present."  CAC ¶¶ 2, 142.  Hickory Springs inaccurately cites Paragraphs 60 and 94 for its conclusion that "the alleged conspiracy lasted *until* Vitafoam's entry into the leniency program," thereby—according to Hickory Springs— making the "relevant time period" from 1999 until February 2010.  Hickory Springs Br. at 4 (emphasis in original).  This, however, badly misreads the CAC.   Paragraph 94 alleges that every price increase from 1999 to Vitafoam's entry into the leniency program was collusive. Obviously, Vitafoam could only tell the government what it knew from the period of its own involvement in the conspiracy.  This does not preclude the conspiracy continuing *after* that date. In fact, the DOJ and Canadian materials cited in the CAC were created in the *summer of 2010* and indicated that the *conspiracy was ongoing*.  CAC ¶ 83-84 (citing Canadian affidavit dated *July 21, 2010*); Goldfein Affidavit dated April 15, 2011, filed in support of Domfoam-Valle Motion to Dismiss, Ex. A (DOJ affidavit filed *July 14, 2010*).

Moreover, Hickory Springs' selective assessment of the CAC ignores allegations concerning two conversations between Vitafoam and Hickory Springs in May-June 2010, when Vitafoam stated it was raising its prices at the end of the month.  As the CAC explains, "Lunsford [from Hickory Springs] inquired how much and, when told it would be by

34

approximately 12%, agreed that this was an acceptable number to Hickory Springs." CAC ¶ 111. This is precisely the type of "smoking gun" testimony that is normally *absent* in antitrust complaints. *See Text Messaging*, 630 F.3d at 628.  The same analysis applies to Hickory Springs' attack on the September 4, 2005 email cited in CAC ¶ 112(h).  Hickory Springs Br. at 5.

**F.     Inoac USA And Crest**

1.     Allegations relevant to Crest and the Inoac Parties[7]

The CAC includes detailed allegations of the Crest and the Inoac Parties' participation in the alleged conspiracy. First the CAC identifies the relevant entities:

28.     Defendant Inoac International Co., Ltd. ("Inoac International") is a Japanese company with its principal place of business at 450-0003 2-13-4 Meieki-Minami, Nakamura-ku, Nagoya, Japan. Inoac International is a subsidiary of Inoac Corp., and part of Inoac's domestic Japanese network engaged in production and sales of flexible polyurethane foam. During the Class Period, Inoac International and/or affiliates it controlled directly sold flexible polyurethane foam throughout the United States.

29.     Defendant Inoac USA Inc. ("Inoac USA") is a private corporation with its principal place of business at 901 ½ Nutter Drive, Bardstown, Kentucky 40004. Inoac USA is the parent company of Defendant Crest Foam Industries Inc. Inoac USA itself is a subsidiary of Inoac Corp., and part of Inoac's overseas network engaged in foam products fabrication sales. During the Class Period, Inoac USA and/or affiliates it controlled directly sold flexible polyurethane foam throughout the United States.

30.     Defendant Inoac Corporation ("Inoac Corp.," and collectively with Inoac International and Inoac USA, "Inoac") is a Japanese company with its principal place of business located at 450-0003 2-13-4 Meieki Minami, Nakamura-ku, Nagoya, Aichi, Japan. Inoac Corp. makes flexible polyurethane foam for, *inter alia*, furniture, bedding, and cushions. During the Class Period, Inoac Corp. and/or affiliates it controlled directly sold flexible polyurethane foam throughout the United States.

31.     Inoac Corp. participated in the conspiracy through the actions of its respective officers, employees, and representatives acting with actual or apparent authority. Further, Inoac Corp. benefited from the conspiracy by receiving greater profits than it would have

---

7     As noted to the Court at the April 27, 2011 status conference, Plaintiffs are in the process of serving Inoac International and Inoac Corp.  For efficiency's sake, all individual allegations relating to Crest and the Inoac Parties are included here.

received had the conspiracy not existed. Inoac Corp. also was a member of the conspiracy by virtue of its status during the Class Period as the alter ego or agent of Inoac USA and Inoac International. Inoac Corp. dominated or controlled Inoac USA and Inoac International regarding conspiracy activities and used that domination or control to charge artificially high prices for flexible polyurethane foam.

32.     Defendant Crest Foam Industries Inc. ("Crest") is a Delaware corporation with its principal place of business at 100 Carol Place, Moonachie, New Jersey 07074. Crest, a wholly-owned subsidiary of Inoac USA, was formerly a joint venture between Vitafoam and Inoac Corp. in which Vitafoam had majority control. In 2010, Inoac took 100% control of Crest. During the time period for which Vitafoam had majority control of Crest, executives of Vitafoam acted as agents for Crest in the conspiracy described in this Complaint. During the Class Period, Crest and/or affiliates it controlled directly sold flexible polyurethane foam throughout the United States.

The CAC then provides specific information concerning Crest and the Inoac Parties'

participation in the conspiracy:

83.     Information sworn under oath on July 21, 2010 by Pierre-Yves Guay of the Commissioner of Competition in Canada to support a search warrant describes information provided by "Witness A," this same employee of Vitafoam, regarding conduct "in Canada and in the United States." The information states under oath: "Witness describes himself as someone who gathers and shares information across the foam sectors. Witness A confirmed to Competition Law Officers that he had discussions, exchanges of information and agreements regarding the price of foam with the following contacts within the foam industry:

| Companies | Contacts | Positions |
|---|---|---|
| Inoac International Co. | Mike Cotter | Marketing Manager |
| Inoac International Co. | Ken Miya | Managing Director |

Conduit of information[8]:

| Companies | Contacts | Positions |
|---|---|---|
| Inoac USA | Max Ozeki | VP Foam Division |

85.     During the Class Period, while he was employed by Woodbridge, the Vitafoam Vice President also confirmed that he spoke to Bill Lucas, the President of Vitafoam, to discuss price increases specifically for foam applications in the automotive industry. Bill

---

[8]  "Conduit of information means that Witness A had discussions with these individuals who reported market conditions and price increases by alleged cartel members to him.  These discussions were not about price fixing or market allocation but rather represented simply a transmission of information."

Lucas also acted for Crest, which was controlled by Vitafoam, in these communications.

88.     In 2004, while employed by Woodbridge, the Vitafoam Vice President attended a meeting at Crest with Bill Lucas, who was representing Vitafoam and Crest. During the meeting, there was a discussion regarding price increases of foam.

103.    On June 2, 2010, two executives of Vitafoam spoke concerning a price increase announcement. One of the Vitafoam executives explained it was important to talk to Raj Mehta of Crest Foam about the price increase announcement.

112.    The Defendants also exchanged emails in furtherance of the conspiracy to fix prices for flexible polyurethane foam:

b.  During October and November 2004, the Vitafoam Vice President reported to his supervisor at Woodbridge by email that he had discussions with Bill Lucas, acting for Vitafoam and Crest, which resulted in an agreement for a foam price increase effective January 1, 2005.

c.  On October 21, 2004, the Vitafoam Vice President sent an email to his supervisor at Woodbridge stating: "Lucas and I are talking about our favorite subject. Jan. 1 as a possible date." This email concerned a price increase discussion for foam for the automotive sector with an effective date of January 1, 2005.

d.  On November 2, 2004, the Vitafoam Vice President sent an email to his supervisor at Woodbridge and other superiors at Woodbridge saying that he "Met with Lucas at PFA" and that Lucas was "most interested in their auto increases. They will announce for Jan. 1. They would go +20%."

e.  On March 9, 2005, the Vitafoam Vice President sent an email to his supervisor at Woodbridge with the subject header "Spoke to Lucas." The email stated "They are going to market probably next week. Looking for a Jan. 1 effective date. Were going at 18%. I said we would most likely be closer to 15%." He reported that he "has not heard from Foamex" and "is going to try to call them again to see what number they will go with."

f.  On March 9, 2005, the Vitafoam Vice President sent an email to his supervisor at Woodbridge regarding another call with Bill Lucas, representing Vitafoam and Crest. "Spoke with Lucas again last week. We are trying to meeting in Chattanooga." He also wrote: "We use the schedule[d] discussions to lead into the real reasons for the calls. Said that they were successful at the mills, in Furniture – they were still one [price increase] behind." The email continued: "I let him know we were going March 15th in Detroit [automotive sector]. He said they would probably wait until May 1. Would have liked a more coordinated push."

g.  On May 5, 2005, the Vitafoam Vice President while he an employee at Woodbridge emailed that he spoke with Bill Lucas of Vitafoam and Raj Mehta, the General Manager of Crest, regarding price increases for May 2005. This relationship between Woodbridge, Crest, and Vitafoam continued for years. In a June 2, 2010 conversation between the Vitafoam Vice President and the current President, they discussed Mr. Mehta again and information to pass to him in furtherance of the conspiracy.

h.  On September 14, 2005, the head of a competitor company wrote to a Vitafoam executive and stated "In separate conversation, I talked to Lucas. They are out with 11% on blocks nothing on Auto…."

2.  <u>Responses to Inoac USA and Crest's specific arguments</u>

(a)  Inoac USA

Inoac USA admits the CAC alleges that Inoac USA was at least acting as a "conduit of information."  Inoac-Crest Br. at 2-3.  That alone would satisfy the "slight" evidence standard for liability in a conspiracy.

But Inoac USA also grossly understates what the CAC actually alleges, because the allegations of Inoac's involvement as a conduit—an allegation emerging from ongoing government investigations of collusion—cannot be delinked from the rest of the CAC.  For example, the CAC alleges that Inoac USA's parent, Inoac Corp., and Inoac USA's affiliate, Inoac International, participated in the conspiracy and profited therefrom.  CAC ¶¶ 28-29, 31, 83.  Inoac Corp. is also alleged to have participated in a variety of joint ventures with other defendants, including Vitafoam, whose role in the conspiracy has been detailed in the CAC.  CAC ¶¶ 32, 44, 46.

Furthermore, Defendant Crest, which is Inoac USA's wholly-owned subsidiary, was clearly involved in the conspiracy while under Inoac USA's stewardship.  *E.g.,* CAC ¶ 103.  This fact alone plausibly ties Inoac USA to the conspiracy.

The CAC also alleges that "Inoac Corp. dominated or controlled Inoac USA and Inoac International regarding conspiracy activities and used that domination or control to charge artificially high prices for flexible polyurethane foam."  CAC ¶ 31.  This allegation is sufficient to implicate Inoac USA.  *See* pp. 6-8, *supra*.  This is all the more so given all of the other allegations of Inoac involvement in the conspiracy.

(b)  Crest

The CAC sets forth that Crest was a joint venture of Vitafoam and Inoac Corp. prior to 2010, and that Vitafoam had majority control of the venture. CAC ¶ 32.  The CAC further pleads that, during the period in which Vitafoam controlled Crest, Vitafoam executives acted as agents for Crest in the price fixing conspiracy. *Id.*  One such agent repeatedly identified in the CAC is Bill Lucas ("Lucas"), who represented Crest in multiple calls, meetings and negotiations pertaining to the conspiracy.  CAC ¶¶ 85, 88, 112 (b)-(h).  This information is confirmed in documents emerging from the ongoing government investigations.  CAC ¶¶ 112(b)-(h).

These allegations are more than sufficient to state a claim.  Crest asserts—without any substantiation—that Lucas did not represent Crest in price fixing activities.  Inoac-Crest Br. at 4-7.  But the CAC alleges with specificity that Lucas *did* act for Crest. *E.g.*, CAC ¶¶ 32, 85, 112(f); *see also* ¶ 88 ("a meeting at Crest with Bill Lucas, who was representing Vitafoam and Crest").

Moreover, contrary to Crest's argument, its liability is in no way dependent on piercing Vitafoam's corporate veil.  Inoac-Crest Br. at 7.  Plaintiffs have alleged that Crest conspired *alongside* Vitafoam and the other Defendants—an allegation that is supported by Crest's continued participation in the conspiracy after Vitafoam sold its interest.  CAC ¶ 103 (recounting 2010 conversation between Vitafoam executives regarding need to "talk to [the Crest General

39

Manager] about the price increase announcement"). That being said, the CAC allegations in support of piercing the corporate veil (CAC ¶¶ 28-32) are more than adequate at this stage of the litigation. *See TFT-LCD II*, 599 F. Supp. 2d at 1184-85; *see generally* pp. 6-8, *supra*.

Finally, Crest attempts to explain away as a mere innocuous discussion (Inoac-Crest Br. at 7-8) the conversation in which a Woodbridge executive spoke with Crest's General Manager, Raj Mehta, about May 2005 price increases. CAC ¶ 112(g). Such discussions about price increases are not typical or appropriate for competitors. Moreover, Crest cannot properly take the conversation out of the context of other allegations in the CAC, including, for example, the allegation that in June 2010—after Inoac acquired Crest—a Vitafoam executive noted the importance of discussing a price increase announcement with Mehta. *Id.* ¶ 103.

### G. Leggett and Mohawk

#### 1. Allegations relevant to Leggett and Mohawk

The CAC includes detailed allegations of Leggett and Mohawk's participation in the conspiracy. First the CAC identifies the relevant entities:

33. Defendant Leggett & Platt Inc. ("Leggett") is a Missouri corporation with its principal place of business at 1 Leggett Road, Carthage, Missouri 64836. Leggett manufactures, *inter alia*, flexible polyurethane foam and other components for the bedding and furniture industries. During the Class Period, Leggett and/or affiliates it controlled directly sold polyurethane foam throughout the United States.

34. Defendant Mohawk Industries Inc. ("Mohawk") is a Delaware corporation with its principal place of business located at 160 S. Industrial Boulevard, Calhoun, Georgia 30701. Mohawk manufactures, *inter alia*, flexible polyurethane foam and other components for the flooring industry. During the Class Period, Mohawk and/or affiliates it controlled directly sold polyurethane foam throughout the United States.

The CAC then provides specific information concerning Leggett and Mohawk's participation in the conspiracy:

84.     The sworn affidavit from Pierre-Yves Guay also separately states that it is the result of an investigation of "previous and ongoing conduct contrary to" the Competition Act of Canada by entities including…Mohawk…Leggett & Platt…. The violations of law alleged in the affidavit concerned conduct both "in Canada and in the United States."

105.    On June 3, 2010, Dean Brayiannis of Valle called Steve Prescott of Vitafoam:

> Brayiannis: "I sent you a text regarding price increase letters. I'm assuming you've got most of the ones that you wanted to see."

> Prescott: "I didn't see, I had the old boy had faxed me one from a couple of days ago…Yah, okay, no problem, Yah, I guess, like that's, you know, it's game on again, isn't it."

> Brayiannis: "Ah, we'll see what happens. I've got Carpenter, Flexible, Mohawk, Leggett."

> [Continuing conversation]

106.    On June 9, 2010, Brayiannis called Prescott twice, leaving a voice mail message first, then called again to further discuss the price increase.

> Brayiannis: "Still haven't seen or heard of your increase letter yet."

> Prescott: "Well, have a look around."

> Brayiannis: "I have. Haven't found anything yet…I've still got one guy telling me that you haven't issued a letter. So have you issued? Yes or no?"

> Prescott: "People will lie to you, Dean."

> Brayiannis: "Are you around the same time frame as us? July 5th or what?"

> Prescott: "Ah, yah, close."

> Brayiannis: "Okay. And you haven't seen what, sorry? You haven't seen other increase letters or did you get all of those?"

> Prescott: "Well, I know, I know that, know Stan, Stan said that he'd seen the Mohawk one and…I guess one of the other U.S. guys. You know, everyone waits for the leader and once the leader goes out then everyone else follows cause we all know that the prices of material have gone up so, you know what I mean?"

> Brayiannis: "Well at the end of the day over the last two increases we have

chatted about it so just wanna make sure you got your letter out."

Prescott: "Yah. Okay pal."

112.    The Defendants also exchanged emails in furtherance of the conspiracy to fix prices for flexible polyurethane foam:

l. On July 11, 2008, Stan Miller reported back to Prescott via email, stating:

"Steve, I talked to Carpenter and he says that he has found his info. That Mohawk has gone up the 12 points on business other then the EOR orders from the show. He said they went up the full 12% in Vancouver and they have gotten some for the business back. He had not heard of Scottdale [sic] increase but had been told that there was a good chance they would be going up. I just talked to Randy from Shnier and he said from the pricing his sales people have found that Mohawk has not gone up. Carmine has been after him for copies of their pricing but he can't get his hands on it. He told me they lost an order to Mohawk in Calgary for Carpet Supermarket and that is where Ben Flagel is now." Prescott asked in an email to Miller "Will Ben share info?" Miller shortly thereafter on the same day responds to Prescott via email, stating, "Dan from Carpenter just called and said they will be going up 13% on Aug. 11/08."

n. Letters announcing a May 2009 increase…from Mohawk dated April 10, 2009…from Leggett & Platt dated April 15, 2009…were all present in Vitafoam files. Following that price increase, there was another price increase in June 2009. Price increase letters from Mohawk…all dated May 18, 2009, and from Leggett & Platt…dated May 19, 2009 were also present in Vitafoam files.

2.    Responses to Leggett and Mohawk's specific arguments

Leggett and Mohawk's principle argument is that the CAC's allegations against them are too thin to link them to the conspiracy.  Leggett-Mohawk Br. at 2-4.  But the allegations here go far beyond what is required under *Twombly* or its progeny for pleading purposes.  And these allegations alone, if proven at trial, would be sufficient to meet the standard of "slight" evidence of participation in the conspiracy that would give rise to liability.

The CAC lists instances where Vitafoam admitted to conspiring with Leggett and Mohawk, CAC ¶¶ 105-06, 112(l) and notes that Leggett and Mohawk pricing information was

found in Vitafoam's files—facts wholly consistent with involvement in the conspiracy as described to the government by Vitafoam's witnesses.  *Compare id.* ¶ 112(n); *with* ¶¶ 76, 92, 95-96.  The CAC also alleges, based on documents referenced in the CAC, that the Canadian government is *specifically investigating* Leggett and Mohawk.  CAC ¶ 84.

Leggett and Mohawk remarkably assert (as they did during a March 22, 2011 teleconference with the Court) that the Canadian government's investigation of various Defendants, including them, does not support a plausible inference of a conspiracy.  Leggett-Mohawk Br. at 5.  They further argue that the Canadian affidavit and CAC do not list "one allegation" of improper, much less illegal, communications or activity by Leggett or Mohawk.  Leggett-Mohawk Br. at 5.

As a general matter, the existence of a government investigation may not by itself support a plausible inference of a conspiracy, but can in connection with other allegations be a compelling factor in support of such an inference.  Joint Brief Opp. at 23-25; *e.g., Packaged Ice*, 723 F. Supp. 2d at 1008-09; *Hyland v. Homeservices of Am., Inc.*, 2007 WL 2407233, at *3 (W.D. Ky. 2007).  The specific allegations against Leggett and Mohawk here include evidence of conspiratorial communications between them and other Defendants, which are consistent with the conspiracy as a whole.  CAC ¶¶ 105, 106, 112(l, n).

Moreover, the CAC also establishes the plausibility of the allegations against Leggett and Mohawk by alleging that a *sworn affidavit* from an officer of the Canadian Competition Bureau identifies Leggett and Mohawk as complicit in conduct in violation of the Competition Act of Canada that occurred in Canada and the United States.  *Id.* ¶ 84.

Leggett also cannot complain that it will be unfairly burdened by discovery in this action.

43

Leggett is among the foam manufacturers who are plaintiffs in *In re Urethane Antitrust Litigation* and who were the subject of a motion to compel concerning evidence of the conspiracy in this case.  Joint Brief Opp. at 25.  As a result of the grant of that motion to compel, Leggett has agreed to document production for the period January 1, 1994 to December 31, 2008 from four document custodians, and is negotiating search terms, plus additional noncustodial document discovery. Joint Status Report 4/08/11 (Dkt. No. 1971), at 2-4 & Ex. L.

Leggett and Mohawk also observe that they are not listed in Paragraph 83 of the CAC, which describes communications that a particular vice president of Vitafoam had with other defendants.  But it is not necessary for Leggett and Mohawk to have been involved in *every* aspect of the conspiracy, and certainly nothing about Paragraph 83 is inconsistent with other allegations in the CAC specifically describing Leggett and Mohawk's involvement.

### H.  Otto Bock and Plastomer

#### 1.  Allegations relevant to Otto Bock and Plastomer

The CAC includes detailed allegations of the involvement of Otto Bock and Plastomer in the alleged conspiracy. First the CAC identifies the relevant entities:

35.     Defendant Otto Bock Polyurethane Technologies, Inc. ("Otto Bock") is a private company with its principal place of business at 3 Penn Center West, Suite 406, Pittsburgh, Pennsylvania 15205. Otto Bock is a subsidiary of Otto Bock Holding GmbH & Co. KG, a German company with its principal place of business at Max-Naeder-Street 15, 37115 Duderstadt, Germany and the corporate slogan "Best in Foam." During the Class Period, Otto Bock and/or affiliates it controlled sold flexible polyurethane foam throughout the United States.

36.     Defendant Plastomer Corporation ("Plastomer") is a private company with its principal place of business at 37819 Schoolcraft Road, Livonia, Michigan 48150. Plastomer, which describes itself as "the recognized Pioneer in Flexible Foam products for manufacturing industries in North America and the World," produces and sells flexible polyurethane foam primarily for the transportation industry. During the Class Period, Plastomer and/or affiliates it controlled sold flexible polyurethane foam

44

throughout the United States.

The CAC then provides specific information concerning Otto Bock and Plastomer's participation in the conspiracy:

83.    Information sworn under oath on July 21, 2010 by Pierre-Yves Guay of the Commissioner of Competition in Canada to support a search warrant describes information provided by "Witness A," this same employee of Vitafoam, regarding conduct "in Canada and in the United States." The information states under oath: "Witness describes himself as someone who gathers and shares information across the foam sectors. Witness A confirmed to Competition Law Officers that he had discussions, exchanges of information and agreements regarding the price of foam with the following contacts within the foam industry:

| Companies | Contacts | Positions |
|-----------|----------|-----------|
| Ottobock [sic] | John Vins | Sales Manager |
| Plastomer | Bill Baughman | Chief Executive Officer |

### 2.    Responses to Otto Bock and Plastomer's specific arguments[9]

Plastomer does not challenge the allegations that (i) it is a competitor of Vitafoam and engaged in the business of the manufacturing and selling polyurethane foam products; (ii) Bill Baughman was Plastomer's CEO during the relevant period; and (iii) Bill Baughman had discussions, exchanges of price information and agreements regarding price with Vitafoam as admitted under oath by the Vitafoam witness.

Similarly, Otto Bock does not challenge the allegations that (i) it is a competitor of Vitafoam and engaged in the business of the manufacturing and selling flexible polyurethane foam products; (ii) John Vins was a Sales Manager for Otto Bock at the times in issue; and (iii)

---

[9] Because the arguments raised by Plastomer and Otto Bock are so similar, they are addressed in this section together.

John Vins had discussions, exchanges of price information and agreements regarding price with Vitafoam as alleged under oath by the Vitafoam witness.

Plastomer and Otto Bock assert that it is insufficient to allege that their respective employees engaged with Vitafoam in "discussions, exchanges of information and agreements regarding the price of foam."  CAC ¶ 83.  This information, however, was provided under oath by an officer of the Canadian Competition Bureau.  It is based on information from a witness who was part of the conspiracy.  The alleged conduct expressly includes agreements regarding the price of flexible polyurethane foam.  These allegations certainly raise the participation of these defendants "above the speculative level" and provide a "reasonably founded hope that the [discovery] process will reveal relevant evidence to support a §1 claim."  *Twombly*, 550 U.S. at 556, 559.  The involvement of these Defendants in illegal agreements, confirmed under oath and described by a cooperating witness, is at the very least plausible.

In this regard, *Municipal Derivatives*, 700 F. Supp. 2d 378, is on point.  In that case, the Second Amended Complaint made a single specific allegation against Morgan Stanley: that there had been a taped conversation between an employee of the defendant cooperating with the government and a third party, who said that he had given Morgan Stanley the opportunity to lower its bid price through a "last look."  *Id.* at 395-96.  The court ruled that this allegation alone, along with an additional allegation from a companion complaint, stated a claim against Morgan Stanley, because, if the allegation was assumed true pursuant to the motion to dismiss standard, it plausibly suggested that Morgan Stanley participated in the alleged conspiracy. *Id.*

Plastomer also argues that the Canadian affidavit does not, in one section, describe Plastomer as a member of the alleged price-fixing cartel, and that this purportedly means the

46

Canadian investigation did not find evidence of its participation in the price-fixing conspiracy. Plastomer Br. at 3.  But another section of the Canadian investigation affidavit *does* describe Plastomer as involved in "discussions, exchanges of information *and agreements* regarding the price of foam" with a specific employee of Vitafoam—and the Vitafoam employee has confirmed this information.  CAC ¶¶ 83 (emphasis added).

In any event, nothing in the Canadian investigation declaration indicates that Plastomer was *not* part of a conspiracy to fix prices.  In addition, Paragraph 36 of the CAC alleges that Plastomer's principal place of business is in Michigan and that it sold polyurethane foam throughout the United States.  There is no allegation that Plastomer did business in Canada.

## I.     The Vitafoam Parties

### 1.     Allegations relevant to the Vitafoam Parties

Vitafoam is cooperating witness with the Department of Justice and has sought leniency for its involvement in a conspiracy to fix prices of flexible foam.  The suggestion that the CAC, replete with information supplied by Vitafoam, fails to state a claim against Vitafoam is difficult to take seriously.

The details of Vitafoam's involvement in the conspiracy appear throughout the CAC. First the CAC identifies the relevant entities:

41.     Defendant Vitafoam Products Canada Limited ("Vitafoam Canada") is a privately owned and operated company with its headquarters at 150 Toro Road, North York, Ontario M3J 2A9, Canada. Vitafoam Canada manufactures flexible polyurethane foam for use in furniture, bedding and automotive applications, including packaging, medical, industrial and a full range of memory foams. During the Class Period, Vitafoam Canada and/or affiliates in controlled directly sold flexible polyurethane foam throughout the United States.

42.     Vitafoam Inc. ("Vitafoam Inc.," collectively with Vitafoam Canada, "Vitafoam") is a privately owned and operated company with its headquarters a 2215 Shore Drive,

High Point, North Carolina 27263. During the Class Period, Vitafoam Inc. and/or affiliates it controlled directly sold flexible polyurethane foam throughout the United States.

43.     Vitafoam, Inc. offers, among other things, flexible polyurethane foam products for the packaging, furniture, and upholstery industries; flexible polyurethane foam for fabric producers, laminators, trim companies, and original equipment manufacturers in the automotive industry; and flexible polyurethane foam for the residential and commercial sectors.

The CAC then provides specific information concerning the Vitafoam Parties' participation in the conspiracy.[10]  As alleged, "[i]n February 2010, Vitafoam voluntarily approached the [DOJ] to self-report evidence of illegal antitrust activities amongst itself and other Defendants in the flexible polyurethane foam industry and sought acceptance in the DOJ's Corporate Leniency Program.  Since that time, Vitafoam and its employees have been cooperating with a criminal investigation into illegal anticompetitive conduct in the flexible polyurethane foam market."  CAC ¶ 60.  Based on their cooperation, the Vitafoam Parties were accepted into the conditional leniency program and have detailed evidence to the both the DOJ and Canadian authorities, much of which forms the backbone of the CAC.  *Id.* ¶¶ 61-62.

The testimonial evidence the Vitafoam Parties provided came directly from its highest-ranking executives, which included its current and past Presidents, and its current and past Vice Presidents in charge of pricing.  All of these witnesses admitted that the Vitafoam Parties had long been engaged in a price fixing and customer allocation conspiracy for flexible polyurethane foam, including in the Class Period alleged in the CAC.  *Id.* ¶¶ 67-68, 73-74, 79-82, 94.  As described, Vitafoam, through its executives and/or employees, conferred with competitors before raising prices so the group could agree on the amount and timing of the increases.  *Id.* ¶¶ 63-64.

---

[10]   Setting forth the text of all factual allegations relevant to the Vitafoam Parties here would effectively recreate the CAC.  Accordingly, Plaintiffs summarize the most salient points for the Court's benefit.

They also exchanged price increase letters both before and after the increases as a method to obtain agreement, and also to police compliance with the conspiracy.  *Id.* ¶¶ 65-66.

In providing this information, so specific were the Vitafoam executives' recollections that they set forth the names of individuals at competitors with whom they or their subordinates personally conspired.  Included in this long list of names were Stanley Pauley, Ed Malacheck, Mark Kane, and Max Tenpow of Carpenter; Vinnie A. Bonaddio, Don Phillips, Tony Dacosta, Al Zinn, and Doug Dauphin of Foamex; Bruce Schneider and Robert Heller of Future Foam; Don Coleman, Buster Mann, Don Simpson, Lee Lunsford, and Todd Councilman of Hickory Springs; Tony Vallecoccia, Robert Valle, and Dean Brayiannis of Valle; John Howard of Domfoam; John Vins of Otto Bock; Bill Baughman of Plastomer; Max Ozeki, Mike Cotter, and Ken Miya of Inoac; Mike Crowell of Flexible Foam; Bill Lucas of Crest (and Vitafoam); Mel Himel of Vitafoam.  *Id.* ¶¶ 69-70, 72, 75, 77-78, 83, 85, 88-90, 92-93.

The Vitafoam executives also described the methods by which they communicated in furtherance of the conspiracy, which were primarily by phone, but also occasionally by letter or email, or by fax machine where they could cover their tracks.  *Id.* ¶ 71.  Because of the secrecy incumbent in the conspiracy, communications were deliberately designed to conceal conspirators' identities.  *Id.* ¶¶ 118.

The government investigations revealed many documents from the Vitafoam Parties' files that demonstrated the conspiracy in action.  *E.g., id.* ¶¶ 112(a)-(o).  These documents, which consist of emails and letters, demonstrate specific instances of collusion from 2000-2009, and with a wide variety of conspirators, including Woodbridge, Crest, Hickory Springs, Scottdel, Future Foam, Foamex, Carpenter, Mohawk, Flexible Foam, Leggett.  *Id.*  Additional information

49

collected in the investigation demonstrated that the conspiracy continued through 2010, even after Vitafoam entered the conditional leniency program.  *Id.* ¶¶ 60, 89, 97-111.

Governmental officials also obtained extensive recorded phone calls between the Vitafoam Parties and other Defendants (quoted in full in the relevant statement of facts applicable to each other Defendant).  These communications verified that the conspiracy the Vitafoam Parties admitted was true and that the Defendants aimed to include the Vitafoam Parties in their collusive price increases and customer allocation due to long familiarity with each other and participation in the illegal scheme.  *Id.* ¶¶ 97,-111.

### 2.  Responses to the Vitafoam Parties' specific arguments

The Vitafoam Parties argue the CAC purportedly (1) does not plausibly allege the products at issue or time frame of the conspiracy; (2) improperly "lump[s]" Vita Canada and Vita U.S. together; and (3) relies on evidence from certain Vitafoam employees that they obtained while at a prior employer.  *See* Vitafoam Br. at 4-5.  These arguments lack merit.

As discussed several times above, this is not the type of case that *Twombly* cautioned against.  If any Defendants should feel some sort of hypocrisy in making a *Twombly* "plausibility" argument, it is the Vitafoam Parties.  They have admitted they were at the center of it all, and it was their testimony that exposed the existence and scope of the conspiracy.

As to Vitafoam's specific arguments, the products at issue and the time frame of the conspiracy explicitly track evidence the Vitafoam Parties themselves provided to the government. The CAC is also replete with examples of Vita Canada *and* Vita U.S. employees' efforts in furtherance of the conspiracy, CAC ¶¶ 60-62, 67-83, 85, 87-95, 97-111, 112(a)-(o), and Vitafoam's conspiratorial admissions in Canada renders the conspiracy in the United States more

plausible.  *See Packaged Ice*, 723 F. Supp. 2d at 1011 (admissions of conspiratorial conduct in Michigan enhanced expectation and plausibility that discovery would also demonstrate nationwide conspiracy); *In re Chocolate Confectionary Antitrust Litig.*, 602 F. Supp. 2d 538, 576-7 (M.D. Pa. 2009) ("Defendants' alleged conduct in Canada enhances the plausibility of the alleged U.S. price-fixing conspiracy"), *motion to certify appeal granted*, 607 F. Supp. 2d 701 (M.D. Pa. 2009) and *reconsideration denied*, 2009 WL 2486045 (M.D. Pa. 2009).

To the extent the cooperating Vitafoam witnesses in some cases testified, in part, about their participation in the conspiracy while previously employed by other companies, many of these "previous employer" conspiratorial conversations referenced in the CAC were conversations *with Vitafoam Party representatives*.  CAC ¶¶ 85, 88, 92, 112(a)-(g).  Moreover, there is no basis to suggest that any of these cooperating individuals *ceased* their involvement in the conspiracy upon becoming employed by Vitafoam.  Their admissions indicate the opposite.

## J.      The Woodbridge Parties

### 1.      Allegations relevant to the Woodbridge Parties

The CAC provides details of the Woodbridge Parties' participation in the alleged conspiracy.  First the CAC identifies the relevant entities:

44.      Defendant Woodbridge Foam Corporation ("Woodbridge Foam") is a Canadian corporation with its headquarters at 4240 Sherwoodtowne Blvd., Mississauga, Ontario, L4Z 2G6, Canada. Woodbridge Foam has a global partnership with Inoac Corp. called the "World Polyurethane Alliance." During the Class Period, Woodbridge Foam and/or affiliates it controlled directly sold flexible polyurethane foam throughout the United States.

45.      Defendant Woodbridge Sales & Engineering, Inc. ("Woodbridge S&E") is a Michigan corporation with its principal place of business at 1515 Equity Drive, Troy, Michigan 48084. During the Class Period, Woodbridge S&E and/or affiliates it controlled directly sold flexible polyurethane foam throughout the United States.

51

46.     Defendant Woodbridge Foam Fabricating, Inc. ("WFFI," collectively with Woodbridge Foam and Woodbridge S&E, "Woodbridge") is a private company with its principal place of business at 1120 Judd Road, Chattanooga, Tennessee 37406. WFFI is a joint venture between Woodbridge Group and Inoac Corp. During the Class Period, WFFI and/or affiliates it controlled directly sold flexible polyurethane foam throughout the United States.

47.     Woodbridge's primary focus is supplying flexible polyurethane foam for automotive components, but Woodbridge also supplies flexible polyurethane foam for commercial and recreational transportation, building products, construction, packaging, and several consumer and industrial products.

The CAC then provides specific information concerning the Woodbridge Parties'

participation in the conspiracy:

74.     The former Vice President of Vitafoam also participated in conspiratorial conduct during the Class Period with many individuals employed by numerous competitors, including at least…Woodbridge…. The communications involved discussions of price increase percentages and effective dates of such increases, typically by telephone. The competitors exchanged copies of price increase letters to coordinate and support these increases…

80.     In addition, a former Woodbridge employee was employed in Ontario, Canada, from 1986 until 2009 and participated in the conspiracy. While working at Defendant Woodbridge, this employee served most recently as Vice President of Commercial Sales where he had authority to determine prices. In April 2009, this former Woodbridge employee became Vitafoam's Vice President of Sales. In his position at Vitafoam, he had authority to determine prices. This Vitafoam Vice President has also admitted to his role in the long-running price fixing and customer allocation conspiracy with other Defendants.

81.     This Vitafoam Vice President engaged in conspiratorial activity while employed by Woodbridge and Vitafoam during the Class Period by reaching understandings and agreements on price increases with other Defendants. These agreements concerned both the amount and the effective date of the price increases. The objective of the price increase coordination was for the conspirators to pass on cost increases to customers, as well as to maintain their respective market share.

82.     During the Class Period, the Vice President personally engaged in this conspiratorial conduct to fix prices and maintain market share with at least Woodbridge… Co-workers at both Woodbridge and Vitafoam also participated in the scheme.

52

84.    The sworn affidavit from Pierre-Yves Guay also separately states that it is the result of an investigation of "previous and ongoing conduct contrary to" the Competition Act of Canada by entities including…Woodbridge…. The violations of law alleged in the affidavit concerned conduct both "in Canada and in the United States."

85.    During the Class Period, while he was employed by Woodbridge, the Vitafoam Vice President also confirmed that he spoke to Bill Lucas, the President of Vitafoam, to discuss price increases specifically for foam applications in the automotive industry. Bill Lucas, also acted for Crest, which was controlled by Vitafoam, in these communications.

87.    The Vitafoam Vice President, while he was employed by Woodbridge, also had contacts with Vincent Bonaddio at Foamex to discuss price increases for automotive foam products.

88.    In 2004, while employed by Woodbridge, the Vitafoam Vice President attended a meeting at Crest with Bill Lucas, who was representing Vitafoam and Crest. During the meeting, there was a discussion regarding price increases of foam.

90.    Another Vitafoam executive, the President, was previously the Director of Corporate Engineering at Woodbridge from 1985 until January 2008, where he had authority to determine prices. As the President of Vitafoam, a position he held beginning in August 2008, he also had authority to determine prices. Along with other individuals from Defendant companies, he participated in the long-running price fixing and customer allocation conspiracy.

91.    During the Class Period, discussions with competitors in the foam industry involving the current President of Vitafoam while he was at Woodbridge included conversations about legitimate topics like business development or potential joint ventures, and then ultimately led to conspiratorial conversations about price increases. These discussions about coordinating pricing took place during in-person discussions, electronic mail communications, and telephone conversations.

92.    During the Class Period, the President of Vitafoam participated in conspiratorial discussions concerning pricing in the flexible polyurethane foam market with various competitors at both Woodbridge and Vitafoam, including at least Bill Lucas of Vitafoam…. These discussions led to a clear understanding and agreement that the participants would discuss and implement coordinated price increases on the same effective dates.

112.    The Defendants also exchanged emails in furtherance of the conspiracy to fix prices for flexible polyurethane foam:

    a.  In June of 2000, the Vitafoam Vice President—who was an employee at Woodbridge at the time—sent an email to a Vitafoam salesperson asking whether

53

he spoke to Don Phillips of Foamex to which the salesperson responded "Yes, we told him we are going out with our letters 12% effective July 30th; he said we would follow."

b.  During October and November 2004, the Vitafoam Vice President reported to his supervisor at Woodbridge by email that he had discussions with Bill Lucas, acting for Vitafoam and Crest, which resulted in an agreement for a foam price increase effective January 1, 2005.

c.  On October 21, 2004, the Vitafoam Vice President sent an email to his supervisor at Woodbridge where he said: "Lucas and I are talking about our favorite subject. Jan. 1 as a possible date." This email concerned a price increase discussion for foam for the automotive sector with an effective date of January 1, 2005.

d.  On November 2, 2004, the Vitafoam Vice President sent an email to his supervisor at Woodbridge and other superiors at Woodbridge saying that he "Met with Lucas at PFA" and that Lucas was "most interested in their auto increases. They will announce for Jan. 1. They would go +20%."

e.  On March 9, 2005, the Vitafoam Vice President sent an email to his supervisor at Woodbridge with the subject header "Spoke to Lucas." The email stated "They are going to market probably next week. Looking for a Jan. 1 effective date. Were going at 18%. I said we would most likely be closer to 15%." He reported that he "has not heard from Foamex" and "is going to try to call them again to see what number they will go with."

f.  On March 9, 2005, the Vitafoam Vice President sent an email to his supervisor at Woodbridge regarding another call with Bill Lucas, representing Vitafoam and Crest. "Spoke with Lucas again last week. We are trying to meeting in Chattanooga." He also wrote: "We use the schedule[d] discussions to lead into the real reasons for the calls. Said that they were successful at the mills, in Furniture – they were still one [price increase] behind." The email continued: "I let him know we were going March 15th in Detroit [automotive sector]. He said they would probably wait until May 1. Would have liked a more coordinated push."

g.  On May 5, 2005, the Vitafoam Vice President while he an employee at Woodbridge emailed that he spoke with Bill Lucas of Vitafoam and Raj Mehta, the General Manager of Crest, regarding price increases for May 2005. This relationship between Woodbridge, Crest, and Vitafoam continued for years. In a June 2, 2010 conversation between the Vitafoam Vice President and the current President, they discussed Mr. Mehta again and information to pass to him in furtherance of the conspiracy.

h.  On September 14, 2005, the head of a competitor company wrote to a Vitafoam executive and stated "In separate conversation, I talked to Lucas. They are out with 11% on blocks nothing on Auto." He asked the Vitafoam executive to have one of his employees "call Buster [Mann at Hickory Springs] today." After placing the call to Mann, the Vitafoam employee wrote "I called Buster yesterday. We spoke about the bedding stuff. It is at numbers we are not used to."

## 2.  Responses to the Woodbridge Parties' specific arguments

The Woodbridge Parties first attack the CAC by incorporating by reference Sections I.A, B, C, E, and F of Defendants' "common issues" brief.  Woodbridge Br. at 1-2.  For the reasons set forth in Plaintiffs' separately filed opposition to Defendants' Joint Brief, these arguments all are without merit.  To the extent the Woodbridge Parties claim the CAC does not make "individualized allegations" against them, this ignores clear case law that conspiracy allegations need not be made on a "defendant by defendant" basis.  *See* pp. 2-5, *supra*.

But in any event, the suggestion that the CAC lacks particularized allegations about the Woodbridge Parties is simply false.

First, the CAC alleges each Woodbridge Party sold flexible polyurethane foam in the United States during the Class Period.  CAC ¶¶ 44-46.[11]  Second, the CAC alleges that the Woodbridge Parties either conspired together or acted as one another's agents or alter egos.  *Id.* ¶¶ 44-48, 50.  As explained, such allegations plausibly establish that each Woodbridge Party participated in the conspiracy, whether directly or vicariously.  *See* pp. 6-8, *supra*..  Third, the Woodbridge Parties strive mightily to distance Woodbridge S&E and WFFI's conduct from

---

[11]  To the extent the Woodbridge Parties assert in a footnote that "WS&E does not make or sell commodity foam," they offer no evidence for this proposition.  Woodbridge Br. at 3 n. 3.  Further, even though such a claim is improper for a 12(b)(6) motion to dismiss, Plaintiffs allege, as discussed below, that WS&E joined the conspiracy either through its own acts or through the other Woodbridge Parties.  A conspirator is jointly liable for its co-conspirators' acts.  Thus, if WS&E participated in the conspiracy in any of these ways (as the CAC alleges and plausibly supports), then it is liable regardless of its own sales.

Woodbridge Foam, Woodbridge Br. at 2-3, but this is an attempt to rewrite the CAC and impose, without any substantiation, inferences in favor of Defendants – all in violation of the motion to dismiss standard.  The *actual* allegations show that the cooperating witnesses who worked for Woodbridge considered themselves part of "Woodbridge"—not an entity called "Woodbridge Foam"—and that they believed "Woodbridge" was involved in the conspiracy throughout the Class Period.  *E.g.*, CAC ¶¶ 84-85, 87-88, 90-92.

Furthermore, as explained at pp. 17-18, 50-51, *supra*, that some of the specific instances described in the CAC occurred in Canada has no bearing on the plausibility of the conspiracy. The Woodbridge Parties operated in both the U.S. and Canada, and the investigation documents state that the conspiracy occurred "in Canada and in the United States."  CAC ¶¶ 83-84. Additionally, the allegations make clear that Woodbridge employees directly conspired with U.S. companies.  *Id.* ¶¶ 81-82, 84. 87-88, 92, 112(a)-(h).

The Woodbridge Parties' reliance on *Reynolds Metals Co. v. The Columbia Gas Sys., Inc.*, 669 F. Supp. 744 (E.D. Va. 1987), is misplaced.  In *Reynolds Metals*, the plaintiffs alleged *only* that defendant The Columbia Gas System, Inc. ("System") owned its co-defendants and therefore had liability for their acts.  *Id.* at 749-50.  There were no allegations that System actually participated in the conspiracy.  *Id.*  Here, the CAC alleges that *each* Woodbridge Party directly participated in the conspiracy and that they affirmatively acted as each other's agents. CAC ¶¶ 44-48, 50.

The Woodbridge Parties' reliance on *Texaco Inc. v. Dagher*, 547 U.S. 1 (2006), also is unavailing.  The *Texaco* plaintiffs alleged that defendants acted anticompetitively by unifying gas prices under two brands through a joint venture.  *Id.* at 1.  The Court held that, because the

defendants were in a joint venture, there was no Sherman Act violation.  *Id.* at 5-6.  Here, by contrast, Plaintiffs allege in detail that the Woodbridge Parties conspired with *other* competitors.

### K.    **Foamex**

1.    Allegations relevant to Foamex

The CAC alleges in detail Foamex's participation in the conspiracy.  First the CAC identifies the relevant entity:

23.    Defendant FXI – Foamex Innovations, Inc., (f/k/a Foamex International, Inc.) ("Foamex") is a privately owned and operated company with its principal place of business at Rose Tree Corporate Center II, 1400 N. Providence Road, Suite 2000, Media, Pennsylvania 19063-2076. During the Class Period, Foamex directly sold flexible polyurethane foam throughout the United States.

24.    Foamex provides foam for the home, as well as for healthcare, electronics, industrial, personal care, and transportation. Its flexible polyurethane foam is used in automotive cushioning, shipping packages, beds, and furniture. Foamex also provides components for filters, dispensers, gaskets, and seals for products ranging from blood oxygenators to computer disk drives.

The CAC then provides specific information concerning Foamex's participation in the conspiracy:

72.    The former President of Vitafoam, along with his subordinates, had conspiratorial discussions during the Class Period as described above with other Defendants regarding fixing prices and allocating customers. These discussions included at least Tony Dacosta, Al Zinn, and Doug Dauphin of Foamex…

74.    The former Vice President of Vitafoam also participated in conspiratorial conduct during the Class Period with many individuals employed by numerous competitors, including at least…Foamex. The communications involved discussions of price increase percentages and effective dates of such increases, typically by telephone. The competitors exchanged copies of price increase letters to coordinate and support these increases. Individuals from competitors with whom the former Vice President conspired to fix prices and allocate customers included at least…Tony Dacosta of Foamex…

83.    Information sworn under oath on July 21, 2010 by Pierre-Yves Guay of the Commissioner of Competition in Canada to support a search warrant describes information provided by "Witness A," this same employee of Vitafoam, regarding

conduct "in Canada and in the United States." The information states under oath: "Witness describes himself as someone who gathers and shares information across the foam sectors. Witness A confirmed to Competition Law Officers that he had discussions, exchanges of information and agreements regarding the price of foam with the following contacts within the foam industry:

| Companies | Contacts | Positions |
|-----------|----------|-----------|
| Foamex | Vinnie A. Bonaddio | Senior Vice President, Technical Products Group |
| Foamex | Don Phillips | Executive Vice President, Automotive Parts Division |

84.     The sworn affidavit from Pierre-Yves Guay also separately states that it is the result of an investigation of "previous and ongoing conduct contrary to" the Competition Act of Canada by entities including…Foamex…. The violations of law alleged in the affidavit concerned conduct both "in Canada and in the United States."

87.     The Vitafoam Vice President, while he was employed by Woodbridge, also had contacts with Vincent Bonaddio at Foamex to discuss price increases for automotive foam products.

97.     On April 9, 2010, in Cleveland, Ohio, Bruce Schneider of Future Foam spoke by telephone to an executive from Vitafoam. Schneider worked at Future Foam headquarters. Schneider called to inform Vitafoam that Future, Foamex and Flexible intended to increase the price of foam by 20% in the next weeks.

101.     On May 25, 2010, the Vice President of Vitafoam called Howard back. During the call, Howard stated:

> "Just, you know we've kind of stayed out of each other's way for some time here while business is quiet. There's just no business to be had and dropping prices is only going to benefit the customers. I can't afford to have him take stuff away…It'll be a rough go if he wants to go and quote prices in places where he's not currently selling… We do the same thing with Foamex, we don't go after their accounts. Haven't for a while business has been in the shitter. Just kind of stayed away and they've stayed away from our accounts too, so prices have been fairly stable…"

112. The Defendants also exchanged emails in furtherance of the conspiracy to fix prices for flexible polyurethane foam:

a.  In June of 2000, the Vitafoam Vice President—who was an employee at

Woodbridge at the time—sent an email to a Vitafoam salesperson asking whether he spoke to Don Phillips of Foamex to which the salesperson responded "Yes, we told him we are going out with our letters 12% effective July 30th; he said we would follow."

c.  On October 21, 2004, the Vitafoam Vice President sent an email to his supervisor at Woodbridge where he said: "Lucas [from Foamex] and I are talking about our favorite subject. Jan. 1 as a possible date." This email concerned a price increase discussion for foam for the automotive sector with an effective date of January 1, 2005.

> 2.  Responses to Foamex's specific arguments

The current Defendant Foamex was created following the acquisition in bankruptcy of the assets of the former debtor company ("Old Foamex").  Foamex's memorandum of law hinges on two premises.  First, Foamex asserts that Old Foamex's bankruptcy and subsequent June 12, 2009 sale of its assets to Foamex (the "Asset Sale") erased any antitrust liability for acts occurring before that date.  Foamex Br. at 5-10.  Second, Foamex asserts that the CAC fails to allege Foamex's involvement in the conspiracy after the Asset Sale.  *Id.* at 10-14.  For the reasons discussed below, both of these premises are entirely wrong as a matter of fact and law.

> (a)  The Old Foamex bankruptcy and Asset Sale do not affect
> Foamex's pre-Asset Sale liability

Foamex's arguments concerning the purported effect of the Old Foamex bankruptcy and Asset Sale are entirely baseless.  Foamex makes these arguments by relying on inapposite case law and omitting material information.

Foamex contends that the order approving the Asset Sale (the "Sale Order") eliminates any successor liability claims for conduct arising prior to the sale of Old Foamex's assets June 12, 2009.  But Bankruptcy Code section 363(f) provides in relevant part that a debtor may sell property of the bankruptcy estate "free and clear of any interest in such property of an entity

other than the estate" only if at least one of five conditions is satisfied.  11 U.S.C. § 363(f).  The

critical term is "interest in such property of an entity other than the estate," which is not defined

in the Bankruptcy Code.

There are two reasons why the Asset Sale approved pursuant to Bankruptcy Code section

363(f) has no bearing the Plaintiffs' antitrust claims here.  <u>First</u>, under Sixth Circuit law, general

unsecured claims are not "interests" within the meaning of Bankruptcy Code section 363(f).  In

*Michigan Employment Sec. Comm'n v. Wolverine Radio Co. (In re Wolverine Radio Co.)*, 930

F.2d 1132 (6th Cir. 1991), the Sixth Circuit recognized that Bankruptcy Code section 363(f) does

not define the term "interest" but cited with approval *In re White Motor Credit Corp.*, 75 B.R.

944 (Bankr. N.D. Ohio 1987), which held that "[g]eneral unsecured claimants have no specific

interest in a debtor's property.  Therefore, section 363 is inapplicable for sales free and clear of

such claims."  *Id.* at 948 (cited by *Wolverine Radio*, 930 F.2d at 1147).  Because they do not

qualify as "interests" within the meaning of Bankruptcy Code section 363(f), successor liability

relating to such claims likewise is not washed away in a Bankruptcy Code section 363 sale.[12]

Foamex cites to the Sixth Circuit's decision in *In re Travel Agent Commission Antitrust*

*Lit.*, 583 F.3d 896, 902 (6th Cir. 2009).  But *Travel Agent* is simply inapposite, since it involved

---

[12]  The *White Motor Credit* bankruptcy court held that it could nonetheless approve a sale free and clear of
successor liability under Bankruptcy Code section 105(a) and a bankruptcy court's inherent equitable power when
the claims arose prior to confirmation of the debtor's plan of reorganization.  *See* 75 B.R. at 948-49.  This is
unsurprising because a confirmed plan of reorganization discharges claims that arose prior to confirmation, *see* 11
U.S.C. § 1141(c), and a plan of reorganization can provide for a sale of a debtor's assets.  *See* 11 U.S.C. §
1123(a)(5).

FXI cites *In re Trans World Airlines, Inc.*, 322 F.3d 283 (3d Cir. 2003), in which the Third Circuit did hold
that under section 363(f) a purchaser takes assets free and clear of general unsecured claims.  But *Trans World
Airlines* is inconsistent with *Wolverine Radio*, and unnecessarily concludes that claim is an "interest" even though
the terms "claims" and "interests" are treated separately elsewhere in the Bankruptcy Code.  *See* 11 U.S.C. §
1141(c) (providing that property dealt with under a plan of reorganization "is free and clear of all claims and
interests of creditors").

a confirmed plan of reorganization, *not* a pre-confirmation sale of assets under Bankruptcy Code section 363(f).  *See Travel Agent*, 583 F.3d at 901.  A confirmed chapter 11 plan of reorganization results in the discharge of *all* claims against a debtor, regardless of whether the claims are secured or unsecured, liquidated or unliquidated, contingent or non-contingent.  *See* 11 U.S.C. § 1141(c); *see also Travel Agent*, 583 F.3d at 901 ("United's emergence from bankruptcy discharged any liability on claims that arose before its reorganization").

Here, Old Foamex *never* obtained a discharge of claims because it never sought confirmation of a plan of reorganization.  Instead, having transferred substantially all of its assets to Foamex (which was owned by Old Foamex's senior secured lenders and simply continued the operations), Old Foamex simply dismissed the bankruptcy cases and subsequently dissolved as corporate entities.

Second, even if Bankruptcy Code section 363(f) applied to general unsecured claims, the Plaintiffs' antitrust claims here were not subject to the Sale Order because, as a matter of bankruptcy law, they did not arise prior to the Asset Sale.  Though the Bankruptcy Code defines the term "claim" very broadly, *see* 11 U.S.C. § 101(5), it is not limitless.  The so-called "fair contemplation" test provides that a claim may be deemed to have arisen pre-bankruptcy if it is "based upon pre-petition conduct that can be fairly contemplated by the parties at the time of the debtors' bankruptcy."  *In re Jensen*, 995 F.2d 925, 930 (9th Cir. 1993).  In *Jensen*, the Ninth Circuit held that claim arising under CERCLA was not discharged if the claimant could not reasonably contemplate, prior to the bankruptcy proceedings, that it might have a cause of action against the debtor.  *Id.*  Even if all of the acts giving rise to liability occurred prior to the bankruptcy, under the "fair contemplation" test the bankruptcy would not extinguish the claim if

61

the creditor would have had no way to know that it had the claim to pursue. At least one court in the Sixth Circuit, *Signature Combs, Inc. v. United States*, 253 F. Supp. 2d 1028, 1038 (W.D. Tenn. 2003), has adopted the "fair contemplation" test.[13]

Here, as alleged in the CAC, there was no way for the Plaintiffs to have known at the time of the Old Foamex bankruptcy and Asset Sale that Old Foamex and the other defendants were involved in a price-fixing scheme. *E.g.*, CAC ¶¶ 113-18, 130-34, 135(a)-(d). Given that Old Foamex did not list the named Plaintiffs or the other members of the alleged class here as creditors in the Old Foamex schedules of assets and liabilities, Old Foamex likewise did not intend to in any way alert the Plaintiffs that the Plaintiffs held potential claims.[14]

While a notice of the Asset Sale was published in *The Wall Street Journal*, this notice was not sufficient to alert the Plaintiffs that they might have claims against Old Foamex. *Hexcel Corp. v. Stepan Co.*, 239 B.R. 564 (N.D. Cal. 1999), is directly on point. In *Hexcel*, plaintiffs in 1997 filed a class action suit against Stepan Company alleging Stepan had injured the plaintiffs by discharging pollutants. *Id.* at 565. In 1998, Stepan filed a third-party complaint against all entities that could have contributed to the contamination. Hexcel, which had owned a plant in the area, had filed for bankruptcy in 1993 and had confirmed a plan of reorganization in 1995.

---

[13]     While the "fair contemplation" test often has been applied in connection with claims under federal environmental statutes, the test works equally well with other federal statutes, and should be applied to antitrust claims. *See In re Zilog, Inc.*, 450 F.3d 996, 1000 (9th Cir. 2006) (noting the fair contemplation test has been applied to a range of non-environmental claims); *In re Cool Fuel, Inc.*, 210 F.3d 999, 1000 (9th Cir. 2000) (applying the "fair contemplation" test to tax-based claims); *Corman v. Morgan ( In re Morgan)*, 197 B.R. 892, 898 (N.D. Cal. 1996) (applying "fair contemplation" test to fraud claim).

[14]     A debtor must file with the bankruptcy court a schedule listing all of its assets and liabilities. *See* Fed. R. Bankr. Pro. 1007(b) (listing obligation to file schedules of assets and liabilities); *see also In re Weldon*, 184 B.R. 710, 715 (Bankr. D.S.C. 1995) (a debtor has no discretion to determine whether a debt is sufficiently significant to be included on the schedules; the schedules require full disclosure). Indeed, in its schedules of assets and liabilities, Old Foamex disclosed that other plaintiffs had brought actions against Old Foamex, but did not disclose any of the Plaintiffs. *See* Plaintiffs' Request for Judicial Notice dated May 2, 2011 ("Judicial Notice Req."), at Exs. A-B.

Hexcel asserted that Stepan's claims against Hexcel arose prior to 1993 and thus were discharged by Hexcel's bankruptcy.  *Id.*  Even though Stepan was not served with any notices in the bankruptcy, Hexcel asserted that the publication in *The Wall Street Journal* of a notice of the deadline to file proofs of claim was sufficient to bind Stepan.  The bankruptcy court rejected Hexcel's argument, and the district court affirmed:

> Hexcel argues that it addressed these concerns during bankruptcy by publishing notice of the proceedings in the Wall Street Journal so that any potential claimant that Hexcel could not identify would be alerted of the need to assert its interests in the bankruptcy court.  Hexcel may be correct that this publication was sufficient to satisfy its notice obligation to creditors *who could contemplate that they might have a claim*.  It is difficult to imagine, however, how the announcement of a bankruptcy proceeding published in the Wall Street Journal could possibly satisfy due process concerns for a potential who had no way of knowing that may have a claim against the debtor some time in the future.

*Id.* at 571 (emphasis in original); *see also In re Pettibone*, 162 B.R. 791, 808 (Bankr. N.D. Ill. 1994) ("The Bankruptcy Code does not require a party . . . with no known interest in a bankruptcy proceeding to monitor national financial papers and read notices about businesses against which they have no known claims to guard against the possibility they might later be held on notice of claim bar.") (cited by *Hexcel*).

Because under the "fair contemplation" test the Plaintiffs here did not hold "claims" within the meaning of the Bankruptcy Code, the Asset Sale order could not affect the Plaintiffs' rights to pursue the antitrust claims alleged here, including successor liability rights.

> (i)  *Plaintiffs never received adequate notice and thus their claims are not extinguished by the Sale Order.*

The Old Foamex bankruptcy and the Asset Sale also could not have extinguished Plaintiffs' rights to pursue the antitrust claims here for the independent reason that Plaintiffs did not receive constitutionally-mandated adequate notice of the Asset Sale.  "Notice is the

cornerstone underpinning Bankruptcy Code procedure." *Western Auto Supply Co. v. Savage Arms, Inc. (In re Savage Indus., Inc.)*, 43 F.3d 714, 720 (1st Cir. 1994).  Over 60 years ago, the Supreme Court in *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306 (1950), explained:

> An elementary and fundamental requirement of due process in any proceeding which is accorded finality is notice reasonably calculated, under all of the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections.  The notice must be of such nature as reasonable to convey the required information, and it must afford a reasonable time for those interested to make their appearance.

*Id.* at 314.  Numerous courts have relied on *Mullane* in consideration of whether notice is adequate in bankruptcy proceedings.  *See Savage Indus.*, 43 F.3d at 721 (citing cases).

Absent adequate notice, actions in bankruptcy cases that deprive creditors of their rights run afoul of constitutional due process protections.  The remedy is to permit the creditor to proceed against the debtor because the claim has not been discharged, or against the purchaser of the debtor's assets (if otherwise permitted to proceed under applicable non-bankruptcy law).  *See Dalton Dev. Project v. Unsecured Creditors Comm. (In re Unoil)*, 948 F.2d 678, 683 (10th Cir. 1991) (chapter 11 claim not discharged if claimant did not receive notice).

Foamex almost entirely fails to address whether the Plaintiffs received adequate notice of the Asset Sale or any proceedings in the Old Foamex bankruptcy cases.  The Foamex brief merely states at page 9 that the Bankruptcy Court found Old Foamex provided adequate notice and a reasonable opportunity to object and be heard.  Foamex adds in a footnote that the "Bankruptcy Court also found that the Debtors provided actual written notice of the sale motion to the U.S. Department of Justice" and "published notice of the auction, the sale hearing and the sale in the April 16, 2009 national edition of the *Wall Street Journal*."  Foamex Br. at 9 n.7.

In bankruptcy cases, the first issue concerning the adequacy of notice is whether the creditors were known or unknown.  A known creditor is one who is "known or reasonably ascertainable by the debtor."  *Chemetron Corp. v. Jones*, 72 F.3d 341, 346 (3d Cir. 1996).  An unknown creditor is one whose identity or claim is not readily ascertainable and who has merely conceivable, conjectural or speculative claims.  *Id.* at 346.  Known creditors must receive actual written notice of the applicable bankruptcy proceedings.  Unknown creditors may be bound by "publication notice" that otherwise passes constitutional muster.  The debtor has an obligation to make reasonably diligent efforts to identify creditors and their claims.  *Id.*

Notice of the Asset Sale here was entirely inadequate for the Plaintiffs in this action.  First, it is undisputed that Old Foamex did not serve any of the named Plaintiffs with actual written notice of the Sale.  *See* Judicial Notice Req., at Exs. C-F (copies of affidavits of service of the Bankruptcy Court order approving the bidding procedures and the notice of the Sale).  However, at least two of the named Plaintiffs *were known to Old Foamex during the bankruptcy cases* because they were served with actual written notice of Old Foamex's motion to dismiss the cases.  *See id.* at Ex. I (copy of affidavit of service of motion to dismiss cases with relevant excerpts).  In the Old Foamex motion to dismiss the chapter 11 cases, Old Foamex stated that it was going to serve notice of the motion on all "known creditors."  *Id.*, at Ex. H (motion to dismiss chapter 11 cases, at 8, 9).  This means that Old Foamex believed at least these two Plaintiffs could be creditors, which means that such Plaintiffs necessarily should have been served with actual written notice of the Asset Sale.  Because they were not served, their claims are not affected by the Sale.

Second, even if "publication notice" could bind the Plaintiffs, the "publication notice"

used by Old Foamex was constitutionally inadequate.  The actual notice published by *The Wall Street Journal* did *not* disclose that the Asset Sale would eliminate any successor liability claims, and did *not* reference the Asset Sale being free and clear of antitrust claims.[15]  Nothing in the "publication notice" would have alerted the Plaintiffs that there was any need to participate in the Old Foamex bankruptcy cases.  Moreover, even though the Bankruptcy Court authorized Old Foamex to publish the "publication notice" in "such other publications as the Debtors and their advisors determine will promote the marketing and sale of the Purchased Assets," Docket No. 101-9 at 2, Old Foamex did not publish any notice in any industry publications.[16]  Such "publication notice" falls far short of constitutional due process.

(ii)  *Public policy considerations favor Plaintiffs proceeding with their claims*

Public policy also favors permitting Plaintiffs here to proceed with their antitrust claims against Foamex as the purchaser of Old Foamex assets.  *See Perma Life Mufflers, Inc. v. Int'l Parts Corp.*, 392 U.S. 134, 139 (1968), *overruled on other grounds by Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752 (1984) ("[T]he purposes of the antitrust laws are best served by insuring that the private action will be an ever-present threat to deter anyone contemplating business behavior in violation of the antitrust laws").  Foamex, the purchaser of Old Foamex's assets, was not a stranger to Old Foamex that was seeking to start up a new business.  Rather, the purchaser of the assets was the administrative agent of Foamex's senior

---

[15]    A copy of the "publication notice" is located at pages 18-21 of Docket No. 101-9.  The affidavit of the *Wall Street Journal* representative, who attached a copy of the actual notice published in the newspaper, was filed in the Bankruptcy Court on April 16, 2009, and is attached to the Judicial Notice Req., at Ex. G.

[16]    The facts here stand in stark contrast to the facts in *In re Trump Taj Mahal Assocs.*, 156 B.R. 928 (Bankr. D.N.J. 1993).  There, the debtors, who operated casinos in Atlantic City, published notice of a claims bar date in the *Wall Street Journal*, the *New York Times*, and three more regional newspapers published in and around Atlantic City.

secured creditors, which "credit bid" existing debt obligations and then transferred the assets to a new company whose initial shareholders were the same senior secured lenders.  The Asset Sale largely mirrored what would have happened had the lenders simply foreclosed on the assets outside of bankruptcy.  Foreclosures do not wipe away successor liability claims.  *See*, *e.g.*, *Kemper v. Saline Lectronics*, 366 F. Supp. 2d 550, 555 (N.D. Ohio 2005) ("[B]y its very nature the foreclosure process cannot preempt the successor liability inquiry").

Furthermore, contrary to Foamex's assertions that only in June 2009 did Foamex first begin "to manufacture and distribute flexible polyurethane foam products in the United States," Foamex Br. at 4, Foamex merely acquired substantially *all* of Old Foamex's assets—*e.g.*, real property, manufacturing facilities, intellectual property, inventory, and accounts receivable.  Old Foamex never stopped operating during the bankruptcy case.  Foamex continued to employ the Old Foamex employees, including, the individuals named in the CAC.

Finally, were their claims against Foamex extinguished, the Plaintiffs would be left with no remedy.  Typically, following the sale of substantially all of a debtor's assets, there is deadline to submit proofs of claim (commonly referred to as a claim bar date) and either a plan of reorganization in a chapter 11 case or a conversion to chapter 7, both of which establish the procedures by which creditors of a debtor will receive distributions on account of their claims.  By contrast, within a few months of the Asset Sale, the Old Foamex cases were dismissed with nothing left available for claimants like the Plaintiffs.  Thus, the bankruptcy policies of a fresh start for the debtor is largely unaffected if the Plaintiffs proceed against Foamex, and the bankruptcy policy of fair and equitable treatment for creditors will not be satisfied if the antitrust

claims against Foamex were now deemed to have been extinguished.[17]  In analogous contexts, courts have sided with creditors asserting claims based on federal statutes, *see Signature Combs*, 253 F. Supp. 2d at 1040, and this Court should do the same.

> ### (iii)   The Sale Order is inapplicable because Foamex continued the price fixing scheme after the Asset Sale, and the Sale Order cannot affect Plaintiffs' claims

Foamex asserts that the Sale Order, which invoked Bankruptcy Code section 363(f), necessarily excludes any and all antitrust claims that arose prior to June 12, 2009.  Foamex further contends that "[v]irtually every allegation in the CAC regarding the entity direct purchaser plaintiffs call 'Foamex' pre-dates the June 12, 2009 closing of the APA transaction." Foamex Br. at 7.

As recognized by the Sixth Circuit, an "antitrust cause of action . . . accrues each time a defendant commits an act that injures the plaintiff's business."  *DXS, Inc. v. Siemens Med. Sys., Inc.*, 100 F.3d 462, 467 (6th Cir. 1996).  A new section 1 claim arises each time FXI sold a price-fixed product.  *See Klehr v. A.O. Smith Corp.*, 521 U.S. 179, 188 (1997).

It is well settled that if a claim arises after a sale authorized under Bankruptcy Code section 363(f) or after confirmation of a plan under Bankruptcy Code sections 1129 and 1141, the claims is not discharged.  *See Travel Agent*, 583 F.3d at 902 ("As a general rule, a

---

[17]   Moreover, permitting Plaintiffs to proceed with their antitrust claims against Foamex does not adversely affect any bankruptcy policies because, during the Old Foamex bankruptcy case, there was nothing to indicate that Foamex, as a purchaser of Old Foamex's assets, had a reason to be concerned with antitrust violations committed by Old Foamex and was paying more for the opportunity to purchase the assets free and clear of such claims.  Although the Sale Order expressly provided that Foamex was acquiring such assets free and clear of a long list of claims, including antitrust claims, and provided that Foamex would not have acquired the assets unless the Asset Sale was free and clear of liens and claims, such provisions are common in bankruptcy orders, regardless of whether there is any specific antitrust concerns.  *See In re Teton Energy Corp.*, 2010 Bankr. LEXIS 3275 (Bankr. D. Del. Jan. 20, 2010); *In re Taylor-Wharton Int'l, LLC*, 2010 Bankr. LEXIS 3268 (Bankr. D. Del. June 8, 2010); *In re Steve & Barry's Manhattan LLC*, 2008 Bankr. LEXIS 4348 (Bankr. S.D.N.Y. Aug 22, 2008); *In re Burns & Roe Enters.*, 2005 Bankr. LEXIS 3173 (Bankr. D.N.J. Feb. 17, 2005).

successfully reorganized debtor under Chapter 11 of the Bankruptcy Code is liable for any independent conduct that arises after confirmation of its bankruptcy plan."); *see also O'Loghlin v. County of Orange*, 229 F.3d 871, 875-76 (9th Cir. 2000) (debtor's continued actions in violation of the Americans with Disabilities Act could give rise to postpetition claims for damages not encompassed in a debtor's discharge).

Here, the CAC alleges facts demonstrating that the Plaintiffs' claims arose after the Asset Sale.  This is true even if some of the conduct relating to the claims at issue occurred prior to the Asset Sale.   The allegations of the CAC demonstrate that even after the Asset Sale to Foamex closed in June 2009, Foamex simply continued with its ongoing business, with the same employees, machinery, intellectual property, customer lists, and manufacturing facilities that Old Foamex had used.  Indeed, Foamex purchased accounts receivable and continued to provide products to the Plaintiffs, just as Old Foamex had done prior to the Asset Sale.  Foamex did not suddenly, after being sold, start a new business, and the allegations of the CAC show that Foamex continued its involvement in the conspiracy committing new violations of the antitrust laws.

The two cases Foamex cites, *Trans World Airlines* and *Travel Agent*, are easily distinguishable.  In *Trans World Airlines*, in 1995 certain class action plaintiffs settled claims against Trans World Airlines and received as compensation travel vouchers.  In addition, prior to the bankruptcy individuals had filed 29 charges of discrimination had been filed with governmental agencies against Trans World Airlines.  After Trans World Airlines filed its chapter 11 case, American Airlines agreed to purchase all of Trans World Airlines' assets, but only if free and clear of the travel voucher obligations and the discrimination claims.  The EEOC

and the class action claimants objected to the sale, and then appealed from the sale order.  *Trans World*, 322 F.3d at 285-6.  It was undisputed that all of the claims had arisen prior to sale to American Airlines.

Similarly, in *Travel Agent*, the plaintiffs asserted antitrust claims against various airlines, alleging that the conspiracy began in 1995 and had achieved its objectives by 2002.  *Travel Agent*, 583 F.3d at 899. The plaintiffs brought their class action in 2003.  United Airlines, one of the defendants, filed a chapter 11 case in December 2002, and confirmed a plan of reorganization 2006 that discharged all claims against United Airlines.  The Sixth Circuit, in holding that the claims had been discharged under the United Airlines' plan, recognized that the "final act to effectuate that conspiracy occurred in 2002, long before United emerged from bankruptcy."  *Id.* at 901-2.

Here, of course, the CAC alleges that the conduct giving rise to liability continued *after* the sale of the Old Foamex assets and even *after* Old Foamex's bankruptcy cases were dismissed.  Moreover, the CAC alleges that the Plaintiffs could not have learned of the conspiracy to fix prices until 2010 when government agencies raided certain of the Defendants' facilities.  *See* CAC ¶¶ 130-134.  This is a markedly different set of facts from what the Third Circuit and Sixth Circuit addressed in *Trans World Airlines* and *Travel Agent*.  In each of those cases, unlike here, the litigation claimants actually had commenced litigation prior to the bankruptcy court authorized actions that barred their successor liability claims.

> (b)     Foamex in any event is liable for damages caused by the conspiracy throughout the conspiracy period.

Foamex's arguments presuppose Foamex can avoid liability for earlier years of the conspiracy if the Court deems Foamex's only relevant conduct occurred after the June 12, 2009

asset sale.  But it is axiomatic that a defendant is liable for all of its co-conspirators' acts – even

those pre-dating the defendants' own active participation in the conspiracy.  *See Havoco*, 626

F.2d 549, 554 ("[A] co-conspirator who joins a conspiracy with knowledge of what has gone on

before and with an intent to pursue the same objectives may, in the anti-trust context, be charged

with the preceding acts of its co-conspirators"); *Indus. Bldg. Mat, Inc. v. Interchemical Corp.*,

437 F.2d 1336, 1343 (9th Cir. 1971) ("One who enters a conspiracy late, with knowledge of what

has gone before, and with the intent to pursue the same objective, may be charged with preceding

acts in furtherance of the conspiracy."); *K-Dur*, 338 F. Supp. 2d 517, 538 ("[A] co-conspirator is

liable for all acts committed in furtherance of a conspiracy, regardless of when it entered the

conspiracy"); *Nissan Motor Corp.*, 430 F. Supp. 231, 232 ("[P]roof of unlawful affiliation is

sufficient to render a co-conspirator liable for all damages that the conspiracy caused, regardless

of the exact time defendant became a member or the extent of its participation"); *cf. U.S. v.

Atomic Fire Equip. Co.*, 57 F.R.D. 531, 532 (N.D. Ohio 1973) ("The defendant is charged in a

conspiracy to violate the anti-trust laws and as such is criminally liable for each of the acts of his

co-conspirators performed in furtherance of the common scheme.").

　　　　　Thus, it is immaterial whether Foamex's assets were sold in 2009 following bankruptcy,

since the CAC includes specific allegations of Foamex's involvement in the conspiracy

thereafter.   As Foamex itself acknowledges, the CAC alleges that, consistent with the

mechanism Vitafoam's cooperating witnesses described to the Justice Department, Defendants

Future Foam and Vitafoam in 2010 had access to and discussed Foamex's intended price

increases before those increases occurred.  *See* CAC ¶¶ 97-98 (Future Foam and Vitafoam

discussion of planned Foamex price increases); *see also id.* ¶¶ 70, 96 (describing general

mechanisms of the conspiracy).

The CAC also describes the ongoing conduct of two Foamex managers—Vincent Bonaddio and Don Phillips—who had positions at Foamex both *before* and *after* the bankruptcy and asset sale in 2009.  Specifically, the CAC discusses conversations that a current Vitafoam vice president told the Justice Department had had with Mr. Bonaddio and Mr. Phillips.  FXI's *current* website lists both Mr. Bonaddio and Mr. Phillips as part of FXI's "Corporate Management"—confirming the continuity of management even after the bankruptcy and asset sale.[18]  There is certainly no reason to believe that the bankruptcy and asset sale in 2009 would have suddenly caused Foamex and its management to cease the conspiratorial conduct described in detail in the CAC.  *See Kleen Prod., LLC v. Packaging Corp. of Am.*, 2011 WL 1343203, at *9 (N.D. Ill. 2011) ("actions taken pre-discharge do not vanish," meaning that such actions "can establish plausibility as to [this defendant's] claimed intent and agreement to engage in a conspiracy for the same reasons that apply to other defendants").

---

[18]  Foamex also  incorrectly suggests that Paragraph 83 of the CAC—which sets forth the current Vitafoam Vice President's detailed recollection of competitors with whom he conspired over the years—is dependent on Paragraph 87 of the CAC, which describes contacts with Foamex while this witness worked at Woodbridge, pre-FXI Sale.

## Conclusion

For the foregoing reasons, and those set forth in Plaintiffs' response to Defendants' Joint

Brief, Plaintiffs respectfully submit that the motions to dismiss should be denied in their entirety.

DATED: May 2, 2011

Respectfully Submitted,


/s/ William A. Isaacson                              /s/ Stephen R. Neuwirth
William A. Isaacson                                  Stephen R. Neuwirth
BOIES, SCHILLER & FLEXNER LLP                        QUINN EMANUEL URQUHART
5301 Wisconsin Avenue, NW                               & SULLIVAN, LLP
Washington, DC  20015                                51 Madison Avenue, 22nd Floor
Phone:  202-237-5607                                 New York, NY  10010
Fax:      202-237-6131                               Phone:  212-849-7165
                                                     Fax:      212-849-7100


*Direct Purchaser Plaintiffs' Interim Co-Lead Counsel*

Stanley Bernstein
BERNSTEIN LIEBHARD LLP
Bernstein Liebhard LLP
10 East 40th Street, 22nd Floor
New York, NY 10016
Phone:  212-779-1414
Fax:      212-779-3218

Robert Eisler
GRANT & EISENHOFER P.A.
1201 North Market Street
Wilmington, DE 19801
Phone:  302-622-7000
Fax:      302-622-7100

Michael Hausfeld
HAUSFELD LLP
1700 K Street, NW Suite 650
Washington, DC 20006
Phone:  202-540-7200
Fax:      202-540-7201

Hollis Salzman
LABATON SUCHAROW LLP
140 Broadway
New York, NY 10005
Phone:  212-907-0700
Fax:      212-818-0477

Mindee Reuben
WEINSTEIN KITCHENOFF & ASHER, LLC
1845 Walnut Street, Suite 1100
Philadelphia, PA 19103
Phone:  215-545-7200
Fax:      215-545-6535

Bruce Simon
PEARSON, SIMON, WARSHAW & PENNY,
    LLP
44 Montgomery Street, Suite 2450
San Francisco, CA 94104
Phone:  415-433-9000
Fax:      415-433-9008

Brian Strange
STRANGE & CARPENTER
12100 Wilshire Boulevard, Suite 1900
Los Angeles, CA 90025
Phone: 310-207-5055
Fax:      310-826-3210

Stephen Weiss
SEEGER WEISS LLP
One William Street
New York, NY 10004
Phone:  212-584-0700
Fax:      212-584-0799

*Executive Committee for the Direct Purchaser Plaintiffs*