# UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF OHIO

|  |  |  |
|---|---|---|
| In re POLYURETHANE FOAM ANTITRUST LITIG. | ) ) ) ) | MDL Docket No. 2196 Index No. 10-MD-2196 (JZ) |
| This document relates to: | ) ) ) | |
| ALL CASES | ) | |

### DIRECT PURCHASER PLAINTIFFS' OPPOSITION TO DEFENDANTS' JOINT COMMON ISSUES MEMORANDUM IN SUPPORT OF MOTIONS TO DISMISS DIRECT PURCHASER PLAINTIFF'S <u>CONSOLIDATED AMENDED CLASS ACTION COMPLAINT</u>

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ...................................................................................1

STATEMENT OF FACTS...........................................................................................4

    A.    Flexible Polyurethane Foam ...........................................................5

    B.    The Conspiracy to Fix Prices and Allocate Customers. .........................6

        1.    Vitafoam Witnesses. ...................................................... 6

        2.    Canadian Investigation Materials. ............................................. 9

        3.    Detailed Communications....................................................... 10

    C.    Market Factors Support Existence of Conspiracy ................................11

ARGUMENT ...........................................................................................................12

I.    THE COMPLAINT HERE MORE THAN SATISFIES THE PLEADING STANDARD OF PLAUSIBILITY. ...........................................................12

    A.    *Twombly* Did Not Change the Applicability of Rule 8's Notice Pleading Requirements in Antitrust Cases.......................................................12

    B.    The CAC's Non-Conclusory Factual Allegations Must Be Accepted as True at the Motion to Dismiss Stage...................................................17

II.    THE CAC ADVANCES MORE THAN SUFFICIENT FACTS TO SUGGEST A "PLAUSIBLE" CONSPIRACY. ...................................................................19

    A.    Following *Twombly*, No Court Has Dismissed a Complaint With Specific Allegations of Criminal Conduct such as in this Case..........................19

    B.    Government Investigations and Witness Cooperation Corroborate the Plausibility of the Alleged Conspiracy. ...............................................23

    C.    These Allegations Against Defendants Have Been Deemed Sufficient to Support Wide Ranging Discovery. .......................................................25

III.    DEFENDANTS' PARSING OF THE CAC CANNOT SUPPORT A MOTION TO DISMISS. ...................................................................................26

IV.    DEFENDANTS' SPECIFIC ARGUMENTS AGAINST THE CAC MUST FAIL. ........29

    A.    The CAC States an Appropriate Time Span for a Conspiracy. ............29

    B.    The CAC States Each Defendants' Knowing Participation...................34

    C.    The CAC States a Plausible Conspiracy that Includes Customer Allocation.................................................................................34

    D.    The CAC States a Plausible Conspiracy for the Defined Product of Polyurethane Foam. ...................................................................36

    E.    The CAC States a Plausible Conspiracy Throughout the U.S. ............40

    F.    The CAC States a Plausible Single Conspiracy of Some Size and Scope.............42

G.      Plus Factors Support The CAC's Allegation of Conspiracy. ................................44

H.      Allegations of Exchanging Prices Support the CAC. ............................................46

V.      THE CAC PROPERLY PLEADS FRAUDULENT CONCEALMENT. ........................47

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Airborne Beepers & Video, Inc. v. AT&T Mobility L.L.C.*,
499 F.3d 663 (7th Cir. 2007) .................................................................................. 13

*Aktieselskabet AF 21 v. Fame Jeans Inc.*,
525 F.3d 8 (D.C. Cir. 2008) .................................................................................... 12

*American Column & Lumber Co. v. U.S.*,
257 U.S. 377 (1921)................................................................................................ 46

*Anderson News, LLC v. Am. Media, Inc.*,
732 F. Supp.2d 389 (S.D.N.Y. 2010)...................................................................... 22

*Ashcroft v. Iqbal*,
129 S. Ct. 1937 (2009).....................................................................................*Passim*

*Bain Capital Partners, LLC*,
589 F. Supp. 2d 112 (D. Mass. 2008) ..................................................................... 28

*Bell Atlantic Corp. v. Twombly*,
550 U.S. 544 (2007).........................................................................................*Passim*

*Bloemker v. Laborers' Local 265 Pension Fund*,
605 F.3d 436 (6th Cir. 2010) .................................................................................... 4

*Blumenthal v. U.S.*,
332 U.S. 539 (1947)................................................................................................ 27

*Broadcom Corp. v. Qualcomm Inc.*,
501 F.3d 297 (3d Cir. 2007)................................................................................... 13

*City of Moundridge v. Exxon Mobil Corp.*,
250 F.R.D. 1 (D.D.C. 2008)............................................................................. 15, 16

*Conmar Corp. v. Mitsui & Co., (U.S.A.), Inc.*,
858 F. 2d 499 (9th Cir. 1988) ................................................................................. 48

*Continental Cas. Co. v. Auto Plus Ins. Agency*,
*LLC*, 676 F. Supp. 2d 657 (N.D. Oh. 2009)........................................................... 13

*Continental Ore Co. v. Union Carbide and Carbon Corp.*,
370 U.S. 690 (1962)......................................................................................... 13, 26

iii

*Courie v. Alcoa Wheel & Forged Prods*,
577 F.3d 625 (6th Cir. 2009) ........................................................ 12

*Dahl v. Bain Capital Partners, LLC*,
589 F. Supp. 2d 112 (D. Mass. 2008) ........................................... 29

*Dowdy & Dowdy P'ship. v. Arbitron, Inc.*
2010 U.S. Dist. LEXIS 107123 (S.D. Miss. 2010) ....................... 33

*Eidson v. State of Tenn. Dept. of Children's Services*,
510 F. 3d 631 (6th Cir. 2007) ......................................................... 4

*Erickson v. Pardus*, 127 S. Ct. 2197 (2007) ..................................... 4, 14

*Fair Isaac Corp. v. Equifax Inc.*,
2008 WL 623120, at *5 (D. Minn.  2008) ..................................... 15

*FTC v. Superior Ct. Trial Lawyers Ass'n.*,
493 U.S. 411 (1990)......................................................................... 37

*Glen Eden Hospital, Inc. v. Blue Cross & Blue Shield, Inc.*,
740 F.2d 423 (6th Cir. 1984) ......................................................... 19

*Harchar v. U.S.*,
435 B.R. 480 (N.D. Oh. 2010) ....................................................... 13

*HCRI TRS Acquirer, LLC v. Iwer*,
708 F. Supp. 2d 687 (N.D. Oh. 2010)............................................ 13

*Hyland v. Homeservices of Am., Inc.*,
2007 U.S. Dist. LEXIS 47503 (W.D. Ky. 2007) ...................... 20, 24

*In re Aftermarket Filters Antitrust Litig.*,
2009 U.S. Dist. LEXIS 104114 (N.D. Ill. 2009) ........................ 3, 21

*In re Air Cargo Shipping Servs. Antitrust Litig.*,
2009 U.S. Dist. LEXIS 88404 (E.D.N.Y. 2009)........................ 3, 21, 43

*In re ATM Fee Antitrust Litig.*,
2009 U.S. Dist. LEXIS 83199 (N.D. Cal. 2009) ...................... 3, 21, 43

*In re Bath & Kitchen Fixtures Antitrust Litig.*,
2006 U.S. Dist. LEXIS 49576 (E.D. Pa. 2006) ............................. 34

*In re Blood Reagents Antitrust Litig.*,
2010 U.S. Dist. LEXIS 86930, *reconsideration denied*,
2010 U.S. Dist. LEXIS 134261 (E.D. Pa. 2010) ............... 4, 21, 23, 36, 45

iv

*In re Cal. Title Ins. Antitrust Litig.*,
2009 U.S. Dist. LEXIS 43323  (N.D.Cal. 2009) ...................................................... 23

*In re Cathode Ray Tube Antitrust Litig.*,
738 F. Supp. 2d 1011 (N.D. Cal. 2010) .................................................................. 48

*In re Chocolate Confectionary Prods. Antitrust Litig.*,
602 F. Supp. 2d 538 (E.D. Pa. 2009) ........................................................... 3, 21, 43

*In re Citric Acid Antitrust Litig.*,
1996 U.S. Dist. LEXIS 3149 (N.D. Cal. 1996) ...................................................... 38

*In re Copper Antitrust Litig.*,
98 F. Supp. 2d 1039 (W.D. Wis. 2000) .................................................................. 27

*In re Corrugated Container Antitrust Litig.*,
80 F.R.D. 244 (S.D. Tex. 1978)............................................................................. 33

*In re Elevator Antitrust Litig.*,
502 F.3d 47 (2d Cir. 2007)..................................................................................... 39

*In re Fine Paper Antitrust Litig.*,
82 F.R.D. 143 (E.D. Pa. 1979)............................................................................... 33

*In re Fla. Cement & Concrete Antitrust Litig.*,
746 F. Supp. 2d 1291 (S.D. Fla. 2010) .................................................................. 43

*In re Flash Memory Antitrust Litig.*,
643 F. Supp. 2d 1133 (N.D. Cal. 2009) ........................................... 3, 13, 23, 42-46

*In re Flat Glass Antitrust Litig.*,
385 F.3d 350 (3d Cir. 2004).................................................................................. 38

*In re Graphics Processing Units Antitrust Litig.*
527 F. Supp. 2d 1011 (N.D. Cal. 2007) ................................................................. 24

*In re Graphics Processing Units Antitrust Litig.*,
540 F. Supp. 2d 1085 (N.D. Cal. 2007) ...................................................... 14, 24, 25

*In re Hawaiian & Guamanian Cabotage Antitrust Litig.*,
647 F. Supp.2d 1250 (W.D. Wash. 2009).............................................................. 23

*In re High Fructose Corn Syrup Antitrust Litig.*,
295 F.3d 651 (7th Cir. 2002) .......................................................................... 45, 46

*In re Insurance Brokerage Antitrust Litig.*,
618 F.3d 300 (3d Cir. 2010).................................................................................. 44

*In re Iowa Ready-Mix Concrete Antitrust Litig.*,
  2011 U.S. Dist. LEXIS 23311 (N.D. Iowa 2011) ................................................................... 41

*In re Late Fee & Over Limit Fee Litig.*,
  528 F. Supp.2d 953 (N.D. Cal. 2007) ...................................................................................... 23

*In re LTL Shipping Serv. Antitrust Litigation*,
  2009 U.S. Dist. LEXIS 14276 (N.D.Ga. 2009) ......................................................... 15, 33, 47

*In re Municipal Derivatives Antitrust Litig.*,
  700 F. Supp. 2d 378 (S.D.N.Y. 2010) ................................................................. 3, 15, 21, 28, 42

*In re NASDAQ Market-Makers Antitrust Litig.*,
  894 F. Supp. 703 (S.D.N.Y. 1995) ................................................................................... 13, 39

*In re OSB Antitrust Litig.*,
  2007 U.S. Dist. LEXIS 56573 (E.D. Pa. 2007) ...................................................................... 15

*In re Packaged Ice Antitrust Litig.*,
  723 F. Supp. 2d 987 (E.D. Mich. 2010) .................................................... 14, 21, 23, 41, 47, 48

*In re Parcel Tanker Shipping Servs. Antitrust Litig.*,
  541 F. Supp.2d 487 (D.Conn. 2008) ....................................................................................... 23

*In re Plasma-Derivative Protein Therapies Antirust Litig.*,
  2011 U.S. Dist. LEXIS 13279 (N.D. Ill. 2011) ................................................................. 13, 22

*In re Pressure Sensitive Labelstock Antitrust Litig.*,
  566 F. Supp. 2d 363 (M.D. Pa. 2008) ...................................................................................... 13

*In re Rail Freight Surcharge Antitrust Litig.*,
  587 F. Supp. 2d 27 (D.D.C. 2008) ................................................................................... 15, 43

*In re Scrap Metal Antitrust Litig.*,
  1:02cv0844 KMO, Memo. Op. (N.D. Oh. Mar. 31, 2004),
  *aff'd,* 527 F.2d 917 (6th Cir. 2008) ....................................................................... 28, 37, 47, 48

*In re Southeastern Milk Antitrust Litig.*,
  555 F. Supp. 2d 934 (E.D. Tenn. 2008) .......................................................................... 14, 15, 20

*In re Static Random Access Memory (SRAM) Antitrust Litig.*,
  580 F. Supp. 2d 896 (N.D. Cal. 2008) ............................................................... 3, 21, 43, 45

*In re Text Messaging Antitrust Litig.*,
  630 F.3d 622 (7th Cir. 2010), *cert. denied*, 2011 U.S. LEXIS 3339 (2011) ....................... 3, 21

*In re TFT-LCD (Flat Panel) Antitrust Litig.*,
  267 F.R.D. 291 (N.D. Cal. 2010) ..................................................................................... 33, 38

*In re TFT-LCD (Flat Panel) Antitrust Litig.*,
   586 F. Supp. 2d 1109 (N.D. Cal. 2008) ............................................................. 3, 21, 33, 43, 45

*In re TFT-LCD (Flat Panel) Antitrust Litig.*,
   2010 U.S. Dist. LEXIS 65037 (N.D. Cal. 2010) ....................................................... 40

*In re Travel Agent Comm'n Antitrust Litig.*,
   2007 U.S. Dist. LEXIS 79918 (N.D. Ohio 2007),
   *aff'd.,* 583 F.3d. 896 (6th Cir. 2009) ............................................................. 22, 23, 47

*In re Urethane Antitrust Litig.*,
   663 F. Supp.2d 1067 (D. Kan. 2009) ...................................................................... 32

*In re Urethane Antitrust Litig.*,
   683 F. Supp.2d 1214 (D. Kan. 2010) ........................................................ 3, 14, 19, 20, 32, 49

*In re Urethane Antitrust Litig.*,
   No. 04-1616 JWL, Memo Op. at 18 (D. Kan. Dec. 17, 2010) ...................................... 37

*In re Urethane Antitrust Litig.*,
   No. 04-1616 JWL, Memo. Op. (D. Kan. Apr. 5, 2011) ............................................... 25

*In re Vitamins Antitrust Litig.*,
   2000 WL 1475705 (D.D.C.  2000) ........................................................................ 29

*Jacobs v. Tempur-Pedic, Int'l. Inc.*,
   626 F.3d 1327 (11th Cir. 2010) ........................................................................... 22

*Jones v. City of Cincinnati*,
   521 F.3d 555 (6th Cir. 2008) .............................................................................. 17

*Jung v. Ass'n. of Am. Med. Coll.*,
   300 F. Supp. 2d 1133 (D.D.C. 2004) .................................................................... 13

*K & S Associates, Inc. v. Am. Ass'n of Physicists in Med.*,
   2011 U.S. Dist. LEXIS 7739 (M.D. Tenn. 2011) .................................................. 21-22

*Kendall v. Visa U.S.A. Inc.*,
   518 F.3d 1042 (9th Cir. 2008) ............................................................................. 22

*LaFlamme v. Societe Air France*,
   702 F. Supp.2d 136 (E.D.N.Y. 2010) .................................................................... 22

*Martin v. Clark*,
   2010 WL 4256030 (N.D. Oh. 2010) ....................................................................... 4

*Mountain View Pharmacy v. Abbott Labs.*
   630 F.2d 1383 (10th Cir. 1980) ........................................................................... 39

*Pension Comm. of the Univ. of Montreal Pension Plan v. Banc of Amer. Sec., LLC,*
    568 F. 3d 374 (2d. Cir. 2009).................................................................................... 36

*Phillips v. County of Allegheny,*
    515 F.3d. 224 (3rd Cir. 2008) ..................................................................................... 4

*Pinney Dock & Transp. Co. v. Penn Cent. Corp.,*
    838 F.2d 1445 (6th Cir. 1988) .................................................................................. 48

*Re/Max Intern., Inc. v. Realty One, Inc.,*
    173 F.3d 995 (6th Cir. 1999) .................................................................................... 44

*Rx USA Wholesale, Inc. v. Alcon Labs, Inc.,*
    661 F. Supp. 2d. 218 (E.D.N.Y. 2009) ..................................................................... 33

*Sensations Inc. v. City of Grand Rapids,*
    526 F.3d 291 (6th Cir. 2008). ................................................................................. 13

*Sokol v. Akron General Medical Center,*
    1997 U.S. Dist. LEXIS 22078 (N.D. Ohio 1997) ..................................................... 19

*Standard Iron Works v. Arcelormittal,*
    639 F. Supp. 2d 877 (N.D. Ill. 2009) ................................................................. 38, 41

*Starr  v. Sony BMG Music Entm't,*
    592 F.3d 314 (2d Cir. 2010)................................................................................ 14, 23

*State of Mich. ex. rel. Kelley v. McDonald Dairy Co.,*
    905 F. Supp. 447 (W.D. Mich. 1995) ....................................................................... 48

*Swierkiewicz v. Sorema N.A.,*
    534 U.S. 506 (2002).................................................................................................. 14

*Total Benefits Planning Agency, Inc. v. Anthem Blue Cross & Blue Shield,*
    552 F.3d 430 (6th Cir. 2008) ................................................................................ 4, 22

*U.S. v. Am. Radiator & Standard Sanitary Corp.,*
    433 F.2d 174 (3d Cir. 1970), *cert. denied*, 401 U.S. 948 (1971)............................ 27

*U.S. v. American Honda Motor Co.,*
    273 F. Supp. 810 (N.D. Ill. 1967) ............................................................................ 28

*U.S. v. Etheridge,*
    424 F.2d 951 (6th Cir. 1970), *cert. denied*, 400 U.S. 993 (1971)........................... 27

*U.S. v. Gravier,*
    706 F.2d 174 (6th Cir. 1983) *cert. denied*, 464 U.S. 996 (1983)............................ 27

*U.S. v. Grunsfield,*
   558 F.2d 1231, 1238 (6th Cir. 1977), *cert. denied*, 434 U.S. 872 (1977)................................ 26

*U.S. v. Hughes,*
   895 F . 2d. 1135, 1140 (6th Cir. 1990) ................................................................... 27

*U.S. v. Koppers Co.,*
   652 F.2d 290 (2d Cir. 1981)........................................................................... 19

*U.S. v. McLernon,*
   746 F.2d 1098 (6th Cir. 1984) ........................................................................ 27

*U.S. v. Pickett,*
   746 F.2d 1129 (6th Cir. 1984) ........................................................................ 27

*U.S. v. Smith,*
   320 F. 3d. 647, 652 (6th Cir. 2003) .................................................................. 27

*U.S. v. True,*
   250 F.3d 410 (6th Cir. 2001) ......................................................................... 46

*U.S. v. Yonkers Contracting Co.,*
   706 F. Supp. 296 (S.D.N.Y. 1989) .................................................................. 28

*U.S. v. Warner,*
   690 F.2d 545 (6th Cir. 1982) ......................................................................... 27

*White and White, Inc. v. American Hosp. Supply Corp.,*
   723 F.2d 495 (6th Cir. 1983) ......................................................................... 19

Direct Purchaser Plaintiffs, by undersigned interim co-lead counsel, respectfully submit this Opposition to Defendants' Joint Common Issues Memorandum ("Jt. Br.") in Support of their Motions to Dismiss Direct Purchaser Plaintiffs' Consolidated Amended Class Action Complaint.

## PRELIMINARY STATEMENT

Direct Purchaser Plaintiffs' Consolidated Amended Class Complaint ("CAC") exceeds the standards for pleading as articulated by *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007) ("*Twombly*"), *Ashcroft v. Iqbal*, 129 S. Ct. 1937 (2009) ("*Iqbal*"), and their progeny. The Court in *Twombly* stated in conclusion that "we do not require heightened fact pleading of specifics, but only enough facts to state a claim that is plausible on its face" and then dismissed the complaint before the Court because that complaint had "not nudged their claims across the line from conceivable to plausible." *Twombly*, 550 U.S. at 570.

The CAC allegations here cross far over the line from a conceivable to a "plausible" antitrust conspiracy among defendants from at least 1999 to the present. This is the same conspiracy that is the subject of the U.S. Department of Justice's ("DOJ") Antitrust Division's criminal investigation, and has been confirmed by Defendant Vitafoam's witnesses cooperating with DOJ as well as the investigation of the Canadian Competition Bureau.

In their motion, Defendants willfully misread the specifics of the CAC by asserting that its allegations are "vast as they are unspecific" and based on "sporadic instances of communications between a few employees." (Jt. Br. 1) Contrary to this, the CAC details how Defendant Vitafoam has confirmed the existence of the conspiracy, admitted to criminal price fixing and per se violations of the antitrust laws, and sought leniency from the U.S. Department of Justice. CAC ¶¶ 60-62. As part of its leniency application, Vitafoam employees participated in interviews in which they explained how the conspiracy functioned. *Id.* ¶ 62. These Vitafoam employees have described communications between Defendants discussing agreements to fix

flexible polyurethane foam prices, pretexts used to justify coordinated price increases (including using bi-annual Polyurethane Foam Association ("PFA") meetings as cover to hide illicit activity), and the means through which the unlawful agreements between Defendants were reached and monitored. *Id.* ¶¶ 63-65, 70-71, 114. The CAC also details meetings and communications to fix prices and allocate markets during the Class Period between former Vitafoam executives and identified representatives from other Defendants. *Id.* ¶¶ 72, 74-78. These communications included telephone calls to discuss price increases and exchanges of price increase letters. *Id.* ¶¶ 72, 74-78, 92.

In addition, the CAC describes how current Vitafoam employees with pricing power conspired to fix prices in the U.S. with other specifically identified Defendants. CAC ¶¶ 82-84, 103. Specific meetings and communications are detailed throughout the Class Period, including meetings through 2010, as well as details about how Defendants policed one another to ensure that all co-conspirators were complying with unlawful agreements. *Id.* ¶¶ 88-89, 93, 95-97. High level executives of Defendants participated in many telephones calls, resulting in correspondence, where price increases were discussed and exchanged prior to public release, to ensure that Defendants were in fact increasing prices and allocating markets as agreed. *Id.* ¶¶ 96-106, 110-11. Defendants knew these calls were unlawful, but proceeded anyway. *Id* ¶¶ 109. The CAC also describes at least 15 separate emails from the beginning of the Class Period through 2009 confirming that Defendants had an agreement to fix prices, and illustrating how information was exchanged and the conspiracy monitored. *Id* ¶ 112. The CAC identifies over three dozen individuals each of whom is specifically alleged to have participated in discussions of price increases or other collusive conduct. The CAC also details numerous specific instances

where, as confirmed by the cooperating Vitafoam witnesses, Defendants exchanged and communicated about proposed and prospective pricing information. CAC ¶¶ 67-94.

Adding further plausibility to Plaintiffs' conspiracy allegations, the CAC describes how the market for flexible polyurethane foam was ripe for a price-fixing conspiracy based on the structure of the market and other factors. CAC ¶¶ 120-127.

Under *Twombly* and the cases that have followed, a complaint, such as the CAC here – that contains: (1) a participant's admission of the conspiracy, as well as that participant's application for leniency from the Department of Justice; (2) detailed accounts of former and current high-level Defendant executives engaging in conspiratorial activity; (3) and market conditions that are "ripe" for conspiratorial conduct – easily survives a challenge under Rule 12(b)(6). Following *Twombly*, complaints, including some with even less specificity and only circumstantial evidence of collusion, have been upheld as complying with Fed. R. Civ P. 8. *E.g., In re Text Messaging Antitrust Litig*., 630 F.3d 622, 627-29 (7th Cir. 2010), *cert. denied*, 2011 U.S. LEXIS 3339 (2011; *In re Municipal Derivatives Antitrust Litig.*, 700 F. Supp. 2d 378 (S.D.N.Y. 2010); *In re Blood Reagents Antitrust Litig.,* 2010 U.S. Dist. LEXIS 86930, *reconsideration denied,* 2010 U.S. Dist. LEXIS 134261 (E.D. Pa. 2010); *In re Aftermarket Filters Antitrust Litig.,* 2009 U.S. Dist. LEXIS 104114 (N.D. Ill. 2009); *In re Flash Memory Antitrust Litig.*, 643 F. Supp. 2d 1133, 1142 (N.D. Cal. 2009); *In re Chocolate Confectionary Prods. Antitrust Litig*., 602 F. Supp. 2d 538, 574-77 (M.D. Pa. 2009); *In re ATM Fee Antitrust Litig*., 2009 U.S. Dist. LEXIS 83199 (N.D. Cal. 2009); *In re Air Cargo Shipping Servs. Antitrust Litig*., 2009 U.S. Dist. LEXIS 88404 (E.D.N.Y. 2009); *In re TFT-LCD (Flat Panel) Antitrust Litig.*, 586 F. Supp.2d 1109 (N.D. Cal. 2008); *In re Static Random Access Memory (SRAM) Antitrust Litig*., 580 F. Supp. 2d 896, 902-904 (N.D. Cal. 2008).

It is telling that in *In re Urethane Antitrust Litig.*, 683 F. Supp. 2d 1214, 1219 (D. Kan. 2010), some of the Defendants here, including Carpenter and Woodbridge, which there filed a direct, non-class action claim alleging a 10-year conspiracy from 1994 to 2004, argued against and defeated a motion to dismiss raising the same purported *Twombly* arguments the Defendants (including Carpenter and Woodbridge) now make here.

No court before or after *Twombly* has dismissed a case with the type of detailed and specific allegations of criminality described in the CAC here. For the reasons stated herein and Plaitniffs' separate response to Defendants' individual motions, Defendants' motions to dismiss should be denied in their entirety.

## STATEMENT OF FACTS

Under Fed. R. Civ. P. 8, a court must construe the CAC in the light most favorable to the plaintiff, accept its non-conclusory factual allegations as true, and draw all reasonable inferences in favor of the plaintiff. *Bloemker v. Laborers' Local 265 Pension Fund*, 605 F.3d 436, 443 (6th Cir. 2010); *Total Benefits Planning Agency, Inc. v. Anthem Blue Cross and Blue Shield*, 552 F.3d 430, 436-37 (6th Cir. 2008) (Zouhary, J.); *Eidson v. State of Tenn. Dept. of Children's Services,* 510 F. 3d 631, 634 (6th Cir. 2007); *Martin v. Clark*, 2010 WL 4256030 (N.D. Oh. 2010) (Zouhary, J.). As the Supreme Court has also directed, with specific reference to *Twombly*, a judge considering a motion to dismiss must accept as true all of the well-pleaded factual allegations contained in the Complaint. *Erickson v. Pardus*, 551 U.S. at 94 (2007) (*citing Twombly*, 550 U.S. at 555-56); *see also Iqbal*, 129 S. Ct. at 1950 ("[w]hen there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief"); *Phillips v. County of Allegheny*, 515 F.3d. 224, 231 (3rd Cir. 2008) ("The Supreme Court also reaffirmed that, on a Rule 12(b)(6) motion, the facts alleged must be taken as true").

4

The allegations of the CAC here are specific and also detail a government investigation that has revealed evidence of a large scale price fixing conspiracy throughout the U.S. and Canada. CAC ¶ 62. The investigation began after Defendant Vitafoam voluntarily approached the U.S.DOJ in February 2010 to self-report its illegal antitrust activities in exchange for leniency under the DOJ's Corporate Leniency Program. *Id*. ¶¶ 60. Subsequently, Vitafoam and its employees cooperated with the DOJ in its criminal investigation of illegal anticompetitive conduct in the flexible polyurethane foam market. *Id*. The CAC is corroborated by DOJ's interviews with Vitafoam employees, recorded phone calls, document collections, and raids of many Defendants here. This information has revealed the mechanisms, participants, duration, and impact of the conspiracy on direct purchasers in the U.S. *Id*.

A.      **Flexible Polyurethane Foam**

Flexible polyurethane foam is a commodity product used for insulation and padding in a variety of products, including furniture cushions, bedding, packaging, carpet underlay, and automobile products. CAC ¶¶ 1, 56. The price fixing conspiracy alleged in the CAC includes both slabstock and molded polyurethane foam. *Id.* Molded foam has the same characteristics as slabstock foam, the main difference being that it is prepared by pouring the chemical mix into a specially shaped mold, rather than onto a conveyor belt. *Id*. ¶ 58.

Contrary to Defendants' statement that the CAC acknowledges "the differentiated" nature of foam applications, or a lack of homogeneity, the CAC explains that molded and slabstock foam are collectively referred to as a "commodity" by the Polyurethane Foam Association ("PFA"), of which the vast majority of polyurethane foam manufacturers in the U.S. are

members. CAC ¶¶ 126-128. Both of these types of foam are also used in the same industries and for the same purposes. *Id*. ¶ 59.[1]

B.      **The Conspiracy to Fix Prices and Allocate Customers.**

1.      **Vitafoam Witnesses.**

As one of the Vitafoam witnesses made clear to the DOJ, *each* of the price increases for flexible polyurethane foam from January 1, 1999 until Vitafoam's entry into the leniency program resulted from the conspiracy among Defendants. CAC ¶ 94.[2] As the Vitafoam witnesses further stated, Defendants perpetuated the conspiracy by creating a system whereby they communicated privately and reached agreement on both price increases and division of the flexible polyurethane foam market. *Id*. ¶ 63. Prior to each price increase in the Class Period, for example, Defendants collectively discussed *how much* to raise prices, *when* to raise prices, and how and when to *announce* the increases to their respective customers. *Id*. ¶ 66. Defendants also agreed to use the same rationale in justifying the increases to their respective customers. *Id*. ¶ 64. Defendants characterize these allegations of the CAC as "describing legitimate pricing behavior" and quote ¶ 64 of the CAC, but omit the portion of ¶ 64 stating that "Defendants contacted each other" to coordinate their pretextual conduct.

The Vitafoam witnesses further explained that Defendants went to great lengths to avoid detection when carrying out the conspiracy. For example, although they generally communicated by phone or in person, when Defendants communicated via written format, they used initials or first names instead of full names. CAC ¶ 65, 71, 113. When communicating by fax, Defendants covered their tracks by using fax machines at local office supply stores, rather than their own

---

[1] Defendants list the products they sell based on the CAC (Jt. Br. 5), but the CAC does not include a complete list of Defendants' products. CAC ¶¶ 13-47.

[2] As detailed in the CAC, and confirmed in the documents emerging from the pending government investigations, the conspiracy continued in 2010 even after Vitafoam began cooperating with the Justice Department. CAC ¶¶ 60, 89, 97-111.

offices. *Id*. ¶ 118. Defendants also used trade group meetings, such as the PFA, to disguise the conspiracy while appearing to be meeting for legitimate purposes. *Id*. ¶¶ 63, 71, 89, 112(d), 114-116, 128.

As noted in the Vitafoam interviews, Defendants self-policed themselves to ensure that all parties to the conspiracy complied with the price increase agreements. CAC ¶ 66. Defendants frequently exchanged price increase letters to ensure that the agreements were being implemented. *Id*. ¶ 96. If one of the Defendants did not agree to the collusive price increase or indicated they would deviate from the collusive plan the other Defendants would hound the hold out Defendant and threaten to engage in price wars with it. *Id*. ¶¶ 95-96.

The Vitafoam witnesses have stated that executives and representatives acting for other Defendants directly communicated with Vitafoam employees, and reported on communications with other Defendants, as part of the conspiracy. CAC ¶¶ 71, 72, 74-78, 82-84, 85, 92, 112. Employees at Defendant Valle Foam Industries, Inc. ("Valle"), for example, policed other Defendants to coordinate price increase percentages and effective dates, and reported these efforts to Vitafoam. *Id*. ¶ 76. Defendants also agreed not to steal each others' market share by refraining from pursuing each others' customers. *Id*. ¶ 79.

One of the DOJ witnesses was the former President of Vitafoam, who worked at Vitafoam from the 1960s to October 2008, and stated he was directly engaged in long running agreements on coordinated price increases and customer allocation. CAC ¶ 67. This individual stated that he communicated directly with Defendants during the Class Period to discuss and agree to specific price increases. *Id*. ¶ 68. During the Class Period, he ordered other Vitafoam sales personnel to send copies of draft price increase letters to other Defendants. *Id*. ¶ 70. He also instructed these employees to police other Defendants' price increase letters to ensure that all

Defendants were complying with price increase agreements. *Id*. This individual recalled personally speaking about prices with individuals from at least Foamex, Carpenter, Future Foam, Hickory Springs, and Valle. *Id.* ¶ 72.  He also received reports on discussions in furtherance of the conspiracy from a then (and now former) Vitafoam manager, David Gurley, who had numerous contacts with Defendants regarding draft price increase letters, price lists, and other information during the Class Period. *Id*. ¶ 77.  Former Vitafoam employee George Newton also exchanged similar information with at least one Carpenter employee and provided this information to other Defendants during the Class Period. *Id*. ¶ 78.

Another DOJ witness was the former Vice President of Sales and Marketing of Vitafoam, who began his career at Woodbridge before working for Vitafoam from 1973 to 2009. CAC ¶ 73. He admitted to participating in the long time price-fixing and customer allocation conspiracy *throughout North America* with other Vitafoam employees and other Defendants during the Class Period. *Id*. This witness personally recalled speaking to executives at Valle, Carpenter, Woodbridge, Flexible Foam, Hickory Springs, Domfoam, Scottdel, and Foamex in furtherance of the conspiracy. *Id*. ¶ 74. These conversations involved agreement on specific price increase percentages for polyurethane foam as well as the effective dates of such increases. *Id*. ¶ 75-76. This witness further verified that Vitafoam and the other Defendants exchanged price increase letters to ensure compliance with the conspiratorial agreement. *Id*. ¶ 73-75.

Still another DOJ witness was Vitafoam's Vice President of Sales, who also was once employed as Vice President of Commercial Sales at Woodbridge, and who admitted to agreeing on price increases for flexible polyurethane foam with competitors during the Class Period. CAC ¶¶ 80, 82-83. The Defendants with whom this witness recalled personally conspiring include

8

Woodbridge, Vitafoam, Foamex, Carpenter, Future Foam, Hickory Springs, Scottdel, Valle, Flexible Foam, DomFoam, Otto Bock, Plastomer, and Inoac. *Id.* ¶¶ 82-83.

Finally, a fourth DOJ witness was the current President of Vitafoam, who held that position since August of 2008 and was previously employed by Woodbridge throughout the Class Period. CAC ¶ 90. This witness confirmed that, while he was at Woodbridge, he personally discussed and agreed on price increases with numerous competitors, including Vitafoam, Foamex, Flexible Foam, Valle, Carpenter, Hickory Springs, and Future Foam. As a result of these discussions, the witness understood the participants would implement price increases at agreed upon levels and on coordinated effective dates. *Id.* ¶¶ 90-92.

The CAC, as corroborated by Vitafoam witnesses, identifies 13 employees of Defendants as involved in violations of law, a number Defendants somehow label as "small." (Jt. Br. 6)

### 2. __Canadian Investigation Materials.__

Additional corroboration of the conspiracy is found in a Canadian Competition Bureau investigation and Information sworn under oath on July 21, 2010 by Pierre-Yves Guay of the Commissioner of Competition in Canada to support a search warrant. That Information describes information provided by "Witness A," who "describes himself as someone who gathers and shares information across the foam sectors. Witness A confirmed to Competition Law Officers that he had discussions, exchanges of information and agreements regarding the price of foam with the following contacts within the foam industry," who are identified by name Including: Vinnie Bonaddio and Don Phillips of Foamex, Tony Valleccocia and John Howard of Domfoam, John Vins of Hobock, Bill Baughman of Plostomer, Mike Cotter and Ken Miya of Inoac, Todd Councilman and Buster Mann of Hickory Springs, Mike Crowell of Flexible Foam, and Mel Himel of Vitafoam. CAC ¶ 83. The sworn affidavit from Pierre-Yves Guay also separately states

that "The violations of law alleged in the affidavit concerned conduct both "in Canada and in the U.S." *Id.* ¶ 84.

### 3.    Detailed Communications.

In addition to the U.S. and Canadian investigations and the testimony given by Vitafoam witnesses, the CAC describes in detail many indicative email, phone, voicemail messages, and other communications that evidence the conspiracy:

- A Vitafoam witness admitted that *every* price increase from 1999 through their entry into the conditional leniency program in 2010 was collusive.  CAC ¶ 94.

- The Vitafoam witnesses admitted that price increase discussions occurred approximately "two to three times per year" throughout the Class Period, at bi-annual trade association meetings, whenever raw materials increased in price *Urethane* and, at frequent and regular intervals. *Id.* ¶¶ 63-64, 68, 70, 72, 74, 77-78, 82-83, 92, 94.

- Collusive price increases between Woodbridge and Vitafoam/Crest throughout the Class Period, and in meetings between the same parties in at least 2004. CAC ¶¶ 85, 88.

- At PFA meetings on May 26-27, 2010, in Baltimore, Maryland, Vitafoam discussed collusive price increases with Flexible Foam. In these meetings, Flexible Foam questioned the Vice President regarding Vitafoam's inaction with respect to a recent price increase. *Id.* ¶ 89.

- During the Class Period, Vitafoam employee David Gurley emailed his superiors regarding draft price increase letters received from Hickory Springs. *Id.* ¶ 92.

- In 2009, Vitafoam communicated extensively with Valle and agreed on promotional pricing for carpet foam for a shared customer. *Id.* ¶ 93.

- In June 2010 phone calls, Future Foam and Vitafoam discussed price increases by Future Foam, Foamex, Flexible, and Vitafoam. *Id.* ¶¶ 97-99.

- In May 2010 phone calls, Domfoam and Vitafoam discussed the latter's attempts to acquire Domfoam customers. In these calls, Domfoam explicitly acknowledged the agreement to allocate customers. *Id.* ¶¶ 100-102.

- In June 2010 phone calls, Vitafoam executives discussed price increases and coordination with other Defendants. *Id.* ¶¶ 103-104.

- In June 2010 phone calls, Valle and Vitafoam discussed price increases and coordination with other Defendants. *Id.* ¶¶ 105-106.

- In Summer 2010 phone calls between Carpenter and Vitafoam discussing price increases. Carpenter provided a copy of the letter it sent to its customers, which included dates and amounts of the price increases. The two competitors also discussed whether their discussions were unlawful. *Id.* ¶¶ 107-109.

- In May 2010 phone calls, Hickory Springs and Vitafoam executives agreed to a 12% price increase. *Id.* ¶¶ 110-111.

- In emails, the Vitafoam Vice President of Sales (then at Woodbridge) and Vitafoam employees, and internal emails describing communications with Vitafoam and Crest employees discussed various price increases from 2000 to 2005. *Id.* ¶ 112(a)-(g).

- A September 2005 email to Vitafoam from one of its competitors discussed coordinating an 11% price increase. *Id.* ¶ 112(h).

- 2008 emails between Scottdel and Vitafoam concerned price increases and reports about the same from other Defendants, including Mohawk and Carpenter. *Id.* ¶ 112(i)-(m), (o).

- Letters found in Vitafoam's files from Flexible Foam, Mohawk, Carpenter, Vita Canada, Leggett & Platt, and Future Foam announced 2009 price increases in May 2009 and again in June 2009. *Id.* ¶ 112(n).

**C.**     **Market Factors Support Existence of Conspiracy**

In addition to the direct evidence of the conspiracy, the CAC alleges various factors inherent in the market for flexible polyurethane foam that demonstrate why it was susceptible to anticompetitive practices. *Id.* ¶ 119. For example, the majority of polyurethane foam sold in the U.S. comes from North American companies or U.S.-based subsidiaries of foreign companies. *Id.* ¶ 120. The industry has not attracted new entrants; rather, major market players within the industry have acquired competitors and smaller companies in recent years. *Id.* ¶ 121.

Demand for flexible polyurethane foam, moreover, is relatively inelastic, meaning that Defendants' price increases for flexible polyurethane foam did not necessarily affect demand, thus incentivizing them to abuse pricing for U.S. customers. CAC ¶¶ 122-124.

11

Flexible polyurethane foam is also readily interchangeable across manufacturers. Because it is readily interchangeable, flexible polyurethane foam is properly characterized as a commodity product, or one for which competition is primarily driven by price rather than other market pressures. *Id*. ¶¶ 125, 126.

Finally, Defendants had ample opportunities to meet—and *did* meet— under the guise of various trade associations, such as the PFA. *Id*. ¶¶ 128, 129.

## ARGUMENT

**I.     THE COMPLAINT HERE MORE THAN SATISFIES THE PLEADING STANDARD OF PLAUSIBILITY.**

### A.     *Twombly* Did Not Change the Applicability of Rule 8's Notice Pleading Requirements in Antitrust Cases.

Under *Bell Atlantic Corporation v. Twombly*, 550 U.S. 544 (2007), to survive a motion to dismiss brought pursuant to Rule 12(b)(6), a complaint need only contain "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. As the Supreme Court further stated in *Ashcroft v. Iqbal*, the plausibility standard is "not akin to a probability requirement." *Ashcroft v. Iqbal,* 129 S. Ct. 1937, 1949 (2009).  Instead, a plaintiff need only allege "enough factual matter (taken as true) to *suggest* that an agreement was made," *Twombly*, 550 U.S. at 556 (emphasis added), and to 'nudge' their claims across the line from conceivable to plausible." *Id.* at 570. "[A] well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and that recovery is very remote and unlikely." *Id.* at 556; *Courie v. Alcoa Wheel & Forged Prods*, 577 F.3d 625, 630 (6th Cir. 2009) (quoting *Twombly*).

Courts interpreting *Twombly* have consistently stated that the applicable standards governing assessment of a motion to dismiss antitrust claims are still tethered to the concept of notice pleading. *Aktieselskabet AF 21 v. Fame Jeans Inc.*, 525 F.3d 8, 15 (D.C. Cir. 2008)

12

("*Twombly* leaves the long-standing fundamentals of notice pleading intact"); *Broadcom Corp. v. Qualcomm Inc.*, 501 F.3d 297, 317 (3d Cir. 2007) (antitrust complaints are subject to Rule 8); *Airborne Beepers & Video, Inc. v. AT&T Mobility L.L.C.*, 499 F.3d 663, 667 (7th Cir. 2007) ("*Twombly* did not signal a switch to fact-pleading"); *In re Plasma-Derivative Protein Therapies Antitrust Litigation*, 2011 U.S. Dist. LEXIS 13279 at * 22 (W.D. Ill. 2011) ("Rule 8 applies").

Although a complaint must contain factual allegations "to raise a right to relief above the speculative level, Rule 8 does not mandate that a complaint contain 'detailed factual allegations.'" *Sensations Inc. v. City of Grand Rapids*, 526 F.3d 291, 295-96 (6th Cir. 2008).  As this Court has recognized, a complaint exhibits "facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Harchar v. U.S.*, 435 B.R. 480 (N.D. Oh. 2010) (Zouhary, J.); *Continental Cas. Co. v. Auto Plus Ins. Agency, LLC*, 676 F. Supp. 2d 657, 661 (N.D. Oh. 2009) (Zouhary, J.); *accord HCRI TRS Acquirer, LLC v. Iwer*, 708 F. Supp. 2d 687, 690 (N.D. Oh. 2010) (Zouhary, J.).

Moreover, the Supreme Court has made clear that "[t]he character and effect of a [Sherman Act] conspiracy are not to be judged by dismembering it and viewing its separate parts."  *Continental Ore Co. v. Union Carbide and Carbon Corp.,* 370 U.S. 690, 699 (1962); *see also In re Pressure Sensitive Labelstock Antitrust Litig.*, 566 F. Supp. 2d 363, 373 (M.D. Pa. 2008) ("[a] district court must consider a Complaint in its entirety without isolating each allegation for individualized review"); *see In re Flash Memory Antitrust Litig.*, 643 F. Supp. 2d 1133, 1142 n.7 (N.D. Cal. 2009) (same); *Jung v. Ass'n of Am. Med. Coll.*, 300 F. Supp. 2d 119, 155 (D.D.C. 2004) (same); *In re NASDAQ Market-Makers Antitrust Litig.*, 894 F. Supp. 703, 712 (S.D.N.Y. 1995) (same).  Moreover, multiple instances of improper conduct "make it far less

likely that a business justification exists for all of the acts taken in total." *In re Southeastern Milk Antitrust Litig.*, 555 F. Supp. 2d 934, 943-44 (E.D. Tenn. 2008).

Defendants also argue that the CAC is insufficiently specific because it does not contain a "who, what, when, and where" for every meeting and communication in furtherance of the conspiracy. The Supreme Court in *Twombly* disavowed this approach, stating that it did not "require heightened fact pleadings of specifics." 550 U.S. at 570; *see In re Packaged Ice Antitrust Litig.*, 723 F. Supp. 2d. 987, 1005 (E.D. Mich. 2010). "In reaching this conclusion, we do not apply any 'heightened' pleading standard, nor do we seek to broaden the scope of Federal Rule of Civil Procedure 9." *Twombly*, 550 U.S. at 569 n.14. The Court further stated that heightened pleading requirements must be obtained "by the process of amending the Federal Rules and not by judicial interpretation." *Id. (quoting Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 515 (2002)).

Citing *Twombly*, the Supreme Court reiterated in *Erickson v. Pardus*, 127 S. Ct. 2197 (2007), that "Federal Rule of Civil Procedure 8(a)(2) requires only 'a short and plain statement of the claim showing that the pleader is entitled to relief.' Specific facts are not necessary; the statement need only 'give the defendant fair notice of what the … claim is and the grounds upon which it rests.'" *Id.* at 2200.

Courts since *Twombly* have, for this reason, rejected Defendants' demand for heightened specificity beyond that required by Fed. R. Civ. P. 8. *In re Packaged Ice Antitrust Litig.*, 723 F. Supp. 2d 987 (E.D. Mich. 2010); *In re Graphics Processing Units Antitrust Litig.*, 540 F. Supp. 2d 1085, 1095-96 (N.D. Cal. 2007); *In re Urethane Antitrust Litig.*, 683 F. Supp.2d 1214, 1234 (D. Kan. 2010); *see also Starr v. Sony BMG Music Entm't*, 592 F.3d 314, 323 (2d Cir. 2010), *cert. denied*, 131 S. Ct. 901 (U.S. 2011) ("[P]laintiffs were not required to mention a specific

14

time, place or person involved in each conspiracy allegation"); *In re Southeastern Milk Antitrust Litig.*, 555 F. Supp. 2d at 934 (the "who, what, when and where" not mandated by *Twombly*);[3] *see also City of Moundridge v. Exxon Mobil Corp.*, 250 F.R.D. 1, 4 (D.D.C. 2008). "[S]hort of being in the boardroom at the meeting, it is hard … to imagine how plaintiffs could more fulsomely allege that defendants entered into an agreement." *In re Rail Freight Surcharge Antitrust Litig.*, 587 F. Supp. 2d 27, 34 (D.D.C. 2008).  Even at summary judgment, "direct evidence of a conspiracy is rare." *In re Citric Acid Litig.*, 996 F. Supp. 951, 956 (N.D. Cal. 1998).

Defendants' effort to compare the CAC here to the complaint dismissed in *Twombly* is utterly misplaced.  While the CAC here provides page after page of details of Defendants' specific conspiratorial conduct (meetings, phone conversation, exchanges of pricing information, etc.), and does so in the context of active government investigations of that conduct with cooperating witnesses, the complaint in *Twombly* contained no such details or specificity. Rather, as the Supreme Court noted, the *Twombly* complaint proceeded "exclusively via allegations of parallel conduct" – that is, in *Twombly* "the CAC [left] no doubt that plaintiffs rest their § 1 claim on descriptions of parallel conduct and not on any independent allegation of actual agreement" among the defendants.  *Twombly*, 550 U.S. at 564, and 565 n. 11.[4]

---

[3] Defendants cite *In re LTL Shipping Services* for the proposition that "for allegations of conspiracy to reach the plausibility threshold required by *Twombly*, they often must include factual allegations such as the specific time, place, and persons involved in the conspiracy alleged." 2009 U.S. Dist. LEXIS, 44276 at * 45. (N.D. Ga. 2009) This is not the same as a requirement that every act of collusion must be so identified, or else Rule 9(b) requirements would be adopted for antitrust pleadings, a proposition that no court has accepted. *In re Municipal Derivatives Litig.,* 700 F. Supp. 2d 378, 391 (S.D.N.Y. 2010). Consistent with this, *LTL Shipping* states in the next unquoted sentence: "In several cases in which district courts have denied motions to dismiss antitrust conspiracies, the plaintiffs were able to allege specific dates, or at least a specific limited date range, during which the defendants were thought to have reached an anticompetitive agreement. In *In re OSB Antitrust Litig.*, 2007 U.S. Dist. LEXIS 56573 (E.D. Pa. 2007), the plaintiffs alleged that the defendants reached a tacit agreement on or about June 1, 2002, to raise oriented strand board." *In re LTL Shipping Services Antitrust Litig.*, 2009 U.S. Dist. LEXIS 14276 at * 45-46.

[4] Courts have consistently recognized that the allegations in *Twombly* involved mere parallelism and nothing more. *E.g., Fair Isaac Corp. v. Equifax Inc.*, 2008 WL 623120, at *5 (D. Minn.  2008) ("The *Twombly* plaintiffs'

Plaintiffs in *Twombly* were two customers of their local telephone company alleging that the major incumbent local exchange carriers ("ILECs") had conspired for seven years not to compete with each other for customers outside their respective market areas. As factual support for their claim, plaintiffs argued that the Telecommunications Act of 1996 had not led to expected competition among the defendants because the ILECs did not compete with one another outside their traditional territories following deregulation. 550 U.S. at 566.  The Supreme Court in *Twombly* questioned whether such a complaint merely alleging "certain parallel conduct unfavorable to competition, absent some factual context suggesting agreement, as distinct from identical independent action" could survive a motion to dismiss. *Id.* at 557. The Court said no, finding that the complaint there contained no more than an "allegation of parallel conduct and a bare assertion of conspiracy," *id.*, and  noting that the ILEC's alleged parallel conduct itself was no more than a continuation of the "natural" and "routine market conduct" that had  preceded deregulation. *Id.* at 566. *See also id.* At 565 n. 11 (*Twombly* complaint proceeded "exclusively via allegations of parallel conduct"); *id.* 564 (*Twombly* complaint did not include "any independent allegation of actual agreement among the [defendants]"). The Complaint alleged parallel practices by the defendants and contained "a few stray statements" of an agreement by defendants to stay out of each other's markets.  *Id.*  Despite occasional reference in the Complaint to an unlawful agreement, "[t]he nub of the Complaint…is [defendants'] parallel behavior."  *Id.* at 565.

Here, by contrast, the CAC is loaded with precisely the type of "factual enhancements," including details of times, places and people involved, that the Supreme Court said will move a

---

allegations of an illegal §1 agreement rested exclusively on the parallel conduct of the defendant regional telecommunications providers"); *City of Moundridge v. Exxon Mobil Corp.*, 250 F.R.D. at 6 n.3 (D.D.C. 2008) ("Unlike in *Twombly*, the plaintiffs here do not rely on only bare allegations of parallel behavior").

complaint across the line from "possibility to plausibility of entitlement to relief." 550 U.S. at 556.  The CAC is far across that line.

**B.      The CAC's Non-Conclusory Factual Allegations Must Be Accepted as True at the Motion to Dismiss Stage.**

According to Defendants, unless factual allegations specifically cite emails, documents, or recorded conversations, they are "conclusory" and need not be accepted as true, even at the motion to dismiss stage.  (Def. Br. 15-16.)  This, of course, is not how courts define "conclusory" pleadings.  Rather, "conclusory" allegations are "labels and conclusions" or "formulaic recitation[s] of the elements of cause of action." *Twombly*, 550 U.S. at 555; *accord Jones v. City of Cincinnati*, 521 F.3d 555, 559 (6th Cir. 2008) ("We need not accept as true legal conclusions or unwarranted factual inferences").

The paragraphs that Defendants purport to characterize as "conclusory" are actually factual allegations describing such matters as (a) details of the alleged conspiracy as described to the government by cooperating Vitafoam witnesses, *e.g.,* CAC ¶¶ 62-87, 90-96, 113-120; (b) market factors that support the existence of a conspiracy, *id.* ¶¶ 122-25, 127, 129; and (c) fraudulent concealment of the conspiracy. *Id.* ¶¶ 130-60.  These portions of the CAC are not remotely "labels" or "formulaic recitations" of elements of a claim, and they also help provide the "framework of [the] CAC," *Iqbal*, 129 S. Ct. at 1950, in the context of the numerous factual details of defendants' conspiratorial conduct.

Among the remarkable details included in the CAC here are specific names and job titles of individuals that participated in the alleged conspiracy that has emerged from ongoing investigations in the U.S. and Canada.  It is the *absence* of such specificity that a Defendant would normally criticize in a *Twombly* motion.

Here, Defendants, however, remarkably argue that such specificity does nothing to make the conspiracy more plausible because, according to Defendants, the relevant paragraphs of the CAC do no more than identify the names and positions of "defendant's relevant employees." (Jt. Br. 15)  But this is just false.  For example, the CAC paragraphs at issue state that:

> Eight specific Vitafoam personnel "participated in these discussions with other Defendants to share information about and reach agreement on price increases." CAC ¶ 70.

> "The former President of Vitafoam, along with his subordinates, had conspiratorial discussions during the Class Period as described above with other Defendants regarding fixing prices and allocating customers including specified individuals from Foamex, Carpenter, Future Foam, Hickory Springs and Valle. *Id.* ¶ 72.

> A former Vice President of Vitafoam engaged in "conspiratorial conduct during the Class Period with many individuals employed by many competitors, including at least Valle, Carpenter, Woodbridge, Flexible Foam, Hickory Springs, Domfoam, Scottdel, and Foamex. The communications involved discussions of price increase percentages and effective dates of such increases, typically by telephone."  Ten individuals are specifically identified. *Id.* ¶ 74.

> Witness A, an employee of Vitafoam, "had discussions, exchanges of information and agreements regarding the price of foam with the following contacts within the foam industry." The CAC identifies thirteen of these individuals, including Vinnie A. Bonaddio and Don Phillips of Foamex, Tony Vallecoccia of Vallefoam, John Howard of DomFoam International, John Vins of Ottobock, Bill Baughman of Plastomer, Mike Cotter and Ken Miya of Inoac International Co., Todd Councilman of Hickory Springs, Mike Crowell of Flexible Foam Products, Mel Himel of Vita, Buster Mann of Hickory Springs, and Jorge Canamero of CMI Automotive. *Id.* ¶ 83.

> The President of Vitafoam "participated in conspiratorial discussions concerning pricing" with eleven identified individuals, including Bill Lucas of Vitafoam; Donald Phillips and Vincent Bonaddio of Foamex; Michael Crowell of Flexible Foam; Tony Vallecoccia of Valle; Stanley Pauley of Carpenter; Don Simpson, Buster Mann and Lee Lunsford of Hickory Springs; and, Bruce Schneider and Robert Heller of Future Foam. "These discussions led to a clear understanding and agreement that the participants would discuss and implement coordinated price increases on the same effective date." *Id.* ¶ 92.

(emphasis added).

18

## II.    THE CAC ADVANCES MORE THAN SUFFICIENT FACTS TO SUGGEST A "PLAUSIBLE" CONSPIRACY.

### A.    Following *Twombly*, No Court Has Dismissed a Complaint With Specific Allegations of Criminal Conduct such as in this Case.

The essential elements of a Sherman Act Section 1 claim are: (1) a contract, combination or conspiracy (2) affecting interstate commerce (3) which imposes an unreasonable restraint of trade. *White and White, Inc. v. American Hosp. Supply Corp.,* 723 F.2d 495 (6th Cir. 1983); *Sokol v. Akron General Medical Center*, 1997 U.S. Dist. LEXIS 22078 (N.D. Ohio 1997). Horizontal price fixing, bid rigging, and market division of the type alleged here are *per se* violations of Section 1 of the Act. *U.S. v. Koppers Co.*, 652 F.2d 290, 293 (2d Cir. 1981); *see Glen Eden Hospital, Inc. v. Blue Cross & Blue Shield, Inc.*, 740 F.2d 423, 430 (6th Cir. 1984) (price fixing has been per se illegal since the early years of antitrust enforcement).

Defendants argue that an industry-wide conspiracy claim, encompassing, for example, the time periods and products in the CAC, is implausible here. But at no point do Defendants suggest that Plaintiffs have failed to allege violations of the antitrust laws, and instead they assault the breadth of the Complaint through a series of piecemeal attacks.

The pleading standards argued by Defendants here conflict with the standards argued by certain Defendants as opt out plaintiffs in *In Urethane Antitrust Litig.*  In that case, defendants Carpenter and Woodbridge, as plaintiffs, filed a Complaint alleging a conspiracy period from 1994 to 2004. *In re Urethane Antitrust Litig.*, 683 F. Supp. 2d at 1219.  After the Court granted a motion to dismiss claims for the period 1994 to 1999 and denied the motion for the period 1999 to 2004, Woodbridge and Carpenter amended their Complaint again, and the District Court then denied a motion to dismiss for the full period 1994 to 2004 for reasons applicable here:

> Defendants argue that the new allegations are still too vague to satisfy the *Twombly* pleading standards. In that regard, defendants argue that plaintiffs have failed to allege specifically the particular dates, participants, products discussed,

<u>markets discussed, agreements reached, and actions taken as a result for each meeting or communication alleged for that time period, as well as the specific way in which all of the meetings and communications were connected.</u> The Court rejects defendants' argument that plaintiffs have not pleaded sufficient non-conclusory facts to state a plausible claim for the pre-1999 period.

<u>Once again, defendants have attempted to impose an overly strict pleading standard.</u> As noted above, in *Urethane III* the Court based its decision on plaintiff's failure to allege any meetings or communications occurring prior to 1999 or to provide any basis for extending the alleged conspiracy back to 1994. Plaintiffs have corrected that omission in their second amended complaints. First plaintiffs have now alleged various meetings and communications dating back at least to 1994, involving specific participants (plaintiffs have now identified 21 executives involved during that time period, including at least one from each defendant), and occurring in specific locations. <u>Contrary to defendants' argument, plaintiffs are not required to allege every detail for every meeting or communication occurring during the relevant time period</u>. Rather, plaintiffs need only allege enough facts to support a plausible claim of the existence of a conspiracy that does not merely rest on purely conclusory allegations. Plaintiffs have done so here. <u>The applicable standard is not whether any unanswered questions remain about the alleged meetings and communications during the time period, as defendants seem to suggest</u>.

683 F. Supp.2d at 1234 (emphasis added),

Sister courts in the Sixth Circuit also make clear that the allegations in this case are more than sufficient to find a plausible conspiracy. In *In re Packaged Ice Antitrust Litig.*, 723 F. Supp. 2d 987 (E.D. Mich. 2010), a complaint sufficiently pleaded a plausible conspiracy where allegations included criminal guilty pleas, DOJ and state attorney general investigations, insider admissions, and a market structure conducive to conspiratorial conduct. *Id.* at 1003; *accord Hyland v. Homeservices of Am., Inc.,* 2007 U.S. Dist. LEXIS 47503at *3 (W.D. Ky. 2007) (denying motion to reconsider following *Twombly* where allegations included DOJ enforcement action, some admissions of price fixing, and an exchange of price information).

Recent decisions in other circuits also demonstrate that allegations such as found in the CAC or far less substantial allegations are sufficient to find a plausible conspiracy under *Twombly*. *In re Municipal Derivatives Antitrust Litig.*, 700 F. Supp. 2d 378 (S.D.N.Y. 2010); *In*

20

*re Aftermarket Filters Antitrust Litig.*, 2009 U.S. Dist. LEXIS 104114, at *3 (N.D. Ill. 2009); *In re Chocolate Confectionary Prods. Antitrust Litig.*, 602 F. Supp. 2d 538, 574-77 (E.D. Pa. 2009); *In re ATM Fee Antitrust Litig.*, 2009 U.S. Dist. LEXIS 83199 (N.D. Cal. 2009); *In re Air Cargo Shipping Servs. Antitrust Litig.*, 2009 U.S. Dist. LEXIS 88404 (E.D.N.Y. 2009); *In re TFT-LCD (Flat Panel) Antitrust Litig.*, 586 F. Supp.2d 1109 (N.D. Cal. 2008); *In re Static Random Access Memory (SRAM) Antitrust Litig.*, 580 F. Supp. 2d 896, 902-904 (N.D. Cal. 2008); *In re Southeastern Milk Antitrust Litig.*, 555 F. Supp. 2d at 944.

In a late 2010 decision from the Seventh Circuit reviewing a Complaint on interlocutory appeal, Judge Posner emphasized that allegations of "a mixture of parallel behaviors, details of industry structure, and industry practices that facilitate collusion," in combination with "anomalous [pricing] behavior," are sufficient to survive a motion to dismiss. *In re Text Messaging Antitrust Litig.*, 630 F.3d 622, 627-29 (7th Cir. 2010), *cert. denied*, 2011 U.S. LEXIS 3339 (2011).  Conspicuously absent from the *Text Messaging* allegations was "the smoking gun in a price-fixing case: direct evidence, which would usually take the form of an admission by an employee of one of the conspirators, that officials of the defendants had met and agreed explicitly on the terms of a conspiracy to raise price." *Id.* at 628. The court found the allegations plausible even though the complaint there did not contain precisely what the CAC contains here – direct evidence of the defendants conspiring from one of the conspirators itself. *See also In re Blood Reagents Antitrust Litig.*, 2010 U.S. Dist. LEXIS 86930, at *6-7, *reconsideration denied*, 2010 U.S. Dist. LEXIS 134261 (E.D. Pa. 2010) ("factual enhancements" – including price increases, closely aligned contract cancellation, and substantially improved profit margin at the beginning of the conspiracy – were sufficient when combined with parallel pricing to find allegations of conspiracy plausible); *K & S Associates, Inc. v. Am. Ass'n of Physicists in Med.*,

2011 U.S. Dist. LEXIS 7739 (M.D. Tenn. 2011) (allegations of group boycott implemented through trade association accreditation process sufficient under *Twombly*).

The Northern District of Illinois recently held that a complaint adequately alleged a conspiracy where there was, unlike here, no DOJ investigation, no cooperating witness, and no detailed list of conspiratorial conduct.  *In re Plasma-Derivative Protein Therapies Antirust Litig.*, 2011 U.S. Dist. LEXIS 13279 (N.D. Ill. 2011). In *Plasma-Derivative Protein Therapies*, plaintiffs alleged that two manufacturing defendants and a trade association they controlled conspired to restrict supply for therapies that are used to treat various immune deficiency and other diseases. *Id*. at *1. Following comments from the Federal Trade Commission in relation to an abandoned merger by one of the defendants, plaintiffs alleged that defendants engaged in a wide-spread conspiracy to restrict supply, and hence increase prices. *Id*. at *2. The court stated that the allegations "on their own" were not "particularly suggestive" of a conspiracy. 2011 U.S. Dist. LEXIS 13279, at *8. Nonetheless, based on "plus" factors alone, the court found the allegations of conspiracy plausible, and denied the defendants' motions to dismiss.  *Id*. at *9.

In support of their argument, Defendants principally rely on *In re Travel Agent Commission Antitrust Litig.*, 583 F.3d. 896 (6th Cir. 2009), but there the Sixth Circuit upheld the district court's dismissal of the complaint because plaintiffs had alleged only that the airlines had the opportunity to conspire. In 583 F.3d at 905; *see Packaged Ice Antitrust Litig.*, 723 F. Supp. 2d at 1007 (distinguishing *In re Travel Agent Commission Antitrust Litig.*, because "this is not a parallel conduct/bare assertion of conspiracy case").[5] Defendants' reliance on *Total Benefits*

---

[5] Defendants' other "*Twombly*" cases are also inapposite. *Jacobs v. Tempur-Pedic, Int'l. Inc.,* 626 F.3d 1327, 1343 (11th Cir. 2010) (dismissing antitrust claim against manufacturer's distribution policy as a horizontal restraint*); Kendall v. Visa U.S.A. Inc.*, 518 F.3d 1042, 1048 (9th Cir. 2008) ( "Appellants failed to plead any evidentiary facts beyond parallel conduct"); *Anderson News, LLC v. Am. Media, Inc.*, 732 F. Supp.2d 389, 405 (S.D.N.Y. 2010) ("Wholesaler that alleged that publishers' parallel conduct consisted of cutting off wholesaler's magazine supply failed to state claim under § 1"; "there are no allegations of direct evidence of a conspiracy"); *LaFlamme v. Societe*

*Planning Agency, Inc. v. Anthem Blue Cross & Blue Shield*, 552 F.3d 430, 435-36 (6th Cir. 2008) is also misplaced, a case in which the Sixth Circuit affirmed dismissal because, *inter alia*, no agreements between horizontal competitors were even alleged.

**B.** **Government Investigations and Witness Cooperation Corroborate the Plausibility of the Alleged Conspiracy.**

The CAC describes, as the government has disclosed to the Court, a grand jury investigation of antitrust violations in the polyurethane foam industry. The investigation arose because defendant Vitafoam made a leniency application which required it to "admit its participation in a criminal antitrust violation involving price fixing." CAC ¶ 61. Moreover, in order for the DOJ to institute a grand jury investigation, a Department of Justice attorney must "believe[] that a criminal violation of the antitrust laws has occurred" and prepare a detailed memo to that effect. *Antitrust Grand Jury Practice Manual*, Vol. 1, Ch. I.B.1.

Further, as set forth above, an Information sworn under oath from the Bureau of Competition in Canada to support search warrant confirms the existence of "discussions, exchanges of information and agreements regarding the price of foam." CAC ¶ 83. The violations of law identified in the affidavit concern conduct both "in Canada and in the U.S." CAC ¶ 84.

---

*Air France*, 702 F. Supp.2d 136, 154-55 (E.D.N.Y. 2010) ("allegations in the Complaint, 'however true,' do not allow the court to infer any 'more than the mere possibility of misconduct'"); *In re Hawaiian & Guamanian Cabotage Antitrust Litig.*, 647 F. Supp.2d 1250, 1256 (W.D. Wash. 2009) (granting motion to dismiss where complaint made three categories of allegations; (1) "bare allegations" of exchanges of information in trade associations; (2) evidence of antitrust violations in a different ocean; (3) parallel activities); *In re Cal. Title Ins. Antitrust Litig.*, 2009 U.S. Dist. LEXIS 43323 *18 (N.D.Cal. 2009) (common membership in rate setting organization in other states provided opportunity to collude on rates in California, but "opportunity, without more, is not a plausible basis to suggest a conspiracy"); *In re Parcel Tanker Shipping Servs. Antitrust Litig.*, 541 F. Supp.2d 487, 492 (D.Conn. 2008) (dismissing predatory pricing claim, "Nowhere does the complaint cite to specific wrongful acts of specific defendants"); *In re Late Fee & Over Limit Fee Litig.*, 528 F. Supp.2d 953, 956 (N.D. Cal. 2007) ( "plaintiffs contend that alleging such opportunities and incentives, together with the partially parallel conduct, states a claim").

Government investigations are probative of a conspiracy in the context of the myriad other factual allegations in the CAC. *Starr v. Sony BMG Music Entm't*, 592 F.3d at 325 investigation by the New York Attorney General, and two investigations by the DOJ plausibly suggested an illegal agreement; *In re Blood Reagents*, 2010 LEXIS 86930, at *7 ("existence of a parallel criminal investigation—an allegation demonstrating that the government believes a crime may have occurred—and the result is 'enough fact to raise a reasonable expectation that discovery will reveal evidence of an illegal agreement'").[6]

This is particularly the case here where the government investigation is based on an amnesty applicant confessing to price fixing, as well as sworn affidavits from government officials attesting to evidence of antitrust violations.

The cases defendants cite on this point are inapposite. In *In re Travel Agent Comm'n Antitrust Litig.*, 2007 U.S. Dist. LEXIS 79918, *aff'd.*, 583 F.3d 896 (6th Cir. 2009), for example, the court merely found that allegations of completely unrelated investigations in the industry, some of which dated back to the 1980s, did not make the conspiracy more plausible.

In *In re Graphics Processing Units Antitrust Litig.* 527 F. Supp. 2d 1011, 1024 (N.D. Cal. 2007), the court found the existence of a DOJ investigation to be "a non-factor" in a complaint that initially alleged an opportunity to conspire (in stark contrast to the detailed allegations here of meetings and communications among Defendants). However, after that, the Court granted leave to replead. The Court then *upheld* the resultant amended complaint which alleged an industry-wide conspiracy to fix the prices of many types of graphics processing units going back to 2003. *In re Graphics Processing Units Antitrust Litig.*, 540 F. Supp. 2d at 1089

---

[6] *See In re Packaged Ice Antitrust Litig.*, 723 F. Supp. 2d at 1008-09 (government investigations and pleas); *Hyland*, 2007 U.S. Dist. LEXIS at *3 (noting prior government enforcement efforts in denying motion to dismiss); *In re Flash Memory Antitrust Litig.*, 643 F. Supp. 2d at 1149 (same).

("*GPUs II*"). With respect to the amended complaint, the court rejected defendants' contention concerning a lack of specificity:

> Finally, defendants point out that plaintiffs have still not come up with specific allegations of meetings or actions in furtherance of the alleged conspiracy. Plaintiffs so concede. But as the prior order on defendants' motions to dismiss noted, direct allegations of conspiracy are not always possible given the secret nature of conspiracies. Nor are direct allegations necessary.

*Id*. at 1095-96. If the complaint in *GPUs II* could survive, the CAC is indisputably sufficient.

### C. These Allegations Against Defendants Have Been Deemed Sufficient to Support Wide Ranging Discovery.

As noted above, a number of Defendants in this case have filed individual "opt out" lawsuits in *In re Urethane Antitrust Litig.* Alleging a conspiracy to fix prices and allocate markets for polyether polyols and related products which are materials for polyurethane foam. These polyether polyols ingredients such as polyol and TDI described in the CAC here are known as "Urethanes."[7]  Defendants there have sought broad discovery of the allegations in this case, and the Court recently granted a motion to compel that discovery. *In re Urethane Antitrust Litig.*, No. 04-1616 JWL, Memo Op. (D. Kan. Apr. 5, 2011), attached as Exhibit 1. (4/5/11 Memo. Op.) The Court, in its ruling on the motion to compel, noted the existence of the grand jury investigation of polyurethane foam as well as an FBI affidavit supporting search warrants of "various foamers." *Id.* at 2.[8] The Court also noted that one ground for opposing this discovery was that the opt out plaintiffs– and defendants in this case —argue that "the FBI affidavit reveals a risk that deponents could be asked incriminating questions." *Id.* at 5. The Court went on to explain why discovery would proceed in *Urethane* on the "foamer" conspiracy:

---

[7] Defendants in this action filing lawsuits in *In re Urethane Antitrust Litig.,* according to the docket sheet in that action, include Carpenter Co., E.R. Carpenter, L.P., Crest Foam Industries, Inc., Flexible Foam Products, Inc., Hickory Springs Manufacturing Company, Leggett & Platt Inc., Vitafoam Incorporated, and Woodbridge Foam Corporation, Woodbridge Foam Fabricating, Inc.

[8] Search warrants based on probable cause further support the existence of a "plausible" conspiracy.

> Evidence that plaintiffs were willing to accept [Urethane] increases by defendants would be similarly relevant…because plaintiffs' own conspiracy made them willing to accept the higher prices without complaint. Thus the evidence is relevant to whether defendants engaged in a conspiracy in the first place. <u>Although plaintiffs dismiss these arguments as unfounded speculation, the FBI affidavit provides evidence that the foamers used defendants' price increases as a pretext for their own increases.</u>

*Id.* at 12-13 (emphasis added).

The granting of the motion to compel in *Urethane* is also relevant to *Twombly's* reference, which Defendants cite, to the expense of discovery in an antitrust case. This concern is mitigated here by the strength of the CAC allegations, but also because discovery will go forward on conspiracy issues in the *Urethane* litigation. The court in *Urethane* has permitted wide ranging discovery to proceed with respect to the "foamer" conspiracy, including interrogatories, document requests, 26 individual depositions and five 30(b)(6) depositions. 4/5/11 Memo Op. at 2-3.[9] Search terms and document custodians for searches have already been agreed upon. *Id.* at 10; Joint Status Report, Dkt. No. 1971. The Court also held, after reviewing objections to the proposed discovery that responding to the discovery was not shown to be an undue burden. *Id.*

## III. DEFENDANTS' PARSING OF THE CAC CANNOT SUPPORT A MOTION TO DISMISS.

Defendants' *Twombly* argument consists of improper parsing of the components of the CAC – time periods, products, customer allocation, etc. – and arguing that individual allegations standing alone fail to support the existence of a conspiracy. It has long been established that allegations in a price-fixing case are to be considered as a whole, and not on a piecemeal basis. *Continental Ore Co.*, 370 U.S. at 699 ("The character and effect of a conspiracy are not to be judged by dismembering it and viewing its separate parts, but only by looking at it as a whole").

---

[9] Since the April 5 order in *Urethane*, the Department of Justice has requested that depositions be deferred in coordination with the Order of this Court. Dkt No. 1975.

Further, all that is needed to establish a single conspiracy is evidence showing that the conspirators agreed to participate in what they knew to be a collective venture directed toward a common goal. *U.S. v. Warner*, 690 F.2d 545, 549 (6th Cir. 1982). The conspirators need only be aware of the "essential nature of the plan and their connection with it." *Blumenthal v. U.S.*, 332 U.S. 539, 557 (1947); *U.S. v. Pickett*, 746 F.2d 1129, 1134 (6th Cir. 1984), *cert. denied*, 105 S. Ct. 1222 (1985). A "single conspiracy does not become 'multiple conspiracies' merely because 'each member did not know of or become involved in all of the activities in furtherance of the conspiracy.'" *U.S. v. McLernon*, 746 F.2d 1098, 1107-08 (6th Cir. 1984), *quoting Warner*, 690 F.2d at 549; *U.S. v. Gravier*, 706 F.2d 174, 178 (6th Cir. 1983), *cert. denied*, 464 U.S. 996 (1983). When "the separate means and methods [are] connected to each other not only by a common plan [to allocate projects and rig bids], but also by a substantial identity of each of the defendants and co-conspirators in agreeing to and carrying out the [conspiracy]" "the evidence [is] consistent only with the existence of one overall conspiracy." *U.S. v. Am. Radiator & Standard Sanitary Corp.*, 433 F.2d 174, 196 (3d Cir. 1970), *cert. denied*, 401 U.S. 948 (1971).

In this circuit, it is well established that the existence of a single conspiracy or multiple conspiracies is a question of fact for the jury. *U.S. v. Hughes*, 895 F.2d 1135, 1140 (6th Cir. 1990); *accord U.S. v. Smith*, 320 F.3d 647, 652 (6th Cir. 2003). If the evidence could plausibly support the finding that a single conspiracy was proved, a defendant's multiple conspiracy contention must fail. *See U.S. v. Warner*, 690 F.2d at 548; *U.S. v. Grunsfield*, 558 F.2d 1231, 1238 (6th Cir. 1977), *cert. denied*, 434 U.S. 872 (1977); *U.S. v. Etheridge*, 424 F.2d 951, 963-65 (6th Cir. 1970), *cert. denied*, 400 U.S. 993 (1971).

The principle that the jury decides the scope of a conspiracy is equally recognized in criminal antitrust cases and in civil antitrust conspiracy cases. *In re Copper Antitrust Litig.*, 98 F.

Supp. 2d 1039, 1055 (W.D. Wis. 2000) (denying motion to dismiss and stating "[w]hether a conspiracy is single or multiple is a question of fact appropriately determined by a jury"); *accord U.S. v. Yonkers Contracting Co.*, 706 F. Supp. 296, 299-300 (S.D.N.Y. 1989); *U.S. v. American Honda Motor Co.*, 273 F. Supp. 810, 816 (N.D. Ill. 1967).

Nothing in *Twombly*—or any other case cited by Defendants—suggests that the question of whether allegations in the CAC or subsequent proof support the existence of a single, industry-wide conspiracy is appropriate for resolution and dismissal at the motion to dismiss stage. So long as there are allegations of plausible anticompetitive conduct involving named Defendants, the action must proceed because a violation of the antitrust laws has been pled.

The court in *In re Municipal Derivatives Antitrust Litig.*, 700 F. Supp. 2d 378 (S.D.N.Y. 2010) rejected the argument made here challenging based on *Twombly* the scope of a conspiracy:

> Defendants argue that Named Plaintiffs' claims should again be dismissed because "the SCAC fails to allege any facts showing a single conspiracy among all the defendants, or among any subset of defendants regarding the entire municipal derivatives industry. In essence, Defendants contend that even where the SCAC contains allegations of individual acts of wrongdoing, the allegations fail to specify the 'who, when or where' of each allegation of conspiratorial conduct and thus must be dismissed for failing to state an antitrust conspiracy claim. The Court disagrees. As described above, while conclusory allegations devoid of factual specificity are insufficient to survive a motion to dismiss, under *Twombly*, plaintiff must allege simply a factual basis sufficient to establish a plausible inference of an anticompetitive agreement among defendants. Further, *for pleading purposes, plaintiffs are not required to prove the existence of an alleged industry-wide conspiracy*.

700 Supp. 2d at 394 (citations omitted) (emphasis added). Similarly, in its grant of class certificatiaon based on allegations of a single conspiracy in *In re Scrap Metal Antitrust Litig.* No. 1:02cv0844 KMO, Memo Op. at 18 (N.D. Oh. Mar. 31, 2004), *aff'd.* 527 F.2d 917 (6th Cir. 2008), the Court explained: "Again, Plaintiffs have alleged a single conspiracy, Defendants may

not recharacterize the plaintiffs' allegations in order to garner support for their own arguments." Opinion attached as Exhibit 2.

This point is also exemplified by *Dahl v. Bain Capital Partners, LLC,* 589 F. Supp. 2d 112, 118-19 (D. Mass. 2008), where the court denied a motion to dismiss an antitrust claim alleging a single overarching conspiracy based on nine specific examples of rigged bids with some overlapping participants. In *In re Vitamins Antitrust Litig.,* 2000 WL 1475705 (D.D.C. 2000) ("*Vitamins*"), defendants moved to sever the allegations that related to them in plaintiffs' single price-fixing conspiracy claim, arguing that not one but three conspiracies existed, each based on different vitamins produced. Relying on *Continental Ore,* the district court denied the motion to sever portions of the single conspiracy claim, concluding that "it would be improper … to prejudge the scope of the conspiracy that plaintiffs allege." *Id.* at *17.

## IV.     DEFENDANTS' SPECIFIC ARGUMENTS AGAINST THE CAC MUST FAIL.

Even if Defendants' arguments are considered in isolation, each of these arguments fails to justify dismissal under *Twombly* or otherwise under Rule 8.

### A.      The CAC States an Appropriate Time Span for a Conspiracy.

Defendants contend that the CAC is deficient with respect to allegations of the "time span" and the failure to identify the initial date the conspiracy was formed. The plausibility of the conspiracy beginning by at least 1999 and continuing thereafter is supported by the specifics of the Complaint, the cooperating witnesses with DOJ, and the long periods for the conspiracy alleged by DOJ and Canadian authorities.  A search warrant issued by DOJ seeks records for the period January 1999 through the date of the search warrant. Excerpt, attached as Exhibit 3 hereto. An Affidavit from the Canadian Competition Bureau alleges anticompetitive conduct from "approximately 1979 to present." Excerpt, attached as Exhibit 4 hereto.  Further, the

agreed-to period for discovery ordered in *In re Urethane Antitrust Litig.* is January 1, 1994 to date.  Joint Status Report 4/8/011, Dkt No. 1971.

Defendants also allege that there are several years of the conspiracy for which there are no specific allegations. Defendants' argument that specific allegations are needed for each year of a conspiracy is contrary to established conspiracy law and has no relationship to any requirement of notice pleading, even after *Twombly*. Plaintiffs are not required to allege (or prove) acts during every year of a conspiracy. They are required to allege a plausible conspiracy. *Aftermarket Filters*, U.S. Dist. LEXIS 104114, at *3 (rejecting defendant's argument that failure to allege specific meetings between 1999 and 2004 meetings and communications a somehow renders a conspiracy from 1999 to 2004 implausible).  And every defendant who participated in any part of the conspiracy is liable for all acts of the conspiracy.

Defendants also misstate the specifics of the CAC concerning the frequency and time span of the allegations of collusion. For example, the CAC alleges numerous conspiratorial communications beginning in at least1999 and during the Class Period which defendants ignore:

> "Price increase discussions occurred approximately <u>two to three times per year.</u>" CAC ¶ 63.

> Price increases discussions "often coincided with the <u>bi-annual meetings</u> held by the Polyurethane Foam Association." *Id.*

> "When Defendants' raw material suppliers announced price increases for chemical ingredients of foam, such as polyols and TDI, Defendants contacted each other because this provided an opportunity to raise prices. *Id.* ¶ 64.

> "The former President of Vitafoam together with Defendants engaged in <u>frequent and regular</u> unlawful communications during the Class Period where they discussed and agreed to specific price increases and timing of announcements regarding the effective date of those increases." *Id.* ¶ 68.

> "Specifically, <u>each of the price increases</u> for flexible polyurethane foam <u>during the Class Period, going back to at least 1999 and until Vitafoam's entry into the</u>

> leniency program, were the result of conspiratorial discussions among Defendants on pricing." *Id.* ¶ 94.

> "Defendants routinely exchanged and reviewed each other's price increase letters in order to confirm that their conspiratorial agreements were being implemented." *Id.* ¶ 96.

> The CAC includes examples of communications in 2000 (*id.* ¶ 112a), 2004 (*id.* ¶¶ 88, 112b-d), 2005 (*id.* ¶¶ 112e-h), 2008 (*id.* ¶¶ 112i-l), 2009 (*id.* ¶¶ 93, 112m-o), 2010 (*id.* ¶ 89, 97-110)

> Numerous individuals are specifically identified as having conspiratorial discussions to fix prices and allocate customers during the Class Period.  *E.g. Id.* ¶ 70, 72, 74, 77-78, 82-83, 92.

(emphasis added).

Defendants ignore these allegations unless they note a specific year. As a result, their so-called dotplot graph (Jt. Br. 33) of the years of "alleged occurrences" also omits key allegations, including omission of dotplots for price increase discussions two to three times per year, frequent and regular communications about prices, routine exchanges of price increase letters, and all of the price increases for flexible polyurethane foam during the Class Period, each of which was the result of collusion.

Contrary to Defendants' arguments, the CAC also explains the origin of the conspiracy with remarkable clarity:

> "Defendants established a practice where they would communicate and reach an agreement or understanding on the percentage amount and timing of price increases and market allocation in the sale and supply of polyurethane foam." CAC ¶ 63.

> "The general pretext used to explain the conspiratorial price increases was increases in raw material costs." *Id.* ¶ 64.

> "The conspiracy, understanding and agreements regarding price increase percentage amounts among Defendants was the result of telephone conversations, exchanges of price increase letters, face-to-face meetings, and bilateral discussions among the competitors for the purpose of coordinating the amount and timing of price increases." *Id.* ¶ 65.

"The understanding and agreement was reached in actual discussions among competitors about the percentage of price increases, the dates of the increases, and how the conspirators would announce the increases with the same, or nearly the same, effective dates." *Id.* ¶ 66.

Defendants' argument on the failure of the CAC to allege the formation date of the conspiracy is also strange. According to Defendants, if the original date of their conspiracy is murky (due to their own conduct and acts of concealment), a complaint alleging a specific continuing conspiracy in recent years would somehow be deficient. No case supports or would support such a concept. For longstanding conspiracies such as this one, it is acceptable for the CAC to allege that the conspiracy began on or before the period for which relief is requested in the Complaint.[10]

For example, in *In re Urethane Antitrust Litig.*, 683 F. Supp.2d at 1219, the court upheld an amended complaint by Carpenter, Woodbridge, and others alleging a conspiracy period beginning in 1994. In dismissing part of a prior complaint, but permitting the amended complaint, the Court explained the distinction between alleging the formation of the conspiracy vs. the request for relief in the Complaint: "Plaintiffs may not need to allege meetings occurring at any particular intervals; they must at least provide a factual basis for their starting date, however, in order to show an *entitlement to relief beginning on that date*." *In re Urethane Antitrust Litig.*, 663 F. Supp.2d 1067, 1077 (D. Kan. 2009) (emphasis added). After the subsequent Second Amended Complaint alleged acts during the period beginning in 1994, the Court denied a motion to dismiss the amendment– an amendment alleging, similar to the CAC a

---

[10] Defendants argue that a conspiracy beginning in 1999 is inconsistent with the class periods alleged in some previous complaints, including a Complaint by Foam Factory alleging that, until November 2005, foam product prices were stable and included one price decline. That Complaint, however, contained none of the specific and direct information about the existence of a conspiracy before November 2005. In any event, substantial investigation has gone on since the referenced complaint and even if price stability did exist during a period, such stability itself may be the result of collusion.

conspiracy "from at least as early as 1994 and continuing through at least December 31, 2004" and even stating "the exact dates being unknown to Plaintiffs." 683 F. Supp. 2d at 1219; *see* Second Amended Complaint ¶ 47 (9/19/09), attached as Exhibit 3 hereto.[11].

Similarly, in *In re TFT-LCD (Flat Panel) Antitrust Litig.*, 586 F. Supp. 2d at 1109, the Court denied a motion to dismiss a complaint under *Twombly* alleging an antitrust conspiracy between January 1996 and December 11, 2006. Then on class certification, the court shortened the class period to the period January 1999 to December 11, 2006, as more prudent, while noting that courts have certified far longer class periods. *In re TFT-LCD (Flat Panel) Antitrust Litig.*, 267 F.R.D. 291 (N.D. Cal. 2010) (*citing In re Fine Paper Antitrust Litig.*, 82 F.R.D. 143 (E.D. Pa. 1979) (11 year class period); *In re Corrugated Container Antitrust Litig.*, 80 F.R.D. 244 (S.D. Tex. 1978) (18 year class period).

Defendants cite *In re LTL Shipping Serv. Antitrust Litigation*, 2009 U.S. Dist. LEXIS at 14276, for the proposition that the failure to allege the date of formation "alone requires dismissal." (Jt. Br. 16) The complaint in *LTL Shipping*, however, in contrast to the CAC here, offered no more than a "few distinct factual allegations. The majority of Plaintiffs' pleading [was] conjecture and argument." *Id.* *53. In *LTL Shipping,* the court found that "[r]ead as a consistent whole, Plaintiffs at most allege parallel pricing conduct." *Id.* *55. It was in that context that the court concluded that "the time period alleged – from 2003 to 2007 – is far too broad for the court to infer an agreement." *Id.* *67.[12]

---

[11] The Carpenter and Woodbridge Complaint in *In re Urethane Antitrust Litig.* also alleged that "while the exact dates are unknown to plaintiffs," certain defendants subsequently joined the conspiracy. Second Amended Complaint ¶ 50, attached as Exhibit 5 hereto.

[12] Defendants' other cases involve bare-bone or one or two paragraph complaints. *Dowdy & Dowdy P'ship v. Arbitron, Inc.*, 2010 U.S. Dist. LEXIS 107123 (S.D. Miss. 2010) ("the Complaint contains no factual support whatsoever to support the existence of a conspiracy. The Plaintiff does not offer a single fact to suggest that the Defendants ever agreed to restrain trade, communicated regarding the restraint of trade, or shared a common intent to restrain trade"); *RxUSA Wholesale, Inc. v, Alcon Labs, Inc.*, 661 F. Supp.2d 218, 233 (E.D.N.Y. 2009) (complaint failed to allege elements of § 2 claim; § 1 conspiracy claim was stated in one deficient paragraph which stated a "

B.      **The CAC States Each Defendants' Knowing Participation.**

Defendants also argue that there are insufficient facts establishing each individual Defendants' participation in the conspiracy.  As set forth in the separate Opposition to the individual motions to dismiss, under established Sixth Circuit law, the legal standard is whether the Complaint has plausibly alleged slight evidence of participation in a conspiracy by a Defendant. The specific allegations with respect to each defendant are also discussed in Plaintiffs' separate Omnibus Opposition to the individual motions to dismiss.

Defendants' Joint Brief does, however, mischaracterize the CAC as only naming individual employees of Defendants, and not identifying their conduct. The CAC not only specifically identifies individual companies and company employees, but also specifies what they did. Defendants, and specifically their named employees, among other allegations, "participated in these discussions with other Defendants to share information about and reach agreement on price increases," CAC ¶ 70; engaged in conspiratorial discussions during the Class Period "regarding fixing prices and allocating customers," *id.* ¶ 72; participated in "discussions of price increase percentages and effective dates of such increases, typically by telephone," *id.* ¶ 74; "had discussions, exchanges of information and agreements regarding the price of foam," *id.* ¶ 83; "participated in conspiratorial discussions concerning pricing" that "led to a clear understanding and agreement that the participants would discuss and implement coordinated price increases on the same effective date." *Id.* ¶ 92.

C.      **The CAC States a Plausible Conspiracy that Includes Customer Allocation.**

Defendants maintain that the CAC does not state a plausible claim for customer allocation, but the allegations of customer allocation are not a separate claim. The CAC

---

naked conclusion"); *In re Bath & Kitchen Fixtures Antitrust Litig.*, 2006 U.S. Dist. LEXIS 49576 (E.D. Pa. 2006) ("The plaintiffs devote only two paragraphs of the consolidated and amended Complaint to describing the antitrust violations").

here alleges a single claim for relief arising from defendants' restraints of trade in

violation of the antitrust laws.  CAC ¶¶ 154-155. The CAC further states:

> "***In furtherance of the unlawful conspiracy***, each of the Defendants and their
> coconspirators [has] committed overt acts, including, inter alia: a. agreeing to
> charge prices at certain levels and otherwise to fix, increase, maintain and/or
> stabilize prices of polyurethane foam sold in the U.S.; b. participating in meetings,
> conversations, and communications with co-conspirators regarding prices to be
> charged for polyurethane foam; c. ***agreeing to allocate customer***s; d. meeting
> with co-conspirators in order to keep the existence of the conspiracy unknown…."

CAC ¶ 156 (emphasis added).

The allegations of customer and market allocation are thus among the numerous factors

that support the existence of an antitrust conspiracy in the flexible polyurethane foam market.

For example, during conversations on May 20, 2010, John Howard, the President of Domfoam,

complained to the Vice President of Domfoam, that Vitafoams salespersons were "selling at or

quoting low low prices" and going after "accounts they never sold at."  CAC ¶ 100. Howard

further admitted that he *prohibited* his sales people from "going to battle" and "going after

[Vitafoam's] accounts." *Id.* ¶¶ 100-02. Five days later, Howard called the former Vice President

of Vitafoam again and admitted that Domfoam and Vitafoam have "stayed out of each other's

way for some time … and [that] dropping prices is only going to benefit the customers." *Id.*

Howard stated:  "We do the same thing with Foamex, we don't go after their accounts. Haven't

for a while … Just kind of stayed away and they've stayed away from our accounts too, so prices

have been fairly stable. There ain't much business out there and dropping prices and only the

customers are going to benefit."  *Id.* ¶ 101. That same day, Howard left a second voicemail for

the Vice President of Vitafoam in which he admitted he is "quite happy" to "continue to hold our

sales guys off" from competing for customers at low prices. *Id.* ¶¶ 100-02.

Defendants' attempt to characterize these collusive discussions as "competitive decisions

based on independent assessment of market conditions" is a self-serving fiction.  (Jt. Br. 22.)

35

Contrary to Defendants' argument, there is nothing "competitive" or "independent" about calling the vice president of a competitor to complain that its prices are too low and his salespersons are competitive. To the contrary, these direct communications between competitors are emblematic of a conspiracy to fix a price.

These arguments also improperly fail to accept the non-conclusory, factual allegations of the CAC as true or to construe the allegations in favor of plaintiffs. *In re Blood Reagents Antitrust Litig.,* 2010 U.S. Dist. LEXIS at * 12 (*Twombly* does not require "an antitrust plaintiff to plead facts that, if true, definitely rule out all possible innocent explanations"); *see also Pension Comm. of the Univ. of Montreal Pension Plan v. Banc of Amer. Sec., LLC*, 568 F.3d 374, 382 (2d Cir. 2009).

### D.     The CAC States a Plausible Conspiracy for the Defined Product of Polyurethane Foam.

Defendants argue that Plaintiffs' allegations of a conspiracy to fix prices of flexible polyurethane foam must fail because the market includes a diverse set of products, and the CAC's allegations are insufficiently particularized with respect to those products. Defendants' arguments lack merit.

The CAC alleges that Defendants manufactured "flexible polyurethane foam," a commodity chemical product that was reasonably interchangeable across all manufacturers. CAC ¶¶ 126-27. Plaintiffs allege that Defendants engaged in a conspiracy to fix the price of flexible polyurethane foam, a product crossing three basic segments: (1) block or slabstock foam, which is used in furniture cushions; (2) carpet underlay made primarily from scrap foam; and (3) engineered or molded foam, which is used in automobile products among other things. CAC ¶ 56. Given the commodity nature of flexible polyurethane foam, each Defendant is capable of manufacturing flexible polyurethane foam for any uses in these various downstream products.

The CAC's definition of the product at issue is more than plausible. Defendants, moreover, make no argument that the definition of the product at issue is implausible. Nor could they: the CAC's references to flexible polyurethane foam and their product segments are substantially identical to the definitions employed by the DOJ,[13] as well as the Canadian Competition Bureau.[14]  For example, a declaration of an FBI Special Agent in support of a search warrant relating to the conspiracy alleged here state:

> The current investigation involves an international conspiracy to fix prices and allocate customers in the sale of polyurethane foam. Polyurethane foam is grouped into four product segments (1) block foam or commodity foam which is poured and then cut for use for such things as furniture cushions; (2) carpet underlay, made primarily from scrap foam; (3) engineered foam, which is fabricated for use in automobile products, among other things; and (4) technical foam. These products, and the raw materials used to produce them, are transported and shipped though interstate commerce. The subjects of this investigation sell polyurethane foam to customers throughout the U.S."

Exhibit 4 hereto.

It is also well established that a market definition is not required in cases of *per se* violations of the antitrust laws. *FTC v. Superior Ct. Trial Lawyers Ass'n.*, 493 U.S. 411, 435-36 and n. 19 (1990). Consistent with this, courts also routinely uphold complaints and certify classes in the more complicated situation where a cartel allegedly conspired to fix prices (or restrict supply) of multiple products. *E.g., In re Scrap Metal Antitrust Litig.*, Memo Op. (N.D. Ohio 2006) *aff'd.*, 527 F.2d 917, (6th Cir. 2008) (rejecting challenge to class certificatiaon based

---

[13] The Antitrust Division also has stated to this Court and the District of Kansas that its investigation relates to "foam." *See In re Urethane Antitrust Litig.*, No. 04-1616 JWL, Memo Op. at 18 (D. Kan. Dec. 17, 2010).

[14] The Affidavit from the Canadian Competition Commission similarly states: "The product that is the subject of the alleged conspiracy is foam….The resultant foam can be made in a variety of densities and hardness, from flexible foam to rigid foam, depending on the mixing ratio of the chemicals. Due to the versatility of foam, it is used in a variety of industries and applications." Exhibit 4 hereto.

on "complex combination of services provided, type of scrap metals purchased, levels of contamination of scrap, levels of segregation, and volume and transportation costs").[15]

Although not required, Plaintiffs also have made particularized allegations that the conspiracy affected various product segments of the flexible polyurethane foam market. With respect to carpet underlay, for example, the CAC alleges communications between a Vitafoam executive and Valle executive Dean Brayiannis, which lead to a June 2009 agreement on promotional pricing for carpet foam for a shared customer. CAC ¶ 93. There is no merit to Defendants' contention that Plaintiffs' allegation is "purely conclusory" (Jt. Br. 25), as Plaintiffs identify the timing and individuals involved in making the agreement.

 Defendants also ignore allegations that David Gurley, a Vitafoam manager involved in scrap foam for production of carpet underlay, had numerous contacts with other Defendants through which he obtained and shared other Defendants' commercially-sensitive information including draft price increase letters and competitor price lists. CAC ¶ 77. Gurley is alleged to have received draft price increase letters from Defendants Hickory Springs and Scottdel and to have forwarded such letters to Defendant Future Foam. *Id.* ¶¶ 92, 112(m)-(o).

Defendants acknowledge that the CAC contains specific allegations of conspiratorial communications concerning price increases for molded foam used in automobile products, but contend that such allegations are limited only to communications between Vitafoam and Woodbridge in 2004-2005 and between Vitafoam and Foamex. (Jt. Br. 25.) In fact, the CAC also

---

[15] *In re Flat Glass Antitrust Litig.*, 385 F.3d 350, 353-54 (3d Cir. 2004) (affirming class certification where complaint alleged conspiracy among producers of flat glass, an upstream commodity product); *In re TFT-LCD Antitrust Litig.*, 267 F.R.D. at 304 ("There is substantial legal authority holding in favor of typicality in price fixing conspiracy cases, even where differences exist…with respect to pricing, products, and/or methods of purchasing products."); *In re Citric Acid Antitrust Litig.*, 1996 U.S. Dist. LEXIS 3149 at *6 (N.D. Cal. 1996) ("contentions of infinite diversity of product, marketing practices, and pricing have been made in numerous cases and rejected."); *see Standard Iron Works v. Arcelormittal*, 639 F. Supp.2d 877 (N.D. Ill. 2009) (conspiracy plausible for steel products in the flat and long segments of the steel market).

38

alleges that Defendant Crest participated in these discussions. CAC ¶ 85.  Defendants do not

dispute that the CAC identifies specific personnel involved in these illegal discussions. *Id.* ¶¶ 83,

85, 87. The CAC also details several dates on which discussions of price increases occurred. *Id.* ¶

112(c)-(d), (f), (h). Contrary to Defendants' assertion, the CAC also identifies Foamex,

Vitafoam, Vitafoam Canada, and Woodbridge as manufacturers of flexible polyurethane foam

for automotive applications. *Id.* ¶¶ 24, 41, 43, 47.

Defendants may not rely on the allegations of the so-called "legacy" complaints to

contend that molded foam is a separate market from slabstock. (Jt. Br. 27.)  Plaintiffs have done

investigation since those legacy complaints and have pled a plausible conspiracy for flexible

polyurethane foam which is consistent with the investigations of the Department of Justice and

Canadian Competition Bureau.

Defendants also assert that Plaintiffs' allegations are insufficient to render the alleged

conspiracy plausible with respect to foam used in mattresses and furniture. To the contrary, these

allegations demonstrate Defendants' efforts to police the conspiracy. CAC ¶ 112(h)

(communications between Vitafoam and a competitor in effort to pressure Hickory Springs to

maintain price increases in "bedding" ); CAC ¶ 112(f) (communications between Woodbridge,

Vitafoam and Crest in which the latter "were successful" in increasing prices in furniture foam,

but "were still one [price increase] behind").[16]

---

[16] The cases Defendants cite in their brief differ from this case. The complaint in *In re NASDAQ Market-Makers Antitrust Litig.*, 894 F. Supp. at 711, alleged that various market makers conspired to maintain and fix the spread paid by the plaintiffs on certain—but not all—securities traded on the Nasdaq National Market. The Court concluded that the market definition lacked specificity because it did not place the defendants on notice of which securities were at issue. *Id.*  In *Mountain View Pharmacy*, the Tenth Circuit found insufficient a complaint alleging that more than two-dozen drug manufacturers engaged in unlawful tying arrangements, because it failed to "identify the offending defendants, the injured parties, the tied products, or the tying products." *Mountain View Pharmacy v. Abbott Labs.* 630 F.2d 1383, 1387 (10th Cir. 1980). Similarly, the Second Circuit affirmed dismissal in *In re Elevator Antitrust Litig.*, 502 F.3d 50 (2d Cir. 2007), finding that the complaint merely enumerated "every type of conspiratorial activity that one could imagine … entirely in general terms without any specification of any particular activities by any defendant…." *Id.* at 50.

Defendants' reliance on *In re TFT-LCD (Flat Panel) Antitrust Litig.*, 2010 U.S. Dist. LEXIS 65037 (N.D. Cal. 2010) *(* is misplaced as well. There, AT&T Mobility alleged that a cartel of flat panel manufacturers conspired to fix not only prices of TFT-LCD panels, but also CSTN panels, and MSTN panels. *Id.* at *1 fn.2. The complaint only included allegations of price-fixing involving TFT-LCD panels; there were no allegations of price-fixing for CSTN or MSTN panels, both of which were older technologies with substantially different characteristics than TFT-LCD. *Id.* at *4. Dismissing the allegations concerning CSTN and MSTN, the court held that it "cannot infer the existence of such an expanded conspiracy based solely on allegations of price-fixing in the TFT-LCD market." *Id.* at *5.

### E.     The CAC States a Plausible Conspiracy Throughout the U.S.

This antitrust class action does not allege the presence of a conspiracy in a cottage industry restricted to a small geographical portion of the U.S. Rather, the market for flexible polyurethane foam comprises a multi-billion dollar industry which is controlled by large corporations (*i.e.* Defendants) that are required to possess the capital, capabilities and competitive prowess to meet the needs of consumers throughout the U.S. CAC ¶¶ 56-59, 120-21.

The CAC states that each of the Defendants "directly sold polyurethane throughout the U.S." during the Class Period. CAC ¶¶ 13-47. This allegation is supported by the national reach of Defendants' business operations, which is reflected in the fact that the class representatives in California, Illinois, Mississippi, Pennsylvania and Ohio purchased flexible polyurethane foam from defendants who are scattered around the U.S. and Canada. Furthermore, Defendants are the subject of an antitrust investigation by DOJ for their anticompetitive conduct throughout the U.S. CAC ¶ 61.

Recognizing that the CAC presents no factual basis to challenge the geographic scope of the conspiracy, Defendants cite to "legacy complaints" for the proposition that a nationwide

conspiracy is not plausible because flexible polyurethane foam has a "large mass to weight ratio." (Jt. Br. 29.) Plaintiffs have done investigation since those legacy complaints and have pled a plausible nationwide conspiracy which is consistent with the investigations of the Department of Justice and Canadian Competition Bureau. Each of the legacy Complaints cited by Defendants (*Adams Foam Rubber* and *Ace Foam*), moreover, alleged a nationwide conspiracy. *Ace Foam* Compl. ¶ 24; *Adams Foam* Compl. ¶ 27. Defendants identify no complaint or investigation-related material suggesting that the conspiracy here is not national.

Defendants' argument also fails because courts have found plausible nationwide conspiracies to exist in industries with heavy products that are much more expensive and difficult to transport than foam. *E.g., Standard Iron Works,* 639 F. Supp. 2d at 902 (direct purchasers of steel adequately pled a nationwide conspiracy); *In re Packaged Ice Antitrust Litig.*, 723 F. Supp. 2d at 1012-14 (plaintiffs pled a plausible nationwide conspiracy to fix the price of packaged ice).

Further, Defendants do not state why their argument matters. They do not suggest what states should be excluded from the conspiracy. Furthermore, the class consists of those who directly purchased from defendants and any co-conspirators. If purchasers in a state did not purchase from defendants and the conspiracy, they would be excluded from the class.

Unlike this case, *In re Iowa Ready-Mix Concrete Antitrust Litig.*, 2011 U.S. Dist. LEXIS 23311 (N.D. Iowa 2011), cited by defendants, alleged that the defendants had engaged in a "conspiracy to suppress and eliminate competition by fixing the price of ready-mix concrete in the 'Iowa region." *Iowa Ready Mix*, U.S. Dist. LEXIS 23311 *1. The court held that a conspiracy in the Iowa region was not plausible because, among other things, plaintiffs failed to allege that the defendants were competitors in the Iowa region. This case alleges exactly the opposite.

Plaintiffs' claims arise from the alleged anticompetitive conduct of Defendants who operate and conduct business throughout the U.S. and are competitors.

Finally, Defendants' argument that the CAC somehow alleges an anticompetitive conspiracy in Canada rather than the U.S. fails as a matter of law and fact. Contrary to Defendants' contentions, the CAC affirmatively alleges that each of the Defendants – including the Defendants headquartered in Canada – sold polyurethane foam in the U.S. CAC ¶¶ 13-47. The CAC also alleges that Defendants' conduct is the subject of an investigation by the DOJ regarding an anticompetitive conspiracy in the U.S. *Id.* ¶¶ 60-62. The CAC further alleges that defendant Vitafoam has entered the DOJ's corporate leniency program in connection with its anticompetitive conduct in the U.S. *Id.*  Additionally, the CAC details the admissions and recorded conversations of participants in the conspiracy in the U.S. *Id.* ¶¶ 63-118. Therefore, Defendants' allegations that there are "only three paragraphs" in the CAC that reference the U.S. is patently false.

### F.  <u>The CAC States a Plausible Single Conspiracy of Some Size and Scope.</u>

Following *Twombly* and *Iqbal*, courts have denied motions to dismiss in many antitrust cases where the complaint alleged a single overarching conspiracy involving an entire national or international industry, many participants, extensive durations, and sometimes multiple products. For example, as set forth above, Carpenter, Woodbridge and other defendants in this action have been permitted to pursue such claims in *In re Urethane Antitrust Litig.* for a conspiracy alleged to have lasted from <u>1994 through 2004.</u>  *See also In re Municipal Derivatives Antitrust Litig.*, 700 F. Supp. 2d at 378 (upholding a complaint alleging a conspiracy against 16 defendants for colluding on multiple financial instruments beginning in 1993); *In re Flash Memory Litig.*, 643 F. Supp. 2d at 1133 (N.D. Cal. 2009) (complaint alleging a conspiracy against 13 defendants for fixing NAND *Flash Memory* prices from 1999 to February of 2008); In re *TFT-LCD (Flat*

*Panel) Antitrust Litig.*, 586 F. Supp. 2d at 1109 (complaint alleging a conspiracy against 26

defendants for fixing TFT-LCD panel prices from 1996 through late 2006); *In re SRAM Antitrust*

*Litig.*, 580 F. Supp. 2d 896 (complaint alleging a conspiracy against 24 defendants for fixing

various types of SRAM prices from 1996 through 2005).[17]

Here, as noted above, the CAC alleges numerous specific examples of Defendants'

specific conspiratorial conduct throughout the alleged Class Period. The CAC also highlights

that Vitafoam witnesses cooperating with DOJ have already admitted the conspiracy took place

throughout the Class Period. CAC ¶¶ 68, 74, 81, 92. Indeed, the Vitafoam witnesses testified that

*every* price increase was collusive from at least 1999 through the time of Vitafoam's entry into

the Justice Department's conditional leniency program in 2010. CAC ¶ 94. These cooperating

Vitafoam witnesses have admitted that collusive price increase discussions occurred

approximately "two to three times per year" throughout the Class Period, at bi-annual trade

association meetings, and whenever raw materials increased in price, and at frequent and regular

intervals throughout the entire period. *Id.* ¶¶ 63-64, 68, 70, 72, 74, 77-78, 82-83, 92, 94.

Defendants indirectly attack these allegations by relying on *In re Fla. Cement &*

*Concrete Antitrust Litig.*, 746 F. Supp. 2d 1291 (S.D. Fla. 2010), which reduced the class period

alleged in the complaint from a period beginning in 2004 to a period beginning in 2008. The

Complaint there "first allege[d] a wide range of conduct" from which an illegal agreement could

be "inferred" and second alleged statements by two individuals in 2008 which plaintiffs alleged

---

[17] *See also In re Chocolate Confectionary Prods. Antitrust Litig.*, 602 F. Supp. 2d at 574-77 (denying motion to dismiss complaint alleging that members of four corporate families fixed prices for a variety of chocolate confectionary products over a five year period); *In re Rail Freight Surcharge Antitrust Litig.*, 587 F. Supp. 2d at 29, 37 (denying motion to dismiss a CAC against railroads alleged to have entered into a conspiracy going back to 2003 to fix fuel surcharges); *In re ATM Fee Antitrust Litig.*, 2009 U.S. Dist. LEXIS 83199 at *22-*25 (denying by eleven banking entities accused of fixing interchange fees going back to the 1990s); *In re Air Cargo Shipping Servs. Antitrust Litig.*, 2009 U.S. Dist. LEXIS at 88404 (district court reversed the ruling of a magistrate judge granting motions to dismiss for failure to plead a plausible conspiracy by 34 airlines accused of participating since 2000 in a conspiracy to fix air cargo fuel surcharges).

were direct evidence of a conspiracy. *Id.* at 1308, 1317.  For the period from 2004 to 2008, the Court concluded that "Plaintiffs manage only to allege a few instances of parallel conduct" and therefore only permitted the claims to go forward for 2008 and after. *Id.* at 1319.  This case, unlike *Twombly* or *Fla. Cement*, is not based on allegations of parallel conduct; it is based on direct and highly specific allegations of a conspiracy that is the subject of ongoing investigations in the U.S. and Canada.

**G.    Plus Factors Support The CAC's Allegation of Conspiracy.**

"Courts devised the requirement of 'plus factors' in the context of offers of proof of an agreement that rest on parallel conduct, i.e., circumstantial evidence." *See In re Insurance Brokerage Antitrust Litig.*, 618 F.3d 300, 324 n. 23 (3d Cir. 2010); *Twombly*, 550 U.S. at 564 (distinguishing between antitrust claims arising from "parallel conduct" and "independent agreement").  Accordingly, "direct evidence of a conspiracy, such as a document or conversation explicitly manifesting the existence of the agreement in question—'evidence that is explicit and requires no inferences to establish the proposition or conclusion being asserted'—obviates the need for such a showing." *Id.*; *see also Re/Max Intern., Inc. v. Realty One, Inc.,* 173 F.3d 995, 1018 (6th Cir. 1999) (an antitrust plaintiff is not required to rely on indirect evidence "when there is direct evidence that the defendant has actually set prices or excluded competition").

The CAC does not rely on indirect circumstantial conduct, but allegations of *direct conspiratorial evidence* detailing the mechanisms, participants and communications of the conspiracy. CAC ¶¶ 60-118.  Therefore, Defendants' attempt to attack the "plus factors" alleged in the Complaint cannot serve as a basis for granting Defendants' motion to dismiss.

In any event, each of the factors set forth in the CAC is probative of the existence of an antitrust conspiracy in the flexible polyurethane foam market.  High market concentration, inelasticity of demand, and product commoditization—all of which are alleged here—constitute

44

probative "evidence that the structure of the market was such as to make secret price fixing feasible." *In re High Fructose Corn Syrup Antitrust Litig.*, 295 F.3d 651, 655 (7th Cir. 2002); *In re Flash Memory Antitrust Litig.*, 643 F. Supp.2d at 1142 ("[T]he marketplace is alleged to have been conducive to coordinated pricing, as demonstrated by the existence of a concentrated market"); *In re SRAM Antitrust Litig.,* 580 F. Supp.2d at 901-02 (denying motion to dismiss where plaintiffs alleged communications between defendants in conjunction with market conditions establishing that the product was a homogeneous commodity, with a highly concentrated market and high barriers to entry); *see In re Blood Reagents Antitrust Litig.*, 2010 U.S. Dist. LEXIS 86930, at *7 ("The salient features of the blood reagents market-described in the Complaint as one that is highly concentrated, contains high barriers to entry, has inelastic demand, lacks reasonable substitutes, and is based on a standardized product-are each conducive to transforming [defendants' conspiratorial] motive into action").

Similarly, the use of trade association meetings for improper purposes, as alleged in the CAC, is probative of a plausible antitrust conspiracy. *See In re TFT-LCD (Flat Panel) Antitrust Litig.*, 586 F. Supp.2d at 1116 (plaintiffs established a plausible antitrust conspiracy by alleging, *inter alia,* "defendants exchanged numerous types of sensitive competitive information, including pricing information, through trade association meetings, private communications and published data"); *In re Blood Reagents*, 2010 U.S. Dist. LEXIS 86930, at *7 (identifying common membership in trade associations as one of the factors supporting the existence of a plausible conspiracy).

That Defendant Vitafoam has entered into the DOJ's corporate leniency program is also probative of a conspiracy, because the leniency applicant "must admit its participation in a criminal antitrust violation involving price fixing." CAC ¶ 61. Defendants argue that Vitafoam's

participation in the leniency program "creates no inference of a conspiracy with respect to the remaining defendants." (Jt. Br. 38-39.) This argument ignores that Vitafoam's admissions of criminal price fixing in the leniency program, together with the interviews of Vitafoam executives, easily meets a "plausibility" standard for the existence of a conspiracy.

### H.   Allegations of Exchanging Prices Support the CAC.

Defendants finally argue that allegations that they exchanged price information do not plausibly establish a conspiracy. Such arguments are a classic example of viewing allegations in isolation and arguing for dismissal in a contextual vacuum. This argument ignores the vast majority of the CAC, which explains the improper purpose of the price information exchanges.

Plaintiffs allege throughout the CAC that Defendants exchanged price information in order to secure agreement on price increases for the entire cartel. *E.g.*, CAC ¶¶ 63, 66, 68, 70, 74-76, 81, 91-92. Defendants also ignore that the CAC alleges they obtained copies of each other's price increase letters as an *enforcement tool* for the conspiracy. *Id.* ¶¶ 70, 74-75, 95-96, ¶ 112(n). This is certainly the type of behavior the Sherman Act has long aimed to prevent. *American Column & Lumber Co. v. U.S.*, 257 U.S. 377, 411-12 (1921) (price exchanges for the intent of "procur[ing] 'harmonious' individual action among a large number of naturally competing dealers" violated the Sherman Act); *U.S. v. True*, 250 F.3d 410, 423-24 (6th Cir. 2001) (affirming finding of a Section 1 violation where the evidence showed "the conspirators discussed pricing increases prior to making announcements, that these discussions were for unlawful purposes, and that [defendant] personally participated in some of the discussions").[18]

---

[18] *In re High Fructose Corn Syrup Antitrust Litig.*, 295 F.3d at 662 (finding documents discussing coordination of pricing with competitors probative of price fixing); *In re Flash Memory Antitrust Litig.*, 643 F. Supp. 2d at 1142-43 (N.D. Cal. 2009) (denying motion to dismiss because, "taken as a whole," the CAC alleged "Defendants routinely exchanged highly sensitive competitive information, including pricing and production data, to facilitate and monitor their alleged price-fixing conspiracy").

Defendants' cases do not hold otherwise. In *In re LTL Shipping Servs. Antitrust Litig.*, previously discussed *supra* at note 3, allegations about price information exchanges were "conjecture and argument," and did not provide factual allegations demonstrating an intent to collude. 2009 U.S. Dist. LEXIS at *12-14. In contrast, the CAC alleges factual sources — *e.g.*, Vitafoam witnesses and documents from their files—that explain the methods, history, and purpose of Defendants' price information exchanges, and demonstrate that price increase letters were exchanged. CAC ¶¶ 63-118. *In re Travel Agent Comm'n Antitrust Litig.*, 2007 U.S. Dist. LEXIS at 79918, also discussed previously, is similarly inapposite. There, merely obtaining information that was "common knowledge" did not demonstrate anticompetitive intent or effect. *Id.* at *11.

## V.    THE CAC PROPERLY PLEADS FRAUDULENT CONCEALMENT.

Equitable tolling by the doctrine of fraudulent concealment is established when plaintiffs allege that, "1) defendants concealed the conduct that constitutes the cause of action; 2) defendants' concealment prevented plaintiffs from discovering the cause of action within the limitations period; and 3) until discovery, plaintiffs exercised due diligence in trying to find out about the cause of action."  *In re Packaged Ice Antitrust Litig.*, 723 F. Supp.2d at 987 (quoting *Egerer v. Woodland Realty, Inc.*, 556 F.3d 415, 422 (6th Cir. 2009));[19] *In re Scrap Metal Antitrust Litig.,* Memo. Op. at 3.

---

[19] In *In re Scrap Metal Antitrust Litig.* in this District, the Court gave the following jury instruction on fraudulent concealment, which the Sixth Court affirmed on appeal:

> To establish fraudulent concealment as to a specific defendant in this case, plaintiffs must prove each of the following elements by a preponderance of the evidence: (1) First, that the members of the conspiracy actively concealed the alleged conduct that caused plaintiff's antitrust injuries. It is not enough for plaintiffs to show that the members of the conspiracy failed to disclose the alleged conduct; rather plaintiffs must prove that they took active and affirmative steps to prevent plaintiffs from learning about the alleged conduct, such as by keeping their meetings or agreements secret from their accounts or taking steps to conceal the fact of their non-competition; and (2) Second, that plaintiffs failed to discover the fact of the unlawful conspiracy; and

"In the Sixth Circuit, the affirmative acts of concealment may be committed at any time, including during the course and in furtherance of the underlying conspiracy." *State of Mich. ex rel. Kelley v. McDonald Dairy Co.* 905 F. Supp. 447 (W.D. Mich. 1995) (citing *Pinney Dock & Transp. Co. v. Penn Cent. Corp.*, 838 F.2d 1445, 1471-72 (6th Cir. 1988).  Furthermore, "[t]he requirement of diligence is only meaningful, [ ] when facts exist that would excite the inquiry of a reasonable person."  *Conmar Corp. v. Mitsui & Co., (U.S.A.), Inc.,* 858 F. 2d 499, 504-05 (9th Cir. 1988) (applying Sixth Circuit criteria for fraudulent concealment).

Acts in furtherance of a conspiracy, including those acts that "give the illusion of competition" or otherwise attempt to maintain the secrecy of Defendants' conduct, constitute affirmative acts of concealment. *Pinney Dock*, 838 F.2d at 1473; *see also In re Cathode Ray Tube Antitrust Litig.*, 738 F. Supp. 2d 1011, 1024-25 (N.D. Cal. 2010) (fraudulent concealment was sufficiently pled because defendants "took steps to keep their meetings secret" and blamed conspiratorial price increases on market conditions);  *In re Packaged Ice*, 723 F. Supp.2d at 1018 (fraudulent concealment adequately pled where defendants "represented publicly, both to customers and otherwise that their pricing activities were unilateral, rather than collusive, and…Defendants' wrongful conduct was carried out in part through means and methods that were designed to avoid detection").

---

(3) Third, that plaintiffs exercised reasonable diligence in the circumstances and still did not discover the alleged conduct.

In deciding whether plaintiffs have proved fraudulent concealment by the alleged conspirators, you may consider a number of factors. First, the law recognizes that a conspiracy is, by nature, self-concealing. Thus, you may consider the very acts giving rise to the conspiracy when deciding whether it was concealed from the plaintiffs; there is no requirement that the affirmative acts of concealment be independent of the conspiracy itself. You may also consider other activities which operate to conceal anti-competitive conduct such as prearranged or phone bids, confining knowledge of any anti-competitive activity to a limited core group of individuals, engaging in clandestine meetings or using false identities.

527 F.3d 517, 537 (6th Cir. 2008).

These principles are also illustrated in *In re Urethane Antitrust Litig.*, 683 F. Supp. 2d at 1236, in which defendants Carpenter and Woodbridge successfully defended their own allegations of fraudulent concealment. The Court there held that pretextual announcements of price increases based on purported cost increases – substantially identical to allegations made here – were sufficient allegations to toll the statute of limitations. *Id.*  In addition, the Court held that the same secrecy as alleged here in the CAC tolled the limitations period:

> [D]efendants argue that in alleging "secret" meetings occurring before 1999, plaintiffs have merely alleged communications that were private, and thus have not alleged affirmative acts of concealment. The Court rejects this argument. Plaintiffs have alleged that defendants affirmatively acted to make sure that their meetings and communications were not discovered and their agreements remained concealed, for example by meeting and communicating in ways and in places where they could not be observed, such as in hallways, cafes, and private homes; by meeting outside the U.S. to avoid detection here; by agreeing to destroy evidence; and by agreeing to conceal their price-fixing activities.

*Id.*

The allegations of the CAC more than satisfy the requirements for pleading fraudulent concealment. The CAC alleges that Defendants committed affirmative acts of concealment in furtherance of the conspiracy by using the "pretext" of "increases in raw material costs,"  CAC ¶¶ 64, 115; exchanging presumptively legitimate price increase letters so as not to leave a paper trail, *id.* ¶¶ 66, 118, 135; "avoid[ing] detection by communicating through fax machines at a local Staples or other store," *id.* ¶¶ 118, 135; disguising their in-person meetings by visiting "each other's manufacturing facilities for the purported purpose of sharing technological and operational advances" *Id.*; using only first names or initials, *id.* ¶¶ 119, 135; and disguising their conspiratorial meetings under the auspice of trade association meetings." *Id.* ¶¶ 114-17, 135.

These allegations—which Defendants fail to address—detail the acts, conduct and mechanisms by which Defendants concealed the conspiracy.

## <u>CONCLUSION</u>

For the foregoing reasons, Defendants Joint Motion to Dismiss should be denied.

DATED: May 2, 2011

Respectfully Submitted,

| | |
|---|---|
| ____/s/ William A. Isaacson_____ | ____/s/ Stephen R. Neuwirth_____ |
| William A. Isaacson | Stephen R. Neuwirth |
| BOIES, SCHILLER & FLEXNER LLP | QUINN EMANUEL URQUHART |
| 5301 Wisconsin Avenue, NW | & SULLIVAN, LLP |
| Washington, DC  20015 | 51 Madison Avenue, 22nd Floor |
| Phone:  202-237-5607 | New York, NY  10010 |
| Fax:      202-237-6131 | Phone:  212-849-7165 |
| wisaacson@bsfllp.com | Fax:      212-849-7100 |
| | stephenneuwirth@quinnemanuel.com |

*Direct Purchaser Plaintiffs' Interim Co-Lead Counsel*

Stanley Bernstein
BERNSTEIN LIEBHARD LLP
Bernstein Liebhard LLP
10 East 40th Street, 22nd Floor
New York, NY 10016
Phone: 212-779-1414
Fax:    212-779-3218

Michael Hausfeld
HAUSFELD LLP
1700 K Street, NW Suite 650
Washington, DC 20006
Phone: 202-540-7200
Fax:    202-540-7201

Mindee Reuben
WEINSTEIN KITCHENOFF & ASHER, LLC
1845 Walnut Street, Suite 1100
Philadelphia, PA 19103
Phone: 215-545-7200
Fax:    215-545-6535

Brian Strange
STRANGE & CARPENTER
12100 Wilshire Boulevard, Suite 1900
Los Angeles, CA 90025
Phone: 310-207-5055
Fax:    310-826-3210

Robert Eisler
GRANT & EISENHOFER P.A.
1201 North Market Street
Wilmington, DE 19801
Phone: 302-622-7000
Fax:    302-622-7100

Bernard Persky
LABATON SUCHAROW LLP
140 Broadway
New York, NY 10005
Phone: 212-907-0700
Fax:    212-818-0477

Bruce Simon
PEARSON, SIMON, WARSHAW & PENNY,
    LLP
44 Montgomery Street, Suite 2450
San Francisco, CA 94104
Phone: 415-433-9000
Fax:    415-433-9008

Stephen Weiss
SEEGER WEISS LLP
One William Street
New York, NY 10004
Phone: 212-584-0700
Fax:    212-584-0799

***Executive Committee for the Direct Purchaser Plaintiffs***