UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF OHIO

| | |
|---|---|
| ‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾ ) | |
| ) | |
| In re POLYURETHANE FOAM ANTITRUST ) | |
| LITIGATION ) | |
| ) | MDL Docket No. 2196 |
| ‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾ ) | Index No. 10-MD-2196 (JZ) |
| ) | |
| ) | |
| This document relates to: ) | |
| ) | |
| ) | |
| ALL DIRECT PURCHASER CASES ) | |
| ) | |
| ‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾ ) | |

**DEFENDANTS' JOINT REPLY
TO DIRECT PURCHASER PLAINTIFFS' OPPOSITION TO
DEFENDANTS' JOINT "COMMON ISSUES" MEMORANDUM OF LAW
IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS
DIRECT PURCHASER PLAINTIFFS'
<u>CONSOLIDATED AMENDED CLASS ACTION COMPLAINT</u>**

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ............................................................................................... ii

INTRODUCTION AND SUMMARY OF REPLY ARGUMENT ........................................... 1

LEGAL ANALYSIS .......................................................................................................... 2

    I.      The Plausibility Analysis Mandated by *Iqbal* Requires the Court to Reject Direct Purchaser Plaintiffs' Conclusory Allegations and Consider Only Plausible Facts .............................................................................................. 2

    II.    Direct Purchaser Plaintiffs Cannot Nudge the Conspiracy Allegations of the CAC Across the Line from Conceivable to Plausible ..................................... 5

          A.      No *Facts* Support the Broad Conspiracy Alleged in the CAC. ................. 6

          B.      The Product and Geographic Markets Alleged in the CAC Render the Alleged Conspiracy Implausible. ......................................................... 8

          C.      The Existence of Government Investigations Does Not Cure the Deficiencies of Direct Purchaser Plaintiffs' CAC. ................................ 10

          D.      Plaintiffs Incorrectly Rely on the *Urethanes* Litigation, Which Actually Supports Defendants' Motion to Dismiss. .............................. 12

    III.   Direct Purchaser Plaintiffs' Claims of Alter Ego or Control Liability Fail. ........ 13

    IV.   Direct Purchaser Plaintiffs Do Not Satisfy the Pleading Requirements for Fraudulent Concealment, and the Limitations Period for Their Antitrust Claims Should Not Be Tolled. .................................................................... 14

    V.    Further Arguments in Support of Individual Defendants' Separately Filed Memoranda in Support of Their Motions to Dismiss. ...................................... 16

          A.      Plaintiffs Have Failed to Allege that Plastomer and Otto Bock Were Part of the Conspiracy Alleged in the CAC. ............................... 16

          B.      Plaintiffs Mischaracterize Their Own Complaint Regarding the Allegations Pertaining to Mohawk and Leggett & Platt. ....................... 17

          C.      Plaintiffs Do Not Even Allege that Inoac USA or Crest Actually Conspired. ........................................................................................ 18

          D.      The CAC Fails to Allege Any Conspiratorial Conduct by FXI. ............. 20

CONCLUSION .......................................................................................................... 23

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Ashcroft v. Iqbal,*
129 S. Ct. 1937 (2009) .................................................................................................passim

*Bell Atl. Corp. v. Twombly,*
550 U.S. 544 (2007) ....................................................................................................passim

*Celotex Corp. v. Edwards,*
514 U.S. 300 (1995) ........................................................................................................ 22

*Clark v. Bucyrus Int'l,*
No. 5:08-cv-434-JHM, 2009 WL 2163117 (E.D. Ky. July 17, 2009) ................................. 13

*Conley v. Gibson,*
355 U.S. 41 (1957) ............................................................................................................ 3

*Conmar Corp. v. Mitsui & Co. (U.S.A.), Inc.,*
858 F.2d 499 (2d Cir. 1988) ............................................................................................ 16

*Dayco Corp. v. Goodyear Tire & Rubber Co.,*
523 F.2d 389 (6th Cir. 1975) ........................................................................................... 15

*Douglas v. Stamco,*
363 Fed. Appx. 100 (2d Cir. 2010) ................................................................................... 21

*Egerer v. Woodland Realty, Inc.,*
556 F.3d 415 (6th Cir. 2009) ........................................................................................... 15

*Fortress Value Recovery Fund I, LLC v. Columbus Components Groups LLC,*
No. 1:11-cv-00200, 2011 WL 1130442 (N.D. Ohio Mar. 28, 2011) ................................... 13

*HCRI TRS Acquirer, LLC v. Iwer,*
708 F. Supp. 2d 687 (N.D. Ohio 2010) ............................................................................... 2

*Hinds Cnty. v. Wachovia Bank N.A.,*
620 F. Supp. 2d 499 (S.D.N.Y. 2009) ............................................................................... 15

*In re Flash Memory Antitrust Litig.,*
643 F. Supp. 2d 1133 (N.D. Cal. 2009) .............................................................................. 3

*In re Graphics Processing Units Antitrust Litig.,*
527 F. Supp. 2d 1011 (N.D. Cal. 2007) ............................................................................ 10

*In re LTL Shipping Servs. Antitrust Litig.,*
No. 1:08-MD-01895-WSD, 2009 U.S. Dist. LEXIS 14276 (N.D. Ga. Jan. 29, 2009) ............ 7

*In re OSB Antitrust Litig.*,
  No. 06-cv-0826, 2007 WL 2253419 (E.D. Pa. Aug. 3, 2007) ................................................. 3

*In re Packaged Ice Antitrust Litig.*,
  723 F. Supp. 2d 987 (E.D. Mich. 2010)................................................................... 5, 16

*In re Plasma-Derivative Protein Therapies Antitrust Litig.*,
  No. 1:09-cv-07666, 2011 U.S. Dist. LEXIS 13279 (N.D. Ill. Feb. 9, 2011) .......................... 6

*In re Scrap Metal Antitrust Litig.*,
  527 F.3d 517 (6th Cir. 2008)............................................................................. 16

*In re Trans World Airlines, Inc.*,
  322 F.3d 283 (3d Cir. 2003)............................................................................. 21

*In re Text Messaging Antitrust Litig.*,
  630 F.3d 622 (7th Cir. 2010)............................................................................. 6

*In re Travel Agent Comm'n Antitrust Litig.*,
  583 F.3d 896 (6th Cir. 2009), *cert. denied*, 131 S. Ct. 896 (2011) ...............................2, 6, 13

*In re Urethane Antitrust Litig.*,
  663 F. Supp. 2d 1067 (D. Kan. 2009)..................................................................... 11

*In re Urethane Antitrust Litig.*,
  683 F. Supp. 2d 1214 (D. Kan. 2010)...............................................................11, 12, 16

*In re Urethane Antitrust Litig.*
  No. 2:04-md-1616-JWL-JPO, Mem. Op. (D. Kan. Apr. 5, 2011) ......................................... 4

*In re White Motor Credit Corp.*,
  75 B.R. 944 (Bankr. N.D. Ohio 1987)..................................................................... 22

*In re Wolverine Radio Company*,
  930 F.2d 1132 (6th Cir. 1991)........................................................................21, 22

*Kretzmer v. Firesafe Prods. Corp.*,
  805 N.Y.S.2d 340 (N.Y. App. Div. 2005) ................................................................. 23

*Martin v. Clark*,
  No. 3:10-cv-1500, 2010 U.S. Dist. LEXIS 112295 (N.D. Ohio Oct. 21, 2010) ....................... 2

*Michigan ex rel. Kelley v. McDonald Dairy Co.*,
  905 F. Supp. 447 (W.D. Mich. 1995)...................................................................15, 16

*Myers v. United States*,
  297 B.R. 774 (Bankr. S.D. Cal. 2003) .................................................................... 21

*NicSand, Inc. v. 3M Co.*,
    507 F.3d 442 (6th Cir. 2007)..........................................................................17, 19

*Oliver v. St. Luke's Dialysis, LLC*,
    No. 1:10-cv-2667, 2011 WL 1326251 (N.D. Ohio Apr. 5, 2011).......................... 13

*Pinney Dock & Transp. Co. v. Penn Cent. Corp.*,
    838 F.2d 1445 (6th Cir.), *cert. denied*, 488 U.S. 880 (1988)................................. 15

*Pratt v. Ventas, Inc.*,
    365 F.3d 514 (6th Cir. 2004)................................................................................... 22

*Pureworks, Inc. v. Brady Corp.*,
    No. 3:09-cv-00983, 2010 WL 3724229 (M.D. Tenn. Sept. 15, 2010) .................. 13

*Roofers Local 149 Sec. Benefit Trust Fund v. Milbrand Roofing Group, Inc.*,
    No. 05-cv-60218, 2008 WL 53710 (E.D. Mich. Jan. 3, 2008) ............................. 13

*Texaco Inc. v. Dagher*,
    547 U.S. 1 (2006) ................................................................................................... 19

*Total Benefits Planning Agency, Inc. v. Anthem Blue Cross & Blue Shield*,
    552 F.3d 430 (6th Cir. 2008)..........................................................................3, 7, 8

*United States v. El-Hindi*,
    No. 09-4328, 2011 U.S. App. LEXIS 2261 (6th Cir. Feb. 4, 2011)....................... 3

*Wachovia Bank, N.A. v. Zomax Inc.*,
    No. 2:09-cv-0076, 2009 WL 3698443 (S.D. Ohio Nov. 3, 2009).......................... 14

**STATUTES**

11 U.S.C. § 101(31)...................................................................................................... 21

11 U.S.C. § 105(a)........................................................................................................ 22

**RULES**

Fed. R. Civ. P. 12(b)(6) ........................................................................................... 2, 13

**OTHER AUTHORITIES**

U.S. Dep't of Justice Antitrust Div.,
    Ten Year Workload Statistics Report FY 2000-2009,
    http://www.justice.gov/atr/public/workload-statistics.pdf (last visited May 10, 2011) ......... 10

## INTRODUCTION AND SUMMARY OF REPLY ARGUMENT[1]

Direct Purchaser Plaintiffs have taken a limited number of inconclusive excerpts from two affidavits filed in support of government search warrants primarily concerned with events in Canada and attempted to weave an elaborate, unified, nationwide conspiracy theory involving dozens of defendants and hundreds, if not thousands, of foam products over a period of more than a decade. The scope of these government investigations is unknown by any of the parties, and at this point is unknowable, either in terms of geography, companies of interest, or products. Moreover, many Defendants named in the Direct Purchaser Plaintiffs' Consolidated Amended Class Action Complaint ("CAC") are not even mentioned in the affidavits and only a handful of Defendants have received subpoenas in connection with the investigations.

As a consequence, Plaintiffs challenge *Twombly*'s boundaries by filing a Complaint long on conclusions and speculation but very short on facts. In the process, they essentially argue for a return to pre-*Twombly* pleading standards and the opportunity to use discovery to search for grounds to support the plausibility of the expansive conspiracy they purport to allege. The standards established in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), and *Ashcroft v. Iqbal*, 129 S. Ct. 1937 (2009), cannot, however, simply be side-stepped. Defendants' Motions to Dismiss the CAC should be granted.[2]

---

[1] Pursuant to this Court's Order of April 14, 2011 (Dkt. No. 76), Defendants respectfully submit this Joint Reply to Direct Purchaser Plaintiffs' Opposition (Dkt. No. 115) to Defendants' Joint "Common Issues" Memorandum of Law in Support of Motion to Dismiss (Dkt. No. 90) Direct Purchaser Plaintiffs' Consolidated Amended Class Action Complaint (Dkt. No. 46). Defendants focus this Joint Reply on certain specific failings in Direct Purchaser Plaintiffs' Opposition ("Opposition" or "Opp'n") to Defendants' Joint "Common Issues" Memorandum of Law ("Mem."). While Defendants also will respond to certain arguments in the Opposition that reference Direct Purchaser Plaintiffs' Omnibus Response ("Omnibus") to Defendants' Separately Filed Memoranda in Support of Their Motions to Dismiss (Dkt. No. 114), the page limitations preclude Defendants from addressing all of Plaintiffs' arguments. Defendants do not waive any arguments contained in their Joint "Common Issues" Memorandum of Law, or in their individually filed briefs, and respectfully reserve the right to address any of the assertions made in Plaintiffs' Opposition and Omnibus briefs during oral argument on Defendants' Motions to Dismiss.

[2] Defendants' Statement of the Issues to be Decided (Mem. 2) remains unchanged.

**LEGAL ANALYSIS**

I.     **The Plausibility Analysis Mandated by *Iqbal* Requires the Court to Reject Direct
       Purchaser Plaintiffs' Conclusory Allegations and Consider Only Plausible Facts.**

       In response to Defendants' summary of the applicable standard for analyzing and

deciding a Rule[3] 12(b)(6) motion (*see* Mem. 8-15), Direct Purchaser Plaintiffs neglect even to

mention the plausibility analysis articulated by the Supreme Court in *Iqbal*, and spend a third of

their Opposition inviting the Court to ignore its principles.  (*See* Opp'n 12-29.)  However, the

two-pronged plausibility analysis required by *Iqbal* is straightforward.  (*See* Mem. 14-15.)  First,

a district court must identify and disregard those allegations "that, because they are no more than

conclusions, are not entitled to the assumption of truth." *Iqbal*, 129 S. Ct. at 1950.  Second, the

district court must assume the veracity of any well-pleaded factual allegations and determine

whether they *plausibly* give rise to relief. *Id.* Both the Sixth Circuit and this Court follow these

standards. *See In re Travel Agent Comm'n Antitrust Litig.*, 583 F.3d 896, 903-06 (6th Cir. 2009),

*cert. denied*, 131 S. Ct. 896 (2011); *HCRI TRS Acquirer, LLC v. Iwer*, 708 F. Supp. 2d 687, 690

(N.D. Ohio 2010) (Zouhary, J.).  Put slightly differently, in "scrutinizing a complaint" in order to

decide a motion to dismiss under Rule 12(b)(6), a claim has facial plausibility only "when the

plaintiff pleads factual content that allows the court to draw the reasonable inference that the

defendant is liable for the misconduct alleged." *Martin v. Clark*, No. 3:10-cv-1500, 2010 U.S.

Dist. LEXIS 112295, at *3-4 (N.D. Ohio Oct. 21, 2010) (Zouhary, J.) (citing *Hensley Mfg., Inc.

v. ProPride, Inc.*, 579 F.3d 603, 609 (6th Cir. 2009) (quoting *Iqbal*, 129 S. Ct. at 1949)).

       In effect, Plaintiffs ask the Court to ignore *Twombly* and apply a "slight evidence"

standard.  Nowhere is that more evident than in their remarkable contention that "[s]o long as

there are allegations of plausible anticompetitive conduct involving named Defendants, the

---

[3]  All "Rule" references throughout this brief are to the Federal Rules of Civil Procedure.

action must proceed because a violation of the antitrust laws has been pled." (Opp'n 28.)  This misstatement of law not only contradicts the unambiguous plausibility analysis required by *Iqbal*, 129 S. Ct. at 1949-50, but also plainly ignores the Supreme Court's retirement of *Conley*'s "incomplete, negative gloss on an accepted pleading standard."  *Twombly*, 550 U.S. at 563 (rejecting the "no set of facts" language in *Conley v. Gibson*, 355 U.S. 41, 47 (1957)).  The correct question before the Court is not whether *any* anticompetitive activity has been pled -- a standard that would allow any plaintiff to allege a single anticompetitive act and then launch a discovery campaign limited only by the scope of the "conspiracy" the plaintiff speculatively attributes to it -- but whether the non-conclusory, factual allegations in the CAC, and the reasonable inferences from those allegations, plausibly support the conspiracy actually alleged against each of the Defendants.

The "slight evidence" standard the Direct Purchaser Plaintiffs urge the Court to apply is simply wrong and is inconsistent with *Twombly*'s principles and the law of the Sixth Circuit. Not surprisingly, Plaintiffs cite only three post-*Twombly* cases in support of it.  (*See* Opp'n 13; Omnibus 2-4.)  The first, *United States v. El-Hindi*, No. 09-4328, 2011 U.S. App. LEXIS 2261 (6th Cir. Feb. 4, 2011), is an unpublished criminal case that has nothing to do with the Federal Rules of Civil Procedure or *Twombly*.  The second and third, *In re Flash Memory Antitrust Litigation*, 643 F. Supp. 2d 1133 (N.D. Cal. 2009), and *In re OSB Antitrust Litigation*, No. 06-cv-0826, 2007 WL 2253419 (E.D. Pa. Aug. 3, 2007), are cited for the proposition that "allegations of antitrust conspiracy need not be detailed on a 'defendant by defendant' basis" (Omnibus 4 (citations omitted)), a position the Sixth Circuit flatly rejected in *Total Benefits Planning Agency, Inc. v. Anthem Blue Cross & Blue Shield*, 552 F.3d 430, 436 (6th Cir. 2008) (Zouhary, J.) (concluding that "[g]eneric pleading, alleging misconduct against defendants

without specifics as to the role each played in the alleged conspiracy, was specifically rejected by *Twombly*'").

In their Opposition, Direct Purchaser Plaintiffs never squarely address the essence of Defendants' challenge to the CAC -- that Plaintiffs fail to provide factual support for a nationwide conspiracy among twenty-six companies and individuals, involving virtually all foam products and continuing for more than a decade.  Any analysis of the plausibility of these expansive conspiracy allegations is effectively ignored.  Plaintiffs instead avoid specifics, refer broadly to other, dissimilar cases that survived *Twombly* motions without discussing the details of the allegations in those cases,[4] and insist that conclusory statements in the CAC be viewed as factual.  Faced with the fact that the CAC falls well short of the requirements of *Twombly* and *Iqbal* in a number of ways -- any one of which, standing alone, would require dismissal -- Plaintiffs also complain that Defendants unfairly attack the CAC in "piecemeal" fashion.  (*See* Opp'n 19, 26-29.)  However, it is not a "piecemeal" attack to challenge the many ways that the CAC, taken as a whole, fails to meet *Twombly*'s requirements.  In a final effort to avoid dealing with the factual deficiencies of the CAC, Plaintiffs attempt to use the procedural history and a recent discovery opinion in *In re Urethane Antitrust Litigation* ("*Urethanes*"), No. 2:04-md-1616-JWL-JPO, Mem. Op. (D. Kan. Apr. 5, 2011), as a surrogate for the factual support they cannot otherwise provide (*see* Opp'n 25-26 & Ex. 1), even though major portions of the *Urethanes* complaint and other key documents are filed under seal, making the contents unavailable to Plaintiffs and this Court.

---

[4]  The pre-*Twombly* cases Direct Purchaser Plaintiffs emphasize (*see* Opp'n 26-29) are not applicable to the analysis required by *Iqbal*.

Once the CAC's conclusory allegations are disregarded, as they must be, the limited factual allegations in the CAC do not even remotely suggest a conspiracy of the scope and duration claimed by Plaintiffs (*see* Mem. 14-16), and the CAC must be dismissed.

## II.  Direct Purchaser Plaintiffs Cannot Nudge the Conspiracy Allegations of the CAC Across the Line from Conceivable to Plausible.

Direct Purchaser Plaintiffs' Opposition is largely an exercise in applying conclusions, labels, and generalizations in an attempt to create a semblance of plausibility in the CAC.  After performing the first prong of the *Iqbal* plausibility analysis, however, the question is whether the remaining, limited factual allegations in the CAC raise above the speculative level Plaintiffs' claim of a right to relief based on allegations of a nationwide, twelve-year conspiracy involving twenty-six different defendants and an unidentified number of co-conspirators, covering virtually all types and grades of polyurethane foam, as well as hundreds of different foam products.  *See Twombly*, 550 U.S. at 555.  They plainly do not, and the post-*Twombly* cases Plaintiffs rely on for the opposite proposition, rather than supporting their position, simply underscore the fatal flaws in the CAC.

In *In re Packaged Ice Antitrust Litigation*, 723 F. Supp. 2d 987 (E.D. Mich. 2010), for example, plaintiffs alleged a conspiracy involving the three largest producers and distributors of a single homogeneous product -- packaged ice -- in the U.S. and which collectively accounted for 70% of that market.  *Id.* at 997.  Two of these companies had entered into plea agreements with the DOJ, as had several of the companies' top executives.  *Id.* at 998-99.  The complaint also contained detailed factual allegations chronicling the formation, nature and extent, and policing of the conspiracy from a salesman and an officer with different packaged ice companies during the conspiracy.  *Id.* at 997-98.

The complaint sustained by the Seventh Circuit in *In re Text Messaging Antitrust Litigation*, 630 F.3d 622 (7th Cir. 2010), likewise alleged a narrow price fixing conspiracy among only four defendants who collectively held 90% of the market for a single homogenous product -- text messaging services in the United States.  *Id.* at 628.  The Seventh Circuit based its holding in large measure on "complex and historically unprecedented changes in pricing structure made at the same time by multiple competitors."  *Id.*

*In re Plasma-Derivative Protein Therapies Antitrust Litigation*, No. 1:09-cv-07666, 2011 U.S. Dist. LEXIS 13279 (N.D. Ill. Feb. 9, 2011), involved a highly-concentrated nationwide market for a single commodity product.  The complaint essentially tracked the formal complaint filed by the FTC, which had been prepared at the *conclusion* of an extensive merger investigation involving two of the alleged conspirators.  *Id.* at *7.

We will not belabor the point.  Simply put, the outcomes in the cases cited by Plaintiffs were rooted in facts and circumstances peculiar to those cases.  None of these decisions change the requirements of *Twombly* and *Iqbal*, nor lessen Plaintiffs' burden in this action; certainly none of them even remotely justifies the lack of factual detail Plaintiffs have provided for a conspiracy of the scope and complexity they purport to allege.

### A.      No *Facts* Support the Broad Conspiracy Alleged in the CAC.

The Direct Purchaser Plaintiffs attempt to label as "factual" substantial portions of the CAC that clearly are not.  As the Sixth Circuit recognizes, indeterminate assertions regarding "agreements," "defendants," and "conspiratorial discussions" are "precisely the type of naked conspiratorial allegations rejected by the Supreme Court in *Twombly*."  *In re Travel Agent Comm'n*, 583 F.3d at 905 (citations omitted).

The examples of "facts" allegedly supporting the CAC provided by Plaintiffs in their Opposition serve only to illustrate why the CAC fails to satisfy *Twombly*, *Iqbal*, *In re Travel Agent Comm'n*, and *Total Benefits*.  For example, the supposed "factual" support for the timing of the conspiracy -- allegations that "unlawful" communications were "frequent and regular," that price increase letters were exchanged and reviewed "routinely," and that the "conspiratorial discussions" took place "during the Class Period" (Opp'n 30-31 (emphasis and citations omitted)) -- are unquestionably the type of indeterminate, non-factual allegations the Sixth Circuit rejected in *Total Benefits*.  *See* 552 F.3d at 436-37; *see also In re LTL Shipping Servs. Antitrust Litig.*, No. 1:08-MD-01895-WSD, 2009 U.S. Dist. LEXIS 14276 (N.D. Ga. Jan. 29, 2009).  Although Plaintiffs try to distinguish *In re LTL Shipping* by characterizing it as little more than a parallel pricing case (Opp'n 33), the court in that case made clear that even if it assumed the existence of actual meetings and communications to discuss anticompetitive agreements, the allegation that an agreement was reached sometime "from 2003 to 2007" was "far too broad for the Court to infer an agreement."  2009 U.S. Dist. LEXIS 14276, at *66-67.

Plaintiffs likewise have alleged no facts that plausibly link their conspiracy allegations with the United States.  They do not address, for example, the careful analysis by Defendants Domfoam and Valle showing that the Vitafoam witnesses, and the Domfoam and Valle individuals with whom they allegedly communicated, all were located in Canada and worked for Canadian companies.  (*Compare* Opp'n 42 *and* Omnibus 17 *with* Domfoam and Valle's Mot. & Mem. Law Supp. Mot. to Dismiss Direct Purchaser Pls.' CAC (Dkt. No. 97) 5-7.)  Plaintiffs' efforts to connect the four anonymous "Vitafoam" witnesses and named "Vitafoam" employees Steve Pendock, Tim Prescott, and David Gurley to allegedly conspiratorial activity in the United States through conclusory, boilerplate assertions of illegality "in Canada and in the United

States" or in "North America" (*see* CAC ¶¶ 67, 73, 83-84) are plainly insufficient under *Twombly*.

"Facts" regarding each Defendant's participation in the alleged conspiracy are just as obviously lacking.  In their Opposition, Plaintiffs make clear that their *only* allegations regarding each Defendant's actual participation in the alleged conspiracy are variations of the simple assertion that unspecified "Defendants" "participated in conspiratorial discussions concerning pricing" or "had discussions, exchanges of information and agreements regarding the price of foam."  (Opp'n 34 (quoting CAC ¶ 92, 83).)  These are conclusions, not facts, and they do nothing to further the plausibility of the broad conspiracy alleged by Plaintiffs.

**B.      The Product and Geographic Markets Alleged in the CAC Render the Alleged Conspiracy Implausible.**

The CAC makes no effort to show any plausible correlation between the products, which are unspecified, the market, said to be the United States, or any of the twenty-six Defendants Plaintiffs claim are part of the horizontal price fixing and customer allocation conspiracy they attempt to allege.[5]  Instead of addressing these deficiencies, Plaintiffs simply argue that "a market definition is not required in cases of *per se* violations of the antitrust laws."  (Opp'n 37.) That misses the point.

The CAC must allege a plausible conspiracy.  That requires Plaintiffs to identify both the temporal and geographic scope of that conspiracy, as well as the defendants and products involved.  *Twombly* requires no less.  *See* 550 U.S. at 564-66 & n.10; *see also Total Benefits*, 552 F.3d at 436-37.  When they not only fail to provide those details, but also, as Plaintiffs have done

---

[5]  In their Opposition, Direct Purchaser Plaintiffs maintain that "the allegations of customer allocation are not a separate claim" from the price fixing claim.  (Opp'n 34.)  Thus, the price fixing and customer allocation allegations rise and fall together.

here, allege facts -- whether in the CAC or its legacy complaints -- inconsistent with their own "conspiracy" allegations, *Twombly*'s plausibility standard obviously is not satisfied.

For example, while Plaintiffs contend they "made particularized allegations" of conspiracy with regard to molded polyurethane foam (Opp'n 38), the CAC actually provides no more than a *generalized definition* of "flexible polyurethane foam" as "refer[ring] to both slabstock and molded polyurethane foam."  (CAC ¶ 1.)  In their Opposition, Plaintiffs attempt to defend this tautological pleading, not by providing relevant facts, but by relying on *other definitions* -- "definitions employed by the DOJ, as well as the Canadian Competition Bureau." (Opp'n 37 (footnotes omitted).)  However, they are selective in their reliance on these additional, but equally non-factual, definitions.  Thus, the government definitions they reference, among other things, define polyurethane foam to *include* "rigid" or "technical" foam, a product market *excluded* by the CAC.  (*Compare* Opp'n Ex. 3 at 2 (DOJ affidavit) *and* Opp'n at n.14 (quoting from the Canadian ITO) *with* CAC ¶ 56.)[6]  The DOJ and Canadian definitions also were available to the several Plaintiffs whose "legacy" complaints affirmatively disclaimed any allegation of a molded foam conspiracy, as Plaintiffs acknowledge.  (Opp'n 39.)  While Plaintiffs attempt to explain this contradiction by claiming to "have done investigation since [the filing of] those legacy complaints" (*id.*), no "new facts" from this "investigation" are anywhere evident in the CAC or in the Opposition.  Even the allegations about "automobile products" in 2004-05, referred to in Plaintiffs' Opposition (*see* Opp'n 38-39), are not new -- the same allegations were

---

[6]  Plaintiffs also part ways with the DOJ's definition of slabstock (or "block") foam as "commodity foam," and molded foam as "engineered foam" (*see* Opp'n Ex. 3 at 2), now preferring to embrace yet *another* definition that borrows from both: "molded and slabstock foam are collectively referred to as a 'commodity' by the Polyurethane Foam Association."  (Opp'n 5-6 (citing CAC ¶¶126-28).)  But this definition is not found in the CAC at all (much less attributed to the PFA); to the contrary, the CAC *specifically alleges* that "block foam" is "known as *commodity or slabstock* foam" and that "*engineered*, or molded, foam" is a *separate* product "fabricated" through a *distinct* production process.  (CAC ¶¶56-58 (emphasis added).)

made in a number of pre-CAC complaints -- and do not relate to molded foam (as opposed to commodity slabstock) in any event.

### C. The Existence of Government Investigations Does Not Cure the Deficiencies of Direct Purchaser Plaintiffs' CAC.

Plaintiffs place great significance on the existence of ongoing investigations by DOJ and Canadian authorities even though these governmental investigations are insufficient as a matter of law to provide the factual support needed to survive a motion to dismiss. *See, e.g.*, *In re Graphics Processing Units Antitrust Litig*, 527 F. Supp. 2d 1011, 1024 (N.D. Cal. 2007) (finding that the existence of a grand jury investigation "carries no weight in pleading an antitrust conspiracy claim").[7] Any other approach would require the Court to assume that the scope of these confidential investigations is *identical* to the scope of the conspiracy Plaintiffs purport to allege, and that the investigations ultimately will find not just wrongdoing, but wrongdoing co-extensive with those allegations. How that could be so here, where a number of Defendants are not even the subject of the government investigations, is never explained by Plaintiffs.

The claims Plaintiffs make in their Opposition concerning Vitafoam make this point clearly. Even assuming as true, for example, that Vitafoam has submitted an application under the DOJ Antitrust Division Leniency Program, and further assuming some of its current or former employees made the statements attributed to them in the CAC, those assumptions would not make it plausible that *all* Defendants violated the U.S. antitrust laws with regard to *all* polyurethane foam products *throughout the United States* from *1999* forward. The fact the CAC and Plaintiffs have to rely so heavily on alleged statements of employees of Vitafoam, a single

---

[7] The irrelevance of these investigations to whether the CAC satisfies the pleading requirements of *Twombly* and *Iqbal* is underscored by statistics from the Antitrust Division that indicate that, in 2009 alone, the Division initiated 38 grand jury investigations, terminated 31 such investigations, and had 144 pending. *See* U.S. Dep't of Justice Antitrust Div., Ten Year Workload Statistics Report FY 2000-2009, 4, http://www.justice.gov/atr/public/workload-statistics.pdf (last visited May 10, 2011).

participant in the claimed "agreement," further underscores the utter *implausibility* of the sprawling conspiracy alleged in the CAC.

Fundamentally, Plaintiffs are asking the Court to assume that the allegations of the CAC align exactly with the scope of investigations by the DOJ and the Canadian Competition Bureau, that the investigations will result in criminal charges against all Defendants, even the several who are not the subject of any investigation, and that the alleged disclosures attributed to Vitafoam employees support their conspiracy allegations even though Vitafoam itself has moved to dismiss the CAC.  It is a classic "where there is smoke, there must be fire" argument, the quintessential speculative pleading, and plainly inadequate under *Twombly.*

**D.      Plaintiffs Incorrectly Rely on the *Urethanes* Litigation, Which Actually Supports Defendants' Motion to Dismiss.**

Plaintiffs' reliance on *In re Urethane Antitrust Litigation*, 683 F. Supp. 1214 (D. Kan. 2010), to support their claim that the purported conspiracy has existed since at least 1999 is puzzling.  (*See* Opp'n 19-20, 32-33.)  The argument seems to be that because a lengthy conspiracy period was alleged with respect to urethane products in *Urethanes*, so too should a lengthy conspiracy period be allowed here.  The logical fallacy is unmistakable.

It is what Plaintiffs do not say about *Urethanes*, however, that is more significant.  In *Urethanes*, the court originally *dismissed* portions of the complaint that related to the time period before 1999 because of "plaintiff's failure to allege any meetings or communications occurring prior to 1999."  *Id.* at 1233.  *See also In re Urethane Antitrust Litig.*, 663 F. Supp. 2d 1067, 1076-77 (D. Kan. 2009) (citing *Twombly*, 550 U.S. at 565 n.10).  The *Urethanes* plaintiffs were able to remedy this deficiency by amending the complaint to include allegations, according to the court, of "various meetings and communications dating back to at least 1994, involving specific participants . . . including at least one from each defendant[], and occurring in specific

-11-

locations." 683 F. Supp. 2d at 1233. Since large portions of the amended complaint were filed under seal, it is not possible to evaluate the specificity of these allegations, other than to note that the *Urethanes* court found them sufficiently detailed to reverse its earlier decision dismissing portions of the complaint.

Plaintiffs also attempt to use a recent discovery order in *Urethanes* to argue that since some, but not nearly all, of the Defendants will be incurring the cost of civil discovery in *Urethanes* on issues relating to the allegations in the CAC, no extra burden will be imposed on Defendants if the Court allows discovery to proceed in this MDL as well. (Opp'n 26.) *Twombly*, of course, permits no such exception. The fact that the staggering costs of discovery normally attendant to antitrust cases might be mitigated somewhat by events external to the litigation cannot extinguish Plaintiffs' duty to plausibly plead a conspiracy entitling them to pursue a cause of action in the first place. Plaintiffs' argument, moreover, ignores the fact that at least half of the Defendants named in the CAC are *not* plaintiffs in *Urethanes* and are not subject to that discovery order. Even the Defendants who are involved in *Urethanes* continue to negotiate the scope of their discovery obligations, which remain undecided. Just as importantly, Plaintiffs do not commit to limit their own discovery here to that permitted in *Urethanes*. They almost surely will seek broader discovery, meaning that all Defendants would face a significant added burden if discovery were allowed to proceed under the CAC as presently pled, regardless of what happens in *Urethanes*.

III.     **Direct Purchaser Plaintiffs' Claims of Alter Ego or Control Liability Fail.**

Direct Purchaser Plaintiffs have alleged claims against a number of Defendants based solely on conclusory allegations that those Defendants were the "alter ego" of or had "control" over another Defendant. (*See* Mem. 19-20 & n.2.) In their Omnibus brief, Plaintiffs attempt to

defend their allegations by standing *Twombly* on its head and arguing that because alter ego or piercing of corporate veil theories are fact-specific, they should be exempt from *Twombly*'s requirements.  (*See* Omnibus 6-8.)  However, pleading facts, not legal conclusions, is obviously more, not less, important for a claim that is factual in nature, and the Sixth Circuit has expressly rejected claims under Rule 12(b)(6) that are "nothing more than a legal conclusion 'masquerading' as a factual allegation."  *In re Travel Agent Comm'n*, 583 F.3d at 905.

Plaintiffs simply ignore the many post-*Twombly* decisions that have applied the plausibility standard *expressly* to alter ego and veil piercing allegations.  *See, e.g.*, *Oliver v. St. Luke's Dialysis, LLC*, No. 1:10-cv-2667, 2011 WL 1326251, at *6 (N.D. Ohio Apr. 5, 2011) (dismissing claim predicated on piercing defendant's corporate veil); *Pureworks, Inc. v. Brady Corp.*, No. 3:09-cv-00983, 2010 WL 3724229, at *10 (M.D. Tenn. Sept. 15, 2010) (ignoring plaintiff's legal conclusions presented as factual allegations pursuant to *Iqbal* and dismissing alter ego claim upon examining what remained of plaintiff's allegations); *Clark v. Bucyrus Int'l*, No. 5:08-cv-434-JHM, 2009 WL 2163117, at *2 (E.D. Ky. July 17, 2009) (applying *Twombly* and dismissing claim based on vicarious liability).  The cases Plaintiffs cite in support of their position, moreover, either were decided prior to *Twombly* or are easily distinguished.  (*See* Omnibus 7, 20-21.)  In *Roofers Local 149 Security Benefit Trust Fund v. Milbrand Roofing Group, Inc.*, No. 05-cv-60218, 2008 WL 53710, at *2-5 (E.D. Mich. Jan. 3, 2008), for example, a *plaintiff's* motion for summary judgment seeking to find alter ego and veil piercing as a matter of law was denied.

In *Fortress Value Recovery Fund I, LLC v. Columbus Components Groups LLC*, No. 1:11-cv-00200, 2011 WL 1130442, at *5 (N.D. Ohio Mar. 28, 2011), plaintiff alleged extensive facts supporting its veil-piercing theory, including, *inter alia*, that various defendants did not

observe proper corporate formalities or keep separate books and records; that defendants shared specifically identified management and employees; that defendants maintained the same business address; and that some defendants were not adequately capitalized -- allegations lacking in the present case.

Finally, in *Wachovia Bank, N.A. v. Zomax Inc.*, No. 2:09-cv-0076, 2009 WL 3698443 (S.D. Ohio Nov. 3, 2009), one of several co-defendants in an interpleader action, previously had obtained a judgment against a co-defendant, Zomax, whose funds had been garnished by yet another co-defendant that cross-claimed for recovery against the entity that allegedly controlled Zomax as a result of its private equity funding.  2009 WL 3698443, at *2.  Noting that under Sixth Circuit precedent it is possible to pierce the corporate veil when "two enterprises have substantially identical management, business, purpose, operation, equipment, customers, supervisors, and ownership," the district court accepted the co-defendant's allegations of control as sufficient in the special circumstances of this case.  *Id.* at *6 (internal citation omitted).

## IV.   Direct Purchaser Plaintiffs Do Not Satisfy the Pleading Requirements for Fraudulent Concealment, and the Limitations Period for Their Antitrust Claims Should Not Be Tolled.

In an effort to invoke equitable tolling to avoid the bar of the statute of limitations for any claims accruing more than four years before this action was commenced, Plaintiffs conflate the doctrine's three required elements into one and claim they have properly pled fraudulent concealment simply by reciting the catch phrase, "affirmative acts of concealment."  (Opp'n 47-48.)  The law of the Sixth Circuit requires more.

"Three elements must be pleaded in order to establish fraudulent concealment:  (1) wrongful concealment of their actions by the defendant; (2) failure of the plaintiff to discover the operative facts that are the basis of his cause of action within the limitations period; and (3)

-14-

plaintiff's due diligence until discovery of the facts." *Dayco Corp. v. Goodyear Tire & Rubber Co.*, 523 F.2d 389, 394 (6th Cir. 1975)*; see also Pinney Dock & Transp. Co. v. Penn Cent. Corp.*, 838 F.2d 1445, 1465 (6th Cir.), *cert. denied*, 488 U.S. 880 (1988).

As to the third element, it is not enough that the Direct Purchaser Plaintiffs simply state that affirmative acts of concealment have occurred; they instead must "fully plead the facts and circumstances surrounding [their] belated discovery 'and the delay which has occurred must be shown to be consistent with the requisite diligence.'" *Dayco Corp.*, 523 F.2d at 394 (citations omitted); *see also Egerer v. Woodland Realty, Inc.*, 556 F.3d 415, 422 (6th Cir. 2009); *Pinney Dock*, 838 F.2d at 1465.

Nevertheless, in the CAC, Direct Purchaser Plaintiffs provide only a single conclusory allegation regarding their due diligence:

> Plaintiffs and the Class members did not discover, nor could have discovered through reasonable diligence, that Defendants and their co-conspirators were violating the antitrust laws until shortly before this litigation was initially commenced, because Defendants and their co-conspirators used deceptive and secret methods to avoid detection and to affirmatively conceal their violations.

(CAC ¶ 133.)  They do not allege, as they must, that they made reasonable investigations to discover the alleged conspiracy, nor have they detailed when they made them or what they did. As a consequence, any claims arising more than four years prior to the filing of the first complaint in this multi-district litigation must be dismissed.  *See, e.g.*, *Hinds Cnty. v. Wachovia Bank N.A.*, 620 F. Supp. 2d 499, 521-22 (S.D.N.Y. 2009) (rejecting a nearly identical allegation as not adequately pleading fraudulent concealment).

The cases cited by Plaintiffs are not to the contrary.  (*See* Opp'n 47-48.)  By way of example, in *Michigan ex rel. Kelley v. McDonald Dairy Co.*, 905 F. Supp. 447 (W.D. Mich. 1995), the complaint, unlike the CAC, explained how plaintiffs "exercised due diligence in

-15-

attempting to uncover any collusion among bidders for the milk contracts by using a sealed bid system and then reviewing the contracts in detail before awarding the winner." *Id.* at 453. Plaintiffs also rely on cases restating that the fraudulent concealment doctrine has three requisite elements (*see* Opp'n 47-48), including that "plaintiffs exercised due diligence in trying to find out about the cause of action," all of which must be satisfied. *In re Packaged Ice*, 723 F. Supp. 2d at 1017-18.[8]  Other cases cited by Plaintiffs (Opp'n 48) expressly confirm that due diligence, like all elements of a fraud claim, must be plead with particularity. *See, e.g.*, *Conmar Corp. v. Mitsui & Co. (U.S.A.), Inc.*, 858 F.2d 499, 502 (2d Cir. 1988) (holding that "[c]onclusory statements are not enough.  [Plaintiff] must plead with particularity the circumstances of the concealment and the facts supporting its due diligence")).  And, clearly, Plaintiffs' reliance on *Urethanes* is misplaced (*see* Opp'n 49), because the court never addressed the adequacy of the due diligence allegations in that complaint.  683 F. Supp. 2d at 1235-36.

Direct Purchaser Plaintiffs have not adequately pled their due diligence in discovering Defendants' alleged misconduct and claims for damages allegedly sustained more than four years before this action was commenced are time barred and should be dismissed.

## V.    <u>Further Arguments in Support of Individual Defendants' Separately Filed Memoranda in Support of Their Motions to Dismiss.</u>

### A.    <u>Plaintiffs Have Failed to Allege that Plastomer and Otto Bock Were Part of the Conspiracy Alleged in the CAC.</u>

Plaintiffs concede that the only paragraph of the CAC that accuses Plastomer and Otto Bock of alleged illegal conduct is paragraph 83.  (*See* Omnibus 44-45 (citing the Canadian

---

[8]  The district court in *In re Packaged Ice* also criticized the plaintiffs' reliance on *In re Scrap Metal Antitrust Litigation*, 527 F.3d 517, 537 (6th Cir. 2008).  The court pointed out that, contrary to plaintiffs' argument, the Sixth Circuit did not rule that instructing the jury that "a conspiracy is, by its nature, self-concealing" is appropriate in a fraudulent concealment claim in a conspiracy case.  723 F. Supp. 2d at 1018 n.17.  Rather, the Sixth Circuit merely held that on the facts of that case, the instruction was harmless error.  *Id.* (citing *In re Scrap Metal*, 527 F.3d at 538).  Direct Purchaser Plaintiffs make precisely the same argument (*see* Opp'n 47 n.19), which, for the same reason, should be rejected.

affidavit and alleging that Witness A had "discussions, exchanges of information and agreements regarding the price of foam" with Plastomer and Otto Bock).) That paragraph, however, lacks any additional details of Witness A's supposed interactions -- including where and when those interactions occurred and what any purported "agreements" entailed -- and fails to plausibly link Plastomer and Otto Bock to the alleged conspiracy. For Plastomer, Plaintiffs are reduced to asserting that that their pleadings (including the incorporated Canadian affidavit) do *not* allege that "Plastomer was *not* part of a conspiracy to fix prices." (Opp'n 47.) But indeed, the Canadian affidavit incorporated into the CAC -- on which Plaintiffs rely for their only allegations against Plastomer and Otto Bock -- contradicts Plaintiffs' conclusory assertions. In the affidavit, the Canadian Competition Bureau excludes those two companies as alleged cartel members. (*See* Otto Bock's Mem. Law Supp. Mot. to Dismiss (Dkt. No. 96) Ex. A ¶ 5.1.) Only one plausible conclusion can be drawn -- that neither Otto Bock nor Plastomer participated in any alleged conspiracy.

As the Sixth Circuit observed in *NicSand, Inc. v. 3M Co*., 507 F.3d 442, 457 (6th Cir. 2007), "[w]hile [the court] must accept all of a claimant's allegations as true at this stage of a case, that does not mean we must ignore those allegations when they defeat the claim . . . ," and the claims against Plastomer and Otto Bock must be dismissed.

**B.**     **Plaintiffs Mischaracterize Their Own Complaint Regarding the Allegations Pertaining to Mohawk and Leggett & Platt.**

The Direct Purchaser Plaintiffs have alleged no conspiratorial conduct by Leggett & Platt or Mohawk. Nevertheless, they misleadingly claim that "[t]he CAC lists instances where Vitafoam admitted to conspiring with Leggett and Mohawk." (Omnibus 42.) The CAC, however, lacks even a *single* allegation that Vitafoam -- or any other Defendant -- admitted to conspiring with Leggett & Platt and Mohawk, and there are no allegations of conspiratorial

activity by any Leggett & Platt or Mohawk employee.  Instead, the CAC alleges only that (i) in a phone call to a Vitafoam employee, a Valle Foam employee stated that he had price increase letters of Leggett & Platt and Mohawk (CAC ¶ 105); (ii) that the same Vitafoam employee stated in a different call that someone named Stan had seen a Mohawk price increase letter (*id.* ¶ 106); and (iii) that an email from a Vitafoam employee stated that he had heard -- in conversations with competitors *other* than Mohawk or Leggett & Platt -- that Mohawk had increased prices in certain areas and not increased them in others.  (*Id.* ¶ 112(l).)  The allegation that some competitors had some information in their files regarding pricing by these Defendants obviously is not inconsistent with legitimate, non-conspiratorial business conduct.

Without "facts" to support their claims against Leggett & Platt and Mohawk, Plaintiffs once again turn to the search warrant affidavit executed by an agent of the Canadian Competition Bureau for support.  (Omnibus 43.)  Nowhere in that affidavit, however, is there any factual allegation of conspiratorial activity by either Defendant.[9]  Even if that were not the case, neither law nor logic requires this Court to cede its authority to an officer of a foreign government conducting an investigation in Canada to determine if sufficient allegations exist against Leggett & Platt or Mohawk to permit this action to continue against them based on claims of an expansive, long-running conspiracy in the United States.

    C.    <u>Plaintiffs Do Not Even Allege that Inoac USA or Crest Actually Conspired.</u>

Plaintiffs simply do not allege, even in a conclusory fashion, that Inoac USA or Crest conspired with anyone.  To the contrary, the CAC specifically alleges that Inoac USA did *not* engage in any price fixing or market allocation discussions.  (*See* CAC ¶ 83 & n.1.)  Plaintiffs nevertheless attempt to link Inoac USA, which is not alleged to have sold any of the foam

---

[9]  A condensed copy of that affidavit detailing all mentions of Leggett & Platt and Mohawk was provided with their Motions to Dismiss.  (*See* Dkt. No. 100-1, Ex. 2.)

products allegedly subject to conspiratorial activities, to activities attributed to its Japanese affiliate, Inoac International, Inc., (which is not alleged (even in a conclusory way) to have any ownership or control over Inoac USA) and its Japanese parent, Inoac Corp (not alleged to have conspired).  Moreover, as discussed in Section III, *supra*, and Dkt. No. 89 at 6-7, ownership does not suffice to establish USA's liability for alleged actions of a parent.

Plaintiffs also attempt to recast Crest's Motion as simply a denial of (former Vitafoam President) Bill Lucas' alleged authority over Crest, but ignore the critical deficiencies in the allegations of the CAC.  First, nowhere do they allege facts establishing Lucas' authority over Crest, other than Vitafoam's ownership interest in Crest.[10]  (*Id.*)  Second, no allegation:  (a) contends that the "prices" allegedly discussed between Mr. Lucas and "Witness A" were in fact Crest's prices (as opposed to those of Mr. Lucas' employer at the time), (b) identifies any discussions as involving the prices as foam prices (as opposed to foam inputs), or (c) identifies any discussions as "horizontal."

Neither of the government affidavits on which Plaintiffs overwhelmingly rely, moreover, asserts that Crest and USA are even potential conspirators.  (Dkt. No. 89 at 1-3, 5-6 & n.5.)  To the contrary, they expressly *disprove* Inoac USA and Crest's participation in any conspiracy:  "Witness A" in the government investigations and the sole source of these allegations, excluded both Crest and USA from the "list" of parties allegedly discussing or agreeing on foam prices.  (*See* CAC ¶ 83 & Table I.)  *See NicSand*, 507 F.3d at 457.

---

[10]  Plaintiffs mischaracterize Crest as a "joint venture," but do not attempt to connect the "joint venture" with an unlawful price-fixing conspiracy in any event.  *See Texaco Inc. v. Dagher*, 547 U.S. 1 (2006).

D.     **The CAC Fails to Allege Any Conspiratorial Conduct by FXI.**

Direct Purchaser Plaintiffs concede the clarity of the Asset Purchase Agreement ("APA")

and Chief Judge Carey's APA Order.  (*See* Dkt. 101-1, Exs. A(1)-(3) (copy of APA) & C(1)-(4)

(copy of APA Order and exhibits thereto).)  They do not challenge the Bankruptcy Court's

jurisdiction to enter the APA Order.  Nor do they suggest that Chief Judge Carey's approval of

the § 363(f) asset purchase -- based as it was on valid and binding Third Circuit precedent -- was

somehow improper.  Instead, Plaintiffs argue that this Court should simply ignore the APA

Order, disregard the Bankruptcy Court's express findings, and re-write the Asset Purchase

Agreement.  Plaintiffs' arguments are meritless.

An indisputable fact bears repetition:  FXI is *not* Foamex International, Inc.  Nor is FXI

"f/k/a Foamex International, Inc."  (CAC ¶ 23.)  Carelessly or intentionally, Plaintiffs conflate

separate and distinct corporate entities.  Their indiscriminate use of the name "Foamex" makes it

virtually impossible to determine whether Plaintiffs are referring to FXI or Foamex International.

(*See*, *e.g.*, Omnibus 59 (referring to "Foamex's pre-Asset Sale liability").)  They characterize the

Delaware bankruptcy proceeding as a mere charade.  (*Id.* at 69 ("[E]ven after the Asset Sale to

Foamex closed in June 2009, Foamex simply continued with its ongoing business . . . [and]

continued its involvement in the conspiracy").)  Plaintiffs contend that "Foamex did not

suddenly, after being sold, start a new business."  (*Id.*)  Neither FXI nor Foamex International

was "sold."  FXI was incorporated on May 29, 2009, and on June 12, 2009, purchased

specifically defined assets in bankruptcy from Foamex International -- with specifically defined

exclusions.

The CAC fails to allege successor liability, and Plaintiffs' Omnibus offers only vague

hints at such a claim, with no attempt to satisfy any of the applicable elements under New York

law.  With good reason.  The Bankruptcy Court's findings preclude successor liability.[11]  Chief

Judge Carey found that "no common identity of directors or controlling stockholders exists

between the Purchaser and any of the Debtors."  (APA Order ¶ L(f).)  Foamex International, re-

named Linwood International Holdings, Inc., survived the asset sale as a bankrupt entity.  (Dkt.

101-1, Ex. I.)  The Bankruptcy Court found:

> The Purchaser would not have entered into the Final APA and would not
> consummate the transactions contemplated thereby if the sale of the Purchased
> Assets to the Purchaser and the assumption of any Assumed Liabilities by the
> Purchaser were not free and clear of all Liens and Claims, other than the
> Permitted Liens and Assumed Liabilities.

(APA Order ¶ X.)  Plaintiffs concede "such provisions are common in bankruptcy orders"

(Omnibus 68 n.17), but nevertheless urge the Court to disregard the APA Order.[12]

Plaintiffs contend that the Sixth Circuit's narrow interpretation of § 363(f) in *In re

Wolverine Radio Co.*, 930 F.2d 1132 (6th Cir. 1991), permits the Court to ignore the APA Order.

(Omnibus 60.)  Plaintiffs are incorrect.  The Sixth Circuit's construction of § 363(f) did not and

does not bind the Delaware Bankruptcy Court.  Plaintiffs admit the Third Circuit's decision in *In

re Trans World Airlines, Inc.*, 322 F.3d 283 (3d Cir. 2003), authorizes the Bankruptcy Court's

approval of the § 363 asset sale, but argue that *In re Trans World*'s holding is "inconsistent with

*Wolverine Radio*" and "unnecessar[y]."  (Omnibus 60 n.12.)  Courts, however, take a different

---

[11]  (*See* APA Order ¶ S (finding no mere continuation, no continuity of enterprise, no successor status, and no de
facto merger); *id.* ¶ X ("Purchaser shall not be responsible for any . . . Claims, including in respect of . . . any
theories of successor liability."); *id.* ¶ J ("The Purchaser is not an 'insider' of the Debtors, as that term is defined in
section 101(31) of the Bankruptcy Code.").)  Under 11 U.S.C. § 101(31), an "insider" includes a director, an officer,
a "person in control," a general partner, or an affiliate of the debtor.

[12]  In identical circumstances, the Second Circuit, relying on *In re Trans World Airlines, Inc.*, 322 F.3d 283, 292 (3d
Cir. 2003), rejected a claim for successor liability after a § 363 asset sale.  *See also Douglas v. Stamco*, 363 Fed.
Appx. 100, 102 & n.2 (2d Cir. 2010) ("Allowing the plaintiff to proceed with his tort claim . . . would be
inconsistent with the Bankruptcy Code's priority scheme because plaintiffs' claim is otherwise a low-priority,
unsecured claim. . . . [I]t is evident that the potential chilling effect of allowing a tort claim subsequent to the sale
would run counter to the core aim of the Bankruptcy Code, which is to maximize the value of the assets and thereby
maximize potential recovery to the creditors."  *Id.* at 102-03); *see also Myers v. United States*, 297 B.R. 774, 780-82
(Bankr. S.D. Cal. 2003).  *Compare* APA Order ¶ BB ("[T]he immediate consummation of the Sale to the Purchaser
is necessary and appropriate to maximize the value of the Debtors' estates and the Sale will provide the means for
the Debtors to maximize distributions to creditors.").)

-21-

view of binding precedent.[13]

In essence, Plaintiffs want the Court to permit the prosecution of a claim the Bankruptcy Court expressly prohibited -- a claim under a "theory of antitrust . . . relating to the operation of . . . the Purchased Assets prior to the Closing."  (APA Order ¶ 25.)  Such a collateral attack on the APA Order is impermissible.[14]  The Bankruptcy Court retained jurisdiction to:

> interpret, implement, and enforce the terms and provisions of this Order and the Final APA . . . and to adjudicate, if necessary, any and all disputes concerning or relating in any way to the Sale, including, but not limited to, retaining jurisdiction to . . . interpret, implement and enforce the provisions of this Order [and] protect Purchaser against any Liens, Claims or other interest in or against the Sellers or the Purchased Assets of any kind or nature whatsoever, attaching to the proceeds of the Sale . . . .

(APA Order ¶ 40.)  Plaintiffs' challenge to the Bankruptcy Court's exclusion of antitrust claims from the Purchased Assets should be brought, if at all, before Chief Judge Carey.  Their collateral challenge here is plainly improper.

Plaintiffs argue that, under the "fair contemplation test," their antitrust claim "did not arise prior to the Asset Sale."  (Omnibus 61.)  This is a red herring.  The "fair contemplation test" prevents extinguishment of previously unknown claims against the *debtor*.  It does not authorize claims against a § 363(f) asset purchaser that the Bankruptcy Court has expressly

---

[13]  *In re Wolverine* is, in any event, distinguishable.  It addressed only § 363(f), but the Bankruptcy Court did not rely solely on § 363.  The APA Order also cited 11 U.S.C. § 105(a), which addresses the Bankruptcy Court's equitable power to issue orders "necessary or appropriate to carry out the provisions of this title."  (APA Order ¶ B.)  *See also In re White Motor Credit Corp.*, 75 B.R. 944, 948 (Bankr. N.D. Ohio 1987) (authority to sell free and clear "is implicit in the court's general equitable powers" regardless of § 363).  Further, in *In re Wolverine*, the Sixth Circuit found nothing to suggest the bankruptcy court intended to include the claim type at issue among those barred by the court.  930 F.2d at 1147.  Here, by contrast, the Bankruptcy Court expressly precluded "Claims . . . under any theory of antitrust" in a section of the APA Order entitled "Prohibition of Actions Against the Purchaser."  (APA Order ¶ 25.)  The intent of the parties and the Bankruptcy Court could not be clearer.

[14]  *See Celotex Corp. v. Edwards*, 514 U.S. 300, 313 (1995) (refusing to permit collateral attack on bankruptcy order; "[I]t is for the court of first instance to determine the question of the validity of the law, and until its decision is reversed for error by orderly review, either by itself or by a higher court, its orders based on its decision are to be respected. . . . If respondents believed the Section 105 Injunction was improper, they should have challenged it in the Bankruptcy Court.") (citation omitted); *Pratt v. Ventas, Inc.*, 365 F.3d 514, 520 (6th Cir. 2004) (affirming district court's reliance on *Celotex* to require litigant to go through "proper channels of the statutorily-defined appellate process" to challenge bankruptcy court's judgment).

prohibited, or create an exception to the general rule that a purchaser of assets does not acquire the liabilities of the seller.

Plaintiffs also contend that "their claims are not affected by the Sale" because they did not receive written notice.  (Omnibus 65.)  As the APA and the APA Order make abundantly clear, the § 363 asset sale specifically excluded (and FXI did not purchase) any alleged antitrust liability of Foamex International prior to the June 12, 2009 closing.  Any alleged lack of notice in no way transforms Plaintiffs' purported claims against Foamex International into claims against FXI.

Finally, Plaintiffs assert that "Foamex continued the price fixing scheme after the Asset Sale."  (Omnibus 68.)  The CAC, however, contains no allegation -- conclusory or not -- that FXI ever joined the conspiracy, and no allegation of conspiratorial conduct by FXI, or any FXI representative, after June 12, 2009.[15]  Plaintiffs simply presume, incorrectly and improperly, that FXI and Foamex International are one and the same entity.  (*Id.* at 69) ("[E]ven after the Asset Sale to Foamex closed in June 2009, Foamex simply continued with its ongoing business.").  They are not, and the Court should accordingly dismiss Plaintiffs' claims against FXI.

## CONCLUSION

Plaintiffs never address Defendants' core challenge to the CAC -- its failure to provide sufficient facts to support the actual scope and substance of the conspiracy Plaintiffs purport to plead.  They acknowledge that failure by seeking to circumvent it, arguing that the Court should substitute a new "slight evidence" rule for determining the sufficiency of antitrust pleadings

---

[15] Nor is the mere hiring of some of the Debtors' employees sufficient to create successor liability.  *See Kretzmer v. Firesafe Prods. Corp.*, 805 N.Y.S.2d 340, 341 (N.Y. App. Div. 2005).  On page 59 of the Omnibus, Plaintiffs also incorrectly suggest that the allegation in paragraph 112(c) of the CAC relates to FXI.  Notwithstanding Plaintiffs' insertion of "[from Foamex]," into the quote from paragraph 112(c), that paragraph's October 2004 reference to "Lucas" is not a reference to FXI.  The CAC repeatedly alleges that "Lucas" is a Vitafoam employee.  (*See* CAC ¶¶ 85, 92.)

rather than following *Twombly*.  Implicitly recognizing the futility of this argument, Plaintiffs

next attempt to save the CAC from dismissal by attempting to recast obviously conclusory

allegations regarding "conspiracy" and "collusion" as factual.  Plaintiffs eventually retreat to the

fact of ongoing criminal investigations of largely unknown scope and merit, and the *Urethanes*

litigation, as appropriate justifications for the Court to excuse their inability to satisfy *Twombly*

and *Iqbal*.  *Twombly* and *Iqbal* require more, and the CAC should be dismissed.


Dated:  May 11, 2011                              Respectfully submitted,


/s/  James H. Walsh                               /s/  Kendall Millard
James H. Walsh                                    Kendall Millard
Howard Feller                                     BARNES & THORNBURG, LLP
Bethany Lukitsch                                  11 South Meridian Street
MCGUIREWOODS LLP                                  Indianapolis, IN 46204-3535
One James Center                                  Phone: (317) 231-7461
901 East Cary Street                              Fax:    (317) 231-7433
Richmond, VA 23219-4030                           kmillard@btlaw.com
Phone: (804) 775-4356
Fax:    (804) 698-2200
jwalsh@mcguirewoods.com                           /s/   Michael D. Mustard
hfeller@mcguirewoods.com                          Michael D. Mustard
blukitsch@mcguirewoods.com                        BARNES & THORNBURG LLP
                                                  600 One Summit Square
                                                  Fort Wayne, IN 46802-3119
                                                  Phone:  (260) 423-9440
*Counsel for Carpenter Co., E.R.*                 Fax:    (260) 424-8316
*Carpenter, L.P., Carpenter Holdings, Inc.*       mmustard@btlaw.com
*and Carpenter Canada Co.*

                                                  *Counsel for Flexible Foam Products, Inc.,*
                                                  *Ohio Decorative Products, Inc.*

/s/   Frank A. Hirsch, Jr.
Frank A. Hirsch, Jr.
Matthew P. McGuire
ALSTON & BIRD LLP
4721 Emperor Blvd.
Suite 400
Durham, NC 27703
Phone:  (919) 862-2200
Fax:      (919) 852-2260
frank.hirsch@alston.com
matt.mcguire@alston.com

*Counsel for Hickory Springs*
*Manufacturing Company*

/s/   Howard B. Iwrey
Howard B. Iwrey
DYKEMA GOSSETT, PLLC
39577 Woodward Ave., Suite 300
Bloomfield Hills, MI 48304-2820
Phone:  (248) 203-0526
Fax:      (248) 203-0763

*Counsel for Inoac USA Inc. and Crest*
*Foam Industries, Inc.*

/s/   Edward G. Warin
Edward G. Warin
John P. Passarelli
Angela K. Wilson
KUTAK ROCK LLP
1650 Farnam Street
Omaha, NE  68102
Phone:  (402) 346-6000
Fax:      (402) 346-1148
edward.warin@kutakrock.com
john.passarelli@kutakrock.com
angela.wilson@kutakrock.com

*Counsel for Future Foam, Inc.*

/s/   Daniel R. Warncke
Daniel R. Warncke
TAFT STETTINIUS & HOLLISTER LLP
425 Walnut Street, Suite 1800
Cincinnati, OH 45202-3957
Phone:  (513) 381-2838
Fax:  (513) 381-0205
warncke@taftlaw.com

Joe Rebein
SHOOK, HARDY & BACON LLP
2555 Grand Blvd.
Kansas City, MO 64108
(816) 559-2227
jrebein@shb.com

*Counsel for Leggett & Platt, Incorporated*

/s/   Francis P. Newell
Francis P. Newell
Peter M. Ryan
COZEN O'CONNOR
1900 Market Street
Philadelphia, PA 19103
Phone:  (215) 665-2118
Fax:      (215) 665-2013
fnewell@cozen.com
pryan@cozen.com

*Counsel for FXI - Foamex Innovations, Inc.*

/s/   Richard A. Duncan
Richard A. Duncan, MN# 192983
Aaron D. Van Oort, MN# 315539
Emily E. Chow, MN# 0388239
FAEGRE & BENSON LLP
2200 Wells Fargo Center
90 South Seventh Street
Minneapolis, MN 55402-3901
Telephone: (612) 766-7000
Facsimile: (612) 766-1600
rduncan@faegre.com
avanoort@faegre.com
echow@faegre.com

Robert A. Bunda, OH# 0019775
Theresa R. DeWitt, OH# 0010171
Bunda Stutz & DeWitt PLL
3295 Levis Commons Boulevard
Perrysburg, OH 43551
Telephone: (419) 241-2777
Facsimile: (419) 241-4697
rabunda@bsd-law.com
trdewitt@bsd-law.com

*Counsel for Otto Bock Polyurethane Technologies, Inc.*

/s/   Robert J. Gilmer, Jr.
Robert J. Gilmer, Jr.
EASTMAN & SMITH LTD.
One SeaGate, 24th Floor
P.O. Box 10032
Toledo, Ohio 43699-0032
Phone: (419) 247-1766
Fax:    (419) 247-1777
rjgilmer@eastmansmith.com

/s/   Timothy J. Coleman
Timothy J. Coleman
Bruce McCulloch
Terry Calvani
John K. Warren
FRESHFIELDS BRUCKHAUS
DERINGER US LLP
701 Pennsylvania Avenue, NW
Suite 600
Washington DC 20004-2692
Phone: (202) 777-4555
Fax:    (202) 777-4555
tim.coleman@freshields.com

*Counsel for Vitafoam, Inc. and Vitafoam
Products Canada Ltd.*

/s/   Randall L. Allen
Randall L. Allen
Teresa T. Bonder
Erica F. Ghali
ALSTON & BIRD LLP
One Atlantic Center
1201 W. Peachtree St.
Atlanta, GA 30309
Phone:  (404) 881-7000
Fax:     (404) 881-7777
randall.allen@alston.com
teresea.bonder@alston.com
erica.ghali@alston.com

*Counsel for Mohawk Industries, Inc.*

/s/   Daniel G. Swanson
Daniel G. Swanson
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA 90071
Phone: (213) 229-6690
Fax:    (213) 229-6919
dsawnson@gibsondunn.com

Cynthia Richman
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, DC 20036-5306
Phone:  (202) 530-8500
Fax:     (202) 530-9651
crichman@gibsondunn.com

*Counsel for Woodbridge Foam
Corporation, Woodbridge Sales and
Engineering, Inc., and Woodbridge Foam
Fabricating, Inc.*

/s/   Sheldon Klein
Sheldon Klein
BUTZEL LONG
Stoneridge West
4100 Woodward Ave.
Bloomfield Hills, MI 48304
Phone:  (248) 258-1414
Fax:     (248) 258-1439
klein@butzel.com

*Counsel for Plastomer Corporation*

/s/  Shepard Goldfein
Shepard Goldfein
Elliot A. Silver
SKADDEN, ARPS, SLATE,
MEAGHER & FLOM LLP
Four Times Square
New York, NY 10036
Phone: (212) 735-3000
Fax:     (212) 735-2000
shepard.goldfein@skadden.com
elliot.silver@skadden.com

*Counsel for Domfoam International, Inc.
and Valle Foam Industries (1995) Inc.*

<u>CERTIFICATE OF COUNSEL PURSUANT TO L.R. 7.1(f)</u>

Pursuant to Local Civil Rule 7.1(f), Defendants hereby certify that this case has been assigned to the complex track.  Pursuant to the Order Granting Motion Regarding Page Limitations as Modified and Amending the Initial Case Management Order entered in this action on April 14, 2011 (Dkt. No. 76), as well as the status conference the parties had with the Court on May 6, 2011, Defendants were allotted up to 25 pages to file this Joint Reply.  Defendants hereby certify that the Joint Reply meets this requirement.



/s/  Bethany G. Lukitsch

CERTIFICATE OF SERVICE

I hereby certify that on May 11, 2011, a copy of the forgoing Defendants' Joint Reply to

Direct Purchaser Plaintiffs' Opposition to Defendants' Joint "Common Issues" Memorandum of

Law in Support of Defendants' Motion to Dismiss Direct Purchaser Plaintiffs' Consolidated

Amended Class Action Complaint was filed electronically.  Notice of this filing will be sent by

operation of the Court's electronic filing system to all parties indicated on the electronic filing

receipt.  Parties may access this filing through the Court's system.


<u>            /s/  Bethany G. Lukitsch            </u>
Bethany G. Lukitsch
MCGUIREWOODS LLP
One James Center
901 East Cary Street
Richmond, VA  23219-4030
Phone: (804) 775-4711
Fax:    (804) 698-2261
blukitsch@mcguirewoods.com