IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

In re POLYURETHANE FOAM
ANTITRUST LITIGATION

MDL Docket No. 2196

Index No. 10 MD 2196 (JZ)

O R D E R

JUDGE JACK ZOUHARY

**INTRODUCTION**

This matter is before the Court on a series of Motions to Dismiss the Direct Purchaser Plaintiffs' Consolidated Amended Complaint ("the CAC") (Doc. Nos. 89; 91–92; 95–97; 99–103; 109), and the Indirect Purchaser Plaintiffs' (collectively with the Direct Purchaser Plaintiffs "Plaintiffs") Consolidated Amended Complaint ("the ICAC" or collectively with the CAC "the Complaints") (Doc. Nos. 120–22; 125–30) for failure to state a claim upon which relief may be granted.

The parties fully briefed the Motions, and responded in writing to questions propounded by the Court (Doc. Nos. 170–72). On July 1, 2011, the Court heard oral argument with respect to the Motions, and thereafter issued its ruling from the bench. This Order confirms and supplements that ruling.

As the Court indicated at oral argument, certain "housekeeping" duties remain to be resolved, including:

- Defendants' Motions to Dismiss the ICAC with respect to the Indirect Purchaser Plaintiffs' state consumer protection claims;

- An Entry of Appearance filed on behalf of Spring Air International LLC, Spring Air LLC, and Spring Air Ohio LLC (Doc. No. 165)

- Defendants' Motion to Vacate and Set Aside Federal Civil Rule 41(a)(1) Notices of Voluntary Dismissal (Doc. No. 168); and

- A discovery dispute arising from Plaintiffs' request for documents being produced by certain Defendants in their role as plaintiffs in other litigation.

This Order sets forth the Court's ruling on each such issue.

## MOTION TO DISMISS

Federal Civil Rule 8 demands that a pleading contain a "short and plain statement of the claim showing that the pleader is entitled to relief." The pleading standard does not require "detailed factual allegations," but it demands more than an unadorned legal accusation. *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009). A pleading that offers "labels and conclusions" or "a formulaic recitation of the elements of a cause of action will not do." *Id*.

In the antitrust context, a complaint must contain sufficient factual matter that, taken as true, suggests an unlawful agreement was made. *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 556 (2007). A plaintiff may carry this pleading burden by offering allegations of either explicit agreements to restrain trade or sufficient circumstantial evidence "that reasonably tends to prove that the [defendant] and others had a conscious commitment to a common scheme designed to achieve an unlawful objective." *In re Travel Agent Comm'n Antitrust Litig.*, 583 F.3d 896, 907 (6th Cir. 2009) (quoting *Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 768 (1984)). For plaintiffs that follow the latter route, allegations of parallel behavior must do more than describe behavior consistent with independent responses to natural market forces. *Twombly*, 550 U.S. at 566. The complaint in

*Twombly* fell short of this requirement by failing to provide allegations beyond parallel behavior "pointing toward a meeting of the minds" among the competitor firms. *Id.* at 557.

However, when a complaint sufficiently alleges an express conspiratorial agreement, a plaintiff need not worry about the varying inferences that may be drawn from the complaint's allegations so long as one such inference suggests a plausible conspiracy. As the Sixth Circuit recently explained in *Watson Carpet & Floor Covering, Inc. v. Mohawk Indus., Inc.*, 2011 WL 2462833 (6th Cir. 2011), if a complaint specifically alleges both an express agreement to restrain trade and later conduct by defendants consistent with the agreement, a defendant cannot prevail at the pleading stage by offering alternative explanations for the allegedly unlawful behavior. *Id.* at \*1. The plaintiff must set forth an alleged conspiratorial agreement as a plausible explanation of the defendant's conduct, not the *probable or only* explanation. *Id.* (emphasis added). Such a complaint must also plausibly allege that behavior or conduct characteristic of a conspiratorial agreement was undertaken in furtherance of the conspiracy. *Id.* at \*4.

When viewed in isolation, the allegation that Defendants "contracted, combined, or conspired to fix, raise, maintain, and/or stabilize prices and allocate customers" rings conclusory (Doc. No. 46 at ¶ 3; Doc. No. 52 at ¶ 3). Alone, these paragraphs resemble the sort of "formulaic recitation" of an antitrust claim's elements rejected by *Twombly*. But relevant case law counsels this Court to view the individual allegations in context of the whole complaint. *In re Packaged Ice Antitrust Litig.*, 723 F. Supp. 2d 987, 1005–06 (E.D. Mich. 2010) (quoting *In re Se. Milk Antitrust Litig.*, 555 F. Supp. 2d 934, 943–944 (E.D. Tenn. 2008). Moreover, by tying this key general allegation to those that follow, the Complaints make clear that Plaintiffs do not rely on labels alone to establish an express agreement

3

-- "Defendants and their co-conspirators contracted, combined, or conspired . . . *by the means and mechanisms described herein*" (Doc. No. 46 at ¶ 3; Doc. No. 52 at ¶ 3) (emphasis added).

The Complaints heavily rely on materials derived from criminal investigations being conducted by the U.S. Department of Justice ("DOJ") and the Canadian Bureau of Competition ("CBC") into certain potential antitrust violations. As a result, Defendants argue that to conclude the Complaints allege a plausible conspiracy, this Court must assume the as-yet unknown scope of these investigations correspond exactly with the Complaints' alleged conspiracy.

This Court disagrees. Defendants correctly note that some courts have determined the existence of a grand jury investigation into a defendant's potential criminal antitrust liability to be irrelevant to the task of alleging a Sherman / Clayton § 1 violation. *E.g.*, *In re Graphics Processing Units Antitrust Litig.* ("*In re GPU*"), 527 F. Supp. 2d 1011, 1024 (N.D. Cal. 2007). But unlike the plaintiffs in *In re GPU*, Plaintiffs here do not merely couple the fact of ongoing criminal antitrust investigations with allegations of parallel conduct. *Id.* Rather, Plaintiffs extract specific admissions from Defendant Vitafoam employees to the DOJ and the CBC that directly support the existence of a conspiratorial agreement. These statements, by former and current Vitafoam leadership, name competitor employees with whom they engaged in conspiratorial discussions and conduct. Each such allegation is the kind of "smoking gun" that make Plaintiffs' Complaints plausible in alleging antitrust violations. *Watson Carpet*, 2011 WL 2462833 at *5; *See also In re Text Messaging Antitrust Litig.*, 630 F.3d 622, 628 (7th Cir. 2010) (describing one conspirator's admission of having met and agreed with competitors on pricing as direct evidence of a conspiracy).

Having alleged an express agreement, the Complaints must further allege subsequent price increases were undertaken pursuant to the conspiratorial agreement. *Watson Carpet*, 2011 WL

2462833 at *4. Defendants are alleged to have coordinated the amount and timing of flexible polyurethane foam price increases through telephone conversations, exchanging price increase letters, and in-person meetings (Doc. No. 46 at ¶ 65; Doc. No. 52 at ¶ 77). The Complaints contain examples of actions consistent with these methods of pricing coordination, including descriptions of phone calls in which alleged conspiracy members shared price increase levels with competitors before notifying customers (Doc. No. 42 at ¶ 108; Doc. No. 52 at ¶ 119), and email conversations stretching from 2000 to 2009 in which competitors shared draft pricing letters and discussed progress in coordinating price increases (Doc. No. 46 at ¶ 112; Doc. No. 52 at ¶ 123).

Drawing all reasonable inferences in Plaintiffs' favor, as this Court must, *In re Travel Agent Comm'n Antitrust Litig.*, 583 F.3d at 903, the Court finds a sufficient connection alleged between the express agreement to fix prices and divide the market by allocating customers and the many references to discussions among competitors. The Complaints provide this Court sufficient factual allegations to "raise a reasonable expectation that discovery will reveal evidence of illegal agreement." *Twombly*, 550 U.S. at 556. Therefore, both the Direct and Indirect Purchaser Plaintiffs are found to have adequately alleged a conspiratorial agreement to fix prices and allocate customers.

Adequately alleging a conspiratorial agreement in general does not, however, indicate that a plaintiff has alleged *each* defendant's participation in that conspiracy. *Total Benefits Planning Agency, Inc. v. Anthem Blue Cross & Blue Shield*, 552 F.3d 430, 437 (6th Cir. 2008) (dismissing a complaint that, among other shortcomings, failed to allege the "who" of an alleged antitrust conspiracy). To the extent that a Defendant is captured in the Vitafoam employees' statements that form the heart of both the CAC and the ICAC, however, Plaintiffs adequately allege such a

Defendant's participation.[1] Certain Defendants are not mentioned in the Complaints, or argue that distinctions in how the Complaints describe their alleged involvement in the conspiracy compel this Court to find the Complaints fails as to them. The arguments of each such Defendant are considered in turn.

### Otto Bock Polyurethane Technologies, Inc. and Plastomer Corp.

Otto Bock Polyurethane Technologies and Plastomer are identified by "Witness A," a former Vitafoam Vice President whose statements provided the basis for a sworn Information prepared by the Canadian Commissioner of Competition in support of a search warrant, as among those companies with whom the Vitafoam employee engaged in "discussions, exchanges of information and agreements regarding the price of foam" (Doc. No. 46 at ¶ 83; Doc. No. 52 at ¶ 95). But because both companies are excluded from the list of companies that formed the basis of the investigation into potential violations of the Competition Act of Canada (Doc. No. 46 at ¶ 84; Doc. No. 52 at ¶ 96), Otto Bock and Plastomer argue the Complaints do not adequately allege their participation in the conspiracy. Despite this supposed distinction that Witness A's statements implicate but do not attribute specific statements to Otto Bock or Plastomer employees, this Court concludes that an allegation identifying senior company employees as having engaged in behavior consistent with the contours of the conspiracy suffices to state a claim against both Defendants.

---

[1] The following Defendants are specifically identified as having engaged in conspiratorial discussions, conduct, or "discussions, exchanges of information and agreements regarding the price of foam" with Vitafoam employees who have cooperated with U.S. and Canadian authorities conducting criminal antitrust investigations into the flexible polyurethane foam market: the Carpenter entities; Domfoam International, Inc.; Flexible Foam Products, Inc.; Foamex Innovations, Inc.; Future Foam, Inc.; Hickory Springs Manufacturing Co.; Inoac International Co. Ltd.; Otto Bock Polyurethane Technologies, Inc.; Plastomer Corp.; Scottdel, Inc.; Valle Foam Industries, Inc.; and the Woodbridge entities. In addition to being named in these allegations, Scottdell, Inc. and the former senior employees, Louis and David Carson (Doc. No. 46 at ¶¶ 38–39; Doc. No. 52 at ¶¶ 51–52), participated in email conversations in which price increases are discussed among competitors (Doc. No. 46 at ¶ 112 (m),(o); Doc. No. 52 at ¶ 123 (m), (o)).

**Ohio Decorative Products, Inc.**

The Complaints describe Ohio Decorative Products as the parent company of Flexible Foam Products, Inc. (Doc. No. 46 at ¶ 21; Doc. No. 52 at ¶ 27). Ohio Decorative Products is alleged to have "participated in the conspiracy through the actions of its respective officers, employees, and representatives acting with actual or apparent authority . . . . by virtue of its status during the Class Period as the alter ego or agent of Flexible Foam Products . . . . [and having] dominated or controlled Flexible Foam Products" (Doc. No. 46 at ¶ 22; Doc. No. 52 at ¶ 28). Flexible Foam Products, in turn, is featured prominently in the Complaints, including allegations that it engaged in conspiratorial conduct with former and current officers of Vitafoam (Doc. No. 46 at ¶¶ 74, 82; Doc. No. 52 at ¶¶ 86, 94).

Defendant Ohio Decorative Products argues Plaintiffs' allegations of alter ego or agency relationships are conclusory. But when such allegations are considered according to a pleading regime that rejects heightened pleading requirements for allegations subject to Federal Civil Rule 8, this Court finds the Complaints sufficiently allege Ohio Decorative Products' participation in the conspiracy. Whether relations between corporate entities draws a parent into its subsidiary's alleged participation in a conspiracy is a question of fact this Court cannot resolve at this pleading stage. *See Brager & Co. v. Leumi Sec. Corp.*, 429 F. Supp. 1341, 1345 (S.D.N.Y.1977) (denying a motion to dismiss grounded in claimed agency pleading defects because such shortcomings could only be determined and resolved through examination of the claim's merits).

**Leggett & Platt, Inc and Mohawk Industries, Inc.**

The Complaints name Leggett & Platt and Mohawk Industries as subjects of the CBC's investigation into potential violations of the Canadian Competition Act affecting U.S. and Canadian markets (Doc. No. 46 at ¶ 84; Doc. No. 52 at ¶ 96). The Complaints also reference discussions among other Defendants in which competitors display knowledge of Leggett & Platt and Mohawk Industries pricing decisions (Doc. No. 46 at ¶¶ 105–06, 112 (l); Doc. No. 52 at ¶¶ 116–17, 123 (l)), as well as allegations that Vitafoam possessed Leggett & Platt and Mohawk Industries pricing letters (Doc. No. 46 at ¶ 112 (n); Doc. No. 123 (n)).

These Defendants argue such allegations do not plausibly suggest their participation in the conspiratorial agreement because the allegations are conclusory or otherwise insufficient. However, taken together, these allegations are consistent with a plausible larger conspiracy, which contemplates competitor flexible polyurethane foam manufacturers sharing Leggett & Platt and Mohawk Industries pricing information to coordinate and enforce similar price increases among all Defendants. Because an express agreement is alleged, Plaintiffs need not refute, at this stage, Defendants' alternative explanations of the Complaints' averments. The Complaints adequately allege Leggett & Platt and Mohawk Industries participated in the broader conspiracy.

**Inoac Corp., Inoac International, Inoac USA, Inc., and Crest Foam Industries, Inc**.

"Witness A" allegedly engaged in discussions regarding pricing information and agreements with two Inoac International employees and interacted with an Inoac USA employee who served as a "conduit of information" communicating news of competitor pricing increases to "Witness A" (Doc. No. 46 at ¶ 83; Doc. No. 52 at ¶ 95). Like Ohio Decorative Products, the Complaints implicate Inoac in the conspiracy through theories of agency, alter ego, and control of its subsidiaries (Doc. No. 46

at ¶ 31; Doc. No. 52 at ¶ 37). The Complaints also allege that before 2010, Vitafoam exercised majority control of Crest Foam Industries in partnership with Inoac (Doc. No. 46 at ¶ 32; Doc. No. 52 at ¶ 38, and that during this period, Vitafoam "acted for" Crest Foam Industries in discussions with competitors regarding price increases (Doc. No. 46 at ¶¶ 85, 88, 112 (b)–(h); Doc.No. 52 at ¶¶ 97, 100, 123 (b)–(h)).

For the reasons set forth above, Defendants' attacks on the supposedly conclusory nature of the agency pleadings fail. Whether Inoac did function as its subsidiaries' alter ego or whether Vitafoam "acted for" Crest Foam Industries during the alleged pricing discussions referenced in the Complaints are questions of fact that will not be resolved at the this stage. Likewise, because these allegations are consistent with the descriptions of the conspiratorial agreement, this Court rejects Defendants' attempts to cast the supposedly "dual-hatted" Vitafoam employee's conspiratorial discussions on behalf of Crest Foam Industries as lawful behavior or improperly vague. Finally, an allegation that a Defendant helped share pricing information among competitors in an inelastic market can support an inference of anticompetitive conduct, *U.S. v. Container Corp. of Am.*, 393 U.S. 333, 337 (1969), particularly when the conduit's point of contact has admitted to participation in an express agreement to fix prices and allocate customers.

### DISCOVERY CONSIDERATIONS

While this Court finds the Complaints sufficiently allege Plastomer, Otto Bock Polyurethane Technologies, Leggett & Platt, Mohawk Industries, Inoac Corp., Inoac International, Inoac USA, and Crest Foam Industries' participation in the conspiracy, the Court nonetheless recognizes that, as described above, the treatment of each such entity differs in important respects from the majority of Defendants who see their employees individually named as among the cooperating Vitafoam

employee's conspiratorial correspondents. Therefore, consistent with prior practice and pursuant to the authority granted by Federal Civil Rule 26, the Direct and Indirect Purchaser Plaintiffs shall confer with the above-named Defendants to develop a focused and phased discovery plan to determine whether these Defendants should remain in the case.

Defendants' Motions to Dismiss the CAC and the ICAC with respect to individual Defendants is denied. In addition, the Court finds the CAC's Section 1 Sherman Act claim and the ICAC's Section 16 Clayton Act and state antitrust claims[2] to be well-pled.

## UNJUST ENRICHMENT CLAIMS

As discussed at the hearing, the ICAC's unjust enrichment claims are dismissed. The Indirect Purchaser Plaintiffs purport to represent the residents of thirty-two states who purchased products containing flexible polyurethane foam manufactured by Defendants during the twelve-year Class Period (Doc. No. 52 at ¶ 153). Even assuming that the Indirect Purchaser Plaintiffs properly plead the elements of unjust enrichment according to each of the twenty-eight jurisdictions' requirements, this Court finds the unjust enrichment claims inappropriate for class certification. Individual factual questions so predominate over common questions of fact and law as to fall short of the requirement of Federal Civil Rule 23(a)(2). *See Clay v. Am. Tobacco Co., Inc.*, 188 F.R.D. 483, 500–01 (S.D. Ill. 1999) (denying class certification of an unjust enrichment claim because individualized factual determinations are necessary to establish each defendant's liability to a particular plaintiff).

In order for a prospective Class Member to recover under an unjust enrichment claim, the Class Member would face several tasks: identifying the Defendant who manufactured the flexible

---

[2] One exception exists here. Defendants argue, and the Indirect Purchaser Plaintiffs concede, that Nebraska's state antitrust statute may only provide relief, if at all, for the portion of the Class Period following the statute's 2002 enactment and therefore any claims are barred for actions prior to 2002.

10

polyurethane foam incorporated into the purchased product; determining the degree to which the foam product saw its price artificially increased by Defendants' alleged collusive behavior when the Defendant sold the product; and finding whether this collusive pricing "premium" was passed on to the Class Member or absorbed, in whole or in part, by any of the potentially many tiers of secondary manufacturers, distributors, and retailers that separate an Indirect Purchaser Plaintiff from a Defendant. This Court resolves this issue now rather than permit needless and expensive discovery to proceed on a claim that cannot be properly litigated through a class action.

### INDIRECT PURCHASER PLAINTIFFS' STATE CONSUMER PROTECTION CLAIMS

The Indirect Purchaser Plaintiffs seek relief under the consumer protection statutes of twenty jurisdictions. In addition to objections leveled against the Complaints as a whole, Defendants argue that for a variety of unique reasons the Indirect Purchaser Plaintiffs fail to state a claim in some of these jurisdictions. This Court addresses only those claims that must be dismissed.

**Idaho and Pennsylvania**

This Court agrees with Defendants that Plaintiffs may not employ the Idaho Consumer Protection Act ("the ICPA"), Idaho Code Ann. § 48-601 *et seq.*, to pursue a claim premised on allegations of price-fixing. The Idaho Supreme Court has interpreted the ICPA's enumeration of "unfair methods of competition and unfair or deceptive acts" to be an exhaustive list that does not include price-fixing, and has declined an invitation to otherwise construe the ICPA to cover price-fixing. *State v. Daicel Chem. Indus., Ltd.*, 141 Idaho 102, 107–08 (2005). The Indirect Purchaser Plaintiffs concede that their ICPA claim is not viable, and therefore the claim is dismissed.

Likewise, the Indirect Purchaser Plaintiffs concede their claim arising under the Pennsylvania Unfair Trade Practices and Consumer Protection Law ("the PUTPCPL"), 73 Pa. Cons. Stat. § 201-1

*et seq.*, must fail. The Indirect Purchaser Plaintiffs do not plead either deceptive conduct on Defendants' part or detrimental reliance on any Defendants' representations regarding their flexible polyurethane foam products. Consequently, the PUTPCPL claim is dismissed.

**Maine**

To save their claim arising under the Maine Unfair Trade Practices Act ("MUTPA"), Me. Rev. State. Ann. 5 § 205A, *et seq.*, the Indirect Purchaser Plaintiffs rely on *In re New Motor Vehicle Canadian Exp. Antitrust Litig.* ("*In re New Motor Vehicle*"), 350 F. Supp. 2d 160 (D. Me. 2004), which distinguished *Tungate v. MacLean-Stevens Studios, Inc.*, 714 A.2d 792, 797 (Me. 1998). According to the court in *In re New Motor Vehicle*, the holding in *Tungate*'*s* that "in pricing cases under [the MUTPA] the inquiry is whether the price has the effect of deceiving the customer" applies only to "unfair or deceptive acts," not "unfair methods of competition." *Id.* at 187 n.40. However, this Court agrees with the majority of federal courts that have passed on this question, finding no basis for *In re New Motor Vehicle's* crabbed reading of *Tungate.* The Maine Supreme Court does not qualify its pronouncement as applicable to only "unfair or deceptive acts." *In re Flash Memory Antitrust Litig.*, 643 F. Supp. 2d 1133, 1159 (N.D. Cal. 2009).

Therefore, to sustain the MUTPA claim, this Court must conclude that Defendants' alleged conduct could induce a customer to purchase a product that, but for the alleged price fixing and customer allocation scheme, the customer would not have purchased. However, if the alleged conspiracy has any effect on an Indirect Purchaser Plaintiff's decision to purchase, for example, a couch incorporating block foam, Defendants' alleged artificial inflation of foam prices would make such a purchase *less* likely. Thus, this Court finds that a price-fixing conspiracy cannot induce a

customer to purchase a product that would have been less expensive in the absence of such anticompetitive factors. Therefore, the MUTPA claim is dismissed.

**Hawaii**

The Indirect Purchaser Plaintiffs allege a claim under the Hawaii Unfair Trade Practices Act ("the HUTPA"), Hawaii Rev. Stat. § 481 *et seq.* Defendants argue the HUTPA only permits claims alleging a Defendant sold their product below cost with the intent to destroy competition. In reply, the Indirect Purchaser Plaintiffs argue the HUTPA has a broader reach, and that one federal court has sustained a HUTPA claim premised on alleged price-fixing behavior.

The Indirect Purchaser Plaintiffs are partially correct. While the HUTPA does extend beyond below-cost pricing, by its terms the statute touches only price discrimination:

> It shall be unlawful for any person, firm, or corporation . . . to discriminate between different sections, communities, or cities or portions thereof, or between different locations in such sections, communities, cities, or portions thereof in this State, by selling or furnishing the commodity, product, or services at a lower rate in one section, community, or city, or any portion thereof., or in one location in such section, community, or city or any portion thereof, than in another . . . .

Hawaii Rev. Stat. § 481-3. Nor does the Indirect Purchaser Plaintiffs' HUTPA construction find persuasive support in relevant case law. The court in *In re Dynamic Random Access Memory (DRAM) Antitrust Litig.*, 516 F. Supp. 2d 1072 (N.D. Cal. 2007), did not directly examine whether the statute supported a claim grounded in allegations of price-fixing. Instead, the court considered whether an indirect purchaser plaintiff should be deemed eligible for the June 2002 extension of HUTPA indirect purchaser standing according to the dates during which price-fixing behavior is alleged to have occurred *or* when the indirect purchaser plaintiff filed her claim. *Id.* at 1109-10. The court did sustain the indirect purchaser plaintiff's claim, but in the process dedicated no analysis to the key question of whether a claim arising from alleged price-fixing may even be brought under the

HUTPA. This Court finds no basis for reading into the statute a price-fixing-based claim, and therefore dismisses the HUTPA claim.

**Illinois**

The Indirect Purchaser Plaintiffs argue that, despite the supreme court's ruling in *Laughlin v. Evanston Hosp.*, 133 Ill.2d 374 (1990), they may maintain an Illinois Consumer Fraud and Deceptive Business Practices Act ("the ILCFA") claim rooted in allegations of price-fixing. The court in *Laughlin* rejected the plaintiffs' attempt to assert an ILCFA claim based on defendants' alleged discriminatory pricing because such a claim was not actionable under the state's antitrust statute. *Id.* at 389–91.

Here, however, the Indirect Purchaser Plaintiffs can, and do, pursue a price-fixing-based claim under the Illinois Antitrust Act. On this distinction the Indirect Purchaser Plaintiffs urge this Court to follow the ruling in *Siegel v. Shell Oil Co.*, 480 F. Supp. 2d 1034 (N.D. Ill. 2007). There, the court permitted an ILCFA claim stemming from allegations of price-fixing to proceed because, according to the court, *Laughlin* was silent as to "whether consumers can elect to pursue a remedy under the Consumer Fraud Act where the Illinois Antitrust Act *may also provide relief*." *Id.* at 1048–49 (emphasis in original).

But *Laughlin* is far from silent on this point. Indeed, the supreme court specifically found "[t]here is no indication that the legislature intended that the Consumer Fraud Act be an additional antitrust enforcement mechanism." *Laughlin*, 133 Ill.2d at 390. Yet the Indirect Purchaser Plaintiffs ask this Court to permit them to pursue a price-fixing-based ILCFA claim *in addition to* their price-fixing-based Illinois Antitrust Act claim. Illinois' highest court has foreclosed a second avenue for enforcement of the Illinois Antitrust Act, and this Court follows suit. The ILCFA claim is dismissed.

### ENTRY OF APPEARANCES ON BEHALF OF SPRING AIR

On June 27, 2011, an Entry of Appearance was filed on behalf of Spring Air International LLC, Spring Air LLC, and Spring Air Ohio LLC (collectively "the Spring Air entities") (Doc. No. 165), companies that join this Multidistrict Litigation ("MDL") as Direct Action Plaintiffs. As discussed at the July 1 hearing, the Spring Air entities will be subject to the Amended Case Management Order's provisions respecting Direct Action Plaintiffs (Doc. No. 138).

### DEFENDANTS' MOTION TO VACATE AND SET ASIDE NOTICES OF VOLUNTARY DISMISSAL

Defendants have moved to vacate and set aside a number of Federal Civil Rule 41(a)(1) Notices of Voluntary Dismissals entered by Plaintiffs who have filed suits that have since been transferred to this Court as part of this MDL. These voluntarily-dismissed Plaintiffs, however, have not been named in either the CAC or the ICAC. Defendants ask this Court to vacate each Federal Civil Rule 41(a)(1) notice filed to date, reinstate each such party's case, and modify the Case Management Order so that any Plaintiff's future attempt to voluntarily dismiss their case must comply with Federal Civil Rule 41(a)(2). Defendants further request that any party dismissed in this way remain subject to discovery in this MDL. Alternatively, Defendants ask for the conversion of the voluntary dismissals to dismissals with prejudice if this Court allows the current dismissals to stand. Defendants also suggest that if this Court preserves the voluntary dismissals, the dismissed Plaintiffs should be treated as parties for discovery purposes and bound by this MDL's proceedings should such a Plaintiff decide to reinstate their case in the future.

Defendants' Motion is denied. This Court will permit the existing Federal Civil Rule 41(a)(1) dismissals to stand, and will allow future motions to be filed by parties not named in the CAC or the ICAC. However, parties that choose to follow this route will be required to remain available, through

counsel, for deposition and discovery purposes as part of the MDL. If necessary, this Court will address any discovery disputes that may arise between Defendants and parties dismissed through a Federal Civil Rule 41 motion according to the particular circumstances of the dispute. Lead counsel shall serve this Order on counsel for parties recently dismissed in order that those parties are aware of their continued responsibilities.

### *URETHANE* DISCOVERY DISPUTE

The July 1 hearing concluded with a discussion of a discovery dispute regarding the production of materials that Defendants are producing in related litigation. Certain Defendants here are plaintiffs in an MDL pending in the District of Kansas, *In re Urethane Antitrust Litig.*, MDL 1616. The court in *Urethane* recently granted a motion to compel discovery filed by the *Urethane* defendants.

Plaintiffs here seek production of these *Urethane* documents. Defendants object, arguing the *Urethane* documents should be separately requested by Plaintiffs here according to normal discovery procedures, which would permit all Defendants to review the *Urethane* documents, raise objections, and perhaps limit the scope of documents produced. Defendants further argue that granting Plaintiffs' request would violate a confidentiality order under which the *Urethane* documents are being produced. This Court has contacted the Kansas District Court and is assured that granting Plaintiffs' request will not violate any order entered in that court. This Court also concludes that granting Plaintiffs' request will not affect the order entered into between the parties and the DOJ, providing for DOJ review of discovery requests directed at Defendants. Therefore, in the interest of minimizing litigation costs and abiding by the Amended Case Management Order, the requested *Urethane* documents should be produced here in a similar manner and time frame as the Kansas case.

This ruling in no way is meant to predetermine the ultimate relevancy or admissibility of such documents.

## **CONCLUSION**

In summary, this Court disposes of Defendants' Motions as follows. In addition to denying Defendants' Motion to Vacate and Set Aside the Federal Civil Rule 41(a)(1) Notices of Voluntary Dismissal, Defendants' Motions to Dismiss the Complaints are:

- Denied with respect to all Defendants;

- Denied with respect to the Direct Purchaser Plaintiffs' Sherman Act claim and the Indirect Purchaser Plaintiffs' Clayton Act and state antitrust claims. The Nebraska state antitrust claim's applicability is limited to conduct occurring after the statute's enactment;

- Granted with respect to the Indirect Purchaser Plaintiffs' unjust enrichment claims; and

- Denied with respect to all but the following state consumer protection claims lodged by the Indirect Purchaser Plaintiffs: Idaho, Pennsylvania, Maine, Hawaii, and Illinois.

IT IS SO ORDERED.

          s/ *Jack Zouhary*
JACK ZOUHARY
U. S. DISTRICT JUDGE

July 19, 2011