**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO**

**Toledo Division**

| | |
|---|---|
| Sealy Corporation, Select Comfort Corporation, National Bedding Company L.L.C. d/b/a Serta Mattress Company, Simmons Bedding Company, Tempur-Pedic International, Inc., and La-Z-Boy Incorporated, | MDL Docket No. 2196<br>Index No. 10-MD-2196 (JZ)<br>Civil Action No. 1:11-pf-10007 (JZ) |

        Plaintiffs,

vs.

Carpenter Co., E.R. Carpenter, L.P. (f/k/a Carpenter Chemical, L.P.), Carpenter Holdings, Inc., Ohio Decorative Products, Inc., Flexible Foam, FXI-Foamex Innovations, Inc., Future Foam, Inc., Hickory Springs Manufacturing Company, Leggett & Platt Inc., Mohawk Industries Inc., Valle Foam Industries (1995), Inc., Domfoam International, Inc., Vitafoam Inc., Vitafoam Products Canada Limited, British Vita Unlimited, Woodbridge Sales & Engineering, Inc., Woodbridge Foam Fabricating, Inc., and Woodbridge Foam Corporation,

        Defendants.

_____/

## AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiffs Sealy Corporation, Select Comfort Corporation, National Bedding Company

L.L.C. d/b/a Serta Mattress Company, Simmons Bedding Company, Tempur-Pedic International,

Inc., and La-Z-Boy Incorporated ("Plaintiffs"), pursuant to Rule 15(a), Fed.R.Civ.P., submit this

Amended Complaint and sue Defendants Carpenter Co., E.R. Carpenter, L.P. (f/k/a Carpenter

Chemical, L.P.), Carpenter Holdings, Inc., Ohio Decorative Products, Inc., Flexible Foam, FXI-

Foamex Innovations, Inc., Future Foam, Inc., Hickory Springs Manufacturing Company, Leggett

& Platt Inc., Mohawk Industries Inc., Valle Foam Industries (1995), Inc., Domfoam International, Inc., Vitafoam Inc., Vitafoam Products Canada Limited, British Vita Unlimited, Woodbridge Sales & Engineering, Inc., Woodbridge Foam Fabricating, Inc., and Woodbridge Foam Corporation (collectively "Defendants") and allege as follows:

1. This case involves an international conspiracy among Defendants and their co-conspirators not to compete on the sale of polyurethane foam sold to Plaintiffs and others in the United States and elsewhere between at least approximately January 1999 and July 2010. Polyurethane foam is a major input in the production of mattresses and upholstered furniture. Plaintiffs Sealy, Select Comfort, Serta, Simmons and Tempur-Pedic are among the leading manufacturers of mattresses in the United States, and Plaintiff La-Z-Boy is among the leading domestic furniture manufacturers. Each of them directly purchased substantial quantities of polyurethane foam from Defendants and/or their co-conspirators during the conspiracy. As a proximate result of the conspiracy, the prices which Defendants and their co-conspirators charged Plaintiffs and others for polyurethane foam were artificially higher than they would have been in the absence of collusion. Defendants and their co-conspirators knew this. They knew during the conspiracy that if they competed against each other on price for the sale of polyurethane foam, then prices would decline which – in the words of one Defendant – was "only going to benefit the customers." Defendants' conduct challenged in this Amended Complaint is a *per se* violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, which prohibits and declares illegal "every contract, combination … or conspiracy … in restraint of trade or commerce." By this antitrust action, each Plaintiff seeks to recover the overcharge damages which it sustained as a result of Defendants' and their co-conspirators' unlawful conduct, to enjoin Defendants and their co-conspirators from engaging in this unlawful conduct in the future, and such other relief as provided or allowed by law.

KENNY NACHWALTER, P.A.

2. The allegations in this Amended Complaint are pled in the alternative if necessary to avoid inconsistency.

## JURISDICTION AND VENUE

3. This civil antitrust action arises under Section 1 of the Sherman Act, 15 U.S.C. § 1, for treble damages pursuant to Section 4 of the Clayton Act, 15 U.S.C. § 15(a), and for permanent injunctive relief pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26.

4. This Court has subject matter jurisdiction of each of the claims in this action pursuant to 28 U.S.C. §§. 1331 & 1337.

5. Venue is proper in this District pursuant to Sections 4 and 12 of the Clayton Act, 15 U.S.C. §§ 15 & 22, and 28 U.S.C. § 1391, for any one or more of the reasons stated in the subparagraphs below. Each of the subparagraphs below should be read in the alternative if necessary to avoid inconsistency.

(a) Venue is proper in this District pursuant to 28 U.S.C. § 1391(c) because a substantial part of the events giving rise to these claims occurred in this District, including the sale at artificially high prices of polyurethane foam.

(b) Venue is proper in this District pursuant to 28 U.S.C. § 1391(c) because each Defendant is subject to personal jurisdiction in this District.

(c) Defendants transact business or are found in this District, or as alleged in some paragraphs below, they transact business directly and/or through the activities of domestic subsidiaries or affiliates whom each foreign Defendant dominates and controls within this District and, therefore, venue is proper under 15 U.S.C. § 22.

(d) Defendants Valle Foam Industries (1995), Inc., Domfoam International, Inc., Vitafoam Products Canada Limited, British Vita Unlimited, and Woodbridge Foam Corporation are legal aliens and may be sued in any District pursuant to 28 U.S.C. § 1391(d).

3

KENNY NACHWALTER, P.A.

(e)     To the extent that there is no District in which this action may otherwise be brought, then venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because one or more Defendants is/are found in this District.

6.     Defendants are subject to the personal jurisdiction of this Court for any one or more of the reasons stated in the subparagraphs below.  Each of the subparagraphs should be read in the alternative if necessary to avoid inconsistency.

(a)     Defendants are amenable to service of process because each inhabits, transacts business in, has continuous or systematic contacts with, or is found or has sufficient minimum contacts in the United States sufficient to satisfy due process.

(b)     Defendants are amenable to service of process because each inhabits, transacts business in, or is found in this District.  Defendants headquartered outside this District are nevertheless engaged in the business of developing, manufacturing, distributing, advertising and/or selling polyurethane foam throughout the United States, including in this District.

(c)     Defendants are amenable to service of process because each Defendant belonged to the conspiracy alleged in this Amended Complaint and one or more of them, and their co-conspirators, performed unlawful acts in furtherance of the conspiracy in this District including, without limitation, selling polyurethane foam to Plaintiffs and/or others in this District at artificially inflated prices.

(d)     Defendants are amenable to service of process pursuant to Rule 4(k)(1)(A) of the Federal Rules of Civil Procedure and the long-arm statute of the State in which this Federal Court sits because each Defendant has transacted business in the State and because the State's long-arm statute extends jurisdiction to the limits of due process and each Defendant has sufficient minimum contacts with the State to satisfy due process.

4

KENNY NACHWALTER, P.A.

(e)     This Court has personal jurisdiction over Defendants because they and one or more of their co-conspirators contracted to supply services or goods, including polyurethane foam, or have agents who contracted to supply materials or goods, including polyurethane foam, in the State where this Federal Court sits (the "State"); money flowed from Plaintiffs or other purchasers in the State to pay Defendants and their co-conspirators for polyurethane foam; Defendants and one or more of their co-conspirators transact business in the State or have agents who transact business on their behalf in the State in furtherance of the conspiracy; Defendants and their co-conspirators did or caused one or more unlawful acts to be done, or consequences to occur, in the State; and Defendants and their co-conspirators engaged in unlawful conduct described below outside of the State causing injury to Plaintiffs in the State.

## PARTIES

### Plaintiffs

7.      Plaintiff Sealy Corporation ("Sealy") is a corporation organized and existing under the laws of the State of Delaware with its principal place of business in Trinity, North Carolina. Sealy brings this action on its own behalf and on behalf of its assignor, Sealy of Patterson, New Jersey. The reference in this Amended Complaint to "Sealy" refers to Sealy Corporation and its assignor. Sealy is among the leading manufacturers of mattresses which sell under such name brands as "Sealy Posturepedic," "Embody by Sealy," and "Stearns & Foster." During time periods relevant to the allegations in this Amended Complaint, Sealy directly purchased polyurethane foam in the United States from one or more Defendants and/or their co-conspirators and sustained injury and damage as a proximate result of the antitrust violations alleged in this Amended Complaint.

5

KENNY NACHWALTER, P.A.

8.      Plaintiff Select Comfort Corporation ("Select Comfort") is a corporation organized and existing under the laws of the State of Minnesota with its principal place of business in Minneapolis. Select Comfort is among the leading manufacturers of mattresses and related products which sell under Select Comfort's "Sleep Number" and "Select Comfort" brand names. During time periods relevant to the allegations in this Amended Complaint, Select Comfort directly purchased polyurethane foam in the United States from one or more Defendants and/or their co-conspirators and sustained injury and damage as a proximate result of the antitrust violations alleged in this Amended Complaint.

9.      Plaintiff National Bedding Company L.L.C. d/b/a Serta Mattress Company ("Serta") is an Illinois limited liability company with its principal place of business in Hoffman Estates, Illinois.  Prior to approximately February 2003, its name was National Bedding Company d/b/a Serta Mattress Company.  Serta brings this action on its own behalf and on behalf of its assignors, AW Industries, Inc., Salt Lake Mattress & Mfg. Co., Dormae Products, Incorporated, Palu Bedding Co., Inc., and Serta Restokraft Mattress Co., Inc. (all of which are Serta licensees).  The reference in this Amended Complaint to "Serta" refers to National Bedding Company L.L.C. d/b/a Serta Mattress Company and its assigns.  Serta is among the leading manufacturers of mattresses which sell under such brand names as "Comfort Sleep," "Perfect Sleeper," "Perfect Day," and "Sertapedic."  During time periods relevant to the allegations in this Amended Complaint, Serta directly purchased polyurethane foam in the United States from one or more Defendants and/or their co-conspirators and sustained injury and damage as a proximate result of the antitrust violations alleged in this Amended Complaint.

10.      Plaintiff Simmons Bedding Company ("Simmons") is a corporation organized and existing under the laws of the State of Delaware with its principal place of business in Atlanta, Georgia.  Simmons brings this action on its own behalf and on behalf of its assignor, The

6

KENNY NACHWALTER, P.A.

Simmons Manufacturing Co., LLC. The reference in this Amended Complaint to "Simmons" refers to Simmons Bedding Company and its assignor. Simmons is among the leading manufacturers of mattresses which sell under such name brands as "Beautyrest," "Natural Care," "ComforPedic by Simmons" and "BeautySleep." During time periods relevant to the allegations in this Amended Complaint, Simmons directly purchased polyurethane foam in the United States from one or more Defendants and/or their co-conspirators and sustained injury and damage as a proximate result of the antitrust violations alleged in this Amended Complaint.

11.     Plaintiff Tempur-Pedic International, Inc. ("Tempur-Pedic") is a corporation organized and existing under the laws of the State of Delaware with its principal place of business in Lexington, Kentucky. Tempur-Pedic is among the leading manufacturers of mattresses, which sell under such name brands as "Tempur-Cloud," "Temper-HD" and "Tempur Collection." During time periods relevant to the allegations in this Amended Complaint, Tempur-Pedic directly purchased polyurethane foam in the United States from one or more Defendants and/or their co-conspirators and sustained injury and damage as a proximate result of the antitrust violations alleged in this Amended Complaint.

12.     Plaintiff La-Z-Boy Incorporated ("La-Z-Boy") is a corporation organized and existing under the laws of the State of Michigan with its principal place of business in Monroe, Michigan. La-Z-Boy brings this action on its own behalf and on behalf of its assignors, England, Inc. and LZB Manufacturing, Inc., both of which are Michigan corporations. The reference in this Amended Complaint to "La-Z-Boy" refers to La-Z-Boy Incorporated and its assignors. La-Z-Boy is among the leading manufacturers of upholstered furniture which sell under the La-Z-Boy brand and include sofas, chairs, recliners, loveseats, sectionals and sleepers. During time periods relevant to the allegations in this Amended Complaint, La-Z-Boy directly purchased polyurethane foam in the United States from one or more Defendants and/or their co-

7

KENNY NACHWALTER, P.A.

conspirators and sustained injury and damage as a proximate result of the antitrust violations alleged in this Amended Complaint.

13.     Each Plaintiff is a "person" with standing to sue Defendants for damages and other relief under Section 1 of the Sherman Act, 15 U.S.C. § 1.  During time periods relevant to the allegations in this Amended Complaint, each Plaintiff directly purchased in the United States polyurethane foam from one or more Defendants and/or their co-conspirators.

14.     To the extent that any Defendant or co-conspirator engaged in conduct in Canada or Europe in connection with, or as part or in furtherance of, the unlawful conduct alleged in this Amended Complaint, it did so with the intention that such conduct would have, and did have, a substantial and reasonably foreseeable direct, proximate and adverse effect on, and was inextricably linked with, the price of polyurethane foam sold to Plaintiffs and others in the United States, and that domestic effect – individually or in concert with other domestic effects alleged in this Amended Complaint – gives rise to Plaintiffs' antitrust claims alleged in this Amended Complaint.

## Defendants

### Carpenter

15.     Defendant Carpenter Co. ("Carpenter USA") is a privately owned company with its principal place of business in Hickory, North Carolina.  Carpenter USA is the parent of domestic Carpenter entities, including Carpenter ER (defined below) and Carpenter Holdings (defined below).  Carpenter USA is also the parent or other affiliate of foreign Carpenter entities who manufacture and/or sell polyurethane foam, including Carpenter Canada Co. ("Carpenter Canada"), which is a Canadian corporation with its principal place of business in Woodbridge, Ontario, Canada; Carpenter-Dumo NV (Belgium); Carpenter APS (Denmark); Carpenter S.A. (France); Carpenter GmbH (Germany); Carpenter Sweden AB (Sweden); and Carpenter PLC

8

KENNY NACHWALTER, P.A.

(United Kingdom). Carpenter USA characterizes itself as the largest producer of comfort cushioning products, including flexible polyurethane foam, in the world. During time periods relevant to the allegations in this Amended Complaint, Carpenter USA directly and/or through Carpenter ER and/or Carpenter Holdings manufactured and/or directly sold polyurethane foam to one or more Plaintiffs and/or others in the United States, and engaged in the unlawful conduct described in this Amended Complaint in *per se* violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

16. Defendant E.R. Carpenter, L.P. (f/k/a Carpenter Chemical, L.P.) ("Carpenter ER") is a Virginia limited partnership with its principal place of business in Richmond, Virginia. During time periods relevant to the allegations in this Amended Complaint, Carpenter ER directly and/or on behalf of or through Carpenter USA or Carpenter Holdings manufactured and/or directly sold polyurethane foam to one or more Plaintiffs and/or others in the United States, and engaged in the unlawful conduct described in this Amended Complaint in *per se* violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

17. Defendant Carpenter Holdings, Inc. ("Carpenter Holdings") is a Virginia corporation with its principal place of business in Richmond, Virginia. During time periods relevant to the allegations in this Amended Complaint, Carpenter Holdings directly and/or on behalf of or through Carpenter USA or Carpenter ER manufactured and/or directly sold polyurethane foam to one or more Plaintiffs and/or others in the United States, and engaged in the unlawful conduct described in this Amended Complaint in *per se* violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

18. Carpenter USA, Carpenter ER, Carpenter Holdings and/or Carpenter Canada were each members of the conspiracy alleged in this Amended Complaint because of, among other

9

KENNY NACHWALTER, P.A.

reasons, their respective participation in the conspiracy through the actions of their respective officers, employees and representatives.

19. Carpenter USA, Carpenter ER and Carpenter Holdings are individually and collectively referred to in this Amended Complaint as "Carpenter" or the "Carpenter Defendants."

20. During time periods relevant to these allegations, Carpenter manufactured and/or sold polyurethane foam for bedding, furniture, carpet, automotive and other applications.

## Flexible Foam

21. Defendant Ohio Decorative Products, Inc. ("Ohio Decorative") is a corporation organized and existing under the laws of the State of Ohio with its principal place of business in Spencerville, Ohio. Ohio Decorative is the parent of Flexible Foam. During time periods relevant to the allegations in this Amended Complaint, Ohio Decorative directly and/or through Flexible Foam manufactured and/or directly sold polyurethane foam to one or more Plaintiffs and/or others in the United States, and engaged in the unlawful conduct described in this Amended Complaint in *per se* violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

22. Defendant Flexible Foam ("Flexible Foam") is a privately owned company with its principal place of business in Spencerville, Ohio. Flexible Foam is a subsidiary or division of Ohio Decorative Products, Inc. During time periods relevant to the allegations in this Amended Complaint, Flexible Foam directly and/or through or on behalf of Ohio Decorative Products manufactured and/or directly sold polyurethane foam to one or more Plaintiffs and/or others in the United States, and engaged in the unlawful conduct described in this Amended Complaint in *per se* violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

10

KENNY NACHWALTER, P.A.

23.    (a)    Ohio Decorative and Flexible Foam both participated in the conspiracy through the actions of their respective officers, employees and representatives.

(b)    Alternatively, Ohio Decorative was a member of the conspiracy alleged in this Amended Complaint because of, among other reasons, and upon information and belief, the status of Flexible Foam during time periods relevant to these allegations as the alter ego or instrumentality of Ohio Decorative as evidenced by, among other factors, Ohio Decorative's domination or control over Flexible Foam with respect to: (i) the prices at which Flexible Foam sold polyurethane foam; (ii) the hiring and firing of officers or members of the Board of Directors of Flexible Foam; (iii) the budget for Flexible Foam; (iv) the capitalization of and/or loans to Flexible Foam; (v) the transfer of officers or employees between Ohio Decorative and Flexible Foam; (vi) financial benefits provided to officers or employees of Flexible Foam; (vii) the business plan or operation of Flexible Foam; (viii) officers or employees of Ohio Decorative communicated with, serviced or called on purchasers of polyurethane foam despite the presence or with the knowledge of Flexible Foam; (ix) Ohio Decorative used Flexible Foam as its instrumentality or conduit to obtain information about other Defendants' and/or co-conspirators' pricing, sale or production of polyurethane foam obtained through conspiracy communications which Ohio Decorative, in turn, used to make sure that Flexible Foam charged one or more Plaintiffs and/or others supracompetitive prices for polyurethane foam; and/or (x) Ohio Decorative and Flexible Foam has a unified marketing image, including common branding products and/or common corporate logos, insignias or other marks.  Ohio Decorative dominated or controlled Flexible Foam with respect to conspiracy activities alleged in this Amended Complaint.

24.    Flexible Foam and Ohio Decorative are individually and collectively referred to in this Amended Complaint as "Flexible Foam" or the "Flexible Foam Defendants."

KENNY NACHWALTER, P.A.

25. During time periods relevant to these allegations, Flexible Foam manufactured and/or sold polyurethane foam for bedding, furniture, carpet, automotive and other applications.

**Foamex**

26. Defendant FXI-Foamex Innovations, Inc. ("Foamex USA"), formerly known as Foamex International, Inc., is a private company with its principal place of business in Media, Pennsylvania. Upon information and belief, Foamex USA acquired the assets and liabilities of Foamex International, Inc., Foamex L.P., BFF Foam Corp., and 2422735 Canada Inc. (f/k/a Foamex Canada Inc.) ("Foamex Canada"), including liabilities arising from or related to the antitrust violations alleged in this Amended Complaint. During time periods relevant to the allegations in this Amended Complaint, Foamex USA directly and/or through Foamex International, Inc., Foamex L.P., BFF Foam Corp. or Foamex Canada manufactured and/or directly sold polyurethane foam to one or more Plaintiffs and/or others in the United States, and engaged in the unlawful conduct described in this Amended Complaint in *per se* violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

27. Before Foamex USA acquired Foamex International, Inc. and Foamex L.P., and during time periods relevant to these allegations, Foamex L.P. itself and/or on behalf of Foamex International, Inc. manufactured and/or directly sold polyurethane foam to one or more Plaintiffs and/or others in the United States, and engaged in the unlawful conduct described in this Amended Complaint in *per se* violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

28. Before Foamex USA acquired BFF Foam Corp. and Foamex Canada, and during time periods relevant to these allegations, BFF Foam Corp. and Foamex Canada manufactured and/or directly sold polyurethane foam; BFF Foam Corp. and/or Foamex Canada communicated directly or through others with Defendants and/or co-conspirators in furtherance of the

12

KENNY NACHWALTER, P.A.

conspiracy regarding polyurethane foam production, pricing or sale in the United States and/or elsewhere; and BFF Foam Corp. and Foamex Canada engaged in the unlawful conduct described in this Amended Complaint in *per se* violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

29. (a) Before Foamex USA acquired Foamex International, Inc., Foamex L.P., BFF Foam Corp. and Foamex Canada, each of those entities were members of the conspiracy alleged in this Amended Complaint because of, among other reasons, their respective participation in the conspiracy through the actions of their respective officers, employees and representatives.

(b) Alternatively, before Foamex USA acquired them, BFF Foam Corp. and Foamex Canada were each a member of the conspiracy alleged in this Amended Complaint because of, among other reasons, and upon information and belief, their respective status during time periods relevant to these allegations as the alter ego or agent of Foamex International, Inc. and/or Foamex L.P. as evidenced by, among other things, Foamex International, Inc.'s and/or Foamex L.P.'s domination or control over BFF Foam Corp. and/or Foamex Canada with respect to one or more of the following: (i) the prices at which BFF Foam Corp. and/or Foamex Canada sold polyurethane foam; (ii) the hiring and firing of officers or members of the Board of Directors of BFF Foam Corp. and/or Foamex Canada; (iii) the budgets for BFF Foam Corp. and/or Foamex Canada; (iv) the capitalization of and/or loans to BFF Foam Corp. and/or Foamex Canada; (v) the transfer of officers or employees between BFF Foam Corp. and/or Foamex Canada and Foamex International, Inc. and/or Foamex L.P.; (vi) financial benefits provided to officers or employees of BFF Foam Corp. and/or Foamex Canada; (vii) the business plan or operation of BFF Foam Corp. and/or Foamex Canada; (viii) officers or employees of Foamex International, Inc. and/or Foamex L.P. communicated with, serviced or

13

KENNY NACHWALTER, P.A.

called on purchasers of polyurethane foam despite the presence or with the knowledge of BFF Foam Corp. and/or Foamex Canada; (ix) Foamex International, Inc. and/or Foamex L.P. used BFF Foam Corp. and/or Foamex Canada as its/their instrumentality or conduit to obtain information about other Defendants' and/or co-conspirators' pricing, sale or production of polyurethane foam in the United States and/or elsewhere which Foamex International, Inc. and/or Foamex L.P. used to charge one or more Plaintiffs and others supracompetitive prices for polyurethane foam; and/or (x) Foamex International, Inc. or Foamex L.P. and BFF Foam Corp. or Foamex Canada had a unified marketing image, including common branding products and/or common corporate logos, insignias or other marks. Foamex International, Inc. and/or Foamex L.P. dominated or controlled BFF Foam Corp. and/or Foamex Canada with respect to conspiracy activities alleged in this Amended Complaint.

30. FXI-Foamex International, Inc., Foamex International, Inc., Foamex L.P., Foamex Canada and BFF Foam Corp. are individually and collectively referred to as "Foamex" or the "Foamex Defendants."

31. During time periods relevant to these allegations, Foamex manufactured and/or sold polyurethane foam for bedding, furniture, carpet and other applications.

**Future Foam**

32. Defendant Future Foam, Inc. ("Future Foam") is a private company with its principal place of business in Council Bluffs, Iowa. During time periods relevant to these allegations, Future Foam manufactured and/or sold polyurethane foam for bedding, furniture, carpet and other applications. During time periods relevant to the allegations in this Amended Complaint, Future Foam manufactured and/or directly sold polyurethane foam to one or more Plaintiffs and/or others in the United States, and engaged in the unlawful conduct described in this Amended Complaint, in *per se* violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

14

KENNY NACHWALTER, P.A.

**Hickory Springs**

33. Defendant Hickory Springs Manufacturing Company ("Hickory Springs") is a corporation organized and existing under the laws of the State of North Carolina with its principal place of business in Hickory, North Carolina. During time periods relevant to these allegations, Hickory Springs manufactured and/or sold polyurethane foam for bedding, furniture, carpet, automotive and other applications. During time periods relevant to the allegations in this Amended Complaint, Hickory Springs manufactured and/or directly sold polyurethane foam to one or more Plaintiffs and/or others in the United States, and engaged in the unlawful conduct described in this Amended Complaint in *per se* violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

**Leggett**

34. Defendant Leggett & Platt Inc. ("Leggett") is a corporation organized and existing under the laws of the State of Missouri with its principal place of business in Carthage, Missouri. During time periods relevant to these allegations, Leggett manufactured and/or sold polyurethane foam for bedding, furniture, carpet and other applications. During time periods relevant to the allegations in this Amended Complaint, Leggett manufactured and/or directly sold polyurethane foam to one or more Plaintiffs and/or others in the United States, and engaged in the unlawful conduct described in this Amended Complaint in *per se* violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

**Mohawk**

35. Defendant Mohawk Industries Inc. ("Mohawk") is a corporation organized and existing under the laws of the State of Delaware with its principal place of business in Calhoun, Georgia. During time periods relevant to these allegations, Mohawk manufactured and/or sold polyurethane foam for carpet and other applications. During time periods relevant to the

15

allegations in this Amended Complaint, Mohawk manufactured and/or directly sold polyurethane foam in the United States, and engaged in the unlawful conduct described in this Amended Complaint in *per se* violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

**Valle and Domfoam**

36.     Defendant Valle Foam Industries (1995), Inc. ("Valle") is a privately-owned corporation with its principal place of business in Brampton, Ontario.  Valle is the parent of Domfoam International, Inc.  During time periods relevant to the allegations in this Amended Complaint, Valle directly and/or through Domfoam International, Inc. manufactured and/or directly sold polyurethane foam; Valle communicated directly or through others with Defendants and/or co-conspirators in furtherance of the conspiracy regarding polyurethane foam production, pricing or sale in the United States and/or elsewhere; and Valle otherwise engaged in the unlawful conduct described in this Amended Complaint in *per se* violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

37.     Defendant Domfoam International, Inc. ("Domfoam International") is a subsidiary of Valle with its principal place of business in Montreal, Quebec.   Domfoam International characterizes itself as part of the Vallefoam/Domfoam/A-Z Sponge & Foam/Qualifoam Group.   During time periods relevant to the allegations in this Amended Complaint, Domfoam International directly and/or on behalf of Valle manufactured and/or directly sold polyurethane foam; Domfoam International communicated directly or through others with Defendants and/or co-conspirators in furtherance of the conspiracy regarding polyurethane foam production, pricing or sale in the United States and/or elsewhere; and otherwise engaged in the unlawful conduct described in this Amended Complaint in *per se* violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

16

KENNY NACHWALTER, P.A.

38. Valle and Domfoam International are individually and collectively referred to as "Domfoam" or the "Domfoam Defendants."

39. During time periods relevant to these allegations, Domfoam manufactured and/or sold polyurethane foam for bedding, furniture and other applications.

**Vitafoam**

40. Defendant Vitafoam Inc. ("Vitafoam USA") is a private company with its principal place of business in High Point, North Carolina. Vitafoam USA is a part of British Vita Unlimited. During time periods relevant to the allegations in this Amended Complaint, Vitafoam USA directly and/or on behalf of British Vita Unlimited manufactured and/or directly sold polyurethane foam to one or more Plaintiffs and/or others in the United States, and engaged in the unlawful conduct described in this Amended Complaint in *per se* violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

41. Defendant Vitafoam Products Canada Limited ("Vitafoam Canada") is a private company with its principal place of business in Toronto, Ontario, Canada. Vitafoam Canada is a part of British Vita Unlimited. During time periods relevant to the allegations in this Amended Complaint, Vitafoam Canada directly and/or on behalf of British Vita Unlimited manufactured and/or directly sold polyurethane foam; Vitafoam Canada communicated directly or through others with Defendants and/or co-conspirators in furtherance of the conspiracy regarding polyurethane foam production, pricing or sale in the United States and/or elsewhere; and Vitafoam Canada otherwise engaged in the unlawful conduct described in this Amended Complaint in *per se* violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

42. Defendant British Vita Unlimited ("Vitafoam UK") is a company organized and existing under the laws of the United Kingdom, its principal place of business is in London, United Kingdom, and its ultimate parent is Vita Cayman Limited which is located in Grand

17

KENNY NACHWALTER, P.A.

Cayman. Vitafoam UK controls The Vita Group, which includes among its members Vitafoam USA and Vitafoam Canada (along with companies producing polyurethane foam operating in European countries including England, France, Germany, and the Netherlands). During time periods relevant to the allegations in this Amended Complaint, Vitafoam UK, through its domination or control over Vitafoam USA and Vitafoam Canada, manufactured and/or sold polyurethane foam to one or more Plaintiffs and/or others in the United States and/or elsewhere; Vitafoam UK was a conduit or source of information for Vitafoam USA and/or Vitafoam Canada about the conspiracy, including the production, pricing or sale of polyurethane foam in Europe and/or elsewhere; Vitafoam UK communicated directly or through others with Defendants and/or co-conspirators in furtherance of the conspiracy regarding polyurethane foam production, pricing or sale in the United States and/or elsewhere; and Vitafoam UK otherwise engaged in the unlawful conduct described in this Amended Complaint in *per se* violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

43.     (a)     Vitafoam USA, Vitafoam Canada and Vitafoam UK were each members of the conspiracy alleged in this Amended Complaint because of, among other reasons, their respective participation in the conspiracy through the actions of their respective officers, employees and representatives.

(b)     Alternatively, Vitafoam UK was a member of the conspiracy alleged in this Amended Complaint because of, among other reasons, and upon information and belief, Vitafoam USA's and Vitafoam Canada's respective status during time periods relevant to these allegations as the alter ego or agent of Vitafoam UK as evidenced by Vitafoam UK's domination or control over Vitafoam USA and/or Vitafoam Canada with respect to, among other things: (i) the prices at which Vitafoam USA and/or Vitafoam Canada sold polyurethane foam; (ii) the hiring and firing of officers or members of the Board of Directors of Vitafoam USA and/or

18

KENNY NACHWALTER, P.A.

Vitafoam Canada; (iii) the budget for Vitafoam USA and/or Vitafoam Canada; (iv) the capitalization of and/or loans to Vitafoam USA and/or Vitafoam Canada; (v) the transfer of officers or employees between Vitafoam UK and Vitafoam USA and/or Vitafoam Canada; (vi) financial benefits provided to officers or employees of Vitafoam USA and/or Vitafoam Canada; (vii) the business plan or operation of Vitafoam USA and/or Vitafoam Canada; (viii) officers or employees of Vitafoam UK communicated with, serviced or called on purchasers of polyurethane foam despite the presence or with the knowledge of Vitafoam USA and/or Vitafoam Canada; (ix) Vitafoam UK used Vitafoam USA and/or Vitafoam Canada as an instrumentality or conduit to obtain information about Defendants' and/or co-conspirators' pricing, sale or production of polyurethane foam in the United States and/or elsewhere which Vitafoam UK used to make sure that Vitafoam USA charged one or more Plaintiffs and/or others supracompetitive prices for polyurethane foam; and/or (x) Vitafoam UK and Vitafoam USA and/or Vitafoam Canada had a unified marketing image, including common branding products and/or common corporate logos, insignias or other marks. Vitafoam UK dominated or controlled Vitafoam USA and Vitafoam Canada with respect to conspiracy activities alleged in this Amended Complaint.

44. Vitafoam USA, Vitafoam Canada and Vitafoam UK are individually and collectively referred to in this Amended Complaint as "Vitafoam" or the "Vitafoam Defendants."

45. During time periods relevant to these allegations, Vitafoam manufactured and/or sold polyurethane foam for bedding, furniture, automotive and other applications.

**Woodbridge**

46. Defendant Woodbridge Sales & Engineering, Inc. ("Woodbridge S&E") is a corporation organized and existing under the laws of the State of Michigan with its principal place of business in Troy, Michigan. Woodbridge S&E is part of The Woodbridge Group which

itself is a member of the World Polyurethane Alliance. During time periods relevant to the allegations in this Amended Complaint, Woodbridge S&E, directly, through Woodbridge Foam Fabricating, Inc. and/or on behalf of Woodbridge Canada and/or The Woodbridge Group manufactured and/or directly sold polyurethane foam to one or more Plaintiffs and/or others in the United States, and engaged in the unlawful conduct described in this Amended Complaint in *per se* violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

47.     Defendant Woodbridge Foam Fabricating, Inc. ("Woodbridge Fabricating") is a corporation organized and existing under the laws of the State of Tennessee with its principal place of business in Chattanooga, Tennessee.  Woodbridge Fabricating is part of The Woodbridge Group. During time periods relevant to the allegations in this Amended Complaint, Woodbridge Fabricating, directly, through or on behalf of Woodbridge S&E, or on behalf of Woodbridge Canada or The Woodbridge Group manufactured and/or directly sold polyurethane foam to one or more Plaintiffs and/or others in the United States, and engaged in the unlawful conduct described in this Amended Complaint in *per se* violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

48.     Woodbridge S&E and Woodbridge Fabricating are collectively referred to in this Amended Complaint as "Woodbridge USA."

49.     Defendant Woodbridge Foam Corporation ("Woodbridge Canada") is a Canadian corporation with its principal place of business in Mississauga, Ontario. Woodbridge Canada is part of The Woodbridge Group, and the reference in this Amended Complaint to "Woodbridge Canada" includes The Woodbridge Group. Woodbridge Canada and The Woodbridge Group share the same corporate headquarters. During time periods relevant to the allegations in this Amended Complaint, Woodbridge Canada directly, on behalf of The Woodbridge Group, and/or through Woodbridge USA manufactured and/or directly sold polyurethane foam to one or more

20

KENNY NACHWALTER, P.A.

Plaintiffs and/or others in the United States; Woodbridge Canada communicated directly or through others with Defendants and/or co-conspirators in furtherance of the conspiracy regarding polyurethane foam production, pricing or sale in the United States and/or elsewhere; and Woodbridge Canada otherwise engaged in the unlawful conduct described in this Amended Complaint in *per se* violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

50.    (a)    Woodbridge USA and Woodbridge Canada were each members of the conspiracy alleged in this Amended Complaint because of, among other reasons, their respective participation in the conspiracy through the actions of their respective officers, employees and representatives.

(b)    Alternatively, Woodbridge Canada was a member of the conspiracy alleged in this Amended Complaint because, among other reasons, upon information and belief, Woodbridge USA's status during time periods relevant to these allegations as the alter ego or agent of Woodbridge Canada as evidenced by Woodbridge Canada's domination or control over Woodbridge USA with respect to, among other things: (i) the prices at which Woodbridge USA sold polyurethane foam; (ii) the hiring and firing of officers, employees or members of the Board of Directors of Woodbridge USA; (iii) the budget for Woodbridge USA; (iv) the capitalization of and/or loans to Woodbridge USA; (v) the transfer of officers or employees between Woodbridge USA and Woodbridge Canada; (vi) financial benefits provided to officers or employees of Woodbridge USA; (vii) the business plan or operation of Woodbridge USA; (viii) officers or employees of Woodbridge Canada communicated with, serviced or called on purchasers of polyurethane foam despite the presence or with the knowledge of Woodbridge USA; (ix) Woodbridge Canada used Woodbridge USA as an instrumentality or conduit to obtain information about Defendants' and/or co-conspirators' pricing, sale or production of polyurethane foam in the United States and/or elsewhere to make sure that Woodbridge USA

21

charged one or more Plaintiffs and/or others supracompetitive prices for polyurethane foam; and/or (x) Woodbridge Canada and Woodbridge USA had a unified marketing image, including common branding products and/or common corporate logos, insignias or other marks. Woodbridge Canada dominated or controlled Woodbridge USA with respect to conspiracy activities alleged in this Amended Complaint.

51.     Woodbridge USA and Woodbridge Canada are individually and collectively referred to in this Amended Complaint as "Woodbridge" or the "Woodbridge Defendants."

52.     During time periods relevant to these allegations, Woodbridge manufactured and/or sold polyurethane foam for automotive and other applications.

53.     The corporate Defendants identified above participated in the conspiracy alleged in this Amended Complaint by and through the actions of their respective officers, directors, employees and/or agents, each of whom was acting within the scope and course of his/her employment when engaging in conduct in furtherance of the polyurethane foam conspiracy. Alternatively, each corporate Defendant negligently failed to implement sufficient controls to detect and prevent the conduct by its officers, directors, employees and/or agents challenged in this Amended Complaint.

## **Co-Conspirators**

54.     Other companies and natural persons not named as Defendants in this Amended Complaint combined or conspired with Defendants and committed acts in furtherance of the unlawful conspiracy that is alleged in this Amended Complaint. Plaintiffs reserve the right to amend this pleading to add such co-conspirators as named Defendants based upon further investigation and discovery.

22

KENNY NACHWALTER, P.A.

## **PRODUCT**

55.     The reference in this Amended Complaint to "polyurethane foam" refers to flexible polyurethane foam of any grade or blend.  Polyurethane foam is primarily used as a cushioning material in bedding (*e.g.*, mattresses), furniture (*e.g.*, upholstered furniture), flooring underlay and transportation applications.  It is typically produced from a mixture of polyether polyols and/or polyester polyols (collectively "Polyols") and di- and/or poly-isocyanates (collectively "Isocyanates"), along with small percentages of additives and blowing agents.

56.     The structure of the polyurethane foam manufacturing market is conducive to cartelization for a variety of reasons, including, without limitation, one or more of the following:

(a)     Polyurethane foam is a commodity product or has commodity-like characteristics.

(b)     The market for the manufacture of polyurethane foam is concentrated in a small number of sellers.  While firms with collectively less than a substantial market share can unlawfully conspire to fix prices and/or allocate business, in this case Defendants accounted for approximately 80% of the United States production of polyurethane foam during time periods relevant to the allegations in this Amended Complaint.  The market for the domestic supply of polyurethane foam has become increasingly concentrated over the years due to acquisitions and the sale of plants.  For example, in the late 1980s, there were a number of mergers and acquisitions, including acquisitions by Foamex and Ohio Decorative Products.   In about December 1997, Foamex acquired Crain Industries, which at the time was the third-largest polyurethane foam slabstock producer.  In July 2001, Foamex acquired assets of General Foam, including its East Rutherford, New Jersey plant.  In 2006, Vitafoam sold polyurethane foam plants to Ohio Decorative Products and a North Carolina plant to Woodbridge.

(c)     The cost to enter the business of manufacturing polyurethane foam is high, and includes the cost to build a plant and establish and maintain sources of supply of inputs and outputs.

(d)     It would take years for a company to build a plant to manufacture polyurethane foam and to establish a reliable distribution network.

(e)     The process to manufacture polyurethane foam is a chemically-sensitive operation which requires the control of formulation ingredients including Polyols, Isocyanates, silicone surfactant, catalysts and blowing agents.

(f)     The cost to import polyurethane foam manufactured outside the United States makes substitution of foreign polyurethane foam commercially infeasible.

(g)     There are no commercially reasonable substitutes for polyurethane foam because of, among other reasons, application specifications and quality standards.

## TRADE AND COMMERCE

57.     During time periods relevant to the allegations in this Amended Complaint, Defendants and their co-conspirators engaged in business that affects or is within the flow of interstate commerce, and the effect of that business on interstate commerce is substantial. In particular, the activities of Defendants and their co-conspirators are within the flow of interstate and foreign commerce or have a substantial effect upon interstate commerce in that:

(a)     Defendants and their co-conspirators sold and shipped substantial quantities of polyurethane foam in a continuous and uninterrupted flow in interstate commerce to customers located in States other than the States in which the Defendants produced the polyurethane foam.

24

KENNY NACHWALTER, P.A.

(b) Data, information, correspondence and/or financial material were exchanged between each Defendant in the State in which each is located, incorporated, or has its principal place of business and other States.

(c) Money flowed between banks outside of the State in which each Defendant is located, incorporated, or has its principal place of business and other States.

58. The effect of Defendants' and/or their co-conspirators' anticompetitive conduct on United States commerce gives rise to Plaintiffs' claims.

## TOLLING OF THE STATUTE OF LIMITATIONS AND FRAUDULENT CONCEALMENT

59. The statutes of limitation as to Defendants' and their co-conspirators' continuing antitrust violations were tolled, among other reasons, because of the following allegations which may be additive or read in the alternative.

(a) Under 15 U.S.C. § 16(i), the statute of limitations is tolled until one year after the date of the conclusion of the United States' last criminal prosecution of Defendants and co-conspirators regarding the polyurethane foam cartel.

(b) The pendency of a Class Action against Defendants and co-conspirators for conspiring not to compete on the sale of polyurethane foam tolls the running of the statute of limitations as to Plaintiffs' claims.

(c) Defendants' fraudulent concealment as alleged below tolls the statute of limitations.

60. Plaintiffs did not know more than 4 years before filing this Amended Complaint that Defendants and/or their co-conspirators had entered into the conspiracy alleged in this Amended Complaint.

25

KENNY NACHWALTER, P.A.

61. During time periods relevant to the allegations in this Amended Complaint, Plaintiffs used a method of purchasing polyurethane foam that caused each of them to believe in good faith at the time that each of them was receiving competitive prices for polyurethane foam that each of them directly purchased from one or more Defendants and/or their co-conspirators. Unfortunately, as alleged below, as a proximate result of the conspiracy, Defendants and their co-conspirators overcharged Plaintiffs for polyurethane foam during time periods relevant to Plaintiffs' antitrust claims despite each Plaintiff's due diligence.

62. Defendants' and their co-conspirators' conspiracy was self-concealing which prevented Plaintiffs from discovering its existence more than 4 years before filing this Amended Complaint. Notwithstanding the self-concealing nature of their conspiracy, Defendants and their co-conspirators wrongfully and affirmatively concealed the existence of their continuing combination and conspiracy from Plaintiffs by, without limitation, one or more of the following acts:

(a) Providing Plaintiffs and others with false or misleading explanations for changes in the price of polyurethane foam so as to create the illusion that such price changes were the result of unilateral conduct when, in fact, they were the product of collusion.

(b) Instructing members of the conspiracy not to divulge the existence of the conspiracy to others not in the conspiracy.

(c) Avoiding either references in documents or the creation of documents otherwise generated in the ordinary course of Defendants' and/or their co-conspirators' businesses regarding conduct which would constitute an antitrust violation or anticompetitive act.

(d) Conducting covert, secret conspiracy communications or meetings in the United States and elsewhere.

26

KENNY NACHWALTER, P.A.

(e)     Submitting prearranged, complementary losing bids, or not bidding, on contracts for the sale of polyurethane foam so as to create the illusion of competition when, in fact, the bids submitted were not competitive.

(f)     Using code names to conceal the identity of co-conspirators in documents that would otherwise reflect an antitrust violation or anticompetitive act.

(g)     Using their attendance at trade association meetings such as, for example, the Polyurethane Foam Association and the International Sleep Products Association as a cover to conceal their conspiracy and to collude.

(h)     Using public facsimile machines and other means of communicating conspiracy information to each other in documents that would conceal the identity of the sender and/or the recipient.

63.     Plaintiffs did not discover and could not have discovered through the exercise of reasonable diligence the existence of the claims sued upon before more than four years before the statute of limitations was tolled because of the self-concealing character of the conspiracy and/or because of Defendants' and their co-conspirators' fraudulent concealment of the conspiracy as alleged above.

64.     Plaintiffs' claims have been brought within the applicable limitations period.

## **OVERT, UNLAWFUL ACTS IN SUPPORT OF THE ALLEGED ANTITRUST VIOLATIONS**

65.     Beginning as early as approximately January 1, 1999, and continuing until at least July 2010, with an impact that continues thereafter, Defendants and their co-conspirators entered into a continuing conspiracy not to compete on the sale of polyurethane foam sold to Plaintiffs and others in the United States and elsewhere.

66.     Under the terms of their conspiracy, Defendants and their co-conspirators artificially increased, fixed, maintained and/or stabilized prices of polyurethane foam sold to

27

KENNY NACHWALTER, P.A.

Plaintiffs and others at levels above those that would have existed in the absence of collusion; allocated polyurethane foam accounts, including Plaintiffs, among themselves; and/or they restricted the supply of polyurethane foam for sale to Plaintiffs and others.

67. At times during the conspiracy, Defendants and their co-conspirators used claimed changes in the cost of raw materials to manufacture polyurethane foam, including Polyols and/or Isocyanates, as a pretext to collusively increase, fix, maintain and/or stabilize the price of polyurethane foam sold to Plaintiffs and others. In those situations, when Defendants' and their co-conspirators' raw material suppliers announced price increases for chemical ingredients such as Polyols or Isocyanates, Defendants and their co-conspirators communicated and/or coordinated with each other to use those cost increases as a "cover" to collusively and unlawfully increase prices of polyurethane foam sold to Plaintiffs and others. Alternatively or additionally, during those and/or other times during the conspiracy, the prices which Defendants' and their co-conspirators charged Plaintiffs and others for polyurethane foam were higher than they would have been in the absence of collusion.

68. Defendants and their co-conspirators implemented and monitored compliance with their conspiracy through in-person meetings, including meetings under "cover" of trade associations such as the Polyurethane Foam Association (of which U.S. polyurethane foam manufacturers were members and Canadian polyurethane foam manufacturers were regular guests); telephone conversations; and written exchanges (including, without limitation, draft price increase announcements) via facsimile, e-mail or in person.

69. As part of their conspiracy, Defendants and their co-conspirators exchanged information about prospective prices of or price increases in polyurethane foam and/or the allocation of polyurethane foam customers among themselves. These communications in furtherance of the conspiracy included the exchange of draft price increase announcements for

28

KENNY NACHWALTER, P.A.

polyurethane foam sold in the United States and/or elsewhere, and/or discussions in advance about the percentage or amount by which Defendants and/or their co-conspirators were going to increase prices of polyurethane foam sold in the United States and/or elsewhere. For example, and without limitation:[1]

(a) During the conspiracy period, the following Vitafoam officers and employees engaged in conduct in furtherance of the conspiracy alleged in this Amended Complaint, including without limitation:

| | |
|---|---|
| Peter Farah | Bill Lucas |
| Phil Fonseca | Stan Miller |
| Ted Giroux | George Newton |
| David Gurley | Steve Prescott |
| Gerry Hannah | Tim Prescott |
| Rik Hennink | Frank Roncandin |
| Mel Himmel | Robert Zorak |

(b) During the conspiracy, Vitafoam officers or other employees had oral and/or written communications (e.g., e-mails, draft price announcements) in furtherance of the conspiracy alleged in this Amended Complaint with, among others and without limitation:

| | |
|---|---|
| Carpenter | Mark Kane, Ed Malacheck, Stanley Pauley and Max Tenpow |
| Domfoam | John Howard |
| Flexible Foam | Michael Crowell |
| Foamex | Vincent Bonaddio, Tony DaCosta, Doug Dauphin, Donald Phillips and Al Zinn |
| Future Foam | Robert Heller and Bruce Schneider |
| Hickory Springs | Don Coleman, Todd Councilman, Lee Lunsford, Buster Mann and Don Simpson |

---

[1] The list of names and events which follow is not an exhaustive list of either all people who participated in and/or had knowledge of the conspiracy or of all cartel activities.

KENNY NACHWALTER, P.A.

Scottdel        David Carson, Louis Carson and Jeff Carter

Valle           Dean Brayiannis, Robert Valle and Tony Vallecoccia

Woodbridge      Robert Magee, Martin Mazza and Gus Pasquarelli

(c)     During the conspiracy alleged in this Amended Complaint, a Vitafoam witness – who is now believed to be cooperating with law enforcement authorities – had conversations in furtherance of the cartel with, among others, and without limitation: Vincent Bonadio and Don Phillips of Foamex; Tony Vallecoccia (President) of Valle; John Howard (President) of Domfoam; Todd Councilman (Marketing-Sales Manager) of Hickory Springs; Mike Crowell (Vice President, Sales and Marketing) of Flexible Foam; and Mel Himel of Vitafoam.

(d)     In June 2000, the Vitafoam Vice President – who at the time was a Woodbridge employee – sent an e-mail to a Vitafoam salesperson asking whether he spoke to Don Phillips of Foamex, to which the Vitafoam salesperson responded: "Yes, we told him we are going out with our letters 12% effective July 30th [on polyurethane foam prices], he said we would follow."

(e)     In October and November 2004, the Vitafoam Vice President e-mailed his Woodbridge supervisor that he (the Vitafoam Vice President) had had discussions with Bill Lucas, acting for Vitafoam and Crest, regarding an agreement to increase polyurethane foam prices effective January 1, 2005.

(f)     On or about October 21, 2004, November 2, 2004 and March 9, 2005, the Vitafoam Vice President – while a Woodbridge employee – informed his Woodbridge supervisor in substance that he and Vitafoam's Lucas had met to collude on polyurethane foam prices, including the amount and timing of price increases, and he was reaching out to Foamex to collude on polyurethane foam prices as well.

(g) On March 9, 2005, the Vitafoam Vice President e-mailed his Woodbridge supervisor regarding another call with Bill Lucas, representing Vitafoam and Crest. The Vitafoam Vice President wrote: "Spoke with Lucas again last week. We are trying to meeting [sic] in Chattanooga." He also wrote: "We use the schedule[d] discussions to lead into the real reasons for the calls. Said that they were successful at the mills, in Furniture – they were still one [price increase] behind."

(h) On May 5, 2005, the Vitafoam Vice President, while an employee at Woodbridge, e-mailed that he spoke with Bill Lucas of Vitafoam and Raj Mehta, the General Manager of Crest, regarding price increases for May 2005. This relationship between Woodbridge, Crest and Vitafoam continued for years. In a June 2, 2010 conversation between the Vitafoam Vice President and the current Vitafoam President, they again discussed Mr. Mehta and information to pass to him in furtherance of the conspiracy.

(i) On September 14, 2005, the head of a competitor company wrote to a Vitafoam executive and stated "In separate conversation, I talked to Lucas. They are out with 11% on blocks nothing on Auto." He asked the Vitafoam executive to have one of his employees "call Buster [Mann at Hickory Springs] today." After placing the call to Mann, the Vitafoam employee wrote: "I called Buster yesterday. We spoke about the bedding stuff. It is at numbers we are not used to."

(j) On May 22, 2008, Nikki Walborn at Scottdel sent an e-mail with an attachment of a draft Scottdel fuel surcharge and price increase letter to a number of Scottdel employees, including Louie Carson and Jeff Carter. (Within a year of this e-mail, Jeff Carter went from Scottdel to Future Foam). On May 29, 2008, Jeff Carter forwarded this e-mail and price increase letter to David Gurley at Vitafoam, and Gurley then forwarded the e-mail and price increase letter to his superior at Vitafoam, the current President of Vitafoam.

31

KENNY NACHWALTER, P.A.

(k)     On July 7, 2008, Jeff Carter of Scottdel e-mailed a draft price increase letter to David Gurley of Vitafoam. Steve Prescott of Vitafoam ultimately received a copy of the Scottdel price increase e-mail through internal Vitafoam e-mail communications and forwarded it to Vitafoam's Stan Miller and asked him (Miller) to "[c]heck with your Carpenter contact to see when they plan on pulling the trigger [on the polyurethane foam price increase]." On or about July 11, 2008, Stan Miller of Vitafoam e-mailed Steve Prescott of Vitafoam stating that "Dan from Carpenter just called and said they will be going up 13% on Aug. 11, 2008."

(l)     In April 2009, Defendants and their co-conspirators announced a polyurethane foam price increase which they had coordinated in advance. As part of that collusive price announcement, the head of Vitafoam's U.S. and Canadian logistics received a Future Foam polyurethane foam price increase announcement before Future Foam sent it to its customers. The Vitafoam employee shared the announcement with others at Vitafoam who participated in the conspiracy, including Vitafoam's National Sales Manager, who sent the Future Foam price increase announcement to Dean Brayiannis at Valle with the comment: "Who treats you better than me?"

(m)     On May 21, 2009, David Gurley of Vitafoam forwarded via e-mail a draft price increase letter to Jeff Carter. Mr. Carter, in turn, forwarded the Gurley e-mail to David Carson and Louis Carson of Scottdel and stated: "You probably have seen all these. It's crazy out there again, personally I don't think this is enough of an increase."

(n)     Collusive polyurethane foam price increases occurred effective in or about, among other dates, May 2009 and June 2009. In furtherance of those collusive polyurethane foam price increases, and/or to monitor compliance with the unlawful agreement among Defendants and their co-conspirators, Vitafoam collected in its files price announcements by its co-conspirators reflecting these (and other) conspiracy price increases,

32

KENNY NACHWALTER, P.A.

including without limitation, a Flexible Foam price announcement dated April 7, 2009, a Mohawk price announcement dated April 10, 2009, a Carpenter price announcement dated April 13, 2009, a Vita Canada price announcement dated April 14, 2009, a Leggett & Platt price announcement dated April 15, 2009, a Future Foam price announcement dated April 16, 2009; Mohawk, Flexible Foam, Carpenter and Future Foam price announcements each dated May 18, 2009; and Leggett & Platt and Vita Canada price announcements dated May 19, 2009.

(o)     On or about May 26-27, 2010, a Vitafoam employee participating in the conspiracy attended the Polyurethane Foam Association meeting in Baltimore, Maryland where he met with Michael Crowell of Flexible Foam and they discussed polyurethane foam prices.

70.     The allegations in this Amended Complaint detail unlawful conduct and provide examples and insights into how Defendants' and their co-conspirators' conspiracy operated and the scope of their cartel. However, as alleged earlier, Defendants and their co-conspirators fraudulently concealed their conspiracy from Plaintiffs and others for years. Thus, not surprisingly, discovery is needed in this case to reveal the full scope and effect of the polyurethane foam conspiracy. However, in addition to the allegations above, other compelling direct evidence of the conspiracy and the plausibility of Plaintiffs' antitrust clams surfaced in July 2010 when law enforcement authorities from the United States Department of Justice ("DOJ"), the Canadian Competition Bureau ("CCB"), and the European Commission ("EC") executed coordinated raids on Defendants and their co-conspirators as part of Government investigations into alleged cartel activities among polyurethane foam manufacturers and distributors.[2] Upon information and belief, the DOJ, CCB and EC opened those investigations when Vitafoam voluntarily and secretly came forward in February 2010 and confessed to its participation in the

---

[2]     For example, the Carpenter Defendants' offices in Europe were among those raided by the EC.

KENNY NACHWALTER, P.A.

conspiracy and agreed to cooperate with law enforcement agencies in their subsequent investigations.

71.     The fact that Vitafoam (or such other amnesty applicant) had to confess to its involvement in criminal antitrust conduct regarding the polyurethane foam cartel in order to qualify for leniency in the first instance is direct evidence of the conspiracy and the plausibility of Plaintiffs' antitrust claims in this case.

(a)     The DOJ's Corporate Leniency Policy provides in part that for a corporation to obtain leniency regarding illegal antitrust activity, it must among other steps, report the wrongdoing, the "confession" must be truly a corporate act as opposed to isolated confessions of individuals, and the corporation must cooperate with DOJ's investigation. *See* www.justice.gov/atr/public/guideliens/0091.htm. In particular, a leniency applicant "must admit its participation in a criminal antitrust violation involving price fixing, bid rigging, capacity restriction, or allocation of markets, customers or sales or production volumes before it will receive a conditional leniency letter." *See* www.justice.gov/atr/public/criminal/239583.htm at 5.

(b)     The CCB's Immunity Program provides in part that "[a] party implicated in criminal anti-competitive activity … may offer to co-operate with the [CCB] and request immunity." The CCB's Immunity Program falls under Canada's Competition Act, which prohibits conspiracies, agreements or arrangements between competitors or potential competitors to fix prices, allocate markets or restrict the supply of a product.

(c)     The EC's Corporate Leniency Program requires among other acts that an applicant provide the EC with a detailed description of the alleged cartel arrangement, including its aims, activities, functioning, participants and products to qualify from immunity from fines.

72.     In addition to Vitafoam's (or such other amnesty applicant's) admission that it participated in the polyurethane foam conspiracy, Vitafoam's cooperation with the DOJ and the

34

KENNY NACHWALTER, P.A.

CCB has, upon information and belief, yielded additional direct evidence of the cartel in the form of documents, information, and secretly recorded telephone conversations with or telephone messages from Vitafoam co-conspirators. On the basis of that cooperation, the CCB (and, upon information and belief, the DOJ) applied for and received warrants to search the offices of some number of Defendants and/or co-conspirators. The sworn search warrant applications filed by a Senior Competition Law Officer from the CCB states that he "truly believe[s] that the information provided by [Vitafoam's witnesses] is true …."

73. The telephone conversations and telephone messages which Government law enforcement authorities secretly recorded with Vitafoam's cooperation from approximately May 2010 through June 2010 provide a revealing insight into the cartel's operation. For example:

(a) On May 12, 2010, Bruce Schneider of Future Foam called the President of Vitafoam asking about Vitafoam's plans for a polyurethane foam price increase. This call illustrates how the conspirators monitored and exchanged their polyurethane foam price increase announcements in advance of informing their customers. Mr. Schneider explained on the call that "everything is postponed to May 31st or June 1st. There is a [price announcement] letter out from Carpenter for [the] 31st of May. There is a letter out from Flexible for June 1st. Foamex sent a letter two weeks ago at 15% but it looks like now that the increase is going to be 10 and 12% on foam." Vitafoam's President asked Mr. Schneider whether he was "hearing anything from the other guys [*i.e.*, conspirators]" or "is it just kinda market stuff?", to which Mr. Schneider replied: "Yeah, we are hearing 10-12 … It's kinda what we hear from other people what they expect. Ya know, it would have been great to get 20% but I don't think so. … If you hear anything from your friends in Europe … I sure would like to know that as well." The conspiracy price increase ultimately was 9%, and on June 10, 2010,

35

KENNY NACHWALTER, P.A.

Mr. Schneider left a voice mail message for Vitafoam's President asking him to call back because he (Mr. Schneider) had "information of why the increase changed from 10 to 12 to 9."

(b)     Another call between conspirators reveals their exchange and use of polyurethane foam price increase letters to implement and monitor the conspiracy. On June 3, 2010, Dean Bryiannis of Valle Foam called Vitafoam's Vice President and had the following conversation:

> Brayiannis: I sent you a text regarding price increase letters. I'm assuming you've got most of the ones that you wanted to see.
>
> Vitafoam: I didn't see, I had the old boy [one of Vitafoam's sales representatives] had faxed me one from a couple of days ago … Yah, ok, no problem. … [I]t's game on again, isn't it.
>
> Brayiannis: [A]h, we'll see what happens. I've got Carpenter, Flexible, Mohawk, Leggett.
>
> Vitafoam: But it's warranted, you know what I mean. Like, we know the prices of raw material have been going up, so ah.
>
> Brayiannis: Well, you know, I guess what we've gotta see is have another one right behind this one, hopefully the first one will stick right but I guess we will see what our friends at Carpenter will do.
>
> Vitafoam: … [L]ike I say, it's game on. So I would imagine that most manufacturers will move forward with it. We will have to see whether … they do or not and see how it goes.
>
> Brayiannis: Yah, yah. All right. Well our letter is out so hopefully I'm assuming you're probably put something out by now.
>
> Vitafoam: … [I]t's as good as done.
>
> Brayiannis: Ok. Well we're already out, so we've already put our letter out.

(c)     A June 4, 2010 telephone message from Vitafoam's Tim Prescott to a

Vitafoam cooperating witness shows how conspirators coordinated prospective polyurethane

foam price information:

> Hey, it's Tim. … Can you give me a call when you get a chance. I
> don't know whether you've spoken to [Vitafoam's President] but I
> had a message earlier from Dale over at Carpenter and when I
> called him back he was asking what we're going with the price
> increase and he just called me again asking can VPS please call
> John Howard over at Domfoam.

74.     Among the most significant insights and incriminating facts about the conspiracy

revealed by the Vitafoam tapes is that they clearly show that the conspirators knew that by

conspiring not to compete on the sale of polyurethane foam, they were keeping polyurethane

foam prices to their customers higher than they would have been in the absence of collusion.

Conspirators rarely, if ever, admit to overcharging their customers when confronted with their

unlawful conduct after the fact. But at the time of the Vitafoam taped calls, upon information

and belief, Vitafoam's co-conspirators did not know that in February 2010 Vitafoam had turned

itself in, had exposed the conspiracy to and was cooperating with law enforcement officials, and

was legally required to start competing for previously allocated accounts if it wanted to qualify

under the various Government leniency programs. As a result, when Vitafoam salespeople

began soliciting polyurethane foam business from accounts previously allocated to conspirators,

at least one of those conspirators, John Howard of Domfoam, called a cooperating Vitafoam

witness on May 20, 2010 and complained about the poaching in the sort of highly incriminating

manner that usually occurs only when one does not know that he is being tape-recorded.

> Howard: Your [Vitafoam] fellow in Montreal here has been out, has his
> salesman Claude Robinson out knocking on doors they've never knocked
> on before, selling at or quoting at low low prices. If he wants a battle, I'll
> give him a battle … These guys have been in at accounts they've never
> sold at … if he wants a battle, he's got one. We will start going after his
> accounts and it won't be pretty. We'll both end up hurting. … I'm pissed

off and our sales guys are pissed off and they're saying: "John, are you going to do something about this, or are you just going to let this guy keep quoting low prices and taking business away from us." So I'll let the dogs loose or I don't let the dogs loose. Want to mull it over and give me a shout back.

75. On May 25, 2010, Vitafoam's cooperating witness returned Mr. Howard's call and

Mr. Howard made the following additional incriminating statements:

> Howard: Just, you know we've kind of stayed out of each other's way for some time here while business is quiet. There's just no business to be had and **dropping prices is only going to benefit the customers.** I can't afford to have him take stuff away … It'll be a rough go if he wants to go and quote prices in places where he's not currently selling … Tell Normand [Vitafoam's salesman] it's a, I mean we just don't even know who your accounts are. Basically we've just never interfered, but, if he's going to go selling to guys quoting prices at guys where he doesn't currently sell, we're going to go after his accounts. So, business decision, you know, whatever way the chips fall, that's the way they're going to fall, and life will go on. But the guys are asking me-you are always telling us to stay away. We do the same thing with Foamex, we don't go after their accounts, haven't for a while. Business is [sic] been in the shitter, just kind of stayed away and they stayed [away] from our accounts too so prices have been pretty stable. It's just, you know, there ain't much business out there and **dropping prices only the customers are going to benefit.** But let him make his decision and if it is to continue going after them then there'll be some consequences. That's it. I'm not gonna … no [big] threats but I can't not do anything. … (Emphasis added.)

76. Although the Vitafoam taped calls cover only a few months of the conspiracy in

2010, they reveal that the cartel included the United States and polyurethane foam sold in the

United States. For example, and without limitation:

(a) At least three telephone calls in connection with the Vitafoam conspiracy

tapes involved conspirators located in the United States at the time of the calls. On May 12,

2010, Bruce Schneider of Future Foam, located in the United States, called Vitafoam and

discussed a prospective polyurethane foam price increase. On May 27, 2010, a Vitafoam

cooperating witness dialed 828-328-2201 (a North Carolina, United States telephone number)

and spoke to Lee Lunsford at Hickory Springs in North Carolina. On the call, they discussed among other subjects costs for inputs to manufacture polyurethane foam and the timing of polyurethane foam price increases. On June 10, 2010, Bruce Schneider of Future Foam, using the Iowa, United States telephone number 712-323-9122, called a Vitafoam cooperating witness and left a message: "If you want to give me a call I've got information of why the [polyurethane foam price] increase changed from 10 to 12 to 9 [percent]."

(b)     Some of the taped Vitafoam telephone calls discussed in part the United States polyurethane foam market, conspirators physically located in the United States, or United States polyurethane foam customers. For instance, on June 15, 2010, Michel Legendre of Carpenter called a Vitafoam cooperating witness to discuss the conspiracy. Mr. Legendre stated in part that polyurethane foam prices have "gone up in the States. Leggett went up … Leggett's the one that's going up first this time in the US …." Mr. Legendre then sent Vitafoam's witness a facsimile containing a copy of Carpenter's polyurethane foam price increase letter that was to be sent to customers the next day.

(c)     The CCB's sworn search warrant applications state that conspiracy meetings often coincided with the bi-annual meetings of the Polyurethane Foam Association ("PFA"), at least some of which occurred in the United States. *See, e.g.,* May 26-27, 2010 PFA meeting in Baltimore, Maryland. Conspirators located in the United States were members of the PFA, and some conspirators located outside the United States (*e.g.,* Canada) were regular guests at the PFA meetings.

(d)     Robert Woodbridge, the Chief Executive Officer of Woodbridge's Canadian operation, exchanged information with a Vitafoam cooperating witness regarding an increase in the price of polyurethane foam in the United States.

(e) The CCB's sworn search warrant applications characterize the polyurethane foam conspiracy as "international in nature."

(f) Some Defendants manufactured polyurethane foam in the United States and delivered it in Canada. For example, and without limitation, during time periods relevant to the allegations in this Amended Complaint: (1) Foamex sold polyurethane foam which it manufactured at a plant in Seattle, Washington and delivered to one or more customers in Canada; (2) Flexible Foam sold polyurethane foam which it produced at a plant in Portage, Wisconsin and delivered to one or more customers in Canada; and (3) Carpenter USA sold polyurethane foam which it manufactured at a U.S. Carpenter plant and delivered to one or more customers in Canada.

77. This Amended Complaint plainly and plausibly alleges antitrust claims based on the allegations of a direct agreement among Defendants and their co-conspirators not to compete on the sale of polyurethane foam sold to Plaintiffs and others in the United States and elsewhere between at least January 1, 1999 and July 2010. These allegations are supported not only by, among other things, Vitafoam's (or other such amnesty applicant's) admission to DOJ (and relatedly to the CCB and the EC) of participating in the polyurethane foam cartel and the tape recordings, documents and competitor information exchanges identified above, but also by the allegations in this pleading regarding the identity of participants in the conspiracy; a minimum time period for the conspiracy; the basis of the conspiracy; how the conspiracy operated; specific examples of who met or communicated with whom, when, where and for what unlawful purpose; and (as alleged above and below) the elements of Plaintiffs' Sherman Act Section 1 claims. Separate and apart from those allegations of a direct agreement are the allegations in paragraph 56(a)-(g), *supra*, about the structure of the market for the

manufacture and sale of polyurethane foam from which a Court and Jury could reasonably infer that this market was susceptible to collusion.

## ANTITRUST VIOLATIONS

78.     Beginning at least as early as approximately January 1, 1999, and continuing until at least July 2010, with an impact that continues, Defendants and their co-conspirators engaged in a continuing agreement, understanding and conspiracy not to compete on the sale of polyurethane foam in unreasonable restraint of trade and commerce in *per se* violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

79.     The contract, combination and conspiracy among Defendants and their co-conspirators described in the immediately preceding paragraph consisted of a continuing course, pattern and practice of conduct regarding the production, pricing and sale of polyurethane foam in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

80.     The course, pattern and practice of conduct described above included, among other things, a continuing agreement, understanding and concert of action among Defendants and their co-conspirators, the substantial terms and purpose of which were:

(a)     To fix, stabilize, maintain and/or raise prices of polyurethane foam in the United States and elsewhere;

(b)     To allocate the volume of sales and/or market shares of polyurethane foam in the United States and elsewhere;

(c)     To allocate contracts or accounts to supply polyurethane foam in the United States and elsewhere; and/or

(d)     To control or reduce the output of and/or capacity to produce polyurethane foam in the United States and/or elsewhere.

41

KENNY NACHWALTER, P.A.

81. In order to formulate and effect the foregoing illegal combination and conspiracy, Defendants and their co-conspirators engaged in one or more of the following overt acts:

(a) They agreed to exchange and did exchange current and future price information about polyurethane foam sold in the United States and/or elsewhere;

(b) They agreed to coordinate and did coordinate price levels and price movements of polyurethane foam sold in the United States and/or elsewhere;

(c) They agreed on prices and price levels of polyurethane foam sold in the United States and/or elsewhere;

(d) They agreed to allocate and allocated polyurethane foam customers or sales volume, or both, in the United States and/or elsewhere among themselves;

(e) They agreed to allocate and allocated market shares of polyurethane foam in the United States and/or elsewhere; and/or

(f) They agreed to control or reduce, and did control or reduce, the output of and/or capacity to produce polyurethane foam in the United States and/or elsewhere.

82. Defendants and their co-conspirators entered into and refined their illegal combination and conspiracy through, among other things, the overt acts alleged above, including without limitation, participating in conversations and meetings in the United States, Canada and/or elsewhere to discuss the prices of polyurethane foam to be sold, the allocation of polyurethane foam accounts and/or the production of polyurethane foam in the United States and elsewhere; participating in conversations and attending meetings in the United States, Canada and/or elsewhere concerning implementation of and adherence to their conspiracy; issuing price announcements and/or price quotations in the United States and elsewhere in

42

KENNY NACHWALTER, P.A.

accordance with the conspiracy; and/or exchanging information on the sale of polyurethane foam in the United States and/or elsewhere.

83.     As a result of Defendants' and their co-conspirators' conspiracy in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, and during times relevant to the allegations in this Amended Complaint:

(a)     Price competition in the sale of polyurethane foam among Defendants and their co-conspirators to Plaintiffs and others has been restrained, suppressed and eliminated;

(b)     Prices for polyurethane foam sold by Defendants and their co-conspirators have been raised, fixed, maintained and/or stabilized at artificially high and noncompetitive levels throughout the United States and elsewhere; and

(c)     Plaintiffs and other direct purchasers of polyurethane foam from Defendants and their co-conspirators have been deprived of the benefit of free and open competition.

84.     Plaintiffs have been injured in their business or property by reason of Defendants' and their co-conspirators' antitrust violations alleged in this Amended Complaint in amounts not yet ascertained.  Plaintiffs' injuries as direct purchasers of polyurethane foam from Defendants and/or their co-conspirators are injuries of the type the antitrust laws were designed to prevent and flows from that which makes Defendants' and their co-conspirators' acts unlawful.

85.     Plaintiffs are threatened by continuing loss and damage as a result of Defendants' and their co-conspirators' unlawful conduct, and Plaintiffs are entitled to injunctive relief.

KENNY NACHWALTER, P.A.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for the following relief:

(a)     A jury verdict in the amount of the compensatory damages sustained by Plaintiffs.

(b)     A judgment against Defendants, jointly and severally, by the Court in treble the amount of the jury verdict, in accordance with Section 4 of the Clayton Act, 15 U.S.C. § 15, and for attorney's fees, costs and interest as allowable by law.

(c)     A permanent injunction pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, enjoining Defendants from future violations of the antitrust laws and from practices which facilitate those violations.

(d)     Such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiffs demand a trial by jury of all issues so triable.

Dated:  July 26, 2011

Respectfully submitted,

KENNY NACHWALTER, P.A.
Richard Alan Arnold, Esquire
William J. Blechman, Esquire
Douglas H. Patton, Esquire*
James Almon, Esquire
201 S. Biscayne Boulevard
Suite 1100
Miami, Florida 33131
Tel:     (305) 373-1000
Fax:    (305) 372-1861
E-mail:  wblechman@kennynachwalter.com


By:  _William J. Blechman_

William J. Blechman
**Counsel for Plaintiffs**

*Licensed to Practice Law in NY, MA, DC and UT; not licensed in FL.

KENNY NACHWALTER, P.A.

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing document was served via ECF on counsel of record this 26th day of July, 2011:

William J. Blechman

William J. Blechman

412034.1

KENNY NACHWALTER, P.A.