IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | |
|---|---|
| In re POLYURETHANE FOAM ANTITRUST LITIGATION ) ) ) This document relates to: ) )     ALL CASES      ) ) | MDL Docket No. 2196 Index No. 10 MD 2196 (JZ) |

**DEFENDANTS' POSITION STATEMENT ON THE
TRANSACTIONAL DATA PROTOCOL[1]**

Under the Court's Scheduling Order dated April 27, 2011, the parties to this litigation were obligated to provide the Court with a proposed protocol governing the discovery of transactional data. Unfortunately, Plaintiffs have taken an unjustifiably narrow position as to the types of transactional data Plaintiffs are willing to provide to Defendants. Contrary to established case law, and the Court's rulings in the *Urethanes Litigation,* Plaintiffs insist Defendants are not entitled to any so-called "downstream" transactional data from any of the Plaintiffs regarding Plaintiffs use and sales of its products containing polyurethane foam to its customers because it is irrelevant. Plaintiffs' relevance argument – the sole objection voiced during the meet and confer process – is misplaced given that courts have not hesitated to require the production of such data as relevant in factual circumstances indistinguishable from those in this case. *See In re: Urethane Antitrust Litigation*, Case No. 04-MD-01616-JWL (D. Kan. Jan.

---

[1] Defendants Inoac USA Inc., Crest Foam Industries, Inc., Leggett & Platt, Inc., Otto Bock Polyurethane Technologies, Inc., Mohawk Industries, Inc., and Plastomer Corporation while agreeing with the position taken by the other defendants in the brief, are not joining in the Position Statement as the proposed transactional data protocol indicates these Defendants will work separately with plaintiffs in the context of a phased and focused discovery plan.

20, 2010) Order at p. 9 ("After considerable study of *Hanover Shoe* and its progeny, the court finds the downstream data sought by defendants in this case relevant to the claims and defenses asserted herein and not prohibited as a matter of law."); *In re Urethane Antitrust Litigation*, 237 F.R.D. 454, 462-63 (D. Kan. 2006) (same). Other courts have recognized the relevance of such information, although ultimately concluding that the burden would be excessive. *See, e.g., In re Vitamins Antitrust Litig.,* 198 F.R.D. 296, 299 (D.D.C. 2000) ("Defendants are correct that *Hanover Shoe* and its progeny do not render irrelevant plaintiffs' individualized downstream data. . . ."). Plaintiffs, of course, bear the burden of supporting their objection to producing the requested information., *see Urethane*, 237 F.R.D. at 462, but have made no attempt to demonstrate producing the requested data would be unduly burdensome or expensive in light of the obvious benefits to Defendants of such data.[2]

Defendants are not merely asserting the "what's good for the goose is good for the gander" rule in requesting this data. To the contrary, Defendants' reasons for requesting this data for both class and liability issues are many, and denying Defendants access to this data would significantly and adversely impact Defendants' ability to defend the exceptionally broad claims asserted in this litigation. Moreover, the Transactional Data Protocol will apply to all three categories of plaintiffs – direct purchaser class plaintiffs, indirect purchaser class plaintiffs, and non-class direct purchasers, and Defendants' reasons for requesting transactional data from each category of Plaintiffs are equally valid.

---

[2] On May 20, 2011, Plaintiffs requested that Defendants provide information regarding the systems and databases that the individual Defendants use to maintain transactional sales data, production or capacity data, and data regarding production cost. Defendants have complied with Plaintiffs' request. On June 21, 2011, Defendants wrote to Plaintiffs requesting reciprocal information concerning Plaintiffs' systems and databases used to maintain purchase data, transactional sales data and manufacturing costs. Plaintiffs ignored Defendants' request. One month later, on July 21, 2011, Defendants again requested the information. To date, only ten Plaintiffs have even responded. However, the Plaintiffs who have responded provided only limited information regarding their transactional purchase data and have provided no information regarding the other transactional data Defendants requested.

Plaintiffs have defined "flexible polyurethane foam" in their complaints to include "flexible polyurethane foam *and flexible polyurethane foam products*" and allege that Defendants' conspiracy had the "purpose and effect of fixing prices of flexible polyurethane foam *and polyurethane foam products*." *See* Direct Purchaser Consolidated Amended Complaint ¶ 1; Indirect Purchaser Consolidated Amended Complaint ¶ 1. Defined in that manner, many, if not all, Direct Purchaser Plaintiffs, and many Indirect Purchaser Plaintiffs, compete directly with Defendants. For example, foam used in the bedding and furniture industries must be manufactured, then fabricated (i.e., cut into predetermined shapes and sizes). The fabrication may be performed by a Defendant foam manufacturer, it may be performed by a fabricator that purchases from a Defendant and then sells the fabricated foam to a bedding or furniture manufacturer, or it may be performed by a downstream furniture or bedding manufacturer, which, in turn, may purchase the foam either directly from a Defendant or from an intermediary (e.g., a wholesaler or fabricator). A Defendant, in other words, competes directly with both fabricators and other wholesaler intermediaries/class members for sales to the bedding/furniture manufacturers.[3] If a Defendant sells directly to a retailer it would also compete with Plaintiffs who also sell to the same category of retailers. Downstream data regarding the sales and other transactional activities of a competitor that is not alleged to be part of a price fixing conspiracy is self-evidently relevant to the question of whether a Defendant's sales and other transactional activities are consistent or inconsistent with the alleged conspiracy. Defendants just as obviously are entitled to the downstream data to determine how and to what extent Plaintiffs compete

---

[3] As a further example, as Defendant Plastomer understands the CAC, substantially all of Plastomer's closest competitors would be members of the putative class. Plastomer's closest competitors purchase foam, then die cut it, apply laminates and adhesive, and perform other processes, then sell the fabricated goods to automobile manufacturers and tier one suppliers. Plastomer does the same thing for the same class of customers, except that it manufactures most of the foam it uses. Plastomer does not sell to these putative class members, but it does compete with them.

directly with Defendants,[4] *see Morning Star Packing Co. v. SK Foods, L.P.*, 754 F. Supp. 2d 1230, 1235 (E.D. Cal. 2010) ("Where a plaintiff is a competitor to, rather than a customer of, a defendant alleged to have engaged in price fixing, the plaintiff will not have suffered an antitrust injury deriving from the fixing of prices."), in addition to testing Plaintiffs' numerous allegations regarding Defendants' conduct and pricing in the markets for flexible polyurethane foam. *See Urethane*, Case No. 04-MD-01616-JWL (D. Kan. Jan. 20, 2010) Order at pp. 9-14.

Downstream transactional data also is relevant to class certification, particularly issues of common impact and the adequacy of class representatives. *See Urethane,* 237 F.R.D. at 464; *Valley Drug,* 350 F.3d at 1184, 1192, 1196 (reversing the district court's grant of class certification, finding the district court improperly denied a defense request to conduct downstream discovery regarding the plaintiffs' sales practices, and concluding "it would not be unduly burdensome to require the named representatives to bring forth evidence to the court that no fundamental conflict exists among the class members." ).

Two discovery rulings that have come out of the multidistrict litigation in the District of Kansas, *In re Urethane Antitrust Litigation*, No. 04-md-1616-JWL ("*Urethane*"),[5] are of particular relevance to this issue due to the identity of the parties and the Court's July 19, 2011 Order tying production of documents in this case to the production of documents in *Urethane.* First, on August 25, 2006, the *Urethane* court granted the *Urethane* defendants' motion to compel the following categories of discovery from the putative class action plaintiffs:

---

[4] Websites of various of other named Plaintiffs indicate they may also be in direct competition with various Defendants in this action. *See* http://www.jspack.com/polyurethane.html (website for Plaintiff J&S Packaging, Inc.) (describing itself as a "Fabricator of Rigid and Flexible foams"); http://www.adamsfoam.com/ (website for Plaintiff Adams Foam); http:www.mathisbrothers.com (website for Plaintiff Factory Direct); http://www.carpetcushions.com/aboutUs.asp (website for Karsen Company f/k/a Carpet Cushions); http://www.embrowninc.com/ (website for E.M. Brown).

[5] The two *Urethane* decisions were entered in August 2006 and January 2010 *before* the Department of Justice and Canadian investigations of the so-called "foamers" (the Plaintiffs in *Urethane* against whom discovery was being sought) were public and before civil conspiracy complaints against those companies had been filed.

(1) "Corporate policies, practices and procedures for making decisions regarding the purchase or sale of any polyether polyol products"; (2) "Documents concerning the price, volume, grade or form of polyether polyol products purchased by you, including documents identifying the purpose for which you used polyether polyol products"; (3) "Documents concerning the purposes for which you use or used polyether polyol products and documents that show how polyether polyol products are used in the production of your products, including the amount of polyether polyol used in your products" and (4) "Documents concerning communications you had with manufacturers or distributors of end-products in which polyether polyol products are used." *In re Urethane Antitrust Litigation*, 237 F.R.D. 454, 458, 460-61 (D. Kan. 2006). The court determined Defendants were entitled to these documents because they related "to the general nature of polyether polyol products, whether Plaintiffs treated these products as fungible and substitutable, and whether there are substitutes for such products," and these "issues of fungibility and substitutability of polyether polyol products" were relevant to class certification. *Id.* at 460-61.

The court also compelled the plaintiffs to produce documents in response to the *Urethane* defendants' request for "Documents concerning changes in supply, demand, pricing and discounting for polyether polyol products." *Id.* at 459-60. The court found "characteristics and complications of the relevant market may be material to determining whether a class should be certified." *Id.* The court further determined such documents "may evidence 'industry characteristics' and/or also may demonstrate whether there are significant differences in the product market for different purchasers, such that individual issues overwhelm any common issues and render class certification inappropriate." *Id.* at 458, 459-60.

Finally, the court ordered the plaintiffs to provide answers and documents responsive to the defendants' requests for a "Description of, and/or documents showing, the nature of your business, including gross volume in dollars of your sales or products that incorporate polyether polyol products and the customers to whom you sell such products." *Id.* at 458, 461-62. The court determined information concerning "Plaintiffs' buying power, elasticity of demand, and leverage" were relevant to class certification issues because "[a] class action may not be suitable where purchasers with different buying power and elasticity of demand have varying degrees of leverage over the defendants." *Id.* at 461. The court noted that a plaintiff's "status as a distributor of polyether polyol products may set it apart from many of the other putative class members who purchased such products for their own manufacturing purposes." *Id.* Relying on *Valley Drug Co. v. Geneva Pharmaceuticals, Inc.*, 350 F.3d 1181, 1195 (11th Cir. 2003), the court held that class certification may not be appropriate where class representative and putative class members have significantly different and potentially antagonistic economic interests. *Id*

The *Urethane* plaintiffs insisted, as Plaintiffs do here, that defendants' discovery requests were improper "because discovery of downstream data in an antitrust case is prohibited." *Id.* at 462. The court flatly rejected the argument, finding that the requested information was relevant for class certification and other issues. *Id.* at 463-64.

In a subsequent January 20, 2010 order in *Urethane*, the court again granted defendants' motion to compel merits discovery from direct purchaser plaintiffs. This time, the court took an even broader view of the permissible uses of such discovery, ordering plaintiffs to produce documents responsive to the following categories:

1. Plaintiffs' price increase announcements with respect to their products that contain Polyether Polyol Products;
2. Plaintiffs' financial results, both with respect to the company as a whole and the divisions or business units that use Polyether Polyol Products;

3. Regular reports for the business units that use Polyether Polyol Products, such as might be prepared for senior management or the board of directors;
4. Evaluations or analyses of the sales and financial results of the businesses that used Polyether Polyol Products, whether done on a regular basis or otherwise;
5. Evaluations or analyses of the market for products containing Polyether Polyol Products, including the current and forecasted demand for such products;
6. Strategic planning documents pertaining to businesses that use Polyether Polyol Products.

January 20, 2010 Order at p. 3. The court found this information potentially relevant "to determining whether a non-collusive explanation exists for defendants' conduct," and thus relevant to the issue of liability. *See id.* at pp. 10, 13-14. The court also found the requests relevant for the purpose of defending against allegations that "defendants gave pretextual reasons for the prices increases." *Id.* Downstream data, the court concluded, could show plaintiffs offered the same justifications for their own products' price increases as they alleged were "pretextual" conspiratorial explanations used by defendants. *Id.* The court left open the question of whether the defendants' requests also were relevant to the issues of "fact of injury" and "amount of damages." *Id.* at 15-16. The Courts' reasoning is even more applicable to this case, where Plaintiffs, by their own allegations, are sellers of flexible polyurethane foam and make numerous claims about Defendants' conduct and pricing in the markets for flexible polyurethane foam.

Many other courts have reached similar conclusion regarding the relevancy of downstream data. *See Air Tech Equipment, LTD. v. Humidity Ventilation Systems, Inc.*, No. 05-cv-77, 2006 WL 3193720, at *2 (E.D.N.Y. Nov. 2, 2006) (downstream pricing was relevant to the issue of damages where antitrust plaintiffs seek lost profits and injury to business,[6] and not merely overcharges); *J.B.D.L. Corp. v. Wyeth-Ayerst Laboratories, Inc.*, No. 01-cv-704, slip op.

---

[6] Plaintiffs generally have alleged injury to their businesses and property without specificity and are seeking damages in amounts yet to be proven.

7

at 5 (S.D. Ohio June 7, 2004) (downstream data was relevant to the question of whether price increases were anti-competitive).

Plaintiffs essentially contend that the data requested by Defendants is irrelevant not only to the Direct Purchaser Class Action and Non-Class Action cases, but also to the Indirect Purchaser Class Action. Such a position is not justifiable. First and foremost, as noted above, this litigation includes both direct and indirect purchaser class actions. As such, any determination as to whether certain information or data is relevant or irrelevant to "this litigation" must consider all three cases. Second, in their Complaint, the indirect purchasers claim that "the prices charged by Defendants and their co-conspirators to suppliers of Plaintiffs and the Class for polyurethane foam products were maintained at artificially high and supra-competitive levels." (ICAC at 148(a)) (emphasis added.) By definition then, the indirect purchasers did not purchase such products directly from Defendants, but instead from suppliers – the named and unnamed members of the Direct Purchaser Class and Direct Action Plaintiffs. For such indirect purchasers to recover, they must establish that any overcharge from Defendants was passed down through the distribution chain (i.e., through a direct purchaser). Thus, documents showing what direct purchasers did with the flexible polyurethane foam and flexible polyurethane foam products that they bought from Defendants (e.g., whether they sold it, to whom they sold it, at what price and the factors that went into that price) are directly relevant to the indirect purchaser actions. There is no circumstance under which such data, sought here by Defendants and which is uniquely and solely in the possession of Direct Purchaser Class Action and Direct Action Plaintiffs, can be deemed irrelevant.

Plaintiffs simply cannot plead very broad conspiracy claims in very diverse product markets against an entire industry of manufacturers who compete in upstream and downstream

markets and expect to cabin discovery narrowly and frustrate the Defendants' opportunity to conduct legitimate discovery and defend against these sweeping claims.

/s/ James H. Walsh
James H. Walsh
Howard Feller
Bethany Lukitsch
MCGUIREWOODS LLP
One James Center
901 East Cary Street
Richmond, VA 23219-4030
Phone: (804) 775-4356
Fax:    (804) 698-2200
jwalsh@mcguirewoods.com
hfeller@mcguirewoods.com
blukitsch@mcguirewoods.com

*Counsel for Carpenter Co., E.R. Carpenter, L.P., Carpenter Holdings, Inc. and Carpenter Canada Co.*

/s/ Frank A. Hirsch, Jr.
Frank A. Hirsch, Jr.
Matthew P. McGuire
ALSTON & BIRD LLP
4721 Emperor Blvd.
Suite 400
Durham, NC  27703
Phone:  (919) 862-2200
Fax:    (919) 852-2260
frank.hirsch@alston.com
matt.mcguire@alston.com

*Counsel for Hickory Springs Manufacturing Company*

/s/ Kendall Millard
Kendall Millard
BARNES & THORNBURG, LLP
11 South Meridian Street
Indianapolis, IN 46204-3535
Phone: (317) 231-7461
Fax:    (317) 231-7433
kmillard@btlaw.com

/s/ Michael D. Mustard
Michael D. Mustard
BARNES & THORNBURG LLP
600 One Summit Square
Fort Wayne, IN 46802-3119
Phone:  (260) 423-9440
Fax:    (260) 424-8316
mmustard@btlaw.com

*Counsel for Flexible Foam Products, Inc., Ohio Decorative Products, Inc.*

/s/ Edward G. Warin
Edward G. Warin
John P. Passarelli
KUTAK ROCK LLP
1650 Farnam Street
Omaha, NE  68102
Phone:  (402) 346-6000
Fax:    (402) 346-1148
edward.warin@kutakrock.com
john.passarelli@kutakrock.com

*Counsel for Future Foam, Inc.*

/s/   Francis P. Newell
Francis P. Newell
Peter M. Ryan
COZEN O'CONNOR
1900 Market Street
Philadelphia, PA 19103
Phone:  (215) 665-2118
Fax:     (215) 665-2013
fnewell@cozen.com
pryan@cozen.com

*Counsel for FXI - Foamex Innovations, Inc.*

/s/   Robert J. Gilmer, Jr.
Robert J. Gilmer, Jr.
EASTMAN & SMITH LTD.
One SeaGate, 24th Floor
P.O. Box 10032
Toledo, Ohio 43699-0032
Phone: (419) 247-1766
Fax:     (419) 247-1777
rjgilmer@eastmansmith.com

/s/   Timothy J. Coleman
Timothy J. Coleman
Bruce McCulloch
Terry Calvani
John K. Warren
FRESHFIELDS BRUCKHAUS
DERINGER US LLP
701 Pennsylvania Avenue, NW
Suite 600
Washington DC 20004-2692
Phone: (202) 777-4555
Fax:     (202) 777-4555
tim.coleman@freshields.com

*Counsel for Vitafoam, Inc. and Vitafoam Products Canada Ltd.*

/s/   Daniel G. Swanson
Daniel G. Swanson
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA 90071
Phone: (213) 229-6690
Fax:    (213) 229-6919
dsawnson@gibsondunn.com

Cynthia Richman
John W.F. Chesley
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, DC 20036-5306
Phone:  (202) 530-8500
Fax:    (202) 530-9651
crichman@gibsondunn.com
jchesley@gibsondunn.com

/s/  Shepard Goldfein
Shepard Goldfein
Elliot A. Silver
Skadden, Arps, Slate,
Meagher & Flom LLP
Four Times Square
New York, NY 10036
Phone: (212) 735-3000
Fax:    (212) 735-2000
shepard.goldfein@skadden.com
elliot.silver@skadden.com

*Counsel for Domfoam International, Inc.
and Valle Foam Industries (1995) Inc.*

*Counsel for Woodbridge Foam
Corporation, Woodbridge Sales &
Engineering, Inc., and Woodbridge Foam
Fabricating, Inc.*