IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

In Re:                                              Case No. 1:10 MD 2196

Polyurethane Foam Antitrust Litigation              MEMORANDUM OPINION
                                                    AND ORDER
This document related to:  ALL CASES
                                                    JUDGE JACK ZOUHARY

**Introduction**

Before the Court are a series of Motions for Reconsideration (Doc. Nos. 202–203, 214) of this Court's July 19, 2011 Order (Doc. No. 191) ("Order") denying in part a series of Motions to Dismiss the Direct and Indirect Purchaser Plaintiffs' (collectively "Plaintiffs") Consolidated Amended Complaints (collectively "Complaints").  In the alternative, Defendants seek certification for an immediate appeal of the Order.  In addition, one Motion requests a stay of this case until the U.S. Department of Justice ("DOJ") concludes its parallel criminal grand jury investigation (Doc. No. 202).

For the reasons set forth below, the Motions for Reconsideration and Certification for Immediate Appeal are denied.  The Motion for Stay is also denied.  To the extent the Motions for Reconsideration raise arguments not addressed in a similar order denying Defendant Leggett & Platt's Motion for Reconsideration and Certification for Immediate Appeal (Doc. No. 200), additional clarifying remarks are offered.

**Motions for Reconsideration**

Defendants' Motions raise two categories of issues.[1]  First, Defendants seek reversal of certain of the Order's rulings, including:  the application of the Sixth Circuit's decision in *Watson Carpet & Floor Covering, Inc v. Mohawk Indus., Inc. (Watson Carpet)*, --- F.3d ----, 2011 WL 2462833 (6th Cir. 2011) to the Complaints; and the finding that the Complaints sufficiently allege Defendant FXI Innovations' participation in the conspiracy.

Defendants also re-raise two arguments that, if accepted, would narrow the scope of the pleadings.  First, Defendants argue the Complaints fail to properly allege fraudulent concealment with respect to the conspiracy.  Second, Defendants claim the Indirect Purchaser Plaintiffs lack standing to assert state antitrust or consumer protection claims in jurisdictions not represented among the named Indirect Purchaser Plaintiffs.  This Court declined to address the first issue, fraudulent concealment, in its Order.  By contrast, at the July 1, 2011 hearing, this Court postponed standing analysis to a later time (TR 127:12–19).  This Order supplies answers to both challenges.

Finally, Defendants seek a Stay of this litigation pending "resolution" of related government investigations or, in the alternative, staged discovery as to all Defendants (Doc. No. 202-1 at 10–11).

**Overview of *Twombly* and *Iqbal***

Before proceeding, however, a word must be said about the keystone supporting much of the claimed inadequacies in the Complaints: Defendants contention that "at least 90 of the 160-paragraph CAC are unquestionably conclusory" and that, aside from Complaint paragraphs describing the

---

[1]

As indicated in this Court's Order granting the Woodbridge Defendants' Motion for Joinder, a motion addressing common issues will be treated as if all Defendants joined in the motion's filing (Doc. No. 222). Therefore, this Memorandum Opinion refers to "Defendants" generally when discussing common issues, distinguishing among individual Defendants only when necessary.

parties, only 20 paragraphs contain "bits and pieces of factual support," but not enough to support the claims asserted (Doc. No. 90 at 22).  Defendants' dissection of the Complaint purports to be grounded in the plausibility pleading standard articulated in *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) and *Ashcroft v. Iqbal*, 129 S. Ct. 1937 (2009).  However, despite Defendants' characterization of the standard, this Court notes different trends in the manner in which Defendants apply that standard.

This Court evaluates the Complaints in light of the plausibility pleading standard articulated in *Twombly* and reaffirmed in *Iqbal*.  According to this standard, a plaintiff must provide "allegations plausibly suggesting (not merely consistent with)" the defendant's liability.  *Twombly*, 550 U.S. at 557.  However, this standard neither imposes a probability requirement nor requires ultra specific factual allegations.  *Id*. at 555–56.  Rather, the factual allegations "must be enough to raise a right to relief above the speculative level," *id.* at 555, or "raise a reasonable expectation that discovery will reveal evidence" of the defendant's liability.  *Id.* at 556.

Courts use a two-step process when evaluating the facial plausibility of a complaint.  First, a court must dispose of those allegations not entitled to a presumption of truth, namely, "[t]hreadbare recitals of the elements of a cause of action [that are] supported by mere conclusory statements."  *Iqbal*, 129 S. Ct. at 1949.  A plaintiff may not proceed to discovery on a complaint containing only conclusions about the defendant's liability.

Even under this standard, however, legal conclusions still play a role, albeit a limited one.  *Id.* at 1950.  Specifically, "legal conclusions can provide the framework of a complaint" but "must be supported by factual allegations," *id.* at 1950, and cannot themselves be dressed up as factual allegations.  *Twombly*, 550 U.S. at 555, *quoting Papasan v. Allain*, 478 U.S. 265, 286 (1986).  Determining whether a legal conclusion "masquerades" as a factual allegation requires a court to

3

consider whether there exists elsewhere in the complaint factual allegations supporting the allegation. *See id.* at 564 (concluding that on a "fair reading" of the complaint as a whole, a few statements speaking to "agreement" were mere legal conclusions resting on factual allegations of parallel conduct that did not plausibly suggest the existence of an antitrust conspiracy).

Second, a court must examine those allegations, not swept aside as factually-unsupported legal conclusions, to gauge whether the remaining allegations, accepted as true, "plausibly give rise to an entitlement to relief." *Iqbal*, 129 S. Ct. at 1950. A plausible claim is not merely "possible," *Twombly*, 550 U.S. at 557, or "conceivable," *id.* at 570, but rather permits a court to "draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 129 S. Ct. at 1949. A Section 1 claim supported only by allegations of parallel behavior does not permit such an inference to be drawn, for "alleging parallel decisions to resist competition" is not suggestive of a conspiracy. *Twombly*, 550 U.S. at 566.

Though the plausibility pleading standard is undoubtedly a departure from the "no-set-of-facts" standard that reigned for the half-century following the Court's decision in *Conley v. Gibson*, 355 U.S. 41 (1957), *see* Arthur R. Miller, *From Conley to Twombly to Iqbal: A Double Play on the Federal Rules of Civil Procedure*, 60 Duke L. J. 1 (2010), this standard nonetheless operates within a notice pleading regime. A complaint need not contain "specific facts," but in all cases must provide the defendant "fair notice" of the alleged conduct that renders him liable to the plaintiff. *Erickson v. Pardus*, 551 U.S. 89, 93 (2007). For instance, an antitrust defendant is not provided sufficient notice of his role in an alleged conspiratorial agreement spanning a seven-year period in which no "who, where, or when" allegations are advanced. *See Twombly*, 550 U.S. at 565 n.10. Likewise, attempting to implicate individual defendants in an alleged antitrust conspiracy by referring generally to

4

"defendants" will not do if the complaint provides "no clue" as to the terms of the agreement, or what role each defendant played. *In re Travel Agent Comm'n Antitrust Litig*, 583 F.3d 896, 905 (6th Cir. 2009) (*quoting Twombly*, 550 U.S. at 565 n.10). Therefore, while specific facts, like the "who, where, or when" of a claim are not required, to the extent the absence of such allegations fails to provide the defendant fair notice of the claims the plaintiff asserts, a plaintiff does not fulfill his Federal Civil Rule 8 obligation to provide "a short and plain statement of the claim showing that the pleader is entitled to relief."

As they must, Defendants correctly describe the first prong of the plausibility pleading standard, the rejection of conclusory allegations (Doc. No. 90 at 14–20). However, in applying this standard to the Complaint, Defendants transform this standard in two important respects not supported by *Twombly* or its progeny.

Defendants' treatment of certain Complaint paragraphs is indicative of this approach. For instance, Defendants dismiss as conclusory an allegation that:

> In seeking conditional leniency with the DOJ and in connection with a pending Canadian government investigation of antitrust violations by manufacturers of flexible polyurethane foam, several current and former Vitafoam employees agreed to be interviewed regarding the flexible polyurethane foam price fixing conspiracy. These interviews revealed the mechanisms, participants, duration, and impact of the conspiracy. These employees described a cartel among Defendants, who are responsible for production of the majority of flexible polyurethane foam, and other co-conspirators.

(Doc. No. 46 at ¶ 62; Doc. No. 52 at ¶ 74). However, no motion or supporting briefing material filed by any Defendant denies Vitafoam applied to, and was accepted by, the DOJ Corporate Leniency Program. Nor does any Defendant deny that Vitafoam employees were interviewed by DOJ personnel in connection with the Corporate Leniency Program application process, which required Vitafoam

5

executives to admit their participation in an antitrust conspiracy.  In short, no one denies these interviews actually occurred -- yet Defendants still assert the paragraph is "conclusory."

Likewise, Defendants dismiss as conclusory the allegation that:

> The sworn affidavit from Pierre-Yves Guay also separately states that it is the result of an investigation of 'previous and ongoing conduct contrary to' the Competition Act of Canada by entities including Carpenter, Valle Foam, Domfoam, A to Z Foam, Vita Foam Group, Foamex, Flexible Foam, Future Foam, Mohawk, Scottdel, Broadway Foam, Woodbridge, Leggett & Platt, and Hickory Springs. The violations of law alleged in the affidavit concerned conduct both 'in Canada and in the United States.'

(Doc. No. 46 at ¶ 84; Doc. No. 52 at ¶ 96).  Again, no Defendant denies Mr. Guay prepared the sworn affidavit referenced in this Complaint paragraph.  Indeed, two Defendants confirm its existence by attaching excerpts from a public version of the sworn affidavit to their individual Motions to Dismiss, and both excerpts contain the same enumeration of Defendants listed in the relevant Complaint paragraphs (Doc. No. 91-1; Doc. No. 100-2).  Yet again, Defendants insist such a paragraph is conclusory.

The problem thus appears to be a shifting meaning of "conclusory."  Is it the Defendants' contention that the fundamental content of Mr. Guay's personal statements in the affidavit are conclusory or that Plaintiffs' pleading of the existence and knowledge of the affidavit is conclusory? A fine distinction, to be sure, but this Court is guided by step two of the process above -- Plaintiffs' pleading of the admitted existence of the affidavit, with its known content both implicates specific Defendants by name and provides fair notice of the alleged conduct.  The two-step process does not push this Court to tread where Defendants seek to lead -- namely to look "inside" the affidavit to determine whether an individual's sworn statements themselves may be conclusory.  Such a determination is made at a later time by a factfinder to determine the relative truth, credibility, and weight of such sworn statements.

6

**The Consolidated Complaint**

A thorough examination of the Complaint paragraphs Defendants label as conclusory and non-conclusory, respectively, reveals a similar clear trend in Defendants' dissection of the Complaint. First, with only four exceptions[2] *each* and *every* Complaint paragraph that in some form references a "conspiracy," "conspiratorial conduct," "unlawful acts," "agreements," or like terms is automatically dismissed as conclusory.  Defendants pay no regard to factual allegations supporting such descriptions that exist elsewhere in the Complaint, or, as is the case in two Complaint paragraphs excerpted above, in the *very same* Complaint paragraph.  The allegations referring to the fact of the Vitafoam executive interviews fails because it references a "price-fixing conspiracy" as the interviews' subject.  Similarly, the Complaint paragraphs describing Mr. Guay's sworn affidavit, the existence of which Defendants themselves confirm by submitting portions of the affidavit to this Court as part of certain Motions to Dismiss, allegedly fail because such paragraphs reference "violations of law."

Defendants' gloss on the plausibility pleading standard thus dooms *any* Complaint paragraph containing a term that, by itself, constitutes a legal conclusion, regardless of any factual support that may exist for that allegation anywhere in the Complaint.  However, even in its most expansive reading, *Twombly* does not support such exacting dissection of a complaint.  Instead, discussing the conclusory/non-conclusory divide, *Twombly* and *Iqbal* define as conclusory "bare assertions" of liability, *Twombly*, 550 U.S. at 556, and "threadbare" legal statements as being denied a presumption of truth, *Iqbal*, 129 S. Ct. at 1949, but *not* allegations that contain factual support.  By contrast,

---

[2] Specifically, Defendants concede the non-conclusory nature of certain Complaint paragraphs even though these paragraphs reference "illegal antitrust activities" (Doc. No. 46 at ¶ 60; Doc. No. 52 at ¶ 72), "participation in a conspiracy" (Doc. No. 46 at ¶ 61; Doc. No. 52 at ¶ 73), and activities undertaken "in furtherance of the conspiracy" (Doc. No. 46 at ¶ 112; Doc. No. 52 at ¶ 123); (Doc. No. 46 at ¶ 112(g); Doc. No. 52 at ¶ 123(g)).

Defendants strike allegations containing *any* assertions of their antitrust liability, and thus strike all legal conclusions regardless of whether such allegations serve as a framework for the Complaints as permitted by *Iqbal*, or are supported by factual allegations.

Second, Defendants restrict the presumption of truth to only those Complaint paragraphs that contain specific facts, like the inclusion of precise dates (*e.g.*, Doc. No. 46 at ¶ 112(f); Doc. No. 52 at ¶ 123(f)) or transcriptions of telephone calls (*e.g.*, Doc. No. 46 at ¶ 109; Doc. No. 52 at ¶ 120). These Complaint paragraphs, of course, *should* be entitled to a presumption of truth, but limiting the presumption of truth to *only* Complaint allegations containing such specific facts imposes the variety of heightened pleading standard rejected by *Twombly*.  *See Twombly*, 550 U.S. at 570.

For example, Defendants dismiss as conclusory the allegation that "Vitafoam had a purported company policy of not having conversations with competitors, but this policy was merely window-dressing and was not followed in practice during the Class Period" (Doc. No. 46 at ¶ 69; Doc. No. 52 at ¶ 81).  This Complaint paragraph contains no supposedly taboo labels like "unlawful," and therefore was presumably dismissed because, unlike those paragraphs Defendants label as non-conclusory, this allegation does not contain *enough* factual specificity about the claimed "no communication" policy.

Nonetheless, this allegation, and others like it, is entitled to a presumption of truth.  Factual allegations are readily distinguishable from solely legal conclusions.  A factual allegation's veracity can be demonstrated on its own terms.  A legal conclusion, by contrast, would require the analysis of underlying facts, if any, to determine whether the asserted legal determination is appropriate, *i.e.*, whether a defendant negligently manufactured a product.  The allegation that a "no communications"

8

policy existed is clearly a factual allegation, which turns on whether company policy proscribed conversations with competitors and, if so, whether such conversations occurred.

After misapplying *Twombly*'s "conclusory" classification, Defendants further err in describing the level of factual specificity necessary to plausibly suggest and agree to restrain trade.  Specifically, Defendants argue Plaintiffs must advance specific factual allegations describing the "who, what, when, where, and how" of the alleged conspiracy, or some similar collection of interrogatories.  This line of argument extends from *Twombly's* observation that "[a]part from identifying a seven-year span in which the § 1 violations were supposed to have occurred . . . the pleadings mentioned no specific time, place, or person involved in the alleged conspiracies."  *Twombly*, 550 U.S. at 565 n.10.  Defendants argue that for this reason, *i.e.*, the lack of "when, where, or who" allegations, the *Twombly* complaint "was not sufficient to state a claim" (Doc. No. 90 at 22).

*Twombly* stands for no such proposition.  Rather, this portion of the opinion speaks purely in terms of *notice*:

> If the complaint had not explained that the claim of agreement rested on the parallel conduct described, we doubt that the complaint's references to an agreement among the ILECs would have given the *notice* required by Rule 8.  Apart from identifying a seven-year span in which the § 1 violations were supposed to have occured (*i.e.*, "[b]eginning at least as early as February 6, 1996, and continuing to the present,") the pleadings mentioned *no* specific time, place, or person involved in the alleged conspiracies.  This *lack of notice* contrasts sharply with the model form for pleading negligence, Form 9, which the dissent says exemplifies the kind of "bare allegation" that survives a motion to dismiss.  Whereas the model form alleges that the defendant struck the plaintiff with his car while plaintiff was crossing a particular highway at a specified date and time, the complaint here furnishes no clue as to which of the four ILECs (much less which of their employees) supposedly agreed, or when and where the illicit agreement took place.  A defendant *wishing to prepare an answer* in the simple fact pattern laid out in Form 9 would *know what to answer*; a defendant seeking to respond to plaintiffs' conclusory allegations in the § 1 context would have *little idea where to begin*.

*Twombly*, 550 U.S. at 565 n.10 (emphasis added) (citations omitted); s*ee also In re Packaged Ice Antitrust Litig. (Packaged Ice I)*, 723 F. Supp. 2d 987, 1005  (E.D. Mich. 2010) (*Twombly* complaint dismissed, not because of the absence of particularized "when, where, and who" factual allegations, but rather because the complaint, containing only a bare allegation of agreement and descriptions of parallel behavior, did not state a plausible claim for relief; *Hinds County, Miss. v. Wachovia Bank N.A. (Hinds County II)*, 700 F. Supp. 2d 378, 394 (S.D.N.Y. 2010) ("A § 1 complaint must adequately allege the plausible involvement of each defendant and put defendants on notice of the claims against them, but it need not be detailed with overt acts by each defendant."); *In re Travel Agent Comm'n Antitrust Litig.*, 583 F.3d 896, 905–06 (6th Cir. 2009) (court did not require particularized "when, where, and who" factual allegations, only "further circumstance[s] [beyond a conclusory agreement/parallel conduct framework] pointing toward a meeting of the minds" and enough factual allegations to provide defendants adequate notice); *Total Benefits Planning Agency  v. Anthem Blue Cross & Blue Shield*, 552 F.3d 430, 437 (6th Cir. 2008) (dismissing a complaint where "[p]laintiffs *only* offer bare allegations without *any* reference to the 'who, what, where, when, how *or* why'" and no allegations of horizontal agreement among conspirators) (emphasis added); *In re Southeastern Milk Antitrust Litig.*, 555 F. Supp. 2d 934, 943 (E.D. Tenn. 2008) ("[W]hile not answering all specific questions about who, what, when, and where, . . . [the complaints put] defendants on notice concerning the basic nature of their complaints against the defendants and the grounds upon which their claims exist.").

In short, the plausibility pleading standard does not require a court to construct a mandatory checklist of the "who, what, where, when, and how" of an antitrust agreement for each defendant.

10

Common sense prevails, and a complaint survives if it contains "enough factual matter (taken as true) to suggest that an agreement was made" among the defendants. *Twombly*, 550 U.S. at 556.

### *Watson Carpet*

Defendants also argue *Watson Carpet* has no application here, "where the existence of an express agreement is denied, and the question is whether Plaintiffs have alleged sufficient facts to describe and support their claim of express agreement" (Doc. No. 202-1 at 7). This Court remains satisfied the Complaints provide sufficient direct allegations of a conspiratorial agreement necessary to trigger application of the *Watson Carpet* principle.

Defendants are correct in asserting that *Watson Carpet* has no application until the existence of an express conspiratorial agreement is determined. But because a complaint containing an express conspiratorial agreement does not announce itself, a court must examine the complaint as a whole and determine whether such an agreement has been established by direct allegations, or if only circumstantial evidence has been offered in which case the allegations must plausibly suggest, and not merely be consistent with, a conspiratorial agreement. *Twombly*, 550 U.S. at 557.

Through the use of Complaint subheadings, Plaintiffs provide a clear roadmap of alleged antitrust violations. Specifically, after chronicling Defendant Vitafoam's DOJ Corporate Leniency Program application and the content of interviews with Vitafoam executives detailing the scope and terms of the conspiratorial agreement by which Defendants allegedly fixed prices and allocated customers in the flexible polyurethane foam market, Plaintiffs supply specific facts illustrating individual episodes of conspiracy implementation and enforcement.

First, Plaintiffs define the conspiratorial agreement by expressly referencing information derived from Defendant Vitafoam during its successful application to the DOJ Corporate Leniency

11

Program (Doc. No. 46 at ¶¶ 60–61; Doc. No. 52 at ¶¶ 72–73).  As part of the application process, and in connection with a Canadian Bureau of Competition investigation into similar allegedly unlawful conduct, several current and former Vitafoam employees agreed to be interviewed by government officials, disclosing the "mechanism, participants, duration, and impact of the conspiracy" -- the same conspiracy in which all Defendants are alleged to have participated (Doc. No. 46 at ¶ 62; Doc. No. 52 at ¶ 74).  These descriptions include biannual or triannual discussions of collusive pricing (Doc. No. 46 at ¶ 63; Doc. No. 52 at ¶ 75); the use of raw material cost increases as a pretext for adopting the agreed-upon collusive price increase that would have failed in the absence of conspiracy-wide coordination (Doc. No. 46 at ¶ 64; Doc. No. 52 at ¶ 76); the use of telephone conversations, price increase letter exchanges, and in-person meetings to coordinate the amount and timing of price increases (Doc. No. 46 at ¶ 65; Doc. No. 52 at ¶ 77); and understandings and agreements on price level increases the conspirators would set together before publication of pricing letters with the same, or almost the same, effective dates, and sharing of published letters to "police" the agreement (Doc. No. 46 at ¶ 66; Doc. No. 52 at ¶ 78).

The Complaint then chronicles the interviews of individual Vitafoam executives that corroborate the existence of the alleged conspiratorial agreement.  Plaintiffs first use materials from the Vitafoam interviews to describe the conduct of one of that company's former presidents. This officer directed subordinates to send copies of draft Vitafoam pricing letters to competitors in exchange for competitors' draft pricing letters (Doc. No. 46 at ¶ 70; Doc. No. 52 at ¶ 82).  At least seven Vitafoam employees carried out the former Vitafoam president's instructions by engaging in such draft pricing letter exchanges, or otherwise having discussions about the amount and timing of price increases with competitors (Doc. No. 46 at ¶ 70; Doc. No. 52 at ¶ 82).  These Vitafoam

12

employees had such communications with at least eight employees of five other named Defendants (Doc. No. 46 at ¶ 72; Doc. No. 52 at ¶ 84).

Next, the Complaint introduces a former vice president of Vitafoam who, at an earlier point in his career, was employed by Defendant Woodbridge (Doc. No. 46 at ¶ 73; Doc. No. 52 at ¶ 85). This individual had conspiratorial discussions of the variety described above with employees of at least eight other Defendants (Doc. No. 46 at ¶ 74; Doc. No. 52 at ¶ 86), and joined Mark Kane of Defendant Carpenter in coordinating price levels extended to a common customer (Doc. No. 46 at ¶ 75; Doc. No. 52 at ¶ 87). Robert Valle and Tony Valleoccia of Valle Foam shared communications with another Defendant consistent with the conspiracy (Doc. No. 46 at ¶ 76; Doc. No. 52 at ¶ 88). Vitafoam employees David Gurley and George Newton shared and received draft price increase letters and other pricing information, including competitor pricing lists (Doc. No. 46 at ¶¶ 77–78; Doc. No. 52 at ¶¶ 89–90), and Newton exchanged pricing information with other Defendants (Doc. No. 46 at ¶ 78; Doc. No. 52 at ¶ 90).

Direct allegations confirming the existence of a conspiratorial agreement continue with the admitted conduct of the current Vitafoam vice president of sales, who engaged in conspiratorial conduct with at least nine other Defendants (Doc. No. 46 at ¶¶ 80–82; Doc. No. 52 at ¶¶ 92–94), and provided the Canadian Commissioner of Competition a list of ten Defendant firms and twelve Defendant employees with whom he engaged in "discussions, exchanges of information and agreements regarding the price of foam" (Doc. No. 46 at ¶ 83; Doc. No. 52 at ¶ 95). He also admits that, while he was previously employed with Defendant Woodbridge, he discussed with Bill Lucas, the current Vitafoam president, price increases for certain foam products (Doc. No. 46 at ¶ 85; Doc.

No. 52 at ¶ 97), and had similar conversations with an employee of Defendant Foamex (Doc. No. 46 at ¶ 87; Doc. No. 52 at ¶ 99).

The current president of Vitafoam rounds out the group of employees interviewed by DOJ officials in connection with his company's application to the Corporate Leniency Program. He too was previously employed by Defendant Woodbridge in a position where he exercised pricing authority (Doc. No. 46 at ¶ 90; Doc. No. 52 at ¶ 102), and had conspiratorial discussions with at least eleven employees of seven Defendant firms (Doc. No. 46 at ¶ 92; Doc. No. 52 at ¶ 103).

By themselves, allegations describing the broader conspiratorial agreement, as in *Twombly* and *In re Travel Agent*, properly would be labeled conclusory (Doc. No. 46 at ¶¶ 63–66; Doc. No. 52 at ¶¶ 75–78). If supported only by general descriptions of telephone calls, email conversations, and parallel price increases, the Complaints would follow the "conclusory agreement/parallel conduct" archetype and fail at the pleadings stage. However, Plaintiffs have done far more. They have provided direct evidence in the form of the Vitafoam executives' statements, which provides the factual support necessary to grant a presumption of truth to the otherwise conclusory paragraphs that describe the conspiratorial agreement.

The complaint in *Watson Carpet* similarly departed from the "conclusory agreement/parallel conduct" mold. There, like here, the plaintiff provided "detailed allegations of an agreement to restrain trade," *Watson Carpet*, 2011 WL 2462833 at *1,"clearly" establishing the existence of a conspiracy. *Id.* at *4. Specifically, the *Watson Carpet* plaintiff alleged:

> In the spring or early summer of 1998, Defendant Rick McCormick met with Defendant Mohawk's Vice President and Senior Manager, Brad Matthaidess, and Mohawk sales representative Fred Woods, and devised a plan to run Plaintiff out of business and eliminate Plaintiff from the Market. As part of the plan to run Plaintiff out of business, Mohawk would refuse to sell carpet to Plaintiff. By shutting off Plaintiff's carpet supply, Plaintiff would be unable to service its homebuilder customer

> who used Mohawk carpet. Defendant [sic] McCormick, Matthaidess, and Woods
> specifically discussed their intention to run Plaintiff out of business by shutting off his
> supply of Mohawk Carpet. Other management employees at Mohawk, such as Larry
> Brookshire and Dale Byers, also approved, participated in, and made efforts to cover
> up the plan to run Plaintiff out of business in this manner.

(Doc. No. 202-1 at 4 n.2). Because "[u]nlike the plaintiffs in *Twombly* and *In re Travel Agent*, Watson Carpet clearly . . . alleged an express agreement to restrain trade," the court foreclosed the defendants' attempts to substitute lawful explanations that defendants' actions were taken pursuant to an express agreement. *Watson Carpet*, 2011 WL 2462833 at *1. The plaintiff was required to allege "the defendants' agreement *plausibly* explains [conduct allegedly undertaken pursuant to the agreement], not that the agreement is the *probable* or exclusive explanation." *Id.* (emphasis original).

Thus, to the extent *Watson Carpet* articulates a different standard than cases like *Twombly* and *In re Travel Agent*, this standard only differs as to the consequences that flow from the route a plaintiff chooses to follow when pleading an antitrust conspiracy while, of course, leaving the plausibility pleading standard unchanged. *Watson Carpet* departs from *Twombly* and certain of its progeny because the existence of a well-pled conspiratorial agreement necessarily removes the need to determine whether "sufficient circumstantial evidence tending to exclude the possibility of independent conduct" had been presented. *In re Travel Agent*, 583 F.3d at 907. The *Watson Carpet* plaintiff pursued the path of direct allegations to establish its entitlement to relief instead of supplying solely inferential allegations, a well-established pleading dichotomy. *See Eidson v. State of Tenn. Dep't of Children's Serv.*, 510 F.3d 631, 634 (6th Cir. 2007); *Mezibov v. Allen*, 411 F.3d 712, 716 (6th Cir. 2005). This distinction mirrors the "crucial question" for making out an antitrust claim, "whether [Defendants'] conduct toward [Plaintiffs] stemmed from independent decision or from an agreement,

15

tacit or express." *Theater Enter., Inc. v. Paramount Distrib. Corp*., 346 U.S.537, 540 (1954) (emphasis added).

Therefore, in denying the Motions to Dismiss, this Court did not, and could not, infer the existence of an express agreement to restrain trade from purely circumstantial evidence of a conspiratorial agreement.[3]  An express conspiratorial agreement cannot be established through circumstantial evidence, or those allegations that can only be connected to a conclusion of fact by inference.  Rather, when considering the Motions to Dismiss, this Court drew inferences according to the *Watson Carpet* standard *only* from Complaint allegations that could, by themselves, support alternative lawful and unlawful readings.  The detailed admissions of the Vitafoam employees support no such dueling inferences -- a confession to participation in an antitrust conspiracy allows for no lawful explanation.

Alone, the Complaint paragraphs describing the alleged implementation and enforcement of the conspiracy would be circumstantial evidence of an agreement to fix prices.  But cast in the context of an agreement whose existence has been confirmed by confessions of alleged conspirators, what Defendants urge this Court to accept as the harmless "[g]athering of competitive intelligence" (Doc. No. 202-1 at 5) is also consistent with admitted communications taken to coordinate and enforce collusive pricing levels as Plaintiffs allege.  Because the latter, unlawful explanation is a plausible

---

[3]

This Court's prior Order, when read as a whole, makes clear this Court only looked to *Watson Carpet* to supply the standard by which inferences are to be drawn from circumstantial allegations of conduct taken pursuant to a conspiratorial agreement established by direct allegations.  In other words, when a complaint sufficiently alleges an express conspiratorial agreement, a plaintiff need not worry about the varying inferences that may be drawn from the complaint's subsequent allegations so long as one such inference plausibly suggests consistency with the unlawful agreement.  *Watson Carpet* only assists when assessing circumstantial allegations of conspiratorial conduct, not the presence or absence of the antecedent agreement.

16

one, Plaintiffs need not foreclose alternative, lawful explanations for such conduct. *Watson Carpet*, 2011 WL 2462833 at *1.

### Hinds County

Defendants also attack the Vitafoam admissions as, among other things, "hearsay" and only "remotely factual" (Doc. No. 202-1 at 8). Defendants seek to dispose of these allegations through application of their flawed version of the plausibility pleading standard and by reference to *Hinds County, Miss. v. Wachovia Bank N.A. (Hinds County I)*, 620 F. Supp. 2d 499 (S.D.N.Y. 2009). The court in *Hinds County I* was confronted with complaint allegations identifying "twelve individuals employed by the Provider Defendants who allegedly engaged in [conspiratorial discussions]," but refused to accept these allegations as true because to do so would "require the Court to assume the existence of the conspiracy." *Id.* at 518. The court was driven to this conclusion in large part by the fear that an antitrust claim could be pled "simply by obtaining the names and positions of a defendant's relevant employees." *Id.*

This approach is suspect for a number of reasons. Because a plaintiff *could*, without further basis, provide a listing of relevant defendant employees to bolster their antitrust claim, this view resolves *any* doubts as to the evidentiary support for such allegations against the plaintiff. Regardless of whether such evident skepticism was warranted in *Hinds County I*, a similar concern is manifestly inappropriate in this case. Plaintiffs specifically allege the evidentiary support for the allegations identifying individual Defendant employees and the manner in which each is alleged to have participated in an antitrust conspiracy: the interviews with Vitafoam executives conducted as part of Vitafoam's successful application to the DOJ Corporate Leniency Program. This is not a case of a

17

plaintiff having mined a defendant's employee directory for names of relevant officials to bolster an otherwise unsupportable Section 1 claim.

Defendants further attempt to draw parallels to other cases in which motions to dismiss were granted because a court determined that certain non-conclusory allegations could not plausibly suggest the existence of a conspiratorial agreeent.  Defendants again offer up *Hinds County I*, which also featured a defendant that, like Vitafoam, had participated in the DOJ's Corporate Leniency Program.  In that case, however, the complaint contained "no other information about [Bank of America's] participation in the DOJ's leniency program" beyond the mere fact of that defendant's participation.  *Id.* at 515.  As a result, the court in *Hinds County I* rejected the plaintiff's attempt to establish an industry-wide conspiracy based on one defendant's undescribed participation in the leniency program.  *Id.* at 514–15.  Here, not only do we have knowledge of a Defendant's participation in the program, but specific statements made by the Defendant's employees as a condition of participating in the program.

References to *In re Iowa Ready-Mix Concrete Antitrust Litig. (Iowa Ready-Mix)*, 768 F. Supp. 2d 961 (N.D. Iowa 2011) are also inapposite.  There, despite the fact that one defendant entered into plea agreements admitting to conspiratorial conduct with three other companies, the court in *Iowa Ready-Mix* sustained defendants' motion to dismiss the complaint when no "larger picture from which inferences of a wider conspiracy can be drawn from guilty pleas to separate bilateral conspiracies" was presented.  *Id.* at 975.  There, the complaint baldly alleged that defendants "did those things which they combined and conspired to do, including, among other things, discussing, forming and implementing agreements to raise and maintain at artificially high levels of prices for Ready-Mix

18

Concrete," an allegation that without more was not only conclusory, but tautological as well.  *Id.* at 974.

Again, unlike *Hinds County I*, Plaintiffs here advance allegations beyond the mere fact of Vitafoam's participation in the Corporate Leniency Program, summarizing interviews with Vitafoam executives that, when accepted as true, both confirm the existence of a conspiratorial agreement and provide the level of factual specificity absent in *Hinds County I*.  As set forth above, these same allegations provide the "larger picture" absent in *Iowa Ready-Mix*.

As this Court has stated twice before, it is not the mere existence of governmental investigations of Defendants' potential participation in a conspiracy to fix prices and allocate customers in the flexible polyurethane foam market that leads this Court to conclude the Complaints pass muster under Federal Civil Rule 8.  This Court certainly recognizes the pending governmental investigations could, or could not, yield indictments or guilty pleas, and in no way employs a presumption of civil liability when evaluating the Complaints.  Instead, this Court employs the Federal Civil Rule 8 presumption of *truth*, accepting at this stage for purposes of the Motions to Dismiss all non-conclusory, factually supported allegations, including the allegations that the Vitafoam employees, their named conspiratorial correspondents, and all Defendants directly alleged to be members of the conspiracy as confirmed by the Vitafoam admissions, *have* entered an agreement to fix prices and allocate customers.  Whether Plaintiffs can *prove* the existence of this agreement at later stages in this litigation is a different conversation for another day.

### Defendant FXI

Defendant FXI Innovations ("FXI") argues a June 12, 2009 asset sale eliminated any antitrust liability the predecessor firm may have incurred.  Plaintiffs, in reply, challenge the ability of

Bankruptcy Code Section 363(f) to erase successor liability, or, more specifically, whether the June 2009 Asset Purchase Agreement had the effect of erasing Plaintiffs' antitrust claims.  This Court need not reach those arguments.

The Complaints specifically recount the Vitafoam employee's disclosure that each foam product price increase from 1999 until at least early 2010 -- when the Vitafoam employees were interviewed -- was a product of the price-fixing conspiracy (Doc. No. 46 at ¶ 94; Doc. No. 52 at ¶ 105).  Moreover, the Complaints identify Vincent Bonaddio and Don Phillips, senior FXI personnel, as among those employees with whom the current Vitafoam vice president engaged in conspiratorial discussions throughout the Class Period, both before and after the June 2009 asset sale (*e.g.*, Doc. No. 46 at ¶ 83; Doc. No. 52 at ¶ 95).  Because the Complaints allege FXI participated in the conspiracy after the asset sale, a fundamental tenant of conspiracy law that holds one participating conspirator jointly liable for all his co-conspirators' prior acts renders immaterial any alleviation of antitrust liability resulting from the asset sale.  *See Coon v. Froehlich*, 573 F. Supp. 918, 922 (S.D. Ohio 1983).  Of course, if Plaintiffs fail to produce evidence of FXI's participation in the conspiracy after the asset sale, this Court will consider the question of the 363(f) sale's significance as part of a potential summary judgment motion.

### Certification of Immediate Appeal

Defendants' Motions for Certification of Immediate Appeal apply only to the extent Defendants seek review of rulings contained in the July 19 Order.  Therefore, Defendants' fraudulent concealment and standing arguments are excluded from these Motions.  The remaining Motions for Certification of Immediate Appeal are denied for the same reasons described in this Court's Order denying Mohawk and Leggett & Platt's similar motion (Doc. No. 200).

**Fraudulent Concealment**

Defendants challenge Plaintiffs' claims of fraudulent concealment, claiming the Complaints fail to allege fraudulent concealment with the specificity required by Sixth Circuit precedent (Doc. Nos. 203, 232-1). In response, Plaintiffs direct the Court to a number of paragraphs in the Complaints which they claim sufficiently allege specific acts of concealment (Doc. No. 227).

In the Sixth Circuit, a plaintiff alleging fraudulent concealment must plead: "1) defendants concealed the conduct that constitutes the cause of action; 2) defendants' concealment prevented plaintiffs from discovering the cause of action within the limitations period; and 3) until discovery, plaintiffs exercised due diligence in trying to find out about the cause of action." *Egerer v. Woodland Realty, Inc.*, 556 F.3d 415, 422 (6th Cir. 2009) (citing *Pinney Dock & Transport Co. v. Penn Cent. Corp.*, 838 F.2d 1445, 1465 (6th Cir. 1988)).

As a threshold matter, in light of this Court's previous discussion of Defendants' flawed interpretation of the plausibility pleading standard, this Court concludes Plaintiffs pled more than the insufficient recital contained in *Hinds County I* (Doc. No. 90 at 48) (quoting *Hinds County*, 620 F. Supp. 2d at 521–22). Specifically, this Court is satisfied the Complaints sufficiently allege Defendants' concealment of the conspiracy (*see*, *e.g.*, Doc. No. 46 at ¶¶ 64, 114, 118, 135; Doc. No. 52 at ¶¶ 76, 125, 129, 147), and that because of Defendants' deceptive conduct Plaintiffs remained ignorant of the conspiracy throughout the limitations period (*see*, *e.g.*, Doc. No. 46 at ¶¶ 130, 132–33; Doc. No. 52 at ¶¶ 142, 144–45 ).

Plaintiffs are incorrect, however, in asserting Defendants challenge only the first of the three-prong fraudulent concealment test (Doc. No. 227 at 3). Because this Court did not address fraudulent concealment in the July 19 Order (Doc. No. 191), this Court considers arguments contained in both

21

the briefing material submitted in support of the Motions to Dismiss (Doc. No. 90; Doc. No. 138), as well as the memorandum submitted in support of Defendants' Motion for Reconsideration (Doc. No. 203).  In the former briefing materials, Defendants plainly argue Plaintiffs offer only conclusory allegations for each essential portion of the test (Doc. No. 90 at 48; Doc. No. 138 at 19–21). Additional briefing material Defendants submitted after Plaintiffs filed their opposition to the present Motions reaffirms the completeness of Defendants' challenge (Doc. No. 232 at 2).

There remains, then, the question of whether the Complaints satisfy *Pinney's* due diligence requirement.  To counter Defendants' arguments that Plaintiffs must plead specific acts of diligence, Plaintiffs argue fraudulent concealment does not require them to "have investigated whether their suppliers were criminals" (Doc. No. 172 at 7), particularly when law enforcement authorities were likewise unaware of Defendants' alleged price-fixing and customer allocation conspiracy until late in the Class Period.  The correct test, according to Plaintiffs, sees the concealment requirement satisfied when "the plaintiff shows that he neither knew, nor in the exercise of due diligence, could reasonably have known of the offense" (*id*.).

This Court notes a tension between the first two components of the fraudulent concealment test -- the plaintiff's ignorance of the cause of action occasioned by the defendant's concealment -- and the apparent requirement that an admittedly ignorant plaintiff must at the same time exercise diligence in discovering a concealed conspiracy.  When facts exist that should excite the suspicions of a reasonably diligent person, a plaintiff that fails to make proper inquiries to discover his cause of action will not see the limitations period tolled.  By contrast, when no information, actual or constructive, exists hinting at the fact of plaintiff's injury, the "reasonable diligence" requirement seems limited to denying tolling for careless plaintiffs.  *See In re Rubber Chemicals Antitrust Litig.*,

504 F. Supp. 2d 777, 788 (N.D. Cal. 2007) ("The requirement of diligence is only meaningful . . . when facts exist that would excite the inquiry of a reasonable person.") (quoting *Conmar Corp. v. Mitsui & Co.*, 858 F.2d 499, 504 (9th Cir. 1988).

At bottom, the "reasonable diligence" component of the fraudulent concealment doctrine requires the plaintiff to "show[] that he neither knew nor, in the exercise of due diligence, could reasonably have known of the offense." *Klehr v. A.O. Smith Corp*., 521 U.S. 179, 195 (1997) (citing *Pinney*, 838 F.3d at 1465 and *Conmar*, 858 F.2d at 502).  Thus, two paths exist to this showing.  Plaintiff, after receiving information that causes him to inquire into defendant's actions, remains ignorant of his injury despite exercising reasonable diligence; or the plaintiff receives no hint of his claim, sees no need to actively inquire as to whether the defendant has wronged him, and timely files a claim after facts emerge disclosing his cause of action.

This is so in the Sixth Circuit despite *Pinney's* reference to the need to plead and prove that a plaintiff exercised reasonable diligence in attempting to learn of his claim.  *Pinney*, 838 F.2d at 1465, which Defendants imply requires specific acts of diligence.  In *Campbell v. Upjohn Co.*, 676 F.2d 1122 (6th Cir. 1982), the Sixth Circuit rejected Campbell's attempt to exempt from the "reasonable diligence" requirement cases of active concealment.  Campbell alleged he was orally promised by Upjohn officials that by signing a merger agreement he would be provided a "backend payment" that for six years would permit Upjohn to buy Campbell's interest in the successor corporation on terms favorable to Campbell, and that Upjohn would also provide Campbell an incentive employment plan.  Immediately after being confronted by Upjohn officials angered by an alleged misrepresentation on Campbell's resume, Campbell, apparently in a distressed state, signed a merger agreement containing neither the backend payment nor the incentive employment plan.  For

the next six years, from 1969 to 1975, Campbell failed to read the copy of the merger agreement provided him at the 1969 signing. Campbell claimed he only discovered that, contrary to Upjohn's oral assurances, he would not receive the backend payment or incentive employment plan when the former came due in 1975

Because an "avalanche of evidence that would put all but the most indiligent plaintiffs on notice" existed, the court declined to toll the limitations period. *Campbell*, 676 F.2d at 1128. The court then observed:

> A rule of diligence will work no injustice in cases of active concealment. Active concealment by the defendant will be considered in determining the reasonableness of the behavior of the plaintiff under the circumstances. Actions such as would deceive a reasonably diligent plaintiff will toll the statute; but those plaintiffs who delay unreasonably in investigating circumstances that should put them on notice will be foreclosed from filing, once the statute has run. Indeed, in those cases analyzed above which cite the [Seventh Circuit rule tolling the limitations period in cases of active concealment until actual discovery by the plaintiff], the actions of defendants were such that even reasonably diligent plaintiffs would not have been put on notice. The difference between the two rules may prove to be more illusory than real.

*Id*. *Campbell* rejected a view that would create two tolling doctrines, including an iteration of the earlier equitable tolling rule that did not require a plaintiff to prove actual diligence when a defendant had concealed all sources of reasonable suspicion, because the court deemed separate rules unnecessary. According to the court, "[the equitable tolling doctrine's exception] is redundant under our test based on *hypothetical diligence*." *Id*. (quoting *State of Ohio v. Peterson, Lowry, Rall, Barber, & Ross*, 651 F.2d 687, 695 n.16 (10th Cir. 1981) (emphasis added). If a hypothetical reasonably diligent plaintiff would not have been put on inquiry notice, the limitations period is tolled. *See id.*

With one exception, the cases Defendants cite in support of a rule requiring a plaintiff to plead and prove acts of diligence contained facts that, like in *Campbell*, should have put the plaintiff on inquiry notice. *See Egerer*, 556 F.3d at 423–24 (plaintiff insufficiently diligent for not inquiring about

24

the particulars of a business agreement describing only potential benefit for business referrals and "estimated" title insurance costs); *Pinney*, 838 F.2d at 1477–78 (ignored intraoffice memoranda urging certain plaintiff employees to pursue Interstate Commerce Commission complaints and antitrust claims against defendant demonstrates lack of diligence); *Dayco Corp. v. Goodyear Tire & Rubber Co.*, 523 F.2d 389, 394 (6th Cir. 1975) (congressional hearings and a Federal Trade Commission suit that occurred more than a decade before plaintiff brought suit should have triggered further investigation by plaintiff); *Gumbus v. United Food & Comm. Workers Intern. Union*, 1995 WL 5935 (6th Cir. 1995) (six-month limitations period not tolled when plaintiffs, members of the defendant union, could have learned of the union's alleged misrepresentations by monitoring progress of a similar suit filed by plaintiffs' coworkers within the limitations period).   Other cases contained factual circumstances in which the plaintiff could, and did, exercise reasonable diligence.   *See Hinds County II*, 700 F. Supp. 2d at 400 (requirement that bidders certify their proposals were neither courtesy bids nor determined in concert with another bidder deemed sufficient to toll the limitations period)[4]; *Michigan ex rel. Kelley v. McDonald Dairy Co.*, 905 F. Supp. 447, 453 (W.D. Mich. 1995) (use of sealed bid process followed by detailed review of contracts satisfied diligence requirement).

The exception, of course, is *In re Refrigerant Compressors Antitrust Litig.*, 2011 WL 2433392 (E.D. Mich. 2011).   Like here, the *Refrigerant* plaintiffs alleged defendants entered into a price-fixing

---

[4]

The court's decision in *Hinds County II* to toll the limitations period after earlier determining that plaintiffs failed to sufficiently plead fraudulent concealment, *see Hinds County I*, 620 F. Supp. 2d at 521–22, demonstrates this case is consistent with the "hypothetical diligence" standard embraced in *Campbell*.  Unlike here, where Plaintiffs plausibly allege no reasonable methods for discovering the alleged conspiracy existed before 2010, the plaintiffs in *Hinds County II* employed reasonable certification requirements, albeit unsuccessfully, in an effort to prevent bid collusion.

conspiracy affecting prices of refrigerant compressor products.  The court found allegations that plaintiffs "diligently sought to protect themselves from unlawful activity, but it was not until on or about February 18, 2009 that plaintiffs and the Class were able to, or could have been able to, detect the conspiracy" insufficient to satisfy the *Dayco/Pinney* due diligence requirement.  *Id*. at *16.  While the court's opinion does not recount in detail the nature of the alleged conspiracy, no additional allegations are presented suggesting what steps, if any, plaintiffs could have taken to discover the conspiracy prior to an announcement by one defendant that U.S., Brazilian, and European antitrust authorities were investigating defendant's potential violations of antitrust law.

Rather, the same alleged picture presented here existed in *Refrigerants*: plaintiffs purchasing products at supra-competitive prices resulting from the concealed price-fixing conspiracy.  If, in fact, the conspiracy alleged in *Refrigerants*, when accepted as true, contained no aspects that should have triggered the plaintiff's suspicions, it makes little sense to require a plaintiff to inquire of each of his vendors whether a refrigerant compressor's price was determined by market forces or a concealed, multi-year, multi-member antitrust conspiracy.  *Pinney* requires *reasonable* diligence, not constant cynicism.

For these reasons, this Court declines to follow *Refrigerants*.  Instead, the more well-reasoned approach is contained in *In re Packaged Ice I*.  There, plaintiffs alleged a price-fixing conspiracy similar to that in *Refrigerants* and the instant case.  But rather than requiring plaintiffs to plead additional acts of diligence aimed at rooting out the successfully concealed conspiracy, the court in *In re Packaged Ice I* accepted as true the allegation that before the execution of a March 2008 DOJ search warrant, no events did, or should have, excited the plaintiffs' suspicions.  *In re Packaged Ice*,

723 F. Supp. 2d at 1000.  The court then reserved for the factfinder the question of whether this allegation was true in fact.  *Id.* at 1019.

Thus, while a factfinder in this case eventually may be called on to determine whether Defendants did conceal all sources of reasonable suspicion, this Court is satisfied that, when accepted as true, the Complaints establish that no facts existed that did or should have excited Plaintiffs' suspicions about alleged price-fixing and customer allocation conspiracy until the 2010 government raids.  Courts, like *Pinney*, impose a "reasonable diligence" requirement to "encourage those victims [of concealed injuries] diligently to investigate and thereby to uncover unlawful activity." *Klehr*, 521 U.S. at 195.  A plaintiff must provide specific allegations of the conspiracy's concealment and eventual discovery "so that [a] court may clearly see whether, by ordinary diligence, the discovery might not have been before made" and relief sought sooner. *Pinney*, 838 F.2d at 1465.  This Court is satisfied Plaintiffs plausibly allege they could not have discovered the alleged conspiracy at an earlier time.  And because this decision is not contrary to *Pinney's* requirement that, when possible, plaintiffs make reasonable inquiries after facts arousing a suspicion of unlawful activity, the fraudulent concealment doctrine's incentive structure is retained.   Therefore, Plaintiffs sufficiently plead fraudulent concealment.

### Indirect Purchaser Claims in Other States

Defendants next argue the Indirect Purchaser Plaintiffs lack standing to pursue claims under the laws of jurisdictions in which a named Indirect Purchaser Plaintiff does not reside, or to which such a Plaintiff is not sufficiently connected.  Specifically, Defendants contend the Indirect Purchaser Plaintiffs may only pursue state-law claims in Arizona, California, Florida, Kansas, Massachusetts, Michigan, North Carolina, Tennessee, and Wisconsin.

27

In reply, the Indirect Purchaser Plaintiffs urge this Court to defer standing considerations until after class certification.  Invoking *Amchem Prod., Inc. v. Windsor*, 521 U.S. 591 (1997), and *Ortiz v. Fireboard Corp.*, 527 U.S. 815 (1999), the Indirect Purchaser Plaintiffs argue class certification is "logically antecedent" to standing considerations because their supposed standing deficiencies would not exist "but for" their attempt to represent a class of "all persons or entities [residing in certain states] . . . who purchased products containing flexible polyurethane foam which were manufactured, produced or supplied by Defendants or their unnamed co-conspirators from January 1, 1999 to the present" (Doc. No. 52 at ¶ 153).  According to the Indirect Purchaser Plaintiffs, the named Plaintiffs have not asserted individual injury in the jurisdictions in which they do not reside, or to which they are not connected.  Rather, in seeking to represent a class of plaintiffs similarly harmed, the named Indirect Purchaser Plaintiffs argue their injuries are typical of the absent class members they propose to represent.  Therefore, because the named Indirect Purchaser Plaintiffs have sufficiently pled individual standing (Doc. No. 52 at ¶¶ 7–20), this Court should defer consideration of the Indirect Purchaser Plaintiffs' ability to assert claims in a jurisdiction in which they do not reside, or to which they are not connected, until class certification.

Courts have reached differing conclusions on the "logically antecedent" exception to standing analysis.  Some courts, examining the issue of standing before class certification, stated that *Amchem* and *Ortiz* only address class certification before class member standing in the unique context of a mandatory global class settlement.  Those courts also noted *Amchem* and *Ortiz* focused on the standing of absent class members, not the named plaintiffs.  *See Easter v. Am. West Financial*, 381 F.3d 948, 962 (9th Cir. 2004).  Further, such courts argue the "logically antecedent" exception is but one example of the Supreme Court's preference for addressing non-constitutional grounds for

28

disposition, *i.e.,* class certification, before reaching a simultaneously-presented constitutional question like standing. *See In re Potash Antitrust Litig.*, 667 F. Supp. 2d 907, 922 (N.D. Ill. 2009). By contrast, other courts contend when a proposed class contains absent class members who, if certification is granted, would undoubtedly have standing to pursue claims under the laws of states in which a named plaintiff does not reside, class certification is "logically antecedent," and should be addressed first. *See Jepson v. Ticor Title Insur. Co.*, 2007 WL 2060856, *1 (W.D. Wash. 2007).

The Sixth Circuit has not directly reached the question of whether class certification *must* be considered before standing for claims arising under the statute of a state in which a named plaintiff is not resident, and district courts have pursued divergent paths to resolving such standing challenges. *Compare In re Packaged Ice Antitrust Litig. (Packaged Ice II)*, 2011 WL 8911699 (E.D. Mich. 2011) (addressing standing before class certification), *with Hovering v. Transnation Title Insur. Co.*, 545 F. Supp. 2d 662, 667 (E.D. Mich. 2008) (postponing standing analysis until class certification). However, a related Sixth Circuit decision suggests that after concluding a named plaintiff possesses individual standing to seek redress for the alleged injury he suffered, a court should defer consideration of a putative class's standing to assert state-law based claims until class certification.

In *Fallick v. Nationwide Mut. Insur. Co.*, 162 F.3d 410 (6th Cir. 1998), a Nationwide employee claimed his employer improperly denied him health care benefits through the application of a coverage exclusion in a manner inconsistent with the terms of his health care plan in violation of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 2601 *et seq*. The plaintiff sought to represent a class comprising all participants in, or beneficiaries of, health benefit plans administered or insured by Nationwide who were likewise denied plan benefits in violation of ERISA. The district court did not reach the plaintiff's motion for class certification. Instead, the case

29

was dismissed for lack of standing because the plaintiff sought to represent participants in, or beneficiaries of, plans other than his own. *Fallick*, 162 F.3d at 412.

The Sixth Circuit reversed, finding that after correctly concluding the plaintiff had individual standing to seek relief for himself, "the district court's analysis went astray." *Id.* at 421. Specifically, the circuit court concluded that once the named plaintiff's individual standing was established, his capacity to seek relief for the absent members of the proposed class should have been determined according to the requirements of Federal Civil Rule 23, not a motion to dismiss, when the named plaintiff and absent class members's alleged injury had the same source: Nationwide's uniform misapplication of the reasonable and customary coverage exclusion. *Id.* at 423.

This Court would similarly confuse Article III standing and Federal Civil Rule 23's requirements if it would, at this stage, dismiss all state-law claims but those of the jurisdictions in which the named Indirect Purchaser Plaintiffs reside, or to which they are connected. Both the named Indirect Purchaser Plaintiffs and the absent members of the putative class identify the same general cause for their injuries: the alleged price-fixing and customer allocation conspiracy. The named Indirect Purchaser Plaintiffs merely seek relief for themselves under the statutes of the jurisdictions in which they reside, and seek similar relief for absent class members under the antitrust and consumer protection statutes of each such class member's state. Properly understood, neither plaintiff grouping seeks relief for themselves under the laws of a foreign state jurisdiction. The ICAC contains a mixture of state-law claims *only* because the Indirect Purchaser Plaintiffs bring this suit as a proposed class action.

Therefore, since the supposed standing deficiencies Defendants identify arise because the Indirect Purchaser Plaintiffs invoke state antitrust and consumer protection statutes for each state from

which putative class members are drawn, this Court will determine whether the Indirect Purchaser Plaintiffs may, as class representatives, advance their state-law claims at class certification.  If this Court grants class certification, the resulting class will contain individuals with standing to pursue claims under each of the state law claims.  In the alternative, if this Court denies class certification, the Indirect Purchaser Plaintiffs will be limited to pursue claims under the state antitrust and consumer protection statutes of the jurisdiction in which they reside.  In either case, the supposed standing deficiencies will be resolved.

**Motion for Stay**

Finally, Defendants request a Stay of these proceedings pending resolution of the ongoing government investigations of a potential price-fixing and customer allocation conspiracy.  Aside from disagreeing with this Court's determination that the Complaints sufficiently plead an antitrust conspiracy, Defendants provide no additional authorities or factors to support their Motion for Stay. The parties have entered into an agreement with DOJ permitting depositions in this case beginning in late October, and document discovery can continue in the meantime.   Plaintiffs have satisfied their pleading burden, and discovery will proceed consistent with the DOJ agreement.

IT IS SO ORDERED.

_____s/ Jack Zouhary_____
JACK ZOUHARY
U. S. DISTRICT JUDGE

September 15, 2011

31