IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | |
|---|---|
| SPRING AIR INTERNATIONAL LLC, et al., <br><br> Plaintiffs, <br> v. <br><br> ADVANCED URETHANE TECHNOLOGIES, INC. <br><br> Defendant. | **COMPLAINT** <br> **JURY TRIAL DEMANDED** <br><br> MDL Docket No. 2196 <br> Index No. 10-MD-2196 (JZ) <br><br> Case No. 3:12-pf-10021-JZ |
| ENGLANDER SOUTHWEST et al., <br><br> Plaintiffs, <br> v. <br><br> ADVANCED URETHANE TECHNOLOGIES, INC. <br><br> Defendant. | **COMPLAINT** <br> **JURY TRIAL DEMANDED** <br><br> MDL Docket No. 2196 <br> Index No. 10-MD-2196 (JZ) <br><br> Case No. 3:12-pf-10022-JZ |
| JEFFCO FIBRES, INC., <br><br> Plaintiff, <br> v. <br><br> ADVANCED URETHANE TECHNOLOGIES, INC. <br><br> Defendant. | **COMPLAINT** <br> **JURY TRIAL DEMANDED** <br><br> MDL Docket No. 2196 <br> Index No. 10-MD-2196 (JZ) <br><br> Case No. 3:12-pf-10023-JZ |

**PLAINTIFFS MEMORANDUM IN OPPOSITION TO ADVANCED URETHANE TECHNOLOGIES, INC.'S MOTION TO DISMISS PURSUANT TO RULE 12(b)(6)**

### I. INTRODUCTION

This Court has twice determined that Plaintiffs have alleged sufficient facts to "plausibly suggest" a long-running, industry-wide conspiracy to fix and inflate the price of polyurethane

foam. *See* Memorandum Opinions & Orders, at Dkt. Nos. 191, 243. There were fifteen defendants initially named in Plaintiffs' complaints, including foam manufacturer Leggett & Platt ("L&P") of Carthage, Missouri. *Id.* The Court specifically determined that it was plausible that L&P was involved in the industry-wide conspiracy alleged herein. *See* Dkt. No. 191 at *8; hereinafter referred to as "Motion to Dismiss Opinion."

Following those rulings by this Court, the District Court in Kansas, overseeing litigation related to this case, which involved an alleged conspiracy among chemical manufacturers, made reference to specific evidence relating to the "transmittal of information between L&P and a competitor regarding foam price" and indicating that L&P was involved in the polyurethane foam conspiracy. *See In re Urethanes Antitrust Litig.*, Case No. 2:04-md-01616-JWL-JPO, Dkt. 2064 (September 27, 2011), at *3-4, 6 (attached as Exhibit 1, hereto). This evidence was not available to Plaintiffs or the Court during briefing on the initial motions to dismiss and it included several e-mails between Mr. Joseph York, an L&P Executive Vice President, and Mr. Gary Wahrmund, another L&P executive. *Id.* The emails make it clear that Mr. York had obtained information from a Foamex manager regarding future price increases by Carpenter. *Id.*

These emails, among other evidence identified by the court in *Urethanes*, strongly suggest that Mr. York, Mr. Wahrmund, and L&P generally were involved in an industry-wide conspiracy to inflate the price of polyurethane foam. *See id.* at *3; *see also* Case No. 3:12-pf-10021-JZ, Spring Air Intl. Amended Complaint at ¶ 169-70 (alleging these communications).[1]

---

[1] Although neither the *Urethanes* Order nor the Complaint identifies Mr. Wahrmund by name, he is in fact among the recipients of the e-mails discussed in the Amended Complaint, which are incorporated by reference into the pleading. *See* Exhibits 2 & 3, filed under seal (e-mails referenced in the Amended Complaint). *See also Weiner v. Klais & Co.*, 108 F.3d 86, 89 (6th Cir. 1997) (materials cited in the complaint are incorporated by reference into the pleading). Plaintiffs did not identify the recipients with particularity merely to avoid the possibility of being required to file the Amended Complaint under seal.

On March 30, 2007, just two years after the above emails were sent and in the midst of the alleged industry-wide conspiracy to fix the price of polyurethane foam, L&P sold its entire polyurethane foam business to Defendant Advanced Urethane Technologies, Inc. ("AUT"). Pursuant to this sale, at least 18 L&P employees, *including Mr. Wahrmund,* transitioned to work at AUT. While AUT contends that Mr. York did not transition to L&P, it cannot and does not deny that Mr. Wahrmund and several other employees who worked closely with Mr. York did in fact move to AUT. These employees' job duties did not materially change following their transition from L&P to AUT. *See* Amended Complaint at ¶ 171-73, 178-79. These individuals sold the same polyurethane foam, to the same customer base, in the same market, alongside the same supposed competitors, as they had prior to the sale. *Id.* The *only* thing that changed following the L&P sale is that one day these employees performed those tasks for L&P, the next day they performed them for AUT. Not surprisingly, despite AUT's intransigence in providing any discovery to any party in this action thus far, the evidence already suggests that these former L&P employees continued to do business at AUT the same way they had at L&P: by fixing prices. *See* Amended Complaint, at ¶ 173-77.[2] This evidence, alleged in the Amended Complaint, is more than sufficient to withstand AUT's Motion to Dismiss. *Id.*

AUT's only significant argument in favor of dismissal is the repeated contention that AUT has not thus far been the subject of government investigation into the alleged foam conspiracy.[3] This argument is unpersuasive. As this Court is well aware, the Department of

---

[2] In contrast, AUT has not produced a shred of evidence that any former L&P employee took any affirmative step to withdraw from the conspiracy in which they were allegedly involved while at L&P, or even were instructed to do so. As the Court is aware, it is well-settled that a participant in a conspiracy must affirmatively withdraw from an ongoing conspiracy in order to avoid continuing liability for its actions. It is not enough that a conspirator merely stop taking actions in furtherance of the conspiracy.

[3] AUT also suggests the procedural history of these actions somehow supports dismissal, because Plaintiffs allegedly have not "diligently" pursued their claims against AUT. *See* MDL Dkt. No. 469-1 at *8. This is

3

Justice's decisions regarding the prosecution of this case have been influenced, as they are in nearly all cases, by a variety of resource issues that are entirely irrelevant to the question of whether AUT participated in the conspiracy. Moreover, because the amnesty applicant in this case, Vitafoam, exited the U.S. polyurethane foam business in 2006, it is not at all surprising that DOJ may not been provided information sufficient to suggest that the government could prove beyond a reasonable doubt that AUT, which entered the U.S. market in 2007, participated in the conspiracy alleged in this action. In any event, whether the DOJ is investigating (or will in the future investigate) AUT is of no legal relevance to the question before this Court: Is it plausible that members of L&P's foam division continued participating in an ongoing conspiracy (in which they were previously involved) when those employees moved *en masse* from L&P to AUT? The answer is yes, meaning AUT's motion to dismiss must be denied.[4]

## I. ARGUMENT

### A. Rule 12(b)(6) Standard Of Review

The detailed allegations of the Amended Complaint amply satisfy the standard set forth in *Bell Atlantic Corporation v. Twombly*, 550 U.S. 544 (2007). Under *Twombly*, to survive a Rule 12(b)(6) motion, the factual allegations in a complaint claiming violation of Sherman Act Section 1 must be sufficient to "plausibly suggest[]" an agreement. 550 U.S. at 545. *Twombly*

---

makeweight. On the contrary, Plaintiffs have diligently pursued their claims despite AUT's reliance on a variety of procedural delay tactics not attempted by any other Defendant and have repeatedly sought discovery from AUT during the pendency of these motions. AUT has steadfastly refused to provide *any* discovery, whether directed to AUT as a third party in other, related actions or as defendant in these actions. AUT's unwillingness to participate in discovery, even in response to narrowly-targeted third party subpoenas directed *only* at documents in the possession of certain individuals with direct polyurethane foam pricing authority, *see* Dkt. Nos. 443-444, calls into serious question AUT's confidence in its own protestations of innocence.

[4] Furthermore, this Court already rejected AUT's argument when it found that Plaintiffs had sufficiently alleged Ohio Decorative Products Inc.'s participation in the conspiracy, despite the fact that Ohio Decorative was not the subject of either DOJ or the CBC investigations. *See* Dkt. No. 191 at *7.

"does not impose a probability requirement at the pleading stage; it simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of [an] illegal agreement." 550 U.S. at 545.

For purposes of its Motion to Dismiss, AUT has chosen to frame its argument as "whether Plaintiffs adequately allege that AUT was a party to an agreement to fix prices and engaged in conduct in furtherance of the [polyurethane foam] conspiracy." *See* Dkt. No. 469-1 at *8-9. AUT's attempted dissection of Plaintiffs' Amended Complaint *purports* to be grounded in the "plausibility" pleading standard first articulated in *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) and reaffirmed in *Ashcroft v. Iqbal*, 129 S. Ct. 1937 (2009). This Court, however, has already set forth the proper legal analysis and method of application to the facts in this case based on *Twombly* and its prodigy:

> [A] plaintiff must provide "allegations plausibly suggesting (not merely consistent with)" the defendant's liability. However, this standard neither imposes a probability requirement nor requires ultra specific factual allegations. Rather, the factual allegations "must be enough to raise a right to relief above a speculative level," or "raise a reasonable expectation that discovery will reveal evidence" of the defendant's liability. (internal citations omitted).

*See* Dkt. No. 243 at *3; hereinafter referred to as "Motion for Reconsideration Opinion."

The Court also clarified its reliance on *Watson Carpet* in its Motion for Reconsideration Opinion, stating it "looked to *Watson Carpet* to supply the standard by which inferences are to be drawn from circumstantial allegations of conduct taken pursuant to a conspiratorial agreement established by direct allegations. In other words, when a complaint sufficiently alleges an express conspiratorial agreement, a plaintiff need not worry about the varying inferences to be drawn from the complaint's subsequent allegations *so long as one such inference plausibly*

*suggests consistency with the unlawful agreement.*" *See* Motion for Reconsideration Opinion at *16, fn. 3. [Emphasis added.]

### B. Plaintiffs Have More Than Satisfied Twombly's Requirement of Setting Forth Plausible Allegations That AUT Participated in the Alleged Conspiracy.

Plaintiffs' allegations detailing AUT's involvement in this price-fixing conspiracy are more than sufficient to withstand dismissal pursuant to Rule 12(b)(6).[5] The Amended Complaint first identifies, by name and reference to specific conspiratorial communications, actions taken in furtherance of the conspiracy by certain individuals while they were employed at L&P:

> 169. Documents that have been produced in *Urethanes* show L&P's involvement in the conspiracy. For example, in a 2004 email, L&P executive vice president Joe York reported to certain L&P executives, including those responsible for purchases of polyurethane foam, that:
>
>> Foamex confirmed today they saw a Carpenter increase letter announcing a 9% increase effective 6/28/04. Foamex will have a letter out this week. Supposedly, Future will also have one out this week. Carpenter intends to increase prices again 8/1/04, depending on the 7/1/04, chemical increase. We should have our letters ready to mail to selected accounts.
>
> 170. Mr. York emailed L&P executives in a similar fashion on October 17, 2005, stating that: "When I was on the west coast last week I was told Carpenter & Foamex were implementing price increases on buns of 56% effective 11/1/05. *I got this from the Foamex manager so it should be reliable.*" (emphasis added). L&P's expense reports contain information indicating that meetings occurred among L&P executives and its competitors, and in particular that, five days prior to sending this email, Mr. York met with Bud Silvey of Foamex, an L&P competitor.

*See* Amended Complaint at ¶ 169-70.

---

[5] Of course, although AUT's participation in the conspiracy did not begin until 2007, AUT is liable for all acts of all of the co-conspirators over the life of the conspiracy. *In re K-Dur Antitrust Litig.*, 338 F. Supp. 2d 517, 538 (D.N.J. 2004) ("a co-conspirator is liable for all acts committee in further of a conspiracy, regardless of when it entered the conspiracy"); *In re Nissan Motor Corp. Antitrust Litig.*, 430 F. Supp. 231, 232 (S.D. Fla. 1977) ("proof of unlawful affiliation is sufficient to render a co-conspirator liable for all damages that the conspiracy caused, regardless of the exact time defendant became a member or extent of its participation").

These allegations provide direct evidence of these employees' involvement in the conspiracy while at L&P.

Plaintiffs then allege – and AUT does not deny – that L&P employees transitioned to AUT at the time AUT acquired L&P's polyurethane foam business.

> 175. AUT's subsequent head of polyurethane sales was Mr. Joseph Progar. Mr. Progar was also a former L&P manager of polyurethane foam. While he worked for AUT, Mr. Progar, along with sales manager Brian French, who also formerly worked at L&P, authored letters to customers announcing AUT's price increases of foam products. At least some of these letters were sent in coordination with price increase letters by AUT's co-conspirators.
>
> 177. AUT informed customers in advance of anticipated price increases and that information was passed on to other foam manufacturers, such as Carpenter. Carpenter and Hickory Springs had advanced knowledge of AUT's proposed price increases in advance of AUT's mailing the price increase letters to customers. Carpenter expected its conduits in turn to pass on price increase letters or intentions from other foam manufacturers to AUT to inform them about their competitors' intentions.

*See* Amended Complaint at ¶ 175, 177.

It is important to note that the employees allegedly involved in the conspiracy while at L&P, such as Joseph Progar and Brian French, continued performing the same job duties following the transition to AUT. *Id.* at ¶¶172-75. They served the largely the same customers, sold the same product, and "competed" in the same market. *Id.* This substantial identity of interest would itself be sufficient to suggest ongoing participation in the conspiracy and end the Court's inquiry into the sufficiency of the evidence. *See Watson Carpet & Floor Covering, Inc. v. Mohawk Indus., Inc.*, 2011 WL 2462833 at *1 (6th Cir. 2011).

Plaintiffs, however, also have alleged substantial circumstantial evidence indicating that, as common sense suggests, former L&P employees continued to conspire with their competitors, just as they had before moving to AUT. For example, Plaintiffs allege that:

> At least one AUT executive, one of AUT's head of polyurethane sales, met directly with co-conspirator Future Foam between 2007 and 2010. During those meetings AUT discussed with its co-conspirator at least the following: the supply of raw materials for flexible polyurethane foam, opening facilities to pour foam, and current inventory and profitability of foam.

*See* Amended Complaint at ¶178. Here, Plaintiffs provide detailed allegations (despite the fact that at this stage Plaintiffs have benefitted from very limited discovery regarding AUT) about meetings AUT held with its competitors, at which executives discussed the supply, inventory and profitability of foam. Coupled with the fact that AUT's head of polyurethane sales was a former L&P employee (*id.* ¶¶ 171, 173), it is at the very least plausible that such discussions were held in furtherance of the conspiracy this Court has already found to be sufficiently pleaded.

Similarly, Plaintiffs allege that head of sales Joseph Progar and sales manager Brian French authored price increase letters while at AUT that mirrored both the effective dates and the percentage price increases also being imposed by alleged co-conspirators Vitafoam, L&P, Mohawk, Flexible Foam, Carpenter, Future Foam, Foamex, and Scottdell. *Id.* at ¶ 177. Both allegations certainly support an inference that Mr. Progar and Mr. French continued as participants in the established and ongoing conspiracy, despite their change in employer. The Amended Complaint further alleges that other participants in the conspiracy expected AUT's price increase letters to conform with co-conspirators Flexible Foam, Foamex, Future Foam and Carpenter; it also alleges that AUT used third party conduits to pass on price-increase information in advance to its competitors. *Id.* ¶¶ 174-75. In short, the Amended Complaint (a) sets forth the conspiracy that this Court has already found to be plausible; and (b) shows how AUT, as a late entrant to the conspiracy and taking over the reins of L&P, engaged in meetings and communications in furtherance of the conspiracy, and took other specific conspiratorial actions such as coordinating with its co-conspirators as to price increases and the issuance of

price increase letters. Furthermore, the Amended Complaint alleges that AUT was welcomed into the fold by the other co-conspirators, and specifically identified as a participant that took up where L&P had left off. *Id.* ¶ 176.[6]

Employing a common antitrust defense tactic, AUT improperly dismembers the facts of the Amended Complaint and invites the Court to do the same. This approach is especially transparent with regard to AUT's effort to divide the Amended Complaint into "direct" and "circumstantial" evidence or "facts." *See* Dkt. No. 469-1 at *8-13. However, *all* Plaintiffs' allegations must be considered together. In any event, as enumerated above, the Amended Complaint contains allegations indicating both direct and circumstantial evidence for AUT's involvement in the conspiracy: for example, actions such as AUT's issuance of price announcement letters to its customers, which mirrored its co-conspirators' announcements, and detailed factual averments establishing Mr. Progar and Mr. French's participation in the conspiracy while at both L&P and AUT, are more than sufficient to provide the factual support necessary to conclude that it is plausible to infer that these employees continued to conspire while at AUT. *See, e.g., In re OSB Antitrust Litig.*, 2007 WL 2253419, *5-6 (E.D.Pa. 2007); *In re Municipal Derivatives Antitrust Litig.*, 700 F.Supp.2d 378, 395-96 (S.D.N.Y. 2010); *In re Packaged Ice Antitrust Litig.*, 723 F. Supp. 2d 987, 1011; *Milliken & Company v. CAN Holdings*, 2011 WL 3444013, *7-9 (W.D.N.C. 2011).

The Amended Complaint must be taken as a whole, and the plausibility of AUT's involvement is to be assessed in light of Plaintiffs' overall allegations. In the antitrust context, the Supreme Court has warned against considering each allegation in isolation, holding that

---

[6] Although Plaintiffs' current complaint should be more than sufficient to withstand AUT's motion, in the event the Court disagrees, Plaintiffs respectfully request leave to further amend the Complaint within seven days of the Court's Order of Dismissal to include these and other additional allegations.

9

"[t]he character and effect of a [Sherman Act] conspiracy are not to be judged by dismembering it and viewing its separate parts." *Continental Ore Co. v. Union Carbide and Carbon Corp.*, 370 U.S. 690, 699 (1962); *see also Standard Iron Works v. ArcelorMittal*, 639 F. Supp. 2d 877, 902 (N.D. Ill. 2009) (denying motion to dismiss and finding that "Defendants' attempt to parse the complaint and argue that none of the allegations (i.e., quoted public statements, parallel capacity decisions, trade association and industry meetings) support a plausible inference of conspiracy is contrary to the Supreme Court's admonition [in Continental Ore].")

Indeed, courts have denied motions to dismiss when far *less* has been pled than Plaintiffs plead against AUT here, provided the complaint as a whole provides allegations of a conspiracy in which the defendant was involved. *See, e.g In re Static Random Access Memory (SRAM) Antitrust Litig.*, 580 F. Supp. 2d 896, 904 (N.D. Cal. 2008) (denying motion to dismiss with regard to specific defendants even though plaintiffs had alleged "only that they were involved in information exchanges"). While the present focus of the Court is rightly on AUT, it does not follow, of course, that AUT's involvement in the conspiracy is to be considered apart from its co-conspirators. Plaintiffs have already alleged a plausible conspiracy (as the Court has recognized), and furthermore plainly allege multiple ways in which AUT joined the conspiracy (taking over L&P's knowledge), actively engaged in it and promoted it (through communications and coordinated price increases), was recognized as a member of the conspiracy about which co-conspirators held certain expectations (in a role the same as L&P had occupied), and benefited from the conspiracy. AUT's arguments to the contrary are unpersuasive, and should be rejected.

## II. CONCLUSION

For the reasons set forth above, AUT's Motion to Dismiss should be denied.

Dated: March 11, 2013

                                          Respectfully Submitted,

                                          */s/ Charles E. Tompkins*
                                          Charles E. Tompkins
                                          James P. Lynch
                                          Williams Montgomery & John Ltd.
                                          233 South Wacker Drive
                                          Suite 6100
                                          Chicago, Illinois 60606-6359

Doc. #: 1102335

## CERTIFICATE OF SERVICE

I, Charles E. Tompkins, hereby certify that on March 11, 2013, a copy of *PLAINTIFFS' MEMORANDUM IN OPPOSITION TO ADVANCED URETHANE TECHNOLOGIES, INC.'S MOTION TO DISMISS PURSUANT TO RULE 12(b)(6)* was filed electronically. Notice of this filing will be sent by the Court's electronic filing system to all parties indicated on the electronic filing receipt. All other parties will be served by regular U.S. mail. Parties may access this filing through the Court's system.

Dated: March 11, 2013

Respectfully Submitted,

*/s/ Charles E. Tompkins*
Charles E. Tompkins
James P. Lynch
Williams Montgomery & John Ltd.
233 South Wacker Drive
Suite 6100
Chicago, Illinois 60606-6359