# THOMAS WILSON (ACE FOAM, INC.)

| Deposition Pages and Lines | Plaintiffs' Position | Defendants' Position |
|---|---|---|
| **1. Page 101, Lines 4-17**<br><br>4 Q Did you pass-through every bit of price increase<br>5 that you received to your customers?<br>6 A I don't remember.<br>7 MS. SALZMAN: Objection. The further you go into<br>8 this downstream discovery I'm going to start instructing the<br>9 witness not to answer those questions.<br>10 MS. LUKITSCH: We'll take that up when we get<br>11 there.<br>12 THE WITNESS: It's already there.<br>13 MS. LUKITSCH: I believe you produced documents and<br>14 we're entitled to ask questions about the documents that you<br>15 produced while the witness is here.<br>16 MS. SALZMAN: I don't see anything on the documents<br>17 that talks about pass-through.<br><br>==Ruling:  Instruction sustained.  Not relevant whether increase passed on or absorbed.== | Defendants' question seeks to explore whether Ace Foam "passed-through" Defendants' price increases to its own customers.  In doing so, Defendants disregard the Court's Orders dated September 7, 2012 (Dkt. 420) and November 29, 2012 (Dkt. 458), which relied on Hanover Shoe and its progeny to deem such discovery into Plaintiffs' sale, resale or use of polyurethane foam irrelevant to this case, and non-discoverable.  See Sept. Order, Dkt. 420 at 3 ("This court also finds the Hanover Shoe line of cases more persuasive than the Valley Drug line of cases"); Nov. Order, Dkt. 458 at 2 ("Defendants' reliance on the Valley Drug line of cases would allow downstream discovery, but this Court previously rejected that reasoning and those cases."; "In short, this Court believes the downstream discovery requested by Defendants is not relevant and therefore not discoverable.").<br><br>Defendants' rehashed arguments that "pass-through" downstream discovery is relevant to the parallel proceeding brought by the Indirect Purchaser Plaintiffs, and to the extent that downstream negotiations may have affected upstream price negotiations, is similarly misguided.  First, as Plaintiffs have explained in their November 19, 2012 briefing, as well as in their August 2, 2013 Letter to the Court, and as numerous courts have repeatedly held, the existence of an indirect purchaser suit does not make downstream discovery relevant.  See Plaintiffs' August 2, 2013 Letter at 6 n.5; Plaintiffs' Memo. of Law Re Sept. Order at 3 n.4,  Dkt. 454.  Moreover, as Plaintiffs have also explained, Plaintiffs' prices to their customers in a downstream market have nothing to do with the price increases imposed by the Defendants at the manufacturing level, and also do not relate to the amount that Plaintiffs allege they were overcharged at that level.  See Plaintiffs' August 2, 2013 Letter at 6-7; see also Plaintiffs' position below at 4-5 (discussing page 129 of Wilson Transcript, and why downstream discovery is not relevant).  Indeed, courts, including this Court, have consistently held that | Ace Foam, one of the Direct Purchaser (Class) Plaintiffs seeking to serve as a named class representative for the putative Direct Purchaser Plaintiff class, was a manufacturer of fabricated foam products for the furniture industry.  Wilson Dep. 21:23-25; 22:20-22; 33:2-34:9.  As acknowledged by Mr. Wilson, Ace Foam competed directly with Defendants for sales of those products in the Tupelo furniture markets. *Id. at* 47:10-49:3 ("Q.  Who were your competitors for your customers locally? A. Hickory Springs, Foamex. . . ."); 180:12-181:2 ("Q. And did – my question was, did you ever compete against Carpenter for sales to your customers . . . . The Witness: Yes.").  Mr. Wilson single-handedly was responsible for both the sales and purchasing side of his business, and, therefore, was likely to have responsive information regarding his company's sales of fabricated products that Ace Foam manufactured in direct competition with Defendants. *Id.* at 26:19-27:2.<br><br>Defendants' question was reasonably calculated to discover information about Plaintiffs' response to price increase letters issued by Defendants.  As a competitor with Defendants, Ace Foam's response to price increases from its suppliers is relevant to Plaintiffs' principal allegation that Defendants' price increases were merely a "pre-text" for establishing supra-competitive prices. It is also relevant to determining the competitive price level in the market for fabricated foam products.<br><br>Separately, whether Plaintiffs issued price increase letters to their customers when they received price increases from Defendants is equally important to whether Indirect Purchasers have any case, at all.  *See, e.g.*, Indirect Purchaser Pls.' Mem. in Supp. of Class Cert. 17 ("All members of the Class will prove their damages in the same way: first, by establishing the amount of the illegal overcharge on FPF, and, second, by demonstrating the amount of the illegal overcharge that was passed through to |

04264.23318/5469854.1

| Deposition Pages and Lines | Plaintiffs' Position | Defendants' Position |
|---|---|---|
| | Plaintiffs' downstream pricing is entirely irrelevant. See Sept. Order, Dkt. 420; Nov. Order, Dkt. 458; Plaintiffs' August 2, 2013 Letter at 6-8.<br><br>Furthermore, Defendants argue that by instructing the witness not to answer this question, Plaintiffs' counsel refused to allow the witness to answer questions about his own documents. However, the document in question is a price increase letter that Mr. Wilson received from Vitafoam. While the Defendants' question related to downstream pricing, the document itself does not relate to the pricing that Mr. Wilson offered to his customers. Notably, in excerpting this particular exchange to the Court, Defendants did not include the initial question posed to the witness regarding whether he "passed-through" "every bit of price increase" to his customers. See Addendum to Defendants' August 1, 2013 Letter at xlix. This, of course, was the root of Plaintiffs' counsel's instruction not to answer. Instead, Defendants included the next question that had been proffered to Mr. Wilson regarding the Vitafoam price increase letter. Id. Mr. Wilson did, in fact, answer that question. See TW Tr. at 103:6-7. | the price of FPF Products."); Russell Lamb Decl. ¶ 86 ("[I]n order for members of the proposed Class to have been injured by the alleged misconduct, some portion of the overcharge would have to have been passed through to them by Direct Purchasers (and other indirect purchasers) of PU Foam.").<br><br>Accordingly, this is not an attempt to gather information regarding a "pass-through" defense which *Hanover* and its progeny rejected but rather an attempt to seek relevant evidence to respond to the Indirect Purchaser claims and the class certification motion. Aug. 20, 2012 Hr'g Tr., ECF No. 422, at 115:7-8 (Defendants are "not counting passing through. [Defendants] are looking at the market [Plaintiffs] say are price fixed.").<br><br>Thus, given the extremely broad scope of discovery permitted by Rule 26(b), *Ward v. Am. Pizza Co.*, 279 F.R.D. 451, 457 (S.D. Ohio 2012) ("the Federal Rules of Civil Procedure authorize extremely broad discovery") and the minimal burden to Plaintiffs in answering simple general business questions such as this, Defendants should be permitted to ask these questions of Plaintiffs' witnesses that in no way seek detailed customer pricing data. Indeed, Defendants' question seeks information within the scope of the Court's prior discovery orders. While the Court's orders placed limitations on Defendants' detailed discovery of Plaintiffs' specific transactions with their customers, the orders permitted general background discovery. ECF No. 420, at 3 ("basic background discovery regarding Plaintiffs' businesses is appropriate for discovery"); *accord* Aug. 20, 2012 Hr'g Tr., ECF No. 422, at 94:4-6 (Plaintiffs' counsel arguing that "trying to inquire [into] the details of those transactions or what the prices were, that is irrelevant as a matter of law"). The orders also permit discovery of Plaintiffs' competition with defendants. ECF No. 420 at 3 ("This Court is persuaded that the downstream discovery is appropriate only for those Plaintiffs who compete with Defendants in the sale of the same products."). |

04264.23318/5469854.1

| Deposition Pages and Lines | Plaintiffs' Position | Defendants' Position |
|---|---|---|
| | | Notably, Plaintiff counsel, while initially noting her objection, permitted Mr. Wilson to answer this question. Accordingly, Defendants did not include this example in their original submission. |
| 2. Page 106, Line 18 through Page 107, Lines 1-5<br><br>18  Q  When your prices would go up, would you issue price<br>19  increase letters similar to Exhibit No. 5?<br>20       MS. SALZMAN: Objection.  Calls for downstream<br>21  discovery.  Instruct the witness not to answer.<br>22       MS. LUKITSCH:  I believe that this is a general<br>23  question about how he does business, whether or not he issues<br>24  price increase letters.  It's also conduct similar to what<br>25  you're alleging is improper by defendants.  I think I'm<br>00107<br>1            THOMAS WILSON<br>2  entitled to inquire about it.  Are you instructing the<br>3  witness not to answer?<br>4       MS. SALZMAN:  I am instructing the witness not to<br>5  answer.<br><br>==Ruling: Instruction overruled -- with limited follow-up questions to show if business purpose for price increase letters.== | Defendants' question impermissibly seeks to explore whether Ace Foam "passed-through" Defendants' price increases to its own customers.  See Plaintiffs' position above at 1-2 (discussing page 101 of Wilson Transcript, and why "pass-through" downstream discovery is not relevant); see also Sept. Order, Dkt. 420; Nov. Order, Dkt. 458; Plaintiffs' August 2, 2013 Letter at 5-8.  Despite Defendants' insistence to the contrary, such discovery is not warranted to address the extent to which the Indirect Purchaser Plaintiffs suffered an overcharge.  Courts—including this one—have repeatedly held that a parallel indirect purchaser action does not remove the general prohibition against downstream discovery.  See Plaintiffs' position above in Wilson excerpt 1 (discussing page 101 of Wilson Transcript, and why the existence of an indirect purchaser suit does not make downstream discovery relevant); see also Plaintiffs' August 2, 2013 Letter at 6 n. 5, 7-8 (citing decisions discussing same).<br><br>In addition, Defendants argue that this is yet another example where Plaintiffs' counsel purportedly refused to allow the witness to answer questions about his own documents.  See Addendum to Defendants' August 1, 2013 Letter at xlix.  However, Exhibit 5 is a collection of documents, which includes price increase letters that Mr. Wilson received from Vitafoam and Foamex, as well as handwritten notes that Mr. Wilson made about those letters.  Exhibit 5 does not involve price increase letters issued from Ace Foam to its customers, and even if it did, Defendants' questions would still be irrelevant and non-discoverable pursuant to the Court's Orders as discussed above.<br><br>Defendants, on the other hand, contend that, to the extent Plaintiffs issued price increase letters to their customers, that information is relevant to determine whether such | Defendants' question was reasonably calculated to discover information relating to whether Plaintiffs, in competition with Defendants, were engaged in similar conduct that Plaintiffs allege was improper by Defendants—i.e., issuing price increase letters which Plaintiffs claim were merely pre-textual (*see* December 17, 2010 Mem. and Or. (*Urethanes*), ECF No. 1877, at 12.)—and whether Indirect Purchaser Plaintiffs can show they paid an alleged overcharge and, thus, prove their case.  Whether Defendants' price increases were based on its own increases in cost, and therefore an appropriate rational business decision (just like Plaintiffs' decisions to issue price increases), is an issue that the trier of fact will have to determine when considering whether a conspiracy was even plausible.<br><br>Contrary to Plaintiffs' position, the focus of Defendants' question was on Plaintiffs' claim that Defendants had no business justification for increasing prices by announcing price increases through letters.  The question was not focused, as Plaintiffs assert, on obtaining evidence to mount an *in pari delicto* defense.  Indeed, Defendants sought information that would show Plaintiffs (just like Defendants) were acting like any rational business in raising prices in response to cost increases and using price increase letters as a legitimate business practice for announcing price increases.  The question was not aimed at showing that Plaintiffs' conduct was improper.  At minimum, discovery on an issue that *might* cut both ways should be permitted at this stage of the litigation given the "flexible treatment" afforded relevancy for purposes of discovery.  *See* Fed. R. Civ. P. 26 advisory committee's note (1970 Amendments) ("Since decisions as to relevance to the subject matter of the action are made for discovery purposes well in advance of trial, a flexible treatment of relevance is required and the making of discovery . . . is not |

04264.23318/5469854.1

| Deposition Pages and Lines | Plaintiffs' Position | Defendants' Position |
|---|---|---|
|  | Plaintiffs engaged in alleged misconduct similar to Defendants. First, as the Court has already made clear, this case relates to Defendants' alleged anticompetitive conduct, and they have never provided any indication that any Plaintiff engaged in such activity, which is one of the reasons their previous requests for downstream discovery were denied. See Nov. Order, Dkt. 458 at 1-2 ("The alleged control of Defendants, as manufacturers, to collude and raise prices, is the central theme in this case."; Sept. Order, Dkt. 420 at 3 ("This Court agrees with Plaintiffs' position that the focus of this case is on products sold by Defendants as alleged price fixers and not the end product sold by Plaintiffs, the alleged victims."). Further, Defendants' argument amounts to nothing more than an in pari delicto defense disguised as a discovery dispute. Long-settled law, however, rejects in pari delicto as a defense in an antitrust case. See, e.g., Perma Life Mufflers, Inc. v. International Parts Corp., 392 U.S. 134, 139, 88 S. Ct. 1981, 1984, 20 L.Ed.2d 982 (1968) (rejecting in pari delicto defense that plaintiff's participation in challenged scheme barred recovery); Kiefer-Stewart Co. v. Joseph E. Seagram & Sons, Inc., 340 U.S. 211, 214, 71 S. Ct. 259, 261, 95 L.Ed 219 (1951) (rejecting unclean-hands defense based on plaintiff's involvement in unrelated conduct). Thus, Defendants' argument is unavailing and the discovery sought is simply irrelevant.<br><br>Finally, Plaintiffs note that at this stage of the deposition when Plaintiffs' counsel began to instruct the witness not to answer Defendants' questions relating to downstream discovery, Plaintiffs' counsel agreed that the dispute should be raised with the Court at that time as the witness was present for his deposition. Counsel for the Defendants elected not to seek guidance from the Court regarding these matters, and instead to continue the deposition. | a concession or determination of relevance for purposes of trial.").<br><br>Separately, whether Plaintiffs issued price increase letters to their customers when they received price increases from Defendants is equally important to whether Indirect Purchasers have any case, at all. *See* discussion above.<br><br>As discussed above, this is not an attempt to information for a "pass-through" defense which *Hanover* and its progeny rejected but rather an attempt to seek relevant evidence to respond to the Indirect Purchaser claims and the class certification motion.<br><br>Thus, given the extremely broad scope of discovery permitted by Rule 26(b) and the minimal burden to Plaintiffs in answering simple general business background questions such as this, Defendants should be permitted to ask these general questions of Plaintiffs' witnesses that in no way seek detailed customer pricing data. |
| 3. **Page 128, Line 18 through Page 129, Lines 1-16**<br><br>18    Q   Take a look at the page | Exhibit 8 is a collection of handwritten notes mostly relating to Defendants' price increases for products sold to Ace Foam. Defendants' questions, however, relate to a notation that Mr. Wilson included regarding pricing from | Defendants' question was reasonably calculated to discover information relating to product markets in which Plaintiffs directly competed with Defendants, whether Plaintiffs' alleged conspiracy could have resulted in common impact, |

04264.23318/5469854.1

| Deposition Pages and Lines | Plaintiffs' Position | Defendants' Position |
|---|---|---|
| that says ACE_00000035.<br>19   First of all, is this your handwriting on this page 35?<br>20   A   Yes.<br>21   Q   It says "Foamcraft prices." Do you see that?<br>22   A   Yes.<br>23   Q   Do you know whether or not you were receiving a<br>24   price quote from Foamcraft to purchase product?<br>25   A   No.<br>00129<br>1              THOMAS WILSON<br>2   Q   Do you know what this refers to?<br>3   A   It's a lot of different -- I don't remember, ma'am,<br>4   what all that -- I don't remember.<br>5   Q   Would you have an occasion to receive pricing from<br>6   Foamcraft from one of your -- from one of your customers?<br>7   A   No.<br>8   Q   Did your customers ever share the prices that they<br>9   were receiving from their -- from alternate suppliers for<br>10  products that you were selling them?<br>11       MS. SALZMAN:  Objection.  Calls for downstream<br>12  discovery.  Instructing the witness not to answer.<br>13  BY MS. LUKITSCH:<br>14   Q   Are you going to obey your attorney's -- | Foamcraft, which is not a Defendant or foam manufacturer. In fact, Plaintiffs' counsel did not object to a single question Defendants asked regarding the Foamcraft notation, despite Defendants' argument that this is yet another example where Plaintiffs' counsel purportedly refused to allow the witness to answer questions about his own documents.  See Addendum to Defendants' August 1, 2013 Letter at 1.  In fact, Mr. Wilson answered each one of Defendants' questions regarding the Foamcraft notation, and the document in question.  See TW Tr. 128:18-129:7.<br><br>Instead, the question counsel instructed Mr. Wilson not to answer was a broad attempt to probe Mr. Wilson's interactions with his downstream customers regarding prices for products sold at the downstream distribution level.  This Court has made it clear that this topic is not relevant.  See Nov. Order, Dkt. 458 at 1-2 ("The alleged control of Defendants, as manufacturers, to collude and raise prices, is the central theme in this case.  The alleged conspiracy is the price set by the manufacturers, not the price sold to the ultimate customer."); "The downstream market has no apparent link with the bargaining power of Plaintiffs or Defendants in settling the price of the product. Nothing suggests that Plaintiffs' sales affect upstream pricing."; "The focus of this case is the manufacturing of foam, not the downstream use or resale of foam products."; "Again, it is the supply of the foam that is the focus of the Complaint in this case, not the many downstream customers."; "In short, this Court believes the downstream discovery requested by Defendants is not relevant and therefore not discoverable."); Sept. Order, Dkt. 420 at 3 ("This Court agrees with Plaintiffs' position that the focus of this case is on products sold by Defendants as alleged price fixers and not the end product sold by Plaintiffs, the alleged victims."; "(2) fabricated foam product sales and markets of Plaintiffs' businesses are not relevant") (relying on Hanover Shoe and its progeny and rejecting Valley Drug). | and whether Plaintiffs were engaged in similar conduct that Plaintiffs allege was improper by Defendants—exchanging of pricing information with competitors—none of which seek specific customer pricing.  Exhibit 8 appeared to Defendants to show that Ace Foam, a foam fabricator, had obtained a competing foam fabricator's pricing information.[1]  Plaintiffs claim that the fact that Defendants had copies of one another's price increase letters in their respective files, sometimes without any documentation or explanation of their source, supports Plaintiffs' allegation that a conspiracy existed.  Direct Purchaser (Class) Pls.' Mem. in Supp. of Mot. for Class. Cert. 14.  As Defendants have asserted among their affirmative defenses in this case, however, possession of competitor price increase letters is just as consistent with lawful market intelligence-gathering as it is with any suggestion of conspiracy.  Therefore, whether Plaintiffs conducted themselves in a similar fashion is highly relevant and not an attempt to assert an *in pari delicto* defense as Defendants discussed above in Number 2. In addition, as Ace Foam competed directly with Defendants in the same product market, its customers' prices are relevant to, among other things, to show the competitive price level for fabricated foam products and antitrust injury.  Plaintiffs are wrong that the Court's prior orders do not permit such discovery.  ECF No. 420 at 3 ("This Court is persuaded that the downstream discovery is appropriate only for those Plaintiffs who compete with Defendants in the sale of the same products.") accord Oct. 24, 2012 Hr'g Tr., ECF No. 436, at 26:2-6 ("[T]he fabricated foam product sales and markets information is appropriate for discovery."); ECF No. 458 at 2 ("This Court stands by its prior ruling . . . .").  Finally, the exhibit might show that downstream foam customers were sharing the prices of foam suppliers (i.e., Vita or Foamex here), which relates to the twin issues of common impact and fraudulent concealment.<br><br>Finally, Plaintiffs' statement that "the Exhibit in question is |

---

[1] Earlier in the deposition, Wilson testified that Foamcraft was a foam fabricator in the Tupelo area. Wilson Dep. 117:24-118:3.

04264.23318/5469854.1

| Deposition Pages and Lines | Plaintiffs' Position | Defendants' Position |
|---|---|---|
| 15 A Yes.<br>16 Q -- instructions?<br><br>Ruling: Instruction sustained. If the handwritten note is not understood, simply ask "What does this mean?" Depending on answer, will determine what can be asked next. | Defendants further argue that, to the extent Mr. Wilson possessed Foamcraft's pricing information, any subsequent inquiry is relevant to determine whether Plaintiffs engaged in alleged misconduct similar to that of Defendants. However, Plaintiffs' allegations of Defendants' widespread, systematic exchange of price increase letters is hardly the same conduct, and Plaintiffs permitted this line of inquiry in any event. Moreover, Defendants' argument is tantamount to an in pari delicto defense, which numerous courts have rejected in the context of antitrust cases. See Plaintiffs' above position on Wilson excerpt 2 (discussing pages 106-107 of Wilson Transcript, and why the in pari delicto defense is not appropriate in antitrust cases).<br><br>Finally, Defendants contend that the question is relevant to discover information concerning product markets in which Plaintiffs "competed" with Defendants, and to refute common impact. First, regardless whether Mr. Wilson "competed" with Defendants for the sale of fabricated foam, Defendants' question pertaining to discussions that Mr. Wilson had with his customers regarding the downstream distribution market has already been deemed irrelevant and non-discoverable by this Court. See Plaintiffs' position above at 47 (discussing why downstream discovery is not relevant); see also Plaintiffs' position below on Wilson excerpt 5 (discussing pages 181-183 of Wilson Transcript, and why downstream fabricated foam sales are not relevant). Next, Defendants argue that, to the extent downstream customers shared the prices of foam suppliers with Mr. Wilson, the information would be relevant to refute common impact. But, Defendants confuse the issue here. The question Mr. Wilson was instructed not to answer related to discussions that Mr. Wilson may or may not have had with his customers regarding pricing in the downstream distribution market. The question did not relate to pricing that Mr. Wilson, or any other Direct Purchaser Plaintiff, received from the Defendants in this litigation, which as this Court has noted, is the focus of this case. See Nov. Order, Dkt. 458 at 2 | a collection of handwritten notes relating to Defendants' price increases for products sold to Ace Foam" is inappropriate and misleading given the fact the witness never confirmed this was the case precisely because Defendants were blocked from asking questions about the document. If Defendants are not permitted to ask these relevant questions, they will not be able to learn the meaning of handwritten notes. This is precisely why relevancy for purposes of discovery is much broader than relevancy for purposes of admission at trial. See Fed. R. Civ. P. 26 advisory committee's note (1970 Amendments) ("Since decisions as to relevance to the subject matter of the action are made for discovery purposes well in advance of trial, a flexible treatment of relevance is required and the making of discovery . . . is not a concession or determination of relevance for purposes of trial."). |

| Deposition Pages and Lines | Plaintiffs' Position | Defendants' Position |
|---|---|---|
| | ("The alleged conspiracy is the price set by the manufacturers, not the price sold to the ultimate customer."). Moreover, Defendants have not provided any evidence suggesting that their own pricing behavior was (or could have been) affected by Plaintiffs' downstream activities. Thus, as the Court has already held, the information Defendants sought by this question is plainly non-discoverable downstream information. See Plaintiffs' August 2, 2013 Letter at 6-8 (citing other decisions). | |
| **4. Page 173, Line 10 through Page 175, Lines 1-24**<br><br>10  Q  Mr. Wilson, I'm handing you Foamex -- sorry --<br>11  Wilson Exhibit No. 18. And for the record, this is<br>12  ACE_00000122 through 126.<br>13      Can you take a look at the second page of this<br>14  document, which is Bates numbered at the end ACE_123. I'll<br>15  cut out all the zeros. Do you see that?<br>16  A  Uh-huh.<br>17  Q  And this a credit application for your company to<br>18  Foamex; is that correct?<br>19  A  Yes.<br>20  Q  And it's dated November 20th, 2006?<br>21  A  Right.<br>22  Q  It says, "Estimate monthly purchases of $25,000."<br>23  Do you know what that refers to?<br>24  A  That's after all the places had put their own<br>25  business in, their own foam fabricators, and the recession<br>00174 | Plaintiff's counsel's instruction was directed toward Defendants' probing into Mr. Wilson's interactions with his downstream customers. The Court has made it clear that this topic is not relevant. See Plaintiffs' position above on Wilson excerpt 3 (discussing page 129 of Wilson Transcript, and why downstream discovery is not relevant); see also Nov. Order, Dkt. 458 at 2; Sept. Order, Dkt. 420 at 3. Furthermore, as the record clearly reflects, Plaintiffs' counsel ultimately allowed Mr. Wilson to answer Defendants' question in order to clarify his previous answer for counsel, twice. See TW Tr. 175:9-176:7. Thus, Defendants' use of this exchange as an attempt to exhibit the inefficiency of calling the Court mid-deposition is entirely misplaced. As Defendants received an answer to their question, a call to the Court would not have been necessary here. Plaintiffs continue to maintain, however, that a call to the Court to resolve fundamental disagreements throughout the course of this deposition would have proven a more efficient avenue to handle this dispute than the present submissions.<br><br>Further, despite Defendants' argument that this is another example where Plaintiffs' counsel purportedly refused to allow the witness to answer questions about his own documents, (see Addendum to Defendants' August 1, 2013 Letter at l-li), Plaintiffs note that counsel did not instruct Mr. Wilson not to answer any of Defendants' questions related to the document. In fact, Mr. Wilson answered every question Defendants asked with respect to that document. See TW Tr. 173:17-174:8. | This excerpt epitomizes the arbitrariness of counsel's practice of instructing witnesses not to answer, and shows that conducting depositions in this manner is not only contrary to the Federal Rules but highly inefficient, given that the parties inevitably will have to stop depositions mid-stream to raise every nuanced question that prompts an instruction not to answer with the Court by phone, on a piecemeal basis. It is for these reasons the Federal Rules envision objections to be made but testimony to proceed subject to the objections. Fed. R. Civ. P. 30(c)(2). Here, Defendants were permitted to pursue a line of questioning about a document produced by Ace Foam up until the point in which an answer to a question seeking clarification of previous testimony about the document would reveal the names of Ace Foam's customers. Putting aside the fact that the question itself was not directed at discovering the names of Ace Foam's customers, asking general questions about "to whom do you sell" violates neither the plain language nor the spirit of the Court's prior Orders. Moreover, the witness opened the door to the clarification question. The fact that Plaintiff's counsel "ultimately allowed Mr. Wilson to answer Defendants' question in order to clarify his previous answer" equally shows arbitrariness of counsel's practice. In fact, it was Plaintiff's counsel that interjected and asked the question of the witness, which completely turns deposition procedure on its head and shows the extent of counsel's speaking objections.<br><br>It is of no moment that Plaintiff's counsel (even if true) did |

04264.23318/5469854.1

| Deposition Pages and Lines | Plaintiffs' Position | Defendants' Position |
|---|---|---|
| 1         THOMAS WILSON<br>2   hit.  And it was a lot less than what ....<br>3      Q   And the recession -- I'm sorry -- the 25,000 was<br>4   what you estimated that you were purchasing total of foam in<br>5   November of 2006?<br>6      A   Yeah.<br>7      Q   And that was a monthly purchase?<br>8      A   Right.<br>9      Q   Which foam manufacturers added foam -- their own<br>10   foam fabrication that you were referring to when you gave you<br>11   answer?<br>12         THE COURT REPORTER:  I'm sorry.  I didn't get your<br>13   question.<br>14   BY MS. LUKITSCH:<br>15      Q   Okay.  You said this was after all the -- all the<br>16   companies started putting in their own fabrication units.  Do<br>17   you recall that?  Which companies were you referring to that<br>18   added fabrication units?<br>19         MS. SALZMAN:  Objection to the extent it calls for<br>20   downstream discovery.<br>21         THE WITNESS:  Yeah.<br>22         MS. LUKITSCH:  Are you instructing him not to<br>23   answer?<br>24         MS. SALZMAN:  Yes, I'm instructing him not to | | not instruct the witness not to answer any of Defendants' questions related to the document and Plaintiffs' red-herring should be ignored.  The issue (and fact) is Defendants were at the mercy of Plaintiffs' interpretation as to the scope of permissible discovery questions regardless of whether Defendants' question related to the document in question (which it did).  In Plaintiffs' view, if a witness opens the door to a line of questioning, Plaintiffs reserve the right to shut the door at their discretion or take a peak first to see what is on the other side.  That is plainly not permitted by the Federal Rules. |

04264.23318/5469854.1

| Deposition Pages and Lines | Plaintiffs' Position | Defendants' Position |
|---|---|---|
| 25  answer.<br>00175<br> 1          THOMAS WILSON<br> 2          MS. LUKITSCH:  You're instructing him not to<br> 3  clarify his answer?<br> 4          MR. DAMPIER:  Can you read back the question and<br> 5  answer for us?<br> 6          THE COURT REPORTER: (Question and answer read<br> 7  back.)<br> 8  BY MS. LUKITSCH:<br> 9      Q   My question was, which companies were you referring<br>10  to that added foam fabrication units?<br>11          MS. SALZMAN:  You mean of the foam manufacturers or<br>12  of the defendants in this case?  Or do you mean his --<br>13          MS. LUKITSCH:  He made a statement that said this<br>14  was after companies started adding foam fabrication units and<br>15  the recession hit.  And I'm asking him to clarify what he<br>16  meant by the companies added foam fabrication, which<br>17  companies he's referring to in his answer.<br>18          MS. SALZMAN:  Are you referring to the<br>19  manufacturers or are you referring to your customers?<br>20          THE WITNESS:  Furniture manufacturers.<br>21          MS. SALZMAN: Furniture manufacturers? | | |

04264.23318/5469854.1

| Deposition Pages and Lines | Plaintiffs' Position | Defendants' Position |
|---|---|---|
| 22    THE WITNESS: Right.<br>23    MS. SALZMAN: Okay. So then my objection stands.<br>24  And instruction.<br><br>Ruling: Instruction overruled. Allow a general question, and if it becomes clear that downstream discovery is being pursued, then instruct not to answer. | | |
| **5. Page 180, Line 12 through Page 183, Lines 1-4**<br><br>12  Q  Did you ever compete against Carpenter for sales to<br>13  your customers?<br>14  A  I competed with everyone. It was free game.<br>15  Q  And did -- my question was, did you ever compete<br>16  against Carpenter in sales to your customers?<br>17    MS. SALZMAN: He's asked and answered.<br>18    THE WITNESS: Yes.<br>19  BY MS. LUKITSCH:<br>20  Q  And what products did you compete against Custom --<br>21  or Carpenter in?<br>22  A  Foam.<br>23  Q  What foam products?<br>24  A  Fabricated foam.<br>25  Q  Did those include cushions?<br>00181<br>1    THOMAS WILSON<br>2  A  That is cushions.<br>3  Q  And did you compete | Defendants mistakenly represent that Plaintiffs' counsel denied Defendants basic information pertaining to Ace Foam's business here. See Addendum to Defendants' August 1, 2013 Letter at ix. That is simply not the case. In fact, prior to this line of questioning the witness provided ample background information regarding his basic downstream business operations, products that he sold and general customer information. See TW Tr. 22:2-25:9 (testimony regarding basic business background and geographic location serviced); 33:2-34:9 (testimony regarding customer base); 47:10-49:3 (testimony regarding competition in the downstream fabrication market); 49:20-52:11 (testimony regarding the fabrication process). Indeed, Plaintiffs' counsel specifically stated early in the deposition, "I'll allow him to answer some background questions on his business with regard to downstream." TW Tr. 24:22-23. Rather, in this particular instance, Plaintiffs' counsel's instruction was directed toward Defendants' probing into Mr. Wilson's interactions with his downstream customers. This Court has made it clear that this topic is not relevant. See Plaintiffs' position above on Wilson excerpt 3 (discussing page 129 of Wilson Transcript, and why downstream discovery is not relevant).<br><br>Defendants' contention that the information sought here should be discoverable because Mr. Wilson testified that Ace Foam "competed" with Defendants in the foam fabrication business is similarly misguided. Although Defendants repeatedly argue that this Court "acknowledged | Defendants' question was reasonably calculated to lead to the discovery of information about the customers Plaintiff Ace Foam might have competed against with Defendants, including at least Carpenter, Hickory Springs, and Foamex, for the sale of fabricated foam products. Ace Foam's witness had just testified that Ace Foam competed directly with Carpenter, Hickory Springs, and Foamex; however, he could not recall the customers for which Ace Foam competed with these Defendants for business. Accordingly, asking the broader question as to whom Ace Foam sells its foam products was reasonably calculated to lead to the discovery of the customers for which Ace Foam competed with Defendants for business. Such questioning violates neither the plain language nor spirit of the Court's prior Orders and places very little burden, if any, on Plaintiffs. See ECF No. 420 at 3 ("This Court is persuaded that the downstream discovery is appropriate only for those Plaintiffs who compete with Defendants in the sale of the same products."); ECF No. 422 at 93:21-94:1 (The Court: "You're not going to stop a general question in a deposition that might say . . . to whom do you sell . . . ?" Mr. Neuwirth: "No."); ECF No. 436, at 26:2-6 ("[T]he fabricated foam product sales and markets information is appropriate for discovery."); ECF No. 458 at 2 ("This Court stands by its prior ruling . . . .").<br><br>Moreover, the problem with Plaintiffs' claim that Plaintiffs, such as Ace Foam, did not "manufacture" foam in competition with Defendants is the fact that Plaintiffs, as |

04264.23318/5469854.1

| Deposition Pages and Lines | Plaintiffs' Position | Defendants' Position |
|---|---|---|
| against Hickory Springs for<br>4  fabricated foam to your customers?<br>5    A   Yes.<br>6    Q   And did you compete against Vitafoam in the sales<br>7  of fabricated foam to your customers?<br>8    A   I don't remember.<br>9    Q   Do you recall competing against Foamex in the sales<br>10  of fabricated foam to your customers?<br>11    A   Yes.<br>12    Q   Do you recall any specific customers that you<br>13  competed against Carpenter for the sale of fabricated foam to<br>14  your customers?<br>15    A   I don't remember.<br>16    Q   Do you recall any specific customers that you<br>17  competed against Hickory Springs for the sales to your<br>18  customers?<br>19    A   I don't remember.<br>20    Q   Do you recall any customers of Foamex that you<br>21  competed for for the sales to your -- of fabricated foam to<br>22  your customers?<br>23    A   I don't remember.<br>24    Q   Who were your largest customers for fabricated foam<br>25  in the time period of 1996 to 2007?<br>00182<br>1           THOMAS WILSON<br>2       MS. SALZMAN: | the relevance" of discovery into markets where Plaintiffs and Defendants compete, Ace Foam did not manufacture flexible polyurethane foam in competition with the Defendants. Ace Foam's business solely dealt in fabricated foam. See TW Tr. 28:20-25; 46:19-47:9 ("I was in business to fabricate"); 185:21-186:7 ("Fabricated foam. That's all I did."). While it is true that Defendants' fabricated foam products fall within the scope of the alleged conspiracy, this is not a "new" theory, as Defendants disingenuously argue. As Plaintiffs have repeatedly noted, the focus of this case is all slabstock, fabricated, and carpet underlay products Defendants sold during the class period, which were part of a price fixing conspiracy Defendants were able to facilitate due to the collective control they exerted, as manufacturers, on the markets for such products. With respect to fabricated foam, Defendants' control over the prices for fabricated foam inputs gave them the leverage to artificially inflate their prices of fabricated foam products. See Nov. Order, Dkt. 458 at 1-2.<br><br>Thus, despite Defendants' repeated arguments that foam fabricators "compete" directly with them, Defendants, as manufacturers of flexible polyurethane foam, wield considerable power over fabricated foam prices since Plaintiffs must first buy Defendants' foam in order to then sell their products. Such purported competition between foam manufacturers and foam fabricators is therefore tenuous at best. Indeed, the Court recognized this very fact in its Nov. Order, when it declined to expand its previous ruling to allow downstream discovery related to the business of foam fabricators. See Nov. Order, Dkt. 458 at 1-2 ("This Court is not persuaded that its prior ruling should be expanded "; "As a result of the manufacturing process, polyurethane foam is sold as slabstock sheets or a molded foam. No fabricator Plaintiff engages in this manufacturing process. Indeed, there is no suggestion that any Plaintiff is a part of the alleged conspiracy. . . . The alleged conspiracy is the price set by the manufacturers, not the price sold to the ultimate customer."; "The focus of | acknowledged by their own expert Dr. Leitzinger, are seeking damages not just for poured foam "manufactured" by Defendants *but also for* the fabricated foam and carpet cushion products sold by Defendants. In other words, Plaintiffs allege that fabricated foam markets and carpet cushion markets had anticompetitive prices, *see* Pls. Mem. in Supp. of Class. Cert. 36; Pls. Ex. Leitzinger (Expert Report of Jeffrey J. Leitzinger, Ph.D.) ¶¶ 2, n.1; 32, 94, 108, but the competing products their clients admittedly sold are somehow carved out of their economic analysis creating an artificial economic scenario. Assuming prices for fabricated foam were fixed by Defendants (as Plaintiffs allege), information regarding the customer negotiations and prices charged by other companies that sold fabricated foam (like Ace Foam) is relevant as to the competitive price level for fabricated foam (i.e., the prices of companies not participating in the conspiracy might show "but for" prices"), antitrust injury (i.e., did Ace Foam benefit from alleged supra-competitive prices?), common impact, and typicality claims in Plaintiffs' motions for class certification. In this respect, it's not important that Plaintiffs do not "manufacture" foam in the form of slabstock, sheets or molded foam. What is important is that many Plaintiffs manufacture fabricated foam, which is alleged to be part of the conspiracy.<br><br>The distinction Plaintiffs attempt to draw here is self-serving and entirely artificial. Plaintiffs admit, "it is true that Defendants' fabricated foam products fall within the scope of the alleged conspiracy," but refuse to acknowledge the simple consequences that proceed from that admission. Plaintiffs claim that Defendants fixed the prices of fabricated foam products, and thus were able to sell such fabricated foam products to customers at supra-competitive prices. Fabricator Plaintiffs such as Ace Foam, however, have admitted that they also sold fabricated foam products in direct competition with Defendants. In other words, they sold products that competed directly with products allegedly sold by Defendants at supra-competitive prices. If fabricator |

04264.23318/5469854.1

| Deposition Pages and Lines | Plaintiffs' Position | Defendants' Position |
|---|---|---|
| Objection.  Calls for downstream<br>  3   discovery.  Instructing the witness not to answer.<br>  4          MS. LUKITSCH:  The witness just gave me several<br>  5   answers where he said he directly competed against Carpenter,<br>  6   Hickory Springs and Foamex to his customers.  I think that,<br>  7   even under the judge's ruling, we're clearly entitled to<br>  8   understand and explore those -- that competition, including<br>  9   who his customers are and where that competition is.<br>  10         MS. SALZMAN:  You've already asked him if he<br>  11   recalls which customers he competed with, the defendants you<br>  12   named, and he could not recall them.  I don't think that<br>  13   opens the door to asking him the names of all his customers.<br>  14         MS. LUKITSCH:  I disagree.  And you're instructing<br>  15   him not to answer?<br>  16         MS. SALZMAN:  I am.<br>  17         MS. LUKITSCH:  And you're instructing him not to<br>  18   answer any questions about the sales to his customers, even<br>  19   though he stated that he's competed in the foam fabrication<br>  20   business against the defendants in this case?<br>  21         MS. SALZMAN:  You are asking him general questions<br>  22   unrelated to the customers, which he has testified -- which<br>  23   -- for which he's testified that he | this case is the manufacturing of foam, not the downstream use or resale of foam products."; "Again, it is the supply of the foam that is the focus of the Complaint in this case, not the many downstream customers.").  "Competition" at a downstream distribution level, as opposed to the upstream manufacturing level, is not relevant when the purchaser plaintiffs do not themselves manufacture foam and, thus, possess the ability to affect Defendants' conspiratorial prices.  See Plaintiffs' Position above at 6-7 (discussing page 129 of Wilson Transcript, and why downstream discovery is not relevant).<br><br>Thus, while Mr. Wilson testified that he "competed" with Defendants in the foam fabrication business only, discovery about those downstream sales is simply not relevant to this case, nor is it discoverable under this Court's previous rulings.  See Sept. Order, Dkt. 420 at 3 ("This Court agrees with Plaintiffs' position that the focus of this case is on products sold by Defendants as alleged price fixers and not the end product sold by Plaintiffs, the alleged victims."; "(2) fabricated foam product sales and markets of Plaintiffs' businesses are not relevant ").<br><br>Finally, Defendants' attempt to resurrect their Valley Drug-based arguments regarding standing and class certification, which has been rejected by this Court twice, in order to argue the relevance of this discovery is similarly without merit.  See Sept. Order, Dkt. 420 at 3 (rejected Valley Drug line of cases); Nov. Order, Dkt. 458 at 2 ("Defendants' reliance on the Valley Drug line of cases would allow downstream discovery, but this Court previously rejected that reasoning and those cases."). | Plaintiffs such as Ace Foam sold their fabricated foam products to customers at prices equal to or higher than the allegedly supra-competitive prices charged by Defendants *to those same customers*, then *either* such fabricator Plaintiffs clearly *benefited* from the alleged conspiracy, to the detriment of their (and Defendants') customers—i.e., *other class members*, with whom fabricator Plaintiffs clearly would have a conflict—or all parties, including Defendants who sold at competitive prices, *or* the prices at which both fabricator Plaintiffs and Defendants sold such products were not, in fact, supra-competitive.  If, on the other hand, Plaintiffs sold such competing products at lower prices, such pricing would demonstrate that non-fabricator Plaintiffs had lower-priced alternative sources of supply (i.e., fabricator Plaintiffs) from which they could have purchased fabricated foam products, and that Defendants did not, in fact, have the "collective control" over foam pricing that Plaintiffs claim in this case.  Similarly, Plaintiffs claim that Defendants "wield[ed] considerable control over fabricated foam prices since Plaintiffs must first buy Defendants foam in order to then sell their products," but that argument simply does not comport with reality.  If Plaintiffs' argument were true, there would be no independent foam fabricators left in business.  Likewise, fabricators such as Plaintiffs Ace Foam, VFP, Adams Foam, and others would not be buying from non-Defendant foamers or foam brokers such as American Foam.<br><br>Remarkably, Plaintiffs' reliance on Plaintiff's counsel's statement during the Ace Foam deposition that she would "allow him to answer some background questions on his business with regard to downstream" is illuminating as to just how broad Plaintiffs interpret the term "downstream."  Plaintiff's counsel made that statement when Defendant's counsel asked the witness "what geographic location did Ace Foam service?"  The geographic location in which any particular Plaintiff is located and services is relevant to the geographic make-up of the so-called "upstream" market. |

04264.23318/5469854.1

| Deposition Pages and Lines | Plaintiffs' Position | Defendants' Position |
|---|---|---|
| competes with the<br>24 defendants in this case. And the instruction would be, he<br>25 should not answer those questions. If you want to ask him<br>00183<br>1            THOMAS WILSON<br>2 questions about customers that he competes with, the<br>3 defendants in this case, I will allow those questions to<br>4 proceed.<br><br>Ruling: Instruction overruled. Identifying the names of largest customers (lines 24-25) is permissible and that is all that was asked. | | |
| **6. Page 188, Line 24 through Page 189, Lines 1-6**<br><br>24 Q Does your company have price lists that it gives to<br>25 its customers for the fabricated foam products it sells?<br>00189<br>1            THOMAS WILSON<br>2 MS. SALZMAN: Objection. Calls for downstream<br>3 discovery. Instructing the witness not to answer.<br>4 BY MS. LUKITSCH:<br>5 Q Are you going to follow your counsel's objection?<br>6 A Yes.<br><br>Ruling: Instruction overruled. Actual pricing is not sought by the question. | Once again, Defendants' question impermissibly seeks to explore whether Ace Foam "passed-through" Defendants' price increases to its own customers. See Plaintiffs' position above on Wilson excerpt 1 (discussing page 101 of Wilson Transcript, and why "pass-through" downstream discovery is not relevant); see also Sept. Order, Dkt. 420; Nov. Order, Dkt. 458; Plaintiffs' August 2, 2013 Letter at 5-8.<br><br>Further, although Ace Foam may have sold fabricated foam products, this Court's ruling made clear that downstream discovery as it relates to so-called "competitor plaintiffs" is not relevant to this case since they do not also manufacture foam. See Plaintiffs' position above on Wilson excerpt 5 (discussing pages 181-183 of Wilson Transcript, and why downstream fabricated foam sales are not relevant); Nov. Order, Dkt. 458 at 1-2; See Sept. Order, Dkt. 420 at 3. Thus, information pertaining to whether Mr. Wilson issued price lists to his customers is not relevant, nor is it discoverable under this Court's previous rulings. | Defendants' question was reasonably calculated to discover Plaintiff Ace Foam's conduct and pricing behavior as a direct (and actual) competitor of several Defendants, but not actual pricing. For the same reasons as noted above in Number 5, such questions are appropriate and, in fact, permitted by the broad discovery rules and the Court's prior Orders, *see* ECF No. 420, at 3 ("discovery of Plaintiffs' businesses may have some relevance where the parties on opposites sides of the fence in this lawsuit are also competing against each other"); *accord* ECF No. 436, at 26:2-6 ("where there is overlap, the fabricated foam product sales and markets information is appropriate for discovery."), particularly given the low burden of answering questions at a deposition. In this respect, Defendants are not seeking to explore a "passed-through" defense." |

| Deposition Pages and Lines | Plaintiffs' Position | Defendants' Position |
|---|---|---|
| **7. Page 189, Lines 7-15**<br><br>7    Q    For each year since 1999 have your customers paid<br>8    the same prices for each cushion that they've purchased, or<br>9    different net prices?<br>10        MS. SALZMAN: Objection. Calls for downstream<br>11    discovery. Instructing the witness not to answer.<br>12    BY MS. LUKITSCH:<br>13    Q    And are you going to follow your counsel's<br>14    objection?<br>15    A    Yes.<br><br>==Ruling: Instruction sustained. Customer pricing is separate and distinct from supplier pricing, and payments for cushions is not relevant to amount of alleged overcharge paid by Plaintiffs.== | Defendants' question seeks information regarding Mr. Wilson's pricing to his customers. As this Court has previously ruled, the prices that Ace Foam, or any other Plaintiff, charged to its customers in the downstream market are not relevant to this case. Whether Ace Foam offered the same, or different prices to its customers for fabricated foam products has no bearing on the prices that Defendants charged to Plaintiffs for polyurethane foam products. See Nov. Order, Dkt. 458 at 2 ("The downstream market has no apparent link with the bargaining power of Plaintiffs or Defendants in setting the price of the product. Nothing suggests that Plaintiffs' sales affect upstream pricing."). Moreover, Defendants have not provided any evidence to suggest otherwise. Indeed, as this Court has noted, to the extent Defendants pricing behavior was affected by Plaintiffs' downstream activities, "Defendants can show the leverage though the volume and price of purchases Plaintiffs made from Defendants. That is information Defendants already have or can acquire." Nov. Order, Dkt. 458 at 2.<br><br>Furthermore, as Plaintiffs noted in their August 2, 2013 letter brief to the Court (at 6-7), Defendants' argument that downstream discovery is relevant where a Plaintiff finds motivation from its customers to resist an upstream price increase is just another form of the "pass on" defense and is *not* evidence of downstream discovery relevance. Whether a Plaintiff's customer opted to fight a price increase has nothing to do with price increases imposed by the Defendants, and also has nothing to do with the amount that Plaintiff was overcharged. (Dkt. 458 at 1-2 (noting it is the leverage Defendants could exert, as manufacturers, that is the focus of this case).) Moreover, Defendants again have not provided any evidence suggesting their own pricing behavior was (or could have been) affected by Plaintiffs' downstream activities. If a Plaintiff fought a Defendant's price increase, the results of that fight are found in the direct negotiations between the Plaintiff and the Defendant. (Dkt. 458 at 2 (noting Defendants can show | Defendants' question was reasonably calculated to lead to the discovery of admissible evidence for the same reasons discussed above in Numbers 5 and 6. Plaintiffs' assertion that "Defendant have not provided any evidence to suggest" that Plaintiffs' pricing to customers had any "bearing on the prices that Defendants charged to Plaintiffs for polyurethane foam products" is simply false. Indeed, Plaintiffs have acknowledged that price negotiations with their customers significantly impacted the prices Plaintiffs paid Defendants for foam. Direct Action Plaintiff Professional Foam Fabricators 30(b)(6) Dep. 84:10-13 ("Q. Does that mean your negotiation process with your suppliers depended on what your customers told you about your prices? A. Yes."); 1-8:14-18 ("Q. Okay. And it's based on whether or not, as you say, the customer accepts the price that you determine whether you can accept the foam supplier's price for foam; is that correct? A. Yes."). Notwithstanding these admissions, in some cases Plaintiffs have refused to answer questions about this relationship.<br><br>In addition, this question was reasonably calculated to discover whether Indirect Purchaser Plaintiffs can prove their case by showing "some portion of the overcharge would have to have been passed through to them by Direct Purchasers (and other indirect purchasers) of PU Foam." Russell Lamb Decl. ¶ 86. Accordingly, asking whether Ace Foam's customers paid the same price for each foam cushion during the Class Period could potentially lead to evidence regarding whether Indirect Purchasers paid the supra-competitive prices they claim to have paid.<br><br>Consistent with the above discussion, Defendants were not (as Plaintiffs characterize the question) seeking to gather information for a "passed-through" defense. |

04264.23318/5469854.1

| **Deposition Pages and Lines** | **Plaintiffs' Position** | **Defendants' Position** |
|---|---|---|
| | Plaintiffs' leverage in pricing negotiations through "information Defendants already have or can acquire"); Dkt. 454 at 8-9. *See also* Aug. 2, 2013 Letter at 7-8 (collecting cases).)<br><br>Defendants' question is merely another impermissible attempt to explore whether Ace Foam "passed-through" Defendants' price increases to its own customers, or to seek discovery of downstream prices. See Plaintiffs' position above on Wilson excerpt 1 (discussing page 101 of Wilson Transcript, and why "pass-through" downstream discovery is not relevant); Wilson excerpts 1 and 2 (discussing pages 101, 106-107 of Wilson Transcript, and why the existence of an indirect purchaser suit does not make downstream discovery relevant); Wilson excerpt 3 (discussing page 129 of Wilson Transcript, and why downstream discovery is not relevant); Wilson excerpt 5 (discussing pages 181-183 of Wilson Transcript, and why downstream fabricated foam sales are not relevant); see also Sept. Order, Dkt. 420; Nov. Order, Dkt. 458; Plaintiffs' August 2, 2013 Letter at 5-8. | |
| **8. Page 189, Lines 16-22**<br><br>16    Q   Did Ace Foam ever offer discounts or rebates to its<br>17   customers that it competed on against Carpenter, Hickory<br>18   Springs and Foamex?<br>19         MS. SALZMAN:  If you can limit it to those<br>20   customers that you competed in. I think it's an<br>21   inappropriate question considering he said he can't recall<br>22   which customers.<br><br>==Ruling:  Instruction sustained.  No== | Similar to the immediately preceding set of questions, this question sought information regarding Mr. Wilson's pricing practices to his customers.  As noted above, the prices that Ace Foam, or any other Plaintiff, charged to its customers in the downstream market are not relevant to this case.  Whether Ace Foam offered the same, or different prices to its customers for fabricated foam products has no bearing on the prices that Defendants charged to Plaintiffs for polyurethane foam products.  *See* Nov. Order, Dkt. 458 at 2 ("The downstream market has no apparent link with the bargaining power of Plaintiffs or Defendants in setting the price of the product.  Nothing suggests that Plaintiffs' sales affect upstream pricing.").  Moreover, Defendants have not provided any evidence to suggest otherwise.  Indeed, as this Court has noted, to the extent Defendants pricing behavior was affected by Plaintiffs' downstream | Defendants' question was reasonably calculated to discover information concerning the market in which Plaintiff Ace Foam admits to competing directly with several Defendants.  Given the relevance of such information when it is shown that Plaintiffs compete directly with Defendants, as recognized by the Court's prior Orders, it is appropriate for Defendants to ask questions aimed at learning the workings of the markets in which both Plaintiffs and Defendants compete—markets that Plaintiffs claim were part of the allegedly price-fixing conspiracy.  Thus, it is inappropriate for Ace Foam's counsel to limit the witness's answer just to those customers for which they directly compete with Defendants, and not to all customers in general, when Plaintiffs compete directly with Defendants in the same product markets. ECF No. 420, at 3 ("discovery of Plaintiffs' businesses may have some |

04264.23318/5469854.1

| Deposition Pages and Lines | Plaintiffs' Position | Defendants' Position |
|---|---|---|
| likely relevance. *See* No. 7 above. | activities, "Defendants can show the leverage though the volume and price of purchases Plaintiffs made from Defendants. That is information Defendants already have or can acquire." Nov. Order, Dkt. 458 at 2. | relevance where the parties on opposites sides of the fence in this lawsuit are also competing against each other"); *accord* ECF No. 436, at 26:2-6 ("where there is overlap, the fabricated foam product sales and markets information is appropriate for discovery."). <br><br> Plaintiffs' repeated contention that "Defendants have not provided any evidence to suggest that Plaintiffs' pricing to customers had any "bearing on the prices that Defendants charged to Plaintiffs for polyurethane foam products" is simply false. *See* above discussion in number 7. The reality remains Plaintiffs and Defendants often competed with each for the same business and even the same business, as evidence by numerous documents and deposition testimony to date. |
| **9. Page 190, Lines 6-21** <br><br> 6   Q   Were you aware that the scrap foam or foam trim <br> 7   that you sold is a primary input into the manufacture of <br> 8   carpet cushion? <br> 9   A   Yes. <br> 10   Q   And are you aware that there was a market for the <br> 11   scrap foam in the United States? <br> 12        MS. SALZMAN: Objection. <br> 13   BY MS. LUKITSCH: <br> 14   Q   You can answer. <br> 15   A   As I stated earlier, I sold my scrap to Foamcraft. <br> 16   And what happened after that, I didn't know. <br> 17   Q   And did you ever monitor the pricing or try and get <br> 18   a better price for the foam scrap you sold other than selling | Despite Defendants' contention that these questions merely seek general information regarding Mr. Wilson's basic business dealings in scrap foam, in reality, the questions Defendants posed seek information regarding the prices that Mr. Wilson received for scrap foam products that he sold to his customers. Regardless, whether the question Defendants posed pertains to the downstream sale of fabricated foam products, or the downstream sale of scrap foam, the information is not relevant or discoverable under this Court's previous rulings. See Plaintiffs' position above on Wilson excerpt 5 (discussing pages 181-183 of Wilson Transcript, and why downstream fabricated foam sales are not relevant); see also Nov. Order, Dkt. 458; Sept. Order, Dkt. 420. <br><br> Finally, it is apparent that Defendants' questions represent another improper attempt to explore whether Ace Foam "passed-through" Defendants' price increases to its own customers. See Plaintiffs' position above at 1-2 (discussing page 101 of Wilson Transcript, and why "pass-through" downstream discovery is not relevant); see also Sept. Order, Dkt. 420; Nov. Order, Dkt. 458; Plaintiffs' August 2, 2013 Letter at 5-8. | Defendants' question was reasonably calculated to discover information regarding the market for scrap foam, the key raw material input for carpet cushion, which Plaintiffs claim to be part of the alleged price-fixing conspiracy. Scrap foam, in the instance, is upstream not downstream of products Plaintiffs claim are part of the conspiracy. <br><br> Plaintiff had just testified that he sold scrap foam to Foamcraft. In addition to other companies with similar names, Future Foam has a subsidiary named Foamcraft. In this respect, the question seeks relevant information —the price of a key raw material important to determining Plaintiffs' alleged overcharge. Moreover, at this juncture, defense counsel was not seeking discovery of Ace Foam's actual prices for scrap foam but rather seeking information about its general business practices. *Southwest Hide Co. v. Goldston*, 127 F.R.D. 481, 483 (N.D. Tex. 1989) ("Likewise, discovery is not limited to the merits of a case, because a variety of fact-oriented issues unrelated to the merits may arise during litigation."). Thus, the question was well within the broad parameters of Rule 26 and violated neither the plain language nor the spirit of the Court's prior Orders. |

04264.23318/5469854.1

| Deposition Pages and Lines | Plaintiffs' Position | Defendants' Position |
|---|---|---|
| 19  it to Foamcraft?<br>20      MS. SALZMAN: Objection. Calls for downstream<br>21  discovery. Instruct the witness not to answer.<br><br>Ruling: Instruction sustained. Going beyond general business background and seems to be exploring pass through pricing. | | Consistent with the above discussion, Defendants were not (as Plaintiffs characterize the question) seeking information for a "passed-through" defense. |
| **10. Page 191, Lines 11-17**<br><br>11   Q   Did the price that you received for your scrap foam<br>12  vary over time?<br>13      MS. SALZMAN: Objection. Calls for downstream<br>14  discovery. Instruct the witness not to answer.<br>15  BY MS. LUKITSCH:<br>16   Q   And are you going to follow her instruction?<br>17   A   Yes.<br><br>Ruling: Instruction sustained. *See* No. 9 above. | *See id.* | *See id.* |
| **11. Page 191, Line 24 through Page 192, Lines 1-5**<br><br>24   Q   To the customers that you sold fabricated foam in<br>25  competition with Carpenter, Hickory Springs and Foamex, did<br>00192<br>1              THOMAS WILSON<br>2  you issue to them a price list? | Plaintiffs' counsel's instruction not to answer this question was directed toward Defendants' probing into Mr. Wilson's specific interactions with his downstream customers. This Court has made it clear that this topic is not relevant. See Plaintiffs' position above on Wilson excerpt 3 (discussing page 129 of Wilson Transcript, and why downstream discovery is not relevant). Furthermore, Defendants' repeated attempts throughout the course of the deposition to inquire into Ace Foam's pricing to customers, and whether Ace Foam might have issued price lists to customers, despite this Court's ruling that such | See above discussions (i.e., Numbers 3, 5-6, and 8) regarding direct competition between Plaintiffs and Defendants.<br><br>In addition, the question was not (as Plaintiffs characterize it) directed at probing "specific interactions" but rather was directed toward Plaintiff Ace Foam's general business practices concerning the same product it manufactures in competition with Defendants. As such, this question violated neither the plain language nor spirit of the Court's prior orders. ECF No. 420, at 3 ("discovery of Plaintiffs' |

| Deposition Pages and Lines | Plaintiffs' Position | Defendants' Position |
|---|---|---|
| 3      MS. SALZMAN: Objection. Form. She's limiting the<br>4   question to competitors.<br>5       I'm going to instruct him not to answer.<br><br>Ruling: Instruction overruled. The use (or not) of price lists may be relevant. | downstream discovery is not relevant or discoverable, violates the Court's prior orders and is harassing and burdensome as well.<br><br>Further, this Court made clear that such discovery; even insofar as it relates to so-called "competitor plaintiffs" is not relevant to this case. See Plaintiffs' position above on Wilson excerpt 5 (discussing pages 181-183 of Wilson Transcript, and why downstream fabricated foam sales are not relevant); Nov. Order, Dkt. 458 at 1-2; See Sept. Order, Dkt. 420 at 3.<br><br>Finally, Plaintiffs note that for the second time during the course of the deposition, Plaintiffs' counsel agreed to contact the Court to resolve any disputes while the witness was present and available to be deposed. Defendant's raising of this dispute is untimely, and their insistence on waiting to raise this dispute is inefficient and unfair to the witness who allotted time from his employment and to counsel who traveled to attend the deposition in-person. | businesses may have some relevance where the parties on opposites sides of the fence in this lawsuit are also competing against each other"); *accord* Oct. 24, 2012 Hr'g Tr., ECF No. 436, at 26:2-6 ("[T]he fabricated foam product sales and markets information is appropriate for discovery."); ECF No. 458 at 2 ("This Court stands by its prior ruling . . . .").<br><br>Finally, it is Plaintiffs' conduct and broad interpretation of the scope and effect of the Court's prior orders that have made the deposition process so inefficient. Had Plaintiffs simply permitted the witnesses to answer Defendants questions, there would be no inefficiency. Indeed, the Federal Rules aim towards efficiency. Fed. R. Civ. P. 30(c)(2) ("the examination still proceeds; the testimony is subject to any objection"). Certainly the burden, if any, imposed on witnesses answering questions at depositions to the extent of their knowledge does not outweigh Defendants' reasonable attempts to seek relevant information particularly given the "flexible treatment" afforded relevancy at this stage of the litigation. As stated during the deposition, this was the first deposition taken of Plaintiffs in this case. At the time, Defendants were unaware that these instructions would be repeated in other depositions and preferred to wait to raise the issue with the Court so the questions to could be presented in context, with the hope that Plaintiffs would be prohibited from continuing their impermissible instructions not to answer. While this Plaintiff chose to be a named class representative and participate in discovery, Defendants will certainly work with counsel, if allowed to continue the deposition, to minimize any impact on the witness. |
| **12. Page 197, Lines 11-19**<br><br>11      How did you determine your prices for those<br>12   customers that you competed against with Carpenter, Hickory<br>13   Springs and Foamex?<br>14      MS. SALZMAN: | This is yet another example where Defendants' question impermissibly seeks to explore whether Ace Foam "passed-through" Defendants' price increases to its own customers, or to obtain discovery of downstream prices. See Plaintiffs' position above at Wilson excerpt 1 (discussing page 101 of Wilson Transcript, and why "pass-through" downstream discovery is not relevant), Wilson excerpt 3 (discussing page 129 of Wilson Transcript, and | *See id.*<br><br>Consistent with the above, Defendants were not (as Plaintiffs characterize the question) seeking information regarding a "passed-through" defense or specific customer prices. |

04264.23318/5469854.1

| Deposition Pages and Lines | Plaintiffs' Position | Defendants' Position |
|---|---|---|
| Objection. Asked and answered.<br>15  Calls for downstream discover. Instructing the witness not<br>16  to answer.<br>17  BY MS. LUKITSCH:<br>18     Q   And are you going to follow your counsel's advice?<br>19     A   Yes.<br><br>Ruling: Instruction overruled. General questioning how price was determined may be relevant in areas of competitive overlap. | why downstream discovery is not relevant); see also Sept. Order, Dkt. 420; Nov. Order, Dkt. 458; Plaintiffs' August 2, 2013 Letter at 5-8.<br><br>Moreover, Defendants argue that Plaintiffs' counsel instructed the witness not to answer this question based on "document production orders." See Addendum to Defendants' August 1, 2013 Letter at ii-iii. Defendants further argue that Plaintiffs' instruction was inappropriate because the witness testified that he competes with defendants. See Addendum to Defendants' August 1, 2013 Letter at xi. First, as Judge Zouhary noted during the telephone conference, which took place on August 5, 2013, the Sept. and Nov. Orders apply to both document and deposition discovery. See Telephone Conference Tr. 12:10-19, Aug. 5, 2013. Next, as previously stated, Ace Foam did not manufacture flexible polyurethane foam in competition with the Defendants. Ace Foam was a foam fabricator. Again, as this Court's Orders clearly state, downstream discovery as it relates to the sales of fabricated foam at the level of distribution at which Plaintiffs compete is not relevant, and therefore is not discoverable. See Plaintiffs' position above on Wilson excerpt 5 (discussing pages 181-183 of Wilson Transcript, and why downstream fabricated foam sales are not relevant); see also Nov. Order, Dkt. 458 at 1-2; Sept. Order, Dkt. 420 at 2. | |
| **13. Page 199, Lines 14-20**<br><br>14     Q   Other than -- what did you use to calculate the<br>15  labor cost for the fabricated foam products that you sold?<br>16         MS. SALZMAN: Objection. Calls for downstream<br>17  discovery.<br>18         MS. LUKITSCH: Are you instructing him not to<br>19  answer?<br>20         MS. SALZMAN: Yes. | Here, Defendants' questions once again seek information regarding the prices that Mr. Wilson charged to his customers for fabricated foam products. Defendants' mask their attempt to explore whether Mr. Wilson "passed-through" price increases that he received from Defendants by asking how costs affected Ace Foam's ultimate prices to customers. This is yet another example where Defendants try to circumvent this Court's Orders regarding the relevance of such information, even to the extent that it relates to so-called "competitor plaintiffs." See Plaintiffs' position above on Wilson excerpt 1 (discussing page 101 of Wilson Transcript, and why "pass-through" downstream discovery is not relevant), Wilson excerpt 3 (discussing | *See id.* |

04264.23318/5469854.1

| Deposition Pages and Lines | Plaintiffs' Position | Defendants' Position |
|---|---|---|
| Ruling: Instruction overruled. Questions asking how costs affected ultimate price may be relevant. | page 129 of Wilson Transcript, and why downstream discovery is not relevant); Wilson excerpt 5 (discussing pages 181-183 of Wilson Transcript, and why downstream fabricated foam sales are not relevant); see also Sept. Order, Dkt. 420; Nov. Order, Dkt. 458; Plaintiffs' August 2, 2013 Letter at 5-8. | |
| **14. Page 199, Lines 22-25**<br><br> 22   Q   What percentage were your costs for polyurethane<br> 23   foam on a total percentage of the prices that you charged for<br> 24   fabricated seat cushions?<br> 25         MS. SALZMAN:  Same objection and instruction.<br><br>Ruling: Instruction overruled. *See No.* 13 above. | *See id.* | *See id.* |
| **15. Page 200, Lines 3-5**<br><br> 3   Q   What percentage of cost for foam were included in<br> 4   fabricated arm rolls or arm cushions that you sold?<br> 5         MS. SALZMAN:  Same objection and instruction.<br><br>Ruling: Instruction overruled. *See No.* 13 above. | *See id.* | *See id.* |

04264.23318/5469854.1