IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | |
|---|---|
| In re POLYURETHANE FOAM ANTITRUST LITIGATION | MDL Docket No.: 2196 |
| | Index No. 10 MD 2196 (JZ) |
| This Document Relates to: | |
| ALL ACTIONS | |

**AMENDED NOTICE OF RULE 30(B)(6) VIDEOTAPE
DEPOSITION OF LEGGETT & PLATT, INC.**

PLEASE TAKE NOTICE that Direct Action Plaintiffs, the Direct Purchaser Class Plaintiffs and the Indirect Purchaser Class Plaintiffs (collectively "Plaintiffs"), pursuant to Rule 30(b)(6) of the Federal Rules of Civil Procedure, will take the deposition of Leggett & Platt Inc. ("Leggett & Platt").  The deposition will commence at **9:00 a.m. C.S.T.** on **January 16, 2014,** at the offices of **Haynes & Boone LLP, 201 Main St., Fort Worth, Texas 76102**, or at such other time and location as may be determined and mutually agreed upon by counsel for the parties.  The testimony will be recorded by stenographic and sound-and-visual means by a person authorized to administer oaths.

In accordance with Rule 30(b)(6), Fed. R. Civ. P., Leggett & Platt shall designate one or more officers, directors, managing agents or other persons to testify on its behalf concerning the topics set forth in the attached Exhibit A.

Dated: January 9, 2014              Respectfully submitted,

    /s/     Charles E. Tompkins
Charles E. Tompkins
James P. Lynch
WILLIAMS MONTGOMERY & JOHN LTD.
233 S. Wacker Drive
Suite 6100
Chicago, Illinois 60606
Tel.: (312) 443-3200
Fax: (312) 630-8500
Email: CET@willmont.com
       JPL@willmont.com

*Counsel for Direct Action (Non-Class) Plaintifs*

/s/     William A. Isaacson
William A. Isaacson
BOIES, SCHILLER & FLEXNER LLP
5301 Wisconsin Avenue, NW
Washington, DC 20015
Phone: 202-237-5607
Fax: 202-237-6131

/s/     Stephen R. Neuwirth
Stephen R. Neuwirth
QUINN EMANUEL URQUHART
& SULLIVAN, LLP
51 Madison Avenue, 22nd Floor
New York, NY 10010
Phone: 212-849-7165
Fax: 212-849-7100

*Co-Lead Counsel for Direct Purchaser Class*

/s/     Marvin A. Miller
Marvin A. Miller
MILLER LAW LLC
115 South LaSalle Street, Suite 2910
Chicago, IL 60603
Phone: 312-332-3400
Fax: 312-676-2676

*Counsel for Indirect Purchaser Class*

## **EXHIBIT A**

### I.  DEFINITIONS

1. "You," "Your," and "Your Company" mean Defendant Leggett & Platt, Inc., including its predecessors, successors, subsidiaries, affiliates, business divisions, departments or units, and all current and former directors, officers, employees, agents, representatives, and any other person(s) acting or purporting to act on behalf of You.

2. "Polyurethane Foam" means any type, grade or form of "flexible polyurethane foam" and "flexible polyurethane foam products" manufactured by You or any other company named as a Defendant in MDL 2196. This definition is meant to, and does, conform to the definition of "Polyurethane Foam" to which the parties agreed in connection with Plaintiffs' document requests and interrogatories served previously in these consolidated actions.

3. "Defendant" refers to any party named as a defendant in MDL 2196.

4. The term "about" when applied to a specific date means within a range of seven days before or seven days after that date.  When applied to a specific month, it means within a range of two months before or two months after that month.  When applied to a specific year, it means a range of one year before or one year after that year.

5. The terms "and" and "or" are to be read interchangeably so as to give a particular request in which either or both is used the broadest possible meaning.  The term "and/or" is used to give a request a sufficiently broad enough scope so that You do not fail to produce responsive documents because the term "and" or "or" is used instead.

6. The term "Class Plaintiffs" refers to the Class Plaintiffs in MDL 2196.

7. The term "competitor" means any manufacturer, other than Your company, that produced, marketed, sold or distributed Polyurethane Foam.

8. The term "concerning" is to be given the broadest possible interpretation, such that it includes "relating or related to," "describing," "containing," "identifying," or "pertaining to" the subject matter in the deposition subject.

9. The term "conspiracy" means any understanding or agreement.

10. The term "data" means words or numbers, including any information maintained on a computer hard drive, floppy disk, or in any other electronic format.

11. The term "document" or "documents" means all papers, computer or electronic records (including, in particular, electronic or paper versions of e-mail messages), photographs, videotapes or other things within the scope of Rule 34(a) of the Federal Rules of Civil Procedure, which are in Your possession, custody or control, or the possession, custody or control of Your attorneys or any other person or entity who is (or was) Your agent or representative.  Documents

generated by another party or non-party and in Your possession, custody or control are within the scope of this request. With regard to information maintained by electronic means, the terms "document" and "documents" include data processing and computer printouts, tapes, disks, and information stored in computers or data processing equipment, together with programs and program documents necessary to retrieve, read and use such data, and all other mechanical or electronic means of storing or recording data. All drafts and non-identical copies are separate documents and should be produced.

12. The term "including" always means "including without limitation" and should not be construed as limiting the topic in any way.

13. The term "Direct Action Plaintiff(s)" means all plaintiffs named in all direct action complaints pending in MDL 2196 as of September 1, 2013.

14. The term "Class Representative Direct Purchaser Plaintiff(s)" means the named representative direct purchaser class plaintiffs in the direct purchaser class consolidated amended complaint in MDL 2196 as of September 1, 2013.

15. The term "meeting" means the contemporaneous presence of two or more natural persons (whether in person or via any electronic method of communication including but not limited to all telephonic and computer-assisted communications), whether such presence was by chance or pre-arranged, formal or informal, business or personal, and whether or not such presence occurred in connection with some other activity or purpose.

16. The term "inputs" includes raw materials.

17. The term "nameplate capacity" means the output that a facility was intended to produce (stated in increments such as tons/day, tons/month or tons/year) according to its design or engineering specifications.

18. The term "persons(s)" or "people" includes any natural person, corporation, company, organization, partnership, association, trade association, sole proprietorship, joint venture, government agency and any other business entity. The term "person" or "people" as applied to an entity (as opposed to a natural person) includes not just the entity but also its current and former officers, directors, employees and agents. The term "person" or "people" also includes each Defendant.

19. The term "practical capacity" means the output a facility can produce (stated in increments such as tons/day, tons/month or tons/year) assuming normal downtime for scheduled turnarounds, maintenance, repairs and holidays.

20. The temporal reference to the "present" with respect to the date of Your answer in response to a topic below refers to the date on which You testify.

21. The term "purchase" includes any transfer for something of value, including transfers made pursuant to a swap or trade arrangement of any sort whatsoever with any competitor.

22. The phrase "inputs" means the products, chemicals, and all other raw materials used to manufacture Polyurethane Foam.

23. The term "sales" includes any transfer for something of value, including transfers made pursuant to a swap or trade arrangement of any sort whatsoever with one or more competitors.

24. The term "theoretical capacity" means the output a facility can produce (stated in increments such as tons/day, tons/month or tons/year) assuming it produces at maximum throughput and is on line and available to operate twenty-four hours per day, seven days per week, for the entire year.

25. The term "utilized capacity" means the actual output that a facility produced (stated in increments such as tons/day, tons/month or tons/year).

## II. INSTRUCTIONS

1. Pursuant to Fed.R.Civ.P. 30b6, please designate one or more people authorized by You to testify on Your behalf and bind You with respect to Your answers to each of the topics below. If You designate more than one person to testify with respect to a given topic, please identify the witness and the topic(s) for which he/she is being designated to testify. Please be sure that Your designated witness(es) are properly prepared and knowledgeable to testify in response to the topics below. Please identify the witness(es) designated for a given topic below at least 10 business days before he/she is deposed.

2. A given topic below may use the present tense of a verb to describe a topic. The verb tense is used solely for convenience. Each topic below pertains to facts, conduct and events in the past and in the present.

3. You are requested to designate to Plaintiffs, at least ten (10) business days prior to the deposition, one or more officers, directors or other individuals who consent to testify on Your behalf, and provide all information known or reasonably known to You, as the person most knowledgeable, with respect to the topics of examination set forth below.

4. Plaintiffs reserve the right to supplement or modify the topics of examination set forth below based on any meet/confer with defense counsel or further developments in MDL 2196.

## II. GEOGRAPHIC SCOPE AND RELEVANT TIME PERIOD

1. The geographic scope of the topics below is North America.

2. The relevant time period of each topic is January 1, 1999 to the present.

## III. TOPICS OF EXAMINATION

**Organizational structure**

      1.      The identity of Your parents, subsidiaries, affiliates and joint ventures, if any, and their relationship to each other.

      2.      The identity of any of Your employees or officers with decision-making authority for Your manufacture, levels of production, changes in the level of production, distribution, pricing, changes in pricing, or sale of Polyurethane Foam, whether to open or close a Polyurethane Foam plant, or which Polyurethane Foam products to manufacture; the identity of the person(s) to whom he/she reports; and the identity of the person(s) who report to him/her.

      3.      The dates of employment, titles, employment history and responsibilities within Your company of each person identified in "2."

**Manufacture or Sale of Polyurethane Foam**

      4.      The location of each plant where You produce or have produced Polyurethane Foam, the identification of each Polyurethane Foam product that You produced at each plant, and the time period during which You produced each Polyurethane Foam product at each plant.

      5.      The date when You opened each of Your plants that manufactured Polyurethane Foam, how many lines each plant had to manufacture Polyurethane Foam, the applications to which the Polyurethane Foam You manufactured at each plant was put (*e.g.*, furniture and bedding, automotive, etc.), where each plant was located, and the date, if any, when You closed a plant or sold a plant (and, if You sold it, then to whom and a description of the financial terms and conditions of the sale).

      6.      The date(s) when You either closed any of Your plants that manufactured Polyurethane Foam or stopped production of Polyurethane Foam on a line that manufactured Polyurethane Foam and the reason(s) why You closed the plant or stopped the manufacturing line.

      7.      The identification of any State in the United States (excluding Alaska and Hawaii) into which You contend You were unable to supply Polyurethane Foam for purchase during the relevant time period due to geographic or other competitive limitations on Your ability to distribute Polyurethane Foam to such State(s), including the beginning and end (if any) of the time period during which You contend You were unable to supply Polyurethane Foam to the State(s) so identified, and the reason(s) You contend were unable to supply Polyurethane Foam to the State(s) so identified.

      8.      The identity of companies that exited the market for the manufacture of Polyurethane Foam and the date(s) of its/their exit and the location of those companies' plants that manufactured Polyurethane Foam.

9. The identity of companies that entered the market for the sale of Polyurethane Foam and the date(s) of its/their entry and the location of those companies' plants that manufactured Polyurethane Foam.

10. The time periods, if any, when You placed any named Class Representative Direct Purchaser Plaintiff or any Direct Action Plaintiff on allocation for the sale of Polyurethane Foam and Your reason(s) for doing so.

11. The quantity of Polyurethane Foam that You manufacture by plant and by manufacturing line reported on whatever periodic basis You capture such information (*e.g.*, monthly, quarterly, etc.)

12. Any data and/or summary reports You keep or kept regarding the quantity of Polyurethane Foam that You manufacture, including the format in which You keep or kept such data.

13. The reason(s) why You decided to increase or decrease Your production of Polyurethane Foam.

14. The identity of the person(s) who decided to increase or decrease Your production of Polyurethane Foam.

15. Whether, when, and why, You started, stopped or changed Your level of production of Polyurethane Foam at each of Your plants.

16. For each of Your plants in which you manufacture Polyurethane Foam, that plant's annual nameplate capacity, theoretical capacity and practical capacity to produce Polyurethane Foam, and the explanation of the reason(s) for changes, if any, in any of those capacity levels and when those changes (if any) occurred.

17. The extent to which, if at all, any of Your plants switched from manufacturing Polyurethane Foam for one application (*e.g.*, furniture and bedding or any other application) to manufacturing Polyurethane Foam for another application (*e.g.*, automotive or any other application), including the dates of those switches, the applications for which You manufactured Polyurethane Foam before the switch and then after the switch, whether as part of the switch You had to change any aspect of Your manufacture of the Polyurethane Foam in terms of manufacturing process, labor or materials, and the costs to You, if any, associated with making the change.

18. If You cut or shape Polyurethane Foam at Your plant, combine Polyurethane Foam with another material, or add any Ingredients other than isocyanates, polyols, blowing agents, retardants, colors, catalysts or fillers to the Polyurethane Foam that You produce, the identity and description of: (A) whatever other methods You apply/use and Ingredients You add to the Polyurethane Foam that You manufacture; (B) the costs (if any) that You incur for those methods and Ingredients; and (C) any data and/or summary reports reflecting those costs.

19. The geographic scope of Your Polyurethane Foam business, including the geographic locations where You sell Polyurethane Foam.

20. The description of the method or methods that You use to manufacture Polyurethane Foam, the time periods during which You used a specified method to manufacture Polyurethane Foam and, if You changed methods to manufacture Polyurethane Foam, then the reason(s) for the change.

21. The identity of the inputs that You use to manufacture Polyurethane Foam, and the identity of the supplier or suppliers from whom You purchased or obtained each of the inputs.

22. Your inventory capacities and practices and procedures for inventory of Polyurethane Foam.

**Manufacture of Inputs to Produce Polyurethane Foam**

23. Whether, if at all, You manufacture any input(s) to Polyurethane Foam, the identity of the input(s) and the time period during which You manufactured that/those input(s).

24. Why, if at all, You stopped manufacturing any input(s) to Polyurethane Foam and when You stopped manufacturing that input.

25. If You manufacture any input to Polyurethane Foam, whether, why, and when You sell/sold that input to other companies that manufacture Polyurethane Foam and whether and when (if at all) You manufacture(d) the input exclusively for self-supply.

26. If You manufacture any input to manufacture Polyurethane Foam, then any data and/or summary reports reflecting Your cost to manufacture that input, and the explanation for those costs, including how You determined the cost and the components of the cost.

27. If You manufacture any input to Polyurethane Foam, then any data and/or summary reports reflecting the price that You charge Yourself for that input, the explanation for that price, including how You determined the price and the components of the price, and whether the price is "booked" as a price or accounting entry or if funds are actually transferred between Your companies or divisions at the time of "sale" or at any other time.

28. If You manufacture any input to manufacture Polyurethane Foam, then any data and/or summary reports reflecting the price at which You sell or sold that input, if at all, to other companies who manufacture Polyurethane Foam, the explanation for the price, including how You determined the price and the components of the price, and whether the price is actually paid by the purchaser at the time of "sale" or "booked" later as an accounting entry.

29. The cost to You of all inputs which You use to manufacture Polyurethane Foam, and any changes in those costs during the relevant period.

**Costs**

30. The identity and quantification of all costs, including without limitation, fixed, variable, semi-variable, marginal and other costs, You incurred and/or reported on an annual or other periodic basis both in the aggregate and on a plant-specific and product-specific basis in

6

connection with the production, pricing, sale, marketing, holding in inventory, or distribution of each specific type of Polyurethane Foam that You manufacture, distribute and/or sell, including without limitation, accruals, related adjustments and amortization of maintenance and shutdown costs, and the manner in which You accounted for production of multiple products at a single plant, production line, or machine.

31. Any data and/or summary reports you keep or kept reflecting Your costs to manufacture and sell Polyurethane Foam, and the description of those costs.

**Pricing or Sale of Polyurethane Foam**

32. How You price Polyurethane Foam that You sell to Your direct purchaser customers, including to each named Class Representative Direct Purchaser Plaintiff, and each Direct Action Plaintiff.

33. How You identify and/or select opportunities, submit bids, negotiate prices, terms and conditions, and finalize contracts and/or spot market transactions for the sale of Polyurethane Foam.

34. How You determine the timing and amount of price increases for Polyurethane Foam that You sell to Your direct purchaser customers, including to each named Class Representative Direct Purchaser Plaintiff and each Direct Action Direct Purchaser Plaintiff.

35. How you announce price increases for Polyurethane Foam that You sell to Your direct purchaser customers, including to each named Class Representative Direct Purchaser Plaintiff and each Direct Action Direct Purchaser Plaintiff.

36. Your practice of guaranteeing or otherwise fixing prices for periods of time for Polyurethane Foam that You sell.

37. How you determine the amount of surcharges for fuel or any other items or services that you charge to Your customers in connection with Your sale of Polyurethane Foam.

38. All of the factors, if any, that You consider in pricing Polyurethane Foam to customers generally and to any Class Representative Direct Purchaser Plaintiff and any Direct Action Plaintiff in particular.

39. The specific prices and/or amounts, including any credits, discounts, rebates and other charges or debits to the price or amount, by transaction and in the aggregate, at which You sold Polyurethane Foam to any Class Representative Direct Purchaser Plaintiff and any Direct Action Plaintiff from 1999 to the present, including the identification, interpretation, and explanation of Your data and data codes which reflect such prices and/or amounts.

40. A description of audits or financial reviews, if any, that You performed, or any named Class Representative Direct Purchaser Plaintiff or any Direct Action Plaintiff performed, to confirm that the price(s) of Polyurethane Foam that You charged to any of them complied with a pricing provision (if any) in Your supply agreement with that customer.

7

41. If You cut, shape or add any Ingredients other than isocyanates, polyols, water and catalysts to the Polyurethane Foam that You produce, how those actions or Ingredients are included in the price of Polyurethane Foam that You sell.

42. Your use of any formulas to set the prices or the amount of price increases for Polyurethane Foam that You sell.

43. Your data and summary reports reflecting the price(s) at which You sell Polyurethane Foam to Your direct purchaser customers.

44. The methods that You use to ship Polyurethane Foam to Your customers, the costs associated with shipment, Your shipment options, and the geographic area to which You ship Polyurethane Foam manufactured from Your plant(s).

45. Whether, if at all, You sell Polyurethane Foam to, and/or swap or trade Polyurethane Foam with, any other Defendants, why do so, the identity of any ledger or document that details Your sales/swaps/trades involving Polyurethane Foam with any other Defendant, the identity of Your data and summary reports reflecting or referring to the quantity and price of those sales/swaps/trades, the explanation of how You determined the price at which You sold/swapped/traded Polyurethane Foam with any other Defendant, and the identity of the consideration, if any, for the sale/swap/trade.

46. The description of the process by which prices for Polyurethane Foam were negotiated upon the expiration of a contract between You any Class Representative Direct Purchaser Plaintiff or any Direct Action Plaintiff.

47. The description of Your profit margins on Polyurethane Foam that You sell, and an explanation of how those margins increased or decreased over time depending upon the costs of the inputs and ingredients that You used to manufacture the Polyurethane Foam.

48. The description of the impact on Your business of changing the price of Polyurethane Foam that You sell.

**Communications with Polyurethane Foam Competitors**

49. The identity of Your current and former officers, directors, employees and anyone else acting on Your behalf (other than Your lawyers in connection with MDL 2196) who communicated in writing or orally with a person employed or acting on behalf of any Defendant (other than a Defendant's lawyers in connection with MDL 2196) regarding the price or pricing of Polyurethane Foam, any price change in Polyurethane Foam, the sale of Polyurethane Foam to a customer, and/or You or a Defendant not selling Polyurethane Foam to a customer.

50. The identify of Your current and former officers, directors, employees and anyone else acting on Your behalf (other than Your lawyers in connection with MDL 2196) who communicated in writing or orally with a person employed or acting on behalf of any Defendant (other than a Defendant's lawyers in connection with MDL 2196) regarding maintaining, increasing or fixing prices of Polyurethane Foam, not selling Polyurethane Foam to a customer

8

or geographic area, or otherwise not competing on the manufacture, pricing or sale of Polyurethane Foam.

51. The identity of all people whom You identify in response to the immediately two preceding Topics, and anyone else for that matter, whom You fired, suspended, demoted, docked pay, or reprimanded in any way, or whose resignation or retirement You accepted, in connection with or because of that person's communication, or knowledge of communication, with anyone employed or acting on behalf of another Defendant regarding the manufacture, marketing, pricing, distribution or sale of Polyurethane Foam.

52. The identity of the Trade Associations to which You belong whose members include Polyurethane Foam manufacturers, the identity of the person(s) who attend those Trade Associations meetings, and the date(s) of his/her/their attendance at each Trade Association meeting.

53. The identity and description of all of Your communications with BASF, Dow, Bayer, Huntsman and/or Lyondell (the "Chemical Companies") regarding: Your desire, intention or encouragement for any of the Chemical Companies to increase Polyol or isocyante prices for any reason, including, without limitation, in order for You to maintain or increase Your price of Polyurethane Foam; and/or any information that You conveyed to any of the Chemical Companies about an agreement or understanding between or among Defendants to maintain or increase prices of Polyurethane Foam or to allocate in any way the sale of Polyurethane Foam sold by two or more Defendants.

54. Your communications with any Named Representative Direct Purchaser Class Plaintiff or any Direct Action Plaintiff (or its supplier) about the pricing or sale of Polyurethane Foam.

55. The identification and description of Your antitrust compliance or functionally similar business ethics guidelines or program (collectively the "Guidelines"), to whom in Your company those Guidelines were distributed (if any), and the identity, date and description of any violations or breaches of those Guidelines reported to You that pertained to any officer, director, employee or other person acting on behalf of You (other than Your lawyers in MDL 2196) communicating with any competitor regarding the manufacture, pricing, distribution or sale of Polyurethane Foam.

56. The identity of current and former employees who provided written or oral information to any law enforcement or regulatory authority concerning anticompetitive conduct in the production, pricing, marketing, sale, or distribution of Polyurethane Foam.

**Financial Statements**

57. The explanation of the line entries in Your financial statements starting with the following Bates Number: HSM_FoamMDL000024775.

58. The identification, explanation and interpretation of Your transaction data produced in MDL 2196, including any codes and fields for a determination of the prices, quantities, form and type of Polyurethane Foam that You sold from 1999 to the present.

9

59. The financial performance of Your Company.

**Miscellaneous**

60. The facts and documents that support the defenses that You have alleged in Your Answer and Defenses in response to the most recent Direct Purchaser Consolidated Class Action Amended Complaint, Indirect Purchaser Consolidated Class Action Amended Complaint, and each Direct Action Complaint or Amended Complaint in MDL 2196.

61. Your efforts to search for, identify, collect, produce and preserve documents in this litigation or any other investigation or litigation involving Polyurethane Foam.

62. The identity of all past and present employees whose documents You identified, collected, reviewed, searched, or considered identifying, collecting, reviewing, or searching in connection with Your efforts to identify, collect and produce documents for this litigation or any other investigation or litigation involving Polyurethane Foam.

63. The destruction, loss, misplacement, redaction, deletion of, or inability to recover any documents relevant or potentially relevant to this litigation or responsive to the MDL 2196 Plaintiffs' discovery requests, including without limitation the dates that such documents were destroyed, misplaced, redacted or rendered no longer available or reasonably available for discovery purposes, the contents thereof, and the reasons for their destruction, loss, or alteration.

64. Your document retention and document destruction policies, practices and procedures in force at all relevant times, including the applicability or inapplicability of those policies, practices and procedures to documents relevant or potentially relevant to this litigation.

65. The mechanisms and/or systems, including but not limited to software or other computer programs, used by You to create, store, back-up and recover documents relevant or potentially relevant to this litigation.

66. Your on-going efforts to investigate, identify, preserve, collect and produce documents and things responsive or potentially responsive to Plaintiffs' discovery requests and relevant or potentially relevant to this litigation.

67. The existence, description, and location of documents relevant or potentially relevant to this litigation and responsive or potentially responsive to Plaintiffs' discovery requests.

68. The description of the fields and data in, and Your commercial use of, the transactional data that You produced to Plaintiffs in MDL 2196, including, without limitation, the data that You produced pursuant to Court Orders in MDL 2196 at EDF 242 and 245.

69. The electronic data processing systems, programs and outputs that You used to record, store, compute, analyze or retrieve any information relating to the sale, cost, production, pricing, marketing, distribution, profitability or inventory of Polyurethane Foam.

## **CERTIFICATE OF SERVICE**

I certify that on January 9, 2014, I caused a true and correct copy of the foregoing document to be served on counsel via ECF.

/s/     *Charles E. Tompkins*

Charles E. Tompkins