IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | |
|---|---|
| In re Polyurethane Foam Antitrust Litigation | Case No. 10 MD 2196 |
| | QUESTIONS FOR THE HEARING ON CLASS CERTIFICATION |
| This document relates to: ALL CASES and 13-pf-10004 | JUDGE JACK ZOUHARY |

The format for the January 15, 2014 Hearing on the pending Motions for Class Certification (Docs. 577 & 584), Motion for Leave to Amend Answer to Direct Purchaser Plaintiffs' Consolidated Amended Class Action Complaint (Doc. 828), and Motion to Compel Arbitration (Case No. 13-pf-10004, Doc. No. 24) is revised as follows:

> 9:00 a.m. – 11:30 a.m.: Direct Purchasers' Motion (Drs. Leitzinger, Ordover, and Burtis)
> 1:00 p.m. – 3:00 p.m.: Indirect Purchasers' Motion (Drs. Lamb and Ordover).
> 4:00 p.m.– 5:00 p.m.: Arbitration motions and other matters (questions to be filed on January 10, 2014).

At the beginning of each session, all experts for that session will be sworn. This Court, the experts, and counsel for each side will then engage in a discussion, structured around this Court's questions. That conversation may include back-and-forth directly between the experts, in a point/counterpoint fashion, with this Court moderating. For instance, this Court may ask Dr. Leitzinger to comment on Dr. Ordover's critiques with respect to an aspect of his impact model, then ask Dr. Ordover to respond, and so on. This Court may invite counsel to join in the legal aspects of that discussion, or comment on the legal consequences of the expert back-and-forth (*e.g.*, what would follow, as a legal matter, from accepting or rejecting a particular expert's criticisms). Counsel in each session may also make "opening statements"(not to exceed 10 minutes each, delivered before discussion with the experts) that show why Plaintiffs have or have not met Rule 23's requirements.

**Direct Purchasers' Motion for Class Certification**

**Miscellaneous**

1. Discuss Dr. Ordover's statement that it "makes no economic sense" to include within one class the buyers of both slabstock and underlay, when, according to Dr. Ordover, these products are not demand-side substitutes and have differing production methods (Ordover Direct Purchaser Rep. at 29).  (*See also* Def's Direct Purchaser Oppos. at 9) (arguing the class definition "is akin to including firewood, dining tables, and printer paper in the same class because all originate from trees.").  Discuss also Defendants' arguments regarding Direct Purchasers' ability to show impact with respect to fabricated products, which are priced on a "per piece basis" (*see* Def's Direct Purchaser Oppo. at 38).

2. If defenses to liability are common to the class, how does that fact affect predominance analysis (*see* Direct Purchaser Reply at 1) (noting "evidence, *as well as Defendants' arguments* on liability, are indisputably common to the class) (emphasis original)?

3. Must Plaintiffs make some demonstration of ascertainability of the class?  *See In re High Tech Employees*, 2013 WL 5770992, at *7 (N.D. Cal. 2013) (noting that "while Rule 23(a) is silent as to whether the class must be ascertainable, courts have held that the Rule implies this requirement as well").

4. Discuss Direct Purchasers' contention that this Court has already resolved the sole basis for Defendants' Rule 23(a) typicality and adequacy objections.

5.  How do courts in similar cases resolve claims that a plaintiff has failed to carry a Rule 23 burden when the lack of data prevents some aspect of a statistical model from producing results in a particular way (*i.e.*, Dr. Ordover's criticism of Dr. Leitzinger's model for not returning enough statistically significant results, and Dr. Leitzinger's reply that statistical significance is a function of sample size)?

6.  Discuss Dr. Ordover's criticism of a "check box" approach on coordination matters (*see, e.g.*, Ordover Direct Purchaser Rep. at 33). Discuss Defendants' comments regarding conscious parallelism (*see* Def's Direct Purchaser Oppos. at 22).

**Impact**

7.  Discuss the following view on what it means to show impact on a classwide basis: A putative antitrust class *must* produce a statistical model that returns statistically significant impact results for all or nearly all customers. If data flaws (*i.e.*, data shortages, incomplete data fields) prevent that demonstration from being made as statistical matter, there is no antitrust impact as a legal matter with respect to the customer represented by the flawed data (*see* Ordover Indirect Purchaser Rep. at 96) ("Dr. Lamb cannot show antitrust impact for these customers excluded from his statistical analysis."). With enough such "missing" customers, an antitrust class cannot show classwide impact as a statistical matter, and therefore cannot make that showing as a legal matter. Inferences as to these "missing" customers' experiences cannot be drawn from a statistical model's impact results for other customers.

8. Assuming for purposes of discussion that Dr. Leitzinger's regression models function as described in his initial report, why do those models, which purport to analyze the effect of price increase letters on *individual purchases* by *individual buyers*, not incorporate the various complicating factors Dr. Ordover cites (*e.g.*, the presence of purchase contracts, localized competition)?

9. Discuss Dr. Leitzinger's explanation for why his model appears to return counterintuitive results with respect to, for instance, the relation between his demand regressors and price.

10. Discuss Defendants' contention that because Leitzinger's model "ignor[es] time sequences" it fails to fit Direct Purchasers' liability theory (*see* Def's Direct Purchaser Oppos. at 53).

11. Discuss the impacted-revenues/impacted-master billing IDs dispute, and whether the former mode of reporting results can support a conclusion that impact with respect to all or nearly all Direct Purchasers is susceptible of classwide proof.

12. How many of the 9,478 "customers" for which no results could be found when Dr. Burtis inserted Mohawk's transactional data into Dr. Leitzinger's models were unique to Mohawk (*i.e.*, did not purchase any foam product from any other Defendant)?  Of the non-unique, or shared, customers, how many have positive impact coefficients with respect to purchases made from another Defendant?

4

13. Dr. Ordover looks at the universe of master billing IDs in Dr. Leitzinger's dataset and identifies the portion of that universe for which no impact coefficient is estimable. That universe totaled 18,668, and apparently did not include Mohawk data (Ordover Rep. at 134 fig. 26). Dr. Burtis notes more "customers," apparently meaning master billing IDs, in the Mohawk dataset than appear in all other Defendants' transactional data combined. Including Mohawk data, how many master billing IDs exist related to transactions for all Defendants? How many of those master billing IDs failed to return impact coefficients? Returned positive impact coefficients? Returned negative impact coefficients?

14. During the October 2013 deposition of Dr. Burtis, this Court understands there to be discussion of the following event: Apparently Dr. Burtis's firm attempted an appropriate "clean up" of Mohawk data that Dr. Leitzinger did not use in his initial report. Relevant here, that cleaning process appeared to include an attempt by Dr. Burtis's firm to create "master billing IDs" for the Mohawk data -- Dr. Leitzinger had not analyzed the data and so did not create this data field himself, as he did with respect to other Defendants' transactional data.

Counsel for Direct Purchasers showed Dr. Burtis what appears to be an SAS printout that tracked the various steps in her firm's "clean-up" so that the steps could be replicated. Counsel for Direct Purchasers posed a line of questioning that appeared aimed at uncovering whether the step reflected in the SAS printout line beginning "MHK.&datatype" meant that the staff member cleaning the data had simply renamed the data field "sold to" to "MBIDs," and whether that step fit Dr. Leitzinger's approach to generating a master billing ID (*see* Doc. 744, Ex. 110, at 9–12). Did the Burtis approach to creating master billing IDs conform to the

5

Leitzinger approach (*see* Leitzinger Rep. at 58 n. 337), so that the Burtis Report's listing of the number of Mohawk "customers" for which impact coefficients were estimable (or estimable at statistically significant levels) is comparable on an "apples-to-apples" basis with Dr. Leitzinger's results?

15. Provide the number of "customers" in the Burtis analysis for which impact coefficients are not estimable because of collinearity *and not* because of the limited number of observations included in the dataset for that master billing ID (*see* Doc. 744, Ex. 110, at 20) ("[Counsel for Direct Purchasers]: And what is your understanding of the number of instances where solely because of collinearity there is no result coming out of the model? [Dr. Burtis]: I don't remember if I ever separated those two problems out and counted the number of customers that fall into those two buckets. So I'm not sure as I sit here.").

16. Why did Dr. Leitzinger choose not to use a scrap cost index for those Defendants that have always purchased scrap on the open market (*e.g.*, Mohawk), or that have purchased scrap on the open market since a date certain (*e.g.*, Leggett & Platt)?

**Damages**

17. Discuss the standard by which this Court should review whether damages are susceptible of proof on a classwide basis. How deeply need this Court probe into the damages model, considering *Comcast* and its progeny (*see* Def's Direct Purchaser Oppos. at 10) (arguing *Comcast* established, among other things, that "how individual . . . damages *can and will be* calculated for class members . . . is not something that can be put off until after class certification") (emphasis added).

6

18. Discuss Dr. Leitzinger's claim that the specific factor that his persistence measure would take on is a merits-stage question because it relates to quantum of impact. Does Dr. Leitzinger envision that there would be one persistence factor or a persistence factor for each price increase letter? Does a single persistence factor skew persistence damages in any particular direction, considering that the spacing of price increase letters varied substantially throughout the class period? Discuss, and provide citations for, similar cases in which persistence damages have been featured. Discuss, also, Dr. Ordover's claim that this element of the damages theory is mismatched to the impact theory.

19. Dr. Leitzinger asserts that his proposed model contains "no imputation (let alone awarding) of damages to individual members of the proposed class" (Leitzinger Reply. Rep. at 59), but instead calculates damages on a classwide basis only. How, then, would Direct Purchasers allocate this classwide damages sum to individual class members? Must that method be presented at this stage of the proceedings (Direct Purchaser's Reply only states that damages "may be divided among class members based on the transaction-level impact analysis" (Direct Purchaser Reply at 19))? Would a portion of this classwide damages amount be allocated to master billing IDs with *no* estimable positive impact coefficient? If so, by what method would that amount be determined and allocated?

7

20. Dr. Leitzinger includes in his Report a description of the manner in which he claims his impact model "can be used to calculate overcharges for the proposed Class . . . in a formulaic fashion" (Leitzinger Rep. at 63). When Dr. Leitzinger multiplies the amount of price increase attributable to the conspiratorial activity in a given quarter for a given product and Defendant, by "the purchases of that product type from that defendant during the quarter" (Leitzinger Rep. at 63), does he include in those "purchases" the purchases of master billing IDs for which no impact coefficients are estimable?

**Indirect Purchasers' Motion for Class Certification**

**Miscellaneous**

1. Must Plaintiffs make some demonstration of ascertainability of the class? *See In re High Tech Employees*, 2013 WL 5770992, at *7 (N.D. Cal. 2013) (noting that "while Rule 23(a) is silent as to whether the class must be ascertainable, courts have held that the Rule implies this requirement as well").

2. How do courts in similar cases resolve claims that a plaintiff has failed to carry a Rule 23 burden when the lack of data prevents some aspect of a statistical model from producing results in a particular way (*e.g.*, Dr. Ordover's criticism of Dr. Lamb's retailer passthrough as relying on a small and unrepresentative set of retailer data)?

3. Discuss Dr. Ordover's criticism of a "check box" approach on coordination matters (*see, e.g.*, Ordover Direct Purchaser Rep. at 33). Discuss Defendants' comments regarding conscious parallelism (*see* Def's Direct Purchaser Oppos. at 22).

4. Discuss Defendants' view that the inferences Dr. Lamb draws from market structure should be dismissed because Dr. Lamb "never . . . attempted to define the relevant product and geographic markets" in the course of his analysis (Def's Indirect Purchaser Oppos. at 7).

5. Discuss in greater detail Defendants' arguments that the variety of state-law claims Indirect Purchasers assert make the proposed class definition unmanageable. Provide specific examples of how the "ample management tools at [this] Court's disposal" could be used to adjudicate those claims (*see* Indirect Purchaser Reply at 7).

    **Impact**

6. Discuss Dr. Ordover's conclusion that it would make no sense in a competitive market for an overcharge passthrough to exceed 100 percent.

7. Why did Dr. Lamb choose to use ICIS cost data for the input cost variable? Did he consider BLS data? If so, why did he reject that source?

8. Dr. Ordover cites economics literature that discusses the conditions under which, as a matter of theory, the law of one price is thought to apply (*see* Ordover Indirect Purchaser Rep. at 105) (noting these conditions to include "product homogeneity, zero transaction costs, zero search costs, no informational asymmetries, and no market imperfections"). No party appears to claim that the distribution channels entirely conform to those conditions. What does that lack of fit mean for whether the law of one price likely applies in this case, or how it applies?

9. Discuss Dr. Lamb's view that it would not be "relevant" to examine OEM and retailer transaction data to determine whether passthrough occurred in fact (*see* Def's Indirect Purchaser Oppos. at 10–11).

10. Discuss Defendants' characterization of the Lamb Direct Purchaser regression as accomplishing the very thing that Dr. Leitzinger attempted to avoid in his models' impact calculation (*i.e.*, the aggregation of individual Direct Purchasers' experiences (*see* Leitzinger Rep. at 61)).

11. Dr. Ordover and Defendants criticize Dr. Lamb's Direct Purchaser regression as failing to fit Indirect Purchasers' theory of the case by calculating for all Direct Purchasers a single average overcharge rate throughout the Class Period.  That approach, Defendants argue, completely ignores the effects of individual price increase letters, and assumes impact during periods when there is no reason to expect impact existed with respect to foam sales because no price increase letters had been issued for relatively long periods of time.

    Discuss the Indirect Purchasers' reply that the price increase letters were only one mechanism by which Defendants signaled and enforced the conspiracy.  What effect did the conspiracy have on prices during those portions of the Class Period in which relatively long periods of time separated price increase letters?

12. Dr. Lamb lists a variety of ways in which he claims Indirect Purchasers could be identified. By Dr. Lamb's description, the methods appear to not be employed with respect to products sold in each of the Indirect Purchaser states.  For instance, Dr. Lamb only notes that "many states" have enacted mandatory label laws, but does not identify those states.  Likewise, the CRI Green Label program is described in such a way as to suggest that product identification (and therefore association of foam with a particular Defendant) is only possible for qualifying

11

(*i.e.*, "low-emissions") products, but no where do Indirect Purchasers describe the percentage of underlay that is low emissions, whether that portion of the underlay market can be identified, or how identification would occur with respect to non-low-emissions underlay.

Is Dr. Lamb's proposed Indirect Class member identification method speculative in its efficacy, as confirmed by Dr. Robert Maness' attempts at using the methodology to determine which Defendant, if any, produced the foam contained his home and office furnishings (*see* Maness Rep. at 5–6)?  Discuss why that is or is not so, including whether or how this question needs to be addressed as a legal matter or as a statistical matter (that is, whether Dr. Lamb's method, setting aside other issues, requires Class member identification to show impact and damages).

13. How would Indirect Purchasers, who purchased a covered product bearing a relevant label identifying the manufacturer of the product, be able to use that label to identify the manufacturer of the foam contained in the finished product (*see* Ordover Indirect Purchaser Rep. at 119)?

    **Damages**

14. Discuss the standard by which this Court should review whether damages are susceptible of proof on a classwide basis.  How deeply need this Court probe into the damages model, considering *Comcast* and its progeny (*see* Def's Direct Puchaser Oppo. at 10) (arguing *Comcast* established, among other things, that "how individual . . . damages can and will be calculated for class members . . . is not something that can be put off until after class certification").

12

15. Discuss Dr. Ordover's critiques of the Lamb damages method.

16. Even accepting the Vita Defendants' arguments with respect to the Lamb model's ability to establish damages in the manner Vita sees ACERPA requiring, is Vita's position that this Court should deny certification of an Indirect Purchaser class as to Vita *in full*, and not just as to damages?

17. Assume this Court rules against the Vita Defendants on this point, and events proceed according to the Indirect Purchasers' predictions (*see* Indirect Purchaser Vita Reply at 3) (sequencing events so that an ACERPA determination comes after trial). Discuss possible methods for isolating the Vita Defendants' damages in such a scenario (*see id.* at 12).

18. What is the best case (*i.e.*, most factually similar, or most analogous, considering the infrequency of this issue being litigated) in support of Vita's argument that certification is inappropriate because of the potential for ACERPA applying in this case?

IT IS SO ORDERED.

    s/ *Jack Zouhary*
JACK ZOUHARY
U. S. DISTRICT JUDGE
January 9, 2014