IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

In Re:                                              Case No. 1:10 MD 2196

Polyurethane Foam Antitrust Litigation              O R D E R

This document related to: ALL CASES               JUDGE JACK ZOUHARY

Pending before this Court is Direct Purchaser Plaintiffs' ("Direct Purchasers") Motion for Protective Order Regarding Defendants' Subpoenas to Absent Class Members (Doc. 984). Defendants opposed the Motion (Doc. 1021). Direct Purchasers replied (Doc. 1032).

### BACKGROUND

In the latter half of January 2014, Defendants noticed subpoenas on firms in the flexible polyurethane foam industry. In the course of briefing this Motion, Defendants "[a]fter meet-and-confer discussions with counsel [for the subpoenaed parties] and further investigation" withdrew several subpoenas, leaving ten subpoenas (collectively the "subpoenaed parties") which are the subject of this dispute (Doc. 1021 at 3 & n.1) (listing nine remaining subpoenas); (Doc. 1032 at 2 n.1) (clarifying Magna International was "inadvertently omitted" from the collection of subpoenaed parties). The subpoenas seek deposition testimony and requests for production on a relatively broad array of topics (*see* Doc. 1021-9) (exemplar subpoena).

Defendants vacillate as to whether the subpoenaed parties are absent members of the putative Direct Purchaser class, referring (for example) to the subpoenaed parties as "third-party entities" (Doc. 1021 at 2) and premising a later argument on the assumption that the subpoenaed parties are

absent members of the putative Direct Purchaser class (*id.* at 9). Moreover, during a February 21, 2014 phone conference held on a related matter, counsel for the Carpenter Defendants stated he was "surprised" to hear Direct Purchasers contend the subpoenaed parties are absent members of the putative Direct Purchaser class, and that, at most, the subpoenaed parties made only "incidental" purchases of foam products from Defendants.

Incidental or not, if any of the subpoenaed parties purchased Class products from a Defendant during the Class Period, that subpoenaed party falls within the proposed Direct Purchaser class definition, which contains no minimum purchase threshold for membership and does not exclude non-co-conspirator firms or individuals who would otherwise be class members if they also happen to compete with Defendants (*see* Doc. 584 at 2). For purposes of this Motion, this Court assumes the subpoenaed parties purchased a Class product from a Defendant during the Class Period.

## DISCUSSION

Federal Civil Rule 26(c)(1) permits this Court to issue for good cause "an order to protect a party or person [from whom discovery is sought] from annoyance, embarrassment, oppression, or undue burden or expression." This Court may "forbid[] inquiry into certain matters, or limit[] the scope of disclosure or discovery to certain matters." *Id.* at (c)(1)(D).

Direct Purchasers base their opposition to the absent putative class member subpoenas on three grounds. First, Direct Purchasers assert Defendants must "show a particularized need" for discovery requested of a putative class member (Doc. 984 at 4). Second, Direct Purchasers argue the subpoenas seek "downstream discovery," despite this Court's prior Orders deeming such discovery improper for purposes of this MDL litigation (*id.* at 5–7). Third, Direct Purchasers claim the subpoenas are "unduly burdensome and overbroad," and seek to squeeze into the fast-approaching deadline

2

discovery that took three years to complete (*id*. at 7–8). This Court will first address the bookends to Direct Purchasers' Motion -- its particularized-need argument and its undue-burden argument -- before turning to the issue of alleged downstream discovery.

**Particularized Need**

Defendants meet Direct Purchasers' particularized-need argument by noting the U.S. Supreme Court, the Sixth Circuit, and this Court have never required prior court approval for discovery of absent class members (Doc. 1021 at 9). Defendants are correct. Prior to today, this Court has not been asked to wade into a discovery dispute regarding class member discovery, and so has not had a prior occasion to endorse the Manual on Complex Litigation's view (shared by various district courts) that "[d]iscovery of unnamed members of a proposed class requires a demonstration of need." MANUAL FOR COMPLEX LITIGATION § 21.14.

Today this Court endorses the particularized-need rule. That is, if any party seeks discovery of an absent class member in the future, it must first obtain this Court's approval, according to the Manual's framework and case law adhering to the same approach, before that request may issue. That requirement will not apply to the outstanding subpoenas that are the subject of the present Motion -- Defendants, apparently acting in good faith in preparing the subpoenas, should not have held against them their inability to predict this Court's view on absent-class member discovery (even if that view is supported by the weight of case law). The absence of a prior particularized-need showing on Defendants' part is therefore not grounds for quashing the subpoenas.

3

**Burden, Overbreadth, and Timeliness**

Nor is Direct Purchasers' description of the discovery requests as unduly burdensome, overbroad, or "untimely" reason to quash the subpoenas. Defendants represent to this Court in their Opposition that they have accommodated discovery concerns raised by counsel for the subpoenaed parties in the course of meet-and-confer (Doc. 1021 at 8). This Court has no other indications that the subpoenaed parties themselves have concerns regarding the discovery requests. To take an example, this Court's prior phone conference regarding the recent deposition of Flex Foam featured no objection by the subpoenaed party to the deposition topics. Moreover, it is this Court's understanding, based on the phone conference, that Flex Foam complied with Defendants' requests for production without any undue difficulty.

As for the subpoenas' overbreadth, this Court has reviewed the exemplar subpoena submitted in support of Defendants' Opposition to the present Motion (Doc. 1021-9). The subpoena is broad in some respects. But, in this Court's view, the subpoenas are not so overbroad as to warrant quashing. For one, this MDL is itself broad in the topics it addresses. This Court also notes the absence of specific objections from the subpoenaed parties themselves -- either directly, or through class counsel -- as to the subpoenas' topics. Finally, one can read Defendants' subpoenas to reach those "in stream" topics they claim the subpoenas were meant to probe (Doc. 1021 at 7). (*See also* Doc. 1021-9 at 5) (seeking deposition testimony on "[y]our costs of production and delivery of Polyurethane Foam . . . , including by not limited to TDI, MDI, polyols, and scrap or trim foam").

Lastly, as Defendants observe, the subpoenas were served within the fact discovery period. As a result, the subpoenas are timely. While this Court encourages parties to space discovery in such a manner that there is not a "rush" of activity in the waning weeks or days of the fact discovery

4

period, Defendants served these subpoenas more than a month before the impending February 28, 2014 deadline.

**Downstream Discovery**

The troublesome aspect of Defendants' subpoenas is not that they seek discovery from absent class members, or that they are unduly burdensome, overbroad, or somehow untimely. Rather, Defendants' subpoenas can be read -- in fact, read quite easily -- to require production of "downstream" discovery in spite of this Court's prior Orders generally barring such discovery (*see* Docs. 420 & 458).

The exemplar subpoena generally scopes deposition and document production topics by using two terms. First, the subpoenas seek testimony and materials related to "Polyurethane Foam," defined to mean "any type, grade or form of 'flexible polyurethane foam' and 'flexible polyurethane foam products' as those terms are defined and used in the Direct Purchaser Class Complaint ["DPCAC"], [including], without limitation, slabstock, fabricated foam, and molded polyurethane foam," again as defined in the DPCAC (Doc. 1021-9 at 3). Second, the subpoenas seek testimony and materials related to "Polyurethane Foam Products," meaning any "product containing Polyurethane Foam" as the subpoena (and the DPCAC) define that term (*id*.).

Defendants could properly seek discovery from a subpoenaed party who "pours" slabstock, and then sells that slabstock to a third party, about "[t]he conditions, limitations, standards and/or performance requirements required or requested by your customers concerning" that slabstock, which is an "in-stream" product (Doc. 1021-9 at 8); (Doc. 420 at 3) (noting that "if there is competition between the parties, the information sought by Defendants would be relevant"). By contrast, a different subpoenaed party could use slabstock purchased from a Defendant to manufacture, say, a

5

sofa sleeper mattress (*see* Doc. 1021-8 at 2) (touting Prestige Fabricators, Inc.'s sofa sleeper mattresses). Customer "conditions, limitations, and standards" information related to that sofa sleeper mattress, a "Polyurethane Foam Product" because it contains slabstock, would fall within the scope of the subpoena. But this Court's prior "downstream" discovery Orders bar Defendants from probing that topic (*see* Doc. 458 at 2) ("The focus of this case is the manufacturing of foam, not the downstream use or resale of foam products")

With just the exemplar subpoena and minimal information regarding the subpoenaed parties' lines of business -- which apparently include both "in-stream" and "downstream" activities -- this Court determines the most practical method for enforcing the terms of its prior downstream discovery Orders is as follows: Defendants will share with the subpoenaed parties or otherwise inform them in good faith about this Court's downstream discovery Orders. After informing the subpoenaed parties about this Court's prior rulings, Defendants shall inform the subpoenaed parties that they *may* share information that would otherwise be precluded from discovery by this Court's downstream discovery Orders, but that the subpoenaed parties *need not* share such information. *See* Federal Civil Rule 26(c)(1)(D) (permitting a court to "limit[] the scope of disclosure or discovery to certain matters"). It may be the case that a subpoenaed party's document management system mixes information regarding business activity in the different "streams," and cannot easily be separated. This Court does not anticipate any such "sorting" problem with deposition testimony -- that is, the examining party can frame a question so the question only seeks information on the subpoenaed party's dealings in Class products, while avoiding inquiry into resale to third parties further down the distribution chain than Defendants. Therefore, Defendants may not question a deponent on downstream topics.

6

**CONCLUSION**

To close, this Court expects discovery with respect to the subpoenaed parties will conform to Defendants' representations, stated in their Opposition, as to the purpose of the relevant discovery requests (*see* Doc. 1021 at 7) ("Defendants do not seek 'downsteam' discovery . . . [they] seek from the [subpoenaed parties] information regarding products 'in stream' with the products Defendants sell"); (*id.*) (describing the subpoenas as reaching seven areas of inquiry, avoiding "downstream" topics to the extent they inquire about manufacture of Class products). All parties should be careful when drafting discovery requests to avoid matters deemed "off limits" by this Court's prior Orders, and this Order is not intended to modify prior Orders regarding the scope of discovery in this case. The parties have demonstrated they can sift impermissible "downstream" discovery from other permissible topics, and this Court expects they will continue to do so without judicial involvement.

For the reasons above, this Court grants in part Direct Purchasers' Motion.

IT IS SO ORDERED.

                                                          s/ *Jack Zouhary*
                                                        JACK ZOUHARY
                                                        U. S. DISTRICT JUDGE

February 26, 2014