

To:
Cc:
Bcc:
Subject:  MDL 2196 / Plaintiffs' reply in support of their motion to compel the production of requested expert materials in Urethane case

From:  "Bill Blechman" <wjb@kennynachwalter.com>
To:  "'zouhary_chambers@ohnd.uscourts.gov'" <zouhary_chambers@ohnd.uscourts.gov>
Cc:  "Nancy_Sniegocki@ohnd.uscourts.gov" <Nancy_Sniegocki@ohnd.uscourts.gov>,
"'Bradley.Love@btlaw.com'" <Bradley.Love@btlaw.com>,
"'CarpenterServiceList@mcguirewoods.com'" <'CarpenterServiceList@mcguirewoods.com'>,
"'FlexibleFoamService@btlaw.com'" <'FlexibleFoamService@btlaw.com'>, FOAMDAP
<FOAMDAP@kennynachwalter.com>, "'FutureFoamService@kutakrock.com'"
<'FutureFoamService@kutakrock.com'>, "'FXIFoamServiceList@cozen.com'"
<'FXIFoamServiceList@cozen.com'>, "'Hickory.Springs.Service.List@alston.com'"
<'Hickory.Springs.Service.List@alston.com'>, "'InRePolyurethaneFoam@pepperlaw.com'"
<'InRePolyurethaneFoam@pepperlaw.com'>, "'Kendall.Millard@btlaw.com'"
<'Kendall.Millard@btlaw.com'>, "'mmiller@millerlawllc.com'" <'mmiller@millerlawllc.com'>,
"'Mohawk.Foam@alston.com'" <'Mohawk.Foam@alston.com'>, "'PolyurethaneFoam@shb.com'"
<'PolyurethaneFoam@shb.com'>, "'rkerger@kergerlaw.com'" <'rkerger@kergerlaw.com'>,
"'stephenneuwirth@quinnemanuel.com'" <'stephenneuwirth@quinnemanuel.com'>,
"'warncke@taftlaw.com'" <'warncke@taftlaw.com'>, "'wisaacson@bsfllp.com'"
<'wisaacson@bsfllp.com'>, "'WoodbridgeServiceList@gibsondunn.com'"
<'WoodbridgeServiceList@gibsondunn.com'>, "'$ProjectFoamDefense@freshfields.com'"
<'$ProjectFoamDefense@freshfields.com'>, "'jwalsh@mcguirewoods.com'"
<jwalsh@mcguirewoods.com>, "'Kendall.Millard@btlaw.com'" <Kendall.Millard@btlaw.com>,
FOAMDAP <FOAMDAP@kennynachwalter.com>
Date:  03/10/2014 04:51 PM
Subject:  MDL 2196 / Plaintiffs' reply in support of their motion to compel the production of requested expert materials in Urethane case

Dear Judge Zouhary:

Pursuant to Local Rule 7.1(e), Plaintiffs submit this reply in support of their motion to compel Defendants who are direct action plaintiffs in *Urethane* (the "Foamers") to produce the expert reports and backup, and expert testimony, from their direct action case in *Urethane* .

1.　　　　**Timing**: Defendants do not dispute that Plaintiffs' Rule 34 Request was timely under this Court's Scheduling Order, and most all of the requested expert materials did not exist until recently.

Defendants argue that it is too late to turn over the *Urethane* expert materials to Plaintiffs in time for Plaintiffs' initial expert reports.  The timing of the production is entirely *Defendants* ' doing as they (i) refused to produce these materials when Plaintiffs requested on December 27th ; (ii) refused even to talk to us about consenting to access to the materials under the *Urethane* Protective Order; (iii) argued for delay in the *Urethane* court's consideration of Plaintiffs' motion for access; and (iv) refused to produce the requested materials after the *Urethane* court granted Plaintiffs' motion for access.  (Defendants voluntarily produced to Plaintiffs deposition transcripts and sealed documents in *Urethane* after the *Urethane* court granted Plaintiffs access to those materials earlier in this case.)

Contrary to Defendants' argument, Plaintiffs do not intend to request that the expert discovery schedule in this case change if the Court grants our motion. We will deal with Defendants' production of the *Urethane* expert materials just as we must deal with their recent decision to schedule the Rule 30(b)(6) deposition of Defendant Vitafoam on March 18, 2014 – the day *after* Plaintiffs' initial expert reports are due in this case. (We expressed concern to the Court at the February 7, 2014 hearing, Hrg. Tr. at 30:3-5, about substantive depositions occurring after Plaintiffs' reports were due. But Defendants scheduled the Vitafoam Rule 30(b)(6) deposition without conferring with us.) There will be time for Plaintiffs' experts to consider the requested *Urethane* expert materials (just as the Vitafoam Rule 30(b)(6) deposition) before they are deposed in the coming weeks, and Defendants can cross examine Plaintiffs' experts on their opinions, if any, relating to those materials at that time.

2.          **Discovery and Admissibility**: Defendants largely ignore the four (4) separate reasons that Plaintiffs provide for the relevance of the requested expert materials and instead deflect with other points that we address below.

A.          Defendants argue that expert reports by a different expert in another case are not discoverable or usable by an expert in a later case because such reports are not admissible. It is, of course, entirely premature for the Court to rule on the admissibility of the *Urethane* expert reports at this juncture. In fact, there are circumstances in which those reports would be admissible in this case. More fundamentally, Defendants' argument conflates evidentiary concepts and misstates the law.

An expert is permitted to rely on inadmissible hearsay in forming his or her opinion. *Engebretsen v. Fairchild Aircraft Corp.* , 21 F3d 721, 728 (6th Cir.1994) ("Rule 703 allows a testifying expert to rely on materials, including inadmissible hearsay, in forming the basis of his opinion."). That does not, however, necessarily mean that the hearsay relied upon will itself be admissible. *See id.* at 728-29. The Northern District of Ohio has permitted an expert to rely upon expert reports that were prepared in a separate case. In a products liability action, *S.S. v. Leatt Corp.* , No. 1:12-cv-483, 2014 WL 356938 (N.D. Ohio Jul. 15, 2013), the defendant moved to exclude one of plaintiffs' experts. The defendant argued, *inter alia* , that the expert improperly relied on expert reports that were commissioned by the plaintiffs' attorney in another case that involved the same product. *See id.* at *5. The court held that the expert's testimony was admissible, even though it was based upon expert reports prepared in another case. In reaching that conclusion, the court relied upon the Advisory Committee Notes to Fed.R.Evid. 702, which provide that "expert testimony [must] be based on sufficient underlying 'facts or data.' The term 'data' is intended to encompass the reliable opinions of other experts." *Id.* at *8. Urethane chemicals are indisputably the predominant input in making polyurethane foam, and thus, while the products are not the same, we believe them to be sufficiently related or connected as to make the reliance on *Leatt Corp.* reasonable. *See also See Buck v. Ford Motor Co.* , 810 F. Supp. 2d 815, 844 (S.D. Ohio 2011) ("[A]n expert's testimony may be formulated by the use of the facts, data and conclusions of other experts.") (citation omitted); *Ohio Environmental Development Ltd. P'ship v. Envirotest Sys. Corp.* , 478 F. Supp. 2d 963, 974-75 (N.D. Ohio 2007) (permitting an expert to rely upon another expert's

calculations in the same case, even if those calculations were inadmissible).

B.          The urethane conspiracy (2000-2003 according to Defendants' papers at 6 n.6) covers some of the time period of the polyurethane foam conspiracy (1999-2010). We believe that the Foamers' expert uses years after 2003 to benchmark how urethane chemical prices would have behaved during the alleged urethane cartel. The position the Foamers' economist takes in *Urethane*  in explaining urethane chemical prices post-2003 will be related to the position Defendants' economists here take in explaining the relationship between urethane chemical and polyurethane foam prices. For example, the Court will recall from the Class certification hearing that Defendants (including their economic expert, Dr. Ordover, whose firm submits a declaration in support of their response *sub judice* ) purport to justify the increase in polyurethane foam prices in late 2005 (after Hurricane Katrina) and thereafter based upon claimed shortages of urethane chemicals, which supposedly raised the incremental cost of supplying urethane chemicals to Defendants. Plaintiffs' maintain that Defendants' foam prices in that time period were artificially elevated above their urethane chemical costs, and that Defendants used the claimed shortage of urethane chemicals as a cover to conceal supracompetitive conspiracy pricing. We suspect that the economic approach taken by the Foamers' economist in *Urethane*  is in tension with the approach taken by Defendants' economists in this case, which explains why Defendants here are eager to distance themselves from the requested expert materials from *Urethane* .

C.          Contrary to Defendants' statement at page 5 of their papers, the Foamers' expert in *Urethane*  does expressly specify in one paragraph that the urethane economic model accounts for the polyurethane foam conspiracy. *See*  Foamers Response to Plaintiffs' motion to intervene in *Urethane*  at 10-11, Dkt 3135 (D. Kan.).

D.          Defendants do not contest one of the four reasons that we cite for the discoverability of the requested *Urethane*  expert materials: namely, to the extent Defendants contend that Plaintiffs' experts must account for the alleged urethane conspiracy in estimating overcharge damages on polyurethane foam in this case, then the Foamers' expert reports estimating overcharge damages in *Urethane*  are relevant to the effect, if any, of the alleged urethane conspiracy on overcharges on polyurethane foam.

3.          **Chemical data no substitute for reports:** The chemical company pricing data that Plaintiffs already subpoenaed is no substitute for the requested expert materials in *Urethane* . The Foamers' expert reports explain how those chemical prices are used in an econometric model that includes variables beyond just the chemical prices to estimate how urethane chemical prices should have behaved in the absence of the alleged urethane conspiracy. The Foamers' model will account for urethane chemical supply; demand drivers possibly including the demand for polyurethane foam, which is the subject of this case; and explain how market events that are chronicled in this case, including, for instance, Hurricane Katrina in 2005, affected (if at all) the supply of urethane and polyurethane foam supply, price and demand. The backup data that accompanies the Foamers' expert materials in *Urethane*  includes more than chemical pricing data. It includes the code and other data relied on in the Foamer's

economic model, which enables one to understand how their economist estimated overcharges and treated market conditions.

4.          **Disavowing use is not a remedy:** That Defendants proclaim neither they nor their economic consultants in this case will read or use the requested expert materials from *Urethane* indicates to us that they already know that those materials present positions in tension with economic positions that they are taking in this case. *See supra* point 2(B). Besides, the discoverability of the requested expert materials is not determined by whether the producing party would itself use them. If that were the standard, then any party could avoid producing incriminating or unhelpful documents by simply telling the other side that it will not use them in the case.

5.          **Level Playing Field:** Defendants' misstate the facts when they write on page 9 of their Memorandum that "[n]one of Defendants' counsel participated in the *Urethane* case." In fact, Defendant Leggett & Platt's counsel in this case appeared at six depositions in *Urethane* , and in one of them he questioned the witness. Contrary to Defendants' assertion, the Boies Schiller firm does not have access to the requested expert discovery in *Urethane* , its counsel in this case has not appeared in *Urethane,* and the lawyer from the firm previously involved in *Urethane* is now at a different firm.

Based on the foregoing analysis, and the reasons set forth in our opening submission, Plaintiffs respectfully request the entry of an Order compelling Defendants that are direct action plaintiffs in *Urethane* to produce forthwith the expert reports and backup, and expert deposition testimony, in their case in *Urethane* .

      Respectfully submitted,

      William J. Blechman
      Liaison Counsel for Direct Action Plaintiffs
      and Counsel for the Sealy Plaintiffs

      Stephen Neuwirth
      William Isaacson
      Co-Lead Counsel for the Direct Purchaser Class Plaintiffs

      Marvin Miller
      Lead Counsel for the Indirect Purchaser Class Plaintiffs