# Exhibit 1

```
 1                    UNITED STATES DISTRICT COURT
                       NORTHERN DISTRICT OF OHIO
 2                          WESTERN DIVISION

 3     IN RE: POLYURETHANE FOAM      )   Docket No. 10MD2196

 4     ANTITRUST LITIGATION,         )

 5          v.                       )   January 24, 2014

 6                                   )   Phone Conference

 7     ------------------------------

 8                    TRANSCRIPT OF PHONE CONFERENCE
                   BEFORE THE HONORABLE JAMES KNEPP
 9                   UNITED STATES MAGISTRATE JUDGE

10

11     APPEARANCES:

12
       On Behalf of GM:
13     Daniel A. Sasse
       Chahira Solh
14

15     On Behalf of Woodbridge:
       Nicola T. Hanna
16     Dhananjay S. Manthripragada

17

18

19

20

21

22

23

24

25
```

```
1              THE COURT:  Let's turn finally to Woodbridge's
2   motion which is a duel headed monster in terms of the first
3   one being the, what I'll call pejoratively exposed, but
4   the -- I guess my feelings about contention interrogatories
5   which are I don't like them.  I think they -- I think they
6   unfairly cause busy work by folks.  I think there is a
7   very -- there's a very specific time and place for them and
8   I don't think this is either.  I think to some extent the
9   type of things you're basically asking them to respond to a
10  position for summary judgment, to some extent, by
11  completing these types of interrogatories in the first
12  instance and describing documents.  I think that's a --
13  that's just an incalculable amount of work in a case like
14  this, you know.  I -- I understand that you say, well, I --
15  I can't possibly -- I can't possibly know what you're
16  claiming here because these claims are so broad and so --
17  but I don't think it gets you anywhere by saying, okay,
18  tell me every fact and every document that supports the
19  claim that I'm saying is overly broad.  I mean, I think we
20  all know what the claims are here, and I think there's a
21  massive amount of documents here.  And at some point
22  there's going to be some motion practice and that's going
23  to, you know, that's going to cause folks to show what the
24  documents are.  I think you described the categories of
25  documents by -- by a particular description for -- in
```

1  support of a particular claim.  But I think these are -- I
2  think these are hopelessly broad, and I can't imagine the
3  amount of work that would need to be undertaken to respond
4  to these.
5           At the same time, you know, it's something that
6  can't -- can't, by definition, be done until the case is
7  sorted down the road.  I do understand the -- the need to
8  see potentially a -- if there are particular smoking guns
9  or something, that's what I think Rule 26 was designed --
10 Rule 26(A)(1)(A) -- 26(A)(1)(A) -- whatever it is in terms
11 of describing the documents that you're going to use to
12 support your claim.  I -- I presume that you have the
13 benefit of that, and even these questions rise to that but
14 it's probably not until, you know, we get further into the
15 case and start doing some expert discovery and so forth
16 that we're going to be able to see exactly how those
17 documents line up to the theory.  That's what I'm thinking,
18 but I'll give you guys a chance to tell me on the one hand
19 why you think I'm learned hand or on the other hand why you
20 think my crayon must have just broke.
21          MR. HANNA:  Your Honor, this is Nick Hanna from
22 Gibson Dunn for Woodbridge.  Thank you for the opportunity.
23 Let me try to tell you what our problem is and what we're
24 trying to get at.  As a central fact that GM has argued
25 that molded foam is a major issue in this case.  And we

1  frankly can't figure out what they're talking about.  And
2  they've made certain allegations, and we've tried very
3  different ways to get information about what those
4  allegations are based on.  And as you'll hear when we talk
5  a little bit about the disputed custodians, that's also
6  what this issue goes to.  We are trying vitally to figure
7  out what they are talking about in connection with the
8  molded foam claims.  So what we've done is we've propounded
9  what we thought were, you know, fairly -- fairly discreet.
10 Frankly, eight interrogatories in a case of this magnitude
11 isn't much, that focus on specific allegations in the
12 complaint.  We've agreed to, you know, taking their point
13 all facts, all documents, that sort of thing and saying
14 look, give us the material facts.  You know what -- what
15 are you claiming here so that we're on the same page,
16 you're on the same page.  But at some point these issues
17 are going to be have to be narrowed or at least teed up as
18 a finder of fact to figure out what's in dispute, what's
19 not in dispute, what's a real issue and what's not a real
20 issue.  So that's really what we're trying to do.  And --
21 and you know, where we are today, we are about a year into
22 discovery.  The discovery cut off, I believe, is in the
23 middle of February.  You know, we're near the end.  And it
24 seems to me that now is a good time frankly to say to them,
25 you know, tell us what this stuff is based on.  Tell us

1   what your allegations are based on, you know, we do in good
2   faith.  If it turns out that there are new things that pop
3   up in the last three weeks of discovery, you can
4   supplement.  But we want to understand what these -- what
5   these allegations, you know, specifically what you're
6   talking about.  And that's really what we're after.  And
7   you know, it is -- there's not many ways to do that.
8   Contention interrogatories are one of them and.
9   Unfortunately when you have very broad allegations, you
10  have very broad contention interrogatories.  We're willing
11  to work on being fair here and narrow them as necessary,
12  but we really need answers.  And what they've done is
13  completely unhelpful.  I mean, frankly giving us an almost
14  identical list, 37 page list of documents, you know, as
15  you -- as we look into them, you know, some are just
16  clearly irrelevant to the questions.  Others, you know,
17  when you cite an entire deposition transcript and all the
18  exhibits to that deposition transcript, you know, clearly
19  the design of that is not to point anyone in the right
20  direction.  And so for our purposes, the responses are
21  completely unhelpful.  There's no effort really to tailor
22  the answers or to sort of, you know, at least give us the
23  facts on which they base their contentions are.  It
24  really -- it's nothing.  And frankly, it would be busy work
25  for us to try to work through all these documents to try to

```
 1    figure out what the heck they're talking about.  So that's
 2    the burden we have is try to figure out, you know, what are
 3    you alleging here guys.  What are you basing your
 4    allegations on.  I think it's a fair question to ask.  We
 5    try to ask it, and again without repeating myself, you
 6    know, they're necessarily broader than, you know, everybody
 7    might like because the allegations are very vague, very
 8    general, very broad.  And -- and so, you know, you know,
 9    all you can do is quote their -- quote their allegation to
10    them and say, you know, tell me the facts here you're
11    relying on for this.  And so that's what we've done.  And
12    you know, we just want some answers so we can understand
13    the claims and not be stuck with these very broad
14    allegations that as The Court knows present a moving
15    target, allegations that you can't pin down, and that, you
16    know, one day it's molded foam, one day it's laminated, one
17    day is this, and we're sort of struggling to figure out
18    what the real dispute is.
19              And that's -- that's why we need answers.
20    Respectfully we would ask the court to give us good faith
21    answers to these interrogatories.  Now seems to be the
22    right time.  We wait until discovery's over.  We're not
23    going to be able to follow up, you know, we are, you know,
24    aren't going to be able to pursue anything.  And you know,
25    we're near the end anyway, give us a little time so if they
```

1    answer us now they at least have some time, here's what we
2    need to do.
3           THE COURT:  Isn't this necessary -- I mean, okay,
4    I never, in my recollection, litigated an anti-trust case
5    so I'm coming at you with floating knowledge about this
6    because I've never done what you're doing.  But it seems to
7    me that what you're asking for is the stuff from which an
8    expert report is woven.  And were I in your shoes, I would
9    be, I think, waiting to get the expert report that says
10   here's what they did and here's why I say that, that sort
11   of thing as opposed to asking them to weave that for you
12   ahead of time.  That's my -- that's my observation in
13   response to what you just said, that that's typically what
14   I have found expert, you know, and economists and whatever
15   kinds of experts prove in anti-trust cases.  That's the --
16   that's their job is to create that fabric from the ball of
17   yarn that you're kind of kicking around.  But I -- I'm not
18   unsympathetic to what you're saying.
19          And on the one hand, you know, I probably look
20   more favorably on a motion for a more definite statement
21   than a contention interrogatory.  Because I just think
22   they're, the other side at some point just does enough to
23   get -- to get you to, excuse me, shut up, but it really
24   isn't going to move the ball forward until you get the nuts
25   and bolts of an economist report or whatever expert you

1  use.  But let -- let me hear from -- from GM for a second,
2  and then I want to give you another chance to address why
3  I'm wrong about the expert.
4          MS. SOLH:  Your Honor, we agree that the timing
5  of these interrogatories, I mean, it's just premature.  And
6  while, you know, we appreciate that -- that Gibson Dunn and
7  Woodbridge would like a road map of our case, we just don't
8  think it's appropriate at this time, especially given that
9  discovery is still ongoing.  And while we can provide, you
10 know, while what we provided is -- Mr. Hanna is correct
11 that his deposition transcript and deposition exhibits as
12 well as documents and transactional data and interrogatory
13 and other discovery responses, those are the documents that
14 we think at this point show the evidence that GM may rely
15 upon at the end.  And while Mr. Hanna mentioned that
16 Woodbridge is interested in why GM believes molded foam is
17 part of it.  These contention interrogatories are not
18 limited to that.  They are asking for everything that we
19 believe supports the litigation, and for us, GM's claims
20 are not based just on molded, they're based both -- on both
21 the slab and molded foam that GM purchased.  And you know,
22 I think if you read -- if -- if Gibson Dunn reads any of
23 the deposition transcripts, especially the ones of its --
24 of Woodbridge's employees, it's clear we've attended every
25 one of these depositions, we've asked questions, we've used

1   exhibits, documents that we think are important and
2   relevant and that shows the -- that helps illustrate the
3   claims that GM is making. They're not the only documents,
4   you know, there can be other documents that we use of that
5   particular witness. We tried in good faith to list what we
6   thought would be documents that will be relevant at this
7   point. But we can't provide additional information with
8   discovery still ongoing with our experts not having
9   completed their analysis with everyone at Woodbridge having
10  taken the fifth so far and not having taken a 30(B)(6)
11  deposition in which we can at least get additional
12  information. So I think at this point, to the best of our
13  ability, we have answered these interrogatories.
14          MR. HANNA: Your Honor, for example,
15  interrogatory four.
16          THE COURT: This is Nick, right?
17          MR. HANNA: Apology, yes, Nick Hanna for
18  Woodbridge. In interrogatory number four, we reference
19  their complaint where they said molded flexible
20  polyurethane foam was the focus of the conspiracy alleged
21  herein. And the question really is what makes you say
22  that. And you made -- GM made the allegation, they had to
23  have a Rule 11 basis for making the allegation, you know,
24  to begin with. They have something in mind as to why they
25  think that the conspiracy included molded foam as it

1   relates to GM.  And they can frankly simply say it.  And it
2   seems to me not a heck of a lot of work would have to go
3   into that to give the material facts.
4           And again, just the -- you know, as I look at
5   their response, it's a hey stack.  And they're saying the
6   needle's in there somewhere, go find it.  And I don't think
7   that's -- that is an adequate response.  I think that you
8   know, for example, the interrogatory number four, they
9   put -- what those key facts on what they are relying on
10  that led them to file that allegation, led them to make
11  that allegation and what they believe they have as of
12  today.  Again, if more facts come to light and they think
13  it adds to that, they can certainly supplement.  But to
14  say, you know, we don't have to tell you, you'll find out
15  later once discovery, once fact discovery is closed, you'll
16  find that out and they haven't said this, The Court
17  indicated that may happen with experts, but they haven't
18  said it.  We'll sort of figure this out later seems to me
19  to be doing a little bit backwards.  I think, you know,
20  they made the allegation, they should be required to tell
21  us what it's based on.  And to the extent their expert
22  wants to opine on it or amplify on it, that's fine.  But,
23  you know, at this date we ought to know what it's based on.
24  And I think -- I think today we don't.  And that, you know,
25  that 37 page listing of documents, you know, amounts to

```
1    thousands of thousands and thousands of documents,
2    thousands and thousands of pages of documents.  And you
3    know, it is not something that we can go through -- it is
4    not a proper burden I should say.  It's one thing to say
5    here are documents that you can figure this out from, and
6    the burden is equal on both parties, they're not doing
7    that.  They're basically regurgitating our own documents to
8    us in most cases or documents of other defendants and say
9    redacted -- here's the hey stack, dig through here.  And
10   maybe you'll figure out or maybe you won't, but we're not
11   going to point you in the right direction.  That I think is
12   the problem.
13            THE COURT:  Well, but, you know, I hear what
14   you're saying, but then I read the interrogatory, and the
15   interrogatory doesn't say, you know, tell me -- tell me in
16   25 words or less -- it doesn't ask for the simple
17   explanation that you just -- that you just said or tell me
18   what are the best, you know, the best facts upon which
19   you -- your interrogatory says identify all facts and
20   documents that support your contention.  So you said, you
21   basically asked them where's the hey stack, and they say
22   here it is, you know.  And I understand that it's
23   frustrating you get the answer back to a question like
24   that, but that's something of a literal, a literal response
25   to your question.  You didn't say give me the top 25, you
```

```
1    know, pieces of evidence that support what you're saying
2    here or not necessarily would have answered that, but you
3    know what I'm saying, you didn't -- you didn't phrase it
4    the way that you want it to be answered.  And you know, I
5    don't know if they have the capability to write you or the
6    will or if they think it's going to move the ball forward
7    for them by way of settlement at this point, I doubt that
8    they do.  You know, at some point I suspect they'll do
9    exactly what you're asking them to do, but I don't think
10   that that's a burden that they necessarily have to -- have
11   to undertake at this point in the litigation.  I think if
12   the complaint is not understandable by you, you had the
13   right to ask them for a more definite statement.  I think
14   you can test the complaint with motion practice and you
15   know smoke them out that way.  But in terms of, you know,
16   you literally said identify all facts and they said, well,
17   here they are, and now you said well there's too many I
18   can't find them.  Well, I'm sorry but that's -- I just --
19   that's my problem and one of the reasons I hate contention
20   interrogatories and interrogatories that use the word any
21   and all and forever and always.  I mean, you've got to be
22   careful what you wish for because sometimes you get it.
23              MR. HANNA:  Your Honor, if I can respond.  Just
24   to be clear, and as The Court knows, we asked for two
25   things, facts and documents, and they gave us documents.
```

1    But they haven't given us any facts.  They haven't written
2    anything in terms of of facts.  They've just given lists
3    and lists of documents.  So I think to be fair there, you
4    know, we did ask for facts.  They didn't give us any facts.
5    We did agree and offer to limit them to material facts.  I
6    think The Court could very well order them to give a
7    statement of the material fact that they're relying on for
8    those contentions, and that would move the ball forward
9    here.
10              THE COURT:  Can you -- can you guys -- can you
11   guys do that, Dan or Chahira?
12              MS. SOLH:  I mean, you know, we did include a
13   list -- the list of documents, but that's allowed under
14   Rule 33(B).  But you know, I think what we think is
15   material now may not be material after the next set of
16   depositions or after our expert has finished looking at all
17   of the information that we provided to them.  So I mean, I
18   think even limiting it to material fact would be -- it's
19   still premature at this point.  I mean, I just don't
20   understand why this information needs to be learned at this
21   point when we're not filing summary judgment motions until
22   at least July of this year when the expert reports and
23   everything else has come through.  So at this point I still
24   think it would be premature to even fight material facts.
25              THE COURT:  My -- sometimes I get in trouble for

1   this, but my sort of sense of intellectual morality suggest
2   that maybe it wouldn't be a terrible thing if they're truly
3   suggesting, you know, here in front of me and God and
4   everybody that they don't know what the basis for your
5   complaint, even at this juncture subject to possibly
6   changing, would believe you could qualify your answer and
7   make it a moving target such that, you know, as we sit here
8   today, here's the basis, much like you need to do, for
9   example, if they filed a Rule 11 motion, which I'm not
10  suggesting that they do, but that you provide them, you
11  know, a narrative of here's where -- here's the facts that
12  we believe exist and here's why, with the understanding
13  that discovery's ongoing, and this may change. And this is
14  based on our preliminary understanding, but here's where we
15  are right now. You asked us for it, and The Judge ordered
16  us to do it, but, you know, don't rely on this to the
17  extent that you think you're going to fence the sit (sic)
18  with it because we're telling you beginning, middle and
19  end, we're not done yet. What about that?
20            MS. SOLH: Your Honor, I actually I can't believe
21  that they wouldn't know where our -- where our claims are
22  coming from given that somebody from Gibson Dunn has been
23  in every one of the Woodbridge depositions that have taken
24  place and seen the documents that we've used and seen the
25  questions that we've asked in relation to those documents.

```
1   So I think they -- from that, I don't know how they
2   couldn't have an understanding of what our claims and the
3   basis for our claims are.  So I just think having us
4   undertake this additional work is just, for us it's busy
5   work at this point, given that we're two weeks, you know,
6   three weeks from the close of discovery.  That would take
7   us away from preparing for the actual 30(B)(6) deposition
8   of Woodbridge that we have coming up where we can learn
9   information since their executives have taken the fifth.
10  So I mean could we do it, yes, but I still think it's, you
11  know, premature at this point to do anything like that.
12              MR. MANTHRIPRAGADA:  Your Honor, this is DJ.
13  I've attended many of those depositions or at least some of
14  them.  And again, our interrogatories here focused on
15  molded foam.  As Mr. Hanna pointed out, we don't understand
16  the molded foam claims.  And frankly, in the depositions I
17  haven't seen a whole lot of documents or any that I can
18  recall related to their molded foam claims.
19              MS. SOLH:  I mean, I think part of this is also a
20  disagreement.  Woodbridge's contending that any alleged
21  price fixing didn't include molded, and we are contending
22  that it did.  And the way that we read the facts and the
23  way that we presented these questions, it's clear that
24  we've been asking about molded foam, and I recommend that
25  you go back and read some of these transcripts.  But I
```

1  think at this point, you know, if they're in disagreement
2  between the two parties as to whether they think their
3  client did something or didn't, and we've, at these
4  depositions, asked their executives specific about molded
5  foam and shown them documents that have discussed molded
6  foam pricing and that have had competitor pricing related
7  to those, if they read those documents differently than we
8  do, that's just going to be a difference on how they're
9  advocating for their client.  But I would recommend that
10 you -- that they go back and read those transcripts because
11 we clearly ask questions and we've shown documents that
12 relate to molded.  So --
13           MR. HANNA:  Your Honor, this is Nick Hanna again.
14 I do think it's material to move the ball forward certainly
15 on the molded foam issues if we could get a statement from
16 GM at this point as to what they're relying on, obviously
17 with all the caveats, we understand that, but I think, you
18 know, they don't want to say anything, and I think The
19 Court's inclination that, you know, it may move things
20 forward and crystalize some issues is correct.  So I'd ask
21 that the court order that.
22           THE COURT:  Why don't you guys go ahead and do
23 that.  Just give them a narrative and direct them to the
24 specific documents that you have at this stage as
25 preliminary as it is to just give them a factual basis for

```
1   your contentions about molded foam.  I think in the
2   interest of focusing you all moving forward, that that's
3   the one, rather than all of these, always -- all of these,
4   always and everything contention interrogatories, write
5   them a brief summary of the basis for the contentions.
6   Don't just tell them what the contentions are, but tell
7   them a basis for that, and you know, if you were asking
8   people at depositions you could say look at page 27 of
9   somebody's deposition, we were clearly referencing, you
10  know, this communication that contained competitor
11  information and you can begin it by saying this is
12  preliminary, you say in the middle The Judge made us do
13  this and shouldn't be used for anything other than for your
14  purpose of understanding what we have at this point.  And
15  at the end say we're going to -- this is an evolution, you
16  made us do this before we wanted to, so you've got to know
17  this isn't the final answer, this is an interim
18  proposition.  I don't want this to take a week of
19  somebody's time.  I'm talking about a day or two of
20  somebody's time.  Okay.
21          MS. SOLH:  And is this just a response to
22  interrogatory number four which deals specifically with
23  molded foam?
24          THE COURT:  Yes.  Okay.  So that's going to be
25  the order as to those one through eight interrogatories,
```

```
 1   the contention interrogatories is we're going to write a
 2   little term paper about the molded foam allegations and
 3   nothing else.
 4            Now, let's talk about the non-custodians,
 5   custodians that Woodbridge is interested in, the folks
 6   documents that have not here to for been I guess produced,
 7   although GM, as I read it, is saying these folks don't have
 8   responsive documents.  But I guess there's some contention
 9   about that.  So DJ and Nick, this is your motion, so if you
10   want to lay it out a little bit for me, I'd appreciate it.
11            MR. MANTHRIPRAGADA:  Certainly, Your Honor.  This
12   is DJ.  You know, as Nick mentioned, you know, we -- GM now
13   for over seven months has been representing to The Court
14   and to Woodbridge that molded foam is vital and
15   unquestionably relevant to GM's claims.  But, you know,
16   they've refused to or have not been able to produce
17   documents for custodians who had responsibility for
18   purchase of molded foam.  And if they can give me some idea
19   of this document production to date, you know, at least
20   95 percent of the production is drawn from the files of
21   custodians who don't have molded foam responsibility
22   according to the title that GM used for their disclosures.
23   And the production itself, I mean 70 percent is from one
24   single custodian.  In response, I think GM said that they
25   did produce from some molded foam custodians and didn't
```