**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OHIO**

| | |
|---|---|
| In re POLYURETHANE FOAM ANTITRUST LITIGATION | MDL Docket No. 2196<br>Index No. 10-MD-2196 (JZ) |
| This document relates to:<br>ALL DIRECT PURCHASER CLASS ACTIONS | |

**MEMORANDUM OF LAW IN SUPPORT OF THE DIRECT PURCHASER CLASS PLAINTIFFS' MOTION FOR FINAL APPROVAL OF THE LEGGETT & PLATT AND CARPENTER SETTLEMENTS**

# TABLE OF CONTENTS

**Page**


PRELIMINARY STATEMENT ....... 1

STATEMENT OF FACTS ....... 2

A. Carpenter and L&P Both Directly Sold Flexible Polyurethane Foam Into and Into the United States During the Class Period ....... 2

B. At Trial, the Class Would Present Common Evidence of Carpenter, L&P, and the Non-Settling Defendants' Alleged Conduct and Conspiracy ....... 2

C. At Trial, the Class Would Present Common Evidence of Injury and Damages, Although Defendants Dispute That Fact and Those Amounts ....... 3

D. The Terms of the Settlement Agreements ....... 4

E. Notice of the Settlements and Response by Class Members ....... 6

ARGUMENT ....... 7

A. The Proposed Settlements Should be Given Final Approval Because They are Fair, Reasonable, and Adequate ....... 7

1. The Likelihood of Plaintiffs' Success on the Merits Weighed Against the Amount and Form of Relief Offered in the Settlement Supports Approval. ....... 9

2. The Risks, Expense, Delay, and Likely Duration of Continued Litigation Favor Final Approval. ....... 10

3. The Recommendations of Experienced Counsel and Class Representatives Strongly Favor Final Approval. ....... 11

4. Case Analysis by Class Plaintiffs Supports Final Approval. ....... 12

5. The Likely Positive Reaction of the Class Will Support Approval. ....... 13

6. The Settlement Was the Product of Informed, Non-Collusive Negotiations. ....... 14

7. There Is a Strong Public Interest in the Settlement. ....... 14

B. The Settlement Classes Should be Certified ....... 14

CONCLUSION ....... 15

## TABLE OF AUTHORITIES

**Page**

### Cases

*Adoma v. Univ. of Phoenix, Inc.*,
913 F. Supp. 2d 964 (E.D. Cal. 2012)....14

*Amchem*,
521 U.S. at 620....15

*Bailey v. Great Lakes Canning Inc.*,
908 F.2d 38 (6th Cir. 1990)....8

*Berry v. Sch. Dist. of City of Benton Harbor*,
184 F.R.D. 93 (W.D. Mich. 1998)....8

*In re Cardizem CD Antitrust Litig.*,
218 F.R.D. 508 (E.D. Mich. 2003)....11, 12, 13, 14

*Cervantez v. Celestica Corp.*,
2010 WL 2712267 (C.D. Cal. July 6, 2010)....9, 13

*Connectivity Sys. Inc. v. Nat'l City Bank*,
2011 WL 292008 (S.D. Ohio Jan. 26, 2011)....12

*Dewey v. Volkswagen of America*,
909 F. Supp. 2d 373 (D.N.J. 2010)....9, 13

*IUE-CWA v. General Motors Corp.*,
238 F.R.D. 583 (E.D. Mich. 2006)....7, 8, 11

*Int'l Union v. Ford Motor Co.*,
2006 WL 1984363 (E.D. Mich. July 13, 2006)....8, 9

*Kogan v. AIMCO Fox Chase, L.P.*,
193 F.R.D. 496 (E.D. Mich. 2000)....11

*Leonhardt v. Arvinmeritor, Inc.*,
581 F. Supp. 2d 818 (E.D. Mich. 2008)....11

*In re MetLife Demutualization Litig.*,
689 F. Supp. 2d 297 (E.D.N.Y. 2010)....9, 13

*In re Packaged Ice Antitrust Litig.*,
2011 WL 717519 (E.D. Mich. Feb. 22, 2011)....7, 9, 11, 14

*In re Packaged Ice Antitrust Litig.*,
2012 WL 5493613 (E.D. Mich. Nov. 13, 2012)....8

*Pillsbury Co. v. Conboy*,
459 U.S. 248 (1983)....14

*In re Telectronics Pacing Sys., Inc.*,
137 F. Supp. 2d 985 (S.D. Ohio 2001) ....................................................................11, 14

*UAW v. General Motors Corp.*,
497 F.3d 615 (6th Cir. 2007) ..........................................................................................7

*Union Asset Mgmt Holding A.G. v. Dell, Inc.*,
669 F.3d 632 (5th Cir. 2012) ..........................................................................................8

*Women's Comm. For Equal Employment Opportunity (WCEEO) v. Nat'l Broad. Co.*,
76 F.R.D. 173 (S.D.N.Y. 1977) ..................................................................................9, 13

**Statutes**

Fed. R. Civ. P. 23(b)(3)(D) ..........................................................................................15

Rule 12(b)(6)...................................................................................................................12

Rule 23(a)........................................................................................................................14

Rule 23(b) .......................................................................................................................14

Rule 23(b)(3) ..................................................................................................................14

**Miscellaneous**

*Newberg on Class Actions* § 11:41 ...........................................................................7, 13

Direct Purchaser Class Plaintiffs ("Plaintiffs"), by and through undersigned co-lead counsel, respectfully submit this Memorandum in support of their Motion seeking final approval of settlements with Leggett & Platt, Incorporated ("L&P"), and Carpenter Co., E. R. Carpenter, L.P., and Carpenter Holdings, Inc. (collectively, "Carpenter"), along with certification of the respective proposed Settlement Classes for each settlement.

**PRELIMINARY STATEMENT**

The proposed settlements with L&P and Carpenter fall well within the criteria for final approval by the Court. The proposed L&P settlement provides the class with $39.8 million, and the proposed Carpenter settlement provides the class with $108 million. Each settlement also provides the class with valuable cooperation at trial that will help Plaintiffs admit crucial documents in order to prosecute their claims against the non-settling Defendants.

These settlements were the result of arm's-length negotiations by highly experienced counsel for Plaintiffs and come years into this litigation, after Plaintiffs fought off multiple, repeated attempts by L&P and Carpenter to quash their claims. If all other defendants (which remain subject to treble damages) were to provide similar compensation relative to their market share during the class period, then the case would have a total value of approximately $400 million. Given their exposure at trial and the benefit the current settlements provide to the Class and Co-Lead Counsel's ability to prosecute the case, Plaintiffs expect that the case will have more value than that in large part due to these settlements.

It is also respectfully submitted that, for the same reasons as the Court found in its Order certifying the Direct Purchaser Class (Dkt. 1102), the criteria for certification of settlement classes are also well satisfied here.

Notably, as of the date of this submission, no class member has objected to the proposed settlement or the settlement classes. For all of the reasons set forth herein, Plaintiffs respectfully

submit that the proposed L&P and Carpenter Settlements should be finally approved, and the proposed settlement classes for each of the settlements should be certified.

## STATEMENT OF FACTS

### A. Carpenter and L&P Both Directly Sold Flexible Polyurethane Foam Into and Into the United States During the Class Period.

During the class period, Carpenter manufactured and sold flexible polyurethane foam in both the U.S. and Canada. Carpenter manufactured and sold both slabstock and carpet underlay foam throughout the Class Period. For its part, L&P also manufactured and sold flexible polyurethane foam in the U.S. throughout the Class Period. In 2007, L&P sold off its slabstock business to Advanced Urethane Technologies, but directly sold slabstock foam to class members before that date. L&P also sold carpet underlay throughout the Class Period.

### B. At Trial, the Class Would Present Common Evidence of Carpenter, L&P, and the Non-Settling Defendants' Alleged Conduct and Conspiracy.

As set forth at length in Plaintiffs' class certification and summary judgment briefing, they are prepared to present substantial common evidence of Carpenter, L&P, and the non-settling Defendants' alleged conspiratorial conduct throughout the conspiracy. Dkt. 584, 744, 1343. Given the voluminous records submitted in support of both sets of previous briefing, Plaintiffs do not provide that evidence yet again here. However, they note that the evidence previously cited indicates:

- There is common evidence that Carpenter directly participated in the alleged conspiracy throughout the class period. *See, e.g.*, Dkt. 584 Exhibit 22, at WB_0500790 (email from Carpenter employee reporting price increase efforts to Woodbridge); *id.* Exhibit 22, at CC002E0907964 (Carpenter internal memorandum noting "we are still waiting to hear from Flexible Foam with a price increase."); *id.* Exhibit 84 (Carpenter internal distribution of Foamex and Mohawk price announcements); Dkt. 1343 Exhibit 52 (Carpenter noting it will wait to follow price increases of Mohawk, Future Foam, and Flexible); Exhibit 58 (Carpenter noting FFP's March 2005 price increase and announcing intent to follow).

- There is common evidence that L&P directly participated in the alleged conspiracy throughout the class period. *See, e.g.*, Dkt. 584 Exhibit 8 (email from L&P employee announcing they will get prices from two other foam sellers at meeting the following day); *id.* Exhibit 9 (same employee reporting results from meetings with sellers); Exhibit 10 (L&P employee noting in an email that the industry was waiting for Foamex to lead a price increase); *id.* Exhibit 22, at LGPL 0000056292 (email to L&P stating that Foamex would be sending out lead price increase); *id.* Exhibit 22, at LGPL 0000056295 (L&P discussion of Hickory Springs price increase); Dkt. 1343 Exhibit 51 (L&P noting it will not lead but will support industry price increases).

- There is common evidence that the non-settling Defendants participated with Carpenter and L&P in the alleged conspiracy throughout the class period. *See, e.g.*, Dkt. 584 Exhibit 78 (L&P and Carpenter "no exceptions" policies to industry-wide price increases); Dkt. 1343 Exhibit 56 (Vitafoam noting its price increase will follow Carpenter's); Exhibit 61 (Renfro acting as intermediary passing price announcement between numerous Defendants); Conaway Dep. 106:2-108:20; 204:19 – 212:24 (Future Foam employee admitting to direct communications with Carpenter); McCulloch Dep. 71:16-73:19, 74:4-75:4, 204:6-8, 318:15-319:6 (Vitafoam admitting to coordination in pricing in foam industry); Dkt 1343 Exhibits 247-49 (indicating that FFP was aware of upcoming Carpenter price increases).

All Defendants (including Carpenter and L&P) contest this evidence and have submitted summary judgment motions on the merits of Plaintiffs' allegations. (Plaintiffs note this fact at L&P's request.)

### C. At Trial, the Class Would Present Common Evidence of Injury and Damages, Although Defendants Dispute That Fact and Those Amounts.

In addition to common evidence of the alleged conspiracy, Plaintiffs have also discussed at length in previous briefing that they are prepared to offer common evidence that Carpenter, L&P, and the non-settling Defendants' alleged conspiratorial activity injured all or virtually all Direct Purchaser Class members. *See*, *e.g.*, Dkt. 1102 at 31. Based on the report of Plaintiffs' expert, Dr. Jeffrey Leitzinger, after reducing damages for opt outs (which Plaintiffs understand

based on current direct action cases currently represent approximately 25% of sales during the class period), the Class's single damages are between $815-867 million.[1]

All Defendants (including Carpenter and L&P) contest this evidence and have submitted multiple expert reports and briefs arguing that Plaintiffs have inadequate common evidence of injury and cannot, in any event, establish any damages at trial. For example, L&P's expert, Dr. Michelle Burtis, is prepared to testify that she believes L&P did not participate in the conspiracy, that any conspiracy was ineffective and unsuccessful, and that damages are very low to non-existent. Carpenter's expert, Dr. Dennis Carlton, is similarly prepared to testify that he believes that Dr. Leitzinger's analysis is flawed and unreliable, that certain characteristics of effective price-fixing conspiracies are absent in the polyurethane foam industry, and that Carpenter's margins are inconsistent with the existence of the conspiracy alleged by the plaintiffs. Non-settling Defendants also have several more expert witnesses who are prepared to offer testimony along similar lines. While Plaintiffs disagree that there is any merit to these lines of testimony—and are prepared to demonstrate as much at trial—the arguments create the risk that the jury will either find that Defendants owe Plaintiffs less in damages than indicated by Dr. Leitzinger's analysis, or that they do not owe compensatory damages at all, even if there is a verdict in Plaintiffs' favor.

**D. The Terms of the Settlement Agreements.**

The Settlement Agreements with L&P and Carpenter arise from extensive arm's-length and good faith negotiations. DPPs' Co-Lead Counsel participated in fact-gathering sessions and informational meetings, as well as extensive negotiations that took place via telephone, and in

[1] Because the details of Dr. Leitzinger's analysis involve confidential sales numbers for each Defendant, the materials identifying the basis for these damages numbers were filed under seal in connection with the L&P Settlement preliminary approval motion. (Dkt. 1380.)

person in New York, New York; West Palm, Florida; Chicago, Illinois; Boston, Massachusetts; and through written correspondence. The Settlement Agreements include the following relevant provisions:

*Testimony at Trial*: L&P and Carpenter shall voluntarily provide up to two of their employees at trial to authenticate and otherwise demonstrate the basis for admission of L&P and Carpenter documents. This will support DPPs' case against the remaining non-settling Defendants. L&P Settlement Agreement ¶ 10; Carpenter Settlement Agreement ¶ 9.

*Settlement Amount*: L&P has agreed to pay a settlement amount of $39.8 million in cash and Carpenter has agreed to pay a settlement amount of $108 million in cash. Both of these amounts are in exchange for the respective settling Defendants' dismissal with prejudice and a release of all claims. These settlement amounts will be received in a series of payments:

***L&P***

- First Payment: an initial payment of $4 million cash within 10 business days of executing the L&P Settlement Agreement (payment of which has now been received);
- Second Payment: an additional payment of $35.8 million within 10 business days of Final Approval (defined in the L&P Settlement Agreement).

***Carpenter***

- First Payment: an initial payment of $20 million that was paid shortly after the term sheet that preceded the Carpenter Settlement Agreement;
- Second Payment: an additional payment of $88 million within 10 days of Final Approval (which is also defined in the Carpenter Settlement Agreement, although not substantively different than the L&P Settlement Agreement).

*The Parties and the Settlement Products*: The Agreements are binding on the Direct Purchaser Settlement Classes, which are defined identically to the Direct Purchaser Class set forth in the Court's Order Granting Class Certification (Dkt. 1102). L&P Settlement Agreement ¶ 19; Carpenter Settlement Agreement ¶ 19. Excluded from the settlement classes in both

Settlement Agreements are Defendants and co-conspirators, and their respective parents, subsidiaries, and affiliates. L&P Settlement Agreement ¶ 1(j); Carpenter Settlement Agreement ¶ 1(n).[2]

*Releases:* The Agreements release only L&P, the Carpenter Defendants, and Carpenter Released Parties from all claims arising out of or relating to the claims made, or which could have been made on the same or similar facts in the Class Action and Complaint, for conduct prior to Final Approval. L&P Agreement ¶ 12; Carpenter Agreement ¶ 10. Importantly, the Agreements provide that L&P and the Carpenter Defendants' sales and overcharges shall remain in the continuing litigation against the non-settling Defendants, who remain jointly and severally liable for all damage caused by the alleged conspiracy. L&P Settlement Agreement ¶ 13; Carpenter Settlement Agreement ¶ 11.

**E. Notice of the Settlements and Response by Class Members.**

Notice of the Carpenter and L&P settlements and proposed settlement classes was made jointly, per the Court's November 17, 2014 Order. Dkt. 1411. The Notice was designed to provide members of the proposed settlement classes with (among other things) a clear and detailed description of the terms of the settlements; the date of this Court's hearing on final approval of the settlements; the deadlines for opting out of the proposed settlement classes or notifying the Court of an objection to the settlements; phone and internet contact information for the settlement administrator, to permit members of the proposed classes to obtain answers to questions or other information; and notice that, in the event the Court finally approves the

[2] Also excluded from the Direct Purchaser Settlement Class in the Carpenter Settlement Agreement are any Direct Purchaser Class members that have timely opted out of the Settlement. Carpenter Agreement ¶ 1(n). Similarly excluded from the Direct Purchaser Settlement Class in the L&P Settlement Agreement are Direct Purchaser Class members that validly and timely elect to be excluded from the Direct Purchaser Settlement Class. L&P Settlement ¶ 1(c).)

settlements, Plaintiffs' Co-Lead Counsel will seek from the Court an award of attorneys' fees and costs for their work prosecuting the litigation and negotiating and obtaining the settlements. The Notice was accompanied by a Claim Form, the format of which was agreed between Plaintiffs, Carpenter, and L&P, and approved by the Court. Dkt. 1410. The direct mail plan, as well as the publication of the Notice in select trade journals, reflects the expert input of Lael D. Dowd, whose declaration was previously filed as Dkt. 1379.

As per the approved plan, Plaintiffs did distribute the Notice to members of the proposed settlement classes by means of direct mail. Plaintiffs also supplemented this direct mail distribution with publication of a "Publication Notice" (in the form approved by the Court) in trade journals relevant to the proposed settlement classes. In addition, Plaintiffs made the Notice, along with other relevant documents, available on the website, http://www.flexiblepolyurethanefoamsettlement.com. *See* Dkt. 1379.

## ARGUMENT

### A. The Proposed Settlements Should be Given Final Approval Because They are Fair, Reasonable, and Adequate.

Courts adhere to "an initial presumption of fairness when a proposed class settlement, which was negotiated at arm's length by counsel for the class, is presented for court approval." *Newberg on Class Actions* § 11:41 (collecting cases). The Sixth Circuit has noted that the law favors the settlement of class action lawsuits. *UAW v. General Motors Corp.*, 497 F.3d 615, 631 (6th Cir. 2007) (noting the "federal policy favoring settlement of class actions"); *In re Packaged Ice Antitrust Litig.*, 2011 WL 717519 at *7 (E.D. Mich. Feb. 22, 2011) ("*Packaged Ice I*"); *IUE-CWA v. General Motors Corp.*, 238 F.R.D. 583, 593 (E.D. Mich. 2006). This policy applies with equal force whether the settlement is partial, involving only some of the defendants, or complete. *Packaged Ice*, 2011 WL 717519 at *7.

The evaluation and approval of the fairness of a class settlement is committed to the sound discretion of the district court. *IUE-CWA*, 238 F.R.D. at 594; *Bailey v. Great Lakes Canning Inc.*, 908 F.2d 38, 42 (6th Cir. 1990) (absent abuse of discretion, approved settlement "will not be upset"). "In exercising that discretion, the Court may limit the fairness hearing to whatever is necessary to aid it in reaching an informed, just and reasoned decision" and "the settlement or fairness hearing is not to be turned into a trial or rehearsal for trial on the merits." *IUE-CWA*, 238 F.R.D. at 594 (internal quotations and citations omitted); *see also Union Asset Mgmt Holding A.G. v. Dell, Inc.*, 669 F.3d 632, 641-42 (5th Cir. 2012) (*citing IUE-CWA* and noting that "a fairness hearing is not a full trial proceeding" and "[a] fairness hearing is not a trial.").

"Settlement embodies a bargained give and take between the litigants that is presumptively valid" and "the Court should not substitute its judgment for that of the parties." *Int'l Union v. Ford Motor Co.*, 2006 WL 1984363 at *21 (E.D. Mich. July 13, 2006) (internal quotations and citations omitted). The district court judge "must respect the parties' compromise and may not 'substitute his or her judgment [regarding the fairness of the settlement] for that of the litigants and their counsel.'" *IUE-CWA*, 238 F.R.D. at 594 (*quoting Berry v. Sch. Dist. of City of Benton Harbor*, 184 F.R.D. 93, 97 (W.D. Mich. 1998)); *see also In re Packaged Ice Antitrust Litig.*, 2012 WL 5493613, at *4 (E.D. Mich. Nov. 13, 2012) ("*Packaged Ice II*") (same).

In determining whether a settlement is fair, adequate, and reasonable, district courts in the Sixth Circuit analyze the following seven factors: "(1) the likelihood of success on the merits weighed against the amount and form of relief in the settlement; (2) the complexity, expense and likely duration of the litigation; (3) the opinions of class counsel and class representatives; (4)

the amount of discovery engaged in by the parties; (5) the reaction of absent class members; (6) the risk of fraud or collusion; and (7) the public interest." *Packaged Ice I*, 2011 WL 717519 at *8 (*citing UAW*, 497 F.3d at 631). The Court need only consider "those factors that are relevant to the settlement at hand and may weigh particular factors according to the demands of the case." *Id.* (*quoting Ford*, 2006 WL 1984363 at * 22).

### 1. The Likelihood of Plaintiffs' Success on the Merits Weighed Against the Amount and Form of Relief Offered in the Settlement Supports Approval.

The settlements offer class members substantial and certain benefits. Under the proposed Agreements, the proposed Settlement Classes will obtain a nearly $150 million cash benefit and important cooperation for trial. Given the substantial discovery and motion practice to date, along with the impeding trial, the settlement proceeds and cooperation secured by the terms of the Agreements reflect a significant class-wide benefit. *See, e.g., Cervantez v. Celestica Corp.*, 2010 WL 2712267, at *5 (C.D. Cal. July 6, 2010) ("The extensive discovery taken and the parties' thorough litigation of the various issues in this case weighs in favor of the proposed settlement."); *Dewey v. Volkswagen of America*, 909 F. Supp. 2d 373 (D.N.J. 2010) (concluding that stage of proceedings supported settlement when counsel engaged in one year of investigation before suit, took more than 50 depositions after filing, uncovered more than 30,000 relevant warranty claims, and consulted with experts before the completion of fact discovery); *In re MetLife Demutualization Litig.*, 689 F. Supp. 2d 297 (E.D.N.Y. 2010) (same, after nine years of litigation, including motions for summary judgment and class certification); *Women's Comm. For Equal Employment Opportunity (WCEEO) v. Nat'l Broad. Co.,* 76 F.R.D. 173, 176 (S.D.N.Y. 1977) ("[T]he case was very near the trial stage when this settlement was reached, and virtually if not all pre-trial discovery had been completed, a factor favoring counsel's estimate of the likely rewards of continuing the litigation.").

Moreover, a cash payment of $147.8 million is a worthy settlement and a significant achievement in this litigation. Market reports of the polyurethane market in the U.S., together with Carpenter and L&P's documents, establish that these defendants' share of U.S. polyurethane sales during the class period were approximately 35-40% of U.S. sales. (*See* Sealed Declaration of Adam B. Wolfson dated December 23, 2014, Exs. 1-3.) Conservatively utilizing these percent figures and Defendants' estimated market shares relative to one another during the class period, these settlements (and the previous Vitafoam settlement) would translate into settlements with all remaining defendants of ***at least*** $235 million for the same period, which would result in nearly $400 million in collections overall.[3]

Understanding that (a) Defendants intend to argue at trial that they owe the Direct Purchaser Class no money, and (b) the Class's own expert, Dr. Leitzinger, estimates pre-trebling damages in the $500 million range if one does not take into account the persistence effects of the conspiracy, the present settlements amount to a substantial recovery that is well above Defendants' proposed trial damages and nearly one third of the lower bound of the Class's estimated damages for trial.

**2. The Risks, Expense, Delay, and Likely Duration of Continued Litigation Favor Final Approval.**

Assuming the remaining Defendants do not settle, the current settlements provide class members with substantial guaranteed funds pending the resolution of trial, in which the Direct Purchaser Class seeks over $1 billion in pre-trebled damages. It is well-established, however, that class action antitrust litigation has "undeniable inherent risks, such as whether the class will be certified and upheld on appeal, whether the conspiracy as alleged in the complaint can be

[3] Plaintiffs' Co-Lead Counsel believes that the remaining Defendants must settle for far more than this number and proffer it simply for demonstrating the benefit the current settlements confer on the Class.

established, whether Plaintiffs will be able to demonstrate class wide antitrust impact and ultimately whether Plaintiffs will be able to prove damages." *Packaged Ice I*, 2011 WL 717519 at *10. Furthermore, "[e]xperience proves that, no matter how confident trial counsel may be, they cannot predict with 100% accuracy a jury's favorable verdict, particularly in complex antitrust litigation." *Id.* at *10. Although Co-Lead Counsel are confident that the Direct Purchaser Class' claims are meritorious, there is always an inherent risk of recovering little or nothing at trial given the inherent uncertainties in this type of litigation. *See In re Cardizem CD Antitrust Litig.*, 218 F.R.D. 508, 523 (E.D. Mich. 2003). Thus, the current settlements represent a "bird in the hand" while Co-Lead Counsel continue to pursue the six remaining "birds in the bush." *Id.* at 525 (settlement benefits "outweigh the possibility of obtaining a better result at trial, particularly when factoring in the additional expense and long delay inherent in prosecuting this complex litigation through trial and appeal); *In re Telectronics Pacing Sys., Inc.*, 137 F. Supp. 2d 985, 1013 (S.D. Ohio 2001) (settlement "eliminate[ed] the costs and time attendant to continued litigation").

### 3. The Recommendations of Experienced Counsel and Class Representatives Strongly Favor Final Approval.

The judgment of experienced counsel and Class Representatives regarding the settlements should be given significant weight. *See Kogan v. AIMCO Fox Chase, L.P.*, 193 F.R.D. 496, 502 (E.D. Mich. 2000) (given extensive discovery, court should defer to "experienced trial counsel"); *Packaged Ice I*, 2011 WL 717519 at *11 (class counsel's judgment is entitled to "significant weight" and "supports the fairness of the class settlement"); *Leonhardt v. Arvinmeritor, Inc.*, 581 F. Supp. 2d 818, 837 (E.D. Mich. 2008). Thus, the judgment of Direct Purchaser Class' Co-Lead Counsel here that the Agreements are in the best interest of the Class "supports the fairness of the class settlement." *IUE-CWA*, 238 F.R.D. at 597; *see also Cardizem*,

218 F.R.D. at 525 ("In approving a proposed settlement, the Court also considers the opinion of experienced counsel as to the merits of the settlement."). "Both sides made a well-informed decision to enter into the Settlement Agreement. This weighs in favor of approving the proposed Settlement Agreement." *Connectivity Sys. Inc. v. Nat'l City Bank*, 2011 WL 292008 at *5 (S.D. Ohio Jan. 26, 2011).

**4. Case Analysis by Class Plaintiffs Supports Final Approval.**

As recounted in further detail in Plaintiffs' concurrent Motion for an Award of Attorneys' Fees and for Reimbursement of Expenses, Plaintiffs have engaged in substantial case investigation and development to date, all of which leads Co-Lead Counsel to believe that the L&P and Carpenter Settlements are beneficial to and reasonable for the Class.

Since late 2010, Co-Lead Counsel and the remainder of the Direct Purchaser Class Executive Committee have conducted extensive discovery of Defendants and third parties, yielding 5.4 million pages of responsive materials in 219 separate productions and representing 2.4 million total documents. Plaintiffs have taken well over 100 depositions of Defendants' witnesses, defended Defendants' depositions of their own witnesses, coordinated with the other plaintiff groups to conduct discovery, and participated in discovery disputes both in direct communications with the Defendants and before the Court. Plaintiffs have withstood an onslaught of motions and oppositions from Defendants, from the initial Rule 12(b)(6) motions to class certification to the more recent summary judgment and *Daubert* motions. In this process, Defendants have revealed their intended trial and factual arguments on multiple occasions, which provides Plaintiffs with accurate insight into the challenges they face as they prepare this case for a jury.

Given this extensive discovery and case analysis and that "[e]xperience proves that, no matter how confident trial counsel may be, they cannot predict with 100% accuracy a jury's

favorable verdict, particularly in complex antitrust litigation," *In re Cardizem CD Antitrust Litig.*, 218 F.R.D. 508, 523 (S.D. Mich. 2003), Plaintiffs submit that this factor also weighs in favor of the L&P and Carpenter Settlements. *See Cervantez*, 2010 WL 2712267, at *5; *Dewey*, 909 F. Supp. 2d 373; *MetLife Demutualization*, 689 F. Supp. 2d 297; *WCEEO,* 76 F.R.D. 173, 176. It is Plaintiffs' reasoned conclusion, based on the evidence and arguments before them, that settling now with Carpenter and L&P will provide substantial benefit to the Class while permitting Plaintiffs to proceed against all of the remaining non-settling Defendants.

**5. The Likely Positive Reaction of the Class Will Support Approval.**

As set forth in the affidavit of Lael Dowd of Garden City Group, the Claims Administrator, Plaintiffs fully complied with the notice procedures set forth in the Court's Preliminary Approval Orders. Notice was mailed to 48,624 potential class members, in addition to the published notice in trade publications and on the Internet. In the Vitafoam settlement process, there were no objections following notice of the terms of that settlement. Given the substantially higher dollar amounts here and statistics to date, Co-Lead Counsel expects a similar reaction for the current settlements. Assuming that is true—or even if there are minimal objections—that fact will support the adequacy of the settlement and final approval. *Cardizem*, 218 F.R.D. at 527 ("That the overwhelming majority of class members have elected to remain in the Settlement Class, without objection, constitutes the 'reaction of the class,' as a whole, and demonstrates that the settlements are 'fair, reasonable, and adequate'"); *Newberg on Class Actions* § 11.41 (4th ed. 2002) ("If only a small number of objections are received, that fact can be viewed as indicative of the adequacy of the settlement").

**6. The Settlement Was the Product of Informed, Non-Collusive Negotiations.**

Here, there is no evidence of fraud or collusion. To the contrary, settlement negotiations between Plaintiffs and settling Defendants came after vigorous negotiations conducted over many months and in multiple locations. Under these circumstances, courts "respect the integrity of counsel and presume the absence of fraud or collusion in negotiating the settlement, unless evidence to the contrary is offered." *Packaged Ice I*, 2011 WL 717519 at *12; *Telectronics*, 137 F. Supp. 2d at 1016 ("We conclude that this case have been hard-fought, no stone has been left unturned, and there is simply no evidence suggesting collusion or illegality").

**7. There Is a Strong Public Interest in the Settlement.**

As previously set forth, the Settlement also should be approved because there is a strong public interest in settling private antitrust litigation. *See Cardizem*, 218 F.R.D. at 530 (there is a "strong public interest" in private antitrust litigation as well as in "encouraging settlement of complex litigation and class action suits"); *see also Pillsbury Co. v. Conboy*, 459 U.S. 248, 262–63 (1983) (Supreme Court's jurisprudence has emphasized "the importance of the private action as a means of furthering the policy goals of . . . the federal antitrust laws").

**B. The Settlement Classes Should be Certified.**

Given that each of the proposed Settlement Classes is identically defined as the Direct Purchase Class, the Court should certify the Settlement Classes for the same reasons as set forth at length in its class certification order. Dkt. 1408; *see also Adoma v. Univ. of Phoenix, Inc.*, 913 F. Supp. 2d 964, 974 (E.D. Cal. 2012) ("The court previously certified classes in this matter under Rule 23(b)(3), so need not find anew that the settlement class meets the certification requirements of Rule 23(a) and (b).") (collecting cases) (internal citations omitted).

To reiterate, the proposed Settlement Classes, as defined, satisfy each of the elements of Rule 23(a): numerosity, commonality, typicality, and adequacy of representation. Dkt. 1408 at 15-20. Also like the Direct Purchaser Class, common issues would predominate at trial for the Settlement Classes and the class action format is superior for this case. *Id.* at 21-84. Finally, because this is a settlement, manageability of the classes for trial need not be considered, even though the Court already found that manageability was not an impediment to class certification. *Amchem,* 521 U.S. at 620 ("Confronted with a request for settlement-only class certification, a district court need not inquire whether the case, if tried, would present intractable management problems, *see* Fed. R. Civ. P. 23(b)(3)(D), for the proposal is that there be no trial"); *see also* Dkt. 1408 at 84.

**CONCLUSION**

For the foregoing reasons, Direct Purchaser Class Plaintiffs respectfully request that the Court approve their motion for final approval of the proposed Carpenter and L&P settlements and certify the proposed settlement classes.

DATED: December 23, 2014 Respectfully submitted,

*/s/* William A. Isaacson
William A. Isaacson
BOIES, SCHILLER & FLEXNER LLP
5301 Wisconsin Avenue, NW
Washington, DC 20015
Phone: 202-237-5607
Fax: 202-237-6131

*/s/* Stephen R. Neuwirth
Stephen R. Neuwirth
QUINN EMANUEL URQUHART & SULLIVAN, LLP
51 Madison Avenue, 22nd Floor
New York, NY 10010
Phone: 212-849-7165
Fax: 212-849-7100

***Direct Purchaser (Class) Plaintiffs' Interim Co-Lead Counsel***