IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | |
|---|---|
| In re Polyurethane Foam Antitrust Litigation | Case No. 1:10 MD 2196 |
| | MEMORANDUM OPINION AND ORDER RE: DEFENDANT FXI'S <u>SUMMARY JUDGMENT MOTION</u> |
| This document relates to: DIRECT PURCHASER CLASS | JUDGE JACK ZOUHARY |

### INTRODUCTION

In these consolidated proceedings, Plaintiffs allege that dominant firms in the flexible polyurethane foam market engaged in a decade-long conspiracy to fix, raise, and maintain the price of flexible foam products in violation of Section 1 of the Sherman Act. This Court certified a class of Direct Purchasers who bought foam directly from the Defendant firms (*see* Doc. 1102 at 6–7). Defendant Foamex Innovations, Inc. ("FXI") moves for summary judgment on Direct Purchasers' claims (Doc. 1326). For the reasons below, this Court grants in part and denies in part FXI's Motion.

### BACKGROUND

This Court previously set forth in great detail the factual background surrounding the polyurethane foam market and the alleged conspiracy, so does not repeat it here (Doc. 1102 at 2–12). It suffices to note that FXI is currently one of the largest polyurethane foam manufacturers in the United States, "produc[ing] foam for the home, healthcare, electronics, industrial, personal care, and transportation markets," with "$247 million in 2009 sales" (*id.* at 8). Direct Purchasers assert FXI,

with other Defendants, participated in a "conspiracy to fix the prices of flexible polyurethane foam and to allocate customers throughout the United States" (Doc. 1326-1 at 6).  Direct Purchasers further assert FXI participated in this conspiracy "throughout the class period" (Doc. 1343 at 62), defined as "from January 1, 1999 to July 31, 2010" (Doc. 1102 at 6).

Like other Defendants, FXI insists it did not engage in the alleged conspiracy and that the undisputed material facts do not support Direct Purchasers' claim against it.  Unlike the other Defendants, however, FXI's Motion for Summary Judgment does not argue the innocent nature of its own alleged overt acts during the ten years the conspiracy allegedly existed.  Rather, FXI observes it did not even come into existence until May 2009, near the end of the class period.  FXI explains it was incorporated for the purpose of purchasing the assets of Foamex International, Inc. ("Foamex"), which was bankrupt.  FXI then argues it is entitled to summary judgment because: (1) it is unrelated to Foamex and does not succeed to any antitrust liability Foamex may have had; and (2) FXI did not independently join the existing conspiracy.

The undisputed facts relevant to these arguments are set out below.

**History of Foamex and FXI**

*Foamex Bankruptcies*

Foamex came into existence around 1993, well before the beginning of the Class Period.  Within several years, partly through acquisitions, Foamex became the largest manufacturer of polyurethane foam in the United States.  In September 2005, however, Foamex filed for protection under Chapter 11 of the Bankruptcy Code.  *See In re Foamex Int'l, Inc.*, Case No. 05-BK-12685 (Bankr. D. Del.).

A year and a half later, in February 2007, the bankruptcy court confirmed a Joint Plan of Reorganization, ordering "discharge of all debts of, Claims against, Liens on, and Interests in [Foamex], [its] respective assets and properties, arising at any time before [February 12, 2007], regardless of whether a proof of Claim or Interest with respect thereto was filed" (Doc. 1326-4 at 32). Accordingly, as of February 12, 2007, all general unsecured claims against Foamex were discharged. With a restructured balance sheet, Foamex emerged from bankruptcy and continued business.

In early 2009, Foamex was a public company controlled by two investment management firms: D.E. Shaw and Goldman Sachs. Despite the 2007 bankruptcy reorganization, Foamex again found itself unable to continue servicing its debts. Hoping to avoid another bankruptcy, Foamex contacted a competitor, the Carpenter Company, to inquire whether Carpenter was interested in purchasing the Foamex assets. The discussions failed and, in February 2009, some two years after the first bankruptcy, Foamex again sought relief under Chapter 11 of the Bankruptcy Code. *See In re Foamex Int'l, Inc.*, Case No. 09-BR-10560 (Bankr. D. Del.).

Foamex now owed its first lien lenders $324.8 million, plus interest, fees, and expenses. Over half of this debt was owed to two creditors: a fund managed by MatlinPatterson Global Advisers, and a fund managed by Black Diamond Capital Management. In March 2009, the bankruptcy court approved a $95 million debtor-in-possession loan facility ("DIP Loan") among Bank of America, Foamex, and an entity known as "MP-Foam-DIP" -- the latter created by MatlinPatterson Global Advisers for the purpose of securing working capital. The bankruptcy court found the DIP Loan agreement was reached after "extensive negotiations conducted in good faith and at arm's length," and the court concluded the terms of the DIP Loan were "fair and reasonable" (Doc. 1326-6 at 42).

Foamex and MP-Foam-DIP then entered into an Asset Purchase Agreement ("March APA") which was publicly available on the bankruptcy court docket.  The March APA specifically excluded MP-Foam-DIP's assumption of, among other things, "any and all customer claims against [Foamex] . . . to the extent accruing, arising out of or relating to events, occurrences, acts or omissions occurring or existing prior to the Closing Date" (Doc. 1326-7 at 29).  Thereafter, Foamex filed a motion proposing to sell substantially all of its assets through an auction process, pursuant to the terms and conditions of the March APA.  The bankruptcy court approved this proposal, designating MP-Foam-DIP as the stalking horse bidder for the Foamex assets and giving MP-Foam-DIP the right to credit-bid its claims under the DIP Loan (*see generally* Doc. 1326-9).  MP-Foam-DIP's initial bid of $105 million was comprised of $78.4 million in cash and the assumption of $26.6 million in specified liabilities.

The bankruptcy court approved the manner and form of Notice to be used regarding the proposed auction sale of assets; specifically, requiring written notice to (among others) counsel for the unsecured creditors committee, all parties requesting notice pursuant to Bankruptcy Rule 2002, and all parties with executory contracts or known to have expressed an interest in buying the assets. In addition, a Notice was required to be published in the Wall Street Journal (Doc. 1326-9 at 3–4, 7). The bankruptcy court then approved the bidding procedures, which were specifically incorporated into the Notice, and which provided that the sale of assets would be "free and clear of all pledges, liens, security interests, encumbrances, claims, charges, options and interest thereon and there against (collectively, "Claims and Interests"), such Claims and Interests to attach to the net proceeds of the sale of the [Assets]" (Doc. 1326-9 at 15).  In other words, claims on the assets followed the sale proceeds; the claims did not stay with the assets themselves.

4

The asset auction took place in May 2009, and three competing bidders appeared: MP-Foam-DIP, Wayzata Investment Partners, and RBF Capital.  Following lively bidding, Foamex sought approval from the bankruptcy court of an all-cash bid of $141.5 million from Wayzata, and a ruling that the MP-Foam-DIP bid, which included cash and credit, was not qualified.  The bankruptcy court determined that MP-Foam-DIP could credit-bid and ordered Foamex to resume the auction (Doc. 1326-9 at 108).  When the auction concluded, Foamex selected the MP-Foam-DIP credit bid of $155 million (made jointly with Black Diamond) as the highest and best bid.  This auction history shows that, although MP-Foam-DIP ultimately succeeded in securing the purchase of assets, this result was certainly not a foregone conclusion.

Following a hearing, the bankruptcy court, on May 27, 2009, approved the action procedures and the Asset Sale.  Among other findings, the bankruptcy court concluded:

- [MP-Foam-DIP] in no way induced or caused the chapter 11 filings by [Foamex] . . . and no common identity of directors or controlling stockholders exists between [MP-Foam-DIP] and [Foamex] (Doc. 1326-6 at 7).

- "[MP-Foam-DIP] is not a mere continuation of [Foamex] . . . and . . . [MP-Foam-DIP] is not a successor to [Foamex] . . . and the sale does not amount to a consolidation, merger or de facto merger of [MP-Foam-DIP] and [Foamex]" (*id.* at 9).

- all of the "conditions of Section 363(f) of the Bankruptcy Code have been satisfied in full," and the sale of the assets by Foamex was "free and clear of all Liens and Claims against the Debtors, their estates or the Purchased Assets" (*id.* at 11–13).

- "the holders of such Liens or Claims [on Foamex assets] were adequately protected by having their Liens or Claims attach to the net cash proceeds of the sale ultimately attributable to the Purchased Assets in which such creditor alleges a Lien or Claims, in the same order of priority, with the same validity, force and effect that such Liens or Claims had prior to the sale, and subject to any claims and defenses the Debtors and their estates may possess with respect thereto"(*id.* at 12–13).

5

- "[MP-Foam-DIP] shall have no successor or vicarious liabilities of any kind or character, including, but not limited to, under any theory of antitrust" (*id.* at 27).

Two days after the bankruptcy court approved the sale, MP-Foam-DIP converted into a Delaware corporation and renamed itself Foamex Innovations, Inc. ("FXI"). A comparison just before and after the sale shows no common or overlapping ownership:

> Foamex:
> (a) just over 50% of shares were owned by D.E. Shaw; (b) about 35% of shares were owned by Goldman Sachs; (c) about 4% of shares were owned by Foamex President Jack Johnson; and (d) the remaining 11% of shares were owned by twelve other officers and directors of Foamex. Neither of the majority shareholders (D.E. Shaw and Goldman Sachs) later obtained any equity in FXI (Doc. 1359-24 at 7).[1]

> FXI:
> (a) about 57% of shares were owned by MatlinPatterson (Foamex's former creditor); (b) about 37% of shares were owned by Black Diamond (Foamex's former creditor); and (c) the remaining 6% of shares were owned by other former creditors (no single one of them owning more than 2%). No FXI officers or directors owned any shares. Further, neither MatlinPatterson nor Black Diamond had ever owned or controlled any equity in Foamex (Doc. 1359-9 at 35).

This statement -- no overlapping ownership -- holds true with regard to employee stock ownership as well. Specifically, Foamex had provided stock options and restricted stock grants to selected management employees through several different plans. For instance, when Foamex emerged from the earlier bankruptcy in 2007, it adopted a Management Incentive Plan that made available stock options and stock bonuses to certain senior employees and directors. Thus, several officers and directors owned stock in Foamex at the time of the 2009 Asset Sale. That equity, however, did not translate into any interest in FXI -- the inability of Foamex to make a distribution to unsecured creditors following the Asset Sale, along with the subsequent dissolution of Foamex, caused any

---

[1] The ownership percentages listed in the Proxy Statement total more than 100%, so these figures may not be exactly accurate. Further, a few other small shareholders are listed. This possible inaccuracy has no effect on this Court's analysis of whether there existed overlapping ownership.

existing equity ownership to become worthless.  The same held true for officers and directors who owned shares of Foamex.

On the other side of the coin, the March APA required FXI to enter into agreements with certain Foamex senior executives on substantially the same terms as their existing employment agreements -- including stock ownership plans.  Doc. 1326-7 at 59, 67; *see also* Doc. 1343-18 at 32 (CEO Johnson's employment agreement entitling him to participate in equity plan).  Accordingly, several months after the sale, FXI adopted a Management Equity Plan that provided stock options and restricted stock grants to selected high-level employees.  Until these equity awards were made available on December 30, 2009, none of the FXI management owned stock or stock options in FXI.  Further, FXI management did not receive equity awards as part of the Asset Sale -- they received only the right to participate in not-yet-created stock ownership plans.  Thus, to the extent a given executive worked for both Foamex and FXI, and also came to own stock in both entities, those ownership interests were unrelated.

On June 12, 2009, the sale closed and FXI entered into the polyurethane foam business.  Shortly thereafter, FXI hired nearly all of the former Foamex employees (*see* Doc. 1326-7 at 59 (March APA: "Purchaser will offer employment to . . . all employees of [Foamex] listed in Section 7.27(a) of the Seller Disclosure Schedule . . . on terms substantially similar to those in effect for such Offered Employees immediately prior to the Closing Date. . . . Purchaser intends that Section 7.7(a) of the Seller Disclosure Schedule shall contain substantially all of the employees of [Foamex].")).  These employees included: Jack Johnson, former President and CEO; Dave Prilutski, former Executive Vice President and COO; and Don Phillips, former Executive Vice President of Automotive Products.

7

Foamex, no longer in business, moved to dismiss the Chapter 11 bankruptcy proceedings in November 2009.  Foamex claimed remaining assets of $4 million for payment of wind-down costs, professional fees and the first lien debt.  There was no plan or order for a distribution to unsecured creditors from these remaining assets.  The bankruptcy court granted the motion in January 2010, dismissing the bankruptcy (Doc. 1326-12 at 31).  The unsecured creditors and shareholders did not receive distributions or any other value in the bankruptcy proceedings, nor did they acquire any equity interest in FXI.  In February 2010, Foamex -- which, by then, had been renamed Linwood International Holdings, Inc. -- was dissolved.

**FXI Business Activity**[2]

As noted, many FXI executives and managers had worked in the polyurethane foam industry for years, including past employment at Foamex.  To a large extent, these former Foamex employees "picked up where they left off," continuing on behalf of FXI the business Foamex had exited -- that is, manufacturing the same foam products, selling those products to the same customers, and vying against the same competitors.  Direct Purchasers claim Foamex had been a member of the conspiracy to fix, raise, and maintain the price of foam products, and further assert FXI quickly rejoined this conspiracy.  The undisputed facts relevant to this assertion follow.

In February 2010, Canadian polyurethane foam manufacturer Vitafoam sought admission to the U.S. Department of Justice ("DOJ") Corporate Leniency Program.  Vitafoam revealed to the DOJ

---

[2]

Several pieces of meaningful evidence discussed below were highlighted by Direct Purchasers during oral argument, but were *not* discussed in their summary judgment briefing.  This practice is discouraged.  *See Nerswick v. CSX Transp., Inc.*, 692 F. Supp. 2d 866, 882 (S.D. Ohio 2010), *affirmed*, 441 F. App'x (6th Cir. 2011) ("it is not the obligation of the court . . . to comb the record to find evidence or testimony establishing a party's case.").  That said, Plaintiffs' two requests to supplement the summary judgment record (Docs. 1363 and 1461) are granted, though the evidence adduced in Doc. 1363 is mostly unhelpful for the reasons stated in the FXI response at Doc. 1372.

that it participated in a conspiracy to violate the U.S. antitrust laws by fixing prices for polyurethane foam in the U.S. and Canadian markets.  Vitafoam's 30(b)(6) witness in this case, Bruce McCulloch, testified that "Rik Hennik and Bill Lucas of Vitafoam did meet and have conversations with Don Phillips of Foamex" regarding foam prices (Doc. 1343-55 at 832; *see also id.* at 831 ("There is evidence that suggests that Don Phillips from Foamex was also involved in those [conspiratorial] communications.")).  Don Phillips, FXI Executive Vice President of Global Automotive Products, was a high-level manager whom FXI hired shortly after completion of the Asset Sale.  McCulloch further testified, however, that Vitafoam knew of no instances of "conspiratorial communications" between Phillips (or any other FXI employee) and Vitafoam (or any other market participant) *after* June 12, 2009, the date FXI began business operations.  Specifically, McCulloch testified as follows (Doc. 1326-15 at 10–12 (objections omitted)):

> Q.    Do the Vitafoam defendants know of any instances in the United States when any competitor coordinated a price increase letter with FXI, the entity that purchased assets June 12, 2009?
> A.    Vita is not aware of coordination with FXI after June 12, 2009.
>
> Q.    Any instances in Canada?
> A.    After June 12 , 2009?
>
> Q.    Correct.
> A.    Not aware of them.
>
> Q.    Do the Vitafoam defendants know of any instances in the United States when any competitor reached agreement to allocate customers with FXI?
> A.    As defined after June 12, 2009, the answer is no.
>
> Q.    Any instances in Canada?
> A.    With the same qualification, the answer is no.
>
> Q.    Do the Vitafoam defendants know of any instances in the United States when any competitor fixed transactional prices for polyurethane foam with FXI?
> A.    Again, same qualification. The answer is no.

Q. Any instances in Canada?
A. Again, same qualification. The answer is no.

Q. The Vitafoam defendants' investigation has not uncovered any communications at all between Vitafoam, Inc. and FXI, correct?
A. If you want to say "conspiratorial communications," . . . then I can say no[, we have not uncovered any].

Woodbridge Foam Fabricating, Inc. ("Woodbridge Fabricating") is another Defendant that has admitted to price-fixing. Evidence exists that Woodbridge Fabricating conspired with both Foamex companies (before their respective bankruptcies) to fix prices. For example, Bob Bisiorek (Woodbridge) sent an internal email on June 24, 2008 to Frank Donato (also Woodbridge), saying he talked to "DP from F [Don Phillips from Foamex]," and "told him we are going out with our [Price Increase Announcement] letter with 12% effective July 1 for automotive [foam products]. He said he would follow" (Doc. 1343-14 at 117). Similarly, on January 19, 2005, Donato (Woodbridge) sent an internal email to Peter Farah (also Woodbridge) regarding prices being charged by Vitafoam and Foamex. Donato stated he would "call DP [Don Phillips]" and "try to keep Vita and fmx [Foamex] on board. Forget share for now - fix pricing" (Doc. 1343-14 at 114). Woodbridge Fabricating, however, only admitted (as part of its guilty plea in its criminal case) to engaging in an illegal conspiracy from June 2008 through April 2009 -- before the Asset Sale occurred and before FXI came into existence (Doc. 1326-16 at 21).

Nonetheless, there exists more than a scintilla of evidence that Phillips and other Foamex employees continued to engage in conspiratorial communications after April 2009. For example, on May 29, 2009 -- two weeks before the Asset Sale closed -- Nathan Slating (Foamex) sent an internal email to Don Phillips (also Foamex), forwarding pricing information he had obtained from Steve Lukowski (Woodbridge), and stating: "For your ears only. Keep this on the down low. I don't want

10

it out I'm talking pricing with the comp [competition]. I told Steve we'd get together for lunch. Too many e-mails" (Doc. 1343-13 at 2).

Phillips also mentioned Woodbridge pricing in an email shortly after the closing in June 2009, although the context was more innocuous. FXI President Jack Johnson contacted Robert Beamish, Chairman of Woodbridge and a large Woodbridge stockholder. Johnson stated FXI was interested in Woodbridge as a potential acquisition; Beamish explained he had recently sold his personal stock to Woodbridge and suggested Johnson should instead contact Woodbridge CEO Bob Magee to discuss a possible combination. FXI, through Dave Prilutski (COO) and Don Phillips, knew Johnson had approached Beamish. Thus, Phillips sent an email on July 8, 2009 to Johnson and Prilutski with the subject matter "Woodbridge?" The email reads: "Any progress/update on our conversations with them? They just dropped prices again in the Southeast (at Guilford and Milliken) based off the one-time adjustment in the ICIS index. I'm holding the line again and am growing tired of defending" (Doc. 1343-14 at 135). Johnson's same-day response to Phillips was: "Have not been contacted since my discussion with Beamish two weeks ago" (*id*).

Over the next few months, Johnson continued to discuss with Magee of Woodbridge the possibility of acquisition or joint venture, but there is no evidence that Johnson or anyone else discussed pricing (*see* Doc. 1359-6 at 7 (agenda sent by Johnson to Magee in late July 2009 listing discussion topics, including a potential joint venture with Woodbridge in lieu of acquisition, with no mention of prices); Doc. 1359-5 at 1–9 (emails ranging in dates from July 20 to August 18, 2009 regarding scheduling a meeting between Magee, Johnson and others to discuss a possible joint venture, with no mention of prices). Similarly, Phillips, when asked about the July 8, 2009 "Woodbridge?" email, asserted his pricing remark related to the possible acquisition and had nothing to do with an agreement on prices (*see* Doc. 1359-4 at 3; *see also* Doc. 1359-6 at 6) (Magee and

11

Johnson met in September 2009 and concluded no joint venture or acquisition would go forward). Johnson's advance toward Woodbridge was not extraordinary; Foamex had made a similar (unsuccessful) advance toward Carpenter, earlier in 2009, in an effort to avoid bankruptcy.

Another post-Asset Sale example of an FXI communication regarding competitors' prices is a May 23, 2010 email from FXI salesman Brian O'Donnell to his boss, Gary Delmatto.  The email states that foam competitor Carpenter "will send out a 12% increase letter tomorrow" (Doc. 1343-14 at 137).  Direct Purchasers assert this is evidence that FXI and Carpenter were sharing price information in order to fix and maintain prices.  However, O'Donnell states he received Carpenter's 12% price increase information, not from Carpenter, but from an FXI customer (Rusmur Floors) who had already received it from Carpenter (Doc. 1359-7 at 3).  O'Donnell further claims his customers would often tell him about impending price increases that had already been announced by competitors, and he never spoke directly with any competitor about pricing.  While Direct Purchasers offer nothing to contravene O'Donnell's explanations, FXI cites nothing from its customers to support the explanations.  Similarly, in relation to other internal emails sent by FXI salesmen Chip Benjamin, Matt McDevitt, and Gary Delmatto regarding competitors' pricing, the salesmen all state they obtained the price information from their own customers and not through direct conversation with competitors (Doc. 1359-7 at 7, 15, 25) (sworn testimony of these salesmen).

Other post-Asset Sale emails do suggest FXI shared price information with its competitors directly -- not through customers -- well before the prices became effective or were publicly announced.  For example, on December 11, 2009, Fred Rullo, FXI Senior Vice President, sent an email to Randall Lake, General Manager of Future Foam.  The email reads: "Please see the price increase announcement from FXI effective for all foam products effective January 11" -- which was a month away (Doc. 1343-50 at 195) (*but see* Doc. 1467 at 179) (oral argument transcript, where

counsel for FXI asserts Future Foam was both a competitor and a customer, and this email was sent to Future Foam in its role as customer).  Another example: on May 20, 2010, Cleon Smith (Flexible Foam) sent this internal email to Jeff Briney:  "This is the status on the price increase from our competitors at this time.  Carpenter says they are going up on June 1 but won't give a percentage. Future says they . . . may back off [a price increase] till mid June.  NCFI says they are going up on June 1 but won't give a percentage. Vita says they are doing nothing now but may later in the summer.  Foamex [sic, FXI] says they are going up June 1 but won't give a percentage" (Doc. 1343-19 at 311–12).  And a third example: on August 21, 2009, Carlo Fazzalari (Carpenter) sent an email to Domenic Sinopoli (Woodbridge) enclosing the FXI price increase letter: "Don't say where you got it" (Doc. 1343-49 at 96).  These communications can reasonably be construed as evidence that FXI was sharing information with competitors in order to maintain prices, and FXI and its competitors were attempting to hide the fact that they did so.

### ANALYSIS

Direct Purchasers assert FXI is liable for participating in an antitrust conspiracy through two different avenues.  First, FXI is liable because its predecessor Foamex is liable, and FXI succeeds to Foamex's liability.  Second, FXI is liable because, after it came into existence in 2009, it joined the ongoing conspiracy.  Each argument is addressed next in turn.

#### Liability as Successor to Foamex

Direct Purchasers' first theory is that FXI is liable because Foamex is liable, and FXI succeeds to Foamex's liability.  Direct Purchasers' explication of this theory includes several sub-arguments. Specifically, Direct Purchasers argue:

- the 2007 bankruptcy of original Foamex did not discharge antitrust claims, so "new" Foamex remains liable for all of the pre-February 2007 antitrust liability of "old" Foamex;

- despite statements by the bankruptcy court, the 2009 sale did not cleanse the assets from Foamex of antitrust liability for pre-sale conduct;

- even if the bankruptcy court's approval of the 2009 Asset Sale did cleanse the assets of antitrust liability, the Sale Order is not binding on Direct Purchasers because they did not receive constitutionally adequate notice of the bankruptcy proceeding, and so were deprived of due process; and

- there was a de facto merger of Foamex with FXI, so that FXI succeeded to Foamex antitrust liability (which, pursuant to the first argument above, also included "old" Foamex).

Notably, the first three arguments are moot if Direct Purchasers' last argument fails. In other words, even *assuming* that: new Foamex remains liable for old Foamex antitrust violations; *and* the 2009 Asset Sale did not cleanse the Foamex assets of antitrust liability; *and* the Sale Order is not binding on Direct Purchasers because they did not receive adequate notice, FXI is responsible for new Foamex antitrust liability under this theory only if FXI is new Foamex's successor. Because this Court concludes FXI is not "new" Foamex's successor, this Court addresses the first three arguments only briefly and concentrates its analysis on the question of successor liability.

### The 2007 Bankruptcy of Old Foamex

Direct Purchasers argue their antitrust claims were "unliquidated claims" excepted from discharge under specific terms of the 2007 bankruptcy plan. But the confirmed plan explicitly defined and listed all of the unliquidated claims that were not discharged, and Direct Purchasers' antitrust claims were not included (*see* Doc. 1326-4 at 26, ¶ 35; Doc. 1359-27 at 27 & 129–36). Normally, confirmation of a reorganization plan "discharges the debtor from any debt that arose before the date of . . . confirmation." 11 U.S.C. § 1141(d). Further, Section 101(12) of the Bankruptcy Code defines "debt" as "liability on a claim," and Section 101(5) provides that a "claim" includes a "right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, [or] unmatured." Thus, Direct Purchasers' antitrust claims against old Foamex *were*

14

discharged pursuant to the 2007 bankruptcy plan. As discussed below, however, even if Direct Purchasers are correct that "new" Foamex remained liable for the "old" antitrust violations despite the 2007 bankruptcy, FXI does not succeed to either "new" or "old" Foamex antitrust liability.

### The 2009 Asset Sale of New Foamex

Direct Purchasers also argue the 2009 Asset Sale did not cleanse the assets purchased by FXI. The logic behind this argument, however, is unconvincing.

Direct Purchasers observe that 11 U.S.C. § 363(f) provides a debtor may sell property "free and clear of any *interest* in such property of an entity other than the estate" (emphasis added), and Direct Purchasers argue their antitrust claim is not an "interest." Direct Purchasers cite *Michigan Employment Sec. Comm'n v. Wolverine Radio Co.*, 930 F.2d 1132, 1147 n.23 (6th Cir. 1991), which provides some inferential support for this proposition.

Other courts, however, have held that Section 363(f) should be read more broadly to extinguish, as against purchasers, not only "interests" in property being sold but also "claims" against that property. *See, e.g., In re Trans World Airlines, Inc.*, 322 F.3d 283, 293 (3rd Cir. 2003); *In re Grumman Olson Indus.*, 467 B.R. 694, 702 (S.D.N.Y. 2012) ("Although the text of the statute expressly refers only to interests in the property itself, it is now generally agreed -- including in this Circuit -- that this provision may more broadly extinguish claims that arise from the property being sold.") (citations and internal quotation marks omitted).

Further, in *Al Perry Enterps. v. Appalachian Fuels, LLC*, 503 F.3d 538, 541 (6th Cir. 2007), the Sixth Circuit ruled that "[t]he bankruptcy court has clear power to approve the sale of the debtors' assets free and clear of *any interest or claims* that could be brought against the bankrupt estate during bankruptcy pursuant to 11 U.S.C. § 363(f)." *Id*. at 541 (emphasis added) (finding the effect of the bankruptcy court's sale order was to extinguish a *claim*). Thus, *Appalachian Fuels* appears to bring

the Sixth Circuit into alignment with the majority view.  As such, the 2009 Sale Order left Direct Purchasers' antitrust claims attached to the net cash proceeds of the Asset Sale belonging to Foamex, and not to FXI's purchased assets.

### The 2009 Bankruptcy Sale Order

Direct Purchasers assert the Sale Order is not binding on them because they did not receive constitutionally adequate notice of the bankruptcy proceeding.  This assertion is questionable.  The Second Circuit, in a price-fixing case, noted that whether notice of a bankruptcy proceeding was adequate "often turns on what the debtor or the claimant knew about the claim or, with reasonable diligence, should have known." *DPWN Holdings (USA), Inc. v. United Air Lines, Inc.*, 747 F.3d 145, 151 (2d Cir. 2014).

In this case, on the same date that Foamex filed for bankruptcy (February 18, 2009), it issued a press release and a letter to all its customers so stating, including many of Direct Purchasers in this case.  At least one FXI customer who received this letter, Plaintiff Adams Foam Rubber Company ("AFRC"), had earlier raised concerns that Foamex was engaging in a price-fixing conspiracy (Doc. 1359-21 at 2–3) (2007 email from AFRC Executive Vice President (an attorney) to a foam chemical supplier, asking about the appearance of price collusion by foam producers).  *See also* Doc. 1359-21 at 7 (emails between AFRC and Foamex discussing bankruptcy).

### Successor Liability

As an initial matter, it bears repeating that the bankruptcy court explicitly ruled FXI did *not* succeed to Foamex's liability and the two entities did not merge: "[MP-Foam-DIP] is not a mere continuation of [Foamex] . . . and . . . [MP-Foam-DIP] is not a successor to [Foamex] . . . and the sale does not amount to a consolidation, merger or de facto merger of [MP-Foam-DIP] and [Foamex]" (Doc. 1326-6 at 9).  Direct Purchasers assert this language was simply boilerplate, is not supported

16

by any analysis, and does not bind them or this Court.  For the sake of simplifying the analysis, this Court will simply accept all of this as true.[3]  Thus, this Court must determine whether a reasonable fact-finder could conclude FXI is Foamex's successor.

FXI asserts, and Direct Purchasers agree, that this question must be examined under New York law (Doc. 1326-1 at 15; Doc. 1343 at 107).  The general rule in New York is that "a corporation that purchases the assets of another corporation is generally not liable for the seller's liabilities."  *New York v. Nat'l Serv. Indus.*, 460 F.3d 201, 209 (2d Cir. 2006).  However, there are four "exceptions to this rule."  *Id.*  Specifically, "a buyer of a corporation's assets will be liable as its successor if: '(1) it expressly or impliedly assumed the predecessor's . . . liability, (2) there was a consolidation or [de facto] merger of seller and purchaser, (3) the purchasing corporation was a mere continuation of the selling corporation, or (4) the transaction is entered into fraudulently to escape such obligations.'"  *Id.* (quoting *Schumacher v. Richards Shear Co.*, 451 N.E.2d 195, 198 (N.Y. 1983)).

Here, there is no question that FXI did not agree to assume liability for Direct Purchasers' antitrust claims.  FXI agreed to assume only those liabilities specifically set forth in the March APA and approved by the Sale Order, and Direct Purchasers' claims were not included among those liabilities.  Further, the March APA specifically excluded "any and all customer claims against [Foamex], whether known or unknown . . . arising out of or relating to events, occurrences, acts or omissions occurring or existing prior to the Closing Date" (Doc. 1326-7 at 29).  Accordingly, Direct

---

[3] Once again, this assumption is questionable.  Even if Direct Purchasers were challenging the Sale Order on direct appeal, which they are not, a "bankruptcy court's findings of fact are reviewed for clear error."  *U.S. Bank Nat'l Ass'n v. U.S. E.P.A.*, 563 F.3d 199, 205 (6th Cir. 2009).  Although this Court believes the bankruptcy court's order is, at the very least, entitled to deference, this Court does not simply adopt the bankruptcy court's findings and conclusions recited in the *Sale Order* at 9, ¶ S.  Rather, for all the reasons stated in this Order, this Court independently concludes the bankruptcy court was entirely correct when it concluded FXI is neither a successor to nor a mere continuation of, Foamex, and FXI did not engage in a de facto merger with Foamex.

Purchasers do not suggest the first exception to New York's general rule applies. Neither do they assert fraud was involved in the sale to FXI, and so the fourth exception also does not apply.

Rather, Direct Purchasers base their successor liability arguments on the second and third exceptions to the general rule. These "two remaining exceptions -- namely the de facto merger and mere continuation exceptions -- though routinely listed separately, are often regarded as so similar as to be considered a single exception." *Douglas v. Stamco*, 363 F. App'x 100, 102 (2d Cir. 2010). The essential inquiry for both is whether "a transaction, although not in form a merger, is in substance a consolidation or merger of seller and purchaser." *Nat'l Serv.*, 460 F.3d at 209. In other words, the question in this case becomes: was the Asset Sale a "de facto merger"? *See Stamco*, 363 F. App'x at 102.

The *Stamco* and *National Service* courts set out the factors this Court should examine to answer this question. "[T]o determine whether there has been a de facto merger, the Court considers whether there was: '(1) continuity of ownership; (2) cessation of ordinary business and dissolution of the acquired corporation as soon as possible; (3) assumption by the purchaser of the liabilities ordinarily necessary for the uninterrupted continuation of the business of the acquired corporation; and (4) continuity of management, personnel, physical location, assets, and general business operation.'" *Stamco*, 363 F. App'x at 102 (quoting *Nat'l Serv.*, 460 F.3d at 209). The first factor -- continuity of ownership -- "is the essence of a merger, and therefore the exception cannot apply in its absence." *Id.* (quoting *Nat'l Serv.*, 460 F.3d at 211); *see Cargo Partners v. Albatrans, Inc.*, 352 F.3d 41, 46 (2d Cir. 2003) ("the doctrine of de facto merger in New York does not make a corporation that purchases assets liable for the seller's contract debts absent continuity of ownership").

Regarding the four factors set out in *National Service*, Direct Purchasers state that "[n]o one factor is dispositive" and cite *Hinds County, Miss. v. Wachovia Bank N.A.*, 708 F. Supp. 2d 348,

18

363–64 (S.D.N.Y. 2010) (Doc. 1343 at 109).  But *Hinds* actually stands for the proposition that "[n]ot all of these elements are necessary to find a de facto merger." *Id.* (quoting *Fitzgerald v. Fahnestock & Co.*, 730 N.Y.S.2d 70, 71 (N.Y. Ct. App. 2001)).  In fact, the law is clear that absence of the first factor -- continuity of ownership -- is dispositive.  *See New York v. Nat'l Serv. Indus., Inc.*, 380 F. Supp. 2d 122, 131 (E.D.N.Y. 2005), *affirmed*, 460 F.3d 201 (2d Cir. 2006) ("*[S]ome* evidence of continuity of ownership is *required* to find that a de facto merger has occurred, but . . . there is no one particular type or quantum of evidence that must be shown for purposes of this analysis") (emphases added); *Silverman Partners LP v. Verox Grp.*, 2010 WL 2899438, at \*4 (S.D.N.Y. 2010) ("The key, and one factor that must be present according to the Second Circuit, is continuity of ownership.") (citing *Cargo* and *National Service*).

At the end of the day, if Direct Purchasers cannot show continuity of ownership between Foamex and FXI, then they cannot show de facto merger; if Direct Purchasers cannot show de facto merger, then they cannot avoid the general rule in New York that a corporate purchaser of another's assets does not succeed to the seller's liabilities; and if Direct Purchasers cannot avoid the general New York rule, then summary judgment on this theory of liability is required.

As discussed above, there was no continuity of ownership between Foamex and FXI.  The two principal owners of Foamex shares were D.E. Shaw (50%) and Goldman Sachs (35%), with the remaining 15% owned by various Foamex officers and directors.  In contrast, the two principal owners of FXI were MatlinPatterson (57%) and Black Diamond (37%), with the remaining 6% owned by other Foamex creditors (none of which had owned stock in Foamex).  There was simply no overlap in ownership between Foamex and FXI.

19

To avoid facing this stark fact, Direct Purchasers instead direct this Court's attention to the two employee stock ownership plans. Direct Purchasers observe (Doc. 1343 at 115) (internal citations omitted):

> Before the Foamex bankruptcy, the company's management received stock options and stock as part of their respective compensation plans and thus were the company's shareholders and part-owners.  Following the Sale, [FXI] once again awarded management its stock, this time at just over 10% of the now-private company's stock in the form of Series B common stock.  In subsequent financing materials, [FXI] confirmed that its "Common B Shares" constituted 10% of the company's ownership. This is continuity of ownership, plain and simple.

This recitation, however, is *too* plain and simple, because it ignores critical details.  FXI management did not receive any shares (through the employee stock ownership program or otherwise) until, at the earliest, December 30, 2009, over six months after the Asset Sale closed.  This half-year gap cannot reasonably fit within the definition of "continuous ownership."  *See Shamis v. Ambassador Factors Corp.*, 34 F. Supp. 2d 879, 897 (S.D.N.Y. 1999) ("The 'continuity of ownership' factor looks to whether shareholders of the predecessor become, *at the time of the sale of the assets*, shareholders of the successors [sic] corporation.") (emphasis added).  That the March APA contemplated FXI would *eventually* award stock ownership to its executives is not tantamount to those executives having actual, continuous ownership in the two companies before, during, and after the Asset Sale, nor to actual ownership in FXI at the time of the Asset Sale (*see* Doc. 1326-8 at 36 & 92) (Disclosure Schedule of the stock ownership plans and stating they are *not* assumed by FXI).

Indeed, it is undisputed that: managers who owned Foamex shares did not receive any value for their stock; and managers at FXI did not receive shares (or even options) *as part of the Asset Sale*, nor as some sort of exchange for their earlier-owned Foamex shares.  Again, these characteristics cannot be reconciled with the concept of "continuous ownership."

20

The case of *Desclafani v. Pave-Mark Corp.*, 2008 WL 3914881 (S.D.N.Y. 2008), is instructive.  In *Desclafani*, the plaintiff was injured while using a product manufactured by defendant Pave-Mark.  Thereafter, co-defendant Stimsonite purchased Pave-Mark's assets.  Plaintiff sued both Pave-Mark and Stimsonite, asserting Pave-Mark was directly liable and Stimsonite succeeded to Pave-Mark's liabilities pursuant to de facto merger.  To show continuity of ownership between Pave-Mark and Stimsonite, plaintiff noted that: Walter Finley was an executive and majority shareholder at Pave-Mark, and "Stimsonite [later] hired Finley as an executive officer, paid him *pursuant to a Pave-Mark bonus plan that Stimsonite assumed* under the [asset purchase agreement], and subsequently . . . granted him Stimsonite stock options." *Id.* at *4  (emphasis added).  The court found this argument "unpersuasive because there is no evidence in the record that Finley received an ownership interest in Stimsonite -- whether stock or stock options -- as part of the asset purchase," and granted summary judgment to Stimsonite.  *Id.*

The circumstances in this case, where the Foamex executives were small-minority shareholders and subsequently paid under FXI's own compensation plan, not an assumed Foamex compensation plan, weigh even more heavily in favor of summary judgment.  In this case, like *Desclafani*, executive stock ownership in both the asset-selling and asset-buying companies does not establish continuous ownership because the latter equity was not part of the asset purchase itself.

The cases cited by Direct Purchasers are not to the contrary.  In *Ortiz v. Green Bull, Inc.*, 2011 WL 5554522 (E.D.N.Y. 2011), the court examined only whether plaintiff *stated a claim* for de facto merger, not whether the claim survived summary judgment.  *See id.* at *8 ("what the Plaintiff needs to show to ultimately prevail on a de facto merger claim and what the Plaintiff must plead to state a claim are two separate inquiries").  And in *TAP Holdings, LLC v. Orix Fin. Corp.*, 45 Misc.3d 1217(A) (N.Y. Sup. Ct. 2014), continuity of ownership was clear.  *See id.* at *10 (defendants "held

and exercised the rights of the 100% equity owner of Tap prior to the Asset Transfer, and are currently the 80% equity owners of New Tap"); *id.* at *3 (the "Asset Transfer purportedly did not include any notice to Tap Holdings or the public in general, nor did the [defendants] arrange for an auction or any other mechanism by which other parties, including Direct Purchasers, would be able to submit a competing offer").

In sum, the "de facto merger" exception to the general New York rule (that a corporate asset purchaser does not succeed to the seller's liabilities) does not apply in this case. And, as noted earlier, the "de facto merger and mere continuation exceptions [to the general rule] . . . are often regarded as so similar as to be considered a single exception." *Stamco*, 363 F. App'x at 102. However, to be cautious, this Court separately examines New York case law applicable to the "mere continuation" exception.

The "mere continuation" exception to the general rule focuses on whether the asset sale simply allowed the selling corporation to continue in a different form. It is not meant to capture all sales of going-concern businesses, but rather, only those that are akin to a reorganization. *See Alvarado v. Dreis and Krumpf Mfg. Co.*, 2004 WL 258117, at *3 (N.Y. Sup. Ct. 2004) ("The 'mere continuation' exception refers to a continuation of the selling corporation in a different form, and not merely, as plaintiff suggests here, to a continuation of the seller's business."). Thus, the "mere continuation" exception "refers to corporate reorganization . . . where only one corporation survives the transaction; the predecessor corporation must be extinguished." *Schumacher*, 451 N.E.2d at 198.

Direct Purchasers are correct that, in this case, FXI clearly did continue Foamex's business operations after the Asset Sale. The March APA, itself, makes this plain, as Direct Purchasers describe (Doc. 1343 at 113) (citing to Doc. 1326-7):

For nearly all of the assets it acquired, FXI required Foamex to warrant that the assets were fit for the immediate continuation of the "Business." (*See, e.g.*, APA, FXI App. Ex. 9, at § 5.6(b).)  It further required Foamex to "use reasonable efforts to preserve the ongoing operations of the Business." (*Id*. at § 7.1(a)(iii).)  FXI then acquired Foamex's cash and cash equivalents, accounts receivable, inventory, leases, real property, personal property, intellectual property, rights under purchased contracts, general intangibles including goodwill, warranties and indemnities, insurance policies to the extent they related to the Business, properties under employee benefit plans, rights under collective bargaining agreements, and other property. (*Id*. at § 2.1.)  It further acquired all of Foamex's books and records, including customer lists, and promised to offer all of Foamex's employees employment with FXI on substantially the same terms. (*Id*. at § 7.7.)  FXI even acquired the Foamex name, together with a covenant by Foamex and all of its affiliates to cease use of the "Foamex" name. (*Id*. at § 7.13.)  There is no real dispute that FXI continued Foamex's turnkey business.

But, to repeat, the "mere continuation" exception does not focus on whether the *existing business* continues; if this were the case, the exception would nearly always swallow the general rule because the purchaser is usually buying the assets for the very purpose of engaging in the existing business.  Rather the "mere continuation" exception applies where it is the corporate entity itself that continues.  *See Parra v. Production Machine Co.*, 611 F. Supp. 221, 224 (E.D.N.Y. 1985) (the exception "envisions a common identity of directors, stockholders and *the existence of only one corporation at the completion of the transfer*") (emphasis added).

In this case, following the Asset Sale, Foamex remained in existence for a while as a corporate entity.  Indeed, the undisputed facts show that seven months *after* the Asset Sale closed, the bankruptcy court directed the extant Foamex to pay administrative priority claims and wind down expenses from its remaining $4 million in assets.  Under New York law, this fact precludes application of the "mere continuation" exception.  *See Schumacher*, 451 N.E.2d at 198 ("Since [the asset seller] survived the instant purchase agreement as a distinct, albeit meager, entity, the [trial court] properly concluded that [the asset purchaser] cannot be considered a mere continuation of [the seller].").

Finally, to the extent Direct Purchasers imply the Asset Sale was nothing more than a scheme to allow Foamex to continue as a reorganized-but-identical entity, it is notable that two completely unrelated bidders appeared at the Asset Sale (Wayzata Investment Partners and RBF Capital), and Foamex sought permission from the bankruptcy court to accept Wayzata's bid. This shatters any inference that the transaction between Foamex and FXI was arranged from the start to allow a "mere continuation" of Foamex in a different form.

### Liability for Joining the Conspiracy

Direct Purchasers also assert FXI is independently liable because, after it began doing business on June 12, 2009, it joined an ongoing, existing conspiracy to fix prices in the polyurethane foam market. Indeed, Direct Purchasers assert FXI is liable not only for damages going forward from the point it joined the conspiracy in 2009, but for all damages flowing from the time the conspiracy began. Case law supports this view of damages. *See United States v. Ellerman*, 411 F.3d 941, 948 (8th Cir. 2005) ("By joining the conspiracy, [the defendant] participated in, and is liable for, all prior co-conspirators' actions that furthered the conspiracy."). *See also In re Travel Agent Comm'n Antitrust Litig.*, 583 F.3d 896, 902 (6th Cir. 2009) ("As a general rule, a successfully reorganized debtor under Chapter 11 of the Bankruptcy Code is liable for any independent conduct that arises after confirmation of its bankruptcy plan.").

For FXI to be liable for damages under this theory, however, Direct Purchasers must show FXI did, in fact, join the conspiracy. This evidentiary burden is not onerous: "[o]nce a conspiracy has been shown, only 'slight' evidence is needed to connect a defendant to a conspiracy." *United States v. Henley*, 360 F.3d 509, 514 (6th Cir. 2004); *see In re Popcorn Antitrust Litig.*, 783 F. Supp. 1194, 1197 (D. Minn. 1991) (denying summary judgment in a price fixing action based on this "slight evidence" standard). On the other hand, "[a]lthough only 'slight' evidence is needed to connect a

24

defendant to a conspiracy, 'mere association with conspirators is not enough to establish participation in a conspiracy.'" *United States v. Gibbs*, 182 F.3d 408, 422 (6th Cir. 1999) (quoting *United States v. Pearce*, 912 F.2d 159, 162 (6th Cir. 1990)). The question presented here is whether, when viewed in a light most favorable to Direct Purchasers, there exists enough evidence to allow a jury to reasonably conclude FXI knowingly joined the alleged conspiracy and undertook at least some, "slight" activity to accomplish its objectives.

*In re Travel Agent Commission Antitrust Litig.*, 583 F.3d 896 (6th Cir. 2009), reaffirmed that an "antitrust cause of action accrues . . . each time a defendant commits an act that injures the plaintiff's business." *Id.* at 902 (quoting *DXS, Inc. v. Siemens Med. Sys., Inc.*, 100 F.3d 462, 467 (6th Cir. 1996), and citing *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 401 U.S. 321, 338 (1971)). The court explained that the "focus is on the timing of the causes of injury, *i.e., the defendant's overt acts*, as opposed to the effects of the overt acts." *Id.* (quoting *Peck v. Gen. Motors Corp.*, 894 F.2d 844, 849 (6th Cir. 1990)) (emphasis modified).

Further, to establish that FXI joined the conspiracy, Direct Purchasers must show there was "a unity of purpose or a common design and understanding, or a meeting of the minds in an unlawful arrangement." *Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 764 (1984). Although a conspiracy may be proved by direct or circumstantial evidence, the conspiracy cannot be assumed: "proving that conduct is consistent with a conspiracy is not sufficient to allow an inference of conspiracy absent some evidence which tends to exclude the possibility that conduct is independent." *Riverview Investments, Inc. v. Ottawa Cmty. Improvement Corp.*, 899 F.2d 474, 485 (6th Cir. 1990). The Supreme Court clarified this rule as follows:

25

> On summary judgment the inferences to be drawn from the underlying facts . . . must be viewed in the light most favorable to the party opposing the motion." * * * But antitrust law limits the range of permissible inferences from ambiguous evidence in a § 1 case.  Thus, in *Monsanto Co. v. Spray-Rite Service Corp.*, 465 U.S. 752 (1984), we held that conduct as consistent with permissible competition as with illegal conspiracy does not, standing alone, support an inference of antitrust conspiracy . . . . To survive a motion for summary judgment or for a directed verdict, a plaintiff seeking damages for a violation of § 1 must present evidence "that tends to exclude the possibility" that the alleged conspirators acted independently. 465 U.S., at 764. [Direct Purchasers] in this case, in other words, must show that the inference of conspiracy is reasonable in light of the competing inferences of independent action or collusive action that could not have harmed [Direct Purchasers].

*Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587–88 (1986) (citations omitted).

Here, Direct Purchasers allege FXI conspired to collude with its competitors by sharing pricing information, setting nearly identical prices and price-increase effective dates, and agreeing not to compete for customers based on price.  Direct Purchasers assert they have "documentary and testimonial evidence of FXI's post-June 12, 2009 collusion" (Doc. 1343 at 96).  In response, FXI asserts that nearly all of Direct Purchasers' evidence: (1) relates to conduct prior to when FXI came into existence in June 2009; (2) relates to the conduct of other Defendants, not to FXI; and (3) is revealed by other, explanatory evidence as equally consistent with permissible, competitive conduct. For example, FXI observes: (1) Vitafoam's testimony that it shared conspiratorial communications with Don Phillips relates only to the time Phillips was employed with Foamex, not FXI; (2) many emails contain hearsay statements from competitors about what FXI said it would do regarding pricing, as opposed to statements from FXI, itself; and (3) numerous FXI salesmen explain they obtained their competitors' price information from customers, not from the competitors themselves, and Direct Purchasers have adduced no evidence tending to undermine this explanation.

FXI is correct that some of Direct Purchasers' evidence may be "explained away," but not all of it.  It is true the internal email that Slating sent to Phillips ("For your ears only.  Keep this [Woodbridge price information] on the down low.  I don't want it out I'm talking pricing with the comp [competition].  I told Steve [from Woodbridge] we'd get together for lunch.  Too many e-mails."), which is especially damning, was dated two weeks before the Asset Sale closed.  But this email cannot be examined in isolation, without context.  A reasonable jury could conclude the totality of the evidence also shows that: (1) Foamex had been conspiring for several years; (2) virtually all of its employees were hired by FXI to run the new business; (3) Slating sent the email on the cusp of the Asset Sale and indicated he would take further action in the near future -- which he knew had to be on behalf of FXI; and (4) FXI engaged in other overt acts after the Asset Sale.  In other words, a jury could reasonably rely on the Slating email to reject FXI's innocent explanations.

And evidence of post-Asset Sale overt acts by FXI does exist, including: (1) Carpenter's August 2009 email to Woodbridge enclosing FXI's price increase letter, warning "Don't say where you got it;" (2) the December 2009 email from FXI to Future Foam about FXI's future price increase; and (3) the May 2010 Flexible Foam internal email setting out several competitors' stated future pricing intentions, including FXI's.  Moreover, a jury may reject the explanations of FXI salesmen regarding the source of their competitive pricing information.  *See In re High Fructose Corn Syrup Antitrust Litig.*, 295 F.3d 651, 655 (7th Cir. 2002) ("[A] reasonable jury [may refuse] to accept . . . testimony, which is self-serving, uncorroborated, implausible, . . . and inconsistent with the overall evidence of conspiracy"); *United States v. Avery*, 128 F.3d 966, 971 (6th Cir. 1997) (even though witnesses "offered an innocent explanation for the incriminating facts proved by the government [in a conspiracy trial], the jury was free to disbelieve [them]"); *Door v. City of Ecorse*, 2007 WL

27

1308684, at *3 (E.D. Mich. 2007), *affirmed*, 305 F. App'x 270 (6th Cir. 2008) (a "jury [is] free to disbelieve [a witness's] testimony in whole or in part").

To be fair, the overt acts listed above certainly do not amount to overwhelming evidence of conspiratorial activity by FXI. But neither are these acts wholly insignificant, as FXI asserts. The sum of this evidence allows a jury to reasonably conclude FXI was conspiring to fix and coordinate foam price increases with its competitors. Ultimately, Direct Purchasers have met the burden set by the Supreme Court of "showing that the inference of conspiracy is reasonable in light of the competing inferences of independent action or collusive action that could not have harmed [them]." *Matsushita*, 475 U.S. at 587–88.

This Court is mindful that, as the Sixth Circuit instructed, the focus must be on FXI's overt acts, not on what Foamex did earlier, and it is not enough if those overt acts are equally consistent with permissible activity. Indeed, in *In re Travel Agent*, the Sixth Circuit affirmed dismissal of plaintiffs' antitrust claim against United Airlines because plaintiffs pointed only to: (1) conspiratorial overt acts committed by United before its bankruptcy, and (2) acts committed by United after its bankruptcy that were innocuous. *In re Travel Agent*, 583 F.3d at 902. At the same time, however, this Court is also mindful that Direct Purchasers need only adduce evidence that adds up to a "slight connection" between FXI and the alleged conspiracy, and the evidence must be viewed in a light most favorable to Direct Purchasers. Having reviewed the entire record carefully, this Court finds a jury could reasonably conclude FXI did not merely associate with other conspirators; rather, it undertook meaningful activity in furtherance of the ongoing conspiracy, as some of these same employees may have done before for Foamex. Conversely, a jury could also find FXI's innocent explanations credible. This fact question means summary judgment must be denied.

**Antitrust Injury**

Finally, FXI argues that, even if there is sufficient evidence to allow a jury to conclude it joined the conspiracy in 2009, summary judgment is still appropriate because there is no evidence that most of its customers suffered antitrust injury.  This argument, however, is a non sequitur.

Even if FXI is correct that "*most*" of its customers did not suffer antitrust injury, the possibility that *some* customers did is enough to avoid summary judgment.  FXI asserts that about "80% of FXI's automotive sales were subject to collar contracts, as were a significant portion of FXI's bedding and furniture sales," and these collar contracts contained provisions that isolated customer prices from any possible effect of price-fixing (Doc. 1326-1 at 29).  Assuming this assertion is correct -- which, for reasons discussed before is questionable (*see* Doc. 1102 at 57–59) -- that still leaves the remaining 20 percent of FXI's automotive sales susceptible to the effects of the conspiracy.  In other words, FXI's argument that many of its customers were not injured might have relevance to the amount of damages, or the propriety of class decertification, but it does not support the proposition that no reasonable jury could find FXI caused antitrust injury.

### CONCLUSION

FXI is granted summary judgment on Direct Purchasers' claim that FXI is liable for antitrust injury because it succeeds to Foamex's liability, and the jury will be properly instructed on this point.  FXI is denied summary judgment on Direct Purchasers' claim that, after FXI came into existence in 2009, it joined the antitrust conspiracy.  Because these material facts are in dispute, that claim must be submitted to a jury.

IT IS SO ORDERED.

_____s/ Jack Zouhary_____
JACK ZOUHARY
U. S. DISTRICT JUDGE

February 6, 2015

29