IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

In re Polyurethane Foam Antitrust
   Litigation

This document relates to:
DIRECT PURCHASER CLASS

Case No. 1:10 MD 2196

MEMORANDUM OPINION
AND ORDER RE:
SUMMARY JUDGMENT

JUDGE JACK ZOUHARY

### INTRODUCTION

More than four years have passed since law enforcement authorities on two continents executed raids of some of the world's largest manufacturers of flexible polyurethane foam, on suspicion that some or all of the raided firms were active in a price-fixing conspiracy. Details of the search warrant and affidavit used in the United States raids became known after an inadvertent public filing on a federal court docket.

Dozens of lawsuits followed, filed by direct and indirect purchasers of foam products, who range from a person who purchased a foam pillow to large corporations like Ford Motor and Serta Mattress. The cases were consolidated in this Court for pretrial proceedings.

Millions of pages of discovery, hundreds of fact and expert witness depositions, and extensive motion practice ensued. This Court certified a nationwide class of direct purchasers ("Direct Purchasers"). The Carpenter Defendants, Leggett & Platt, Vitafoam, Inc. ("Vitafoam USA"), and Vitafoam Products Canada Ltd. ("Vitafoam Canada") settled with Direct Purchasers. Defendant Woodbridge Foam Fabricating, Inc. ("Woodbridge Fabricating") and two related non-defendant entities pled guilty to federal criminal charges for price-fixing in violation of the Sherman Act.

In six Motions for Summary Judgment (five individual motions and one joint motion), the non-settling Defendants ("Defendants") now seek to end the Direct Purchasers' case (Docs. 1321–22,

1324–25, 1328–29).   In more than four hundred pages of briefing, the parties argue the legal

conclusions that must be drawn from a summary judgment record that overflows seven bankers boxes.

This Court heard oral argument on the Motions (Doc. 1458).  Its ruling follows.

**STANDARD OF REVIEW**

### Summary Judgment Standard

Summary judgment is appropriate if "the movant shows that there is no genuine dispute as to

any material fact and the movant is entitled to judgment as a matter of law."  Federal Civil Rule 56(a).

This Court must "consider all facts in the light most favorable to the non-movant and must give the

non-movant the benefit of every reasonable inference."  *Spirit Airlines, Inc. v. Nw. Airlines, Inc.*, 431

F.3d 917, 930 (6th Cir. 2005) (internal quotation marks omitted).  It may not weigh the evidence or

make credibility judgments.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).  But, "[t]he

mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there

must be evidence on which the jury could reasonably find for the plaintiff."  *Expert Masonry, Inc. v.

Boone County, Ky.*, 440 F.3d 336, 341 (6th Cir. 2006) (internal quotation marks omitted).

It would be "imprecise" to describe the summary judgment standard, applied to an antitrust

case, as "stringent."  *Hyland v. HomeServs. of Am., Inc.*, 771 F.3d 310, 318 (6th Cir. 2014).  "[I]n

defending against summary judgment, [Direct Purchasers] need not 'eliminate all possible

independent justifications [offered] by [Defendants],' so that 'only evidence of concerted action

would be left in the record.'  They need, rather, to produce 'evidence that tends to exclude the

possibility of independent action.'"  *Big Apple BMW, Inc. v. BMW of N. Am., Inc.*, 974 F.2d 1358,

1365 (3d Cir. 1992) (quoting *Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 768 (1984))

(brackets and emphasis omitted).  "[I]n this circuit, courts are generally reluctant to use summary

2

judgment dispositions in antitrust actions due to the critical role that intent and motive have in antitrust claims and the difficulty of proving conspiracy by means other than factual inference." *In re Se. Milk Antitrust Litig.*, 739 F.3d 262, 270 (6th Cir. 2014) (internal quotation marks omitted).

Not just any evidence will create a triable issue, however.  "[A] conspiracy may be demonstrated by direct or circumstantial evidence." *Re/Max Intern., Inc. v. Realty One, Inc.*, 173 F.3d 995, 1009 (6th Cir. 1999).  *Cf. Monsanto*, 465 U.S. at 768.  Distinctions in Direct Purchasers' evidence of conspiracy are important.

Direct evidence of a conspiracy is evidence that is "tantamount to an acknowledgment of guilt." *In re High Fructose Corn Syrup Antitrust Litig.*, 295 F.3d 651, 662 (7th Cir. 2002).  Such evidence will generally preclude summary judgment.  *See In re Publication Paper Antitrust Litig.*, 690 F.3d 51, 63–64 (2d Cir. 2012) (collecting cases).  Given the critical role of such evidence, this Court must carefully assess Direct Purchasers' alleged "direct" evidence to ensure it fits the legal description for such evidence: it "must be evidence that is explicit and requires no inferences to establish the proposition or conclusion being asserted." *Hyland*, 771 F.3d at 318 (citing *In re Baby Food Antitrust Litig.*, 166 F.3d 112, 118 (3d Cir. 1998)).

"[E]verything else including ambiguous statements" is circumstantial evidence of conspiracy. *In re High Fructose Syrup Antitrust Litig.*, 295 F.3d at 662 (emphasis omitted).  "[A]ntitrust law limits the range of permissible inferences from ambiguous evidence in a § 1 case." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 588 (1986).  An antitrust plaintiff must "present evidence that tends to exclude the possibility that the alleged conspirators acted independently . . . [I]n other words, [an antitrust plaintiff] must show that the inference of conspiracy is reasonable in light of the competing inferences of independent action." *Id.* (internal quotation marks omitted).  The "tends to

3

exclude" standard "simply represents an explication of th[e] requirement [that inferences of conspiracy drawn from the evidence be "reasonable"]; it does not represent a new hurdle. In other words, evidence creates the requisite reasonable inference of conspiracy if it tends to exclude the possibility that the alleged conspirators acted independently." *Williamson Oil Co., v. Philip Morris, USA*, 346 F.3d 1287, 1303 (11th Cir. 2003) (internal quotation marks omitted). "[D]eterminations as to the reasonableness of the inferences that c[an] be drawn from the evidence . . . [are] threshold legal determinations . . . appropriately" made by a district court. *Id.* at 1304.

Courts "have been cautious in accepting inferences from circumstantial evidence in cases involving allegations of horizontal price-fixing among oligopolists" because the "theory of interdependence" in such markets holds that oligopolists may engage in parallel pricing behavior -- even price at supracompetitive levels -- without an express or tacit price-fixing agreement. *In re Flat Glass Antitrust Litig.*, 385 F.3d 350, 358–59 (3d Cir. 2004) (some internal quotation marks omitted) (collecting cases). Still, as the Sixth Circuit recently explained:

> Evidence of "conscious parallelism" . . . can support [a price-fixing] claim based upon circumstantial evidence. As the district court put it, "When competitors in a concentrated market establish their prices, not by agreement, but rather in a consciously parallel fashion, this may provide probative evidence of an understanding between competitors to fix prices." However, that is not necessarily the case: Because of their mutual awareness, oligopolists' decisions may be interdependent although arrived at independently. Thus, the law is settled that proof of consciously parallel business behavior is circumstantial evidence from which an agreement, tacit or express, can be inferred but that such evidence, without more, is insufficient unless the circumstances under which it occurred make the inference of rational, independent choice less attractive than that of concerted action.
>
> This court has set out the following considerations, sometimes referred to as "plus factors," in determining when circumstantial evidence amounts to a finding of concerted action: 1) whether defendants' actions, if taken independently, would be contrary to their economic interests; 2) product uniformity; 3) whether the defendants have been uniform in their actions; 4) whether the defendants have exchanged or have had the opportunity to exchange information relative to the alleged conspiracy; and 5)

4

whether the defendants have a common motive to conspire or have engaged in a large number of communications.  However, circumstantial evidence alone cannot support a finding of conspiracy when the evidence is equally consistent with independent conduct.

*Hyland*, 771 F.3d at 319–20 (internal citations and some quotation marks omitted).

The parties' respective tasks at summary judgment may also be affected by a related feature of antitrust law: "broader inferences are permitted [with respect to circumstantial evidence], and the 'tends to exclude standard' is more easily satisfied, when the conspiracy is economically sensible for the alleged conspirators to undertake and 'the challenged activities could not reasonably be perceived as procompetitive.'" *In re Publication Paper Antitrust Litig.*, 690 F.3d at 63 (quoting *In re Flat Glass Antitrust Litig.*, 385 F.3d at 358).  *See also Matsushita Elec.*, 475 U.S. at 588–92.

Generally, Direct Purchasers' conspiracy theory is not "economically senseless."  Rather, "[t]he charge is of a garden-variety price-fixing conspiracy."  *In re High Fructose Corn Syrup Antitrust Litig.*, 295 F.3d at 661.  It makes "perfect sense" for Defendants to join with other dominant producers of slabstock and underlay to agree on the timing and amount of foam price increases.  If successful, the conspiracy would allow each Defendant to enter customer-specific price negotiations with (at least) two powerful tools, to affect prices: (1) an assurance that all Defendants offered similar price increases; and (2) a higher announced price increase than would be produced if, in the absence of an agreement, each Defendant had independently crafted price increase letters.  *See Ezzo's Investments, Inc. v. Royal Beauty Supply, Inc.*, 94 F.3d 1032, 1036 (6th Cir. 1996).

As this Court applies these principles to Direct Purchasers' evidence, it also must avoid certain "traps" common in antitrust summary judgment practice: it must reject Defendants' invitations to weigh or credit evidence; it must not "suppose that if no single item of evidence presented by the plaintiff points unequivocally to conspiracy, the evidence as a whole cannot defeat summary

5

judgment"; and it must "distinguish between the existence of a conspiracy and its efficacy." *In re High Fructose Corn Syrup Antitrust Litig.*, 295 F.3d at 655–56.  An antitrust plaintiff is entitled to the full force of its evidence, considered as a whole. *See Continental Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 698–99 (1962).  An antitrust defendant is likewise entitled to a careful assessment of the evidence as it relates to that defendant. *In re Vitamins Antitrust Litig.*, 320 F. Supp. 2d 1, 19 (D.D.C. 2004).

**Sherman Act**

Section 1 of the Sherman Act prohibits "[e]very contract, combination . . . , or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations."  15 U.S.C. § 1.  Not all alleged restraints of trade are analyzed the same.  "[W]hen a restraint is found to be proscribed *per se*, the plaintiff need only prove that (1) two or more entities engaged in a conspiracy, . . . (2) to effect a restraint or combination prohibited *per se* . . ., (3) that was the proximate cause of the plaintiff's antitrust injury." *Expert Masonry, Inc.*, 440 F.3d at 342 (internal citations omitted).  Horizontal price-fixing conspiracies have long been deemed *per se* violations. *See, e.g., Catalano, Inc. v. Target Sales, Inc.*, 446 U.S. 643, 647 (1980) (per curiam).  Depending on the nature of the alleged anticompetitive conduct, *Calif. Dental Ass'n v. F.T.C.*, 526 U.S. 756, 770–71 (1999), a restraint that is not a *per se* violation receives traditional rule-of-reason or quick-look treatment, *Realcomp II, Ltd. v. F.T.C.*, 635 F.3d 815, 825 (6th Cir. 2011).

"[S]election of a mode of [antitrust] analysis is entirely a question of law."  But "numerous factual questions," like the "terms of the allegedly anticompetitive agreement," underpin that "purely legal decision." *In re Wholesale Grocery Prods. Antitrust Litig.*, 752 F.3d 728, 733–34 (8th Cir. 2014) (internal quotation marks and brackets omitted).  If, after drawing all reasonable inferences in

6

Direct Purchasers' favor, there is no triable issue on the conspiracy as alleged, a different analysis might apply. *See Cont. Cablevision of Ohio, Inc. v. Am. Elec. Power Co.*, 715 F.2d 1115, 1118–19 (6th Cir. 1983) (explaining that "the dissemination of price information is not itself a *per se* violation of the Sherman Act" and is permissible absent a "purpose or effect to restrain competition, or some other evidence of an actual agreement to restrain competition") (quoting in part *United States v. Citizens & S. Nat'l Bank*, 422 U.S. 86, 113 (1975)). First things first. This Court assesses the evidence of conspiracy to determine whether the record supports jury-triable horizontal-price-fixing claims.

### Proof of Conspiracy

The parties agree that, as a general matter, a jury would apply the same principles of conspiracy law whether this case were a criminal prosecution or a civil proceeding (*see, e.g*., Doc. 1325-1 at 13 n.5; Doc. 1343 at 60–65). Direct Purchasers must produce "direct or circumstantial evidence that reasonably tends to prove that [Defendants] . . . had a conscious commitment to a common scheme designed to achieve an unlawful objective." *Monsanto*, 465 U.S. at 768. "To join a conspiracy . . . is to join an agreement, rather than a group." *United States v. Townsend*, 924 F.2d 1385, 1390 (7th Cir. 1991). "No formal agreement is necessary to constitute an unlawful conspiracy. . . . The essential combination or conspiracy in violation of the Sherman Act may be found in a course of dealings or other circumstances as well as in any exchange of words. Where the circumstances are such as to warrant a jury in finding that the conspirators had a unity of purpose or a common design and understanding, or a meeting of minds in an unlawful arrangement, the conclusion that a conspiracy is established is justified." *Am. Tobacco Co. v. United States*, 328 U.S. 781, 809–10 (1946) (internal citation omitted). Direct Purchasers must pose a jury question as to whether each

Defendant knew of "the essential nature of the plan and their connection[] with it."  *Blumenthal v. United States*, 332 U.S. 539, 557 (1947).

A jury can infer agreement to join the conspiracy from a defendant's actions.  *United States v. Hughes*, 895 F.2d 1135, 1141 (6th Cir. 1990).  But, "the importance of the [Defendant's] connection [with the conspiracy] need not be great."  *United States v. Betancourt*, 838 F.2d 168, 174 (6th Cir. 1988). "Once the existence of a conspiracy is shown, the evidence linking an individual defendant to that conspiracy need only be slight."  *United States v. Pritchett*, 749 F.3d 417, 431 (6th Cir. 2014) (brackets and internal quotation marks omitted). If a plaintiff establishes a defendant's membership in a conspiracy, withdrawal from the conspiracy is an affirmative defense.  *See United States v. Brown*, 332 F.3d 363, 374 (6th Cir. 2003).

Direct Purchasers allege "one conspiracy to increase the prices of flexible foam," a "conspiracy [that] *included* slabstock and underlay" (Doc. 1343 at 132) (emphasis in original).  "[A] single conspiracy is not converted into multiple conspiracies merely because there may be some changes in persons involved or because they play different roles."  *United States v. Ruggiero*, 20 F.3d 1387, 1391 (6th Cir. 1994).  Nor does a single conspiracy fragment into multiple conspiracies because a member does not "know every other member" or "know of or become involved in all of the activities in furtherance of the conspiracy."  *United States v. Warner*, 690 F.2d 545, 549 (6th Cir. 1982).

### Antitrust Injury

Direct Purchasers "must show more than a conspiracy in violation of the antitrust laws; they must show an injury to them resulting from the illegal conduct."  *Matsushita Elec.*, 475 U.S. at 586. Direct Purchasers must create genuine disputes of material fact regarding "injury-in-fact and

8

proximate caus[ation]."  They must make the same showing with respect to "[a]ntitrust injury," or "injury of the type the antitrust laws were intended to prevent . . . [and which] flows from that which makes defendants' acts unlawful."  *In re Cardizem CD Antitrust Litig.*, 332 F.3d 896, 909 (6th Cir. 2003) (internal quotation marks omitted).

However, the thrust of Defendants' antitrust-injury arguments is not that Direct Purchasers' injury is not of a type the antitrust laws were intended to prevent.  Rather, Defendants argue that, even assuming the jury could reasonably find knowing participation in a conspiracy, Direct Purchasers fail to produce admissible (or common) proof of injury.  As part of that argument, Defendants attack Direct Purchasers' principal source of impact evidence, the expert testimony of Dr. Jeffrey Leitzinger. For the second time in this litigation, Defendants argue Leitzinger's testimony is so unreliable that it should be excluded under Federal Evidence Rule 702.  Defendants similarly attack the testimony of Dr. Abba Krieger, a statistician retained by Direct Purchasers to comment on Leitzinger's model. (Because Krieger's testimony does not alter this Court's decision on the Motions, this Court does not resolve the *Daubert* Motion to the extent it targets Krieger.)  This Court previously set forth the standard for resolving a Rule 702 motion in its Memorandum Opinion and Order denying Defendants' first motion to exclude Leitzinger's testimony (*see* Doc. 1101 at 2–4).

### Fraudulent Concealment

"Any action to enforce any cause of action under [the Clayton Act] . . . shall be forever barred unless commenced within four years after the cause of action accrued," 15 U.S.C. § 15b, measured from the date a plaintiff suffers injury, *Zenith Radio Corp. v. Hazeltine Research*, 401 U.S. 321, 338 (1971).  Section 15b therefore bars recovery for any antitrust claims that accrued before December 2006, four years prior to the filing of the lawsuits later collected in the Consolidated Amended Class

Action Complaint. But, the limitations period can be tolled if Direct Purchasers prove by a preponderance of the evidence that Defendants fraudulently concealed the basis for their claims.

"To toll a limitations period on this basis, a plaintiff must show (1) wrongful concealment of their actions by the defendants; (2) failure of the plaintiff to discover the operative facts that are the basis of [the plaintiff's] cause of action within the limitations period; and (3) plaintiff's due diligence until discovery of the facts." *Hamilton County Bd. of Comm'rs v. NFL*, 491 F.3d 310, 315 (6th Cir. 2007) (internal quotation marks omitted). "[A]ffirmative concealment must be shown; mere silence or unwillingness to divulge wrongful activities is not sufficient." *Browning v. Levy*, 283 F.3d 761, 770 (6th Cir. 2002) (internal quotation marks omitted). Actions that would "deceive a reasonably diligent plaintiff will toll the statute; but those plaintiffs who delay unreasonably in investigating circumstances that should put them on notice will be foreclosed from filing, once the statute has run." *Id.* If a plaintiff has "[i]nformation sufficient to alert a reasonable person to the possibility of wrongdoing," the plaintiff faces "a duty to inquire into the matter with due diligence." *Au Rustproofing Ctr., Inc. v. Gulf Oil Corp.*, 755 F.2d 1231, 1237 (6th Cir. 1985). "[I]n evaluating the due-diligence element, the court should evaluate . . . acts of active concealment as a factor in determining whether the plaintiff's investigation was reasonable under the circumstances." *Carrier Corp. v. Outokumpu Oyj*, 673 F.3d 430, 447 (6th Cir. 2012). "Fraudulent concealment . . . may be established through the acts of co-conspirators." *In re Scrap Metal Antitrust Litig.*, 527 F.3d 517, 538 (6th Cir. 2008).

DISCUSSION

**Direct Purchasers' Price-Fixing Theory**

Direct Purchasers' conspiracy theory is that Defendants and their co-conspirators communicated and reached agreements and understandings on the percentage amount and effective date of price increases for both slabstock and underlay.  Periodic increases in the primary raw materials used to make flexible foam (polyols, TDI, and MDI -- "chemicals") served as a pretext for price coordination with respect to slabstock.  Similarly, increases in the primary raw material used to make underlay (scrap foam) served as a pretext for price coordination with respect to underlay. Direct Purchasers argue Defendants generally coordinated and revealed price increases using price increase announcements ("PIAs") that (1) attributed the foam price increase to a recent or projected increase in chemicals or scrap pricing, (2) announced a flat percentage price increase for all foam products, for slabstock products, or for underlay products, and (3) identified the date on which the percentage price increase would become effective.  Then, after releasing PIAs to customers, Defendants would exchange published PIAs during the "implementation period" -- the time between the PIA's publication date and the date on which the PIA stated the percentage price increase would take effect -- as a means of verifying that coordination had taken place.  Coordinated price increases provided Defendants a higher, unified starting point for the customer-by-customer price negotiations that followed release of a PIA than would have resulted if each Defendant independently set price increases (Doc. 1343 at 25, 33).

In response, all or some Defendants argue the following propositions:

11

- there is no evidence of an "express" or "global" and "overarching" agreement to coordinate the content and timing of PIAs, and any circumstantial evidence of communications between competitors or of market structure does not tend to exclude the possibility that Defendants acted independently in writing PIAs;

- the testimony of the Cooperating Defendants either does not implicate any Defendant or reflects only episodic, bilateral understandings between Defendants with respect to a few PIAs;

- Direct Purchasers posit that the flexible foam industry is oligopolistic in nature (or at least resembles an oligopolistic industry), with almost all costs of production concentrated (in the case of slabstock) in chemical pricing or (in the case of underlay) scrap pricing and the cost of certain binding agents;

- any observed parallelism in PIA terms is a natural, lawful feature of an oligopolistic industry, one in which price decisions depend on supply and demand factors, as well as strategic considerations of competitors' likely pricing decisions;

- PIAs did not always (or even often) translate into increases in actual "transaction prices," meaning the amount a particular customer would pay;

- because transaction prices are negotiated on a customer-by-customer basis, it would be impossible for the members of the alleged price-fixing conspiracy to monitor transaction prices, rendering the alleged conspiracy implausible in the absence of any ability to detect cheating or enforce the terms of the agreement;

- Defendants intensely competed for foam business or otherwise acted in ways inconsistent with membership in a price-fixing conspiracy -- some Defendants (like Flexible Foam) expanded their foothold in the market, other Defendants (like Foamex -- later FXI) lost market share, other Defendants (like Future Foam) played only small roles in certain segments of flexible foam industry throughout the Class Period, and still other Defendants (like Mohawk and Woodbridge) never produced or sold products that Direct Purchasers allege were part of the conspiracy.

In opposing summary judgment, Direct Purchasers point to several categories of evidence, which provide the structure for this Court's review of the summary judgment record:

1. Purported "direct evidence" of conspiracy;

2. Evidence of parallel business behavior;

12

3.    Price discussions between Defendants, which account for much of the volume of Direct Purchasers' evidence, including: Defendants' own e-mails and faxes; discussions between Defendants facilitated by scrap brokers; the testimony of employees of Canadian flexible foam producers who admit direct involvement in competition law violations affecting sales in the United States and (Direct Purchasers argue) implicate Defendants in the same conspiracy; and the guilty plea of Woodbridge Fabricating and two related non-defendant entities;

4.    Claims that Defendants' price discussions with one another ran counter to their independent economic interests;

5.    Other "plus factors" evidence, including market structure, opportunities Defendants had to conspire during the Class Period, and Defendants' motives to enter into a price-fixing conspiracy; and

6.    Certain current and former Defendant employees' Fifth Amendment invocations during depositions.

**Direct Evidence of Conspiracy**

Direct Purchasers assert (Doc. 1343 at 70):

[T]here is overwhelming direct evidence of a conspiracy among Defendants and their co-conspirators to increase the prices of foam.  There are numerous documents memorializing direct communications among executives of Defendants in furtherance of the conspiracy, as demonstrated by the Appendices.  Defendants have admitted specific conspiratorial acts [including Domfoam, Valle Foam, the Vitafoam Defendants, and Woodbride Fabricating] . . . . Phone records included in these Appendices detail numerous calls among Defendants during price increase announcement periods, various witnesses have testified that Defendants communicated with each other about prices, and other witnesses have invoked their Fifth Amendment right in response to questions about this conspiracy.

However, none of this material is "direct evidence" of conspiracy as to the moving Defendants.

Direct Purchasers' evidence of competitor communications and opportunities to communicate is (at best) circumstantial evidence of conspiracy (*see, e.g.*, *id.* at 40) (discussing Doc. 1343-14 at 21, an e-mail in which a Flexible Foam salesman tells his Regional Vice President of Sales that the salesman has other competitors' PIAs without explaining the provenance of such letters).  When scrutinized closely (as this Court has done), the so-called Cooperating Defendant evidence reveals

13

no admissions of guilt on the part of the Defendants who now move for summary judgment. *See In re Publication Paper Antitrust Litig.*, 690 F.3d at 64. Though Defendants sometimes recounted in e-mails the substance of phone calls with competitors, the dozens of call logs included in the summary judgment record simply show that, on a certain day and time, one senior Defendant employee called another. With no additional context, such evidence standing alone is as consistent with lawful conduct (*e.g.*, a call to discuss purchase of a Defendant's flexible foam plant) as it is with collusion (*e.g.*, a call to discuss coordination of the next round of PIAs). Nor does a Defendant employee's Fifth Amendment assertion lead, without any connecting inference, to the conclusion that the witness or Defendant joined in an antitrust conspiracy (*see* Doc. 1343 at 65–66). Finally, this Court has reviewed the 32-volume Opposition Appendices. Direct evidence of conspiracy does not hide there, either.

Except for Woodbridge Fabricating, each of the non-settling Defendants denies it engaged in any form of price-fixing, and Woodbridge argues this lone guilty plea disproves Direct Purchasers' theory. In sum, Direct Purchasers point to no specific "evidence that is explicit and requires no inferences to establish the . . . conclusion" that any of these Defendants engaged in price-fixing. *See Hyland*, 771 F.3d at 318 (internal quotation marks omitted). This Court "must therefore analyze [Defendants'] motion[s] for summary judgment under the standards articulated" in *Monsanto*, *Matsushita*, and related cases. *InterVest, Inc. v. Bloomberg, L.P.*, 340 F.3d 144, 163 (3d Cir. 2003).

### Parallel Pricing

Without direct evidence of agreement, Direct Purchasers' claims depend on circumstantial evidence and a theory of parallel pricing behavior resulting from coordination among competitors. Therefore, Direct Purchasers must show questions of fact that Defendants engaged in parallel business

14

behavior. *See Apex Oil Co.*, 822 F.2d 246, 253 (2d Cir. 1987). Defendants attempt to show they did not price in parallel by emphasizing differences in PIA publication dates, effective dates, or announced percentage price increases (*see, e.g.*, Doc. 1328-1 at 15–16). Direct Purchasers, on the other hand, assemble and compare Defendants' PIAs on a quarterly basis (see, e.g., Doc. 1328-3 at 121–22). Direct Purchasers also note that Defendants did not move in the alternative for partial summary judgment, claiming (for example) that a jury could not find a conspiracy existed prior to the 2005 Hurricane season.

While a jury may find Defendants' more discriminating review of PIA parallelism more persuasive than Direct Purchasers' quarterly analysis, Direct Purchasers' evidence creates questions of fact that Defendants priced in parallel. The quarterly analysis reveals outliers in announced percentage price increases, and though all Defendants did not issue PIAs in each price-increase quarter, the same analysis of pricing parallelism reveals substantial similarity in slabstock and underlay PIAs with respect to the non-settling Defendants (particularly in the later portions of the Class Period, when Defendants' communications with each other became more frequent). In a significant number of quarters, all announcing Defendants issued identical or near identical price increases. And, Defendants do not point to any principle of antitrust law establishing that this substantial similarity in business behavior, standing alone, entitles them to judgment as a matter of law. *See, e.g.*, *United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 222 (1940) (explaining that "price-fixing includes more than the mere establishment of uniform prices"); *In re Currency Conversion Fee Antitrust Litig.*, 773 F. Supp. 2d 351, 368 (S.D.N.Y. 2011). *Cf. Cason-Merenda v. Detroit Med. Ctr.*, 862 F. Supp. 2d 603, 625–29 (E.D. Mich. 2012).

15

**Plus Factors**

*Price Discussions between Defendants.*  Evidence of communications between competitors can serve as circumstantial evidence of price-fixing.  *See, e.g.*, *Apex Oil Co.*, 822 F.2d at 254; *In re Plywood Antitrust Litig.*, 655 F.2d 627, 634 (5th Cir. Unit A 1981); *Gainesville Util. Dep't v. Fla. Power & Light Co.*, 573 F.2d 292, 301 (5th Cir. 1978).  But, "communications between competitors do not permit an inference of an agreement to fix prices unless those communications rise to the level of an agreement, tacit or otherwise."  *In re Baby Food Antitrust Litig.*, 166 F.3d at 126 (internal quotation marks omitted).  The range of inferences that can be drawn from evidence of competitor communications depends in part on whether drawing an inference of conspiracy would attach antitrust liability to pro-competitive behavior.  *See In re Coordinated Pretrial Proceedings in Petroleum Prods. Antitrust Litig.*, 906 F.2d 432, 445 (9th Cir. 1990) (hereafter "*In re Petrol. Prods. Antitrust Litig.*"); *Krehl v. Baskin-Robbins Ice Cream Co.*, 664 F.2d 1348, 1357 (9th Cir. 1982).  An exchange of price information "can in certain circumstances increase economic efficiency and render markets more, rather than less, competitive."  *United States v. U.S. Gypsum Co.*, 438 U.S. 422, 443 n.16 (1978).  Whether such evidence (alone, or together with other evidence) tends to exclude the possibility of independent, lawful action depends on: (1) who communicated with whom; (2) when those conversations occurred and the type of information exchanged; (3) how the exchanges occurred; and (4) the legitimate reasons that may be offered for exchanging the information.

When a plaintiff charges that defendants fixed prices for their products, discussions about pricing or market conditions between low-level salesmen who lack pricing authority is not probative of conspiracy.  *See In re Baby Food Antitrust Litig.*, 166 F.3d at 125–26.  Contrast that low-level chatter with the "far different situation where upper level executives [with pricing authority] have

16

secret conversations about price"; such discussions may support an inference of conspiracy. *In re Flat Glass Antitrust Litig.*, 385 F.3d at 368–69. Similarly, an exchange of information regarding completed sales is less probative of an agreement to fix prices than an exchange of information regarding current or future pricing. *Compare Blomkest Fertilizer, Inc. v. Potash Corp. of Saskatchewan*, 203 F.3d 1028, 1034 (8th Cir. 2000) (en banc) (discussion of completed sales), *with In re Ethylene Propylene Diene Monomer (EPDM) Antitrust Litig.*, 681 F. Supp. 2d 141, 176 (D. Conn. 2009) (discussion of future pricing decisions). A direct and secret price discussion between competitors is more probative of a conspiracy than are indirect and public communications, ostensibly undertaken by the conspiring competitors to "signal" to one another. *Williamson Oil Co.*, 346 F.3d at 1306 (signaling evidence not capable of supporting inference of coordinated action).

Finally, context can be key in determining the range of inferences that a jury may draw from competitor communications. For example, as sometimes is the case in the foam industry, the communicating firms may wear two hats -- they may compete in the sale of certain products, while at the same time carrying on a supplier-customer relationship or a joint venture with respect to other products. A defendant may then attempt to explain the communications as nothing more than a supplier and customer discussing the price of a product that one hopes to sell to the other, or partners communicating about their joint venture business. *In re Dairy Farmers of Am., Inc., Cheese Antitrust Litig.*, 2014 WL 4083938, at *32 (N.D. Ill. 2014). In other words, context matters.

***Who is Talking Price with Whom.*** This Court has reviewed the more than seven thousand pages of e-mail and fax correspondence Direct Purchasers submitted in opposition to summary judgment. Though careful not to confuse quantity of evidence with quality of evidence, this extensive summary judgment record reveals a fairly dense web of communications between high-level

17

competitor employees, almost all of who had pricing authority for the foam product that was the subject of discussions.

The record reveals the price discussions themselves, as memorialized in e-mails and faxes between Defendants and their co-conspirators, and documents and deposition testimony recounting the nature of these discussions (*see, e.g.*, Doc. 1343-50 at 42) (Don Coleman of Hickory Springs passing along to his senior staff details of price discussions with Bob Magee of Woodbridge).  When such discussions occurred, they generally saw one Defendant pass to another (including through conduits) draft or published PIAs, or Defendants discuss impending or recent price increases without also exchanging PIAs.  This Court notes a sampling of these competitor-to-competitor discussions about pricing in an Appendix to this Memorandum Opinion and Order.  These discussions tend to cluster around periods in which PIAs were issued.

Mostly, Defendants exchanged "published PIAs," or PIAs that bore a date on or before the date of the competitor-to-competitor communication.  However, in a significant number of instances Defendants exchanged "draft PIAs," which can be identified in several ways.  First, the Defendant employee would inform his counterpart that the PIA was "draft," "proposed," had not been sent to customers, or would be sent to customers on a particular date.  Second, the Defendant employee would share a PIA that bore a date *after* the date of the e-mail or fax exchange (a jury could reasonably infer that a Defendant would not have sent a PIA dated January 3, 2015 to a customer on January 1, before sending the same PIA to a competitor Defendant on January 2).  Third, the Defendant employee would share a PIA in a form that would not likely have first been sent to customers (*e.g.*, a red-lined PIA).

These record exchanges occurred between Defendants' most senior employees.  To name just a few of each Defendant: Flexible Foam's Chief Operating Officer (Rich Whitling) and its Vice Presidents of Sales and Marketing (Jeff Briney and Mike Crowell) joined in the conversations.  So did Future Foam employees with pricing authority, including the company's Director of Operations for Carpet Cushion (Marc Vitale) and a Regional Manager (Al Diamond).  Hickory Springs' President (Don Coleman), its Corporate Director of Administration (Don Simpson), its Eastern Division Vice President (Buster Mann, responsible for most pricing decisions in that region), and the lead Hickory Springs employee at the Olympic Products joint venture (Todd Councilman, Flat Block Business Director) also took part.  Mohawk's President, Jack Lens, was a repeated party to e-mails with competitor employees and scrap brokers.  And almost all of Woodbridge's brass -- its President (Robert Magee), its Vice President (Frank Donato), and its lead slabstock employee (Peter Farah) -- engaged in extensive communications with competitors.

When these senior employees spoke with one another, they exchanged what a jury could conclude is sensitive business information -- draft PIAs, published PIAs (of which there are more instances of direct competitor exchanges not cited above), and performance on past price increases. On a number of occasions, a senior employee of one company would notify his counterpart at a competing firm that salesmen of the competing firm had been quoting "low" prices.  More often than not, the senior competitor employee would state or imply that he would "check into" the prices being quoted by his salesmen.  Similarly, competitors would speak with one another in ways inconsistent with vigorous competition -- for example, Jack Lens asked scrap broker David Charak to send word to Leggett & Platt that it ought not go forward with a price increase because Mohawk had backed off the same increase (Doc. 1343-35 at 420).  At the time, Leggett & Platt and Mohawk were competitors

19

in the underlay market, and one might ask why Jack Lens did not prefer to rescind his price increase, allow Leggett & Platt to go forward with its own, and win business for Mohawk from former Leggett & Platt customers.  Other Defendants communicated directly regarding "market rationalization" (Woodbridge and Hickory Springs), "cooperation" and the goal of avoiding "fighting" in the context of concerns about price wars (Woodbridge and Vitafoam USA), and "[p]ossible customer conflicts and how to avoid them" (Flexible Foam and Woodbridge).

This Court must consider the range of inferences that can be drawn from competitor-to-competitor correspondence on an individual basis.  Considered individually, some of the evidence Direct Purchasers rely on is just as consistent with lawful conduct as it is with conspiracy (sometimes, less so).  For example, an exchange between Fred Rullo of Foamex and Randall Lake of Future Foam does not support an inference of conspiracy, because the exchange occurred in the context of a vendor (Foamex) and customer (Future Foam) relationship (Future Foam could not produce rolls at a California plant, so it purchased rolls from Foamex) (Doc. 1343-14 at 140; Doc.1354-5 at 3). Likewise, the April 2008 exchange between Jack Lens of Mohawk and Marc Vitale of Future Foam, in which Lens promises to retaliate for Mohawk business lost to Future Foam, speaks of competition as much as Lens' references to the "irresponsible" approach of price-based competition suggests collusion.  And some of the exchanges between Hickory Springs and Woodbridge employees through or including employees of the two firms' joint venture, Olympic Products, lack strong probative value. Some of these exchanges relate to the joint venture's pricing decisions.  Other such exchanges are ambiguous as to whether Hickory Springs and Woodbridge employees exchanged information on the pricing decisions of their separate and competing foam product lines, or instead discussed joint venture pricing. Joint venture pricing for non-automotive slabstock foam was set by Hickory Springs

employees, while joint venture pricing for automotive slabstock foam was set by Woodbridge employees. However, a jury could find that many more Defendant communications lack such innocuous context.

**Admissions by Certain Defendants.** This Court must not tightly compartmenalize the evidence and ignore the context created for these price discussions. Important here is the evidence of the Cooperating Defendants. Defendants argue such evidence reveals only a geographically distinct conspiracy. Not so. In part, the Cooperating Defendants provide further evidence of direct competitor pricing discussions involving Defendants, some of which are not memorialized in the substantial documentary record *(see, e.g.*, Doc. 1343-55 at 845–46 (Mike Crowell of Flexible Foam speaking with Frank Donato of Vitafoam Canada); Doc. 1343-55 at 810–11 (Bruce Schneider, President of Future Foam, speaking with Peter Farah, President of Vitafoam Canada); Doc. 1343-54 at 337 (David Gurley of Vitafoam Canada speaking with and Jeff Carter of Scottdel -- and later Future Foam). The Cooperating Defendants also explain the role played by price discussions in the price-fixing conspiracies in which they admittedly participated and the terms of those agreements.

The Vitafoam Defendants are Antitrust Criminal Penalty Enhancement and Reform Act applicants and conditional beneficiaries of the Department of Justice's ("DOJ") Corporate Leniency Program for admitted antitrust violators. The record contains deposition testimony of two different Vitafoam Rule 30(b)(6) witnesses who are also attorneys: the Foam deponent, who testified in this litigation, and the Urethanes deponent, who testified in a suit alleging price-fixing by chemical suppliers in which some Defendants have taken on the role of direct action (non-class) plaintiffs. *See In re Urethanes Antitrust Litig.*, MDL No. 1616 (D. Kan.).

21

The Foam deponent denied there was a "global, overarching agreement" (Doc. 1343-55 at 821).  He could not state that every PIA issued during the Class Period was coordinated between Defendants (*id*. at 822).  He declined examining counsels' invitations to characterize Vitafoam's interactions with other Defendant employees as having resulted in "agreements."  "I'm not going to comment on what is and what is not an agreement throughout this [deposition]," he explained, "because agreement takes two and I can't tell you what the other side [*i.e.*, the other Defendant's employee] was thinking" (*id*. at 821).  *See also id.* at 830 ("I agree that [whether discussions resulted in an "agreement"] is a legal conclusion because, you know, I've told you that I am an antitrust lawyer, and agreement is a loaded word.").

So the Foam deponent would not unequivocally state that the all-Defendants, all-products, all-PIAs conspiracy functioned in the United States.  More generally, however, Vitafoam did admit to conspiring with North American foam manufacturers, including with respect to the price of foam that would be sold in the United States (*id*. at 854, 883).  The Foam deponent explained the nature of this collusion:  "[R]ather than having one agreement, *an* agreement, there were a series of events, discussions, that took place in or around price increase periods, when a price increase was in the market" (*id*. at 821) (emphasis added).  "[T]he whole idea was to communicate so you would not be surprised, which means that you would not go out at 10 percent and your competitors wouldn't and you'd -- and you'd lose business" (*id*. at 844).  When "Vita[foam] Canada" was surprised "they lost business" (*id*.)  "[T]here are letters that went out at a rate, a specific rate and a specific time because of the communication with competitors" (*id*.).  In certain instances, "Vitafoam spoke to competitors for the purpose of getting a price increase and having it stick" (*id*. at 891).

22

Vitafoam's description of price discussions between competitors is mirrored in the evidence offered by the other Cooperating Defendants, various employees of the Canadian foam producers Domfoam and Valle Foam.  In January 2012, a representative of the two firms signed a "Statement of Admissions," filed in an Ontario, Canada court alongside an indictment and sentencing document. The filings related to Domfoam and Valle Foam 's admitted violations of the Canadian Competition Act, which netted the firms a $12.5 million (CAD) criminal fine (Doc. 1343-2 at 17).

Valle Foam is a wholly owned subsidiary of Domfoam (*id.* at 20).  The companies produce slabstock and underlay (*id.* at 21).  With respect to each product segment, the companies admitted (*id.* at 22 (admission with respect to slabstock); *id.* at 24 (admission with respect to underlay):

> For the purpose of forming and carrying out the alleged conspiracy, Domfoam/Valle, Carpenter [Canada], Vita[foam Canada] and Foamex [Canada] established a practice whereby the members of the alleged cartel would communicate about the amount and effective date of price increases in the sale and supply of . . . [foam] products in Canada.  They would agree to use the same or similar effective dates and the same or similar price increase ranges, which had the overall effect of unduly lessening competition in Canada.  The information regarding the price increase percentages and effective dates would be included in the price increase letters sent to customers and would constitute a price baseline, which would be used as a starting point for customer negotiations.

Coordination of slabstock PIAs would follow increases in raw chemical pricing, while coordination of underlay PIAs would follow increases in scrap foam pricing (*id.* at 22, 24).  The Statement of Admissions recites conduct that affected only Canada, and describes agreements or understandings only among Canadian firms.

But, viewed in the context of other record evidence and in the light most favorable to Direct Purchasers, no barrier running from Washington to Maine sealed off Canadian foam manufacturers from their American counterparts.  For instance, Valle Foam and Domfoam sold flexible foam in the northeastern United States (Doc. 584-11 at 11).  Sales in the United States amounted to roughly 15

23

percent of the firm's total sales during the Class Period, the same period described in the Statement of Admissions (Doc. 584-15 at 35). Vitafoam Canada's United States sales also averaged 15 percent of its gross revenues each year (Doc. 1343-55 at 833). All Cooperating Defendants would announce the same price increases for both Canadian and U.S. sales (excepting differences in pricing attributable to exchange rates) at approximately the same time (*id*. at 834; Doc. 584-15 at 37), and purchased chemicals from the same set of American chemical manufacturers as did Defendants. And, as noted above, Cooperating Defendant employees occasionally engaged in price discussions with Defendant employees like Ken Hlaudin of Flexible Foam or Frank Donato of Woodbridge (and later, Vitafoam Canada).

John Howard, Domfoam's General Manager in Quebec, played a role in setting the firm's flexible foam pricing (Doc. 584-11 at 11). He admitted in a declaration that "since 1996, I am personally aware and testify that I and competitors in the foam industry communicated from time to time . . . to coordinate the percentage amount and timing of price increases for foam," a practice that helped the industry "push through a price increase to customers (*id*. at 14–15). Competitors would also exchange PIAs "to demonstrate to each other that the industry was increasing its prices by a certain amount and at a certain time" (*id*. at 18). Such coordination "was the accepted way of doing business in the polyurethane foam industry at that time" (*id*. at 15). He lists competitors' employees with whom he coordinated PIAs, but all the named employees worked for Canadian foam producers (Howard's listing does include Vitafoam Canada employees, who, in turn, had price discussions with Defendant employees as described in the Appendix). *See also* Doc. 584-9 at 5–16 (declaration of Dean Brayiannis, one-time Director of Sales and Marketing for Valle Foam, relating similar information about his communications with Canadian foam manufacturers regarding the timing and

amount of flexible foam PIAs). Howard explained how conspiratorial discussions occurred, an explanation that mirrors the Foam deponent description (Doc. 1343-54 at 596):

> Meetings weren't held by all the foamers saying, 'Okay. Now it is time. We've got to put letters out.' But on an informal basis, 'I'm raising prices, and its going to be on this date and this percent. And here's evidence of what I'm going to do.' And I'll fax a letter over to Mike Calderone [at Foamex Canada] or I'll receive one from somebody else. So that's as sophisticated as we got in assuring that everyone was on the same page in terms of getting prices up when there was a chemical price increase.

Tony Vallecoccia, President and CEO of the two companies, claimed he would "bless" proposed flexible foam price increases that he knew his subordinates had proposed after coordinating with competitors, and that he and his competitors had "understandings" as to how Canadian flexible foam producers would respond to raw chemical price increases (Doc. 584-15 at 37, 39). But he also testified that there was "[n]o agreement with anybody" regarding his companies' pricing decisions in the aftermath of raw chemicals or scrap foam price increases (Doc. 1328-53 at 3–4).

Finally, though not among the Cooperating Defendants, a jury could conclude that Woodbridge Fabricating's admissions to criminal violations of the Sherman Act further confirm the nature and purpose of price discussions between Defendants and the terms of the agreement. In Summer 2014, Woodbridge Fabricating pled to an information that charged the firm with having "participated in conversations and meetings to discuss polyurethane flexible slab stock automotive foam prices"; "agreed, during those conversations and meetings, to coordinate the timing and amount of price increases for polyurethane flexible slab stock automotive foam in the United States and elsewhere"; "exchanged information during those conversations and meetings, for the purpose of monitoring and enforcing adherence to the agreement to coordinate the timing and amount of price increases for polyurethane flexible slab stock automotive foam"; and that in fact it "coordinated the timing and amount of price increases for polyurethane flexible slabstock automotive foam customers"

(Doc. 1343-2 at 30–31). *See also id.* at 36–37. The coordination related to PIAs with effective dates of July 2008 and August 2008 (Doc. 1328-76 at 21). Though not named in the plea agreement, Defendants concede that Foamex conspired with Woodbridge Fabricating on at least two PIAs (*see, e.g.*, Doc. 1329-1 at 18 (Woodbridge acknowledging that certain identical Foamex and Woodbridge PIAs were "encompassed in [Woodbridge Fabricating] pleas"); Doc. 1343-43 at 221).

Of course, all of this evidence has its limitations. Valle Foam and Domfoam deny having had price discussions with the employees of U.S. foam producers (a claim in tension with record evidence). Vitafoam employees never carried on price discussions with Mohawk employees. And each Defendant did not communicate with the employees of every other Defendant or with each Cooperating Defendant (though the overlap in communications is substantial). However, even accounting for these and other evidentiary shortcomings, it would be error for this Court to "suppose that if no single item of evidence presented by the plaintiff points unequivocally to conspiracy, the evidence as a whole cannot defeat summary judgment." *In re High Fructose Corn Syrup Antitrust Litig.*, 295 F.3d at 655. All of this evidence provides context for understanding the conclusions a reasonable jury could draw from Defendants' price discussions. These communications: occurred during price increase periods, in private, and sometimes (as described below) were coupled with affirmative attempts to keep the fact of the communications secret; joined Defendants' most senior employees in conversations about price; display a level of repetition and structure distinguishing the conversations from random chats between competitors; involve the exchange of future pricing information and price increases that had been published to customers but not yet implemented; match the communication patterns described by the Cooperating Defendants and Woodbridge Fabricating, each to some extent admitted price fixers; and expressly caused Defendants to modify pricing

decisions. "The inference of concerted rather than interdependent action is therefore stronger." *In re Flat Glass Antitrust Litig*., 385 F.3d at 369.

      **Actions against Self-Interest**.  In this case, Defendants' communications serve as a plus factor, which tends to exclude independent conduct.  A related plus factor, actions against self-interest, requires "a showing that the defendants' behavior would not be reasonable or explicable (*i.e.*[,] not in their legitimate economic self-interest) if they were not conspiring to fix prices or otherwise restrain trade -- that is, that the defendants would not have acted as they did had they not been conspiring in restraint of trade." *City of Tuscaloosa v. Harcros Chems., Inc*., 158 F.3d 548, 572 (11th Cir. 1998).  "Ordinarily, an affirmative answer to [this plus factor] will consistently tend to exclude the likelihood of independent conduct." *Re/Max Int'l, Inc.*,173 F.3d at 1009.  However, this Court "must exercise prudence in labeling a given action as being contrary to the actor's economic interests, lest [it] be too quick to second-guess well-intentioned business judgments of all kinds." So, "if a benign explanation for the action is equally or more plausible than a collusive explanation, the action cannot constitute a plus factor." *Williamson Oil Co*., 346 F.3d at 1310.  *See also In re Citric Acid Litig*., *In re Citric Acid Litig.*, 191 F.3d 1090, 1100 (9th Cir. 1999).

      Direct Purchasers' focus with this plus factor is not parallel pricing, market behavior which may simply reflect interdependence. *See, e.g*., *In re Flat Glass Antitrust Litig*., 385 F.3d at 360–61 *Petruzzi's IGA Supermarkets, Inc. v. Darling-Delaware Co.*, 998 F.2d 1224, 1244 (3d Cir. 1993). Instead, Direct Purchasers emphasize Defendants' mutual, usually direct, exchange of sensitive business information.  Absent an express or tacit agreement to coordinate pricing, Direct Purchasers argue it was "risky [for Defendants to privately exchange such information] because their prices could be undercut but-for an understanding to use the information to coordinate rather than to compete"

(Doc. 1343 at 73).  Defendants' "benign" explanations either lack support in the record or depend on disputed questions of fact.

First, Defendants argue that direct and private communications between competitors made market prices more transparent.  Citing fundamental economic principles, Defendants note "[a]ll market participants benefit from full information in the market."  More, such information disseminated broadly "enhances competition and makes the market more competitive" (Doc. 1467 at 16).  Direct Purchasers do not quarrel with this rule of economics; they instead argue that (at minimum) the evidence creates fact questions as to whether Defendants' competitor communications were undertaken with either the purpose or effect of improving price transparency for market participants.  Direct Purchasers say the competitor communications were aimed at improving Defendants' knowledge of each other's pricing strategies prior to when price increases were announced, and then again before the price increases were implemented, so that Defendants could push chemical price increases through to consumers and preserve (or increase) margins in a period of rising costs, industry overcapacity, massive economic recession, and substantial declines in demand for flexible foam.  Evidence supports this competing view.  *See Gray v. Shell Oil Co.*, 469 F.2d 742, 747 (9th Cir. 1972); *Cf. United States v. Coop. Theatres of Ohio, Inc.*, 845 F.2d 1367, 1373 (6th Cir. 1988).

Second, certain Defendants argue that their price discussions were not aimed at the "downstream" purpose of cooperatively increasing or maintaining margins.  Instead, Defendants exchanged price information to gain leverage "upstream" in negotiations with chemical firms.  This supposed justification made its first appearance at oral argument.  And, aside from a single reference to a discussion between Mike Crowell of Flexible Foam and Frank Donato of Vitafoam Canada (a

28

discussion referenced in the U.S. search warrant and affidavit) (Doc. 1467 at 29), the "upstream" justification lacks evidentiary support.  Moreover, one party to this "upstream" conversation, Donato, has refused to testify in this matter, invoking his Fifth Amendment privilege against self-incrimination.  He also figures prominently in Woodbridge and Vitafoam Canada's price discussions with competitors (*see, e.g.*, Doc. 1343-14 at 114) (Donato to Peter Farah, both then of Woodbridge: "Don't know what we should do.  Dan wants me to call" Don Phillips of Foamex.  "Will try first thing in the morning.  I think we should go strong and tr[y] to keep Vita and [Foamex] on board.  Forget share for now -- fix pricing").

Third, Defendants argue that the information they shared was all "public information" because it had already been shared with customers before Defendants shared the same information with one another.  However, many of the specific communications noted in the Appendix indicate that oral announcements of planned price increases to customers did *not* precede Defendants' pre-publication sharing of price increase information with one another (and, at the least, this argument raises disputed questions of fact).  At most, this approach of advance oral notice creates questions of fact as to whether (for example) a Mohawk employee had called customers to provide a "heads-up" about an impending April 2006 underlay price increase before Jack Lens, Mohawk's President, e-mailed a copy of a draft PIA to scrap broker David Charak, who then forwarded the draft PIA to senior underlay employees at Leggett & Platt, Future Foam, Flexible Foam, and Carpenter (*see* Doc. 1343-15 at 34; Doc. 1343-36 at 225, 234–41).  Similar fact questions abound in the record.

Relatedly, Defendants contend they obtained competitor pricing information from customers.  This may be true in some cases (*see, e.g.*, Doc. 1321-18).  In other cases -- for example, competitor PIAs found in a Defendant's files with no paper trail showing receipt of the letter from another

29

Defendant or a customer -- receipt of a competitor PIA from a customer is at least as possible as receipt from a Defendant. *See In re Citric Acid Litig.*, 191 F.3d at 1103. But the record contains dozens of direct communications between Defendants or through conduits like the scrap brokers, in which pricing information was shared during the pre-announcement and implementation periods (not an overwhelming number of such discussions, to be sure, but still substantial evidence considering Direct Purchasers focus on coordination with respect to some two dozen price increase periods and *not* with respect to the many individual foam sales that occurred throughout the Class Period). And there are factual disputes regarding whether and under what circumstances a customer would be willing to share a PIA with a Defendant, and if Defendants would even consider information received from customers to be a trustworthy basis for setting pricing policy.

Taken for what they are -- the private exchange of sensitive business information between senior competitor employees with pricing authority -- a reasonable jury could conclude that, had Defendants approached the task of PIA drafting independently, they would not have shared such information. *See In re Currency Conversion Fee Antitrust Litig.*, 2012 U.S. Dist. LEXIS 19760, at **16–18 (S.D.N.Y. 2012). PIA percentage price increases and effective dates mattered for Defendants. Attempts to now downplay the significance of PIAs -- because PIAs did not always (or even often) lead to quarter-over-quarter increases in transaction prices -- stand in conflict with the importance placed on the terms of PIAs during the Class Period as a means of moving pricing. For example, intrafirm communications show Defendant employees carefully deliberating over the amount and timing of proposed price increases (*see, e.g.*, Doc. 1343-14 at 100; Doc. 1343-20 at 4 (FXI employee questioning PIA terms proposed by a colleague: "Why 10%? and not 12% for buns, rolls, toppers and 10% for Fab? If both TDI and Polyol are going up 10% ~ 7.2% increase needed

30

to breakeven.  This [*i.e.*, the lower proposed price increase levels on buns, rolls, toppers, and fabricated foam] leaves very little margin for any carve outs?  I would target a higher increase considering the challenges we would face [during customer-by-customer negotiations] with the big guys"); Doc. 1343-55 at 759–60; *but see* Doc. 1328-21 at 177) (defense expert report opining that PIAs contained only "meaningless effective dates for meaningless [proposed] price increases").

A jury could reasonably conclude that Defendants shared such information with each other because there existed a common understanding of how the information would be used -- not to compete, but to collude.  And a jury can draw that inference without "threaten[ing] to chill procompetitive behavior." *Petruzzi's IGA Supermarkets, Inc.*, 998 F.2d at 1232.  No one disputes that the signaling of price increases to customers through PIAs serves a legitimate market function.  *Cf. Reserve Supply Corp. v. Owens-Corning Fiberglas Corp.*, 971 F.2d 37, 53 (7th Cir. 1992).  Nor does any party dispute that a flexible foam producer may gather competitive intelligence through legitimate channels.  The factual disputes that prevent this Court from granting judgment as a matter of law in Defendants' favor do not turn on the source of price information in ambiguous circumstances -- whether customers or competitors.  Instead, the evidence shows direct exchanges of such information and related discussions sufficient to deny summary judgment.

***Market Structure; Opportunities and Motives to Conspire; Fifth Amendment Privilege.***
Direct Purchasers offer a range of other plus-factors evidence, which they argue tends to exclude the possibility of independent conduct.  These additional plus factors include:

- Market structure evidence showing slabstock and underlay markets are susceptible to collusion.  According to this evidence, Defendants treat large portions of both products as commodities which lack close substitutes. There also is evidence of substantial entry barriers in the slabstock market and (to a lesser degree) the underlay market.  Defendants' market share calculations

31

indicate moderate market concentration.  And throughout the Class Period, Defendants maintained substantial excess production capacity.

•    Defendants had opportunities to conspire, as shown by at least four categories of evidence.  First, certain Defendants were members of flexible foam industry trade associations (*e.g*., the Polyurethane Foam Association and the Carpet Cushion Council), as well as trade associations chiefly comprised of the intermediate users of flexible foam products (*e.g*., the International Sleep Products Association).  Second, certain Defendant employees exchanged telephone calls throughout the class period.  The fact that such conversations occurred is evidenced by telephone call logs and telephone service provider billing statements; the record typically does not reveal the subject matter of such calls.  Third, Defendant employees would mingle during outings sponsored by chemical manufacturers and customers (*e.g*., ski trips and golf tournaments). Fourth, Defendants regularly communicated with each other while carrying on supplier-customer relationships, discussing the sale of foam production plants or equipment, while operating joint ventures with other Defendants, and during sales calls on shared customers.

•    Defendants each had a motive to enter into a price-fixing conspiracy.

At most, equally strong inferences of conspiracy and independent conduct can be drawn from each of these categories of evidence.  Standing alone, they do not defeat summary judgment, but they contribute to Direct Purchasers' circumstantial case.  Direct Purchasers' market-structure evidence "no more than corroborate[s]" that both the slabstock and underlay markets are or approximate "an oligopolistic market which is . . . conducive to parallel pricing.  The evidence does nothing to explain whether the parallel pricing was achieved by agreement or mere interdependent decisions."  *White v. R.M. Packer Co., Inc*., 635 F.3d 571, 580 (1st Cir. 2011).  Likewise, "[e]vidence that the defendant had a motive to enter into a price fixing conspiracy means evidence that the industry is conducive to oligopolistic price fixing, either interdependently or through a more express form of collusion."  *In re Flat Glass Antitrust Litig*., 385 F.3d at 360.  It is hard to imagine a horizontal price-fixing case in which a defendant would not have a desire to earn supracompetitive profits, which of course can be gained from unlawful collusion or from lawful parallel pricing.  So, too, with the opportunities-to-

conspire evidence, to the extent it is not coupled with other evidence describing topics discussed by competitor employees.  *In re Baby Food Antitrust Litig.*, 166 F.3d at 133.

Direct Purchasers also argue that the Fifth Amendment privilege assertions of Defendant employees made during depositions in this matter additionally support the denial of summary judgment (Doc. 1343 at 32–33, 65–66).  The Fifth Amendment "privileges [an individual] not to answer questions put to [the individual] in any . . . proceeding, civil or criminal, formal or informal, where the answers might incriminate [the witness] in future criminal proceedings."  *In re Morganroth*, 718 F.2d 161, 165 (6th Cir. 1983).  But "the prevailing rule [is] that the Fifth Amendment does not forbid adverse inferences against parties to civil actions when they refuse to testify in response to probative evidence offered against them[.]"  *Baxter v. Palmigiano*, 425 U.S. 308, 318 (1976).  *See also Hoxie v. Drug Enforcement Admin.*, 419 F.3d 477, 483 (6th Cir. 2005).  The same negative inference can, in certain circumstances, be offered against an invoking witness's current or former employer.  *See, e.g.*, *Coquina Inv. v. TD Bank, N.A.*, 760 F.3d 1300, 1311 (11th Cir. 2014); *Cerro Gordo Charity v. Fireman's Fund Am. Life Ins.*, 819 F.2d 1471, 1481 (8th Cir. 1987).  This Court doubts a negative inference could be drawn against a firm that is an alleged co-conspirator of the invoking witness's employer.  *See In re High Fructose Corn Syrup Antitrust Litig.*, 295 F.3d at 664.

Regardless of the invoking individual's employment status, "the overarching concern is fundamentally whether the adverse inference is trustworthy under all of the circumstances and will advance the search for the truth."  *LiButti v. United States*, 107 F.3d 110, 124 (2d Cir. 1997).  "In most circumstances silence is so ambiguous that it is of little probative force. . . . Silence gains more probative weight where it persists in the face of accusation, since it is assumed in such circumstances

33

that the accused would be more likely than not to dispute an untrue accusation." *United States v. Hale*, 422 U.S. 171, 176 (1975).

Because other record evidence poses a jury question of whether Defendants had a conscious commitment to a common scheme of PIA coordination, this Court need not rely on privilege evidence.

### A Jury Could Reasonably Conclude Each Defendant joined in the Conspiracy

Direct Purchasers present substantial evidence of senior Defendant employees engaging in price discussions, sometimes providing one another advance notice of PIAs, sometimes sharing PIA information during the implementation period when a proposed price increase was being tested in the market, and sometimes discussing the progress of past PIAs (including questioning each other about whether they or lower level employees effectively were undermining price increases by quoting "low" prices). Direct Purchasers produced evidence of three Canadian firms (and of another firm, Vitafoam USA, which produced and sold flexible foam in the United States until 2006) that admitted participation in a North American price-fixing conspiracy. Through declarations, depositions and court filings, the admitted conspirators explain how that conspiracy functioned. They also identify specific Defendant employees with whom they discussed pricing. One Defendant, Woodbridge Fabricating, entered a limited guilty plea in federal district court to violations of the Sherman Act. Woodbridge employees located in Canada had extensive discussions with Canadian and U.S.-based flexible foam producers throughout the Class Period.

Direct Purchasers have further shown that, absent a tacit or express agreement to coordinate PIAs, such price discussions ran counter to Defendants' independent economic interests. And Direct Purchasers have created a jury question as to whether these price discussions served a pro-competitive purpose, or were aimed at cooperatively pushing through cost increases to customers. "[W]hen

34

viewed in conjunction with the parallel conduct" --  a significant number of financial quarters in which many Defendants issued the same or similar PIAs -- such evidence "would permit a fact-finder to infer a conspiracy."  *In re Publication Paper Antitrust Litig.*, 690 F.3d at 62.  "Permit," not "require."

But Defendants raise a series of arguments, all of which assert that despite the evidence noted above, no reasonable jury could infer a conspiracy or a particular Defendant's involvement in a conspiracy (assuming one could be proven).  Some of these arguments are common to all Defendants, while others arise from features unique to a particular Defendant.

***Evidence of Competition.***  Defendants argue the summary judgment record contains overwhelming evidence of competition at the transactional level -- that is, in the prices negotiated with each customer.  Take Flexible Foam, for example, which prides itself on being a "pricing maverick" which expanded its production capacity and geographic reach over the Class Period.  On several occasions, Flexible Foam erected new plants in areas where it did not have a significant number of customers (or any customers at all).  Flexible Foam had no guarantee that the substantial investment to build these plants would pay off with new sales volume.  Flexible Foam (and other Defendants) therefore argue that because such vigorous competition existed "[t]he facts in their totality demonstrate that any degree of parallelism . . . was prompted by [a Defendant's] self-interest[] to remain competitive in the face of rising costs," not an agreement to coordinate PIA amounts and effective dates (Doc. 1321 at 24).  *See also* Doc. 1322-1 at 12–17.

But this Court may not weigh the evidence at summary judgment, and it cannot ignore (for example) the fact that Mike Crowell planned to discuss with Frank Donato of Woodbridge -- who appears in more price discussions than perhaps any other person during the Class Period -- how the

35

two might avoid customer conflicts, or Richard Whitling's frequent exchanges with the scrap brokers (along with strong circumstantial evidence of the role played by scrap brokers in facilitating coordination), or Whitling's relationship with Bus Culotta of Leggett & Platt.

After all, Flexible Foam and other Defendants do not argue in the alternative that they did not conspire during earlier portions of the Class Period, during which evidence of coordination is comparatively thin. Nor do they argue in the alternative that they did not conspire with respect to slabstock, for which there is less evidence than activity related to underlay. "Their defense is that they didn't do it[,]" with respect to any PIA or any product (Doc. 1467 at 71).

Finally, while the competition evidence may suggest cheating on the agreement, that fact would be relevant to the extent of antitrust injury (if any). The Sherman Act proscribes effective as well as ineffective price-fixing conspiracies. *See United States v. Hayter Oil Co. of Greeneville, Tenn.*, 51 F.3d 1265, 1273–74 (6th Cir. 1995). And, there is evidence that when such alleged cheating came to the attention of senior Defendant employees, they would complain to counterparts at the low-ball pricing firm, using language that sharply departs from the language of competition (Doc. 1343-41 at 151).

*Price "Leaders" and Price "Followers."* Smaller market participants like Future Foam and Hickory Springs argue market dynamics (including the fact that all Defendants faced similar chemicals and scrap cost shocks) compelled them to follow price increases initiated by larger Defendants. Had they preceded larger Defendants in announcing a price increase, Future Foam and Hickory Springs' higher pricing would not sway the market price in the way a Foamex, Carpenter, or Flexible Foam PIA might. Small Defendants who jump the gun would thus lose market share. On the other hand, if a small Defendant elected not to follow (or to follow soon enough) a larger

Defendants' price increase in a period of rising costs, the smaller Defendant would be left with narrowing margins and, eventually, the need to recoup rising costs on its own, without larger Defendants leading the price increase. "Thus, the evidence demonstrates that Future Foam [and Hickory Springs], . . . relatively small polyurethane foam and rebond carpet cushion products manufacturer[s], acted rationally and as expected by following the pricing lead of [their] competitors with larger market shares" (Doc. 1324-1 at 9–10). *See also* Doc. 1322-1 at 24.

But the evidence also shows that admitted price-fixers may never have led price increase quarters (Doc. 1343-54 at 328). The evidence further shows that when (in Defendants' view) Future Foam found itself forced to follow price leaders: Marc Vitale was providing advance notice of his price increases to Duane Renfro, a man who had fed Vitale with similar advance information from other Defendants in the past (and would do so again in the future); Ken Conaway was sharply questioning price leader Carpenter about whether it had backed off a price increase; and Larry Diamond was directly contacting Carpenter to learn if it was "putting out another [increase] and if so the percentages" (Doc. 1343-48 at 333). Such "follow the leader" behavior, viewed in context with other evidence, does not defeat Director Purchasers' claims.

***Woodbridge Fabricating Plea Agreement.*** Typical of conspiracy cases, there is more evidence here of conspiratorial conduct with respect to some Defendants than others. Of the remaining Defendants, only Woodbridge Fabricating has admitted fixing prices in the United States. As noted above, it did so in a plea agreement that covered an 11-month period late in the Class Period. The agreement was narrowly drawn to relate only to "polyurethane flexible slab stock automotive foam prices" (Doc. 1343-2 at 30–31). Woodbridge argues the "narrow scope of the plea agreement entered into by" Woodbridge Fabricating "is so manifestly inconsistent with [Direct Purchasers'] vast

conspiracy theory that it renders the theory implausible" (Doc. 1329-1 at 11).  A criminal guilty plea to a Sherman Act violation thus becomes evidence affirmatively disproving Direct Purchasers' broader case, also alleging Sherman Act violations.

A reasonable jury could -- though, of course, it need not -- reject Woodbridge Fabricating's argument.  It does not suggest "complete dereliction by the DOJ" to hold a triable claim exists in this case as to a conspiracy theory substantially broader than that admitted by Woodbridge Fabricating. The DOJ must negotiate plea agreements against the backdrop of the beyond-a-reasonable-doubt standard; Direct Purchasers need only convince a jury that it was more likely than not that Woodbridge and other Defendants colluded in issuing PIAs.  Moreover, whatever unique legal investigatory tools the DOJ may enjoy in a criminal investigation, Direct Purchasers undisputedly brought greater legal resources to bear in prosecuting this case.

Most importantly, the Woodbridge Fabricating guilty plea must be viewed in context with the other, extensive evidence related to Woodbridge that tends to exclude independent conduct.  Around the time that the July and August 2008 PIAs were issued, for example, Frank Donato was urging colleague Bob Bisiorek to contact Foamex, a contact that Bisiorek admitted resulted in an agreement between Woodbridge and Foamex (albeit the only agreement of which he had knowledge) (Doc. 1343-43 at 221; Doc. 1464-1 at 5).  This "agreement" formed the basis for the Woodbridge Fabricating guilty plea.  But Frank Donato engaged in similar discussions throughout the Class Period, including in periods that fall outside the temporal scope of the Woodbridge Fabricating plea. Woodbridge barely mentions any of this evidence in its briefs in support of summary judgment.  The Woodbridge Fabricating guilty plea is not conclusive evidence of the conspiracy charge.  But nor does the scope of the guilty plea, alone or together with other evidence, defeat Direct Purchasers' claims.

*Single or Multiple Conspiracies.*  Defendants contend "the clear evidence [is] that a single conspiracy involving slabstock foam, fabricated foam, and carpet cushion would be implausible and make no economic sense" (Doc. 1328-1 at 48).  These types of flexible foam are produced by different Defendants, using different inputs and different production methods, and are purchased by different sets of customers that rarely overlap (*see* Doc. 1328-19 at 41 fig. 8).  PIAs for slabstock and underlay were issued at different times, because increases in the cost of chemicals and scrap foam generally did not occur together.  Because of these market differences, Defendants argue Direct Purchasers cannot fulfill *Matsushita*'s requirement to "come forward with more persuasive evidence to support their claim[, alleging a conspiracy that rests on an implausible economic theory,] that would otherwise be necessary" (Doc. 1328-1 at 49) (quoting *Matsushita*, 475 U.S. at 587).

"Whether a single conspiracy or multiple conspiracies have been shown is a question of fact resolved by the jury," provided the evidence reasonably could support either conclusion. *Hughes*, 895 F.2d at 1140.  "The principal considerations in determining the number of conspiracies are the existence of a common goal, the nature of the scheme, and the overlapping of the participants in various dealings." *United States v. Smith*, 320 F.3d 647, 652 (6th Cir. 2003).  Defendants cite no legal authority holding that simply because two products are not interchangeable, a conspiracy theory that encompasses both products is implausible.

Direct Purchasers offer evidence of a "common goal": to coordinate the percentage increase and timing of slabstock and underlay PIAs, with the purpose and effect of inflating the baseline from which customer-by-customer negotiations would proceed and overwhelming buyer resistance to unjustified price increases by presenting a "common front" among Defendants.  "The goals of all the participants need not be congruent for a single conspiracy to exist, so long as their goals are not at

cross-purposes." *United States v. Maldonado-Rivera*, 922 F.2d 934, 963 (2d Cir. 1990).  And that common goal was pursued by common means (*see, e.g.*, Doc. 1343-2 at 22, 24).

Interdependence among the participants simply means that activities of one aspect of the scheme (slabstock coordination) were "necessary or advantageous" to the activities of another aspect of the scheme (underlay coordination).  It need not be the case that slabstock coordination could not occur without underlay coordination, or that underlay coordination was caused by slabstock coordination.  *See Dahl v. Bain Capital Partners, LLC*, 937 F. Supp. 2d 119, 135 (D. Mass. 2013). *See also In re Vitamins Antitrust Litig.*, 320 F. Supp. 2d 1, 16 (D.D.C. 2004) (requiring only "fairly minimal" evidence of interdependence).  And Direct Purchasers produce evidence in which Defendants trace slabstock and underlay production to similar raw materials -- slabstock is produced from TDI, MDI, and polyols; scrap is produced from the waste product of fabricated slabstock or from recycled flexible foam; and underlay is produced from scrap.  The cost of one product in this chain (underlay) would affect the cost of other products in this chain (slabstock and scrap), and vice versa. Each aspect of the conspiracy helped co-conspirators pass cost shocks on to customers (*see* Doc. 1343-16 at 92).

Finally, there is substantial overlap in the actors who coordinated pricing of both slabstock and underlay.  The Cooperating Defendants admit coordination with respect to both product markets. Flexible Foam, Future Foam, Hickory Springs, and FXI produced both types of flexible foam, and discussed pricing for both products (*see* Doc. 1328-6 at 104).  *See also United States v. Yonkers Contracting Co.*, 706 F. Supp. 296, 298 (S.D.N.Y. 1989).  Direct Purchasers' single-conspiracy claim can reach the jury.

*Mohawk's Knowing Participation in the Single Conspiracy*.  Mohawk builds its primary argument in support of summary judgment from Direct Purchasers' claim that there was a single conspiracy (Doc. 1325-1 at 12 n.4) (disavowing reliance on other Defendants' arguments against the existence of a single conspiracy).  Mohawk does not attempt to describe Mohawk President Jack Lens' extensive interaction with scrap brokers and other Defendants in a manner consistent with independent conduct.  Indeed, Mohawk's primary summary judgment argument works the same whether Mohawk admits it was a kingpin of underlay coordination or just a peripheral player.

Instead, Mohawk emphasizes its narrow product focus during the Class Period -- it only manufactured rebond underlay and (from 2004 through 2006) prime underlay.  It also emphasizes that Lens' communications with competitors relate only to underlay (rebond or prime), to scrap costs (the primary input for rebond underlay), or to chemical pricing in the context of prime underlay.  Because there is no slabstock-related evidence as to Mohawk, and because Jack Lens stated he never had any slabstock-related discussions with other Defendants (Doc. 1325-4 at 69–70), Mohawk argues Direct Purchasers necessarily fail to create a fact question that Mohawk knew of and intended to join a single conspiracy that included slabstock and underlay.  Further compounding this failure of proof, Mohawk argues that Direct Purchasers' single-conspiracy theory is implausible as to them.  Because Mohawk lacked slabstock operations, it could neither engage in slabstock PIA coordination, monitoring, or the allocation of slabstock customers, nor could it internally source any of its own scrap foam needs (either through internal fabrication activities, or under buy-back agreements with slabstock customers).  Mohawk purchased all its scrap foam needs on the open market.  According to Direct Purchasers, coordination of slabstock PIAs increased the price Mohawk paid for scrap foam.

Direct Purchasers argue they need not prove each Defendant's knowing participation in a conspiracy to raise, maintain, or stabilize the price of slabstock and underlay.  They must prove knowing participation in a conspiracy to raise, maintain, or stabilize the price of flexible polyurethane foam, which affected slabstock and underlay.  "By actively conspiring to raise the prices of underlay, Mohawk participated in this broader price fixing conspiracy" (Doc. 1343 at 132):

> It is true that at times courts have spoken as though, if [Mohawk] makes a[n] . . . agreement with [Hickory Springs or another underlay Defendant], [Mohawk] becomes a party to any conspiracy into which [Hickory Springs] may enter, or may have entered, with third persons.  That is of course an error: the scope of the agreement actually made always measures the conspiracy, and the fact that [Hickory Springs] engages in a conspiracy with others is as irrelevant [to the scope of Mohawk's agreement] as that [it] engages in any other crime.  It is true that a party to a conspiracy need not know the identity, or even the number, of his confederates; when he embarks upon a criminal venture of indefinite outline, he takes his chances as to its content and membership, so be it that they fall within the common purposes as he understands them.  Nevertheless, he must be aware of those purposes, must accept them and their implications, if he is to be charged with what others may do in execution of them.

*United States v. Andolschek*, 142 F.2d 503, 507 (2d Cir. 1944) (Hand, J.).  *See also United States v. Peoni*, 100 F.2d 401, 403 (2d Cir. 1938) (Hand, J.) ("Nobody is liable in conspiracy except for the fair import of the concerted purpose or agreement as he understands it.").  Direct Purchasers embrace the same sort of error by implying they need not prove Mohawk's knowledge of the slabstock component of the conspiracy.  The fact that Direct Purchasers' single conspiracy included slabstock is not a mere "detail," of which Mohawk could be ignorant while still showing knowing involvement in the conspiracy as alleged.  *See Blumenthal*, 332 U.S. at 557.  Overcharges attributable to slabstock account for two-thirds of the classwide damages (*see* Doc. 1328-6 at 104).

Nor does the "slight connection" rule eliminate the need to show Mohawk knowingly joined in a conspiracy that included the two products (*see* Doc. 1467 at 113–14).  Direct Purchasers "must

42

prove that [Mohawk] was aware of the object of the conspiracy and that [it] voluntarily associated [it]self with [the conspiracy] to further its objectives."  Once Direct Purchasers make that showing, Mohawk cannot absolve itself by showing that, though it knew the conspiracy extended to slabstock, it participated only in underlay coordination.  "[Mohawk's] connection to the conspiracy . . . need only be slight.  [It] need not be an active participant in every phase of the conspiracy, so long as [it] is a party to the general conspiratorial agreement."  *United States v. Hodges*, 935 F.2d 766, 772–73 (6th Cir. 1991) (internal citations and quotation marks omitted).  *In re Lithium Ion Batteries Antitrust Litig.*, 2014 WL 309192, at *13 n.13 (N.D. Cal. 2014).

Direct Purchasers cite evidence establishing Mohawk's "awareness of co-conspirators' efforts to raise prices on slabstock":  Mohawk's communications with known slabstock producers; and Mohawk's production of prime underlay and communications with other Defendants about prime underlay or chemical pricing.  (A third category of evidence explains why Mohawk's participation in the single conspiracy makes sense (Doc. 1343 at 134–35), but that evidence does not provide direct or circumstantial evidence that Mohawk knew the single conspiracy existed if the first two categories of evidence do not.).

Jack Lens of Mohawk frequently spoke with Don Simpson of Hickory Springs, discussing scrap foam pricing (which Mohawk purchased from Hickory Springs) or rebond underlay pricing (which Mohawk sold in competition with Hickory Springs).  But neither scrap nor underlay coordination would necessarily include discussions about or knowledge of slabstock coordination by other Defendants, and none of the specific communications to which Direct Purchasers point relate to slabstock.  Direct Purchasers argue that "Hickory Springs, a conspirator in both portions of the conspiracy, manufactured both slabstock and underlay, permitting the inference that Mohawk learned

43

of and/or knew about the slabstock portion of the conspiracy from communications like these" (Doc. 1343 at 133). "[M]ere association with conspirators is not enough to establish participation in a conspiracy." *United States v. Gibbs*, 182 F.3d 408, 422 (6th Cir. 1999) (internal quotation marks omitted).

Direct Purchasers next note that from 2004 through 2006, Mohawk produced prime underlay at its Hope, Arkansas plant. As Lens explained, Mohawk produced prime underlay in a manner similar to slabstock production -- prime underlay was "made from virgin chemicals" using a conveyor belt and curing process like that used for slabstock (Doc. 1343-55 at 746–47). Direct Purchaseser therefore contend that because "Lens communicated with at least Simpson of Hickory Springs regarding the chemical inputs into prime foam[, a] jury could conclude that during this period, just like any other manufacturer of slabstock, Mohawk had every incentive to participate in a price fixing conspiracy that relied on increased raw material inputs to increase foam prices" (Doc. 1343 at 133).

Based on the record, a jury could reasonably conclude that slabstock and prime underlay are substantially similar in respects relevant to the scope of Mohawk's knowledge of its competitors' activities. For some Defendants, "Prime carpet [underlay] . . . is actually made on the slabstock polyurethane foam manufacturing line," emerging as a cured bun before it is sent through a cutting device (Doc. 1353-1 at 31–33). While Mohawk used an extrusion process at its Hope facility (*id*. at 22), it fed foam production with the exact chemicals used to make slabstock foam. In addition to repeated discussions about rebond underlay prices, Mohawk had knowledge of prime underlay price discussions between its competitors (*see, e.g*., Doc. 1343-19 at 256–58). *See also* Doc. 1343-15 at 32) (internal Leggett & Platt e-mail, stating Jack Lens had advance knowledge of a Flexible Foam 15 percent rebond underlay price increase, which was noticed to customers the following day in a letter

44

that signaled a 15 percent rebond underlay price increase and a 20 percent prime underlay price increase).

A jury could find that Defendants and Mohawk discussed rebond underlay price increases to cooperatively pass cost shocks through to rebond customers.  A jury also could conclude Mohawk knew that its competitors' prime underlay discussions shared the same purpose.  And, finally, a jury could decide that the fair import of Mohawk's agreement with its competitors included knowledge of similar conversations with respect to slabstock.  Slabstock production faced the same cost increases that triggered Defendant's prime underlay conversations.  Mohawk knew Defendants sought to pass through cost shocks affecting prime underlay through to customers, and a jury could reach the same conclusion with respect to slabstock.

This Court considers the issue of Mohawk's knowledge of the conspiracy's scope to be a close call, and will allow a properly instructed jury to consider in the first instance whether Mohawk knowingly participated in the single conspiracy Direct Purchasers allege.

Mohawk's other summary judgment argument, that it is entitled to judgment as a matter of law because Direct Purchasers calculate impact and damages for so-called Arbitration Customers (whose claims have been stayed in this case), is denied without prejudice.  As discussed at oral argument, this issue is contingent on the type of jury verdict (if any) returned in Direct Purchasers' favor at the liability and impact trial, and Arbitration Customers have otherwise viable claims against other Defendants.  Mohawk will not face damages in this litigation related to the claims of Arbitration Customers.

**Impact Evidence is Admissible and Creates Questions of Fact**

In certifying the Direct Purchaser Class, this Court reviewed in great detail a series of expert reports submitted by Leitzinger (Direct Purchasers' primary class certification and merits expert), Dr. Ordover (Defendants' class certification expert), and Dr. Burtis (Leggett & Platt and Mohawk's class certification expert).  This Court also questioned and heard testimony from each expert (*see* Docs. 938, 967).  After analyzing Leitzinger's models in great detail, this Court concluded Direct Purchasers offered methods of proving impact and damages on a classwide basis (Doc. 1102 at 38–85).  For similar reasons it denied a motion to exclude Leitzinger's testimony (Doc. 1101 at 1–9).

During expert merits discovery, Leitzinger made slight modifications to his impact and damages models, performing additional sensitivity analysis.  Two changes are most relevant.  First, Leitzinger introduces new cost variables.  One new variable measures the slabstock-producing Defendants' chemical costs, using transactional data received from major chemical manufacturers BASF, Bayer, Dow, and Huntsman (Doc. 1343-56 at 287–88).  The other new variable measures scrap costs, based on a scrap-cost variable constructed using instrumental variable analysis (*id*. at 285–87).  Second, Leitzinger "prorated Defendants' price increase announcements to reflect the timing of the announcements within each quarter" because, in some price-increase quarters, PIAs of all or some Defendants took effect late in the quarter (*id*. at 288).  Leitzinger also performed a persistence-damages calculation, using lagged variables for previous quarters' PIAs.  He explains (*id*. at 290) (footnote omitted):

> [i]nasmuch as Defendants issued price increases on average approximately every three quarters, I included three lagged price increase announcement variables, representing announcements from one, two, and three quarters prior to the current quarter.  The coefficients on these lagged price increase announcements may be positive (to the extent that the full effects of price increase announcements on actual prices required multiple quarters to emerge), zero (to the extent that price increase announcements no

46

longer had an effect on prices in subsequent quarters), or negative (to the extent that price distortions introduced by the price increase announcements resulted in an over-correction in subsequent quarters).

With this modified model, Leitzinger finds impact results substantially similar to the initial estimates produced in class certification discovery (*compare id*. at 302, *with id*. at 304). He estimates an all-Defendants average overcharge percentage of 5.1 percent for underlay, and 4.7 percent for slabstock (*id*. at 309–10).

Defendants' impact arguments, raised in the context of summary judgment or Rule 702 motions, fall into four categories. Each is discussed in turn.

*(1) Model Results***.** Before certifying the Direct Purchasers Class, this Court considered an array of arguments advanced by Defendants, all aimed at showing Leitzinger's models could not show impact on a classwide basis. Many of these arguments tended toward a central contention: because of how Leitzinger constructed his model, the models failed to produce impact results (or valid results) for large portions of the Direct Purchaser Class. Defendants and their experts now advance substantially the same arguments (though modified to fit the output of Leitzinger's revised models).

Defendants argue that Direct Purchasers' "only proof of antitrust impact comes from Dr. Leitzinger's regression results" (Doc. 1328-1 at 34; see also Doc. 1322-1 at 27). Not so (*see* Doc. 1102 at 31–37, 66). Relatedly, Defendants argue because there is "nothing in the record to fill [the] void [represented by the 40 percent of Master Billing IDs ("MBIDs") for which impact coefficients are not estimable because of absence of usable purchase data or purchase patterns], Defendants are entitled to have these purchases removed from the case as well" (Doc. 1328-1 at 35). Claims of impact as to purchases related to MBIDs whose impact coefficients bear a p-value of greater than .05 allegedly also fail (*id*.). Also not true. Leitzinger will testify at trial about his models' designs and

47

results.  He will then explain the bases for inferring from those models and results an impact finding

for (1) non-estimable MBIDs or (2) MBIDs that are only associated with impact coefficients lacking

in the "conventional" level of statistical significance.

After (1) examining in detail Leitzinger's four expert reports (*see* Docs. 1326-3, -4, -5, -6) and

the many Defense expert reports submitted at class certification and summary judgment; (2) reviewing

the transcripts of Leitzinger's four depositions (*see* Doc. 1328-7 at 1–65; Doc. 1328-9 at 1–63; Doc.

1328-10 at 1–73; Doc. 1328-11 at 1–75); and (3) personally examining Leitzinger at the January 2014

class certification hearing (*see* Doc. 967), this Court cannot say Leitzinger's models produce results

that fail as a matter of law, or are so unreliable as to warrant exclusion under Federal Evidence Rule

702.  Rather, Leitzinger's extensive review of the discovery record supports his qualitative

conclusions about the flexible foam industry, and his quantitative modeling of customer experiences

is the result of careful consideration of Direct Purchasers' case theory.  A jury may choose to accept

or reject all or part of Leitzinger's testimony.

However, this Court will grant summary judgment with respect to purchases associated with

the 2,266 negative impact coefficients.  Defendants claim "a negative impact coefficient indicates that

the alleged conspiracy lowered foam and carpet cushion prices below what [Leitzinger's] model[s]

would predict based on those same supply and demand variables" (Doc. 1328-1 at 34) (emphasis

omitted).  Direct Purchasers fail to address this alternative ground for summary judgment to explain

(for example) the other evidence that would allow a jury to find impact as to these purchases.

***(2) "Nonsensical" But-for Price Predictions.***  Defendants say they have identified "[c]lear

proof of the unreliability of Dr. Leitzinger's work" -- his models predict "that the 'but-for' price of

foam [would] *decline*[] every year from 1999 to 2010, despite substantially increasing input costs,"

48

becoming so disconnected from expected patterns in "but-for" pricing that Leitzinger predicts Defendants would have sold foam below cost for large portions of the Class Period (Doc. 1328-1 at 37 & 38 figs. 20–21).

Leitzinger responds in two ways. He first notes that, from Defendants' transactional data, one can calculate Defendants' standard cost margin (*i.e.*, gross profits), then compare that standard cost margin to estimated overcharges. Such a comparison shows a Defendant's gross profits far exceed the Leitzinger models' overcharge estimates (Doc. 1328-6 at 36–37). The models therefore do not predict but-for-world sales at massive discounts (*see id.*). Leitzinger also explains that if one were to subtract the models' estimated overcharges from a Defendant's average actual transaction prices, an approximate but-for foam price would result (*id.* at 40). This estimated but-for foam price moved closely with costs. The but-for foam price would not remain flat or decline while costs increase substantially (*see, e.g.*, Doc. 1328-6 at 100).

Defendants have not presented an argument that compels summary judgment on this basis. Defendants ignore Leitzinger's claim that the but-for foam price trend reasonably parallels trends in chemical or scrap costs (*see* Doc. 1355 at 19). While this Court understands Leitzinger's models' directly predict changes in prices (and do not directly predict actual prices), Defendants have not demonstrated that Leitzinger's alternative approaches for double-checking his model's indirect but-for price predictions are unreasonable or otherwise rely on flawed premises.

*(3) Controlling for an Oligopolistic Price Premium.* Defendants assert that Direct Purchasers cast the slabstock and underlay markets as oligopolies (Doc. 1328-1 at 12). Pricing in an oligopoly, Defendants say, is not a simple matter of supply and demand. Instead, competitor firms set price on the basis of supply and demand factors, as well as the expected pricing decisions of other dominant

competitor firms.  "Dr. Leitzinger has made no effort to measure the impact of oligopolistic interdependence in foam and carpet cushion markets; his models purport to control only for supply and demand variables, and do not attempt to control for the effects of oligopoly."  Therefore, the models may find antitrust "impact" in the lawful practice of interdependent pricing (*id*. at 42–43).

At summary judgment, Defendants carry the burden of showing the absence of genuine disputes of material fact.  One can assume the slabstock and underlay markets are moderately concentrated (Doc. 1328-6 at 46), without also assuming the interdependent pricing would occur in the industry, absent the alleged collusion.  *See, e.g.*, *In re Petrol. Prods. Antitrust Litig*., 906 F.2d at 443 (noting "[t]here has been a considerable debate in the literature over whether interdependent pricing is an inevitable or inherent feature of certain types of concentrated markets" and collecting conflicting studies).  Defendants do not offer evidence suggesting that interdependent pricing at supracompetitive levels would occur in either market segment absent collusion (much less evidence that would compel such a conclusion).  And in any event, Leitzinger's models would not predict overcharges that depend on an oligopoly pricing premium because (among other things) the models measures quarter-over-quarter price changes, and Defendants offer no evidence or explanation why an oligopolistic pricing premium would change between quarters.

*(4) Impact and Damages as to Omitted Transactional Data.*  Direct Purchasers sue to recover damages on the sale of (among other products) automotive slabstock foam.  Leitzinger does not include automotive slabstock foam transactional data in his impact dataset, even though Defendants provided such data.  He claims the information was unusable in his models "because of the issues associated with the timing of price increase communications and . . . product identification" (Doc. 1328-10 at 57; *see also* Doc. 1328-6 at 75).  Price increases for automotive slabstock foam either were

not signaled to customers through PIAs, or it is unclear whether a Defendant's general slabstock foam PIAs applied to automotive slabstock foam.  Leitzinger excluded from his impact dataset all Woodbridge transactional data -- including non-automotive slabstock foam -- because the data lacked identification of "foam types or product types" (Doc. 1328-3 at 61–62 n.336), data fields Leitzinger's impact models require to operate.

Leitzinger explained how he generated damage results for automotive slabstock foam, as well as for Woodbridge's non-automotive slabstock foam.  He (1) excluded automotive slabstock foam and all Woodbridge transactional data from his impact dataset; (2) calculated impact coefficients and an overcharge figure for slabstock based on the experiences of non-automotive slabstock foam customers of Defendants other than Woodbridge; and (3) then calculated a classwide damages figure by applying the slabstock overcharge to Defendants' aggregate slabstock foam sales, including Defendants' automotive slabstock foam sales and all Woodbridge's slabstock sales.

In FXI and Woodbridge's view, the "[l]ack[] of any transaction-based evidence of impact on Woodbridge sales (and on sales to automotive [slabstock] foam customers of any defendant)" forces Leitzinger to rely on "*fictional* overcharge 'estimates'" (Doc. 1329-1 at 20) (emphasis in original).  The overcharge estimates are "fictional" with respect to automotive slabstock foam sales and Woodbridge's sales because the estimates are based on the impact coefficients of non-automotive slabstock foam of Defendants other than Woodbridge (*id*. at 20–21).  If a Direct Purchaser had bargaining power based on the volume of its foam purchases (as automotive slabstock foam buyers did), FXI and Woodbridge contend that bargaining power would tend to reduce antitrust impact.  Further, FXI contends that its separate slabstock business units, headed by different individuals, independently drafted PIAs for automotive slabstock foam and non-automotive slabstock foam, with

no necessary connection between the increase amounts or effective dates set by the two units (*see* Doc. 1328-21 at 171–75).

FXI and Woodbridge also argue Direct Purchasers commit *Comcast* error by calculating damages for automotive slabstock foam and for Woodbridge sales.  Direct Purchasers' liability theory depends on coordinated price increases.  But, Direct Purchasers "dispense with the need for letters or transactional impact for Woodbridge (and all automotive foam) customers.  Absent common price letters causing common impact (per the theory of harm), no corresponding common regression (the measure of damages) can exist for those customers" (Doc. 1329-1 at 23).  "[H]ere, the economic impact that Dr. Leitzinger calculates is unhinged from the supposedly harmful event: *damages do not vary at all* regardless of whether Woodbridge sent a price increase letter or not, whether it announced an identical, higher[,] or lower increase than other defendants (or none at all), and whether customer-specific circumstances (such as bargaining power) mitigate or negate any putative impact" (*id.* (internal quotation marks omitted) (emphasis in original).

Direct Purchasers contend a reasonable jury could accept Leitzinger's damage calculations for automotive slabstock foam because automotive and non-automotive slabstock foam are produced from the same chemicals, and therefore were subject to the same cost shocks.  Woodbridge, FXI, and the Vitafoam Defendants controlled 90 percent of product sales, which Defendants referred to as a commodity.  Thus, antitrust injury as to automotive slabstock foam customers would be similar to injury as to non-automotive slabstock foam customers, and widespread.

As an initial matter, neither FXI nor Woodbridge show that Leitzinger's reasons for excluding these data somehow misrepresents the data.  Woodbridge notes that General Motors, a Direct Action (non-Class) Plaintiff, retained another expert (Dr. Debra Aron) who found Woodbridge's data usable

(Doc. 1328 at 20 n.7).  But Woodbridge does not explain whether Aron's statistical model is comparable to Leitzinger's models, such that her use of Woodbridge's transactional data would have any bearing on Leitzinger's exclusion of the same data.  None of Aron's expert reports have been filed in connection with Defendants' summary judgment motions.  But judging from Defendants' experts' discussion of Aron's model, the two experts' models differ in fundamental ways (*see, e.g.*, Doc. 1328-26 at 37, 40) (Woodbridge expert report describing Aron's "molded foam model" as a "quantity weighted multiple regression analysis" which estimates impact based on "the estimated coefficients on [only] . . . two indicator" variables).

These challenges at best win FXI and Woodbridge a reduction in damages corresponding to automotive slabstock foam sales (or a narrowing of the certified class).  Both Defendants would remain jointly and severally liable for the conspiracy's non-automotive slabstock foam overcharges, including their own.  This Court already has determined a jury could accept as reasonable the inferences Leitzinger draws from structural and statistical evidence to offer opinions on impact as to certain categories of MBIDs and otherwise unusable transactional data.  But those inferences more closely resemble apples-to-apples comparisons (*e.g.*, using *underlay customers*' impact coefficients to predict the purchasing experiences of *underlay customers* for whom impact coefficients are not estimable) than the reasoning Leitzinger uses to show impact on automotive slabstock foam (*e.g.*, using *non-automotive slabstock foam customers*' impact coefficients to predict the purchasing experiences of *automotive slabstock foam customers*).  Even so, questions of impact as to automotive slabstock foam customers can reach a jury.  As courts frequently hold, a plaintiff can prove impact using a dataset that is less than complete as to each defendant.  *See, e.g., In re Scrap Metal Antitrust Litig.*, 2006 WL 2850453, at *15 & n. 41 (N.D. Ohio 2006), *aff'd*, 527 F.3d 517 (6th Cir. 2008).

Leitzinger's exclusion of such data goes to the probative weight of his models' impact and damages findings; it does not mandate judgment as a matter of law.

This Court likewise rejects Defendants' *Comcast* error arguments.  Questions of fact exist regarding Woodbridge's participation in a price-fixing conspiracy, which can be proved (or not) using common evidence.  Damages in this case will be the result of a single theory of antitrust harm: Defendants' alleged coordination of slabstock and underlay price increases.  Leitzinger's impact models measure the percentage change in price attributable to PIAs, holding constant other relevant drivers of price.  The resulting impact coefficients prove fact of damage.  The impact coefficients then combine to create Leitzinger's average overcharge figure, which proves quantum of damages.

The claim that "damages do not vary at all" despite differing PIA terms or customer characteristics is therefore both an oversimplification of how Leitzinger's models arrive at a damages figure and (apparently) a reference to a heightened standard of proving antitrust damages.  Impact coefficients, calculated for each product-customer observation with usable data, account for the different experiences of consumers in a far more granular way than (for example) a during/after regression model with one or a few indicator variables.  At the least, there is a reasonable basis for a jury to infer Woodbridge customers' experience based on the models' results and other evidence.  And for proof of damages, it is "enough if the evidence show[s] the extent of the damages as a matter of just and reasonable inference, although the result be only approximate."  *Story Parchment Co. v. Paterson Parchment Paper Co.*, 282 U.S. 555, 563 (1931) (cited with approval in *Comcast Corp. v. Behrend*, 133 S. Ct. 1426, 1433 (2013)).

**Tolling the Limitations Period is a Jury Question**

Finally, Defendants argue that, as a matter of law, recovery for pre-December 2006 claims is barred because Direct Purchasers (1) have produced no evidence of active concealment and (2) failed to exercise due diligence (Doc. 1328-1 at 29–33). (Each class representative for whom tolling is an issue testified that it did not know of the alleged conspiracy prior to the 2010 government raids; Defendants argue such assertions "miss[] the mark" and fail to excuse Direct Purchasers' claimed lack of due diligence based on other suspicions class representatives had during the Class Period. (Doc. 1355 at 15.).  Material factual disputes prevent this Court from granting judgment as a matter of law on either basis.

Direct Purchasers' active-concealment evidence begins with the typical PIA's recitation of the causes for a price increase (*e.g.*, the increasing cost of chemicals or rising scrap prices), which "misled class members by providing pretextual reasons for the increase" (Doc. 1343 at 90).  Defendants allegedly shared information in a manner that would evade detection.  Defendants would occasionally send or receive PIAs using personal e-mail accounts.  Defendants also received PIAs that had been faxed from public fax machines (*e.g.*, a fax machine at a Comfort Inn or from an office supply store), a means of communication that (on Direct Purchasers' view) attempted to conceal pricing discussions between competitors.  Defendants' files contain PIAs with fax transmission or address information obliterated.  And Defendants used shorthand or code to refer to competitor employees and price discussions.  For Frank Donato, "DP from F" meant Don Phillips from Foamex.  When Donato and Bill Lucas of Vitafoam USA talked about "[o]ur favorite issue," they talked about prices.

Defendants also cautioned one another in handling information received from or about a competitor.  In August 2005, scrap broker Duane Renfro advised Clyde Scott of Leggett & Platt that

55

he would "have [for] you [Flexible Foam's] price increase letter this afternoon or first thing in the morning."  Apparently before receiving the PIA, though, Scott wrote to colleagues Larry Heppe and Joe York "Flexible with Chuck [Moeller] at 'helm' is announcing a 15% increase (they are below everyone now in Texas) Alliance & Carpenter will be announcing soon.  Not 15% but to get Apples & Apples. This is confidential.  Wait till I get announcements before saying anything" (Doc. 1343-16 at 121).  In May 2009, an FXI employee learned by e-mail from a Woodbridge employee that Woodbridge had "re-quoted [FXI customer JCI] based on current economics about 3 weeks ago and they tell me that my foam price is too high compared to current (you) and another company; not sure who that is.  I am re-working the numbers to see if I can come down, but I am not sure if I can make it down to where they want me to be.  I'd say it is about 50/50 on if I try to sweeten it or if I walk away and keep the PIP [apparently a misspelled reference to "FIP" or "foam-in-place"] business."  The FXI employee then forwarded the Woodbridge employee's comments to Don Phillips of FXI, writing "[f]or your ears only.  Keep this on the down low.  I don't want it out that I'm talking pricing with the comp.  I told Steve we'd get together for lunch.  Too many e-mails" (Doc. 1343-13 at 2).  And in August 2009, an FXI employee e-mailed his company's published PIA to a Carpenter employee, stating "[d]on't say where you got it . . ." (*id*. at 123), while David Gurley of Vitafoam Canada asked colleague Peter Farah to "keep . . . confidential" an e-mail chain he had forwarded to Farah showing competitors engaged in general price discussions (*id*. at 111–14).

Direct Purchasers argue that the allegedly pretextual reasons for a price increase stated in the PIA are "archetypal concealment" (Doc. 1343 at 90).  Defendants argue allegedly pretextual statements in PIAs are not enough, building on the undisputed fact that "higher raw material costs . . . preceded every announced PIA."  But Direct Purchasers' pretext argument does not deny that cost

56

shocks preceded PIAs. Rather, a portion of the announced price increase was not the product of "rising costs," but rather collusion with competitors (Doc. 1343-8 at 265). "[T]he price announcements do not constitute mere silence as to the existence of a conspiracy, but [instead are] . . . affirmative acts of concealment." Direct Purchasers "do not argue that the conspirators falsely stated that costs were rising . . . , but rather they allege that the conspirators falsely stated that prices were being raised *because of* those conditions, when in fact they were raising prices in furtherance of a price-fixing conspiracy. Such conduct goes beyond mere silence or nondisclosure." *In re Urethane Antitrust Litig.*, 913 F. Supp. 2d 1145, 1163–64 (D. Kan. 2012) (emphasis added) (collecting cases). Such statements are affirmative acts of concealment, separate from the alleged price-fixing itself. Defendants' price-fixing violations would have been established when they agreed to coordinate price increase amounts and timing. *See Dry Cleaning & Laundry Inst. of Detroit, Inc. v. Flom's Corp.*, 841 F. Supp. 212, 217 (E.D. Mich. 1993). Nothing in that conclusion conflicts with *Pinney Dock & Transp. Co. v. Penn Cent. Corp.*, 838 F.2d 1445, 1473–80 (6th Cir. 1988) (granting summary judgment on freighters' fraudulent concealment claims because one had expressly contemplated an antitrust action against a coalition of railroads while the second failed to produce proof of affirmative misrepresentations and also knew that railroads "were acting jointly to [the shipper's] detriment" with respect to handling charges), or any other binding caselaw identified by Defendants. *See Carrier Corp.*, 673 F.3d at 447 (concluding claim that a defendant offered "false and pretextual reasons" for the pricing of copper tubing failed to satisfy Federal Civil Rule 9(b)); *Bridgeport Music, Inc. v. Diamond Time, Ltd.*, 371 F.3d 883, 891 (6th Cir. 2004) (assuming acts of affirmative concealment but finding statute of limitations barred copyright infringement claim because of plaintiff's failure to exercise due diligence).

57

Shifting to due diligence, Defendants maintain that Direct Purchasers' conspiracy theory itself put Direct Purchasers on inquiry notice that a price-fixing conspiracy may have operated in the flexible foam industry: Direct Purchasers "maintain that the similarity in these allegedly pretextual price increase announcements are evidence of conspiracy," yet Defendants sent these similar PIAs to class representatives who, according to their deposition testimony, became suspicious as to why Defendants priced similarly (Doc. 1328-1 at 30–32). However, aside from pricing similarity, Defendants cite to no other red flags that they say should have triggered investigation into possible antitrust violations. This Court must leave arguments like these to the jury. "[D]oing nothing might be reasonable where nothing suggests to a reasonable person that wrongdoing is afoot. However, once wrongdoing is suspected, the plaintiff must be diligent, even if doing so might in hindsight be considered futile." *Venture Global Eng'g, LLC v. Satyam Computer Servs., Ltd.*, 730 F.3d 580, 588 (6th Cir. 2013). The degree of investigation (if any) the plaintiff must undertake depends on the nature of the red flags a reasonable person should have had knowledge of. *See Campbell v. Upjohn Co.*, 676 F.2d 1122, 1128 (6th Cir. 1982). So, for example, when the claim is that an oil company "deliberately miscalculated" and underpaid royalty payments it owed lessors, then "deliberately falsified . . . monthly accounting statements" and explained royalty payment calculations in a way that could not be independently verified, the proper limitations period is a question of fact. *Lutz v. Chesapeake Appalachia, L.L.C.*, 717 F.3d 459, 475 (6th Cir. 2013).

There is something more here -- not the fact of similar pricing (which Defendants deny, and which in any case has long been insufficient, on its own, to make out a Section 1 claim, *cf. Theatre Enterprises, Inc. v. Paramount Film Distrib. Corp.*, 346 U.S. 537, 541 (1954)), but rather the admission of some class representatives that they were "suspicious" about whether Defendants'

similar PIAs had been written independently.  But according to the caselaw, a plaintiff cannot present tolling arguments to a jury only in cases that include far more ominous signs of misconduct and far graver failures to investigate such misconduct.  *See, e.g.*, *Pinney Dock,* 838 F.2d at 1451–53, 1477–78 (barring antitrust claims, alleging defendant railroads conspired to control "dock unloading and land transportation business" by squeezing out "self-unloaders" like the plaintiff, where the plaintiff corporations's legal counsel repeatedly advised the company that it had a possible competition-law cause of action and that advice was ignored because the company decided legal action at that time could be delayed and "would [have] be[en] a waste of time and money"); *Campbell*, 676 F.2d at 1124–25, 1127–28 (claim for fraudulent inducement in the signing of a contract barred because the plaintiff signed a "merger agreement," which omitted a "back end payment" that he claimed had been orally guaranteed him, and then neglected to read the merger agreement "for nearly six years" until the back-end payment came due and went unpaid); *Dayco Corp. v. Goodyear Tire & Rubber Co.*, 523 F.2d 389, 394 (6th Cir. 1975) (denying tolling because fourteen years before suit "Congress conducted hearings that explored some of the same violations" pursued by the plaintiff).

### CONCLUSION

This Court has carefully examined the substantial summary judgment record.  Questions of fact exist that allow a jury to test Direct Purchasers' claims.  Therefore, for the reasons noted above, this Court:

- Denies Flexible Foam's Motion for Summary Judgment (Doc. 1321).

- Denies Future Foam's Motion for Summary Judgment (Doc. 1324).

- Denies Hickory Springs' Motion for Summary Judgment (Doc. 1322).

- Denies Mohawk's Motion for Summary Judgment (Doc. 1325), allowing Mohawk to raise arbitration issues after the jury verdict.

- Denies Woodbridge Defendants' Motion for Summary Judgment (Doc. 1329).

- Denies in part Defendants' Joint Motion for Summary Judgment and *Daubert* Motions; but grants that part of the Motion with respect to purchases associated with negative impact coefficients (Doc. 1328).

IT IS SO ORDERED.

_____s/ Jack Zouhary_____
JACK ZOUHARY
U. S. DISTRICT JUDGE

February 9, 2015

60

# APPENDIX

Communications between and among Defendants; spelling and grammatical errors appear in the original documents.

- On March 21, 2000, Foamex faxed Vitafoam a copy of its draft PIA, dated the next day.  The same letter then arrived at Carpenter via a Comfort Inn fax on March 23 (*see* Doc. 1343-22 at 52, 56).

- In December 2000, Peter Farah updated his Woodbridge colleagues on discussions with Tony Vallecoccia of Valle Foam.  Part of the discussions involved proposed foam or chemical transactions between the two companies, but Vallecoccia also informed Farah that "Valle has come with an 8% price increase" (Doc. 1343-23 at 112).

- In January 2001, Max Ten-Pow of Carpenter Canada informed his Carpenter colleague, Jim Hacker, that even though he did not want a certain direct purchaser's business, he preferred to "string . . . along" the direct purchaser "for a while."  At that time, Vitafoam Canada [w]as obviously raising their prices," spurring the direct purchaser's interest in Carpenter. "Let's let Vita continue to get their price up." Hacker continued the conversation, telling Ten-Pow that "[t]he Montreal Foamex guy called Jerry [on] Friday about [a recent Foamex price increase] - wanting to know if we will follow.  I expect that we will follow quickly with a letter of our own.  Maybe we shouldn't get Mcknights business" (Doc. 1343-24 at 112).  The next month, Ten-Pow advised Carpenter leadership that "[t]he competition - Vita - appears to be behaving as we trade off a 'bad customer' to them for a couple good ones," and that "[w]e are in the process of getting our [PIAs] out to the customers and will be looking keenly to see how competition acts and if they act in accordance with the announced price increase" (*id*. at 128).

- In August 2001, David Fowler and Peter Farah of Woodbridge discussed what to do about competition from Vitafoam (Doc. 1343-15 at 80):

  > Vita is slashing pricing we are matching.  I propose to start serious discussions with Vita.  Please let's have some good conversations with Vita.  It would be better if we could work with them rather than have fights all over the place [Peter Farah].[1]  I agree.  We are in negotiation mode already with the pricing.  They are trying to take business away from us.  Our response has to be in pricing and opening up a discussion.

---

[1]

It is not apparent from the e-mail whether Farah offered the comments that preceded or followed his name, which appears in brackets in the original e-mail.  Farah wrote the original e-mail, which Fowler then edited to add comments (*see* Doc. 1343-15 at 79 ("Peter . . . I have put my comments throughout your message.")).  Farah then offered "comments on your comments . . . as well!" (*id*.).

- Woodbridge employees discussed similar efforts to open discussions with another competitor two months later, when Frank Donato wrote a memo to colleagues Peter Farah and Dave Fowler. "Gentleman Some notes from various discussions at the recent [Polyurethane Foam Association] meetings." This particular memo concerned talks with Foamex (Doc. 1343-25 at 66 (bullets in original)):

  - [Foamex was] represented by Vinnie Bonnadio (VP Sales Technical products), Andrew Johnson (new R&D head) and John Televontos.

  - Vinnie approached me and expressed a desire to keep the lines of communication between us more open to avoid 'not being stupid'. He also agreed to introduce me to his automotive counterpart . . . [and] suggested a meeting in Cincinnati in the near future.

  - Leaving automotive aside, he wanted know what our intentions were in technical foams. He asked point blank if we were getting into reticulated. He also said quite clearly that they were targeting Plastomer.

  - He said they would fight hard in diaper[ foam] -- and would not lose any more business, which led to the conversation of keeping a more open dialogue.

- In March 2002, Vitafoam employee Richard Loftin forwarded a news article noting a chemical price increase "to the automotive sector" to Bill Lucas, President of Vitafoam USA, urging discussion on how Vitafoam would respond, and noting "I have somewhat of a commitment from Foamex that they will be announcing an increase for May 1" (Doc. 1343-26 at 53).

- In May 2002 Michael Faus of Carpenter sent a draft Carpenter PIA to Larry Diamond of Future Foam (*id*. at 94).

- In August 2002, Vitafoam Canada's Gerry Hannah reported to his colleagues that Carpenter "indicated they would like to get a 5% increase on rebond underlay Oct. 1st" and that Carpenter had spoken with Domfoam "and they have agreed to also go for it," though only in Canada (Doc. 1343-27 at 35). Next month, National Sales Manager Steve Pendock updated Hannah and Vitafoam Canada President Mel Himel that Pendock had spoken with "Fred" -- presumably Fred Zickmantel of Domfoam -- who confirmed "they and Carpenter have made a motion in Western Canada," but not yet in Eastern Canada because "of no confirmation that Carpenter had made their play yet." Pendock reported he would speak again with Fred, "confirm his and Carpenters position," and then "pull the trigger as soon as possible (*id*. at 48).

- In June 2003, Frank Donato of Woodbridge planned to visit Flexible Foam's Spencerville, Ohio plant. In discussing the details of that proposed trip by e-mail, Mike Crowell of Flexible Foam explained that senior Flexible Foam official Lewie Moeller would show Donato the Plant, and that Donato also should expect to meet with Chuck Moeller, then Flexible Foam's

Chairman.  Crowell advised: "Agenda for the meeting is very informal," and included among other proposed discussion topics "[p]ossible customer conflicts and how to avoid them" (Doc. 1343-15 at 91–92).

•   In July 2003, Clyde Scott told Leggett & Platt colleague Larry Heppe that scrap broker David Charak "called today and indicated that Carpenter was announcing a 10% bonded price increase" (Doc. 1343-29 at 23).

•   In June 2004, Joe York reported to his senior Leggett & Platt colleagues Larry Heppe and Gary Wahrmund: "Foamex confirmed today they saw a Carpenter increase letter announcing a 9% increase effective 6/28/04.  Foamex will have a letter out this week.  Supposedly, Future will also have one out this week.  Carpenter intends to increase prices again 8/1/04, depending on the 7/1/04, chemical increase.  We should have our letters ready to mail to selected accounts" (Doc. 1343-30 at 126).

•   Clyde Scott of Leggett & Platt made the rounds with competitors that same month.  In an early June 2004 e-mail with the subject "Increase," Scott told colleague Joe York he was "having lunch tomorrow with Vita.  Will get theirs.  Hickory will send me theirs and I will get Foamex [from a customer] and Flexible [from another customer]," if those firms had sent out PIAs (*id.* at 155).  The next day, Scott reported on the luncheon: "Vita indicates they have not officially sent out a [PIA] yet, or waiting to see what the others are doing.  Hickory told me the same today.  Also as far as I know Flexible hasn't either.  All waiting to see what happens.  Foamex and Carpenter are the only official ones I can find that been sent out.  I did not check [other non-defendants].  According to what I was told Carpenter wants Foamex to lead" (*id.* at 157).  Later that month, he met with Don Simpson of Hickory Springs, in part to discuss scrap foam that Hickory Springs sold to Leggett & Platt: "Anything you want me to inquire about," Scott asked colleagues Joe York and Larry Heppe.  York replied "Would be interested in what they see with the foam increase & what their position is."  The next morning, Scott reported back: "Don indicated they are still waiting to see what everyone is going to do.  Indicates everyone needs, however carpenter and others want Foamex to lead.  Don indicated Flexible is going to be a problem, More facilities and low prices" (*id.* at 195–95).

•   In June 2004, Carpenter noted that Future Foam and Foamex letters would be "out this week" and noted the effective dates and percentage price increase (or, in Future Foam's case, the lack thereof) for each letter (*id.* at 140).

•   In July 2004, Michael Faus of Carpenter sent Al Diamond of Future Foam, Carpenter's PIA, dated the prior day (*id.* at 230–31).

•   In August 2004, Don Phillips of Foamex, preparing to return a call to Peter Farah of Woodbridge who had asked for a "sit down to discuss the Auto market," e-mailed Foamex colleagues for information about a deal Farah had been discussing with Vinnie Bonaddio of Foamex.  A Foamex colleague replied, "Make sure you let me know when you get to talk to him, I'd like to hear how it goes.  Finally we get to say 'Oh we're not out trying to upset the

market, we're just trying to get our margins up and keep our business.  We can really work together on it.' I do hate those guys" (Doc. 1343-31 at 37).

• In September 2004, scrap broker Duane Renfro asked Frank Hurst of Carpenter whether Carpenter had issued a PIA, and if so, whether Hurst would send it along.  Renfro continued: "I would like to assist our industry in passing this increase through and if I can forward the letter on to the rest of the industry it can only help."  Hurst then turned to his colleagues at Carpenter, apparently looking to oblige Renfro.  Forwarding on Renfro's e-mail, Hurst asked Ken Thompsen, "Do you have a letter?" (*id*. at 135).

• In October 2004, Frank Donato of Woodbridege and Bill Lucas of Vitafoam USA spoke about "our favorite subject" (Doc. 1343-32 at 68), which the Vitafoam Defendants admitted referred to a price increase (Doc. 1343-20 at 225).  "Jan 1[, 2005] as a possible date" (Doc. 1343-32 at 68).

• In November 2004, Frank Donato reported to Woodbridge colleagues about his discussions with Bill Lucas of Vitafoam USA during a Polyurethane Foam Association trade show: "Most interested in their auto increases.  They will announce for Jan 1.  He said including Dow's Jan 1 announcement -- they would go to +20% . . .  Waiting to hear our plan.  I said we were linking to our automotive group -- but would call him sometime this week" (Doc. 1343-30 at 51).  The same month, Bill Moser of Woodbridge played golf with a Vitafoam employee, discussing future pricing..  Vitafoam was "prepared to raise prices.  He didn't give me the exact percentage but I gathered it will be between 12 and 18 percent.  I ask him what their effective date was going to be and he commented 'we're waiting on you guy's'" (Doc. 1343-32 at 127).

• Elsewhere that month, Ed Malechek of Carpenter reported to a colleague that "Hickory is still complaining that they want to get prices up at Lazy Boy and we will not support."  The colleague responded:  "Since when do we trust what Hickory has to say? If they want to lead an increase at La-Z-Boy, we can support them, by not being willing to take on any new La-Z-Boy business" (*id*. at 142).

• In January 2005, Ted Giroux of Vitafoam Canada learned from a colleague that "WTB" -- presumably William T. Burnett -- proposed a 5 percent increase, "a decrease over what they advised.  It was a 9 % increase now only 5 %."  Giroux forwarded this news on to New Jersey-based Vinnie Bonaddio of Foamex, later asking "Are you planning any increase in Jan? We need to get our ducks in line for the retail market."  The Foamex employee said the company would not increase in January.  Giroux then volunteered that Vitafoam Canada would raise prices "5 to 8% March 1" (Doc. 1343-33 at 63–66).  Later that month, Frank Donato explained to Woodbridge colleague Peter Farah that Don Phillips of Foamex had clarified Foamex had not backed off a recent price increase by granting concessions to a large customer (*id*. at 108).

4

- In February 2005, Donato reported to his colleagues that, "[a]s I tried to find out what the other guys are doing in the market . . . the comment came back that [Foamex] are saying that we are spoiling the increases by caving. We are the bad guys -- at least as they are telling it" (*id*. at 147). That same month, Carpenter employees discussed internally methods for increasing pricing at bedding accounts that enjoyed three-month guarantees on prices. "We could probably get by with charging more for toppers at some of the regional bedding accounts," one Carpenter employee noted. "However, to make it work at the national accounts we would need to have some collusion with [Flexible Foam] and Foamex" (*id*. at 154).

- On March 1, 2005, Clyde Scott of Leggett & Platt sent Don Simpson of Hickory Springs a PIA dated the previous day, "[f]or your info." Simpson forwarded the letter on to his team, "FYI -- Let's see if they really follow through with it. Let me know if you see this on the streets in the near future" (*id*. at 182). Also in March 2005, Woodbridge and Vitafoam again discussed the timing of future pricing and the need "for a more coordinated pricing" (*id*. at 223), and discussed coordination again in May 2005 even though Woodbridge said it did not need a further increase (Doc. 1343-34 at 28).

- In August 2005, Clyde Scott of Leggett & Platt forwarded on to colleagues a Mohawk PIA that had not yet been sent to customers, advising "Share it with David [Charak] but wait until it is sent out to [Mohawk] customers to distribute" (*id*. at 132).

- Elsewhere that month, Woodbridge President Bob Magee informed his subordinates "Hickory and Woodbridge have been discussing market rationalization off and on. Hickory is visiting tomorrow to discuss some moves they are considering that could parallel Woodbridge effort? Perhaps opportunity perhaps competition I'm not sure. We will have some good open discussion" (*id*. at 152).

- In October 2005, Clyde Scott of Leggett & Platt shared a published PIA with scrap broker Duane Renfro, who on the same day forwarded the PIA to senior employees at underlay competitors Flexible Foam, Carpenter, and Mohawk (1343-35 at 27–36). Two days letter, Renfro circulated Mohawk's published PIA to the same group, asking Carpenter for its PIA (*id*. at 69, 72, 170). Carpenter agreed (*id*. at 175). And at month's end, Renfro sent Carpenter's published PIA to Mohawk and Leggett & Platt (*id*. at 317, 321).

- Elsewhere in October 2005, Woodbridge employees internally shared information on future Flexible Foam price increases (*id*. at 160). Later that month, Donato e-mailed Farah, musing about market conditions and an impending price increase. He noted "Vita" and Foamex's increase and surcharges. "Don't know what we should do. Dan wants me to call" Don Phillips of Foamex. "Will try first thing in the morning. I think we should go strong and tr[y] to keep Vita and [Foamex] on board. Forget share for now - fix pricing" (Doc. 1343-14 at 114). Thirteen days later, on October 19, Donato reported to Farah that he had spoke with Phillips, in response (in part) to customer rumors that Foamex planned to shutter a facility. But he further reported, "Also, they are at 40 -42 and waiting for us to follow." Farah

forwarded this e-mail on to Woodbridge President Bob Magee, among others (Doc. 1343-15 at 70).

• In November 2005, Bill Lucas of Vitafoam USA and Frank Donato of Woodbridge spoke, a chat Donato reported to Woodbridge colleague Peter Farah: "They [*i.e.*, Vita] are going to market probably next week.  Looking for a Jan 1 effective date.  Were going at 18%.  I said we would most likely be closer to 15%.  Has not heard from Foamex.  Thin[k]s they are afraid of what we will do.  Is going to try and call them again to see what number they will go with" (Doc. 1343-15 at 74).

• Elsewhere that month, scrap broker Duane Renfro e-mailed a copy of a published Mohawk PIA to Rich Whitling of Flexible Foam. "I have Leggett & Platt's letter as well if you want it," Renfro offered.  "I need yours" (Doc. 1343-35 at 434–35).

• In December 2005, Clyde Scott of Leggett & Platt met with scrap broker Duane Renfro "to discuss scrap for January & 2006.  During meeting he indicated that Mohawk did want the 4th increase & planned to lead the increase.  It would come out in January to take effect in Feb.  Indicated they still needed 1st qtr." because of various costs increases.  "Mohawk feels Carpenter will support, hopes we will and thinks small bonders will.  NOT sure about Foamex & Flexible in that they had played games in certain areas.  Indicated he thought their pricing, ours & carpenters were about same" (*id.* at 388).  Renfro met with Mohawk again in the first week of January 2006, at which time the "fourth increase" had been issued (*id.* at 392).  But over a week later, Lens wrote Charak's assistant, Nancy Swoboda: "Please tell David that due to Carpenter's lack of support, I have recinding our price increase."  Charak forwarded Lens' note to Clyde Scott of Leggett & Platt: "For your information, Jack [Lens] is rescinding his price increase per this note to me.  He called this morning and didn't want Larry [Heppe of Leggett & Platt] to go out with one when [Lens] was rescinding his" (*id.* at 420).

• Charak served as a conduit for Defendant employees looking to build support for another underlay increase in March 2006.  Clyde Scott of Leggett & Platt advised his colleagues: "Got a call from federal.  David Cherek.  He had talked to frank hearst" of Carpenter "and frank informed him that they needed an increase and would support one now.  although he didn't support Mohawk's attempt.  Bill hall of flexible also advised David they needed one and would support.  I believe jack lens (Mohawk) would also.  I've heard that foamex is coming out with one."  None of the underlay producers "could make money on current pricing," all wanted an increase, but they had not agreed or indicated who would lead (Doc. 1343-36 at 164).  The next month, Lens sent a draft Mohawk PIA to Charak, who sent the draft PIA on to Scottdel, Carpenter, Leggett & Platt, and Flexible Foam (*id.* at 222–23, 225, 227, 230, 234, 239).[2]  And on May 9, 2006, Renfro sent a "Flexible increase letter" to Frank Hurst of

---

[2] Typically, David Charak's assistant Nancy Swoboda would e-mail Defendant employees using her own e-mail account.  However, the e-mails would be written as if signed by Charak (*see, e.g.*, Doc. 1343-48 at 436).

6

Carpenter which Renfro described as a "draft letter"; but the PIA he forwarded is dated May 2, one week prior (*id*. at 451).  He sent the same letter to Leggett & Platt (*id*. at 448).

- In July 2006, Jack Lens complained to David Charak that either Frank Hurst of Carpenter was "lying" or did not know the prices his west coast Carpenter salesmen were then quoting customers, because Carpenter was "out across the country bombing pricing."  As a result, Lens said he would have to rescind all or part of a recent PIA.  Charak asked if he should pass the information on to Hurst.  Lens responded "do with it as you see fit" (Doc. 1343-37 at 87).

- Mike Crowell of Flexible Foam had lunch with Woodbridge representatives, including Frank Donato and Peter Farah, to discuss "automotive business" in April and July 2007 (a Future Foam employee joined the July lunch) (Doc. 1343-39 at 47, 111).  In May 2007, his colleague Jan Denenberg shared with senior Flexible Foam officials an "internal Hickory Springs memo" -- in truth, an e-mail -- that he received "from a source."  The internal Hickory Springs e-mail discussed how Hickory Springs chemical pricing or order amounts might be affected by an explosion at a chemical plant (*id*. at 93–95).

- In September 2007, Michael Faus of Carpenter shared a published Flexible Foam PIA with Al Diamond of Future Foam (Doc. 1343-40 at 40–41).  A week later, in October 2007, Faus shared Carpenter's PIA, published the same day, with Diamond (*id*. at 122–23).  Elsewhere that month, Peter Farah received indirectly from Todd Councilman, a Hickory Springs employee, word that Hickory Springs would increase prices 10 percent on November 1.  Councilman managed non-automotive slabstock foam production at Olympic Products, a joint venture run by Hickory Springs and Woodbridge to operate the former Vitafoam USA plant in Pleasant Gardens, North Carolina.  Farah forwarded word of the increase to Bob Magee, Woodbridge's President, noting "No wonder JCI is warming to WFC lamination!"  Magee asked, "You need to go for it too?" (*id*. at 129–31).

- On November 16, 2007, Ron Smolinski, director of sales for Foamex Automotive Products Group, reported to his boss Don Phillips (among others): "[Dan] Fritz [, a Foamex employee,] just called me.  He had a discussion with [Woodbridge employee David] Flora this morning.  Woodbridge is going out with their price increase letters today" (Doc. 1343-41 at 79).  Fritz claims that "Mr. Flora offered that information" (Doc. 1343-54 at 351).  At 8:10 a.m., Mike Smykwoski of Foamex then directed Smolinski "get a copy of their letter ASAP" (Doc. 1343-14 at 124).  Five minutes later, Smolinski e-mailed Fritz directly: "Any chance you can get a copy of the Woodbridge increase letter?  Tell Flora we will follow" (*id*. at 127).  Flora claims he cannot recall any such discussions (Doc. 1446 at 2).

- Two weeks later, Bill Moser of Woodbridge reported to colleague Frank Donato that "[t]he Foamex corp. controller contacted Flora today and ask him if we were going to market with a price increase.  They want to raise their prices but do not want to go to war with us."  Donato was undecided.  He suggested allowing Foamex to lead so that Woodbridge could steal some of Foamex's customers.  "Frankly I don't see how we cannot be at war when we were 50/50 they went and took back the jci volume."  Johnson Controls, Inc. was then a substantial foam

customer.  "Of course they don't want a war.  They have 70% of the market."  Donato suggested "we let Dave do some fishing" and then discuss later (Doc. 1343-41 at 126).

•   Elsewhere in December 2007, Jack Lens of Mohawk emailed Marc Vitale, his underlay counterpart at Future Foam, to give Vitale notice that a Future Foam salesman had undercut Mohawk on a Mohawk account: "[i]t probably isnt kosher to be sending you this email but I just wanted to let you know that Mel cut our prices at . . . two accounts by 15%.  We are matching the prices, as we always do.  Just thought you would want this information."  Vitale said he would "see if this is accurate" (id. at 151).

•   On January 6, 2008, Al Diamond of Future Foam e-mailed Michael Faus of Carpenter, noting that he was sorry he had missed Faus's call and inviting Faus to call him again.  Three days later, Faus replied, attaching a Carpenter PIA, dated the following day, and asking Diamond to give him a call the next day (Doc. 1343-42 at 33).

•   In February 2008, Carpenter employees discussed a customer's claim that Flexible Foam was "not increasing prices."  Ed Malachek asked "[w]hat's going on."  Stan Yukevich assured him "Wayne says the increase hasn't changed.  Last week Rich Whitling [of Flexible Foam] was complaining that [Hickory Springs] had killed the first increase and [that] Flexible [Foam] was planning to implement the 8% as planned" (id. at 171).

•   In April 2008, Jacks Lens of Mohawk emailed Marc Vitale of Future Foam after Future Foam won a large customer account from Mohawk.  Lens threw down the gauntlet: "Let me tell you what is going to happen now."  Mohawk would match Future Foam's quote, undercut Future Foam's prices to its two largest customers, and continue this "two-for-one" strategy "for as long as it takes to have your company understand that you can try to take out accounts based on service, quality, or relationships but if you try to take it by undercutting our prices, you will have less business than before."  Lens recognized that "[Future Foam] need[s] more business like everyone else does but there are professional ways of getting it and there are irresponsible ways of getting it."  Vitale responded by explaining the former Mohawk account was, before Mohawk, a Foamex account, serviced by the same underlay plant that Future Foam purchased from Foamex the year before.  He also defended the Future Foam quote as not "irresponsible" Vitale told Lens that aside from some rebate terms the Future Foam quote was not in fact lower than Mohawk's price (apparently accusing the customer of lying to Mohawk about the basis for its switch to Future Foam).  Vitale concluded: "Most weeks we are asked to match a price from one of our customers that was given to them by a competitor.  Like you, we always match prices if we are given last look" (Doc. 1343-14 at 146).

•   On May 16, 2008, scrap broker Duane Renfro e-mailed Rich Whitling of Flexible Foam, advising "3 committed to the cause, but again when they sign on the dotted line I will become a believer."  Whitling replied the same day to advise that Flexible Foam Executive Vice President Candace Moeller would return the following week, and that Renfro "[s]hould have copy of letter first of week" (Doc. 1343-42 at 297).

8

• Six days passed. On May 22, 2008, Joe York of Leggett & Platt told colleague Larry Heppe that "Jack lens got word today that Flexible is announcing a 15% increase effective 6/23. I told Jack we were considering one for 7/1. He said they needed as well & would be supportive" (Doc. 1343-15 at 32). The next day, Rich Whitling of Flexible Foam sent his company's underlay PIA, published that day, to scrap broker David Charak, who then had his assistant send the Flexible Foam PIA (along with a published Scottdel PIA) to Jim Hacker of Carpenter (Doc. 1343-43 at 29–32). The letter: a 15% increase in rebond pricing, effective June 23, 2008, just as Lens had noted to York the day before. Hacker received the PIA on the same day it was published. So did Jack Lens of Mohawk. Upon receipt of Charak's email passing along the Flexible Foam and Scottdel PIAs, Lens thanked Renfro and explained "ours will be out early next week." Four minutes later, Lens again replied to Charak, observing "would be great to know what carpenter is planning." Charak replied, "I'll check it out and let you know" (Doc. 1343-15 at 55–61). And one week later, Don Simpson of Hickory Springs sent to David Gurley of Vitafoam Canada published Carpenter and Flexible Foam underlay PIAs. Gurley then forwarded the PIAs internally to Vitafoam Canada President Mel Himel (Doc. 1343-33 at 125–27). This Court finds no record e-mail in which Whitling or Charak forwarded the May 23 Flexible Foam PIA to Hickory Springs. Yet, somehow, Simpson came into possession of not just the published Flexible Foam PIA; he obtained the very copy of the PIA that Whitling had sent to Charak (*compare id*. at 125–27 (Simpson sending to Gurley Flexible Foam PIA bearing "Post-It Fax Note" that reads "To: David C. From: Rich W."), *with id*. at 29–31 (Charak sending to Hacker Flexible Foam PIA bearing the same Post-It Fax Note)). That same day, Lee Lunsford of Hickory Springs forwarded on to his colleagues a Carpenter PIA, asking: "Have we anything on Flexible, Future or AUT?" Buster Mann replied "Future will have a letter out soon for 20% on June 30th" (Doc. 1343-14 at 193).

• On June 24, 2008, Frank Donato of Woodbridge e-mailed colleague Bob Bisiorek. The e-mail's subject read "Did you ever," and the body of the e-mail read "Talk to DP from F" -- Donato's shorthand for Don Phillips of Foamex. Bisiorek replied: "Yes, told him we are going out with our letter with 12 percent effective July 1 for automotive. He said he would follow" (Doc. 1343-43 at 221). In deposition, Bisiorek explained that, in response to Phillip's statement that Foamex would follow Woodbridge, Bisiorek stated "I said we [*i.e.*, Woodbridge] would try to hold firm on that increase to the market." Examining counsel then asked, "And did he also say -- agree that Foamex would try to hold firm as well?" Bisiorek: "Yes, I thought we had an agreement that we would go to the market . . . [w]ith the 12 percent increase on July 1st." But Bisiorek denies that he had any other agreements with Don Phillips during the Class Period, or with any other Defendant from June 2008 until the time he left Woodbridge in May 2012 (Doc. 1461-1 at 5).

• On July 8, 2008, Marc Vitale of Future Foam and scrap broker Duane Renfro traded e-mails. First, Vitale sent Renfro a published Scottdel PIA. Renfro replied "Thanks. I am already in the process of finding out what everyone else is doing." That evening the two resumed e-mail conversations, initially attempting to plan a golf outing or dinner. Renfro continued: "FYI i hear through the grapevine that Mohawk is going up around August 18th around 12% . . . just

9

rumor. i also heard through another grapevine that [Flexible Foam] will be going up the same 12% or so. again as you kno can only tell you what I hear through the grapevine. i am assuming [Future Foam] will follow the same type of suit." Vitale responded, perhaps providing evidence of just the sort "grapevine" Renfro consulted to gather advance knowledge of competitor pricing: "I am drafting the letter but it will probably say 12-15 on August 11. I like the range because people think they are getting a deal" (Doc. 1343-14 at 163–67).

- In a July 9, 2008 e-mail chain, Jeff Briney of Flexible Foam instructed a group of Flexible Foam employees to "have your manufacturing locations get the envelopes ready for foam and rebond cushion increase." Briney then continued the conversation with only Whitling, asking "Any idea on Date and %? We can start verbally preparing the customers." Whitling replied, "14 percent on August 4th. Same as your old company." Briney closes the e-mail chain, "Sounds like collusion to me . . . How about 15% on [August] 11?" (*id.* at 5). Flexible Foam issued a July 9, 2008 letter with the exact terms Briney proposed (Doc. 1343-45 at 66, 68). The same day, Whitling sent a Flexible Foam underlay PIA (this one reflecting a 12-15% price increase) to scrap broker Duane Renfro, attaching the letter and noting "[g]oes out tomorrow" (*id.* at 73–75). Two days later, Renfro forwarded the Flexible Foam PIA on to the senior underlay employees of four Defendant competitors -- Future Foam, Mohawk, Hickory Springs, and Carpenter -- copying each man to a single e-mail with the subject "additional increase info" (*id.* at 137).

- Renfro was busy in other ways on July 9. Marc Vitale of Future Foam e-mailed Renfro a Future Foam PIA with the subject "This will be mailed tomorrow." Within the day, Renfro had forwarded the Future Foam PIA to Jim Hacker of Carpenter and Jack Lens of Mohawk, informing both men that the letter had not been sent to customers (*id.* at 53, 56–57, 77–78).

- On July 11, 2008, Jeff Carter of Scottdel shared the company's "next" underlay PIA with David Gurley of Vitafoam Canada, who forwarded the letter on to senior Vitafoam management. Vitafoam Canada employee Steve Pendock asked a colleague to "Check with your Carpenter contact to see when they plan on pulling the trigger." The colleague checked with Carpenter, learned Mohawk may have "gone up 12 points on business," and that "there was a good chance they would be going up" (*id.* at 178–80).

- A week later, Bus Culotta of Leggett & Platt shared with Rich Whitling of Flexible Foam the recently published PIAs of six competitor Defendants (*id.* at 252–59).

- At the end of July 2008, Jim Hacker of Carpenter sent a draft PIA to scrap broker Duane Renfro, who forwarded the PIA and Jim Hacker's e-mail to Rich Whitling of Flexible Foam, one day after publication (Doc. 1343-44 at 96–97). Renfro sent the same PIA and e-mail combination (showing that Hacker had sent the PIA to Renfro) to Marc Vitale of Future Foam, after Vitale asked for a copy of the Carpenter letter (*id.* at 99, 102).

- In August 2008, Peter Farah leaves Woodbridge's Toronto office (Doc. 1343-54 at 336; Doc. 1467 at 204), joining Vitafoam Canada as its President (Doc. 1343-55 at 811). "Nine months

to a year" later, Frank Donato also leaves Woodbridge and joins Vitafoam Canada, becoming Vice President of Sales and Marketing (*id*.).  *See also* Doc. 1343-54 at 342 (estimating arrival as April 2009).

- On a Wednesday in September 2008, Mark Younger of Leggett & Platt sent a "proposed price increase letter" to scrap broker Duane Renfro.  Though the letter was dated two days before, Younger explained "We will be sending this out next week" (Doc. 1343-46 at 18–19).  Two days later, on Friday, Renfro forwarded the Leggett & Platt PIA to Future Foam, Flexible Foam, and Carpenter (*id*. at 21–22, 24–25, 27–28).

- The following day, senior Carpenter employees received what appears to be a report of recent Carpenter foam sales.  Ed Malechek observed in reference to the report, "[l]ooks like lots of price reductions."  Michael Faus replied, "This was in response to lost market share.  Margins remain healthy.  I listen[ed] to the corporate VM from [senior Carpenter employee Stan] Yukevich about the foamers complaining about Carpenter destroying the increase?  Is there a particular market this chatter is coming from because I think overall we have done a pretty good job of getting our prices up.  As you know, we have lost market share in Tupelo, Temple, Russellville and some on the West Coast due to holding firm on the increase."  Malechek replied "They," presumably the "complaining" foamers, "just said we were playing a lot of games and had done nothing at many accounts."  Faus identified the markets where Carpenter had lost "market share due to holding firm on the increase," and later observed it was "disappointing to hear the rhetoric" (*id*. at 34–35).

- Rich Whitling of Flexible Foam was "friends" with Bus Culotta of Leggett & Platt, who frequently sent Whitling competitor PIAs (*see, e.g.*, Doc. 1343-14 at 35–55).  The two also regularly spoke by phone.  In September 2008, in a discussion with Leggett & Platt colleagues, Culotta offered to "call Flexible and investigate" rumors that Flexible Foam (among others) had rescinded a PIA.  Culotta did not reveal who at Flexible Foam would be willing to have such discussions, but the evidence of Culotta and Whitling's relationship suggests Whitling would be his contact.  Culotta's colleague, Larry Dunn, told Culotta "Please do" call Flexible Foam (*id*. at 57).

- Finally, on September 29 and 30, a group of Foamex employees discussed the progress of a planned October 6 underlay price increase.  Customers had informed Foamex that competitors like Carpenter, Future Foam, and Flexible Foam had rescinded their own PIAs because scrap prices had stabilized.  The Foamex employees were unsure whether rescissions were isolated (limited to the reporting customers) or "across the board."  If the former, Foamex would "hold an increase where we can as long as we can."  Bob Graham explained to the group: "I talked with Marc Vitale [of Future Foam] and he said they pulled back the increase.  His sense is that some of the competitors didn't pass along the full increase in the prior three increases and they were trying to catch up.  He also said they implemented the full increase to all their customers but that he was still behind the eight ball for the whole period because of a low beginning inventory.  I think we may need to pull back the increase" to focus instead on "hold[ing] on

11

to as much of the prior increases as scrap costs start to go down.  This may allow us to make up for the lost profit of the third quarter" (Doc. 1343-46 at 150–52).

- On April 4, 2009, Rich Whilting of Flexible Foam asked scrap broker Duane Renfro "What % and dates is everyone going up?  I need to get a letter out hopefully after L&P.  We are not large enough to lead" (Doc. 1343-48 at 27).  Two days later, Jim Hacker told his Carpenter colleagues "The brokers told me that we should expect a price increase letter in the 10-14% range from Mohawk, effective Mid-May.  Supposedly Future, Flexible [Foam], and [Leggett & Platt] will all support the increase" (*id*. at 29).  Whitling sent Renfro Flexible Foam's PIA on April 8 and told Renfro to call him (*id*. at 37).

- On April 9, certain Defendants' senior underlay employees sent PIAs to, and received PIAs from, both of the scrap brokers, Duane Renfro and David Charak.  Jack Lens of Mohawk sent Renfro a Mohawk PIA, dated April 10 (*id*. at 177–78).  Later that day, Renfro sent the Mohawk PIA to Marc Vitale of Future Foam, Jim Hacker of Carpenter, and Rich Whitling of Flexible Foam (*id*. at 48–49, 147–48, 208–209).  Renfro sent the Whitling PIA to Vitale and Hacker as well (*id*. at 89–90, 174–75).  At the same time, Charak shared the same letters with groups of Defendant employees.  In the morning, Lens sent the April 10 Mohawk PIA to Charak (*id*. at 177–78).  Charak then sent the Mohawk PIA and a Flexible Foam PIA to Vitale of Future Foam, David Carson of Scottdel, Hacker of Carpenter, and John Howard of Domfoam (*id.* at 89–90, 180–85, 188–89, 198–01, 203–06).  Charak spoke with Carson by telephone, and Carson later promised Charak's assistant, Nancy Swoboda, that Carson would "get our letter to you tomorrow some time" (*id*. at 180).  Carson apparently followed through on his promise, because on April 10 Charak sent Scottdel's PIA to Lens of Mohawk and Hacker of Carpenter (*id*. at 216–17, 219–20).

- Three days later, on April 13, Vitale of Future Foam asked scrap broker Renfro "[i]s there a [Leggett & Platt] letter floating around?"  Renfro replied: "Not yet but this week, need yours.  Have a carpenter print letter will send tomorrow" (*id*. at 242).  Renfro followed up the next day, asking Vitale "Are you sending a letter out?" (*id*. at 252).  Vitale sent Renfro a Future Foam PIA, dated April 16, that "a few people" were then "proof reading" but which was "close to final" (*id*. at 254–55).  On April 15, Steve Pendock of Vitafoam Canada got his hands on the draft Future Foam PIA (the record does not reveal whether Vitale or Renfro sent the draft PIA to Pendock).  Pendock then forwarded the PIA to Dean Brayiannis of Domfoam, asking "Who treats you better then me?" (*id*. at 275–76).  Whitling of Flexible Foam received from Renfro the draft Future Foam PIA on the same day (*id*. at 272–73).  So did Hacker.  After sending Hacker the draft Future Foam PIA at roughly 9:00 a.m., Renfro e-mailed Hacker near midnight in an e-mail with subject line "Info."  "I have the one you are waiting for will send tomorrow" (*id*. at 267, 269–70).  In between these first and second e-mails to Hacker, Vitale sent Renfro a later draft of the same Future Foam PIA and again asked for a copy of Leggett & Platt's letter (*id*. at 262–63).  Renfro promised to send the Leggett & Platt PIA "[a]s soon as I get it" (*id*. at 265).  Two hours later, Mark Younger of Leggett & Platt sent Leggett & Platt's April 14 PIA to Renfro, asking Renfro to "[p]lease delete string of emails below"

12

(*id*. at 278–80).  Renfro forwarded the letter to Whitling of Flexible Foam and Vitale of Future Foam the next day (*id*. at 289–90, 292–93).

- On May 14, 2009, scrap broker David Charak advised Jack Lens of Mohawk: "I was talking to Marc Vitale [of Future Foam] today and he is coming out tomorrow with an increase letter of 14% for June 22" (*id*. at 331).  The next day, Charak sent Lens a Future Foam underlay PIA, dated three days later, matching these exact terms (*id*. at 337–38).  Renfro received the PIA from Vitale (*id*. at 344–45).  *See also id.* at 340–42 (Charak sending the draft Future Foam PIA to Jim Hacker of Carpenter).  Also on May 14, Michael Faus informed his Carpenter colleague Ed Malechek that "Future Foam is planning on putting out another Carpet Cushion price increase letter."  Malechek noted "They were not firm on the last one."  Faus replied, "[j]ust an FYI, [Larry] Diamond" of Future Foam, with whom Faus repeatedly exchanged PIAs throughout the Class Period, "wanted to know if we were planning on putting out another and if so the percentages" (*id*. at 333).

- Also in May 2009, Jack Lens of Mohawk and Don Coleman of Hickory Springs exchanged e-mails.  The two discussed the price of scrap, which Hickory Springs had long sold to Mohawk.  But Lens also asked Simpson "Did you ever raise prices on bonded? we have another increase of 14% for June 22."  Simpson replied, "I am being told the first increase is being delayed until 2 week of June" (*id*. at 75, 76).  Lens replied, "not by us.  we did not extend ANYONE past June 1.  and we arent extending ANYONE past July 1 on the second.  We are busy" (*id*. at 73–74).

- In May 2009, Jeff Carter of Future Foam forwarded to Louie and David Carson of Scotdell an internal Vitafoam Canada e-mail sent to Carter by David Gurley of Vitafoam Canada.  The Vitafoam e-mail noted Vitafoam would raise its prices.  Carter "personally . . . [did not] think this is enough of an increase."  Carson replied, "Thanks for the info.  We are coming out with letter soon as had raised ours 18% May 18th, and holding until July 18th," and noted other terms of the increase (*id*. at 60–61).  The two competitors continued discussions about price increases in June 2009, when Carson reached out to Carter: "Help Jeff if you can.  Sorry didn't get back to you sooner.  As you know we had the bright idea to increase our prices on May 11th 18% and guarantee them through June 10th.  Putting out letter this week going up 15%, 7/13.  The thing that has me confused is what the real market is going to be then, as we got way ahead and want this one to be in the ballpark as we don't want to screw things up for everyone.  My gut feeling could be another by Aug. 1st."  Carter replied, noting some of his company's own difficulties in the market and the rising cost of scrap.  "We went the full 12% on May 18th allowing some buy ins but are going up 14% on 6/22 firm and most likely 14% on 7/6."  Carson then forwarded Carter's comments to other Scotdel employees, noting that according to Carter's comments "the prices I came up with are too low" and would have to be revised "to get us closer to the market" (*id*. at 113).

- In July 2009, Jack Lens of Mohawk advised Don Simpson of Hickory Springs that Hickory Springs employees in Portland were quoting "below the market," and that Hickory Springs had one increase while Flexible Foam and Mohawk had two.  "[W]e are sticking with ours.

13

might want to pass the word" (Doc. 1343-49 at 75).  Also in July, Jan Denenberg of Flexible Foam shared with Al Diamond of Future Foam a Flexible Foam PIA, published the same day (*id*. at 15).  Also that same day, Al Diamond of Future Foam sent Michal Faus of Carpenter the same Flexible Foam PIA (*id*. at 17–18), and the following day Diamond sent Faus an FXI PIA, published the same day (*id*. at 26–27).

• In September 2009, Don Coleman of Hickory Springs advised a group of his senior staff that "[i]n talking with Bob McGee [of Woodbridge] he tells me that Carpenter, Future, Flexible, and Vita(Canada) have letters out announcing a 20% increase on foam.  He says that Foamex is announcing 20% on everything except automotive.  All effective on October 1st.  FYI only and not intended for any other use" (Doc. 1343-50 at 42).  Elsewhere that month, a Carpenter employee informed Michael Faus of Carpenter that Hickory Springs and Future Foam employees had told the Carpenter employee when each company would release PIAs (*id*. at 64).  And, senior Flexible Foam employees discussed the fact that "Ken Hladun [of Flexible Foam] spoke to Tony [Vallecoccia] at Valle Foam[, who] said they were going up 8% on 10/19" (*id*. at 104).

• In October 2009, a Hickory Springs employee relayed to his colleagues that a customer "called to tell me one of our competitors has agreed to table the increase until Nov 1st," and that a second competitor might follow suit.  "I asked who they are he said he would rather not say."  But, based on clues the customer had dropped, the Hickory Springs employee guessed the two competitors were FXI and Future Foam.  Lee Lunsford then e-mailed Buster Mann, both of Hickory Springs, asking "What has Future told you?" (*id*. at 127).  Among other Future Foam employees, Jim Mulvey at Future Foam was Mann's contact "on reticulated" foam as well as "on other issues" (Doc. 1343-14 at 185).  Also in Fall 2009, Mann and Frank Donato of Vitafoam Canada spoke by phone.  Mann revealed that Hickory Springs had issued a PIA, calling for a 20 percent price increase (Doc. 1343-55 at 870).

• In November 2009, Jan Denenberg of Flexible Foam e-mailed colleagues Jeff Briney and Doug Terrill, recounting a lunch he had with Ed Malachek of Carpenter and Ken Conaway of Future Foam.  He wrote: "Had lunch with Ed Malachek and Ken Conaway.  Ken came out and asked Ed if they backed off on increase.  Ed said they already put increase through.  Ken said no the next one.  Ed said that one was questionable.  Pretty ballsey by Conaway."  Briney replied, "I like his style when it benefits us" (Doc. 1343-50 at 177).  When questioned about this exchange, Conaway claimed that he could not recall any such discussion with Malachek, nor could he recall that he sat with either Malachek or Denenberg (though he does claim to remember that the lunch likely would have occurred during a certain trade association meeting, that roughly 100 people attended the luncheon, and that 8 or 10 people would have sat at his table (Doc. 1343-54 at 261, 263)).  But, he said he had no reason to believe that Denenberg would report a conversation that did not occur (*id*. at 267).  He was also reluctant to concede that he talked with competitors about pricing, offering the cryptic explanation that talking with a competitor about "[b]acking off a price increase" would not be a price-related discussion: "I don't know that I would say that was about prices of foam products.  It was an

14

increase that had never materialized at that time" (*id*. at 253).  In other words, it was a conversation about whether, in the future, Carpenter would increase prices.

•   In January 2010, Bob Steelman of Carpenter wrote to various Carpenter employees, noting "Hickory is being stupid with the last two price increases."  He thought two Hickory Springs salesmen particularly culpable.  One was "bragging that he is going to get aggreive in the bedding market place based on Hickory holding the last two increases.  I told Powers we will hook our engine to the Jamison train and others that have been true partners.  When I see [Don] Coleman [of Hickory Springs] and Bush I am going to let them know how I feel" (Doc. 1343-51 at 64).

•   In April 2010, Don Simpson of Hickory Springs, writing to subordinates, explained that "Jack [Lens] stated that back when the Industry had the 3 price increases, [Hickory Springs] did not support them.  They are not support our efforts at this time, and they are getting business back that they lost."  Raymond Botteen replied, "Bull -- we have never not supported anyone on any price increase -- ever -- period.  I am so fed up with their /his responses and flat out lies."  Simpson replied that he also disagreed with Lens' comments, and was "hoping to get him to support" the price increase (Doc. 1343-15 at 2).

•   In May 2010, Cleon Smith of Flexible Foam advised his colleagues on "the status on the price increase from our competitors at this time," noting what various competitors (including Carpenter, Future Foam, Vitafoam, and Foamex) "say" about future price increases.  However, Smith did not know these various competitors' proposed increase amounts (Doc. 1343-52 at 166).

•   In late May 2010, various Defendants gave one another notice of each other's future PIAs or PIA implementation -- Future Foam told Hickory Springs when it would propose raising prices 12 percent (*id*. at 182), while Flexible Foam advised Domfoam "we will be implementing a 12% increase on June 7th" and asked for "any feedback so I can stay competitive.  If the word is out there is still no increase I will relay that to Doug [Terrill of Flexible Foam]" (*id*. at 226).  A Flexible Foam employee recounted a conversation he had with Tony Vallecoccia of Valle Foam, in which the two men discussed the general price increase plans of Carpenter and Vitafoam Canada (*id*. at 238).

•   On June 10, 2010, Bus Culotta of Hickory Springs e-mailed Rich Whitling of Flexible Foam a Hickory Springs PIA dated June 11, 2010.  Culotta explained "initial draft (says final) but should be mailed by tomorrow or Monday.  Will try to call you when I land" (Doc. 1343-14 at 49) (capitalization corrected).

•   In July 2010, a Mohawk plant manager relayed to Jack Lens of Mohawk information from a customer, who told Mohawk that while Mohawk was increasing prices 12 percent, Hickory Springs was only "going up 6 %."  The Plant Manager explained, "I know you always know about these things."  Lens forwarded the e-mail on to Don Simpson of Hickory Springs, asking if there was any truth to Hickory Spring's lower pricing.  "We are going up 12," Lens explained.  "You guys must be guilty about how much profit you are making" (Doc. 1343-15 at 5).

15