IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | |
|---|---|
| In re Polyurethane Foam Antitrust Litigation | Case No. 1:10 MD 2196 |
| This document relates to: | MEMORANDUM OPINION AND <u>ORDER DENYING DECERTIFICATION</u> |
| INDIRECT PURCHASER CLASS CASES | JUDGE JACK ZOUHARY |

**INTRODUCTION**

In these consolidated proceedings, Plaintiffs allege that dominant firms in the flexible polyurethane foam market engaged in a decade-long conspiracy to fix, raise, and maintain the price of foam products. This Court certified a class of Indirect Purchaser Plaintiffs ("IPPs") who bought certain consumer products containing foam manufactured by a Defendant (Class Certification Order, Doc. 1102). This Court defined the Indirect Purchaser Class to include "[a]ll persons or entities in . . . [30 different states and District of Columbia] who purchased [carpet underlay, bedding, and upholstered furniture products] containing flexible polyurethane foam . . . , not for resale, which were manufactured, produced or supplied by Defendants or their unnamed co-conspirators from January 1, 1999 to the present" (*id.*).

Defendants petitioned the Sixth Circuit for permission to appeal the Class Certification Order, but the court denied the request (Doc. 1345). In its denial, the Sixth Circuit concluded: (1) Defendants did not "demonstrate[] that the district court abused its discretion in certifying a class given the facts of the underlying case" (*id.* at 3); (2) the question of "whether [Article III] standing is established is dependent upon whether the definition of the class is sufficiently narrow to exclude uninjured parties," and this Court "applied this standard in defining the classes here" (*id.* at 4); and

(3) "the district court sifted through the abundant evidence in the record and rigorously analyzed that evidence before concluding that the Direct and Indirect Purchasers classes established the Rule 23 requirements and that the classes could establish through common evidence the antitrust [claim] elements" (*id.* at 7). The Supreme Court subsequently denied Defendants' petition for writ of certiorari from the Sixth Circuit's decision (*see* Doc. 1543).

Certain Defendants now move to decertify the Indirect Purchaser Class (Docs. 1692, 1694). Defendants argue: (1) the "15 consumer protection and unfair competition claims" present individual questions that "so predominate over common questions of fact and law" that the IPPs cannot meet the commonality requirement set out in Federal Civil Rule 23(a)(2) (Doc. 1692-1 at 14); (2) the identities of IPP Class members are "unascertainable," meaning "it is [not] administratively feasible for the court to determine whether a particular individual is a member of the proposed class" (*id* at 24; *see also* Doc. 1694-1 at 2); and (3) the IPPs "have no workable model to calculate damages [owed] to individual IPP Class members" (Doc. 1694-1 at 12). As discussed below, this Court concludes none of these arguments support decertification.

### STANDARD OF REVIEW

"[A] district court's order denying or granting class status is inherently tentative." *Coopers & Lybrand v. Livesay*, 437 U.S. 463, 469 n.11 (1978). District courts have the discretion, even the obligation, "to reassess their class rulings as the case develops." *McNamara v. Felderhof*, 410 F.3d 277, 281 n.8 (5th Cir. 2005) (internal quotation marks omitted). Thus, "a class may be redefined or decertified entirely at any time prior to final judgment." *In re Whirlpool Corp. Front-Loading Washer Prods. Liab. Litig.*, 302 F.R.D. 448, 459 (N.D. Ohio 2014); *see also General Tel. Co. of Sw v. Falcon*, 457 U.S. 147, 160 (1982) ("Even after a [class] certification order is entered, the judge remains free to modify it in light of subsequent developments in the litigation."); *McNamara*, 410 F.3d at 280 n.8

("a trial court overseeing a class action retains the ability to monitor the appropriateness of class certification throughout the proceedings and to modify or decertify a class at any time before final judgment"); Wright & Miller, 7AA FED. PRAC. & PROC. § 1785.4 (3rd ed. 2005) (noting the court may decertify a class even "at the close of plaintiff class's case-in-chief, and at the completion of the trial on the merits"). Indeed, "changes in proposed class definitions are commonplace in litigation under Rule 23." *Ammons v. La Z-Boy Inc.*, 2009 WL 3460306, at *5 (D. Utah 2009).

Still, "decertification is a 'drastic step,' not to be taken lightly." NEWBERG ON CLASS ACTIONS § 7:37 at 190 (3rd ed. 1992); *see also Glazer v. Whirlpool Corp.*, 2014 WL 7781167, at *1 (N.D. Ohio 2014) (decertification "is not to be taken lightly or without definitive, material alteration of the law or facts"). "[I]t is an extreme step to dismiss a suit simply by decertifying a class, where a 'potentially proper class' exists and can easily be created." *In re Urethane Antitrust Litig.*, 2013 WL 2097346, at *2 (D. Kan. 2013) (quoting *Woe v. Cuomo*, 729 F.2d 96, 107 (2nd Cir. 1984)). "Prior to decertification, the Court must consider all options available to render the case manageable." *Chisolm v. TranSouth Fin. Corp.*, 194 F.R.D. 538, 554 (E.D. Va. 2000).

A district court "retains significant discretion to make decertification and modification decisions and its decision is reviewed only for abuse of discretion." NEWBERG, § 7:38 at 191; *see Powers v. Hamilton Cnty. Pub. Defender Comm'n*, 501 F.3d 592, 619 (6th Cir. 2007) ("district courts have broad discretion to modify class definitions"). At the same time, "[o]nce a class is certified, the parties can be expected to rely on it and conduct discovery, prepare for trial, and engage in settlement discussions on the assumption that in the normal course of events it will not be altered except for good cause." *Cook v. Rockwell Int'l Corp.*, 181 F.R.D. 473, 477 (D. Colo. 1998) (quoting MANUAL FOR COMPLEX LITIG. THIRD § 30.18 at 223 (1995)). "Sometimes, however, developments in the litigation, such as the discovery of new facts or changes in parties or in the substantive or procedural law, will

3

necessitate reconsideration of the earlier order and the granting or denial of certification or redefinition of the class." *Id.*

## DISCUSSION

**Commonality**

In the Second Amended Class Action Complaint (Count III), the IPPs assert claims for violation of 15 different state consumer protection and unfair competition laws (Doc. 371 at ¶¶ 191–207). In 2013, in opposition to class certification, Defendants argued these fifteen claims "present[] insurmountable problems under both Rule 23(a) and 23(b)(3) because the class asserts multiple types of claims based upon multiple state statutes" (Doc. 1102 at 126) (internal quotation marks omitted).[1] This Court rejected Defendants' argument, concluding "Indirect Purchasers have shown the essential elements of their claims are susceptible of proof on a classwide basis, and have presented analysis of the relevant state laws suggesting any differences that might exist among the various state statutes are minimal and can be addressed with special verdict forms" (*id.* at 127).

With their recent Motion for Decertification, Defendants again attack Count III, contending it is inappropriate to certify this claim for class treatment because "no 'one law' will apply to that class and, worse, the Court will have to engage in individualized fact-finding to determine which state's law applies to each individual class member's claim" (Doc. 1692-1 at 14). Defendants also assert "the various States' consumer protection statutes differ radically," such that they "cannot be addressed in a single multi-state class" (*id.* at 17, 19).

---

[1] In 2013, Defendants argued that differences in state law precluded class treatment of not only Count III but also Count II, which asserts a claim for violation of 23 different state antitrust laws (Doc. 371 at ¶¶ 167–190). Defendants do not reassert this Count II argument in their Motion for Decertification.

4

Other federal courts have rejected the same lack-of-commonality argument in price-fixing and antitrust cases. *See, e.g., In re Nexium Antitrust Litig.*, 777 F.3d 9, 14 (1st Cir. 2015) (affirming certification of a nationwide class of indirect purchasers pursuing claims "under the antitrust and consumer protection laws of 24 states and the District of Columbia"); *In re Flonase Antitrust Litig.*, 284 F.R.D. 207, 216 (E.D. Pa. 2012) (certifying a class of indirect purchasers and noting "[a]lthough Indirect Purchasers assert [four different] state law claims of monopolization, [unfair and deceptive trade practices], and unjust enrichment, proof of the essential elements of these claims will be common across the class and focused on [defendant's] behavior, not that of the individual class members"); *In re Wellbutrin XL Antitrust Litig.*, 282 F.R.D. 126, 137 (E.D. Pa. 2011) (certifying an indirect purchaser class which asserted claims "under the law of six different states"); *In re Pharm. Indus. Average Wholesale Price Litig.*, 233 F.R.D. 229, 230–31 (D. Mass. 2006) (certifying four subclasses of end-payors, where each subclass brought claims against a different defendant for violation of consumer protection laws of 41 states). The cases Defendants cite for the proposition that courts "routinely deny multi-state certification" of state law claims are all distinguishable for several reasons, including that none are antitrust cases (Doc. 1692-1 at 14–15).

Further, this Court is not persuaded it will have to examine each class member's claim individually to determine which state law applies. Ohio's choice-of-law rules presume that the law of the place of injury normally applies; this presumption may be overcome only if a defendant "can demonstrate that another state has a more significant relationship to the action." *Muncie Power Prods., Inc. v. United Techs. Auto., Inc.*, 328 F.3d 870, 874 (6th Cir. 2003) (examining Ohio choice-of-law rules). Defendants make no suggestion whatsoever that the normal presumption should not adhere in this case, and the alleged price-fixing conspiracy is not tied to any particular state. In other words, the choice-of-law analysis here is simple: the law of the state where the class member

5

purchased their foam-containing product will apply in every instance. *See In re Wellbutrin*, 282 F.R.D. at 136 (undertaking a choice-of-law analysis in an antitrust multistate class action and concluding "the weight of the relevant factors in this case favors applying the law of the place of purchase to govern the transaction"). Thus, choice-of-law issues do not make this class action unmanageable and do not justify decertification.

Also, it is not true that differences between 15 state consumer protection and unfair competition laws overwhelm common issues. First, Defendants point to no "material alteration of the law or facts," *Glazer*, 2014 WL 7781167, at *1, occurring after this Court concluded that the "Indirect Purchasers have shown the essential elements of their claims are susceptible of proof on a classwide basis, and have presented analysis of the relevant state laws suggesting any differences that might exist among the various state statutes are minimal and can be addressed with special verdict forms" (Doc. 1102 at 127).

And second, the differences Defendants identify are relatively minor or immaterial. For example, Defendants observe the applicable consumer protection laws have "statutes of limitations ranging from one year (Oregon), to three years (New Hampshire, New York), to six years (Vermont), to ten years (Rhode Island)" (Doc. 1692-1 at 19). But IPPs correctly respond that these differences are ultimately irrelevant, because IPPs "have offered sufficient evidence of fraudulent concealment to toll [all] applicable statutes of limitations" (Doc. 1754 at 34; *see also* Doc. 1102 at 86 ("Defendants do not argue [various email and fax communications between defendants related to pricing] cannot serve as common evidence of fraudulent concealment, and this Court so finds.")). Similarly, Defendants assert the 15 state laws "differ substantially in types of remedies allowed -- some allow for punitive damages [e.g., Missouri] . . . , while California, for example, allows only restitution and

6

injunctive relief" (Doc. 1692-1 at 19). But this Court already concluded this type of difference is minimal.

In the end, the question is not whether the 15 state consumer protection and unfair competition laws are different -- they are -- but whether those differences overwhelm common issues. In other multistate antitrust class actions, courts regularly hold that common issues predominate. For example, in *In re Wellbutrin,* the court concluded:

> Each class member's claims depend on whether or not the defendants unlawfully engaged in anticompetitive behavior to limit the entry of generic competitors in violation of each state's respective antitrust and/or consumer protection laws. . . . Although this action is brought under the law of six different states, proof of the essential elements of these statutes will also require common proof. The antitrust laws and consumer protection laws for these six states do not differ in material respects.

282 F.R.D. at 137; *see also Waste Mgt. Holdings, Inc. v. Mowbray*, 208 F.3d 288, 296–97 (1st Cir. 2000) ("As long as a sufficient constellation of common issues binds class members together, variations in the sources and application of statutes of limitations will not automatically foreclose class certification under Rule 23(b)(3)"); *In re TFT-LCD (Flat Panel) Antitrust Litig*., 267 F.R.D. 583, 593 (N.D. Cal. 2010), *amended*, 2011 WL 3268649 (N.D. Cal. 2011) (where an indirect purchaser class brought claims under antitrust, consumer protection, and unfair competition laws of 24 different states, listing seven critical, common questions of law and fact -- at least six of which are also common in this case); *In re Rubber Chemicals Antitrust Litig*., 232 F.R.D. 346, 351 (N.D. Cal. 2005) (where an antitrust conspiracy has been alleged, courts have consistently held that "the very nature of a conspiracy antitrust action compels a finding that common questions of law and fact exist"); *In re Terazosin Hydrochloride Antitrust Litig.*, 220 F.R.D. 672, 700 (S.D. Fla. 2004) (certifying 17 statewide classes of indirect purchasers, noting "[a]lthough each proposed class is proceeding under its own state law, class certification pursuant to Rule 23(b)(3) is nonetheless appropriate where there

is a commonality of substantive law applicable to all class members"); *In re Infant Formula Antitrust Litig.*, 1992 WL 503465, at *6 (N.D. Fla. 1992) (certifying a nationwide class because "[w]here a horizontal price-fixing conspiracy is alleged, the questions common to the class predominate over questions that may affect only individual class members").

In this case, common questions of law and fact predominate. Differences in state laws do not overwhelm common issues, create insurmountable analytical or administrative problems, or make this class action unmanageable. Indeed, class certification here "is superior to, and more manageable than, any other procedure available for the treatment of factual and legal issues raised by [IPPs'] claims. What would be unmanageable is the institution of countless individual lawsuits with the same facts and legal issues." *In re Static Random Access Memory (SRAM) Antitrust Litig.*, 264 F.R.D. 603, 615 (N.D. Cal. 2009) (certifying a nationwide indirect purchaser class).

**Ascertainability**

In the Class Certification Order, this Court addressed briefly the issue of whether Plaintiffs had established "ascertainability." This Court stated:

> Rule 23(a) and (b)(3) require Plaintiffs to establish six requisites before a class may be certified: numerosity, commonality, typicality, adequacy, predominance, and superiority.
>
> Some courts note a seventh "implied" requirement of "ascertainability." . . . *Both proposed class definitions meet that requirement*. For a class to be ascertainable, the proposed definition "must be precise, objective, and presently ascertainable." It must not rely on "subjective" factors like a class member's state of mind. "For example, the class may consist of those persons and companies that purchased specified products . . . from the defendants during a specified period . . . ." ANN. MANUAL ON COMPLEX LIT. § 21.222 (4th ed.).

Doc. 1102 at 13–14 (emphasis added).

Defendants again point to no "material alteration of the law or facts," *Glazer*, 2014 WL 7781167, at *1, occurring after this Court concluded the definition of the IPP class meets the

8

ascertainability requirement. Further, although some circuit courts of appeals (especially the Third) have demanded that class action plaintiffs prove "ascertainability," the Sixth Circuit has not. Thus, Defendants have again not shown good cause for this Court to repudiate its earlier class certification decision.

Moreover, the arguments Defendants now offer are unconvincing. This is partly because the ascertainability requirement "is implicit rather than explicit in Rule 23," so courts "have discussed ascertainability in varying and distinct ways," leading to a real "lack of precision" in its definition. *Byrd v. Aaron's Inc*., 784 F.3d 154, 162 (3rd Cir. 2015). However, the Third Circuit recently explained precisely what the ascertainability requirement means: "The ascertainability inquiry is two-fold, requiring a plaintiff to show that: (1) the class is defined with reference to objective criteria; and (2) there is a reliable and administratively feasible mechanism for determining whether putative class members fall within the class definition. The ascertainability requirement consists of nothing more than these two inquiries." *Id.* at 163 (internal quotation marks and citations omitted).

Further, the *Byrd* court made clear that ascertainability "does *not* mean that a plaintiff must be able to identify all class members at class certification -- instead, a plaintiff need only show that class members *can be identified*." *Id.* (internal quotation marks and citations omitted; some emphasis added). Put differently, "the identity of individual class members need not be *ascertained* before class certification;" it is "enough that the class be ascertain*able*." *Boundas v. Abercrombie & Fitch Stores, Inc.*, 280 F.R.D. 408, 417 (N.D. Ill. 2012) (quoting MANUAL FOR COMPLEX LITIG. § 21.222 at 270 (4th ed. 2004)) (latter emphasis in original). For example, the ascertainability requirement is not met "if class members are impossible to identify without extensive and individualized fact-finding or 'mini-trials.'" *Byrd*, 784 F.3d at 163 (quoting *Marcus v. BMW of N. Am., LLC*, 687 F.3d 583, 593 (3rd Cir. 2012)). On the other hand, "the fact that class members will be required to submit some

9

information in order to determine whether they are members of the class does not render the class definition unascertainable." *In re TFT-LCD (Flat Panel) Antitrust Litig.*, 267 F.R.D. at 592.

In this case, IPPs clearly meet the first prong of the *Byrd* ascertainability requirement -- that is, "the class is defined with reference to objective criteria." *Byrd*, 784 F.3d at 163. This Court defined the composition of the IPP class as (i) persons or entities in certain states; (ii) who purchased for their own use (not for resale) carpet underlay, bedding, and upholstered furniture products (iii) that contain flexible polyurethane foam (iv) which was manufactured, produced, or supplied by defendants (v) between January 1, 1999 to the present (Doc. 1102 at 7). These are all objective criteria. *See In re TFT-LCD (Flat Panel) Antitrust Litig.*, 267 F.R.D. at 592 (finding ascertainable a class of indirect purchasers of electronic equipment that incorporated flat panel screens made by defendants because "Class members must live in one of the listed states, must have made a purchase during the class period, the purchase must have been for the class member's own use and not resale, and the product must contain a TFT–LCD panel made by one of the defendants. These are objective criteria."). Indeed, Defendants do not seriously argue that Plaintiffs fail this definitional prong of the ascertainability requirement.

Rather, the thrust of Defendants' argument is that the "IPPs in this case cannot simply look at a sales receipt, a product instruction manual, or the product itself and 'presently ascertain' from those sources whether the product contains flexible polyurethane foam manufactured, produced, or supplied by one of the Defendants" (Doc. 1694-1 at 4). This argument might have more force if Defendants did not overwhelmingly dominate the U.S. flexible polyurethane foam market. The evidence shows, for example, that all named Defendants controlled 92% of the furniture and carpet underlay markets in 2001, 96% of the bedding market in 2003, and well over 90% of the entire market in 2009. It is highly unlikely that foam comprising an IPP consumer's bedding, furniture, or carpet

10

underlay product purchased in one of the 30 class states was not manufactured by one of these Defendants.

In addition, this Court already concluded the IPPs made a sufficient showing that they can trace and identify the manufacturer of foam in a product purchased by an IPP. For example, IPPs can: (1) use "information derived from the Carpet and Rug Institute's ('CRI') 'Green Label' program" to identify the foam manufacturer for an IPPs' carpet underlay; and (2) refer to "Uniform Registration Numbers" that "must appear on the finished product's label" to identify the foam manufacturer for an IPPs' furniture and bedding products (Doc. 1102 at 100). And sometimes identification is much simpler: "Serta testified at their depositions and have made public statements that they exclusively buy [foam] from one of the [D]efendants. We can trace that. If a member of the class purchased a Serta bed, we know where that foam came from" (*id.* at 101) (quoting Doc. 967 at 131–33).

Although it will require sifting through substantial information, there does exist a practicable process to ascertain who is and is not a member of the IPP class. That there is no *perfect* mechanism to identify in every instance whether a Defendant manufactured the foam in an IPPs' consumer product (and if so, which Defendant) does not mean certification is inappropriate. IPPs have defined the class using objective criteria, and identified a viable method for determining whether a consumer actually falls within that class definition. [2]

---

[2]

Defendants add that, beyond being imperfect, the IPPs have not yet shown a method to ascertain class members: "IPPs have not produced a shred of evidence -- not even a single *example* -- in the year since this Court's class certification decision to demonstrate how [using labels and transactional data] would work or that it does work" to identify the manufacturer of polyurethane foam in a consumer product (Doc. 1694-1 at 8). However, as noted, IPPs have done all they need to do at this juncture: "'the identity of individual class members need not be ascertained before class certification.' . . . It is enough that the class be ascertain*able*." *Boundas*, 280 F.R.D. at 417 (quoting MANUAL FOR COMPLEX LITIG. § 21.222 at 270 (4th ed. 2004)) (emphasis in original). If, during trial, Defendants can show that ascertainment really does pose insurmountable problems for class treatment or claims administration, this Court will reconsider the propriety of certification. *See Garcia v. Tyson Foods, Inc.*, 890 F. Supp. 2d 1273, 1297–98 (D. Kan. 2012), *aff'd*, 770 F.3d 1300 (10th Cir. 2014) (a court may decertify a class, or narrow the class definition, even after trial).

11

**Workable Damages Model**

Finally, Defendants argue the IPPs "have no workable model to calculate damages [owed] to individual IPP Class members" (Doc. 1694-1 at 12).  This Court disagrees.

It is clear IPPs may base proof of damages on a methodology that begins with determination of an aggregate amount of damages owed to the entire class.  "The use of aggregate damages calculations is well established in federal court and implied by the very existence of the class action mechanism itself." *In re Pharm. Indus. Average Wholesale Price Litig.*, 582 F.3d 156, 197–98 (1st Cir. 2009). *See also* 3 NEWBERG ON CLASS ACTIONS § 10.5, at 483–86 (4th ed. 2002) ("Aggregate computation of class monetary relief is lawful and proper."); *In re Scrap Metal Antitrust Litig.*, 527 F.3d 517, 534 (6th Cir. 2008) (quoting *In re NASDAQ Mkt.-Makers Antitrust Litig.*, 169 F.R.D. 493, 526 (S.D.N.Y. 1996) ("Damages in an antitrust class action may be determined on a classwide, or aggregate, basis, . . . where the [evidence] . . . provide[s] a means to distribute damages to injured class members in the amount of their respective damages.").

To the extent Defendants argue in their current decertification motions that the IPPs have no reliable methodology for proving aggregate damages, this Court will address that question in a separate Order resolving Defendants' motion to exclude IPPs' economist, Russell Lamb.  However, Defendants' main contention is that IPPs have no "workable model" for allocating any aggregate damages to individual plaintiffs, once aggregate damages are proved.  Defendants insist that, "[w]ithout knowing how much foam, and what type or grade of foam, was used in a [given plaintiff's] product, as well as the price of that foam, it is impossible even to begin [an individualized] damage assessment" (Doc. 1694-1 at 13).  Defendants stress that "IPPs simply do not have the requisite factual foundation for making any of these determinations across the millions of potential [IPP] Class members" (*id.*).   In sum, Defendants contend that, even if it is possible to determine the gross

12

amount of overcharges for foam paid by the entire IPP class, it is not possible to determine how much of that gross amount is attributable to a given mattress, couch, or carpet underlay owned by an individual IPP.

However, this argument goes to claims administration, not damages. The point of proving aggregate damages is to avoid plaintiff-by-plaintiff proof. *See In re NASDAQ*, 169 F.R.D. at 526 ("The aggregate class damage approach has obvious case management advantages. By eliminating individual damage proofs at trial, the length, complexity and attendant costs of litigation are greatly reduced."). Allocating damages to each plaintiff will not require "mini-trials;" rather, it will require a claims administration process where each plaintiff will have to substantiate their claim with evidence that they purchased a product containing foam manufactured by a Defendant. It remains to be seen exactly what proofs might be required, but it is unlikely each claimant will, as Defendants suggest, have to "disassemble[] their products and physically measure every piece of foam inside" (Doc. 1694-1 at 14). Rather, an antitrust plaintiff need only show "the extent of damages as a matter of just and reasonable inference, although the result be only approximate." *Story Parchment Co. v. Paterson Parchment Paper Co.*, 282 U.S. 555, 565 (1931); *see In re Scrap Metal Antitrust Litig.*, 2006 WL 2850453, at *24 (N.D. Ohio 2006) ("the Sixth Circuit has recognized that Plaintiffs need not establish their damages in a concrete fashion, reasonable estimations are permitted").

A leading treatise observes that "courts have almost uniformly rejected defendants' arguments that a plaintiff's ability to demonstrate only aggregate damages means that individual damage assessments will devolve into so many proceedings that common issues will not predominate over individual ones, thereby failing the predominance requirement of Rule 23(b)(3)." NEWBERG ON CLASS ACTIONS § 12:2 (5th ed. 2015). "Courts have held that so long as plaintiffs present a common method for determining individual damages, aggregate damages are sufficient to secure class

certification" (*id.*). As this Court noted when it certified the IPP class, "[t]he individuation of damages in consumer class actions is rarely determinative under Rule 23(b)(3). Where, as here, common questions predominate regarding liability, then courts generally find the predominance requirement to be satisfied even if individual damages issues remain" (Doc. 1102 at 118) (internal quotation marks omitted).

Defendants do identify a case or two where a court denied class certification because the plaintiffs "failed to demonstrate that the calculation of individualized actual economic damages, if any, suffered by the class members can be performed in accordance with the predominance requirement of Rule 23(b)(3)." *Bell Atlantic Corp. v. AT&T Corp.*, 339 F.3d 294, 308 (5th Cir. 2003). But even the *Bell Atlantic* court acknowledged that "relatively few motions to certify a class fail because of disparities in the damages suffered by the class members" and many courts "have certified classes even in light of the need for individualized calculations of damages." *Id.* at 306 (footnotes and citations omitted). *Bell Atlantic* affirmed denial of class certification because it was highly likely some "business[es] that would fall within the definition of the . . . class . . . would nevertheless not have suffered *any* economic injury." *Id.* at 305 (emphasis added) (also noting the "dubious and highly speculative assumptions" necessary to show economic injury). That is not the case here.

Earlier, this Court concluded the IPPs "present a workable damages methodology. . . . [They] can prove with generalized evidence the end-use overcharge rates, which rates Defendants can fully contest at trial. Those overcharge rates then can be applied to *each verified claim*, yielding a class member's recovery" (Doc. 1102 at 118) (emphasis added). Defendants' most recent arguments do not persuade this Court differently. The fact that allocation of aggregate damages to individual plaintiffs may be laborious, or less than perfectly accurate, does not fatally undermine predominance

14

or the propriety of class certification. A well-designed claims process can ensure each class member receives damage payments only if and as appropriate.

## CONCLUSION

For the above reasons, Defendants' Motions to Decertify the Indirect Purchaser Class (Docs. 1692 & 1694) are denied.

IT IS SO ORDERED.

                                                        s/ *Jack Zouhary*
                                        JACK ZOUHARY
                                        U. S. DISTRICT JUDGE

July 21, 2015