IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | |
|---|---|
| In re Polyurethane Foam Antitrust Litigation | Case No. 1:10 MD 2196 |
| This document relates to: DIRECT PURCHASER CLASS | MEMORANDUM OPINION AND ORDER RE: SETTLEMENT MOTIONS |
| | JUDGE JACK ZOUHARY |

### INTRODUCTION

The Direct Purchaser Class moves for final approval of six class settlements, entered into with Defendants FFP Holdings, LLC, Foamex Innovations, Inc., Future Foam, Inc., Hickory Springs Manufacturing Co., Mohawk Industries Inc., and the Woodbridge Defendants (Doc. 1828).  Direct Purchaser Class Counsel move for an award of attorney fees, reimbursement of expenses, and incentive awards for representative Plaintiffs (Doc. 1830).  And Direct Action Plaintiff Ashley Furniture Industries, Inc. moves to withdraw its exclusion from the Direct Purchaser Class, so that it may participate in four of the six settlements (Doc. 1884).

For the reasons that follow, this Court grants final approval of each settlement, grants in part and denies in part Class Counsel's Fee Petition, and denies Ashley's Motion.

### BACKGROUND

***Case Background.***  In April 2014, this Court certified a nationwide class of direct purchasers, firms that purchased flexible polyurethane foam from Defendants, the dominant manufacturers of that product (*see* Doc. 1102).  Notice to absent class members explained the right to withdraw from the

Litigation Class, but warned class members "If you exclude yourself from the . . . Class, you will no longer be part of this lawsuit" (*see, e.g.*, Doc. 1379-4 at 1).

This Court selected the Direct Purchaser Class as the initial trial case, setting an aggressive summary judgment briefing schedule and an April 2015 trial date (Doc. 1272 at 2, 4; Doc. 1308; Doc. 1482).  Soon thereafter, the Carpenter Defendants and Defendant Leggett & Platt, Inc. settled with the  Class (Docs. 1391 & 1406).

Direct Purchasers opposed both summary judgment and *Daubert* filings from the remaining six Defendants, prevailing in February 2015 on most of the summary judgment arguments and *Daubert* motions (*see* Docs. 1481 & 1490).  The case entered an intense period of trial preparation, which included motion *in limine* briefing, preparation of deposition designations, proposals for juror questionnaires, jury verdict forms and jury instructions, compiling more than 11,000 trial exhibits and lengthy witness lists, depositions of Defendants' late-disclosed trial witnesses, and logistical coordination for what would have been a complicated civil trial.  Direct Purchasers prepared "opening statements, witness outlines, and summary exhibits" that looked less like trial aides and more like wallpaper (Doc. 1828-3 at ¶ 53; *see also* Doc. 1602-1).

*Settlement Terms*.  As they prepared for trial, Direct Purchasers pursued settlement talks with the remaining Defendants, facilitated by Eric Green and U.S. District Judge David Katz (Doc. 1828-3 at ¶ 41).  FXI and Hickory Springs settled first (Docs. 1539 & 1578).  FFP, Future Foam, Mohawk, and the Woodbridge Defendants settled one week before trial (Doc. 1624).

Each settlement promised the voluntary trial testimony of at least one Defendant employee, who would authenticate corporate documents (Doc. 1699-2 at ¶ 10; Doc. 1699-3 at ¶ 11; Doc. 1699-4 at ¶ 11; Doc. 1699-5 at ¶ 10; Doc. 1699-6 at ¶ 10; Doc. 1699-7 at ¶ 9).  The settling parties also

2

stipulated that each Defendant's transactional data would remain part of the case, and could be used at trial to establish a joint and several damages figure as to non-settling Defendants (Doc. 1699-2 at ¶ 12; Doc. 1699-3 at ¶ 13; Doc. 1699-4 at ¶ 12; Doc. 1699-5 at ¶ 12; Doc. 1699-6 at ¶ 12; Doc. 1699-7 at ¶ 11).  Finally, the settlements provided for substantial payments:

- FFP: single lump-sum payment of $16 million (Doc. 1699-2 at ¶ 6);

- FXI: single lump-sum payment of $60 million (Doc. 1699-3 at ¶ 6);

- Future Foam: $32 million, using a payment schedule ending in March 2016 (Doc. 1699-4 at ¶ 6);

- Hickory Springs: $19.5 million, using a payment schedule ending in January 2017 (Doc. 1699-5 at ¶ 6);

- Mohawk: single lump-sum payment of $98 million (Doc. 1699-6 at ¶ 6); and

- The Woodbridge Defendants: $50 million, using a payment schedule ending in November 2017 (Doc. 1699-7 at ¶ 5).

Direct Purchasers retained Marianne DeMario, an expert in business valuation and financial forensics.  DeMario scrutinized company financials of four Defendants to "advise[] on [these] Defendants' claims of inability to pay large settlement amounts" (Doc. 1830-1 at 18).  Based on her review, DeMario concludes the proposed settlement amounts and payment schedules reasonably track each Defendant's ability to pay, "given each [Defendant's] current assets and expected future cash flows" (Doc. 1700 at ¶¶ 6–10).

***Procedural Background.***  In May 2015, this Court preliminarily certified the settlement classes and preliminarily approved the six settlements, the settlement notices and claim form, and the plan of allocation (Doc. 1703).  This Court allowed absent class members until September 16, 2015, to object to final approval or to the Fee Petition (*id*. at 2).  No class member objected.  Michael Narkin, who is not a class member, filed an untimely "objection" (Doc. 1912).

In July 2015, Direct Purchasers moved for final approval (Doc. 1828). Direct Purchasers report that class members who represent "$16,062,282,281 in Class Period Purchases" timely filed claims, and that 96.4 percent of that purchase volume is tied to validated claims (Doc. 1910 at 5).

That same month, Class Counsel moved for a fee award, asking for 30 percent of the $275.5 million settlement fund, or $82.65 million (Doc. 1830-1 at 7). Class Counsel justify this fee award by providing a "lodestar cross-check," comparing the hours billed on this case to the percentage-of-the-fund request. Class Counsel state "[a] lodestar cross-check confirms that, to date, [Class Counsel] have incurred fees of $65,091,177.65" (*id.* at 12), a figure that corresponds to more than 137,000 hours billed by law firm partners, associates, summer associates, paralegals, and other litigation support staff (*see* Doc. 1829-4 at 2). To date, Class Counsel have been awarded $47.28 million in attorney fees, comprised of: (1) a 30-percent share of the $9.8 million Vitafoam Defendant settlement; (2) a 30-percent share of the $108 million Carpenter Defendants settlement, and (3) a 30-percent share of the $39.8 million Leggett & Platt settlement (*see* Doc. 598 at 3; Doc. 1534 at 12–13; Doc. 1924).

Class Counsel also ask for reimbursement of remaining expenses of $315,325.12 (Doc. 1830-1 at 17). In connection with two prior rounds of approved class settlements, Class Counsel received two expense awards totaling $9,022,171.15 (Doc. 598 at 4; Doc. 1534 at 13).

Finally, and for the first time in this litigation, Class Counsel request a $35,000 incentive award for each of the seven representative Plaintiffs (Doc. 1830-1 at 18).

This Court held a fairness hearing on October 9, 2015. If this Court grants all portions of the Fee Petition -- the 30-percent attorney fee request, reimbursement of expenses, and the incentive awards -- Class Counsel would receive approximately $129.9 million as fees and $9,337,496.27 as

4

reimbursement for expenses; the representative Plaintiffs would receive $245,000 in incentive awards; and approximately $293,617,503.73 would be left for pro rata distribution to class members.

DISCUSSION

### Settlement Approval

"The claims, issues, or defenses of a certified class may be settled, voluntarily dismissed, or compromised only with the court's approval." Federal Civil Rule 23(e). This Court must verify that the settlement classes may be certified under Rule 23. *See id*. (a) & (b)(3). This Court must direct adequate notice to members of the settlement class. *See id.* (c)(2)(B). And because the proposed settlements "would bind class members, the court may approve [each] only after a hearing and on finding that it is fair, reasonable, and adequate." *Id.* (e)(2).

***The Settlement Classes Should be Finally Certified.*** A settlement class must satisfy Federal Civil Rule 23(a) and (b). *See Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 620 (1997). This Court previously certified a litigation class, using a class definition that, except for the lack of reference to opt-out plaintiffs, is identical to the settlement class definitions (*compare* Doc. 1115 at ¶ 3, *with* Docs. 1699-2 at ¶ 1(l), 1699-3 at ¶ 1(l), 1699-4 at ¶ 1(l), 1699-5 at ¶ 1(m), 1699-6 at ¶ 1(m), *and* 1699-7 at ¶ 1(o)). For the reasons previously noted, this Court likewise concludes the settlement classes satisfy the Rule 23 commonality, typicality, adequacy, numerosity, predominance, and superiority requirements (*see* Doc. 1408 at 15–16, 17–20, 21–85).

***Notice to the Class is Adequate.*** Because this Court preliminarily certified the settlement classes under Rule 23(b)(3), this Court "must direct to class members the best notice that is practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort." Federal Civil Rule 23(c)(2)(B). Notice to absent class members must

5

meet minimum due process requirements.  *See Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 173–74 (1974).

Direct Purchasers provided absent class members with adequate notice of the settlement terms. The Class Administrator pulled class member addresses from Defendants' transactional data, which record the addresses of companies that, during the Class Period, purchased flexible foam from a Defendant (*see* Doc. 1828-2 at ¶¶ 8–10).  Not all of those addresses remained valid at the time of the mailing, but even so, almost 65 percent of absent class members received direct mail notice (*id.* at ¶ 12).  The Class Administrator supplemented the direct-mail notice campaign with trade publication advertisements (*id.* at ¶¶ 13–14), internet banner ads (*id.* at ¶¶ 15–16), a press release (*id.* at ¶ 17), a settlement website (*id.* at ¶ 18), and a toll-free telephone number (*id.* at ¶ 19).

Under the circumstances of this case, the Class Administrator's notice program was the "best notice practicable," Federal Civil Rule 23(c)(2), and was "reasonably calculated to reach interested parties," *Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 318 (1950).

***The Settlements are Finally Approved.***  "Several factors guide the inquiry [of whether a class settlement is fair, reasonable, and adequate]: (1) the risk of fraud or collusion; (2) the complexity, expense and likely duration of the litigation; (3) the amount of discovery engaged in by the parties; (4) the likelihood of success on the merits; (5) the opinions of class counsel and class representatives; (6) the reaction of absent class members; and (7) the public interest."  *Int'l Union, United Auto., Aerospace, & Agr. Implement Workers of Am. v. Gen. Motors Corp.*, 497 F.3d 615, 631 (6th Cir. 2007).  Each of these factors weighs in favor of final approval.

First, there is no evidence to remove the "presumption that the class representatives and counsel handled their responsibilities with the independent vigor that the adversarial process

6

demands." *Id.* at 628.  Settlement talks took place directly between the parties as well as with the assistance of respected mediators (Doc. 1828-3 at ¶¶ 41, 44).  And the nearly five years of litigation that preceded settlement talks were not "pretense and posturing," *Moulton v. U.S. Steel Corp.*, 581 F.3d 344, 351 (6th Cir. 2009), but rather knock-down, drag-out fights over (for example) class certification.  The result of these fights ultimately led experienced counsel and sophisticated clients to pick negotiated settlements over continued litigation.

Second, the complexity, expense, and likely duration of this litigation favor voluntary settlement of the class claims.  Class Counsel had invested the overwhelming majority of attorney time and litigation expenses, in the form of discovery work, before reaching the six settlements (*see* Doc. 1829-4 at 2; Doc. 1829-6 at 2).  Still, a lengthy trial, post-trial motions, and appeals from the jury's verdict would have piled on fees and costs, and would have delayed recovery (if any) by class members.

Third, before entering settlement discussions, Class Counsel received 219 document productions from Defendants or third parties, totaling 2.4 million documents that spanned 5.4 million pages, and deposed more than 200 fact and expert witnesses (Doc. 1828-3 at ¶¶ 19–20).  Class Counsel reviewed expert reports from nearly a dozen Defendant expert witnesses (*id*. at ¶ 22).  Class Counsel then culled that enormous discovery record for use at trial, preparing deposition designations and exhibit lists and responding to Defendants' "12,000 proposed [trial] exhibits and thousands of pages of deposition designations" (*id*. at ¶ 52).

"All of this discovery matters for settlement purposes because it provides Direct Purchasers and the settling Defendants a clear picture of the relative merits of claims and defenses.  The parties entered into these settlements with full view of the evidentiary record to assess the class claims." *In*

*re Polyurethane Foam Antitrust Litig.*, 2015 WL 1639269, at *4 (N.D. Ohio); *cf. Olden v. Gardner*, 294 F. App'x 210, 218 (6th Cir. 2008) (explaining that the lack of pre-settlement discovery can "weaken[] the class counsels' ability to advocate effectively for the plaintiff class during settlement negotiations and therefore suggests that the settlement was not fair, reasonable, and adequate"). More than that, because most of the settlements occurred after the parties completed pre-trial disclosures, Direct Purchasers and the remaining Defendants had a sense of how discovery would be used at trial. This allowed Direct Purchasers to have the clearest picture yet of what the class claims were worth.

Fourth, "[t]he most important of the factors to be considered in reviewing a settlement is the probability of success on the merits. The likelihood of success, in turn, provides a gauge from which the benefits of the settlement must be measured." *In re Gen. Tire & Rubber Co. Sec. Litig.*, 726 F.2d 1075, 1086 (6th Cir. 1984) (citation omitted). At trial, Defendants would have attacked Direct Purchasers from many angles -- contesting proof of conspiratorial agreement and antitrust impact as each Defendant worked to separate itself from the crowd of co-Defendants (Doc. 1490 at 12). At a more fundamental level, Direct Purchasers had to develop a persuasive, coherent approach to connecting the dots between e-mail, fax, phone conversations, and the use of price increase announcements ("PIA") over a ten-year-plus Class Period.

In light of these trial challenges, the benefit of the settlements is substantial. Dr. Jeffrey Leitzinger, Direct Purchasers' primary economic expert, performed regression analyses to "isolate[] from other factors and then measure[] the impact of Defendants' price increase letters on actual prices," on the "best-case scenario" assumption that each set of PIAs originated in a price-fixing conspiracy that included every Defendant (Doc. 1408 at 36, 72). Leitzinger estimated best-case-

8

scenario damages, prior to trebling, of $836.4 million (Doc. 1700-1 at 2).  This estimate puts into perspective the successful gross settlement of $433.1 million.

Fifth, this Court gives weight to the opinion of Class Counsel that the settlements include fair, reasonable, and adequate compensation for a release of the class claims.  Class Counsel have extensive experience litigating antitrust class actions, including leadership roles in similarly large cases, and they and their colleagues have spent tens of thousands of hours litigating this case.

Sixth, after notice and opportunity to comment on or object to the settlement, no class member timely objected to the settlement.  Michael Narkin filed an "objection" to the settlements (Doc. 1912), but as explained at length in this Court's companion Order sanctioning Narkin for his patently frivolous filings (Doc. 1970), Narkin is not a class member.

Moreover, Narkin filed his October 8, 2015 "objection" more than two weeks after the September 15, 2015 objection deadline (Doc. 1703 at 2).  Narkin apparently attempts to excuse his late filing by arguing he was "deprived of notice and due process" because Class Counsel did not serve the Fee Petition on Narkin (Doc. 1912 at 2).  Because Narkin is not a class member, he is not entitled to any notice of Class Counsel's filings, much less direct service of the filings, and the notice actual class members received satisfies due process as explained above.

Last, "[s]ettlement of this antitrust action serves the public interest by ensuring effective enforcement of the antitrust laws and deterrence of anti-competitive conduct in the marketplace."  *In re Cardizem CD Antitrust Litig.*, 218 F.R.D. 508, 530 (E.D. Mich. 2003).  Because all of these factors weigh in favor of final approval, this Court approves the six settlements.

This Court also approves the plan of allocation.  "'An allocation formula need only have a reasonable, rational basis, particularly if recommended by experienced and competent class counsel.'"

*In re Visa Check/Mastermoney Antitrust Litig.*, 297 F. Supp. 2d 503, 519 (E.D.N.Y. 2003) (quoting *In re Am. Bank Note Holographics, Inc.*, 127 F. Supp. 2d 418, 429–30 (S.D.N.Y. 2001)).  Direct Purchasers' proposal to allocate net settlement funds on a pro rata basis (Doc. 1699-12 at 2) is both reasonable and rational.

### Ashley Furniture's Motion to Withdraw Class Exclusion is Denied

In Fall 2014, this Court approved class notice following certification of the Litigation Class. That notice advised each absent class member that, if the class member opted out of the Litigation Class, "you will no longer be part of this lawsuit" (Doc. 1379-4 at 1).  At the same time, this Court approved notice of the settlements with Defendants Leggett & Platt and Carpenter.  Direct Action Plaintiff Ashley Furniture decided to opt out of the Litigation Class, but did not opt out of the two settlement classes (Doc. 1884-2 at ¶ 2; *see also* Doc. 1540).

Ashley opted out of the Litigation Class to "pursue settlement discussions with certain current suppliers and to prevent the running of the statute of limitations based on the expiration of the opt-out deadline in the Certified Class" (Doc. 1884-2 at ¶ 2).  It filed suit against six Defendants -- FFP, FXI, Future Foam, Hickory Springs, Mohawk, and the Woodbridge Defendants.  *See Ashley Furniture Indus., Inc. v. Hickory Springs Manuf. Co.*, No. 15-pf-10000, Doc. 1 at ¶¶ 7–18 (N.D. Ohio).  Ashley reached settlements with two of these six Defendants (FXI and Future Foam), but "desires to withdraw its request for exclusion from the Certified Class, so that it can participate in the Class Settlements with respect to Mohawk, Woodbridge, FFP, and Hickory Springs" (Doc. 1884-2 at ¶ 3). The Direct Purchaser Class opposes Ashley's "opt-in" request (Doc. 1900).

Nothing in the Federal Civil Rules expressly allows a party to withdraw its request for exclusion from a litigation or settlement class.  District courts occasionally grant such requests, but

10

not with any clear agreement on the source of the court's power to withdraw exclusions. *See, e.g.*, *In re MoneyGram Int'l, Inc. Sec. Litig.*, 2011 WL 855311, at *2 (D. Minn.) (citing Rule 60(b)(6)); *In re Elec. Carbon Prods. Antitrust Litig.*, 447 F. Supp. 2d 389, 397 (D.N.J. 2006) (analogizing to Rule 23(e)(4)(B)'s limitations on withdrawal of objections to class settlements); *In re Elec. Weld Steel Tubing Antitrust Litig.*, 1982 WL 1873, at *2 (E.D. Pa.) (citing Rule 23(c)(1)(C), allowing amendment or alteration to a class definition prior to entry of final judgment). "[C]ourts will grant requests to rejoin only after considering (1) possible prejudice to the class and (2) the potential for abuse of Rule 23." *In re MoneyGram Int'l, Inc. Sec. Litig.*, 2011 WL 855311, at *2.

Measured on a purchase volume basis, Ashley is among the largest opt-out Plaintiffs, having bought more than $500 million in flexible foam from Defendants during the Class Period, or 3.2 percent of all Class Period purchases made by class members who have not opted out of the Class (Doc. 1901 at 4; Doc. 1910 at 5). This half-billion in purchase dollars did not play a role in any of the six settlement talks. After Ashley opted out of the Class, Direct Purchasers had Leitzinger re-run his regression models, excluding the data of Class opt-outs, including Ashley. Because the revised model used lower Class Period purchase volumes than the original model, the revised class damages estimate also was lower than the original estimate. Direct Purchasers used Leitzinger's revised damages estimate as a basis for settlement discussions with the remaining Defendants. If Ashley's Class Period purchases had been included in the revised model, Direct Purchasers estimate the settlements would have increased by $10 to $30 million (Doc. 1900 at 6). Ashley does not dispute that prediction.

On Ashley's accounting, "the effect of allowing Ashley's [opt-in] is, at best, $387 per claimant, or the difference between [an average claim value of] $12,098 and $11,711" (Doc. 1903 at

11

4).  But the settlement funds will not be distributed by averaging claims; the funds will be distributed on a pro rata basis.  Ashley's opt-in would reduce class member claim payouts by an average of 3.2 percent, but the actual percentage reduction will be higher for some class members, and may run into the thousands of dollars for large purchasers of flexible foam.

This diminution in claim value prejudices the Class.  Had Ashley remained in the Class, the value of the settlements likely would have increased; Defendants would have paid more to settle more claims.  Now, however, Ashley asks to split with the Class a settlement figure not negotiated on the basis of Ashley's purchases.

Ashley responds by relying heavily on *In re Static Random Access Memory (SRAM) Antitrust Litigation*, 2013 WL 1222690, at *2 (N.D. Cal.), a decision permitting Hewlett Packard to opt into settlement classes from which it previously sought exclusion.  That court reasoned

> the Direct Purchaser Class has not offered evidence to show that HP's initial opt-out decision was motivated by a desire to extract a larger settlement for itself.  Although HP might have incurred certain litigation-related costs had it remained in the class, the Direct Purchaser Class has not shown that these costs would have been substantial. Nor has the Direct Purchaser Class shown that HP's pro rata share of the settlement distribution -- 1.5 percent -- is large enough to prejudice Class members significantly.

*Id.*  Ashley argues that, because its request would have a similar diluting effect on the value of class claims, the Direct Purchaser Class "has failed to show that allowing Ashley's motion would cause significant prejudice to the Settlement Class" (Doc. 1903 at 4 & n.4).  Ashley says this Court should reject Direct Purchasers' attempt to distinguish *SRAM*, which boils down to "3.2% is greater than HP's 1.5% in *SRAM*" (*id.* at 3).

*SRAM* is inapt not only because Ashley's opt-in would have twice the dilution effect of HP's opt-in (though that alone establishes prejudice in this case).  The court in *SRAM* observed that the class "ha[d] not offered evidence to show that HP's initial opt-out decision was motivated by a desire

to extract a larger settlement for itself," 2013 WL 1222690, at *2, an observation relevant to whether HP used Rule 23's opt-out provision "to gain leverage for a separate settlement," *In re MoneyGram Int'l, Inc. Sec. Litig.*, 2011 WL 855311, at *3.

Ashley admits that it opted out of the Litigation Class to pursue settlements with the six remaining Defendants, and that this opt-out decision bore fruit in the form of non-class settlements with Future Foam and FXI (Doc. 1884-2 at ¶¶ 2–3). Ashley therefore opted out of the Class to gain leverage with Defendants in separate settlement talks, not because of mistake or ignorance. *See, e.g.*, *Martens v. Smith Barney, Inc.*, 191 F.R.D. 54, 55 (S.D.N.Y. 2000) (permitting opt-in because former class members had opted out of the class based on an erroneous reading of the class notice); *In re Del-Val Fin. Corp. Sec. Litig.*, 162 F.R.D. 271, 276 (S.D.N.Y. 1995) (same). Other than *SRAM*, no case cited by the parties permitted a plaintiff who opted out of a certified class *before* conclusion of a class settlement, in order to pursue direct settlement talks, to opt back into the same class *after* settlement is reached, diluting class members' share of the settlement in the process. *See, e.g.*, *In re Urethane Antitrust Litig.*, 2008 WL 5215980, at *2 (D. Kan.) ("the class members cannot have relied to their detriment on 3M's original opt-out because they chose to participate in the settlement while 3M was still a potential class member -- and thus will receive in settlement the same amount they would have had 3M never opted out to begin with").

Ashley is a sophisticated company that believed the road to a larger settlement lay through separate settlement talks with Defendants, and now has second thoughts about that decision. Permitting Ashley to gamble with direct settlement negotiations, obtain settlements from two Defendants, and then reverse its opt-out for the four remaining Defendants would prejudice the Class

and, moreover, condone an improper use of the class member opt-out right. This Court denies Ashley's Motion.

### Fee Petition

An award of attorney fees must only be "reasonable under the circumstances." *Rawlings v. Prudential-Bache Props, Inc*., 9 F.3d 513, 516 (6th Cir. 1993). The fee award decision must account for the reality that "[t]he interest of class counsel in obtaining fees is adverse to the interest of the class in obtaining recovery because the fees come out of the common fund set up for the benefit of the class." *Id.* Having paid for resolution of claims against it, a defendant generally does not care which portions of the settlement fund go to class members and which to class counsel. *See In re Dry Max Pampers Litig.*, 724 F.3d 713, 717 (6th Cir. 2013). This Court must therefore critically examine the fee request to protect the Class's interests while fairly compensating Class Counsel. *See Rodriguez v. W. Publ'g Corp*., 563 F.3d 948, 968 (9th Cir. 2009) ("At the fee-setting stage when fees are to come out of the settlement fund, the district court has a fiduciary role for the class.").

This Court strikes that balance by considering:

(1) the value of the benefit rendered to the plaintiff class; (2) the value of the services on an hourly basis; (3) whether the services were undertaken on a contingent fee basis; (4) society's stake in rewarding attorneys who produce such benefits in order to maintain an incentive to others; (5) the complexity of the litigation; and (6) the professional skill and standing of counsel involved on both sides.

*Bowling v. Pfizer, Inc*., 102 F.3d 777, 780 (6th Cir. 1996) (ellipsis omitted). The goal of a fee award is to ensure "counsel is fairly compensated for the amount of work done as well as for the results achieved," *Rawlings*, 9 F.3d at 516, and as Class Counsel themselves recognize by framing their request in the context of prior awards and their total lodestar (*see, e.g.*, Doc. 1830-1 at 12–13), it would not make sense to grant fee awards for successive settlements in the same case without

14

reference to the fee awards that came before.  Class Counsel have already received substantial fee awards from prior settlements, and those prior fee awards are relevant to assessing a reasonable award for Class Counsel's efforts in achieving the six settlements.

**Value of the Benefit Provided.**  The value of the settlements is substantial, $275.5 million, added to $157.6 million awarded in connection with prior settlements.  The total settlement amount is excellent, roughly 52 percent of Leitzinger's damages model prior to trebling. *Rodriguez*, 563 F.3d at 964 (except where the merits of a plaintiff's claims are very strong, "courts generally determine fairness of an antitrust class action settlement based on how it compensates the class for past injuries, without giving much, if any, consideration to treble damages").

**Value of Attorney Services.**  Class Counsel have invested an enormous amount of attorney time and money in prosecuting this case on behalf of the Class.  Class Counsel's final lodestar is more than $65 million, representing more than 137,000 hours worked (Doc. 1829-4 at 2).  Boies Schiller & Flexner LLP (40,993 hours) and Quinn Emanuel Urquhart & Sullivan, LLP (30,896 hours) claimed the majority of those hours (Doc. 1829-2 at 3, 18), with the balance of the work performed by a wide range of plaintiff-side litigation firms.

Class Counsel's hourly rates are high, but those rates reflect the reputation and ability of their firms.  The hourly rates are, moreover, Class Counsel's standard hourly rates, charged to paying customers.  Class Counsel estimate the lodestar using their historical hourly rates -- that is, the hourly rate the attorney charged (for example) in 2013 when he or she performed the work, not the attorney's hourly rate at the time the fee petition was filed.  Class Counsel tout this billing tactic as an added benefit to the Class, explaining that class counsel in other cases often estimate lodestar using rates in

15

effect at the time of the fee petition (Doc. 1926 at 9). This refusal to recoup the time value of past work is a further benefit to the Class.

**Class Counsel's Fee Arrangement.** The representative Plaintiffs entered into contingent fee agreements with Class Counsel. This Court has reviewed in camera copies of those agreements. Each agreement conditions payment of attorney fees on recovery by the client, and five of the seven agreements specify that attorney fees will be at least one-third of the client recovery. Class Counsel also have gone out-of-pocket for the heavy expenses of litigating this case. The Class Counsel firms contributed more than $8 million to a litigation common fund (Doc. 1829-10 at 3), and used that fund to pay more than $6.6 million in expenses (Doc. 1829-6 at 2).

**Societal Interest in Rewarding Class Counsel.** "Attorneys who take on class action matters serve a benefit to society and the judicial process by enabling . . . small claimants to pool their claims and resources." *In re Telectronics Pacing Sys., Inc.*, 137 F. Supp. 2d 1029, 1043 (S.D. Ohio) *decision clarified by* 148 F. Supp. 2d 936 (S.D. Ohio 2001). Moreover, "[s]ociety's interests are clearly furthered by the private prosecution of civil cases which further important public policy goals, such as vigorous competition by marketplace competitors." *In re Se. Milk Antitrust Litig.*, 2013 WL 2155387, at *5 (E.D. Tenn.). Class Counsel's efforts are also notable for continuing in spite of significant delay in parallel criminal investigations, which produced results far more limited than the Direct Purchaser case. The criminal investigation jump started this case, but since then, Class Counsel have led the charge.

**Case Complexity and Risk.** "Antitrust class actions are inherently complex. The legal and factual issues are complicated and highly uncertain in outcome." *In re Skelaxin (Metaxalone) Antitrust Litig.*, 2014 WL 2946459, at *3 (E.D. Tenn.). Class Counsel's legal theory was not

particularly complex, alleging the existence of a horizontal price-fixing conspiracy (albeit one with the less common feature of alleged price-fixing at the PIA, not transactional, level).  The case's complexity came instead from at least two areas.

First, Class Counsel filed this suit as a putative class action during a period of change and uncertainty in class certification standards.  *See, e.g.*, *Whirlpool Corp. v. Glazer*, 133 S. Ct. 1722 (2013) (granting, vacating, and remanding); *Comcast Corp. v. Behrend*, 133 S. Ct. 1426 (2013); *Amgen Inc. v. Conn. Ret. Plans & Trust Funds*, 133 S. Ct. 1184 (2013); *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541 (2011).  For that reason and because of the PIA-coordination conspiracy theory, Direct Purchasers developed an impact and damages model that was substantially more complex than tested approaches, such as the benchmark model.  What's more, Leitzinger's model appears to be unique, and brought with it all the difficulties of developing and defending a unique theory of antitrust impact and damages.  As the intense class certification battle showed, it was by no means a foregone conclusion that this Court would have found Leitzinger's testimony admissible under Federal Evidence Rule 702 or common proof of impact or damages under Federal Civil Rule 23.  Without Leitzinger's testimony, the Class impact and damages case would have fallen apart before it could even reach a jury.  *See In re NASDAQ Mkt.-Makers Antitrust Litig*., 187 F.R.D. 465, 476 (S.D.N.Y. 1998).

Second, Direct Purchasers' case depended heavily on connecting the dots between a broad range of e-mails, faxes, phone calls, and witness testimony over a very lengthy Class Period.  It is still not clear how Class Counsel would have accomplished that task.  Class Counsel proposed to use "summary exhibits," timelines that Defendants measured as covering a 110-foot-long roll of paper when printed (Doc. 1602 at 1).  Even if the timelines had been allowed at trial, the mountain of

17

information contained in those timelines may have simply overwhelmed the jury -- "2,200 'events' over an 11 year period, including more than 1,000 excerpts from emails and other internal communications, 191 phone and fax records, and information from hundreds of price increase letters" (*id.*).  Bottom line -- these settlements are all the more impressive considering the difficulty of presenting this sprawling case to a jury.

   ***Skill and Reputation of Class and Defense Counsel.***  Finally, this Court fashions its fee award by considering the skill and reputation of Co-lead Counsel and the executive committee firms. Co-lead Counsel are among the most respected antitrust practitioners in the country, litigating important antitrust matters in other courts while at the same time managing this case.  *See, e.g.*, *In re Rail Freight Fuel Surcharge Antitrust Litig.*, 725 F.3d 244 (D.C. Cir. 2013); *O'Bannon v. Nat'l Collegiate Athletic Ass'n*, 7 F. Supp. 3d 955 (N.D. Cal. 2014) *aff'd in part, vacated in part*, 802 F.3d 1049 (9th Cir. 2015) (petition for rehearing en banc pending).  The team they assembled to litigate this case includes many of the country's leading antitrust plaintiff-side law firms.  And each Defendant was represented by top antitrust defense firms.

   Considering the enormous task of discovery, the complicated legal and factual issues that were key to class certification and summary judgment, the caliber of opposing counsel, and the large, up-front, and contingent investment needed to litigate this case, this Court appreciates that there are few groups of lawyers who could have obtained a similar result.

   ***A 20 Percent Fee Award for the Six Settlements, and an Overall Fee Award of 23.6 Percent, are Appropriate.***  Each of the *Bowling* factors favors a substantial fee award, above and beyond the substantial fee awards of $47.28 million Class Counsel have already received.  Having considered each factor, Class Counsel's submissions, and work on this case to date, this Court finds that a 20

18

percent fee award, equal to $55.10 million, is a reasonable fee award for these six settlements.  Added to prior fee awards, Class Counsel will recover as attorney fees 23.6 percent of the gross settlement amount, or $102.38 million.

This Court has carefully considered the 30-percent fee request and the handful of decisions cited by Class Counsel.  While these comparisons are helpful, they are also at best only anecdotal evidence of how other district courts, confronting different facts, have exercised their broad discretion to set a reasonable fee award.

*In re TFT-LCD (Flat Panel) Antitrust Litigation*, No. 3:07-md-01827-SI, Doc. 4436 at ¶ 3 (N.D. Cal. 2011), awarded class counsel 30 percent of a $405 million settlement.  But even with that generous award, class counsel barely broke even.  "[A] lodestar 'cross-check,'" the court explained, "reveals a fair and reasonable multiplier of 1.096, based on over 250,000 hours of work."  *Id.* at ¶ 2. Likewise, *In re Southeastern Milk Antitrust Litigation*, 2013 WL 2155387, at **1, 3, granted class counsel a one-third share of a $158 million settlement, but there "[t]he total settlement, when combined with the prior settlement, [wa]s over 70% of the total damages calculated by plaintiffs' damages expert," a staggering recovery ratio that far exceeds the outstanding result in this case and, indeed, any other case cited by Class Counsel.  *In re VisaCheck/Mastermoney Antitrust Litigation*, 297 F. Supp. 2d 503 (E.D.N.Y. 2003), is also of limited comparative value.  That case is an extreme outlier.  Class counsel there secured the largest antitrust settlement in U.S. history at the time, consisting of compensatory relief that was more than eight times the Class recovery here, and compensatory and injunctive relief valued at between fifty-seven and two-hundred times the Class recovery (depending on how one assigns a dollar value to the injunctive relief).  *See id.* at 508, 509,

511–12. *In re Tricor Direct Purchaser Antitrust Litigation*, No. 1:05-cv-00340-SLR, Doc. 543 at ¶ 11 (D. Del. 2009), provides scant explanation for its 33 percent fee award.

To the extent the practice of other district courts is relevant, this Court's fee award more closely fits the percentage-award trend than do the decisions Class Counsel cite. *See, e.g.*, Theodore Eisenberg & Geoffrey P. Miller, *Attorney Fees and Expenses in Class Action Settlements: 1993-2008*, 7 J. EMPIRICAL LEGAL STUD. 248, 262 tbl.5 (2010) (antitrust class actions have a mean fee award of 21.02 percent of the Class Recovery); Brian T. Fitzpatrick, *An Empirical Study of Class Action Settlements and their Fee Awards*, 7 J. EMPIRICAL LEGAL STUD. 811, 835 tbl.8 (2010) (mean fee award of 25.4 percent for antitrust settlements reached in federal class actions during 2006 and 2007); Theodore Eisenberg & Geoffrey P. Miller, *Attorney Fees in Class Action Settlements: An Empirical Study*, 1 J. EMPIRICAL LEGAL STUD. 27, 73 tbl.7 (2004) (settlements with class recoveries of more than $190 million have a mean fee award of no more than 17.6 percent of the class recovery, with a standard deviation of 9.6 percent); *see also* NEWBERG ON CLASS ACTIONS § 15:83 (5th ed.) (citing an unpublished 2006–11 study, finding the median fee award in antitrust class actions is 25.2 percent of the gross settlement).

Class Counsel offered a Declaration and testimony from Professor Brian Fitzpatrick of Vanderbilt University Law School (Doc. 1910-3), who has written on class action litigation and attorney fees. He opined that Direct Purchasers' fee request is reasonable and within the range of fee awards in similar cases (*see, e.g.*, *id.* at 4, 11). At the fairness hearing, he conceded that a broad range of fee award percentages would be reasonable (Doc. 1926 at 38–39). Fitzpatrick merely confirms that fee awards can reasonably differ, depending on case specifics, and that the district judge who has lived the case is in a good position to assign a value to class counsel's efforts.

It also bears noting that "in 'mega-cases' in which large settlements . . . serve as the basis for calculating a percentage, courts have often found considerably lower percentages [than 24 percent] of recovery to be appropriate." MAN. COMPLEX LIT. § 14.121, 188 (2004); *but see In re Enron Corp. Sec., Derivative & ERISA Litig*., 586 F. Supp. 2d 732, 754 (S.D. Tex. 2008). District courts justify a scaling approach for a variety of reasons. "In many instances the increase [in the size of the settlement] is merely a factor of the size of the class and has no direct relationship to the efforts of counsel." *In re NASDAQ Mkt.-Makers Antitrust Litig*., 187 F.R.D. at 486 (quotation marks omitted). In large cases, "class counsel's costs of litigating an action do not scale up as quickly as the size of the settlement does." Brian T. Fitzpatrick, *Do Class Action Lawyers Make Too Little?*, 158 U. PA. L. REV. 2043, 2066 (2010); *see also Goldberger v. Integrated Res., Inc*., 209 F.3d 43, 52 (2d Cir. 2000) ("it is not ten times as difficult to prepare, and try or settle a 10 million dollar case as it is to try a 1 million dollar case" (quotation marks omitted)). District courts explain that as the size of the fund increases, they award smaller percentages of a gross settlement fund in order to recognize a primary goal for class action litigation: passing on to class members the benefit of economies of scale. *See Walmart Stores, Inc. v. Visa U.S.A., Inc*., 396 F.3d 96, 122 (2d Cir. 2005). The inverse scaling approach is one factor to consider in determining an appropriate fee in a case of this size, and that approach is entirely consistent with *Bowling*. Here, the value of the benefit provided to the Class substantially outpaced the value of the attorney services required to produce that result.

Class Counsel also emphasize the reasonableness of a 30-percent fee award by viewing that award in lodestar terms. Class Counsel "request[] a grand total of $130.59 million in attorneys' fees, which is a 2.01 multiplier on the total lodestar" of $65,091,177.65 (Doc. 1830-1 at 15). Fitzpatrick likewise states that a 2.01 multiplier is within the range of similar fee awards (Doc. 1910-3 at 11).

Class Counsel's multiplier argument assumes their lodestar is an accurate reflection of the hours reasonably expended in prosecuting this case, but Class Counsel have not proven that to be so. While this Court does not doubt that all the work billed was in fact performed, it does doubt that all of that time was reasonably necessary to advance this case.

Class Counsel contend that not a single hour billed in this case was wasteful or duplicative (Doc. 1910 at 8–9). The more than 137,000 hours spent on this case would be enough to employ a team of 66 attorneys or support staff for an entire year, doing nothing but each billing this case for 2,080 hours. The Class Counsel legal team includes leading antitrust lawyers, but even they are not perfect.

Other aspects of Class Counsel's billing records give this Court pause, though to a lesser extent than Class Counsel's claims about their waste-free billing. Class Counsel billed, at high rates, several hundred hours of summer associate work (*id*. at 2–4). There is also a large amount of litigation support staff time billed, at high rates, for what appear to be secretarial duties (*see, e.g.*, Doc. 1910-1 at 22; Doc. 1910-2 at 8).

These and other concerns are the result of this Court posing a handful of questions in advance of the fairness hearing, questions designed to better understand the work and staffing patterns that produced the lodestar estimate. An in-depth lodestar analysis might well reveal additional concerns, but such extra analyses are unnecessary. Even assuming the lodestar accurately reflects the hours reasonably spent prosecuting this case, it cannot be seriously argued that a 1.57 multiplier unreasonably discourages class counsel from litigating a case like this one, while a 2.01 multiplier (or greater) strikes the right balance. Under this Court's fee award, Class Counsel break even -- based on hourly rates that themselves are calculated to account for litigation risk -- and then recognize an additional $37.28 million return on the time and money they invested in this case. That fee award

22

"fairly compensate[s Class Counsel] for the amount of work done as well as for the results achieved," *Rawlings*, 9 F.3d at 516, while paying due regard for the interests of the real parties in interest in this case, the members of the Direct Purchaser Class.

Finally, Co-lead Counsel are empowered to "distribute the fees in a manner that, in the judgment of Co-Lead Counsel, fairly compensates each firm for its contribution to the prosecution of the Plaintiffs' claims" (Doc. 1830-1 at 11 n.2).

**Reimbursement of Expenses.** Class Counsel ask for reimbursement of $315,325.12 (*id.* at 17–18; Doc. 1829-6 at 2). This Court previously granted Class Counsel reimbursement of expenses of $9,022,171.15 (Doc. 598 at 4; Doc. 1534 at 13). Because the remaining, un-reimbursed expenses are of the kind typically paid by clients in antitrust litigation (*see* Doc. 1828-3 at ¶¶ 63–65), this Court grants reimbursement of remaining expenses, *see In re Cardizem CD Antitrust Litig.*, 218 F.R.D. at 535.

**Incentive Awards.** Finally, Class Counsel move for $35,000 incentive awards for each of the seven representative Plaintiffs (Doc. 1830-1 at 18–20). "Incentive awards are typically awards to class representatives for their often extensive involvement with a lawsuit." *Hadix v. Johnson*, 322 F.3d 895, 897 (6th Cir. 2003). "[A]pplications for incentive awards are scrutinized carefully by courts who sensibly fear that incentive awards may lead named plaintiffs to expect a bounty for bringing suit or to compromise the interest of the class for personal gain." *Id.* The Sixth Circuit has never categorically disapproved of incentive awards. *See In re Dry Max Pampers Litig.*, 724 F.3d at 722. District courts in this Circuit routinely grant incentive awards to representative plaintiffs in antitrust matters, when the representative plaintiff actively participates in the litigation. *See, e.g.*, *In re Prandin Direct Purchaser Antitrust Litig.*, 2015 WL 1396473, at *5 (E.D. Mich.); *In re Skelaxin*

23

*(Metaxalone) Antitrust Litig.*, 2014 WL 2946459, at *4; *In re Se. Milk Antitrust Litig.*, 2013 WL 2155387, at *8; *In re Packaged Ice Antitrust Litig.*, 2012 WL 5493613, at *9 (E.D. Mich.).

Here, the representative Plaintiffs responded to document requests and were deposed (Doc. 1830-1 at 20; Doc. 1828-3 at ¶¶ 18, 20). They also advised Class Counsel on the flexible foam market (Doc. 1830-1 at 20). Because the representative Plaintiffs actively participated in this litigation, and considering the relatively small incentive awards (together, roughly .00005 percent of the total settlement amount of $433.1 million), this Court grants each Plaintiff a $35,000 incentive award.

### CONCLUSION

For these reasons, this Court grants the Direct Purchaser Class Motion for Final Approval (Doc. 1828), denies Direct Action Plaintiff Ashley Furniture Industries, Inc.'s Motion to Withdraw Request for Exclusion from the Direct Purchaser Certified Class (Doc. 1884), and grants in part and denies in part Class Counsel's Motion for an Award of Attorneys' Fees, for Reimbursement of Expenses, and for an Incentive Award to the Direct Purchaser Class Representatives (Doc. 1830). For the reasons discussed in this Court's companion Order sanctioning Narkin, filed with this Opinion, this Court certifies, pursuant to 28 U.S.C. § 1915(a)(3), that Narkin could not in good faith appeal this decision.

Therefore:

1. Final approval of the six Settlement Agreements is granted pursuant to Federal Civil Rule 23(e).

2. Each Direct Purchaser Settlement Class consists of the certified Direct Purchaser Litigation Class minus the persons and entities who request exclusion from the Litigation Class or from the relevant Direct Purchaser Settlement Class. For the reasons explained in this Court's Order on Class Certification (*see* Doc. 1102), the Direct Purchaser Settlement Classes meet the requirements of Rule 23 and are therefore certified for the purposes of these settlements.

3.     The persons and entities identified in Exhibits A and B have timely and validly requested exclusion from the specified Direct Purchaser Settlement Classes or from the Litigation Class and therefore are excluded from the Direct Purchaser Settlement Classes and not bound by this Order, and may not make any claim or receive any benefit from the relevant settlement, whether monetary or otherwise.  These excluded persons and entities may not pursue any Released Claims on behalf of those who are bound by this Order.  Each Direct Purchaser Settlement Class member who has not requested to be excluded from the Direct Purchaser Settlement Classes for a specified settlement, and is not listed in Exhibit A or B, is bound by this Order, and will remain forever bound.

4.     As to the Released Parties, as defined in the respective Settlement Agreements, the Class Action and any and all currently pending direct purchaser class action lawsuits directly related to the subject matter of this litigation are dismissed with prejudice and in their entirety, on the merits, and, except as provided for in the Settlement Agreement, without costs.  This dismissal shall not affect, in any way, Direct Purchasers' right to pursue claims, if any, outside the scope of the releases set forth in the six Settlement Agreements.

5.     The Releasing Parties release, forever discharge, and covenant not to sue the specified Released Parties from and for Claims as set forth in the six Settlement Agreements.

6.     This Order does not settle or compromise any other claims by Class Representatives or the Direct Purchaser Settlement Classes against the Defendants or other persons or entities other than Released Parties, and all rights against any other Defendant or other person or entity are specifically reserved.  The sales of Polyurethane Foam to members of the Direct Purchaser Settlement Classes by Released Parties shall remain against the non-settling Defendants, to the extent any exist, as a basis for damage claims, and shall be part of any joint and several liability claims against any non-settling Defendant or other person or entity other than the Released Parties.

7.     This Court directs entry of final judgment of dismissal as to the Released Parties, as set forth in its separate orders entered following this Order.

8.     Without affecting the finality of this Order, this Court retains exclusive jurisdiction over the Class Action and the six Settlement Agreements, including the administration, interpretation, consummation, and enforcement of the six Settlement agreements.

9.     The escrow accounts established by certain of the parties, and into which Settlement Funds have been and will be deposited, plus accrued interest, is approved as a Qualified Settlement Fund pursuant to Internal Revenue Code Section 468B and related Treasury Regulations.

IT IS SO ORDERED.

_____s/ *Jack Zouhary*_____
JACK ZOUHARY
U. S. DISTRICT JUDGE

November 19, 2015