IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

In re Polyurethane Foam Antitrust
   Litigation

This document relates to:
INDIRECT PURCHASER CLASS

Case No. 1:10 MD 2196

MEMORANDUM OPINION
AND ORDER RE:
SETTLEMENT MOTIONS

JUDGE JACK ZOUHARY

## INTRODUCTION

The Class of Indirect Purchaser Plaintiffs ("IPPs") moves for final approval of nine class action settlement agreements listed in the following table.  Further, Class Counsel for the IPPs moves for an award of attorney fees, reimbursement of expenses, and incentive awards for representative plaintiffs (Doc. 1908).

| Settling Defendants | Gross Settlement Amount | Portions of Settlement Amount that are Contingent or Payable More than 3 Weeks in the Future | Docket Number of Agreement |
|---|---|---|---|
| Carpenter Co. | $63,500,000 | **$43.5 million** is not payable until all appellate rights are exhausted | 1751-2 |
| FFP Holdings, LLC | $2,750,000 | none | 1854, Ex. A |
| Future Foam, Inc. | $10,500,000 | **$2.5 million** is not due until July 31, 2016; and **$4 million** is contingent on a successful outcome in separate litigation against Dow Chemical | 1854, Ex. C |
| FXI Holdings, Inc. | $9,500,000 | none | 1854, Ex. B |
| Hickory Springs Manufacturing Co. | $10,250,000 | **$1.5 million** is not due until June 30, 2016; another **$1.5 million** is not due until June 30, 2017; and **$5.25 million** is contingent on a successful outcome in separate litigation against Dow Chemical | 1751-3 |
| Leggett & Platt Incorporated | $26,500,000 | none | 1751-4 |

| Settling Defendants | Gross Settlement Amount | Portions of Settlement Amount that are Contingent or Payable More than 3 Weeks in the Future | Docket Number of Agreement |
|---|---|---|---|
| Mohawk Industries Inc. | $16,000,000 | none | 1751-5 |
| Vitafoam Products Canada Limited and Vitafoam, Inc. ("Vitafoam") | $2,750,000 | none | 1751-6 |
| Woodbridge Foam Corporation, Woodbridge Sales & Engineering, Inc., and Woodbridge Foam Fabricating, Inc. ("Woodbridge") | $9,500,000 | **$2.25 million** is not due until a year from now; and <br> **$2.25 million** is not due until December 31, 2017 | 1751-7 |
| **TOTAL** | $151,250,000 | **$62.75 million** | |

## PROCEDURAL BACKGROUND

Plaintiffs in this multidistrict antitrust litigation asserted claims that numerous dominant firms in the flexible polyurethane foam market engaged in a decade-long conspiracy to fix, raise, and maintain the price of foam products.  Plaintiffs bringing these claims included: (1) direct purchasers -- that is, businesses that purchased foam directly from Defendants and incorporated that foam into consumer products, such as furniture, mattresses, or carpet underlay; and (2) indirect purchasers -- that is, individuals and businesses that purchased these foam-containing consumer products.

This Court previously certified both a class of Direct Purchaser Plaintiffs ("DPPs") and also a class of Indirect Purchaser Plaintiffs ("IPPs") (Doc. 1102 (redacted version at Doc. 1408); Docs. 1115 & 1117).  This Court recently granted final approval to DPP settlement agreements, and also granted in part the fee petition filed by Class Counsel for the DPPs (Doc. 1971).

The IPPs followed a similar pattern of sequential settlements.  This Court preliminarily approved nine settlement agreements, along with the plan of notice, claim forms, and Plan of Allocation (Doc. 1861).

2

The IPP class now moves for final approval of these settlement agreements (Doc. 1988).  In addition, Class Counsel submits a fee application, seeking: (1) an award of attorney fees in the amount of $45,375,000, which is 30% of the nine classwide settlements totaling $151,250,000; (2) reimbursement of $5,115,811.72 in expenses; and (3) a total of $200,000 in incentive awards payable to the Class Representatives (Doc. 1908 at 1–2, 18).

This Court received objections to the settlements and/or the fee application from the following class members:[1]

|    |    |    |
|----|----|----|
| 1. | Chris Andrews (*pro se*) | Doc. 1920 & 1928 |
| 2. | Jill Cannata | Doc. 1950 |
| 3. | Melissa Holyoak and John Tabin by the Center for Class Action Fairness ("CCAF") | Doc. 1960 |
| 4. | Sean Cochran | Doc. 1964 |
| 5. | Michael Narkin (*pro se*) | Doc. 1965 |
| 6. | Jennifer Hinojosa (*pro se*) | Doc. 1967 |
| 7. | Patrick Sweeney (*pro se*) | Doc. 1968 |

Class Counsel were directed by this Court to answer questions (Docs. 1973 & 1997) as part of a final fairness hearing, at which time this Court heard argument from IPP Class Counsel and two objectors -- Andrews and CCAF.  In addition, this Court heard from the IPP Claims Administrator, Eric Miller who, after the hearing, submitted a Declaration elaborating upon some of his comments at the hearing (Doc. 2010).

---

[1]

An attorney also filed a notice of appearance on behalf of "Objector Kelly Marie Spann," but neither Spann nor her attorney ever filed any objection (Doc. 1962).

Sweeney's objection was filed on November 17, 2015.  The due date was November 13, 2015, and IPPs assert the objection is untimely.  Sweeney indicates in his certificate of service, however, that he mailed his objection on November 11, so this Court accepts it as timely.

Finally, IPPs argue that Andrews and Hinojosa do not have standing to object, because they have not provided sufficient documentation to show they purchased a covered foam-containing product in a covered State.  This Court agrees their claim documentation is weak, but nevertheless chooses to simply address their respective objections on the merits.

Based upon all this available information, along with this Court's five-year oversight of this MDL, this Court is prepared to clear the final hurdle in these cases.

### THE SETTLEMENT AGREEMENTS

Before addressing the merits of the IPPs' motions and objections, this Court summarizes the nine settlement agreements and the current claims status. These agreements have a total potential value of $151,250,000. Of this amount, (a) Defendants have already deposited $85 million into escrow accounts; (b) Hickory Springs and Woodbridge will deposit another $3.5 million within 15 days of final approval by this Court; (c) Future Foam, Hickory Springs, and Woodbridge will deposit another $10 million over the next two years; (d) Carpenter will deposit another $43.5 million once all appellate rights are exhausted; and (e) another $9.25 million may eventually become payable, contingent upon whether Hickory Springs and Future Foam succeed in separate litigation against Dow Chemical scheduled to go to trial in mid- to late-2016.[2]

As a general matter, the settlement amounts will be used to pay benefits to class members; common benefit fees and expenses to Class Counsel; expenses to the Claims Administrator; incentive awards to Class Representatives; and "leftovers" to *cy pres* beneficiaries. The objectors have raised issues regarding all these payment categories (*see, e.g.*, Doc. 2018 at 5–20, 29–33). This Court examines these objections below.

---

[2]

If Hickory Springs succeeds in separate litigation against Dow Chemical, the proceeds are payable as follows: (1) Hickory must use the proceeds to pay certain amounts to the "Sealy Plaintiffs" in this case; (2) if there are additional proceeds, Hickory must pay the $5.25 million contingent amount to the IPP class; and (3) if there are additional proceeds, Hickory must accelerate its guaranteed future payments to the IPP class. By comparison, if Future Foam succeeds in separate litigation against Dow Chemical, provisions (2) and (3) listed above also apply; but there is *no* analogous requirement as in provision (1) that Future Foam pay the "Sealey Plaintiffs" before the IPP class receives the $4 million contingent amount.

Regarding payments to class members, the claim form is designed so that a class member will participate in all nine settlements, unless the class member affirmatively chooses to be excluded from a particular settlement agreement.  Each of the settlement agreements provide for the following allocations and weightings:

- First, each settlement agreement allocates the settlement funds as follows: 36.93% to bedding claims, 30.70% to carpet padding claims, and 32.37% to furniture claims.  These percentages represent the proportional volume of commerce that each product category bears to the total volume of polyurethane foam products.

- Second, each class member's claim is "weighted" as follows: bedding claims at 80% of purchase price, carpet padding claims at 90% of purchase price, and furniture claims at 75% of purchase price.  These percentages reflect roughly the proportion of the product that is made up of foam (that is, carpet padding contains proportionally more foam overall than does bedding, so the purchase price of carpet padding is weighted higher than the purchase price for bedding, for purposes of claim-valuation).

- Third, bedding claims are paid *pro rata* from the bedding sub-fund, carpet claims from the carpet sub-fund, and furniture claims from the furniture sub-fund.  If any sub-fund is not fully paid out -- which, in light of the claim submission statistics cited below, is extremely unlikely -- it pours over into the other sub-funds.  Further, if there is any money left over after all distributions are made, then the remainder goes to *cy pres* beneficiaries approved by this Court.  Any *cy pres* remainder is forecast to be very small.

### CLAIMS TO DATE

The deadline for class members to submit claims is February 29, 2016.  The Claims Administrator reports the following statistics as of December 23, 2015:

|  |  |
|---|---|
| Total Claims Received: | $27,473 million |
| From Individuals: | $26,402 million |
| From Businesses: | $  1,071 million |
|  |  |
| Total Gross Claim Amount: | $456.9 million |
| Carpet Claims: | $  93   million |
| Bedding Claims: | $151.6 million |
| Furniture Claims: | $212.3 million |

5

The Claims Administrator believes these figures are likely to increase substantially, because: (1) there is one more month for class members to submit claims; (2) class members with larger claims (businesses) tend to take longer to submit their claims than class members with smaller claims (individuals), since businesses have more records to gather -- thus, many of the largest claims are probably not yet filed; and (3) historically, in class actions, a large proportion of class members wait until the deadline to file claims (Doc. 2018 at 64; Doc. 2010-1 at 2–3).

These figures reveal the total value of claims made so far ($456.9 million) already exceeds the total value of potential settlement funds ($151.25 million), and also that the value of claims made for each category (carpet, bedding, and furniture) exceed, respectively, the total value of potential settlement funds for each category. This suggests every sub-fund *will* be fully paid out -- there will not be any "pour-over" from one sub-fund to another.

These figures reflect that claimants will definitely not receive full reimbursement for their claims. Rather, claimants will receive some percentage of their claims, paid on a *pro rata* basis. Given the Claims Administrator's statistics to date, it appears very likely claimants will ultimately receive less than 20% (maybe less than 10%) of their claim value.

### LEGAL STANDARDS FOR APPROVAL OF THE SETTLEMENT AGREEMENTS

Federal Civil Rule 23(e) mandates that "[t]he claims, issues, or defenses of a certified class may be settled, voluntarily dismissed, or compromised only with the court's approval." To certify a class for settlement, a court must first consider whether the proposed class meets the requirements of Rule 23(a) & (b). *See Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 620 (1997). The court is also required to direct adequate notice to members of the settlement class. Federal Civil Rule 23(c)(2)(B). If these requirements are met, then the court must ensure the proposed class action settlement is "fair,

6

reasonable, and adequate." Federal Civil Rule 23(e)(2); *see also In re Flonase Antitrust Litig.*, 291 F.R.D. 93, 98 (E.D. Pa. 2013) (quoting *In re Prudential Ins. Co. of Am. Sales Practice Litig.*, 148 F.3d 283, 316 (3rd Cir. 1998)) ("[A] class action cannot be settled without the approval of the court and a determination that the proposed settlement is 'fair, reasonable and adequate.'"). "Whether a class action settlement satisfies Rule 23(e) is committed to the sound discretion of the district court." *Lonardo v. Travelers Indem. Co.*, 706 F. Supp. 2d 766, 778 (N.D. Ohio 2010) (citing *Bailey v. Great Lakes Canning, Inc.*, 908 F.2d 38, 42 (6th Cir. 1990)).

This Court has already addressed the propriety of class certification and the adequacy of notice. Specifically, in 2014, this Court issued a lengthy decision concluding the IPPs met the requirements for class certification under Rule 23(a) and (b)(3) (*see* Docs. 1102, 1408, & 1117). The Sixth Circuit denied a petition for interlocutory review (*see* Doc. 1345). For all the reasons stated previously, this Court concludes the IPP settlement class -- which is defined the same as the IPP litigation class -- also satisfies the Rule 23 requirements of commonality, typicality, adequacy, numerosity, predominance, and superiority.

Further, this Court earlier approved the plan of notice and the claim forms, concluding they "satisfy Federal Civil Rule 23(e) and due process" (*see* Doc. 1861 at 2). The Claims Administrator undertook "broad paid-media notice involving print and Internet vehicles, including . . . [c]onsumer magazines; [a] newspaper supplement; [t]rade magazines; Internet banner and text ads on multiple networks, including social media and targeted websites; and [a] news release" (*see* Doc. 1751-12 at 11). For example, notice was placed in 598 different newspapers, reaching into every major media market in the country; on website banners on Facebook and Google for 60 days; and in numerous magazines directed both at the general populace and also at businesses likely to be large consumers of foam-

containing products, such as hotels (*id.* at 13–15).  This notice plan was designed to reach at least 85% of the target audience, which is essentially national in scope (*id.* at 15).  Under the circumstances of this case, the Claims Administrator's notice program was the "best notice practicable," Federal Civil Rule 23(c)(2), and was "reasonably calculated to reach interested parties," *Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 318 (1950).

The analysis still remaining for this Court is whether the nine proposed class action settlements are "fair, reasonable, and adequate."  Federal Civil Rule 23(e)(2).   To conduct this analysis, courts within the Sixth Circuit refer to a list of seven factors identified in *UAW v. General Motors Corp.*, 497 F.3d 615, 631 (6th Cir. 2007).  These factors are: "(1) the risk of fraud or collusion; (2) the complexity, expense and likely duration of the litigation; (3) the amount of discovery engaged in by the parties; (4) the likelihood of success on the merits; (5) the opinions of class counsel and class representatives; (6) the reaction of absent class members; and (7) the public interest."  *Vassalle v. Midland Funding LLC*, 708 F.3d 747, 754 (6th Cir. 2013) (quoting *UAW*, 497 F.3d at 631).   In addition, "[a]lthough not included in the seven *UAW* factors, in evaluating the fairness of a settlement [the Sixth Circuit has] also looked to whether the settlement 'gives preferential treatment to the named plaintiffs while only perfunctory relief to unnamed class members.'"  *Id.* at 755 (quoting *Williams v. Vukovich*, 720 F.2d 909, 925 n.11 (6th Cir.1983)).

This Court will assess these factors two different ways, first setting out general assessments before addressing specific concerns raised by the objectors.  Finally, because the question of attorney fees is especially important when determining the fairness of a class action settlement, this Court will analyze that issue separately.

THE *UAW* / *VASSALLE* FACTORS

**Risk of Fraud or Collusion**

In this case, there is no evidence to remove the "presumption that the class representatives and counsel handled their responsibilities with the independent vigor that the adversarial process demands." *UAW*, 497 F.3d at 628.  Settlement talks took place directly between the parties as well as with the assistance of respected mediators.  The nearly five years of litigation that preceded settlement talks were not "pretense and posturing," *Moulton v. U.S. Steel Corp.*, 581 F.3d 344, 351 (6th Cir. 2009), but rather knock-down, drag-out fights over (for example) class certification, admissibility of expert testimony, and the propriety of summary judgment.  The result of these fights ultimately led experienced counsel and sophisticated clients to reasonably choose negotiated settlements rather than continued litigation.  There is absolutely no basis for this Court or any objector to suspect any of the nine settlements reached between IPPs and Defendants are the result of fraud or collusion.  This Court rejects completely the inflammatory and conclusory accusations of fraud by *pro se* objector Andrews.

**Complexity, Expense, and Likely Duration of the Litigation**

The complexity, expense, and likely additional duration of this litigation clearly favor voluntary settlement of the class claims rather than continued fighting.  Class Counsel invested substantial attorney time and litigation expenses, in the form of discovery and motion practice, before reaching the nine settlements.  There remained the prospect of a lengthy trial, post-trial motions, and appeals from a jury's verdict.  This would have generated additional fees and costs, and would have delayed recovery (if any) by IPP class members.

Moreover, the IPPs' case involved multiple defendants and a lengthy Class Period, requiring Plaintiffs to discover facts against each Defendant; prepare for a trial where they would have to address

9

and overcome each Defendant-specific argument; and prove to a jury that the alleged conspiracy extended over the entire decade-long conspiracy period.  In light of ongoing litigation risks, this factor weighs heavily in favor of approving the nine settlements.

### Amount of Discovery Engaged in by the Parties

Before entering settlement discussions, Class Counsel received document productions from Defendants and third parties totaling nearly 4 million pages, and participated in more than 150 fact and expert witness depositions.  Class Counsel also reviewed expert reports from nearly a dozen defense expert witnesses, and were repeatedly called upon to defend the opinions of IPPs' own damages expert, Dr. Lamb, at deposition, in briefing, and at hearings.  "All of this discovery matters for settlement purposes because it provides [both IPPs] and the settling Defendants with a clear picture of the relative merits of claims and defenses.  The parties entered into these settlements with full view of the evidentiary record to assess the class claims." (Doc. 1971 at 7 (approving settlements with DPPs)).  *Cf. Olden v. Gardner*, 294 F. App'x 210, 218 (6th Cir. 2008) (explaining that the lack of pre-settlement discovery can "weaken[] the class counsels' ability to advocate effectively for the plaintiff class during settlement negotiations and therefore suggests that the settlement was not fair, reasonable, and adequate").

In sum, the lengthy and thorough discovery undertaken by IPPs, together with their testing (through summary judgment and *Daubert* motions) of the strength of the facts discovered, supplied IPPs with a clear picture of what their class claims were worth.  Accordingly, this factor weighs in favor of final approval.

**Likelihood of Success on the Merits**

"The most important of the factors to be considered in reviewing a settlement is the probability of success on the merits. The likelihood of success, in turn, provides a gauge from which the benefits of the settlement must be measured." *In re Gen. Tire & Rubber Co. Sec. Litig.*, 726 F.2d 1075, 1086 (6th Cir. 1984) (citation omitted).  Both IPPs and Defendants faced substantial risk if this case proceeded to trial.  As previously noted: "In this Court's view, a jury could return (1) a no-liability verdict with respect to some or all Defendants, or (2) a substantially smaller damages figure than is contemplated by [Dr. Lamb's] best-case scenario assumptions, or (3) a 'home run' for the Class." *In re Polyurethane Foam Antitrust Litig.*, 2015 WL 1639269, at *5.

At trial, Defendants would have attacked the IPPs from many angles.  Each Defendant would have worked to separate itself from the crowd of co-defendants, contesting proof of conspiratorial agreement and antitrust impact.  At a more fundamental level, IPPs had to develop a persuasive, coherent explanation, understandable by lay jurors, that (1) "connected the dots" to show conspiracy through use of e-mail, fax, phone conversations, and the use of price increase announcements ("PIA") over a ten-year-plus Class Period; and (2) illustrated the fact and amount of "pass-through damages." Moreover, Defendants would surely appeal any adverse verdict, and "this Court's class certification decision (among other important interlocutory rulings) [would] be fair game for appellate review" (Doc. 1534 at 7–8).  It must also be noted there is some evidence that a few Defendants might have been judgment-proof (Doc. 1988-1 at 9–17 (accurately summarizing the risks of going to trial)).  All this makes clear that collecting a judgment from Defendants was far from guaranteed.

In light of these trial challenges, the benefit of the settlements is substantial.  The total potential settlement amount of $151.25 million equates to more than 54% of the total, uncapped class damages

estimated by Dr. Lamb using chemical manufacturer cost data, and 87% of the total estimated class damages using this data if pass-through is capped at 100% of the direct purchaser overcharge.  Class Counsel states the $151.25 million total settlement amount is the fourth largest antitrust recovery obtained by an indirect purchaser class in the United States.

Given the real possibility that IPPs could have received much less -- even zero -- from a jury at trial or following an appeal, this factor also weighs in favor of approval.

### Opinions of Class Counsel and Class Representatives

This Court easily credits the opinion of Class Counsel that the settlements do provide fair, reasonable, and adequate compensation for a release of the class claims.  Class Counsel has extensive experience litigating class actions, including leadership roles in similarly large antitrust cases.  *See, e.g.*, *Glickenhaus & Co. v. Household Int'l, Inc.*, 787 F.3d 408, 412 (7th Cir. 2015) (liaison counsel Marvin Miller, who is Lead Class Counsel in this case, was part of the trial team in a securities class action that obtained a jury verdict of $2.46 billion); *Messner v. Evanston Northwestern Healthcare Corp. Antitrust Litig.*, 2013 WL 6490152 (N.D. Ill. 2013) (co-lead class counsel Marvin Miller, who is Lead Class Counsel in this case, obtained reversal of the denial of class certification of an antitrust class).  Class Counsel has spent tens of thousands of hours learning the strengths and weaknesses of IPPs' claims.  Further, the Class Representatives have at least implicitly endorsed the settlements by virtue of having already submitted claims or indicating their intention to do so.

In sum, this Court has no reason to second-guess Class Counsel's conclusion that these settlements are in the best interest of the IPP class.

### Reaction of Absent Class Members

The size of the class of IPPs in this case is enormous; indeed, in a brief submitted to the Supreme Court, defense counsel characterized this case as "likely the largest class action ever

12

certified." Petition for Writ of Certiorari at 2, *Carpenter Co. v. Ace Foam, Inc.*, 135 S. Ct. 1493 (2015) (No. 14-577). Nonetheless, only a handful of class members have chosen to opt out of the settlements.[3]

Further, another small group of objections, filed by serial objectors, are not well-taken. In contrast, over 27,000 individuals and businesses have so far filed claims. None of the business or institutional entities, the largest potential claimants, has opted out or filed an objection.

These statistics weigh in favor of final approval. "That the overwhelming majority of class members have elected to remain in the Settlement Class, without objection, constitutes the 'reaction of the class,' as a whole, and demonstrates that the Settlement is 'fair, reasonable, and adequate.'" *In re Cardizem CD Antitrust Litig.*, 218 F.R.D. 508, 527 (E.D. Mich. 2003).

**The Public Interest**

Resolution of disputes through settlement rather than trial is normally in the public interest, as settlement serves to conserve scarce judicial resources. Further, "[s]ettlement of this antitrust action serves the public interest by ensuring effective enforcement of the antitrust laws and deterrence of anti-competitive conduct in the marketplace." *In re Cardizem*, 218 F.R.D. at 530. No party has suggested (and this Court does not apprehend) any legitimate countervailing interest that weighs against settlement approval.

**Treatment of the Named Plaintiffs**

A settlement can be unfair if it "gives preferential treatment to the named plaintiffs while only perfunctory relief to unnamed class members." *Vassalle*, 708 F.3d at 755 (internal quotation marks

---

[3]
      Class counsel explains that eight entities or individuals have requested exclusion, but: (1) three have done so even though they are *direct* purchasers -- that is, not members of the IPP class -- but want to make clear they will not be bound by orders in this case; (2) one is a school in Pennsylvania, which is not a Class State; (3) two have not provided the requisite information about their purchases; (4) one submitted the exclusion request after the deadline; and (5) one purchased two pillows for a total of $10.

omitted). In this case, it is clear that the unnamed class members are receiving much more than "perfunctory relief." The vast bulk of the settlement funds in this case will *not* be received by the named, representative Plaintiffs, most of whom are individuals with relatively small claims. Rather, the settlement funds will be distributed in a straightforward fashion, *pro rata*, to every claimant equally.

This is very different from the circumstances in *Vassalle*, where the named plaintiffs each received $2,000 plus exoneration of debts, while the unnamed class members received no money and their debts were not exonerated. *Id.* at 755–56. The disparity in *Vassalle* was stark, amounting to essentially *no* relief to unnamed class members. That is certainly not the case here.

### OBJECTIONS

The *UAW* / *Vassalle* factors listed above each weigh in favor of final approval. This Court has also carefully examined the submissions filed by the objectors, who contend various aspects of the nine settlement agreements are unfair. The IPPs have responded to all the objections on the merits, but also spend several pages detailing the background of each objector. To varying degrees, IPPs assert that all the objectors (1) are serial objectors; (2) have improper motives; (3) plainly misstate the facts; (4) offer boilerplate language they have presented to other courts unsuccessfully; (5) have suffered serious disciplinary proceedings; (6) make scurrilous, unfounded accusations (*e.g.*, perjury and fraud by IPP counsel); and/or (7) make extortionist threats. Except for the fact that objector CCAF has appeared and objected in numerous other class-action cases, these characterizations do *not* apply to CCAF -- CCAF's objection is lucid and filed in good faith. In contrast, *all* these characterizations *do* apply to objector Narkin, and at least some apply to every other objector. IPPs ask this Court to impose sanctions against at least some of the objectors, and also to require each objector to post a bond for any appeal.

14

"It is undisputed that some objectors add value to the class-action settlement process by: (1) transforming the fairness hearing into a truly adversarial proceeding; (2) supplying the Court with both precedent and argument to gauge the reasonableness of the settlement and lead counsel's fee request; and (3) preventing collusion between lead plaintiff and defendants." *In re Cardinal Health, Inc. Sec. Litig.*, 550 F. Supp. 2d 751, 753 (S.D. Ohio 2008). Unfortunately, however, "class actions also attract those in the legal profession who subsist primarily off of the skill and labor of, to say nothing of the risk borne by, more capable attorneys. These are the opportunistic objectors. Although they contribute nothing to the class, they object to the settlement, thereby obstructing payment to lead counsel or the class in the hope that lead plaintiff will pay them to go away." *Id.* at 754.

Several of the objectors in this case clearly fall into the latter category. Nonetheless, this Court chooses not to impose any sanction -- at least now. Even objector Andrews, who repeatedly makes baseless accusations using inappropriate language (*e.g.*, Doc. 1928 at 43) (asserting Class Counsel engaged in "high on meth document discovery review"), also identifies a few legitimate concerns (*e.g.*, Doc. 1920 at 9) (questioning why counsel did not identify specific potential *cy pres* beneficiaries in the settlement agreement). Andrews deserves opprobrium, but his objection is not entirely devoid of color. Accordingly, even though the objectors raise many unfounded, conclusory, and frivolous objections, this Court will simply focus on the merits of the objections that deserve analysis.

### Content of Forms and Claims Administration Process

Objector Andrews offers a litany of questions as a means of complaining about the claims process and claim forms. For example, he asks (Doc. 1920):

1.   Why do claimants have to provide a social security number?

2.   Why do they have to check off each separate settlement from which exclusion is desired, rather than check off the ones in which they want to be included?

15

3.      Why don't claimants receive acknowledgment of their claim by the Administrator?

4.      Why is it not stated how long it will take for checks to arrive?

Of course, there are good answers to each of these questions:

1.      To prevent fraud and comply with potential tax requirements.

2.      To make a claimant's participation in all settlements more likely.

3.      Because it would increase administrative costs.

4.      Because it is impossible to predict accurately how long it will take to investigate spurious claims and finally determine benefit amounts.

None of the issues Andrews raises suggests the design of the claim forms or the claims administration process carries any meaningful or serious faults.

Andrews also challenges the requirements for opting-out. For example, Andrews asks (1) Why can't opt-outs file their form online instead of having to mail it in?; and (2) Why are opt-outs asked to provide "unnecessary" information, such as which particular settlements they want to opt out of, and what foam-products they bought? It suffices to say, again, there are good answers to these questions and Andrews does not identify any serious faults in the opt-out process. Indeed, even if the occasional suggestion Andrews offers is reasonable, he does not show the existing format is *unreasonable*. And, so long as the settlement agreements and the processes used to effectuate them are "fair, reasonable, and adequate," Federal Civil Rule 23(e)(2), this Court has no reason to disapprove them.

In a two-page objection, Sweeney offers a list of boilerplate, conclusory assertions, including the "[c]laims administration process fails to require reliable oversight, accountability, and reporting about whether the claims process actually delivers what was promised;" and the claim "[t]imeframes and deadlines benefit Defendants and Class Counsel, but not Class Members" (Doc. 1968). Sweeney

16

offers absolutely no analysis or factual support for these statements. His objections, like Andrews, are also overruled.

### Plan of Allocation

Andrews asserts there "should be a minimum distribution amount set, say $10.00, because a de minimis threshold is necessary to ensure an efficient allocation of the settlement fund" (Doc. 1920 at 8–9). The effect of such a threshold, however, would be -- if anything -- to deprive a number of class members with low-value claims from receiving any payment. While it is true there comes a point where the cost of sending a check for settlement benefits can exceed the value of the check itself, it is also true that "something is better than nothing" in a class settlement. *In re Whirlpool Corp. Front-Loading Washer Prods. Liab. Litig.*, 2010 WL 2756947, at *3 n.3 (N.D. Ohio 2010) (citing *In re Bridgestone/Firestone, Inc.*, 288 F.3d 1012, 1015–16 (7th Cir. 2002)), *aff'd*, 722 F.3d 838 (6th Cir. 2013); *see also Miller v. Ghirardelli Chocolate Co.*, 2015 WL 758094, at *1 (N.D. Cal. 2015) (granting final approval of a class settlement where claimants received up to $1.50 per uncorroborated product purchase, up to a maximum of $24). Andrews may be correct that it is appropriate for *some* settlements to have a minimum distribution amount, but he has not shown it is inappropriate for the settlements in this case not to have one.

Objector Cochran offers a different criticism, complaining that, by "weighting" various claims (*e.g.*, bedding claims are weighted at 80% while carpet claims are weighted at 90%), the Plan of Allocation "sets improper limits on the amount that a claimant may receive for each Qualifying Claim" (Doc. 1964 at 1). Cochran implies that a claim for a $1,000 mattress should be weighted at 100%, not 80%, and the 80% weighting deprives the claimant of funds he is due: "If the entire amount of the Net Settlement Fund is not consumed by filed claims at the existing caps, the caps should be removed and the entire Settlement Fund paid out to the claimants *pro rata*." *Id.* at 3.

17

This objection is not well-taken for three reasons.  First, the mattress is not made up entirely of foam, so the purchaser is not entitled to 100% of the purchase price as damages.  Second, even if the mattress was 100% foam, the "pass through" of illegal foam markup attributable to the final mattress price is not 100% of that price.  In other words, the weightings reflect a reasonable estimate of the relative proportions of how much the illegal foam markup affected the total price of different categories of a final product.  And third, it is already clear that "the entire amount of the Net Settlement Fund" *will* be "consumed by filed claims at the existing caps" (*id.*).

**Incentive Awards**

The settlements provide for a total of $200,000 in incentive awards for the Class Representatives -- $10,000 each for the 13 individuals, and $35,000 each for the two companies.[4] Andrews asserts these awards "may be excessive" and suggests it will create an "unfair disparity" between the named Plaintiffs and the unnamed class members.  Andrews cites *Vassalle*, 708 F.3rd 747, where the Sixth Circuit reversed final approval of a class settlement because, among other things, "the disparity in the relief afforded under the settlement to the named plaintiffs, on the one hand, and the unnamed class members, on the other hand, made the settlement unfair."  *Id.* at 755.

As noted above, the disparity in *Vassalle* was stark, amounting to essentially no relief to unnamed class members, compared with $2,000 incentive awards to the representative plaintiffs.  In other words, *all* the available compensation went to the named plaintiffs.  In this case, there will be over $100 million available to all claimants on a *pro rata* basis; the $200,000 in incentive awards will amount to less than 0.2% of the total payments.  There is no unfair disparity.

---

[4]  Objectors Andrews, Hinojosa, and Cannata all state the incentive awards will be $285,000, but their math is incorrect -- the total will be $200,000.  Hinojosa simply asserts "the requested $285,000 in incentive payments" is excessive, without any analysis or explanation (Doc. 1967 at 1).  Cannata does even less, merely asserting that all requested fees and awards are unreasonable (Doc. 1950 at 1).  This Court's analysis of Andrews' objection applies equally to Hinojosa and Cannata.

18

Moreover, the Sixth Circuit has endorsed the use of incentive awards. *See Hadix v. Johnson*, 322 F.3d 895, 897 (6th Cir. 2003) ("Numerous courts have authorized incentive awards . . . [as] efficacious ways of encouraging members of a class to become class representatives and rewarding individual efforts taken on behalf of the class."); *see also* Doc. 1971 at 23–24 (granting final approval to the DPP settlement agreements and noting, "[d]istrict courts in this Circuit routinely grant incentive awards to representative plaintiffs in antitrust matters, when the representative plaintiff actively participates in the litigation") (citing cases).

The incentive awards of $10,000 each for the individuals and $35,000 each for the companies are well within an appropriate range. And this Court accepts Class Counsel's explanation that "[t]he requested incentive award for the corporate plaintiffs is higher than for the individuals because . . . [the corporations] did a more substantial amount of work on the case -- reviewing and producing a much larger quantity of documents and making their corporate executive available for lengthy depositions" (Doc. 1997 at 21).

**Amount of Damages versus Amount of Settlements**

Several objectors suggest the settlement results are so unimpressive that the settlement agreements are inadequate. Cochran characterizes the settlements as "a very modest result," "decidedly mediocre," and "underwhelming" (Doc. 1964 at 3, 5). Narkin asserts "[t]here is no adequate showing that the proposed Settlement bears any relationship to the alleged damages inflicted by Defendant [sic] on Plaintiffs" (Doc. 1965 at 1). And Andrews throws muck by asking rhetorically "what are the highest single damages calculated by the expert that the class can recover before [trebling]?"; and suggesting the $151.25 million total settlement is inadequate by quoting the statistic that wholesale U.S. mattress revenues in 2012 were $6.8 billion (Doc. 1920 at 7–8).

19

This Court rejects these mischaracterizations.  Addressing Andrews' objection first, the answer to his question is that IPP expert Dr. Lamb calculated damages in this case using four different methods.  The first method was to use chemical price data published by Independent Chemical Information Services ("ICIS"), and *not* capping the possible pass-through at 100%, which yielded a damages calculation of $2.2 billion.  The second method was to use ICIS chemical price data and capping the possible pass-through at 100%, which yielded a damages calculation of $1.25 billion.  The third was to use data obtained by the DPPs from Defendants' own chemical suppliers, and not capping the possible pass-through at 100%, which yielded a damages calculation of $279.5 million.  And the fourth was to use data obtained by the DPPs from Defendants' own chemical suppliers and capping the possible pass-through at 100%, which yielded a damages calculation of $173.3 million.  During *Daubert* briefing, Defendants insisted the lowest number was more reliable than the other three.

Calculated against these different damage assessments, the $151.25 million settlement is, respectively, 7%, or 12%, or 54%, or 87% of Lamb's estimates.  Measured in this way, it is unfair to call the $151.25 million settlement "mediocre."  For example, IPPs cite *In re Rite Aid Corp. Securities Litigation*, 146 F. Supp. 2d 706, 715 (E.D. Pa. 2001), which observed that, since 1995, securities class action settlements "have recovered between 5.5% and 6.2% of the class members' estimated losses."  In *Van Horn v. Nationwide Property & Casualty Insurance Co.*, 2010 WL 1751995 (N.D. Ohio 2010) *aff'd*, 436 F. App'x 496 (6th Cir. 2011), the court described the settlement result -- where class members received approximately 50% of their actual damages in a *simple contract* case -- as "a moderately good one."  *Id.* at *5.  And in the DPP case, this Court described the settlement as "excellent," where it represented "roughly 52 percent of [Plaintiff expert] Leitzinger's damages model prior to trebling."  Doc. 1971 at 15.  These comparisons undermine any argument that the result in this case is inadequate.

20

Further, the statistic cited by Andrews -- that wholesale U.S. mattress revenues in 2012 were $6.8 billion -- is a *non sequitur*. This figure does not in any way measure the "antitrust markup / pass-through" at issue, which is how damages must be measured, much less account for the fact that the class definition does not include numerous states.

More important, "[i]t is well-settled that a cash settlement amounting to only a fraction of the potential recovery will not *per se* render the settlement inadequate or unfair. Indeed, there is no reason, at least in theory, why a satisfactory settlement could not amount to a hundredth or even a thousandth part of a single percent of the potential recovery." *In re Bear Stearns Cos., Inc. Sec. Litig.*, 909 F. Supp. 2d 259, 270 (S.D.N.Y.2012) (citations and internal quotation marks omitted). The propriety of a settlement must be assessed as "a function of both (1) the size of the amount relative to the best possible recovery; and (2) the likelihood of non-recovery (or reduced recovery)." *Id.* Here, there was a very real risk of complete non-recovery, and the ratio of actual recovery to best-possible recovery is, at the least, above average. The possibility "that the settlement could have been better . . . does not mean the settlement presented was not fair, reasonable or adequate," because "[s]ettlement is the offspring of compromise; the question . . . is not whether the final product could be prettier, smarter or snazzier, but whether it is fair, adequate and free from collusion." *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1027 (9th Cir. 1998).

The objectors' armchair-quarterbacking and wishing-for-more does not provide valid grounds to disapprove the settlements. The objection that the settlement is insufficient, inadequate, or unfair is not well-taken.

**Matters Not Mentioned in the Class Notice**

***Contingent Amounts.*** Although the Class Notice lists nine settlement amounts and the $151.25 million total, it does not state that $9.25 million (6.1%) is contingent upon whether Defendants Hickory

Springs and Future Foam succeed in separate litigation against Dow Chemical.  Nor does it state that $10 million (6.6%) will not be paid into the settlement escrow account(s) for some period of time. Objector CCAF argues the Notice is therefore deficient.

CCAF cites to no case directly on point; rather, it cites cases for the general proposition that "notice must be of such nature as reasonably to convey the required information, and it must afford a reasonable time for those interested to make their appearance." *Mullane v. Central Hanover Bank*, 339 U.S. 306, 314 (1950) (citation omitted).  CCAF also cites cases where the court found notice was insufficient, but those scenarios are egregious.  *See, e.g.*, *In re Katrina Canal Breaches Litig.*, 628 F.3d 185, 198 (5th Cir. 2010) (finding notice insufficient because "the notice did not inform class members of the possibility that they would not receive *any* direct benefit from the settlement" and "does not clearly inform class members of the real possibility, acknowledged by all parties, that there may be [*only*] a *cy pres* distribution *in lieu of* any direct distribution of funds to the class members") (emphasis added).  Indeed, *Katrina* also emphasized that class notice "is not required to provide a complete source of settlement information."  *Id.* at 197 (quoting *Maher v. Zapata Corp.*, 714 F.2d 436, 452 (5th Cir. 1983)).

In *Vassalle*, the Sixth Circuit set out the relevant standard for assessing whether class notice is adequate:

> [D]ue process requires that notice to the class be reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections.  Due process, however, does not require the notice to set forth every ground on which class members might object to the settlement.  Rather, all that the notice must do is fairly apprise the prospective members of the class of the terms of the proposed settlement so that class members may come to their own conclusions about whether the settlement serves their interests.

*Vassalle*, 708 F.3d 747, 759 (6th Cir. 2013) (citations and internal quotation marks omitted).

22

The Notice in this case meets this standard.  The Notice directs class members to the website www.polyfoamclassaction.com, where the full settlement agreements are posted. The amount of contingent funds is only 6.1% of the total, which is highly unlikely to be a decisive factor in whether a class member would decide to participate or instead opt out.[5]  The same conclusion is all the more true with respect to settlement funds that are payable over the next two years instead of immediately. *See, e.g.*, *In re Oral Sodium Phosphate Solution-Based Prods. Liab. Action*, No. 09-SP-80000, Doc. 427 (N.D. Ohio 2015) (documenting the history of seven payments of settlement benefits to class members over a period of more than five years).  Nor is it unusual for class action claimants to receive their first payment over a year after submitting their claim (Doc. 2010-1 at 1–3).

*Identity of Cy Pres Beneficiaries.*  Several objectors raised issues related to *cy pres* beneficiaries.  One issue is whether Class Notice was inadequate because it did not identify with particularity the entities that might receive settlement funds pursuant to the *cy pres* doctrine.  The second issue is whether it is appropriate for the settlement agreements to provide for *cy pres* distribution of settlement proceeds *at all*.  This Court addresses the first issue now and the second issue later.

Objector CCAF, and to a lesser extent objector Andrews, take issue with the failure of Class Notice to provide the specific identities of potential *cy pres* beneficiaries.  The Notice does explain that "it is possible that any money remaining after claims are paid will be distributed to charities or other beneficiaries approved by the Court" (Doc. 1860 at 16), but gives no other information.  The Plan of Allocation adds only this (*id.* at 27):

---

[5]

   For example, a $1,000 mattress claim will be valued at 80% ($800), and will then ultimately be assigned a *pro rata* payment of, say, 20% ($160) -- probably less.  The contingent settlement funds (assuming all are received) would pay only 6.1% of this amount, or about $9.75 of this $160.  This potential difference is unlikely to be a factor in the class member's decision to participate or opt out, especially when the alternative is to bring an independent lawsuit.

> In the event there are Settlement Funds remaining after distribution of all payments to Eligible Claimants according to Section III of this Plan of Allocation, the remaining Funds will be distributed to charities or other beneficiaries that have objectives related as closely as possible to the purposes and remedies sought by the class action. These beneficiaries will be suggested by Lead Counsel and are subject to approval by the Court at the appropriate time, if circumstances warrant.

Thus, class members do not know, before electing to participate or not, whether there will be a *cy pres* distribution and if so, to whom.

CCAF does provide support for the proposition that *cy pres* beneficiaries must be disclosed with particularity at the time of settlement. In *Dennis v. Kellogg Co.*, 697 F.3d 858 (9th Cir. 2012), the benefits provided by the class-action settlement agreement included (1) $2.75 million, used to pay eligible claimants up to $15 each; (2) donation of any left-over funds -- which, ultimately, amounted to almost $2 million -- "to unidentified 'charities chosen by the parties and approved by the Court pursuant to the *cy pres* doctrine'"; and (3) donation of $5.5 million worth of specific Kellogg food items to charities that feed the indigent. *Id.* at 862–63. The district court granted final approval to the settlement agreement, but the appellate court reversed, because (i) the agreement did not specifically identify the *cy pres* recipients; and (ii) the category of charities mentioned, although laudable, had nothing to do with the purpose of the lawsuit (rectifying false advertising) or the plaintiffs involved (purchasers of Kellogg's cereal). The *Dennis* court added that its "concerns are not placated by the settlement provision that the charities will be identified at a later date and approved by the court." *Id.* at 867.

Several other federal appellate courts, however, disagree with *Dennis*. In *Baby Products Antitrust Litig.*, 708 F.3d 163, 180 (3d Cir. 2013), the court reversed final approval and remanded for further consideration because the district court could not have known how large a portion of the settlement funds would ultimately be distributed *cy pres* instead of to members of the class -- $18.5

million out of the $35.5 million settlement.  Importantly, however, the *Baby Products* court also held that the "failure to identify the *cy pres* recipients [in the settlement agreement and class notice] is not a due process violation.  Class members know there is a possibility of a *cy pres* award and that the Court will select among recipients proposed by the parties at a later date.  This knowledge is adequate to allow any interested class member to keep apprised of the *cy pres* recipient selection process."  *Id.* at 180.  Even though the *Baby Products* court agreed with and cited *Dennis* for other propositions, *id.* at 178, it simply disagreed with *Dennis* on the necessity of listing specific *cy pres* beneficiaries in the class notice.

This Court has found another appellate case that sets out a well-considered approach for choosing between *Dennis* and *Baby Products*.  In *BankAmerica Corp. Sec. Litig.*, 775 F.3d 1060 (8th Cir. 2015), after the district court granted final approval of a class action settlement, the claims administration process proceeded to the point where $2.44 million remained in the $333.2 million settlement fund.  *Id.* at 1062.  Class counsel asked that this remainder be distributed as follows: (1) a final, additional attorney fee award of $98,000; and (2) the rest ($2.34 million) to three charities suggested by class counsel.  *Id.*  The district court granted the motion but the appellate court reversed, finding several problems with the *cy pres* distribution process, including the large amount and the choice of recipients.  *Id.* at 1064–67.

Relevant to CCAF's objection, the *BankAmerica* court also discussed under what circumstances class notice will be inadequate for failing to identify the *cy pres* recipients.  The court concluded: "[The objector] argues that the award must be reversed because [class counsel] did not notify the class of its motion for a *cy pres* distribution. We agree that, *unless the amount of funds to be distributed cy pres is de minimis*, the district court should make a *cy pres* proposal publicly available and allow class

members to object or suggest alternative recipients before this court selects a *cy pres* recipient. This gives class members a voice in choosing a 'next best' third party [*cy pres* recipient] and minimizes any appearance of judicial overreaching." *Id.* at 1066 (emphasis added) (citing *Baby Prods.*, 708 F.3d at 180).

In this case, as discussed below, any *cy pres* distribution will be *de minimis*. Unlike *Dennis*, *Baby Products*, and *BankAmerica*, where the *cy pres* distributions were in the millions of dollars, a *cy pres* distribution in this case will occur only after "the marginal cost of making an additional pro rata distribution to the class members exceeds the amount available for distribution." *Klier v. Elf Atochem N. America, Inc.*, 658 F.3d 468, 475 n.15 (5th Cir. 2011). As *BankAmerica* suggests, even under the more stringent standard, class notice may be silent about the identity of recipients of *de minimis cy pres* distributions without violating Rule 23. Those are the circumstances present in this case. Accordingly, CCAF's objection is not well-taken.

Having concluded that Class Notice in this case is fair and adequate, despite its silence about the identity of potential *cy pres* recipients, this Court also adds that CCAF has nonetheless identified a best practice. Especially because the term "*de minimis*" carries no precise definition, and also in the interest of full disclosure, this Court agrees that class counsel in most cases would be wise to identify in their class action settlement precisely what entities may receive *cy pres* distributions. This practice increases transparency and minimizes the likelihood that a settlement agreement will not receive final approval, or that approval is reversed on appeal.

Accordingly, rather than put this issue off until the claims administration process comes to a close, this Court orders as follows.

Within thirty (30) days of the date of this Order, Lead Counsel shall submit a proposal identifying the "charities or other beneficiaries that have objectives related as closely as possible to the

purposes and remedies sought by the class action," to whom any *cy pres* distributions will be made. Doc. 1860 at 27; *see also BankAmerica*, 775 F.3d at 1067 (adding that "unclaimed funds should be distributed for a purpose as near as possible to the legitimate objectives underlying the lawsuit, the interests of class members, and the interests of those similarly situated" and noting that the geographic distribution of *cy pres* funds should be similar to the geographic scope of the class). This Court commends to Class Counsel, as they consider potential *cy pres* recipients, the above-cited cases, as well as: *Nachshin v. AOL, LLC*, 663 F.3d 1034, 1038 (9th Cir. 2011) (discussing mechanisms necessary to correct "some court[s'] . . . abandon[ment of] the 'next best use' principle implicit in the *cy pres* doctrine"); *Pearson v. NBTY, Inc.*, 772 F.3d 778 (7th Cir. 2014); and the American Law Institute's *Principles of the Law of Aggregate Litigation* ("ALI *Principles*") § 3.07 (2010) (often cited in these cases). *See also* discussion at the final fairness hearing (Doc. 2018 at 33–36, 43–45, 49–50).

### *Cy Pres* **Distribution**

Objector Cochran takes issue not with the absence in the Class Notice of the identity of *cy pres* beneficiaries, but with any *cy pres* distributions at all. For example, Cochran asserts that "no settlement money may be paid to *cy pres* [sic] *until every class member who has filed a claim has received 100% of alleged damages*, which in this case would include treble and punitive damages" (Doc. 1964 at 1–2) (emphasis changed from original). In support of this assertion, Cochran cites *Klier* and *BankAmerica*. But these authorities do not stand for the proposition Cochran asserts. Rather, *Klier* states as follows:

> Because the settlement funds are the property of the class, a *cy pres* distribution to a third party of unclaimed settlement funds is permissible "*only when it is not feasible to make further distributions to class members*" [quoting ALI *Principles* § 3.07 cmt. a]. Where it is still logistically feasible and economically viable to make additional pro rata distributions to class members, the district court should do so, except where an additional distribution would provide a windfall to class members with liquidated-damages claims that were 100 percent satisfied by the initial distribution. A cy *pres* distribution puts settlement funds to their next-best use by providing an indirect benefit to the class. That option arises only if it is not possible to put those funds to their very best use: benefitting the class members directly.

27

*Klier*, 658 F.3d 468 at 475 (emphasis added, footnotes omitted).  *BankAmerica* quoted with approval this language from *Klier*, and also quoted the entirety of ALI *Principles* § 3.07 which is increasingly followed by appellate courts.  *See Bank America*, 775 F.3d at 1063–64.

The essence of these authorities is that a "*cy pres* award is supposed to be limited to money that can't feasibly be awarded to the intended beneficiaries."  *Pearson*, 772 F.3d at 784.  This will occur, for example, when "the amounts involved are too small to make individual distributions economically viable."  ALI *Principles* § 3.07(b).  The *Klier* court explains:

> In large class actions, substantial administrative costs attend the distribution of settlement funds.  As the settlement funds are disbursed and the amount still available for distribution to the class declines, there comes a point at which the marginal cost of making an additional pro rata distribution to the class members exceeds the amount available for distribution.  It is only at this point that a district court has discretion to order a *cy pres* distribution.

*Klier*, 658 F.3d at 475 n.15 (internal citation omitted).

In this case, Class Counsel and the Claims Administrator have made clear that the claims administration process will follow the precepts set out above.  Specifically, the Claims Administrator explained that (1) there will be at least two distributions; (2) expectations are that, after all distributions are made, "[less] than $50,000 will remain as residual," mostly due to uncashed checks; and (3) "To avoid having leftover funds at the completion of the settlement process and to ensure the residual balance remaining in the fund after the initial and subsequent distributions are distributed to the Class to the greatest extent possible, [the Claims Administrator] will undertake an analysis, in consultation with Class Counsel, to determine whether it is economically feasible to perform additional rounds of distributions to class members" (Declaration of Eric Miller (Doc. 2010-1) at ¶¶ 7, 9).  Only after funds have "reach[ed] a point whe[re] it is no longer economical to continue making distributions" will the Administrator notify Class Counsel that "the [remaining] funds should become part of the residual for *cy pres* as stated in the Plan of Allocation and referenced in the Notice to the Class" (*id.* at ¶ 12).

28

In sum, this case is not like *Klier, BankAmerica*, or *Pearson*, where hundreds of thousands or even millions of dollars were directed to *cy pres* recipients instead of to class members.  Rather, *cy pres* distributions will be made only after it is no longer economically practical to make distributions to the class, and only with this Court's approval that this *de minimis* distribution is appropriate.

### ATTORNEY FEES

The single most-addressed issue raised by all the objectors is the amount of attorney fees and expenses requested by Class Counsel.  In addition to the amount of fees, objectors also challenge the timing of Counsel's receipt of fees, and how the fees are divided among Class Counsel.  This Court addresses these issues in reverse order.

### Division of Common Benefit Fees Between Counsel

Although the nine settlement agreements do not speak to how any fee award will be divided among IPP Class Counsel, the motion for fee award does state: "Lead Counsel also requests the Court's authorization to distribute the fees in a manner that, in the judgment of Lead Counsel, fairly compensates each firm for its contribution to the prosecution of Plaintiffs' claims" (Doc. 1987-1 at 14–15 n.1).  CCAF objects to this plan, asserting that "Rule 23(h) requires the district court to set and allocate the fee award.  It is legal error for the court to delegate the allocation of that fee award to a non-judicial third party or to defer to the allocation proposed by the attorneys themselves." (Doc. 1960 at 36).

CCAF is wrong.  Courts routinely permit counsel to divide common benefit fees among themselves.  *See, e.g.*, *In re Warfarin Sodium Antitrust Litig.*, 391 F.3d 516, 533 n.15 (3d Cir. 2004) (affirming the district court's decision to permit co-chairs of the Executive Committee to divide attorney fees according to their discretion, and declining to "deviate from the accepted practice of allowing counsel to apportion fees amongst themselves"); *In re Telectronics Pacing Sys., Inc.*, 137 F.

29

Supp. 2d 1029, 1033 (S.D. Ohio 2001) (approving distribution of a "single fee from which the [plaintiffs' Steering Committee] will allocate the attorneys' fees among the attorneys who provided a benefit to the Class"); *In re Broadwing, Inc. ERISA Litig.*, 252 F.R.D. 369, 383 (S.D. Ohio 2006) ("Class Counsel shall allocate the award of attorneys' fees among counsel for the Class based on their good-faith assessment of the contribution of such counsel to the prosecution of this Action."); *In re BP Propane Indirect Purchaser Antitrust Litig.*, No. 06-CV-3541, Doc. 209 at 2 (N.D. Ill. 2010) ("Any and all allocations of attorneys' fees and expenses shall be allocated among Plaintiffs' Counsel at the direction of Lead Counsel at its discretion, who shall apportion the fees and expenses based upon their assessment, in its sole discretion, of the respective contributions to the litigation made by each counsel.").

Furthermore, the Sixth Circuit has suggested it would adopt the approach approved in *Warfarin* and the other cases cited above.  In *Bowling v. Pfizer, Inc.*, 102 F.3d 777 (6th Cir. 1996), the objectors wanted to discover class counsel's fee-sharing agreements.  The district court denied discovery, stating it "will not become involved in how the counsel and court-appointed special counsel divide the total fee award."  *Id.* at 781.  The Sixth Circuit affirmed, observing:

> The district court examined the work performed by [both] class and special counsel and the value their work conferred upon the class.  Thus, the district court decided exactly what that *group* of attorneys' work was worth and then awarded a fee commensurate with that worth.  *How special counsel and class counsel ultimately divide that fee among themselves appears to be irrelevant.*  As long as class and special counsel are paid only what their collective work is worth, their distributions among themselves, even if done in a manner unrelated to the services a particular counsel has performed for the class, will in no way harm the class or negatively impact the fund from which the class's benefit is measured.

*Id.* (emphasis added).

CCAF cites one case that gives some support to its position.  *In re High Sulfur Content Gasoline Prods. Liab. Litig.*, 517 F.3d 220, 229 (5th Cir. 2008), reversed a common benefit fee award because

a five-member fee committee determined who would get what, and the district court rubber-stamped

their determination. *High Sulfur* contrasted that with circumstances where all the attorneys come to

agreement among themselves (*id.* at 234 (internal citations omitted)):

> Appellees cite several district court cases from this circuit in which courts . . . award[ed] a lump-sum attorneys' fee and allow[ed] counsel to divide up the award by agreement. That fee allocation procedure, however, is significantly different from the procedures used here. It is one thing for all attorneys to come to an agreement about dividing up fees, and quite another for five attorneys to declare how an award will cover themselves and seventy-four other attorneys with no meaningful judicial supervision or review.

*High Sulfur* is inapposite for two reasons. First, as between *High Sulfur* and *Bowling*, this Court

is bound to follow the latter which is from the Sixth Circuit. Second, from the beginning of this case,

all attorneys working as Class Counsel have long known the procedure for how any fee award would

be divided (*see* Doc. 29 at 2) (making Lead Counsel responsible for "[a]llocating among counsel any

attorneys fees that may be awarded by the Court (subject to the jurisdiction of the Court to resolve any

disputes related to such allocation)"). Unlike *High Sulfur*, where there was no fee agreement between

counsel, all the Plaintiffs' attorneys who participated in this case agreed (at least implicitly) to receive

remuneration under this mechanism.

Accordingly, the objection that this Court may not delegate to Lead Counsel the task of

allocating the fee award among Class Counsel is overruled. This Court adds, however, that if a fee

dispute does erupt -- and this Court does not expect one will -- this Court retains jurisdiction to settle

that dispute.

### Timing of Payment of Attorney Fee Awards

As noted earlier, of the $151.25 million in settlement funds, Defendants will have deposited

$88.5 million into escrow within fifteen (15) days of the date of this Order. There is another $10

million in payments payable over the next two years, plus $43.5 million payable once all appellate

rights are exhausted, plus $9.25 million in contingent funds.  Objector Cannata asserts that "Class Counsel's fees should be deferred until such time as the Court has received reports indicating the amount of monetary relief that has actually been delivered to the Class" (Doc. 1950 at 2).  Similarly, CCAF insists that "Counsel is not entitled to a fee award based on funds that may never materialize and never benefit the class" (Doc. 1960 at 21).  CCAF cites several cases where courts delayed payment to class counsel until the distribution process was complete.  *See, e.g.*, *Bowling v. Pfizer, Inc*., 102 F.3d 777, 780 (6th Cir. 1996) (affirming common benefit fee award consisting of an immediate payment of "10% of the $102.5 million that has been paid into the common fund to date," plus "up to $6.25 million more over the next ten years [based upon] . . . up to 10% of the [ten future] $6.25 million annual [settlement] payments").

This objection is well-taken, as Class Counsel concedes.  In fact, Class Counsel cites another case standing for the same proposition (Doc. 1991 at 40):

> Class Counsel has always been willing to wait to obtain the portion of its . . . fee until the contingency is satisfied and Defendants deposit such funds in escrow.  Courts have applied this sort of fee payment schedule in cases where there is a delayed payment into the fund.  *See, e.g.*, *In re Flonase Antitrust Litig*., 291 F.R.D. 93, 113 (E.D. Pa. 2013) (awarding 33⅓% of the amounts paid into the initial settlement fund "plus 33⅓% of any sums that may become part of the Settlement Fund after the calculation provided for in the Plan of Allocation").

It is worth noting there are good reasons for IPPs to agree that some of the settlement funds should not be payable immediately.  The delayed-payment mechanism was necessary in order to secure a larger total fund from Defendants, some of whom were at risk of bankruptcy and had already obligated themselves to pay other settlements to DPPs.  Ultimately, IPPs will get more money by agreeing to accept some of it as deferred or contingent.

That said, however, it is only fair that counsel and the class they represent are treated equally.  Class members will receive benefits, and Class Counsel will receive fees, only if and when funds

become available. Payment of common benefit attorney fees to IPP Class Counsel will be made on a percentage basis only as settlement funds are deposited into the settlement escrow account(s).

### The Amount of the Award of Attorney Fees and Expenses

In their fee petition, Class Counsel for IPPs asks this Court to (a) use the "percentage-of-the-fund" method to calculate a common benefit fee award; and (b) award a fee of 30% of the gross settlement amount of $151.25 million, which equals $45,375,000. IPPs also ask for reimbursement of $5,122,065.78 in expenses.

Objectors attack these figures in three ways, arguing (1) the 30% figure is too high; (2) Counsel's lodestar, which this Court must use as a cross-check against the 30% figure, is inflated; and (3) the percentage should be applied against the net settlement amount, not the gross amount. This Court examines the last contention first, and then weighs the other two objections together.

***Gross versus Net.*** Objectors Andrews and CCAF assert that any common benefit fee percentage should be assessed only after subtracting the $5.1 million in expenses, $200,000 in incentive awards, and roughly $1.57 million in notice costs (*see* Doc. 1920 at 23–24 (misstating some of these numbers); Doc. 1960 at 20–23). Andrews and CCAF cite several cases supporting this position. *See, e.g.*, *Pearson*, 772 F.3d at 781 ("[A]dministrative costs should not have been included in calculating the division of the spoils between class counsel and class members. Those costs are part of the settlement but not part of the value received from the settlement by the members of the class. The costs therefore shed no light on the fairness of the division of the settlement pie between class counsel and class members.") (internal quotation marks omitted); *In re Cardinal Health Inc. Secs. Litig.*, 528 F. Supp. 2d 752, 771 (S.D. Ohio 2007) ("The net recovery more truly approximates the amount of money that benefits the Class. Because the percentage approach is meant to align the attorneys' fees with the amount of money the class receives, the net recovery is a more appropriate metric.").

As CCAF concedes, however, other cases hold it is within the discretion of this Court to use the gross amount. *See, e.g.*, *In re Online DVD-Rental Antitrust Litig.*, 779 F.3d 934, 953 (9th Cir. 2015) ("The district court did not abuse its discretion in calculating the fee award as a percentage of the total settlement fund, including notice and administrative costs, and litigation expenses. We have repeatedly held that the reasonableness of attorneys' fees is not measured by the choice of the denominator. . . . [T]he choice of whether to base an attorneys' fee award on either net or gross recovery should not make a difference so long as the end result is reasonable.") (citations and internal quotation marks omitted); *Powers v. Eichen*, 229 F.3d 1249, 1258 (9th Cir. 2000) ("[T]he choice of whether to base an attorneys' fee award on either net or gross recovery should not make a difference so long as the end result is reasonable. Our case law teaches that the reasonableness of attorneys' fees is not measured by the choice of the denominator.").

Furthermore, numerous district courts in the Sixth Circuit have based fees on the gross settlement amount, and none have been reversed on that ground. *See, e.g.*, *In re Prandin Direct Purchaser Antitrust Litig.*, 2015 WL 1396473, at *4 (E.D. Mich. 2015) (granting fee award of one-third of the gross settlement fund); *In re Sulzer Orthopedics, Inc.*, 398 F.3d 778, 780–82 (6th Cir. 2005) (affirming individual fee awards made from a common benefit fund based on the gross settlement amount); *Bowling*, 102 F.3d at 779 ("It is within the district court's discretion to determine the 'appropriate method for calculating attorney's fees.'" (quoting *Rawlings v. Prudential-Bache Props., Inc.*, 9 F.3d 513, 516 (6th Cir.1993))).

Accordingly, this Court overrules objectors' assertion that, when using the "percentage-of-the-fund" method to determine a common benefit fee award, the percentage this Court chooses must be applied to the net settlement amount.

34

*The Fee Award.*  The Sixth Circuit directs district courts, "[w]hen awarding attorney's fees in a class action, [to] . . . make sure that counsel is fairly compensated for the amount of work done as well as for the results achieved." *Rawlings*, 9 F.3d at 516.  At the same time, however, the fee award must account for the reality that "[t]he interest of class counsel in obtaining fees is adverse to the interest of the class in obtaining recovery because the fees come out of the common fund set up for the benefit of the class." *Id.*; *see also Rodriguez v. West Publ'g Corp.*, 563 F.3d 948, 968 (9th Cir. 2009) ("At the fee-setting stage when fees are to come out of the settlement fund, the district court has a fiduciary role for the class.").

A court has available "two methods for calculating [common benefit] attorney's fees: the lodestar and the percentage-of-the-fund." *Van Horn v. Nationwide Prop. & Cas. Ins. Co.*, 436 F. App'x 496, 498 (6th Cir. 2011).  "District courts have discretion 'to select the more appropriate method for calculating attorney's fees in light of the unique characteristics of class actions in general, and of the unique circumstances of the actual cases before them.'" *Rawlings*, 9 F.3d at 516.  "The lodestar method better accounts for the amount of work done, while the percentage of the fund method more accurately reflects the results achieved." *Id.*

In this case, for three reasons, this Court elects to use the percentage-of-the-fund method, with a lodestar cross-check.  First, Class Counsel requests the percentage approach, and none of the objectors argue otherwise -- they argue only that the percentage requested is too high.  Second, "[i]n general, . . . percentage of the fund has been the preferred method for common fund cases, where there is a single pool of money and each class member is entitled to a share (*i.e.*, a 'common fund')." *Lonardo v. Travelers Indem. Co.*, 706 F. Supp. 2d 766, 789 (N.D. Ohio 2010); *see also Connectivity Sys. Inc. v. Nat'l City Bank*, 2011 WL 292008, at *13 (S.D. Ohio 2011) (the percentage-of-the-fund method "most closely approximates how lawyers are paid in the private market and incentivizes

lawyers to maximize class recovery, but in an efficient manner"). And third, the percentage-of-the-fund method avoids the need for highly-detailed examinations and calculations required when fact-checking the lodestar. *See In re Cardinal Health Inc. Sec. Litigs.*, 528 F. Supp. 2d 752, 761 (S.D. Ohio 2007) ("The lodestar method has been rightly criticized for . . . burdening district judges with the tedious task of auditing time records."). Still, "most courts adopting the percentage approach [also] conduct a 'lodestar cross-check' to prevent counsel from receiving a windfall. The cross-check requires the Court to calculate the lodestar multiplier in the case and ensure that the fee award is still *roughly* aligned with the amount of work the attorneys contributed." *Id.* at 764 (emphasis added).

When assessing the reasonableness of a fee award, courts examine these factors: "(1) the value of the benefit rendered to the plaintiff class; (2) the value of the services on an hourly basis; (3) whether the services were undertaken on a contingent fee basis; (4) society's stake in rewarding attorneys who produce such benefits in order to maintain an incentive to others; (5) the complexity of the litigation; and (6) the professional skill and standing of counsel involved on both sides." *Moulton v. U.S. Steel Corp.*, 581 F.3d 344, 352 (6th Cir. 2009) (quoting *Bowling,* 102 F.3d at 780). This Court's assessment of these factors in this case is as follows.

<u>Value of the Benefit Provided</u>. As discussed above, the value of the nine settlements is substantial. The total settlement amount is excellent, amounting to 87% of Dr. Lamb's most conservative damages model prior to trebling. *See Rodriguez*, 563 F.3d at 964 (except where the merits of a plaintiff's claims are very strong, "courts generally determine fairness of an antitrust class action settlement based on how it compensates the class for past injuries, without giving much, if any, consideration to treble damages"). And the settlements provide a clear benefit to the class: quick and certain payment of a portion of their damages on a *pro rata* basis.

Class Counsel's Fee Arrangement.  The representative Plaintiffs entered into contingent fee agreements with Class Counsel.  This Court has reviewed *in camera* copies of those agreements.  Each agreement conditions payment of attorney fees on recovery by the client, and several agreements specify that attorney fees will be at least 35% of the client recovery.  Class Counsel also have gone out-of-pocket for the heavy expenses of litigating the IPPs' case -- over $5.1 million.

Societal Interest in Rewarding Class Counsel.  "Attorneys who take on class action matters serve a benefit to society and the judicial process by enabling . . . small claimants to pool their claims and resources."  *In re Telectronics Pacing Sys., Inc.*, 137 F. Supp. 2d at 1043.  Moreover, "[s]ociety's interests are clearly furthered by the private prosecution of civil cases which further important public policy goals, such as vigorous competition by marketplace competitors."  *In re Se. Milk Antitrust Litig.*, 2013 WL 2155387, at *5 (E.D. Tenn. 2013).  Class Counsel's efforts are also notable for continuing despite significant delay in parallel criminal investigations, which produced results far more limited than this MDL lawsuit.

Case Complexity and Risk.  "Antitrust class actions are inherently complex. The legal and factual issues are complicated and highly uncertain in outcome."  *In re Skelaxin (Metaxalone) Antitrust Litig.*, 2014 WL 2946459, at *3 (E.D. Tenn. 2014).  In this case, the IPPs' success at trial would depend heavily on explaining the meaning of a vast web of communication between numerous alleged conspirators over a lengthy Class Period.  Plaintiffs faced substantial obstacles in establishing antitrust liability, causation, and damages.  It is still not clear how Class Counsel would have accomplished these tasks.  The nine settlements are impressive considering the difficulty of presenting this sprawling case to a jury.  Moreover, Class Counsel filed this suit as a putative class action during a period of change and uncertainty in class certification standards.  *See, e.g.*, *Whirlpool Corp. v. Glazer*, 133 S. Ct. 1722 (2013) (vacating decision affirming class certification and remanding for further consideration);

37

*Comcast Corp. v. Behrend*, 133 S. Ct. 1426 (2013) (reversing class certification in an antitrust action); *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541 (2011) (reversing class certification in a gender discrimination action).  In sum, Class Counsel undertook significant risk that they would not succeed in a complex case.

Skill and Reputation of Class and Defense Counsel.  Lead Counsel is a respected antitrust practitioner, litigating important antitrust matters in other courts while at the same time managing the IPPs' case.  *See Messner v. Evanston Nw. Healthcare Corp. Antitrust Litig.*, 2013 WL 6490152 (N.D. Ill. 2013).  Each Defendant was represented by top antitrust defense firms.  All counsel tackled the enormous task of discovery, the complicated legal and factual issues surrounding the class certification, the dispositive and *Daubert* motions, and the commitment to this complex litigation.

Value of Attorney Services.  Class Counsel invested a large amount of attorney time and money in prosecuting this case on behalf of the IPP Class.  Class Counsel submits a final lodestar calculation showing that (1) they spent a total of 75,361 hours (after some write-offs); (2) their rates, including secretaries through partner-level attorneys, ranged from $75 to $900, averaging $448; and (3) their total lodestar is about $33.74 million.  Class Counsel calculates this lodestar using historical hourly rates -- that is, the hourly rate the attorney charged (for example) in 2013 when the work was performed, not the attorney's hourly rate at the time the fee petition was filed.  Class Counsel tout this billing tactic as an added benefit to the Class, explaining that class counsel in other cases often estimate a lodestar using rates in effect at the time of the fee petition.  This Court agrees that this decision not to recoup the time value of past work is a benefit to the Class.

A 24% Fee Award is Appropriate.  Given Class Counsel's lodestar calculation of $33.74 million, and its request for a fee award of $45.375 million, Counsel is essentially advocating for a

multiplier of 1.34.  While this multiplier is reasonable, the lodestar calculation is overstated.  A more appropriate lodestar calculation is 20% lower, so a more appropriate fee award is also 20% lower.

This Court thoroughly reviewed the time sheets and summaries submitted by Class Counsel in order to assess the strength of the objectors' attacks upon the fee petition.  The objectors assert that (i) many of the rates charged by Counsel are too high and above-market, (ii) many of the hours charged are unnecessary or duplicative, (iii) there is insufficient documentation of hours spent, (iv) expensive partner-level attorneys did work that other individuals with lower rates could have done, and (v) counsel paid contract attorneys low rates and then billed them at many times what they were paid.  Some of these concerns are valid.  In particular:

- Are the rates charged too high?

The rates charged by Counsel are high.  But IPPs provide the following statistics, which generally undercut this objection: (i) the average billing rate for partners in the DPPs' lodestar was 25.8% higher than the average rate for partners in the IPPs' lodestar ($705.06 versus $560.13); (ii) the average rate for all other (non-partner) attorneys in the DPPs' lodestar was 25.1% higher than the average rate for all other attorneys in the IPPs' lodestar ($438.30 versus $350.22); and (iii) the average rate for paralegals in the DPPs' lodestar was 27.8% higher than the average rate for paralegals in the IPPs' lodestar ($244.84 versus $191.60).  Ultimately, the hourly rates used by Counsel in the lodestar calculation are not unreasonable, with the understanding that they are already "calculated to account for litigation risk" (Doc. 1971 at 22 (entering the final fee award for DPP Class Counsel)).

- Are some of the hours charged unnecessary or duplicative?

There are certainly hours lurking in the time sheets that could have been avoided.  "While this Court does not doubt that all the work billed was in fact performed, it does doubt that all of that time

was reasonably necessary to advance this case. . . . The Class Counsel legal team includes leading antitrust lawyers, but even they are not perfect" (*id.*).

But nothing stands out as a clear waste of time.  Based on this Court's review, it would be fair to decrease the number of hours used by Counsel in the lodestar calculation by a few percentage points, but not more.

- Is there insufficient documentation of hours spent?

Put simply, no.

- Did expensive attorneys do work that cheaper attorneys or paralegals could have done?

Analysis of the time sheets leads to the same conclusion noted above, that some of the law firms were better than others at ensuring work was performed by the least expensive individual capable of doing the job.  This factor leads this Court to conclude it would be fair to decrease the lodestar calculation by another few percentage points, but not more.

- Did counsel pay contract attorneys low rates but bill them at high rates?

The answer is "yes," and this factor gives this Court the greatest concern.  Counsel submitted for *in camera* review a chart showing what contract attorneys were paid.  These same attorneys were billed out at $250–$525/hour.  As CCAF points out, "the rate passed through by law firms to paying clients [for contract attorneys] rarely exceeds $150/hour" (Doc. 1960 at 11).  IPPs answer that "it is beyond cavil that law firms may charge more for contract attorneys' services than these services directly cost the law firm."  *City of Pontiac Gen. Empls. Ret. Sys. v. Lockheed Martin Corp.*, 954 F. Supp. 2d 276, 280 (S.D.N.Y. 2013).  But it is also true that "there is absolutely no excuse for paying these temporary, low-overhead employees $40 or $50 an hour and then marking up their pay ten times for billing purposes."  *In re Beacon Assocs. Litig.*, 2013 WL 2450960, at *18 (S.D.N.Y. 2013).  Careful

review of the time sheets shows the total time billed by contract attorneys is 16,935 hours, for a total of $6,589,434, or an average of $389/hour. If instead these hours are all billed at $150/hour, the lodestar would decrease by $4.05 million, or 12%.

With these factors, this Court concludes the lodestar is about 20% higher than it should be. Rather than $33.74 million, an appropriate lodestar is closer to $27 million. Using this figure, Class Counsel's request for a $45.375 million fee award would translate to a multiplier of 1.68.

As this Court noted in its Order entering the final fee award for DPP Class Counsel, discussions by other courts of the fund percentage selected, and the effective multiplier that this percentage implied, provide "at best only anecdotal evidence of how other district courts, confronting different facts, have exercised their broad discretion to set a reasonable fee award" (Doc. 1971 at 19). It is easy to find cases with higher percentages and higher multipliers than the ones IPPs request (*see* Doc. 1987-1 at 19–21, 29–30), and easy to find cases with much lower ones as well (*see* Doc. 1960 at 16, 18–20, 32–33). In the Sixth Circuit, "[w]hen using a percentage-of-the-fund approach to calculate attorneys' fees, twenty-five percent has traditionally been the benchmark standard, with the ordinary range for attorney's fees between 20–30%." *In re Cardizem CD Antitrust Litig.*, 218 F.R.D. 508, 532–33 (E.D. Mich. 2003) (citations and internal quotation marks omitted).

In the DPP case, final award to Class Counsel totaled "23.6 percent of the gross settlement amount," yielding an effective multiplier of 1.57 (Doc. 1971 at 19). Weighing all the factors discussed above, this Court concludes IPPs are entitled to a final award amounting to 24% of the gross settlement amount, which is an effective multiplier of 1.34 of the appropriate lodestar of $27 million. This means that Class Counsel essentially received the multiplier requested. It is this Court's understanding that, within fifteen (15) days of the date of this Order, Defendants will have deposited a total of $88.5

41

million in settlement funds into the settlement escrow account(s). Accordingly, IPP Class Counsel are entitled to payment of 24% of this amount (equal to $21,240,000) immediately upon deposit of those funds. As additional settlement funds are deposited, Class Counsel are entitled to payment of 24% of those amounts. Counsel is not entitled to any portion of the interest generated by the settlement funds.

Finally, "under the common fund doctrine, 'class counsel is entitled to reimbursement of all reasonable out-of-pocket litigation expenses and costs in the prosecution of claims and settlement, including expenses incurred in connection with document production, consulting with experts and consultants, travel and other litigation-related expenses.'" *New England Health Care Emps. Pension Fund v. Fruit of the Loom, Inc.*, 234 F.R.D. 627, 634–35 (W.D. Ky. 2006) (quoting *In re Cardizem CD Antitrust Litig.*, 218 F.R.D. at 535), *aff'd sub nom. Fidel v. Farley*, 534 F.3d 508 (6th Cir. 2008). Class Counsel ask for reimbursement of $5,115,811.72 in expenses. This Court's review confirms these unreimbursed expenses are of the kind typically paid by clients in antitrust litigation. Accordingly, this Court grants reimbursement of these expenses.

### APPELLATE BOND

Class Counsel asks that, if any objector files an appeal from this Order, this "Court [should] require each objector to post a bond for appellees' attorneys' fees, as well as any litigation costs (*e.g.*, escrow fees, distribution costs) or other expenses necessitated by an unsuccessful appeal" (Doc. 1991 at 89). The decision whether to require an appellate bond and its amount, however, will depend on the nature of the individual objector's appeal. *See Gemelas v. Dannon Co.*, 2010 WL 3703811, at *1 (N.D. Ohio 2010) ("In deciding whether to impose a Rule 7 bond, courts typically consider (1) the appellant's financial ability to post a bond; (2) the risk that the appellant would not pay appellee's costs if the appeal is unsuccessful, (3) the merits of the appeal, and (4) whether the appellant has shown any bad

42

faith or vexatious conduct.").  Moreover, until an objector actually files an appeal, the question of the propriety of an appellate bond is premature.  Accordingly, Counsel's request for an appellate bond is denied without prejudice.

## CONCLUSION

This Court grants the Motions by the Indirect Purchaser Plaintiff Class for Final Approval of the nine settlement agreements (Docs. 1987 & 1988), and grants in part and denies in part the Motion for Attorney Fees and Expenses, and an Incentive Award to the Class Representatives (Doc. 1908).

Therefore:

- Final approval of the nine Settlement Agreements is granted pursuant to Federal Civil Rule 23(e).

- Each Indirect Purchaser Settlement Class consists of the certified Indirect Purchaser Litigation Class minus the persons and entities who request exclusion from the Litigation Class or from the relevant Indirect Purchaser Settlement Class.  For the reasons explained in this Court's Order on Class Certification (Doc. 1102), the Indirect Purchaser Settlement Classes meet the requirements of Rule 23 and are therefore certified for the purposes of these settlements.

- The persons and entities identified in Exhibit A have timely and validly requested exclusion from the Indirect Purchaser Settlement Classes or from the Litigation Class and therefore are excluded from the Indirect Purchaser Settlement Classes and are not bound by this Order, and may not make any claim or receive any benefit from the relevant settlement, whether monetary or otherwise.  These excluded persons and entities may not pursue any Released Claims on behalf of those who are bound by this Order. Each Indirect Purchaser Settlement Class member who has not requested to be excluded from the Indirect Purchaser Settlement Classes for a specified settlement, and is not listed in Exhibit A, is bound by this Order, and will remain forever bound.

- As to the Released Parties, as defined in the respective Settlement Agreements, the Class Action and any and all currently pending indirect purchaser class action lawsuits directly related to the subject matter of this litigation are dismissed with prejudice and in their entirety, on the merits, and, except as provided for in the Settlement Agreements, without costs.  This dismissal shall not affect, in any way, Indirect Purchasers' right to pursue claims, if any, outside the scope of the releases set forth in the nine Settlement Agreements.

- The Releasing Parties release, forever discharge, and covenant not to sue the Released Parties from and for Claims as set forth in the nine Settlement Agreements.  The Releasing Parties are permanently enjoined and barred from instituting, commencing, or prosecuting any action or other proceeding asserting any Released Claims released in the nine Settlement Agreements against any of the Released Parties, either indirectly, individually, representatively, derivatively, or in any other capacity, by whatever means, in any local, state, or federal court, or in any agency or other authority or arbitral or other forum wherever located.

- This Order does not settle or compromise any other claims by Class Representatives or the Indirect Purchaser Settlement Classes against the Defendants or other persons or entities other than Released Parties, and all rights against any other Defendant or other person or entity are specifically reserved. The sales of goods containing Polyurethane Foam to members of the Indirect Purchaser Settlement Classes by Released Parties shall remain against the non-settling Defendants, to the extent any exist, as a basis for damage claims, and shall be part of any joint and several liability claims against any non-settling Defendant or other person or entity other than the Released Parties.

- Pursuant to Federal Civil Rule 54(b), this Court directs entry of final judgment of dismissal as to the Released Parties, as set forth in its separate orders entered following this Order.

- Without affecting the finality of this Order, this Court retains exclusive jurisdiction over the Class Action and the Settlement Agreements, including the administration, interpretation, consummation, and enforcement of these Settlement agreements.

- The escrow accounts established by certain of the parties, and into which Settlement Funds have been and will be deposited, plus accrued interest, are approved as Qualified Settlement Funds pursuant to Internal Revenue Code Section 468B and related Treasury Regulations.

IT IS SO ORDERED.

_____s/ Jack Zouhary_____
JACK ZOUHARY
U. S. DISTRICT JUDGE

January 27, 2016

44